**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00694-PAB-NYW

MOSTAFA KAMEL MOSTAFA,

    Plaintiff,

v.

WILLIAM BARR, U.S. Attorney General,
CHRISTOPHER WRAY, FBI Director,
KATHLEEN H. SAWYER, BOP Director,
B. TRUE, ADX Florence Warden,
MS. TUTTOILMUNDO, H Unit Manager, and
JOHN AND JANE DOES, ET AL,

    Defendants.

---

**RESPONSE OPPOSING MOTION FOR RECONSIDERATION (ECF No. 50)**

---

Plaintiff Mostafa, aka "Abu Hamza al-Masri," was convicted of numerous serious terrorism crimes against the United States. In his motions for a temporary restraining order, ECF No. 39 ("TRO Motion"), and to "fully or partially" reconsider the Court's order denying that motion, ECF No. 50, Mostafa invokes COVID-19 as a means to obtain immediate release from the ADX or changes in his living conditions that he claims, without justification, pose a danger to him. The Court should deny the motion for reconsideration.[1]

Mostafa fails to show the Court made a "manifest error of law or fact" in denying his TRO Motion. *Nat'l Bus. Brokers, Ltd. v. Jim Williamson Prods., Inc.*, 115 F. Supp. 2d 1250, 1256 (D.

---

[1] Mostafa has filed a motion to amend his complaint, ECF No. 43, and Defendants have not objected to that amendment. ECF No. 48. The Court has not yet completed the mandatory screening of the proposed amended complaint pursuant to 28 U.S.C. § 1915A. Here, the current Defendants (collectively, "BOP") respond to the TRO Motion in their official capacities only.

Colo. 2000) ("To succeed in a motion to reconsider, a party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision"), *aff'd*, 16 F. App'x 959 (10th Cir. 2001). Nor has he shown "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Perkins v. Fed. Fruit & Produce Co. Inc.*, 945 F. Supp. 2d 1225, 1231-32 (D. Colo. 2013) (following "standards of Rule 59 and 60 to determine whether to alter or vacate an interlocutory order") (quoting *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).

Rather, as the Court correctly found, it lacks power to order Mostafa's release in this civil action. This Court was also correct in concluding that Mostafa has not exhausted his administrative remedies for the preliminary injunctive relief he seeks. But even if there were no threshold deficiencies, the TRO Motion fails. As Florence Complex Health Services Administrator ("HSA") Himlie explains in a sworn declaration, the BOP and ADX have implemented a comprehensive program to fight the virus and to protect the health of the inmate population—resulting, to date, in only two ADX inmates having tested positive for COVID-19. Both of those inmates live in a different housing unit from Mostafa, and that unit has been quarantined to avoid exposing inmates in any other unit. Moreover, Mostafa's allegations that his medical needs are not being addressed are unfounded. Despite his persistent lack of cooperation with BOP medical personnel, he receives attentive care, including appropriate medications and frequent medical examinations. In fact, Mostafa is scheduled to be evaluated by the BOP's chief hand therapist and a prosthetics and orthotics specialist later this week.

For all of these reasons, Mostafa is not entitled to emergency injunctive relief.

# FACTS

**I.      Mostafa's criminal background as an al Qaeda operative and his current motion.**

Mostafa was convicted of eleven "conspiratorial and/or substantive crimes relating to terrorism," including hostage taking; providing material support for terrorism; providing material support to al Qaeda, a designated foreign terrorist organization; and supplying goods and services to the Taliban. *United States v. Mustafa*, 753 F. App'x 22, 26-27 (2d Cir. 2018). His assertions of benign intent were wholly belied by his nefarious crimes. *Id.* at 27-28 (describing criminal conduct and noting that Mostafa encouraged his followers to kill *kaffirs*, or non-Muslims, "even if there's no reason for it"). Mostafa is incarcerated at the ADX, which he argued invalidated his life sentence. The Second Circuit disagreed. *Id.* at 42-43 (rejecting arguments that sentence was rendered "procedurally and substantively unreasonable" by fact that district court did not "make a discretionary recommendation [not to house him at the ADX] that the BOP would not be required to follow," and finding that no court-conditioned avoidance of ADX confinement was made "a specific condition of extradition").

In the TRO Motion, Mostafa urged that he be released and returned to the United Kingdom because it is allegedly too dangerous for him to be confined at the ADX in the era of COVID-19. He also raised a scattershot collection of COVID-related allegations, focused primarily on the BOP's alleged inattention to his prosthetics and his need for an evaluation by an occupational therapist. *See generally* ECF No. 39.

This Court denied the TRO motion, finding that it has no authority to order Mostafa's release. ECF No. 42 at 3 n.1. The Court also observed that the relief requested in the TRO Motion

lies "wholly outside the issues in [his] suit." *Id.* at 2 (quoting *Hicks v. Jones*, 332 F. App'x 505, 508 (10th Cir. 2009)). The Court further saw "no indication that [Mostafa] has exhausted his administrative remedies." *Id.* As explained below, the Court is correct, on all points.

## II.  Mostafa's health conditions are properly managed at the ADX, although he repeatedly thwarts the efforts of medical staff to care for him.

BOP personnel are addressing Mostafa's risks for COVID, both by managing his health conditions and by taking aggressive steps to prevent the introduction and spread of the virus at the ADX. Himlie Decl., Ex. 1 ¶ 55.

### A.  Mostafa is consistently monitored and receives prescription medications.

Mostafa, who is 62 years old, is housed in H Unit at the ADX. *Id.* ¶ 53. Although Mostafa's age does not put him in a high-risk category pursuant to guidance issued by the Centers for Disease Control, *id.* ¶ 33, BOP medical staff nevertheless took extra precautions to evaluate him because he is over age 55. *Id.* ¶¶ 34-35, 54. Mostafa has not exhibited symptoms of COVID-19. *Id.* ¶ 53.

At 6'1" tall, with a weight that varies between approximately 195 and 220 pounds depending on whether he is on a self-imposed hunger strike, Mostafa is neither obese nor morbidly obese. *Id.* ¶ 56. His type 2 diabetes is controlled with an oral medication. *Id.* ¶¶ 57, 60. His average blood-glucose readings are generally within acceptable limits. *Id.* ¶ 60.

Mostafa also has high blood pressure, for which he is prescribed two medications. *Id.* ¶ 57. These medications, like his diabetes medication, are "self-carry," which means that Mostafa keeps those medications in his cell and is personally responsible for taking them as directed. *Id.* ¶ 58. By his own report, he is not routinely compliant with taking these medications, particularly his blood

pressure medications, and BOP medical records show that he frequently refuses to take the recommended dosage. *Id.* ¶¶ 58-59 (describing his refusals to take recommended higher doses of blood pressure medication). And Mostafa further complicates efforts to monitor his health by sometimes refusing blood pressure checks. *Id.* ¶ 59.

Finally, while Mostafa has some skin irritation, he has been provided adaptive appliances for his prostheses that allow him to apply creams to the affected areas. *Id.* ¶ 61. However, inspections of his prostheses and these appliances show that he seldom uses these devices, which further minimizes any irritation to the ends of his arms. *Id.* His medical records indicate that he told a BOP physician in July 2020 that he applies a steroid cream for skin irritation twice a day, 3-4 times per week. Ex. 1, Att. 20 at 1.

### B.     Mostafa refused to meet with a prosthetics expert in February 2020.

On February 13, 2020—before COVID-19 ended all non-emergency medical consultations—the BOP arranged for Mostafa to meet with an orthotics and prosthetics specialist to be measured for new arm prosthetics. Fellows Decl., Ex. 2 ¶¶ 7-8. He ignored the advice of the Assistant Health Services Administrator on the Florence Complex, who urged him to participate in the appointment. *Id.* ¶ 8 (noting that, despite the efforts of the AHSA, Mostafa "refused to have the measurements and castings done to make the new devices"); *id.* Att. 2 (Mostafa informed medical staff that his attorney will "decide[] what arm prosthetics he is to have"). This refusal conforms with Mostafa's well-established pattern of refusing medical care appointments and tests. *Id.* ¶ 9.

### C.     Mostafa has an appointment with the BOP's top hand specialist in two days.

Although in-person visits with providers outside the prison have been limited to medical

5

emergencies during the pandemic, Mostafa will be seen by both the BOP's top hand specialist and a prosthetics and orthotics specialist on December 16, 2020. *Id.* ¶ 7. This evaluation will take place by VTC, with the participating medical professionals reviewing video of Mostafa's cell in advance of their consultation with him. *Id.*[2]

To sum up, notwithstanding Mostafa's repeated non-compliance with medical directives, he always has access to BOP medical personnel who stand ready to carefully monitor his status and adjust his medications, if only he will work with them and follow their advice and guidance. *See* Ex. 1 ¶ 63 (observing that Mostafa "has the power to further protect and enhance his health by being compliant with his medication regimen and other treatments that are offered to him").

### III.    Mostafa is able to maintain personal cleanliness.

Mostafa has mounted various complaints about his alleged inability to maintain cleanliness in the face of the pandemic. Most particularly, he complains that he must use his teeth to tear open the containers of the prepackaged food items on his religious diet tray. *See*, *e.g.*, TRO Motion at 11. Not so. The food containers are opened in a certified-foods kitchen and placed into easy-access containers that he can open with his prosthetic devices. Ex. 2 ¶ 10. Further, he is able, with the assistance of his prosthetic devices, to clean his cell. *Id.* ¶ 12.

### IV.    ADX has taken steps to prevent COVID-19 and to isolate infected individuals.

The BOP files with this response a declaration from HSA Himlie setting forth the aggressive measures the BOP in general, and the ADX in particular, are taking to protect, quarantine, and exclude symptomatic individuals from the institution. *See* Ex. 1 ¶¶ 23-51. The

---

[2] If Mostafa refuses to meet with these personnel, the BOP will inform the Court in a status report.

BOP's preventive measures have been designed in reliance on guidance from the CDC and the World Health Organization. *Id.* ¶¶ 8, 10-11, 15, 27, 29, 31, 33-35, 42, 44.

These measures have proven effective at the ADX. There have been only two cases of inmates testing positive for COVID-19 at the ADX, and those cases were limited to a single housing unit far-removed from Mostafa's housing unit. *Id.* ¶ 47. One of those inmates has recovered and the other is recovering at this time. *Id.* The entire unit where those positive cases occurred will be quarantined for a minimum of 14 days until the entire unit has tested negative for COVID-19. *Id.* Additionally, at this time, 23 ADX staff members have tested positive for COVID-19; 21 of them have since recovered and returned to work. *Id.* The other two will be allowed to return only after a minimum leave of 10 days *and* when they are asymptomatic. *Id.*

## ARGUMENT

Mostafa's overarching demand is to be released from custody, TRO Motion at 4, but in lieu of that, he wants relief that he contends will allow him "to comply with COVID-19 protective guidelines." *Id.* Although his filings are far from clear, the BOP construes his secondary demand as seeking an occupational therapy evaluation and the implementation of certain hygiene measures.

As the Court already correctly found, ECF No. 42, Mostafa is entitled to no relief.

**I.     Mostafa's request must be denied because of threshold defects.**

   **A.     The PLRA precludes the Court entering a release order in this case.**

In denying the TRO Motion, this Court rightly concluded that there is "no support for releasing [Mostafa] based simply on the Court's power to issue preliminary injunctive relief." ECF No. 42 at 3 n.1. Specifically, the PLRA precludes this Court from granting Mostafa's request to

release him from BOP custody to the United Kingdom. *See generally passim* TRO Motion.

The PLRA creates a carefully articulated scheme for "the entry and termination of prospective relief in civil actions challenging prison conditions." *Miller v. French*, 530 U.S. 327, 331 (2000). In particular, the PLRA places strict limits on courts' ability to order the release of inmates "[i]n any civil action in Federal court with respect to prison conditions." 18 U.S.C. § 3626(a)(3)(A). It provides that "no court shall enter a prisoner release order unless": "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied … ; and (ii) the defendant has had a reasonable amount of time to comply with the previous court orders." *Id.* The PLRA also precludes prisoner release orders unless "entered … by a three-judge court." *Id.* § 3626(a)(3)(B). Together, these requirements ensure that a three-judge court's prisoner release order is a "last resort remedy." *Brown v. Plata*, 563 U.S. 493, 514 (2011).

The PLRA defines "prisoner release order[]" in expansive terms to include "any order … … that directs the release from … a prison." 18 U.S.C. § 3626(g)(4). And the PLRA specifically contemplates "prisoner release order[s]" in "civil action[s]" concerning "prison conditions." *Id.* § 3626(a)(3)(A). The PLRA thus addresses Mostafa's claim and chosen remedy here. But this case is not before a "three-judge court," and this Court has not "previously entered an order for less intrusive relief." *Id.* § 3626(a)(3)(A), (B). Because the PLRA's precursor requirements for entering a "prisoner release order" are not met, this Court should join numerous other courts in holding that the PLRA prevents the Court from granting release based on COVID-19. *See*, *e.g.*, *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1126 (N.D. Ill. 2020); *Plata v. Newsom*, 445 F. Supp. 3d 557, 571

(N.D. Cal. 2020); *Maney v. Brown*, 464 F. Supp. 3d 1191, 1208 (D. Ore. 2020).

The proper way for Mostafa to seek release from custody is to make a request for compassionate release from his sentencing court pursuant to 28 U.S.C. § 3582(c)(1)(A)—the method that Congress created for courts to reduce sentences in extraordinary circumstances.[3] A preliminary injunction in a civil case is not a proper remedy. The Court should deny the TRO Motion on this basis alone.

### B. Mostafa failed to exhaust his administrative remedies under the PLRA.

Mostafa's motion should be denied for the additional threshold reason that he has failed to exhaust his administrative remedies as required by the PLRA—whether the TRO Motion is construed as seeking release from custody or some other measures Mostafa thinks he needs.

The PLRA requires that an inmate, before filing suit, exhaust all available administrative remedies. 42 U.S.C. § 1997e(a); *see also*, *e.g.*, *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) ("An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies."). The Supreme Court has made clear that the exhaustion requirement applies to all suits regarding prison life, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), and that "unexhausted claims cannot be brought in court," *Jones v. Bock*, 549 U.S. 199, 211 (2007). Importantly, the PLRA's exhaustion requirement extends to emergency motions in the COVID-19 context. *See*, *e.g.*, *Nellson v. Barnhart*, 454 F.

---

[3] The docket sheet in Mostafa's criminal case indicates that he is pursuing this remedy in his sentencing court. On September 11, 2020, the sentencing court ordered attorneys to assume representation of Mostafa for the purpose of filing a motion for compassionate release. *See* ECF No. 568. He cannot seek compassionate release from this Court. 28 U.S.C. § 3582(c)(1)(A).

Supp. 3d 1087, 1093 (D. Colo. 2020). In *Nellson*, this Court concluded that it could "not alter the mandatory requirements of the PLRA for COVID-19," and that the motion for a TRO in that case was properly denied because the plaintiff failed to exhaust his administrative remedies. *Id.* at 1094.[4]

Here, Mostafa has not exhausted any administrative remedy submission concerning COVID-19. Trujillo Decl., Ex. 3 ¶¶ 10-17. Nor has he shown that the administrative remedy process is unavailable. *See Ross v. Blake*, 136 S. Ct. 1850, 1858-60 (2016). These omissions require dismissal of Mostafa's TRO Motion.

## II.     Mostafa is not entitled to a preliminary injunction about the handling of COVID-19.

Even if there were no threshold defects, Mostafa cannot meet his high burden to establish entitlement to preliminary injunctive relief.

### A.     Legal standards.

An injunction is an "extraordinary and drastic remedy" which requires that "the right to relief must be clear and unequivocal." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). A party seeking a preliminary injunction[5] bears the high burden to establish a clear showing of four elements: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

---

[4] As this Court further explained, in the event of evidence of imminent harm, 28 C.F.R. § 542.18 offers an emergency procedure whereby "the Warden shall respond not later than the third calendar day after filing." *Nellson*, 454 F. Supp. 3d at 1093.

[5] The standards for a preliminary injunction and a temporary restraining order are the same. *See, e.g.*, *Hicks*, 332 F. App'x at 508 (recognizing that both are evaluated pursuant to same standards).

injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

In this case, however, Mostafa's burden is even higher because he seeks preliminary injunctive relief specifically "disfavored" by the Tenth Circuit. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial. Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.* (internal citation omitted). "To get a disfavored injunction," Mostafa "faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: [He] must make a 'strong showing' that these tilt in [his] favor." *Id.*

Any injunction that Mostafa may be seeking here falls into at least two of these specifically disfavored categories. His demand to be released, or for alterations in how correctional officials (including medical personnel) have decided to manage COVID-19, would be mandatory and would clearly alter the status quo. *Id.* Moreover, he has failed to meet his burden to make a strong showing in his favor on the likelihood-of-success-on-the-merits and the balance-of-harms factors.

### B. Mostafa fails to show a likelihood of success on the merits.

#### 1. Mostafa's merits claims are unrelated to the relief he seeks here.

As an initial matter, as this Court correctly found, Mostafa's claims in the pending complaint are unrelated to the injunctive relief he seeks. ECF No. 42 at 1-2 (observing that Mostafa's claims were unrelated to his request for a TRO and noting that the TRO could be denied "on this basis alone"); *see also*, *e.g.*, *Little v. Jones,* 607 F.3d 1245, 1251 (10th Cir. 2010) (holding

11

that a party moving for a preliminary injunction "must establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint") (internal quotations omitted); *Devose v. Herrington*, 42 F.3d 470, 471 (10th Cir. 1994) (same).

However, even if the Court evaluates the TRO Motion in light of the allegations in Mostafa's proposed amended complaint,[6] which mentions COVID and liberally may be read to bear some relationship to the injunctive relief he seeks, his TRO Motion nevertheless fails.

### 2. Mostafa cannot establish an Eighth Amendment claim.

In the proposed amended complaint, Mostafa seems to claim the BOP's response to COVID violates his Eighth Amendment rights on grounds similar to those raised in the TRO Motion. *See generally* ECF No. 43-1. Mostafa cannot establish an Eighth Amendment claim.

First, he has failed to show that he can satisfy the objective prong, which requires a showing that he has been deprived "of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). He cannot make that showing, nor can he establish that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original). Here, the record is clear that prison officials have taken steps "to ensure [Mostafa's] *reasonable safety*." *Farmer*, 511 U.S. at 844 (emphasis added).

The COVID-19 pandemic exposes everyone—prisoner and non-prisoner alike—to the risk

---

[6] As noted above, the current Defendants did not object to Mostafa amending his complaint, ECF No. 48, but the Court has not yet completed its review of the new claims, nor is undersigned counsel yet authorized to represent the new parties Mostafa has sued in their individual capacities.

of falling ill. The BOP's efforts to protect ADX inmates are aligned with official guidance from leading world health authorities for mitigating the risks associated with the pandemic. Ex. 1 ¶¶ 8, 10-11, 15, 27, 29, 31, 33-35, 42, 44 (preventive measures based on guidance from CDC and WHO). Those efforts have resulted in just two ADX inmates testing positive for COVID-19 at this time. Mostafa—who, as a single-celled ADX inmate encounters fewer people than most members of the public—has not shown that he faces any grave risk of contracting the virus. Nor has he established any other grave risk.

As the BOP explained above, Mostafa is an uncooperative patient, but nevertheless receives consistent medical attention and prescription medications (even if he refuses to take them). Moreover, while he has refused to meet with BOP medical specialists to be fit for new prosthetics, the BOP hasn't given up and is having its top hand specialist evaluate Mostafa just two days from now. And there is no merit to Mostafa's claims that his food or his cell is unsanitary. His meal trays are opened for him, and if he will simply use his prosthetics, he can clean his cell.

Second, just as Mostafa has not met his burden to show that he is subjected to an objectively "unreasonable risk" of harm, *Helling*, 509 U.S. at 36, he also has not shown (1) that any BOP official is aware of facts from which the inference could be drawn that he faces a substantial risk of serious harm and has actually drawn that inference, and (2) that any BOP official, in their dealings with Mostafa, possesses a culpable mental state that amounts to *criminal recklessness*. *Farmer,* 511 U.S. at 828, 837 (1994); *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006). Rather, the record shows that BOP officials have taken aggressive and appropriate measures to abate any risk to him, including by addressing his particular medical needs. These steps, in the

face of a global pandemic and Mostafa's own obstinately recalcitrant behavior, demonstrate a high degree of care. *See Farmer*, 511 U.S. at 844-45 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").

### C. Mostafa fails to show that he will suffer irreparable harm.

Mostafa also must show he faces certain, imminent, irreparable harm. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005). "The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* Mostafa hasn't met this standard, in light of all of the measures the BOP has implemented to protect ADX inmates in general and Mostafa in particular. Indeed, were Mostafa ever to suffer harm, it is far more likely that *he* would be the cause—where the record shows that he routinely resists the advice of BOP medical providers.

### D. Mostafa hasn't shown that the equities and public interest favor him.

Even if Mostafa could show a likelihood of success on the merits and that irreparable harm would result without preliminary injunctive relief, he must make a "strong showing" that the balance of equities tips in his favor and that a disfavored injunction is in the public interest. *See Winter*, 555 U.S. at 20; *Free the Nipple*, 916 F.3d at 797. He has failed to do it.

Because the BOP has already taken aggressive measures to prevent Mostafa (and all ADX inmates) from contracting COVID-19, he has little to no interest in obtaining additional injunctive relief in that regard. The BOP, by contrast, has a significant interest in maintaining control over its response to the pandemic and the flexibility to decide how best to manage an ever-changing

14

situation in the extraordinarily dangerous environment of the ADX. There is also a strong public interest in confining a convicted al Qaeda operative in an institution that will prevent him from causing further harm. *See* 18 U.S.C. § 3626(a)(2) (compelling courts to consider numerous factors, including the "impact on public safety," before granting preliminary injunctive relief to inmate).

Here, the BOP has marshalled both its administrative expertise in running prisons and the guidance of health experts to design a pandemic response that combats the spread of the virus and takes into account special factors related to prison security and administration. Officials have also determined how best to address Mostafa's medical issues, if Mostafa will only allow them to do so.

## CONCLUSION

The Court should deny the motion for reconsideration, ECF No. 50, and uphold its denial of Mostafa's TRO Motion. ECF No. 42.

Respectfully submitted December 14, 2020.

          JASON R. DUNN
          United States Attorney

          s/ *Susan Prose*
          Susan Prose
          Assistant United States Attorney
          1801 California Street, Suite 1600
          Denver, Colorado 80202
          Tel: (303) 454-0100; Fax: (303) 454-0411
          Email: susan.prose@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

   I hereby certify that on December 14, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

  None.

and I hereby certify that I have directed personnel in the U.S. Attorney's office to mail the foregoing to the following non-CM/ECF participant by U.S. Mail:

  Mostafa Kamel Mostafa
  Reg. No. 67495-054
  Florence Admax
  U.S. Penitentiary
  Inmate Mail/Parcels
  Po Box 8500
  Florence, CO 81226


                s/ *Susan Prose*
                U.S. Attorney's Office