# Exhibit 1
# Declaration of Health Services
# Administrator Himlie

*Mostafa v. Barr, et al.*,
No. 20-cv-00694-PAB-NYW (D. Colo.)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00694-PAB-NYW

MOSTAFA KAMEL MOSTAFA,

      Plaintiff,

v.

WILLIAM BARR, U.S. Attorney General,
CHRISTOPHER WRAY, FBI Director,
KATHLEEN H. SAWYER, BOP Director,
B. TRUE, ADX Florence Warden,
MS. TUTTOILMUNDO, H Unit Manager, and
JOHN AND JANE DOES, ET AL,

      Defendants.

---

**DECLARATION OF HEALTH SERVICES ADMINISTRATOR S. HIMLIE**

---

I, Health Services Administrator Himlie, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment and knowledge obtained as a health services supervisor, hereby declare as follows relating to the above-titled matter. All attachments to this declaration are true and accurate copies of Federal Bureau of Prisons (Bureau) records maintained in the ordinary course of business.

1.      I am the Complex Health Services Administrator (HSA) with the Federal Bureau of Prisons (Bureau) at the Federal Correctional Complex in Florence, Colorado (FCC Florence). FCC Florence includes four separate institutions: the Federal Prison Camp (FPC) (minimum security), the Federal Correctional Institution (FCI) (medium security), the United States Penitentiary Florence– High Security (USP), and the United States Penitentiary Florence –

Administrative Maximum (ADX).

2.      I have been employed by the Bureau, in positions of increasing responsibility, since November 2008.  I have been the FCC Florence HSA since March 2018.  In addition to my experience as a HSA, I have been licensed as a Registered Nurse since May 2008.

3.      As part of my official duties as the FCC Florence HSA, in collaboration with the Clinical Director, I manage and direct the activities of a multi-disciplinary team responsible for providing medical, dental, and allied health services (pharmacy, laboratory, and radiology) to the inmate population.  I am also the primary supervisor for mid-level providers, emergency medical technicians, and nurses.  I also provide administrative oversight to all contract physicians at FCC Florence.

4.      With respect to COVID-19, specifically, I am involved on a daily basis in the identification, planning, and implementation of all Bureau directives for preventing the spread of COVID-19 at FCC Florence, including FCI Florence.  In addition to my normal role as FCC Florence HSA, I also serve as the Logistics Section Chief for the "FCC Florence Command Center" (discussed in further detail below), which is responsible for coordinating FCC Florence's COVID-19 response.  Through this role, I have knowledge of both the Bureau's national directives relating to COVID-19 and the additional steps that FCC Florence, specifically, has taken to combat COVID-19 within the complex.  Accordingly, through the course of my official duties, I have personal knowledge regarding the numerous measures, discussed below, that have been implemented both Bureau-wide and at FCC Florence in order to prevent and manage the spread of COVID-19.

5.      I am familiar with federal inmate Mostafa Kamel Mostafa (Inmate Mostafa), Federal Register Number 67495-054, who has been incarcerated at the ADX since October 8,

2015.

## I.  NATIONAL STEPS TAKEN BY THE BUREAU TO ADDRESS COVID-19[1]

6.       Before discussing the steps being taken at FCC Florence, specifically, I will first discuss the phases of the Bureau's national response to the COVID-19 pandemic, which apply generally across all Bureau institutions.  As set forth below, the Bureau has taken—and is continuing to take—significant measures in response to the COVID-19 pandemic in order to protect the safety and security of all staff and inmates, as well as members of the public.

7.       In January 2020, the Bureau became aware of the first identified COVID-19 cases in the United States and quickly took steps to prevent its introduction and spread in Bureau institutions.  The Bureau's response, detailed below, has occurred over eight distinct "phases" to date, and each has been executed and adopted by FCC Florence.  The Bureau will continue to modify and adjust its response as circumstances change, and at the guidance and direction of worldwide health authorities.

### A.  Action Plan for COVID-19 – Phase One

8.       In January 2020, the Bureau began Phase One of its Action Plan for COVID-19.  Phase One activities included, among other things, seeking guidance from the Bureau's Health Services Division regarding the COVID-19 disease and its symptoms, where in the United States infections were occurring, and the best practices to mitigate its transmission.  *See* https://www.bop.gov/resources/news/20200313_covid-19.jsp.  In addition, an agency task force

---

[1] As illustrated below, the Bureau's national guidance has undergone a number of changes in response to the evolving threat.  The Bureau has established a COVID-19 resource section on its public webpage which is available at: https://www.bop.gov/coronavirus/.  This webpage includes updates on the Bureau's response to COVID-19 and positive COVID-19 tests among inmates and staff at Bureau institutions nationwide.

was established to begin strategic planning for COVID-19 Bureau-wide.  This strategic planning included building on the Bureau's existing procedures for pandemics, such as implementing its pre-approved Pandemic Influenza Plan.  From January 2020 through the present, the Bureau has been coordinating its COVID-19 efforts with subject-matter experts both internal and external to the agency, including implementing guidance and directives from the World Health Organization (WHO), the Centers for Disease Control and Prevention (CDC), the Office of Personnel Management (OPM), the Department of Justice (DOJ), and the Office of the Vice President.  *See id.*

**B.      Action Plan for COVID-19 – Phase Two**

9.      On March 13, 2020, the Bureau implemented "Phase Two" of its Action Plan. *See* https://www.bop.gov/resources/news/20200313_covid-19.jsp.  Phase Two put into place a number of restrictions across all Bureau facilities over a 30-day period, to be reevaluated upon the conclusion of that time period. Specifically, the Bureau suspended the following activities for a period of 30 days, with certain limited exceptions:

a.      Social visits;[2]

b.      Legal visits;

c.      Inmate facility transfers;

d.      Official staff travel;

e.      Staff training;

f.      Contractor access;

---

[2] To help ensure that inmates maintained social ties during this time, the BOP increased most inmates' telephone allotment to 500 minutes per month (from 300 minutes per month).  Since April 9, 2020, inmates are no longer charged to make telephone calls during the COVID-19 emergency.

g.      Volunteer visits; and

h.      Tours.

10.      In addition, during Phase Two, inmates were subjected to new screening requirements.  Specifically, all newly arriving Bureau inmates were screened for COVID-19 symptoms and "exposure risk factors," including, for example, if the inmate had traveled from or through any high-risk COVID-19 locations (as determined by the CDC), or had had close contact with anyone testing positive for COVID-19.  Asymptomatic inmates with exposure risk factors were quarantined, and symptomatic inmates with exposure risk factors were isolated and evaluated for possible COVID-19 testing by local Bureau medical providers.[3]

11.      Staff were also subjected to enhanced health screening in areas of "sustained community transmission," as determined by the CDC, and at medical referral centers.  Colorado was designated a "sustained community transmission" state on March 19, 2020, and FCC Florence implemented this enhanced screening for staff and contractors at that time.  The enhanced screening measures required all staff to self-report any symptoms consistent with COVID-19, as well as any known or suspected COVID-19 exposure, and further required all staff to have their temperature taken upon entry into any Bureau facility.

12.      Finally, in addition to the measures listed above, the Bureau implemented national "modified operations" in order to maximize social distancing within Bureau facilities.  These modifications included staggered meal times and staggered recreation times, for example, in order to limit congregate gatherings.  Additionally, the Bureau established a set of quarantine and

---

[3] Throughout this declaration, "isolation" refers to a symptomatic inmate being confined to a single cell within a designated housing unit or medical unit. "Quarantine," on the other hand, refers to asymptomatic inmates who may remain within their assigned housing units, together, but may not interact with staff or inmates outside of these housing units.

isolation procedures for known or potential cases of COVID-19.

**C.     Action Plan for COVID-19 – Phase Three**

13.     On March 18, 2020, the Bureau implemented Phase Three of the COVID-19

Action Plan for Bureau locations that perform administrative services (i.e., non-prison locations),

which followed DOJ, Office of Management and Budget, and OPM guidance for maximizing

telework.  In this phase, individuals who had the ability to telework and whose job functions did

not require them to be physically present were directed to begin teleworking.  *See*

https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

14.     Additionally, as part of this phase, and in accordance with the Pandemic Influenza

contingency plan, all cleaning, sanitation, and medical supplies were inventoried.  *See id.*

**D.     Action Plan for COVID-19 – Phase Four**

15.     On March 26, 2020, the Bureau implemented Phase Four of its Action Plan.  *See*

https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.  In Phase Four, the

Bureau revised its preventative measures for all institutions.  Specifically, the agency updated its

quarantine and isolation procedures to require all newly admitted inmates to the Bureau, whether

in areas of sustained community transmission or not, to be assessed using a screening tool and

temperature check.  This screening tool and temperature check applied to all new intakes,

detainees, commitments, prisoners returned on writ from judicial proceedings, and parole

violators, regardless of their method of arrival.  Thus, all new arrivals to any Bureau institution—

even those who were asymptomatic—were placed in quarantine for a minimum of 14 days or

until cleared by medical staff.  Symptomatic inmates were placed in isolation until they tested

negative for COVID-19 or were cleared by medical staff as meeting CDC criteria for release

from isolation.

**E.      Action Plan for COVID-19 – Phase Five**

16.      On March 31, 2020, the Director of the Bureau ordered the implementation of

Phase 5 of its COVID-19 Action Plan, which took effect on April 1, 2020.  *See id.*  Specifically,

the Director ordered the following steps to be taken:

a.   For a 14-day period, inmates in every institution will be secured in their assigned

cells/quarters to decrease the spread of the virus.

b.   During this time, to the extent practicable, inmates should still have access to

programs and services that are offered under normal operating procedures, such as

mental health treatment and education.

c.   In addition, the Bureau is coordinating with the United States Marshals Service

(USMS) to significantly decrease incoming movement during this time.

d.   After 14 days, this decision will be reevaluated and a decision made as to whether or

not to return to modified operations.

e.   Limited group gathering will be afforded to the extent practical to facilitate

commissary, laundry, showers, telephone, and Trust Fund Limited Computer System

(TRULINCS[4]) access.

17.      On April 8, 2020, the Bureau's Director, M.D. Carvajal, issued a memorandum to

the Bureau inmate population providing an update on actions taken by the Bureau up to that

point.  Among other requests, inmates were asked to maintain clean housing areas, to wash their

---

[4] TRULINCS is the internal Bureau computer and electronic message platform that inmates use
to communicate with staff in the institutions and individuals in the community.  Through this
platform, inmates receive updates, notices, and can read inmate bulletins posted on the system by
Bureau staff.

hands frequently, to avoid touching their faces, and to observe social distancing as much as practical.  *See* Att. 1, Memorandum for the Inmate Population (April 8, 2020).

### F.  Action Plan for COVID-19 – Phase Six

18.  On April 13, 2020, the Director of the Bureau ordered the implementation of Phase 6 of its COVID-19 Action Plan.  *See* https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf. Specifically, the Director ordered an extension of "all measures from Phase 5, to include enhanced modified operations for all institutions, until May 18, 2020."  *Id*.  The extension of the modified operations for all Bureau institutions was continued to minimize inmate movement and further decrease the spread of COVID-19.  Staff were directed to wash their hands frequently and take other precautions, such as wearing gloves and masks, when interacting with inmates.

### G.  Action Plan for COVID-19 – Phase Seven

19.  On May 18, 2020, the Director of the Bureau ordered the implementation of Phase 7 of its COVID-19 Action Plan.  *See* https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp.  Specifically, the Director ordered the continuation of "its nationwide action plan as described in the Phase 6 Action Plain, to include measures to minimize movement and decrease the spread of the virus." *Id*.  These restrictions remained in place through June 30, 2020, at which time the plan was reevaluated.  *See* Att. 2, Inmate Bulletin: Modified Operations (May 12, 2020).

### H.  Action Plan for COVID-19 – Phase Eight

20.  On July 1, 2020, Phase 8 of the Bureau's COVID-19 Action plan was implemented, which continued all nationwide action as described in Phase 7.  *See* Att. 3, Memorandum for all Chief Executive Officers (June 30, 2020).  Those restrictions will remain in

place until at least July 31, 2020, at which time the plan will be reevaluated.  *Id.*  Additionally, Phase 8 offered specific strategies to limit possible COVID-19 exposure during court trips and movement between institutions, along with enhanced intake procedures for individuals entering Bureau custody, among other protections. *Id.*

## I.       **Action Plan for COVID-19 – Phase Nine**

21.       On August 5, 2020, Phase 9 of the Bureau's COVID-19 Action Plan was implemented, which continued the measures contained in the Phase 8 memo, and added limitations on staff training and travel.  Att. 4, Phase 9 Memo (August 5, 2020).  Additionally, Phase 9 allows for in-person legal visits under certain circumstances and resumed certain forms of inmate programming, among other requirements.  *Id.* at 3.  Phase 9 has been extended twice, with the latest occurring on November 1, 2020, and the measures contained therein will remain in place "until further notice."  Att. 5, Second Phase 9 Extension Memo (November 1, 2020). Current modified operations plan also allows for social visits in specific circumstances, along with limited group gathering with extra attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. *See* https://www.bop.gov/coronavirus/covid19_status.jsp

## J.       **Incident Command System**

22.       In addition to the above phases of the Bureau's official Action Plan, on March 11, 2020, the Bureau activated its "Incident Command System," commonly referred to as a Command Center, at Central Office in Washington, D.C., in response to the COVID-19 pandemic.  *See* https://www.bop.gov/coronavirus/overview.jsp.  The Incident Command System is a standardized, all-hazard incident management tool.  The Bureau has used the Incident Command System in the past to address a number of other disruptive incidents, such as fires,

human and animal disease outbreaks, and hazardous materials incidents.  The Incident Command System is structured in a manner that is intended to match the severity and complexity of the disruption for which it is activated.  Through the Incident Command System, the Bureau's National Command Center, in conjunction with local command centers, works to mitigate the health and safety risks of the COVID-19 pandemic incident by providing accurate information to all Bureau institutions, holding Bureau institutions accountable for abiding by Bureau directives and guidance, and coordinating the Bureau's national response.

## II.     STEPS TAKEN AT FCC FLORENCE TO ADDRESS COVID-19

23.     In addition to the steps taken at the national level, FCC Florence itself has also taken a number of additional measures in response to the COVID-19 pandemic.

### A.     FCC Florence Command Center

24.     As a result of the COVID-19 threat, a Command Center at FCC Florence was activated.  This Command Center works together and, in conjunction with the Central Office Command Center and North Central Regional Command Center, to monitor, plan, and implement national directives and other procedures at FCC Florence.  The FCC Florence Command Center is currently scheduled to remain active for an indeterminate period of time and is staffed from 6:00 a.m. to 4:00 p.m., Monday through Friday.

25.     As noted above, I serve on the FCC Florence Command Center as the Logistics Section Chief.  In this role, I order, account for, and distribute critical medical supplies, oversee management of infectious disease control onsite, and coordinate the Complex's enhanced staff and inmate screening.  I also provide ongoing education to staff and inmates regarding steps that should be taken to prevent the introduction and spread of COVID-19 into FCC Florence.

26.     FCC Florence has taken myriad steps to prevent the introduction and spread of

COVID-19 into its facilities, including providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures; ordering necessary cleaning, testing, and medical supplies; engaging in enhanced cleaning and disinfecting measures; and taking a number of other preventative measures. I will discuss each in turn, below.

### B.   Inmate and Staff Education relating to COVID-19

27.     From the outset of the COVID-19 pandemic, FCC Florence officials have provided regular updates to inmates and staff regarding the virus and the Bureau's response, and have educated inmates and staff regarding measures that they themselves should take to stay healthy.  Additionally, informative posters have been posted throughout the institution detailing the importance of good hygiene and hand washing.  For example, the following (non-exhaustive) items have been posted on inmate televisions and/or distributed to inmates as handouts to provide information and advice to the inmate population:

a. March 10, 2020 – FCC Florence Warden True provided information to the inmate population at FCC Florence, advising inmates as to the number of cases identified (through March 6, 2020), how COVID-19 spreads, symptoms of COVID-19, information to aid in slowing the spread of COVID-19, and treatment options for COVID-19.  *See* Att. 6, Inmate Town Hall Information (Mar. 6, 2020).

b. April 1, 2020 – In this bulletin, Warden True explained, "In response to COVID-19, the [Bureau] has instituted a comprehensive plan that includes screening, testing, appropriate treatment, prevention, education, and infection control measures.  *See* Att. 7, Inmate Town Hall Bulletin (Apr. 1, 2020).  The Warden advised the inmates that, beginning April 1, 2020, FCC Florence would be implementing a "Stay in Shelter"

for 14 days.  *Id.*  Warden True also asked inmates to "continue to increase [their] sanitation and hygiene efforts in the housing units and in [their] cells," and advised inmates that staff have "increased the sanitation efforts throughout the institution." *Id.* at 1-2.  Likewise, the bulletin advised inmates that they "are encouraged to avoid touching [their] faces," "wash [their] hands frequently with soap and water," and "[p]ractice social distancing whenever practical."  *Id.*

c.   April 7, 2020 – Following the issuance of face coverings to all inmates at FCC Florence, the FCC Florence Health Services Administrator issued an inmate bulletin to all FCC Florence inmates.  *See* Att. 8, Inmate Bulletin – Face Masks (April 7, 2020).  In this bulletin, the Health Services Administrator explained proper mask-wearing procedures and reminded the inmates to frequently wash their hands with soap and water.  *Id.*

d.   April 14, 2020 – Warden True issued an inmate bulletin to all inmates at FCC Florence regarding the implementation of Phase Six.  *See* Att. 9, Inmate Bulletin – Phase Six (April 14, 2020).

e.   April 15, 2020 – Throughout the four institutions at FCC Florence, additional color copies of two CDC campaign posters were posted in all housing units and other areas of the institutions that are frequented by staff and inmates.  *See* Att. 10, CDC Stop the Spread of Germs and Wash Your Hands Factsheets.

f.    April 21, 2020 – The Director of the Bureau explained that COVID-19 safeguards at all Bureau institutions during Phase Six are designed, and continued from Phase Five, to minimize inmate movement and further decrease the spread of COVID-19.  *See* Att. 11, Bureau Director Memorandum to Inmate Families and Friends (April 21,

2020).

g.  July 13, 2020 – Warden True provided information on Phase 8 restrictions, including reminders on ways to prevent the transmission of illnesses, screening, and inmate movement, among other information.  *See* Att. 12, Inmate Bulletin, COVID-19 Status Update (July 13, 2020).

28.     In addition to providing education to inmates, FCC Florence staff have been similarly educated regarding the importance of washing their hands, not touching their face, maintaining appropriate social distancing, and cleaning/disinfecting all equipment, including their uniforms.  Medical staff provided training to correctional staff on how to appropriately don and remove Personal Protective Equipment (PPE).

**C.     Screening for COVID-19 at FCC Florence**

29.     Due to the "Shelter in Place" order implemented pursuant to the above-listed Phases, inmate movement at FCC Florence has been highly restricted for several months.  As noted above, some restrictions are being lifted, then reinstated (e.g., visitation).  However, any restrictions that are being lifted are done so in accordance with the Bureau's and the CDC guidelines to prevent and/or manage the introduction or spread of COVID-19 the introduction the risk of a COVID-19.  It should be noted that inmates at the ADX are housed in individual cells where they eat their meals.

30.     The following screening measures for both inmates and staff are currently in place, and will remain in effect even after the "Stay in Shelter" order is lifted, until Bureau officials determine that they are no longer necessary to prevent and/or manage the introduction or spread of COVID-19 at any of the institutions at FCC Florence.

**1.     Inmates**

31. *Incoming/Outgoing Inmates*: FCC Florence screens all arriving inmates immediately upon their arrival.  These screening procedures are as follows:

a. When inmates arrive at the institution, they are met by Health Services medical providers, who conduct an initial screening for symptoms of COVID-19 (including fever, cough, and shortness of breath), as well as for "exposure risk factors," including whether the inmate has traveled from, or through, any locations identified by the CDC as increasing epidemiologic risk within the past 14 days, or has had close contact with anyone diagnosed with COVID-19 in the post 14 days.  *See* Att. 13, Coronavirus Disease 2019 (COVID-19) Inmate Screening Tool.  Health Services medical providers wear PPE during these interactions.

b. Following this initial screening, inmates are escorted to an intake/quarantine unit where they are then tested for COVID-19 and then quarantined.  While in quarantine they are monitored to ensure they do not develop any symptoms consistent with COVID-19 (i.e., temperature check and symptom check one daily for the duration of the quarantine), and tested again on day 14.  After the receipt of negative test results from the second test, inmates may be released into general population.

c. These screening procedures apply to all incoming FCC Florence inmates, no matter which of the four institutions they are designated to be housed, and these inmates are initially screened at FCI Florence as opposed to their designated institutions. When inmates arrive at the institution, they are met by Health Services medical providers, who conduct this initial screening in a designated area at FCI Florence separate from other staff and inmates. Health Services medical providers wear PPE during these interactions.

14

d. All inmates releasing or transferring from FCC Florence are placed in quarantine for 21 days prior to their scheduled departure from the institution. While in quarantine, if the inmate is transferring from FCC Florence to another institution, the inmate, in addition to the daily symptom and temperature checks, is tested for COVID-19 on day 1 of quarantine and day 14 of quarantine. The transferring inmate must be moved within 14 days of receiving a negative test result on the second test, but can be transferred sooner. If the inmate is releasing to the community from FCC Florence, the inmate, in addition to the daily symptom and temperature checks, is tested for COVID-19 on day 1 and day 14 of quarantine.

32. *General Population.* Inmate movement within FCC Florence is currently limited on a modified schedule designed to maximize social distancing and allow departments to maintain sanitation regulations and minimize the risk of infection. All inmates are encouraged to self-monitor and to report symptoms of illness to unit staff either orally or via a written request to staff, commonly referred to as a copout. All inmates were provided with three cloth masks that can be sent out for cleaning with their laundry, and are required to use them when social distancing is not possible. Medical staff are required to be present in each housing unit daily to conduct sick call and pill line. The presence of medical providers affords inmates further opportunity to report any medical concerns. In addition, unit staff and other department representatives (including staff from education, commissary, psychology, and recreation) are required to conduct daily rounds in each housing unit in order to ensure that the inmate population remains safe and healthy. If an inmate has an issue that he wants to bring to the staff's attention, he can do so via a written request at any time, or during these rounds with staff.

33. *At Risk Individuals.* As the FCC Florence HSA and Logistics Section Chief, I

was responsible for reviewing, in conjunction with a small team of medical providers, inmate medical records in order to determine which individuals at FCC Florence are considered "high risk" for COVID-19 pursuant to CDC guidelines. These guidelines can be found at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Per CDC guidance, "high-risk" individuals include those over 65 and those with certain underlying medical conditions. *See id.*

34.     In order to identify which inmates at FCC Florence should be considered "high risk," my team searched the Bureau's medical records for (1) all inmates aged 55 and over[5]; and (2) all inmates who have been diagnosed with a condition identified by the CDC as being "high risk."

35.     Based on this search, we compiled a list of individuals at FCC Florence considered to be "high risk" based on these established CDC criteria.  During the week of March 16 through March 20, 2020, we screened each of these high-risk individuals for the same "exposure risk factors" identified above, and conducted temperature checks for all high-risk inmates.  We also provided these inmates additional education regarding COVID-19 prevention, and advised them to seek medical care immediately if they began to develop any symptoms.

36.     *Inmates with Work Details.*  FCC Florence is also conducting enhanced screening for all inmates with ongoing work details, such as food service, cleaning orderlies, and general maintenance.  These functions are considered to be "essential."  Each of these inmates is screened for illness before each of their assigned work details.  This includes being screened for any symptoms of illness and having their temperature taken.

_____

[5] We chose to search for inmates 55 and over, rather than 65 and older, in an abundance of caution and to be conservative in our approach to assessing risk.

37.     *If a Positive Test Occurs*: When a positive test occurs, *all* inmates are screened daily through temperature and symptom checks, and staff would implement the following controls. *See* Att. 14, Memo – Isolation Procedures for a Positive Case.  Further, when a positive test occurs, a contact investigation is conducted (if applicable) and individuals who possibly came in contact with the positive inmates are alerted.  Numerous alerts are released informing applicable FCC Florence staff of the results as well.

   a.   Any inmate who presents with symptoms consistent with COVID-19 is evaluated by a medical provider in the Health Services Department.  Based upon this evaluation, a determination will be made whether isolation and/or testing is appropriate.

   b.   If any inmate is isolated, the inmates housed in the same housing unit with him will be quarantined pending results of a COVID-19 test provided to the inmate for a minimum of 14 days.

   c.   Inmates may also be placed in a quarantine setting if they are exposed to a person with COVID-19, where they will be monitored daily for a period of at least 14 days.  Quarantine will only be discontinued once 14 days elapse without the inmate(s) developing symptoms.

   d.   FCC Florence Health Services medical providers are prioritizing immediate medical care for anyone who claims symptoms indicative of a COVID-19 infection.

### 2.      Staff and Visitors

38.     All individuals entering FCC Florence, including staff, delivery drivers, or any other visitors, must undergo a health screening upon entry.  This includes having their temperature taken.  *See* Att. 15, Coronavirus Disease 2019 (COVID-19) Staff Screening Tool.  This screening is conducted by staff wearing a face covering, gloves, and eye protection.

39.     The individuals conducting this health screening prior to the front entrance of FCC Florence are authorized to deny entry to any individual if he or she has a body temperature of 100.4 degrees Fahrenheit, or above, or reports other symptoms consistent with COVID-19 (they are required to consult with FCC Florence medical providers in advance of the decision to deny entry).

40.     This screening applies to *all* staff and visitors, including those who leave the grounds of FCC Florence even for a short duration of time, such as to purchase lunch.

41.     The FCC Florence employees have also been educated regarding the importance of staying home if they are feeling ill, and are required to self-report any COVID-19 exposure (known or suspected) as well as any positive COVID-19 test.  If a symptomatic staff member is tested for COVID-19, they are not permitted to return to work until after receiving the results of the test.

42.     Staff members were provided with three cloth masks and are instructed to use them in situations where social distancing is not possible, or when interacting with inmates. Additionally, staff are encouraged to follow the "best practices" as listed by the CDC, including staying home if they are sick, washing hands appropriately and often, the appropriate method to cough/sneeze to lessen the chance of exposure, cleaning commonly touched areas, and social distancing.

43.     Once identified, any staff member that tests positive is placed on leave and remains away from the institution for a minimum of 10 days and until they are asymptomatic.

**D.     COVID-19 Testing at FCC Florence**

44.     The CDC has identified four "priority levels" for testing individuals with a suspected COVID-19 infection.  *See* Att. 16, CDC Priorities for Testing Patients with Suspected

COVID-19 Infection.  Priority levels one through three include hospitalized patients and healthcare workers with symptoms (Priority Level 1); symptomatic patients in long-term care facilities, individuals 65 years or older, individuals with underlying conditions, and first responders (Priority Level 2); and symptomatic critical infrastructure workers, individuals who do not meet any of the criteria in Priority Levels 1 or 2, healthcare workers and first responders, and individuals with mild symptoms in communities experiencing high numbers of COVID-19 hospitalizations (Priority Level 3).  *Id.*  The fourth, or non-priority level, is for individuals without symptoms.  *Id.*

45.     At FCC Florence, the decision whether to test an inmate for COVID-19 is made by Bureau medical providers based on a number of criteria, including but not limited to: (1) the nature and severity of the symptoms; (2) the inmate's potential exposure to COVID-19; (3) whether the inmate is considered "high-risk," and (4) whether the inmate is on a work detail, such as food service, that requires the inmate to interact with other inmates or staff.

46.     To date, the Bureau has tested over 85,506 inmates nationwide.  *See* https://www.bop.gov/coronavirus/ (under the "COVID-19 Inmate Test Information" tab). FCC Florence has tested 1,378 inmates for COVID-19, with 64 of the tests still pending.  *See id.*[6] Of these tests, 65 have been administered to ADX inmates.  *Id.*

47.     As of the date of this submission, two ADX inmates have tested positive for COVID-19, between the fourth week of November and first week of December, 2020. Both inmates are housed in the same unit which is far removed from H Unit, where Inmate Mostafa is housed.  One has recovered and the other is recovering at this time.  Their care is being

---

[6] On the website, click on the "[l]earn more about the data and view individual facility stats" tab for facility-specific information.

appropriately managed, including by means of quarantining the entire unit for a minimum of 14

days until the entire unit has tested negative for COVID-19. As of the date of this submission, 23

staff members that are primarily assigned to the ADX have tested positive for COVID-19; 21

have since recovered and returned to work. The other two staff members will be allowed to

return to work only after they are away and placed on leave for a minimum of 10 days and are

symptomatic.[7]

> **E.      Additional Measures to Combat COVID-19.**

48.      In addition to the above steps, FCC Florence has taken a number of additional

measures to combat COVID-19.

49.      First, with respect to staff specifically:

a.      Correctional staff have been provided PPE to be used in appropriate

locations throughout FCC Florence such as quarantined areas, isolation units, and

screening sites.  FCC Florence has sufficient PPE on hand, including N-95 respirator

masks, surgical masks, and rubber gloves, to meet its current and anticipated needs, as

well as the ability to order additional PPE should the need arise.

b.      On April 5, 2020, all staff were provided protective face masks for daily

use.  Since then, staff were provided with three cloth masks. Staff are required to wear

these masks at all times when six-foot physical distancing measures cannot be observed.

---

[7] As of the date of this submission, a total of 438 inmates at FCC Florence's other institutions
(FCI, USP, and FPC) have tested positive for COVID-19. Of this number 215 have recovered
and the remaining 223 are recovering at this time. 60 staff members assigned to FCC Florence's
other institutions have tested positive for COVID-19 and 38 have recovered and returned to
work. Inmate Mostafa has no exposure to inmates and staff members at the other institutions on
the complex.

Staff are also required to keep a mask with them at all times in the event that social distancing cannot be maintained.

      c.    FCC Florence has limited the number of in-person meetings scheduled onsite for staff.  If such meetings take place, they are limited to 10 people and must be conducted in areas permitting individuals to maintain an appropriate distance from one another.  FCC Florence has also implemented a video-conferencing system to replace in-person meetings to the extent practicable.

      d.    Correctional staff are required to disinfect all common equipment, such as keys and radios, upon obtaining these items from the supply room and again upon their return.  Staff also have regular, consistent access to soap and hand sanitizer.

      e.     Correctional staff entering more than one institution during a shift has been minimized.  However, if a staff member does have to enter a second institution, they must clear the screening procedures, including a temperature check, prior to entering the second institution.

50.    Second, all inmates have access to sinks, water, and soap at all times.  New inmates admitted to any institution at FCC Florence automatically receive soap.  And all inmates may receive new soap weekly, either by purchasing soap in the commissary, or free of charge for qualifying inmates.  Finally, FCC Florence inmates' laundry is collected and washed regular basis.

51.    Third, all common areas in inmate housing units are cleaned daily, and are typically cleaned by inmate orderlies multiple times throughout the day, with a designated disinfectant that kills human coronavirus. Common areas outside inmate living areas, including the lobby, bathrooms, corridors, etc., are also cleaned with the same disinfectant on a daily basis

(and often multiple times per day).  Each housing unit has been stocked with cleaning supplies for use by inmate orderlies and other inmates to clean both the common areas and their cells on a daily basis.

### III.   HEALTH STATUS OF INMATE MOSTAFA

52.     In my capacity as the FCC Florence HSA and as a Registered Nurse, I am aware of Inmate Mostafa's health status.

53.     Inmate Mostafa, who is 62 years old, is currently housed in H Unit at the ADX.  No inmates in H Unit have tested positive for COVID-19.  To date, because Inmate Mostafa has exhibited no symptoms of COVID-19 and has had no direct exposure to the disease, he has not been tested for COVID-19.  In addition, the two positive ADX inmate cases occurred in an entirely separated housing unit.  Furthermore, medical staff make daily rounds in each housing unit.  In the event Inmate Mostafa had an medical question or problem, he has the ability to contact medical personnel on a daily basis.

54.     Because Inmate Mostafa is considered a "high risk" inmate because of his age, *see* ¶¶ 34-35, above, he was screened in March for "exposure risk factors," *see* ¶ 10, above, and had none.

55.     In addition to the health and safety protocols discussed above, BOP medical personnel are managing Inmate Mostafa's risks for COVID-19.

56.     First, Inmate Mostafa is neither obese nor morbidly obese.  He has a history of engaging in hunger strikes which cause his weight to vary.  When he is on a hunger strike, his weight may be as low as approximately 195 pounds, but when he is not, his weight may be approximately 220 pounds.  When he is at the upper end of this range, he may be somewhat overweight, but not excessively so.

57.     Inmate Mostafa has hypertension and Type 2 diabetes, for which he is prescribed medications.  For hypertension, Inmate Mostafa is prescribed Losartan and Hydrochlorothiazide, a diuretic.  For his Type 2 diabetes, he is prescribed Metformin, an oral medication. He is not on insulin.  *See* Att. 17, BEMR Medication Summary.[8]

58.     Inmate Mostafa's medications are "self-carry" medications, meaning that he maintains those medications in his cell and is responsible for self-administering them.  However, by his own report, he does not always follow the advice of medical staff regarding appropriate dosage of his medications and frequently reports to staff that he is not compliant with taking his medications.

59.     As recent examples, on October 15, 2020, Inmate Mostafa was seen by a physician assistant to whom he reported that, despite having an improved but still elevated blood pressure, he "does not want an increase in medication and will not take it[.]" Att. 18, 10/15/2020 Clinical Encounter, at 2; *see also id.* at 1 (claim by Mostafa that his blood pressure "is high due to him being in pain with his teeth"). In August 2020, Mostafa reported to the physician assistant that he was not compliant with his medications at that time. Att. 19, 8/6/2020 Clinical Encounter, at 1 ("Inmate reports not taking his medications in the last 2 weeks and tells me that is why his readings are elevated."); *see also* Att. 20, 7/7/2020 Clinical Encounter, at 2 (Mostafa "says he has not had [Losartan] in about 2 weeks.").  He told the physician assistant that "[h]e does not want to take the increased dose of Losartan however will take the previous 25 mg dose." Att. 19 at 1; *see also* Att. 21, 9/15/2020 Clinical Encounter, at 1 (describing August 2020 encounter). In response, the "dose of Losartan [was] decreased due to inmate refusing to take higher dose." Att.

_____

[8] When Inmate Mostafa is on a hunger strike, Metformin may be withheld because of the risks associated with low blood sugars when Mostafa chooses not to consume food.

21 at 1.  Inmate Mostafa also sometimes refuses requests to take his blood pressure, which makes monitoring his status more difficult. *See* Att. 18 at 1 (10/15/2020 encounter noting that "inmate refused last BP for monitoring"); Att. 22, 2/27/2020 Clinical Encounter – Administrative Note (noting that "Inmate refused last BP check").

60.      Inmate Mostafa's HgBA1c readings, or average blood glucose levels, are generally within acceptable limits. However, he also has a pattern of refusing labs to obtain those readings. Att. 20 at 1 ("Unfortunately IM refused his last labs MAY 18, 2020 to evaluate his A1c.").

61.      Inmate Mostafa has some chronic skin scaling and peeling. He has been given adaptive appliances for his prostheses to enable him to apply topical agents to his skin. However, routine inspections of his prostheses and adaptive appliances show little to no use of these devices. As an ADX physician recorded on September 11, 2020, Inmate Mostafa:

> Has prosthetics but complains that he cannot use them. Had an OT evaluation with accommodations made. The appliances provided are still in his p[o]session but have not been used. These include sleeves to be slipped on the eating utensils so that his prosthetics can grip them for eating. There is a sponge that can be used with his prosthetics for washing.

Att. 23, 9/11/20 Clinical Encounter – Administrative Note.  Because Inmate Mostafa does not use regularly uses these devices, he has not exhibited skin breakdown on his arm stumps.

## IV.      CONCLUSION

62.      In conclusion, the Bureau and FCC Florence take the COVID-19 pandemic extremely seriously and have implemented numerous measures to proactively combat the spread of this disease to staff members and the inmate population.  The various phases of the Bureau's Action Plan have been designed and implemented in a systemic manner both nationally and at FCC Florence in order to mitigate the spread of COVID-19.  These procedures have, to date,

protected Inmate Mostafa from contracting COVID-19.

63.    Further, Bureau medical staff are providing appropriate treatment, including medications, to treat Inmate Mostafa's medical conditions.  He has the power to further protect and enhance his health by being compliant with his medication regimen and other treatments that are offered to him.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief. Executed on this 11th day of December 2020, in Florence, Colorado.

/s/ *S. Himlie*
Health Services Administrator
FCC Florence
Federal Bureau of Prisons

**Enclosures**

Att. 1, Director's Memorandum for the Inmate Population (April 8, 2020)

Att. 2, Inmate Bulletin: Modified Operations (May 12, 2020)

Att. 3, Memorandum for all Chief Executive Officers (June 30, 2020)

Att. 4, Phase 9 Memo

Att. 5, Phase 9 Second Extension Memo

Att. 6, Inmate Town Hall Information (March 6, 2020)

Att. 7, Inmate Town Hall Bulletin (April 1, 2020)

Att. 8, Inmate Bulletin – Face Masks (April 7, 2020)

Att. 9, Inmate Bulletin Phase 6 (April 14, 2020)

Att. 10, CDC Stop Spread of Germs and Wash your Hands Factsheet

Att. 11, Director Memo to Inmate Families (April 21, 2020)

Att. 12, Inmate Bulletin, COVID Status Update (July 13, 2020)

Att. 13, COVID-19 Inmate Screening Tool

Att. 14, Memo – Isolation Procedures for a Positive Case (June 10, 2020)

Att. 15, COVID-19 Staff Screening Tool

Att. 16, CDC Priorities for Testing Patients with Suspected COVID-19 Infection

Att. 17, BEMR Medication Summary

Att. 18, 10/15/2020 Clinical Encounter

Att. 19, 8/6/2020 Clinical Encounter

Att. 20, 7/7/2020 Clinical Encounter

Att. 21, 9/15/2020 Clinical Encounter

Att. 22, 2/27/2020 Clinical Encounter – Administrative Note

Att. 23, 9/11/20 Clinical Encounter – Administrative Note

# Himlie Declaration – Attachment 1

*Mostafa v. Barr, et al.*,
No. 20-cv-00694-PAB-NYW (D. Colo.)



**U.S. Department of Justice**

**Federal Bureau of Prisons**

*Office of the Director*                    *Washington, DC 20534*

April 8, 2020

MEMORANDUM FOR THE INMATE POPULATION

FROM:        M.D. Carvajal, Director

SUBJECT:        COVID-19 Pandemic

I would rather be able to address you directly, however, that is not practical at this time. Instead, I am writing this letter to tell you what we are doing as an agency to safeguard your health during the COVID-19 pandemic. I want to thank each of you for your understanding and cooperation as we diligently work to try and prevent the introduction of coronavirus in our facilities and to stop the spread of it in the facilities that have already been affected. It is critically important that each and every one of us take this seriously - together we will all get through this.

Let me share some information with you and dispel any rumors you may have heard. Despite the planning and preparations that has been ongoing since January 2020, and the implementation of the first three phases of our COVID-19 Action Plan, the BOP had its first positive inmate case on March 21, 2020, and the first positive staff case the very next day. Unfortunately, I am also saddened to report, as of today, we have had eight COVID-19 inmate-related deaths. On March 26, 2020, we implemented Phase 4 requiring all individuals entering our facilities, including staff, be screened and temperature checked. This was a critical step to ensure we reduce the risk of introducing and spreading the virus inside our facilities.

The Executive Staff and I have made decisions that directly impact each of you. No decision, regardless of how large or small, is taken lightly or done without considerable thought. Stopping social visits has a major impact on you and your loved ones. But, by doing so we are keeping you, your family, and the community safe. We

increased your monthly phone minutes to help compensate for the lack
of visits and by Thursday, April 9, 2020, telephone calls will be
free to you for the duration of this emergency (please note, however,
collect calls will still be charged to the receiving phone number).
We recognize how important it is for you to keep in touch with your
families, especially at this time.  They need to know how you are
doing and you need to know how the virus is affecting them.

Access to legal counsel remains a paramount requirement but, like
social visiting, the BOP is reducing the risk of exposure created
by external visitors.  As such, while in general, legal visits will
be suspended for 30 days, case-by-case accommodation will be
accomplished at the local level and confidential legal calls will
be allowed in order to ensure inmates maintain access to counsel.
Limiting facility-to-facility transfers, and other inmate movement,
as well as implementing screening and quarantine and isolation
procedures, have been essential to slowing the spread of the virus.
The nationwide modified operations implemented to maximize social
distancing and limit group gatherings, such as staggering meal times
and recreation, have also been helpful.  However, the growing number
of quarantine and isolation cases in our facilities indicates we need
to do more.

Accordingly, on April 1, 2020, another decision was made that
directly impacts you.  For a 14-day period, inmates in every
institution have been secured in their assigned cells/quarters to
decrease the spread of the virus.  Again, we did not make this
decision lightly, and I know this can be frustrating for all of you.
But just like in communities nationwide who have been required to
shelter in place, we feel the safest course to prevent the spread
of the virus and keep you healthy is to have you shelter in place
as well.  After 14 days, this decision will be reevaluated and a
determination will be made as to whether or not to return to modified
operations.

All of our efforts are toward one goal -- keeping everyone in our
prisons, both staff and inmates, safe.  We are still in the early
stages of this virus; it is not even near the peak in the United
States.  With that said, I need your continued patience,
understanding, and cooperation.  I need you to communicate with
staff openly and honestly.  We need to know how you are feeling -
both physically by telling staff if you are feeling sick, coughing
or running a fever, and mentally, if you are anxious or scared.

I am also asking that you keep yourselves and your areas as clean
as possible.  On April 4, 2020, the CDC issued updated guidance
encouraging all persons to use masks in public, as such, masks have

been issued to you.  There are universal precautions that we must all follow – we are sharing many of the same areas.  Please remember to always:

- Wash your hands, especially after touching any frequently used item or surface.
- Avoid touching your face.
- Sneeze or cough into a tissue and wash your hands thereafter, or use the inside of your elbow.
- Observe social distancing as much as practical in our environment.

These are not normal times.  Our world is much different than it was a month ago.  We recognize this is hard on you, but remember it is equally hard on everyone.  Staff are experiencing many of the same feelings as you, your family, as well as myself.

I want to close by personally telling you that your cooperation has made a difference during this difficult time.  Please continue to be patient and understanding.  Wash your hands frequently, cover your coughs and sneezes, and avoid touching your face.  Maintain an appropriate social distance as often as you can.  And, equally as important, communicate with the staff about how you are feeling, ask questions, and share your concerns.  This pandemic is a global emergency and the BOP is taking proactive operational measures to safeguard each of you that are entrusted to our care and custody. I am committed to doing everything I can to help keep all of you healthy and safe.

# Himlie Declaration – Attachment 2

*Mostafa v. Barr, et al.*,
No. 20-cv-00694-PAB-NYW (D. Colo.)

# FCI Florence Inmate Bulletin

## Modified Operations

Beginning Monday, May 18, 2020, the following modifications will be made:

<u>Outdoor Recreation -</u> Inmates will be allowed to participate in outdoor recreation for one hour.  Groups of 10 will be allowed to exit the unit at a time, not to exceed a total of 30 inmates.  Inmates are required to wear masks at all times while outside of their cell, to include while on the recreation yard, and to practice social distancing.  **USE OF RECREATION EQUIPMENT IS PROHIBITED**.

<u>Food Service -</u> Inmates will be allowed to pick up meals on a limited basis in a "Grab & Go" manner.  Groups of 10 will be allowed to exit the unit at a time, not to exceed a total of 30 inmates.  Inmates are required to wear masks at all times while outside of their cell, to include moving to and from Food Service, and to practice social distancing.

<u>RDAP -</u> Small groups (no more than 10) will be allowed to program, while ensuring social distancing is being practiced (6 feet).

If you have any questions, please direct them to Captain Giconi.

Failure to adhere to the above requirements may lead to the suspension of these modifications.

5/12/2020
**Date**

C. Carter
**C. Carter, Warden**

# FCI Florence Inmate Bulletin

## Operaciones Modificadas

Comenzando el lunes, 18 de mayo de 2020 las siguientes modificaciones se hará:

**Recreación al aire libre**: Los reclusos se le permitirá participar en la recreación al aire libre durante una hora. Grupos de 10 se le permitirá para salir de la unidad a la vez, no exceder un total de 30 internos. Los reclusos son obligatorio usar mascaras en todo momentos mientras que fuera de su celda, para incluir mientras en el patio de recreo, y para practicar distancia social. **EL USO DE EQUIPOS DE RECREACIÓN ESTÁ PROHIBIDO.**

**Servicio de Alimentos-** Se permitirá a los reclusos para recoger las comidas de forma limitadas, Manera de "Grab & Go". Grupos de 10 podrán salir de la unidad a la vez, para no exceder un total de 30 reclusos. Los reclusos deben usar máscaras en todo momento mientras que fuera de su celda para incluir la mudanza hacia y desde el Servicio de Alimentos y practicar el distanciamiento social.

**RDAP-** Grupos pequeños no más de 10 se le permitirá programar al tiempo que se garantiza que se practique el distanciamiento social 6 pies.
Si tiene alguna pregunta por favor dirijalos al Capitán Giconi.
Incumplimiento de los requisitos anteriores puede llevar a la suspensión de estas modificaciones.

5/12/2020
**Date**

C. Carter
**C. Carter, Warden**

# Himlie Declaration – Attachment 3

*Mostafa v. Barr, et al.*,
No. 20-cv-00694-PAB-NYW (D. Colo.)



**U.S. Department of Justice**
**Federal Bureau of Prisons**

_Washington, D.C. 20534_

June 30, 2020

**MEMORANDUM FOR ALL CHIEF EXECUTIVE OFFICERS**

**FROM:** **ANDRE MATEVOUSIAN, ASSISTANT DIRECTOR**
**CORRECTIONAL PROGRAMS DIVISION**

NICOLE ENGLISH
Digitally signed by NICOLE ENGLISH
Date: 2020.06.30 14:46:26 -04'00'

**N. C. ENGLISH, ASSISTANT DIRECTOR**
**HEALTH SERVICES DIVISION**

**SUBJECT:** **CORONAVIRUS (COVID-19) PHASE EIGHT ACTION PLAN**

This memorandum describes the Bureau's (BOP) Coronavirus (COVID-19) Phase Eight Action Plan, which includes an extension of previously disseminated guidance along with new measures to implement in the management of the pandemic.

## EXTENSION OF PHASE SEVEN ACTION PLAN:

Effective Wednesday, July 1, 2020, the BOP will continue its nationwide action as described in the Phase Seven Action Plan. These restrictions will remain in place through July 31, 2020, at which time the plan will be reevaluated.

## COURT TRIPS:

A number of variables affect the risk of COVID-19 transmission during in-person court appearances and will determine some of the specific management strategies that are needed at each location. The U.S. Marshals Service (USMS) takes responsibility for the inmate once they leave the BOP institution until their return. Each USMS district may have their own procedures. Individual courts may also have different COVID mitigation procedures and requirements. Knowing the likelihood of BOP inmates mixing with non-quarantined, Non-BOP inmates while in USMS custody during a court visit is essential to determine the risk of COVID-19 exposure. The frequency of an inmate's court appearance and the number of inmates going to a court at any one time are also important factors to consider. It is recommended that each BOP detention center contact the USMS and the court to ascertain their COVID-19 mitigation procedures and consult with Regional Health Services staff on developing an individualized strategy. The following are general principles to follow:

- Inmates in COVID isolation should not have in-person court appearances unless absolutely necessary. Strongly consider the inmate appearing via telephone hearing. If a VTC is accessible, that can also be used as an alternative.

- Inmates in COVID quarantine (intake/exposure) should delay in-person court appearances until they are COVID tested at the end of quarantine. It is recommended that VTC or telephone appearances be used as alternatives. In general, testing an inmate immediately before or after a court visit would have little utility and is not recommended. However, Abbott ID NOW tests can be used on a case-by-case basis, especially if a visit is required by the court.

- Inmates should wear face coverings and perform hand hygiene just before departure from and upon return to the institution.

- BOP officials should request that BOP inmates be cohorted only within their own housing or quarantine cohort and not be mixed with inmates from other housing units or other institutions, or transported with inmates from other institutions to the extent possible while at court.

- Upon return to the detention center, inmates should be quarantined if they were outside of the institution and were exposed to inmates from other housing units or locations (e.g., county jails). Periodic testing of inmates with frequent court appearances should be considered. The 14-day quarantine period must be restarted for any inmate who is in close contact with other inmates not from their housing unit or location.

## INTAKES:

As we return to a more normalized inmate movement, the quarantine site model will no longer be utilized. All inmates entering an institution will require enhanced intake procedures:

- Institutions are to designate specific quarantine and isolation areas in advance with capacity numbers commensurate with anticipated levels and frequency of incoming inmates. Ideally, inmates should be quarantined or isolated in single-cell, if possible. When cohorting is necessary, the best practice is to keep cohorted inmates together and not add to the cohort when new intakes arrive.

  New intakes should undergo the same previously described intake screening process with symptom and temperature screening. Inmates will be tested on arrival with an approved viral PCR test from a nasopharyngeal swab using either an Abbott ID Now POC test or commercial send out lab test.
    - Inmates that test positive and/or are symptomatic will be placed immediately in isolation. They will remain in Isolation until they meet the CDC test-based strategy criteria for isolation release which includes two negative tests at least 24 hours apart, the first may be performed with either Abbott ID POC or commercial lab test, but second must be commercial lab test.

    - Inmates that are asymptomatic and test negative are placed in quarantine. They will remain in quarantine until:

- They become symptomatic during the quarantine period. These inmates should be tested (Abbott or commercial) and placed in Isolation immediately. Depending on the housing circumstances, potential contacts (e.g. cellmate, cohort, housing unit) will need to reset their quarantine. When risk of exposure and/ or spread of transmission is higher, re-testing of potential contacts could be considered. A testing frequency of every 3 to 4 days is preferred whenever feasible in consultation with Regional Infection Prevention and Control Consultant and the Regional Medical Director.

- On or after 14 days. The inmates that have remained asymptomatic will be tested with a commercial lab test. Inmates should remain in quarantine status until test results are complete. If the test is positive, see above bullet. If the test is negative, the inmate may be released to General Population.

## MOVEMENT:

Movement of inmates between BOP institutions can be a simple, short-distance transfer between two institutions or a complex, multi-day, multi-institution process. When a planned movement involves multiple stops, staff and agencies, and potential mixing with other inmate groups from other BOP facilities or other correctional jurisdictions, the risk of COVID-19 exposure and transmission increases. Refer to the HSD Guidance (6/19/20) for Inmates who are transferring or Releasing from a BOP Facility, https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/guidance_for%20_transferring_or%20 0releasing%20inmates_20200619.pdf

- As inmate movement operations move toward "normalizing", the number and complexity of inmate moves will increase. This process of normalizing should be done in a measured approach to allow institutions, regions and the agency develop best practices moving forward.

- Institutions/ Regions should evaluate their space and staffing resources to accommodate increased numbers of the various types of quarantine inmate groups (intake, exposed and pre-release) as well as isolation inmates in various stages of the process. Moving to a test out strategy for discontinuation of isolation may prolong isolation for various groups of inmates longer than 14 days. Various and/or large groups of quarantine and isolation inmates may require a re-distribution of inmates amongst institutions within a region.

- The first step in ensuring safe inmate movement is a full test-in/out, 14-day pre-release quarantine of transferring inmates prior to transport.

    o Planning an inmate move should occur with enough time in advance to allow for a full test in/out 14-day quarantine and turnaround time for test results (21 days).

    o Planning should be coordinated with all the institutions involved from the beginning stages so that setting of dates will allow for the above process to occur for all the potential inmates on that move.

- o Inmates who have tested negative at the completion of their quarantine should stay in quarantine status until they are transferred, preferably within 5 days of the negative result, but may still move within 14 days of the negative result.

- o If an inmate develops symptoms and/or tests positive, they will not be permitted to travel until they have met the CDC test-based criteria for test-based release from isolation. On rare occasions, there may be exceptions where an inmate must travel prior to the completion of this process or even with a positive result (e.g. court ordered transfer). In these cases, the transfer must be discussed and approved by local executive staff from the institutions and regions involved with input from health services staff, as needed.

- o For inmates who have previously tested positive for COVID-19: (refer to https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/covid19_testing_expanded_inmate_testing_strategies_2020619.pdf)

    - ▪ If they cleared isolation using the CDC test-based strategy more than 14 days prior to travel date, they will need one negative commercial viral lab test completed prior to travel and do not need any further testing or quarantine prior to transfer

    - ▪ If they cleared isolation using a symptom or time-based strategy, they will need one negative commercial viral lab test completed prior to travel and do not need further testing or quarantine prior to transfer.

    - ▪ If the test is positive, they cannot travel and must be placed in isolation until they meet the test-based criteria with two negative tests at least 24 hours apart. The first may be performed with either Abbott ID POC or commercial lab test, but second must be commercial lab test.

- Planning of inmate movement should be coordinated with close involvement of local Executive Staff, CMC, Unit Team and Health Services staff from all involved institutions/regions and transport agencies. Communication and accurate information are vital to ensure a proposed inmate movement has minimized any potential risk of COVID-19 exposure/transmission.

- To the extent possible, manifests should be generated that allow for appropriate social distancing during transport (e.g. loading a bus/ plane at 50% capacity).

- "Normal" transport routes and schedules will need to be reviewed and reconsidered. Inmate movement should be coordinated in a manner that:

    - o **Has minimal stops/holdovers:** e.g. consider institutions meeting at a halfway point to pick-up inmates rather than having multiple stops and holdovers.

- o **Minimizes the amount of time inmates are held in holdover:** the longer an inmate spends in transit, the greater the risk. The frequency of certain drop offs/pick-ups may need to be increased to minimize holdover times.

- o **Avoids mixing of inmate groups** as much as possible:

    - The following Inmate group terms will be defined as follows:

        - **BOP group** - inmates who have completed a full test in/out pre-release/ transfer quarantine process prior to transfer from a BOP facility.

        - **Non-BOP group** - inmates from other agency/correctional jurisdiction who have not undergone a full test in/out quarantine.

    - Maximize runs with only BOP groups; make every effort to coordinate runs for Non-BOP groups separately.

    - There are many scenarios where mixing of BOP groups from different BOP institutions is unavoidable.  If all BOP-groups have been properly tested in/out of a pre-release/transfer quarantine just prior to transport at their sending institution, this practice is acceptable.

    - Ideally, any Non-BOP group during a transfer will have been tested for COVID-19 prior to transport.  However, this is often not possible or verifiable.  All Non-BOP group inmates must have a temperature check and symptom screen immediately prior to transport.  Anyone with a known positive COVID-19 test or who has fever or symptoms will not be admitted on the transport.

    - If a BOP group is mixed with a Non-BOP group at any point in the transfer process, all the inmates in that group will require intake screening, testing and intake quarantine (asymptomatic) or isolation (symptomatic) at their destination institution.

- During transport, BOP-group inmates should wear at least facial coverings and staff should wear at least facial covering and gloves. For transport of Non-BOP or mixed groups, inmates should wear surgical masks and staff should wear surgical masks and gloves during transport and add gown and eye protection with direct contact.

- Documentation on the BEMR exit summary/transfer paperwork (e.g. In-Transit Form) needs to include results of the same-day symptom screen and temperature check, the most recent COVID-19 test result, and the inmate's COVID-19 history.  To ensure proper documentation of negative COVID-19 testing from a commercial lab is displayed on the exit summary, the BOP ICD code of Z03818-c19 will need to be added to the inmate's health problem list.  This will then display properly upon the inmate Exit Summary.  The BEMR Exit Summary/transfer paperwork

should be provided to the bus LT/USMS to verify that a commercial lab test has been completed with a negative test result.

- **Holdover Sites/Bus Hubs:**

    o Holdover/Bus hub sites should designate specific holdover quarantine areas in advance in numbers commensurate with anticipated levels and frequency of incoming inmates.

    o For BOP group transfers that have not mixed with Non-BOP groups and require holdover at a facility, the BOP groups can generally be placed directly into a holdover unit setting without a test in/out process and do not need to complete a full 14-day quarantine prior to moving on to their next destination.

    o These holdover groups should be housed separately from the new intake, post-exposure and prior to release/transfer* quarantine groups at that institution.
    *Note there is a distinction between inmates coming from another institution in holdover status waiting to "transfer"/continue on to their next destination versus inmates that are originating from the holdover site and waiting to transfer.

    o The various holdover groups may be housed together, if necessary.

    o If a holdover site/bus hub is known to receive Non-BOP groups, they should consider having designated quarantine/isolation units for them and manage them as new intakes.

        ▪ Those that are symptomatic and/or test positive must be placed in isolation and can be released after meeting CDC test-based criteria for release from isolation into general population or transfer. If transfer is to occur after 14 days from their release from isolation, they will need one negative commercial viral lab test completed prior to travel. They do not need any further quarantine prior to transfer.
        ▪ Those that are asymptomatic and test negative will be placed in quarantine. When they complete quarantine and test-out:

            o For those inmates that are expected to remain at the holdover site for a prolonged period of time, they can be released to General Population. If they are released to General Population, future transfers will require pre-transfer test-in/test-out quarantine.

            o For those inmates expected to transfer within a reasonable period of time, they should remain in quarantine until their transfer date. They should transfer within 14 days of the test-out negative result or be re-tested prior to transfer.

- ▪ If a holdover site/bus hub receives a mixed group of BOP and Non-BOP groups or BOP group that has previously mixed with a Non-BOP group, they must now all be managed as a Non-BOP group.

## DESIGNATED (FINAL RECEIVING) INSTITUTIONS:

Transferred inmates will undergo the same process as a new intake, to include intake screen and temperature check, COVID-19 testing and isolation versus new intake quarantine at the final designated facility.

## QUESTIONS:

If staff have questions about COVID-19, they may reach out to the agency at the following email box: COVID19Questions@bop.gov.

We appreciate your assistance as we continue to work collaboratively to mitigate the transmission of COVID-19 within our prisons nationwide, and with all phases of our COVID-19 response.

# Himlie Declaration – Attachment 4

*Mostafa v. Barr, et al.*,
No. 20-cv-00694-PAB-NYW (D. Colo.)



**U.S. Department of Justice**
**Federal Bureau of Prisons**

_Washington, D.C. 20534_

August 5, 2020

**MEMORANDUM FOR ALL CHIEF EXECUTIVE OFFICERS**

**FROM:**      **ANDRE MATEVOUSIAN, ASSISTANT DIRECTOR**
**CORRECTIONAL PROGRAMS DIVISION**

**L. CRISTINA GRIFFITH, ASSISTANT DIRECTOR**
**HUMAN RESOURCE MANAGEMENT DIVISION**   LINELL GRIFFITH   Digitally signed by LINELL GRIFFITH Date: 2020.08.05 08:36:50 -04'00'

**N. C. ENGLISH, ASSISTANT DIRECTOR**   NICOLE ENGLISH   Digitally signed by NICOLE ENGLISH Date: 2020.08.05 08:22:21 -04'00'
**HEALTH SERVICES DIVISION**

**SUBJECT:**      **CORONAVIRUS (COVID-19) PHASE NINE ACTION PLAN**

This memorandum describes the Bureau's (BOP) Coronavirus (COVID-19) Phase Nine Action Plan, which includes an extension of previously disseminated guidance along with new measures to implement in the management of the pandemic.

## EXTENSION OF PHASE EIGHT ACTION PLAN

The BOP will continue its nationwide action as described in previous phase memorandums. These measures will remain in place through August 31, 2020, at which time the plan will be evaluated.

## STAFF TRAINING

All in-person training is suspended through August 31, 2020.   Exceptions to in-person training includes: ICT I, ICT II, completion of mandatory requirements for Annual Training, OSHA mandated certifications, and any training that can be conducted remotely to fulfill ongoing mandatory credentialing requirements that cannot be waived.   Any other exceptions to this suspension must be routed through the appropriate Assistant Director or Regional Director, and submitted to the Deputy Director for final approval.

## STAFF TRAVEL

All non-essential official staff travel is suspended through August 31, 2020.   Any requests for travel, except for deployment to institutions to assist with the COVID-19 pandemic, must be approved by the appropriate Regional Director or Assistant Director.

## LEGAL ACCESS

As courts begin to conduct more criminal and civil proceedings, inmates will need increased access to counsel and legal materials.

Legal calls and/or virtual legal visits:   Telephone calls and/or video conferencing with outside counsel should be accommodated to the extent possible.   Please work with your IT Department to provide and expand virtual access to attorneys whenever possible using either a VTC unit and/or WebEx.

In-Person Legal Visits: Consistent with standing guidance, in-person legal visits should be accommodated upon request. The legal visits should be accommodated based on local resources, and consistent with the following recommendations:

Inmates in medical isolation for COVID-19 should not have in-person legal visits unless absolutely necessary. Strongly consider rescheduling or, as an alternative, utilize video teleconferences (VTC) and telephone legal calls.

Inmates in quarantine for COVID-19 may have asymptomatic COVID-19 infection or be in the incubation period, and should delay legal visits until they are COVID-19 tested negative at the end of quarantine. Video tele-conferencing (VTC) or legal telephone calls with attorneys are recommended as alternatives, if available.

In general, testing an inmate for COVID-19 immediately after a legal visit would have little utility and is not recommended.

Further considerations for in-person legal visits include:

o Inmates and attorneys/ legal visitors should wear face coverings (cloth or surgical mask) and should perform hand hygiene (washing hand with soap and water or using hand sanitizer) just before and after in-person visits.

o Use of Plexiglas or similar barrier between inmate and attorney is strongly recommended for in-person visits.   In the alternative, if a barrier is not present, social distancing (i.e., 6 feet apart) should be used.

o Attorney/legal visitors should be symptom screened and temperature checked upon entry into the facility, should wear a face covering, and perform hand hygiene just before and after the legal visit. Legal visitors who are sick or symptomatic should not be allowed to visit.

o If necessary, documents should be passed back and forth in a manner to avoid touching.

o When legal attorney rooms are available, they should be utilized to allow for social distancing among all present in the room. If there is no legal attorney room available and if there are more than one attorney/inmate pair present, all pairs should be separated by more than six feet to the extent possible while protecting attorney-client communications.

o Tables, chairs, and other high-touch surfaces should be disinfected between usage.

Electronic Law Library and Discovery Materials: Whenever possible, consistent with social distancing protocols and safe institution operations, inmates should be permitted access to the Electronic Law Library (ELL) under conditions determined by the Warden at each facility. Similarly, inmates will need access to discovery materials relevant to pending cases, beyond those which are maintained by the inmate in his or her cell. We recommend that a schedule be established to permit fair and timely access to ELL terminals and discovery materials upon inmate request, and that the schedule be provided to inmates at the facility.

## PROGRAMMING

Inmate programming is an essential function in our facilities, and delivery of First Step Act approved Evidence-Based Recidivism Reduction (EBRR) Programs and Productive Activities (PAs) is required by law. Institutions will offer programming in the following ways:

• Residential programs (i.e., RDAP, BRAVE, SOTP, TCU, FIT, etc.) will immediately resume full time treatment, as required by policy. Programs may resume groups with more than ten participants, however, other social distancing modifications should remain in place (e.g., holding groups in larger spaces; suspending community meetings).

• Delivery of non-residential EBRR Programs and PAs (e.g., GED, Anger Management) will resume/continue. These services will be offered at no less than half of their regular capacity.

• Institutions should continue to deliver EBRR and PA programming consistent with the curriculum; however, staff may offer programs on the housing unit or in outdoor or unused spaces for safety/social distancing.

• GED testing, in groups of six or less, will resume with priority given to inmates releasing within 120 days. Other inmates may be tested if resources allow.

Appropriate SENTRY assignments must be used to track program enrollment and participation. Inmates must be recommended for and allowed to sign up for programs that meet their assessed needs.

General population recreation access will resume.   Ordinarily, inmates in groups of no more than 100 will be able to access the recreation yard for a minimum of one hour at a time as long as they remain appropriately distant from one another.   Inmates should have access at least three times per week and attend the recreation yard with inmates from their designated housing units.   Group sports or use of gym equipment (e.g., weights, basketballs) are prohibited.   Small classes that do not involve physical contact may be offered at the discretion of the Warden.   If this occurs, all materials must be thoroughly sanitized after each use.

• Recreation in Special Housing will resume, consistent with standards outlined in policy.

Institutions with active COVID-19 cases may make exceptions to these programming requirements for the safety of staff and inmates.   Modification requests are sent to the Regional Director and concurrence given by the Reentry Services Division.

Beyond program delivery, staff are required to complete needs assessments on all newly-committed inmates, and this process remains in effect during the pandemic. As a reminder, needs are assessed by Unit Team, Health Services, Psychology Services, and Education staff.   The results of the assessments must be keyed into SENTRY or Insight.   Based on the needs assessment, inmates must be enrolled in an appropriate EBRR Program or PA.

## VOLUNTEERS AND CONTRACTORS

Institution access for Volunteers and Contractors will continue as previously described in the Phase Six Action Plan.

## UNICOR

In consultation with Safety & Health Services departments, Wardens will develop plans to safely have UNICOR operations at their institutions running at least 80% capacity no later than September 1, 2020 and 100% normal operation levels no later than October 1, 2020.   Written plans are due to the Regional Directors for approval by Tuesday, August 11, 2020. Wardens whose institutions have a UNICOR operation will also develop and forward plans to establish UNICOR units.   A standard questionnaire for reporting of these plans will be provided by the Assistant Director for FPI.

Institutions with active COVID-19 cases may make exceptions to these work requirements for the safety of staff and inmates.   Modification requests are sent to the Regional Director and concurrence given by the Assistant Director, FPI.

## COMPLIANCE REVIEWS

Effective immediately, the Program Review Division (PRD) will be conducting unannounced site visits to ensure institution operations conform to the ongoing COVID guidance.   This compliance review will include, but is not limited to, adherence with the Health Services Division guidance on best practices for managing COVID-19 outbreaks, CDC guidance on COVID-19 precautions, and all of the Phase Memorandums outlining our progression as an agency through this crisis.   PRD will soon disseminate written standards that will encompass the scope of their review.

## COURT TRIPS

A number of variables affect the risk of COVID-19 transmission during in-person court appearances and will influence some of the specific management strategies that are needed at each location.   The U.S. Marshals Service (USMS) takes responsibility for the inmate once they leave the BOP institution until their return.   Each USMS district may have their own COVID management procedures.   Individual courts may also have different COVID prevention/mitigation procedures and requirements.   Recognizing the likelihood of BOP inmates mixing with non-quarantined, non-BOP inmates while in USMS custody during a court visit is essential to assess the risk of COVID-19 exposure.

The frequency of an inmate's court appearance and the number of inmates going to a court at any one time are also important factors to consider.   It is recommended that each BOP detention center contact the USMS and the court to ascertain their COVID-19 mitigation procedures and consult with Regional Health Services staff on developing an individualized strategy.   The following are general principles to follow:

- Inmates in COVID isolation should not have in-person court appearances unless absolutely necessary.   Strongly consider the inmate appearing via telephone hearing or via a VTC if it is accessible.

- Inmates in COVID quarantine (intake/exposure) should delay in-person court appearances until they are COVID tested negative at the end of quarantine.   It is recommended that VTC or telephone appearances be used as alternatives.   In general, testing an inmate immediately after a court visit would have little utility and is not recommended as a strategy.   If in-person attendance is required, however, Abbott ID NOW tests can be used on a case-by-case basis if a visit is ordered by the court.

- Inmates should wear face coverings and perform hand hygiene just before departure from and upon return to the institution.

- BOP officials should request to the USMS that BOP inmates be cohorted only within their own housing or quarantine cohort and not be mixed with inmates from other housing units or other institutions, or transported with inmates from other institutions to the extent possible while at court.

- Upon return to the detention center, inmates should be quarantined if they were outside of the institution and were exposed to inmates from other housing units or locations (i.e., county jails).   Periodic testing of inmates with frequent court appearances should be considered.   The 14-day quarantine period must be restarted for any inmate who is in close contact with other inmates not from their housing unit or location.

## INTAKES

As we return to a more normalized inmate movement, the quarantine site model will no longer be utilized.   All inmates entering an institution will require enhanced intake procedures:

- Institutions are to designate specific quarantine and isolation areas in advance with capacity numbers commensurate with anticipated levels and frequency of incoming inmates.   Ideally, inmates should be quarantined or isolated in single-cells, if possible. When cohorting is necessary, the best practice is to keep cohorted inmates together and not add to the cohort when new intakes arrive.

- All new intakes should be screened for COVID-19 on arrival, to include a symptom screen, temperature check, and an approved viral PCR test (either an Abbott ID Now POC test or commercial send out lab test) performed on a sample obtained from a nasopharyngeal, mid-turbinate, or anterior nares swab.

  - Inmates who test positive and/or are symptomatic will be placed immediately in medical isolation.   They will remain in medical isolation until they meet the CDC symptom-based (for symptomatic inmates) or time-based (for asymptomatic inmates) release from isolation criteria.

  - Inmates who are asymptomatic and test negative are placed in quarantine. They will remain in quarantine until:

    - They become symptomatic during the quarantine period.   These inmates should be tested (Abbott or commercial) and placed in medical isolation immediately.   Depending on the housing circumstances, potential contacts (e.g., cellmate, cohort, housing unit) will need to reset their quarantine.   When risk of exposure and/ or spread of transmission is higher, re-testing of potential contacts could be considered.

- A testing frequency of every 3 to 4 days is preferred whenever feasible in consultation with the Regional Infection Prevention and Control Consultant and the Regional Medical Director.

- On or after 14 days.    The inmates who have remained asymptomatic will have a symptom screen, temperature check, and be tested with a commercial lab test.    Inmates should remain in quarantine status until test results are available.    If the test is positive, see above bullet. If the test is negative, the inmate may be released to General Population.

## MOVEMENT

Movement of inmates between BOP institutions can be a simple, short-distance transfer between two institutions or a complex, multi-day, multi-institution process.    The risk of COVID-19 exposure and transmission increases as the complexity of the move increases. Movement variables that increase the risk of COVID-19 exposure and transmission should be avoided whenever possible and include multiple stops, staff and agencies; and potential mixing with other inmate groups from other BOP facilities or other correctional jurisdictions. However, even a direct movement from one facility to another is not without some degree of risk due to the characteristics and communicability of COVID-19.    Refer to the HSD Guidance (6/19/20) for Inmates who are transferring or Releasing from a BOP Facility,
https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/guidance_for%20_transferring_or%20releasing%20inmates_20200619.pdf

- As inmate movement operations move toward "normalizing", the number and complexity of inmate moves will increase.    This process of normalizing should be done in a measured approach to allow institutions, regions and the agency develop best practices moving forward.

- Institutions/ Regions should evaluate their space and staffing resources to accommodate increased numbers of the various types of quarantine inmate groups (intake, exposed and pre-release) as well as isolation inmates in various stages of the process.    Various and/or large groups of quarantine and isolation inmates may require a re-distribution of inmates amongst institutions within a region.

- The first step in ensuring safe inmate movement is a full test-in/out, 14-day pre-release quarantine of transferring inmates prior to transport.

  o Planning an inmate move should occur with enough time in advance to allow for a full test in/out 14-day quarantine and turnaround time for test results (21 days).

o Planning should be coordinated with all the institutions involved from the beginning stages so that setting of dates will allow for the above process to occur for all the potential inmates on that move.

o Inmates who have tested negative at the completion of their quarantine should stay in quarantine status until they are transferred, preferably within 5 days of the negative result, but may still move within 14 days of the negative result.

o If an inmate develops symptoms and/or tests positive, they will not be permitted to travel until they have met the CDC symptom or time-based criteria for release from isolation. On rare occasions, there may be exceptions where an inmate must travel prior to the completion of this process or even with a positive result (e.g., court ordered transfer). In these cases, the transfer must be discussed and approved by local executive staff from the institutions and regions involved with input from health services staff, as needed.

o For inmates who have previously tested positive for COVID-19: (refer to https://sallyport.bop.gov/co/hsd/infectious_disease/covid19/docs/covid19_testing_expanded_inmate_testing_strategies_2020619.pdf)

- If they meet CDC release from isolation criteria and are within 90 days of their original COVID-19 diagnosis (initial symptom onset for symptomatic patients or initial positive COVID-19 test for asymptomatic patients), they do not need any further testing or quarantine prior to transfer.

- If they meet CDC release from isolation criteria but are more than 90 days out from their original COVID-19 diagnosis, they should be placed in quarantine and tested just like an inmate who has never had the infection.

- If the test is positive, they cannot travel and must be placed in isolation until they meet the CDC release from isolation criteria.

- Planning of inmate movement should be coordinated with close involvement of local Executive Staff, CMC, Unit Team, and Health Services staff from all involved institutions/regions and transport agencies. Communication and accurate information are vital to ensure a proposed inmate movement has minimized any potential risk of COVID-19 exposure/transmission.

- To the extent possible, manifests should be generated that allow for appropriate social distancing during transport (e.g., loading a bus/ plane at 50% capacity).

- "Normal" transport routes and schedules will need to be reviewed and reconsidered. Inmate movement should be coordinated in a manner that:

    o **Has minimal stops/holdovers:** e.g., consider institutions meeting at a halfway point to pick-up inmates rather than having multiple stops and holdovers.

    o **Minimizes the amount of time inmates are held in holdover:** the longer an inmate spends in transit, the greater the risk. The frequency of certain drop offs/pick-ups may need to be increased to minimize holdover times.

    o **Avoids mixing of inmate groups** as much as possible:

        ▪ The following Inmate group terms will be defined as follows:

            • **BOP group** - inmates who have completed a full test in/out pre-release/transfer quarantine process prior to transfer from a BOP facility.

            • **Non-BOP group** - inmates from other agency/correctional jurisdiction who have not undergone a full test in/out quarantine.

        ▪ Maximize runs with only BOP groups; make every effort to coordinate runs for Non-BOP groups separately.

        ▪ There are many scenarios where mixing of BOP groups from different BOP institutions is unavoidable. If all BOP-groups have been properly tested in/out of a pre-release/transfer quarantine just prior to transport at their sending institution, this practice is acceptable.

        ▪ Ideally, any non-BOP group during a transfer will have been tested for COVID-19 prior to transport.   However, this is often not possible or verifiable.   All non-BOP group inmates must have a temperature check and symptom screen immediately prior to transport.   Anyone with a known positive COVID-19 test or who has fever or symptoms will not be admitted on the transport.

        ▪ If a BOP group is mixed with a non-BOP group at any point in the transfer process, all the inmates in that group will require intake screening, testing

and intake quarantine (asymptomatic) or isolation (symptomatic) at their destination institution.

- During transport, BOP-group inmates should wear at least facial coverings and staff should wear at least facial covering and gloves. For transport of Non-BOP or mixed groups, inmates should wear surgical masks and staff should wear surgical masks and gloves during transport and add gown and eye protection with direct contact.

- Documentation on the BEMR exit summary/transfer paperwork (e.g. In-Transit Form) needs to include results of the symptom screen and temperature check performed within 24 hours of release or transfer; the most recent COVID-19 test result; and the inmate's COVID-19 history.   To ensure proper documentation of negative COVID-19 testing from a commercial lab is displayed on the exit summary, the **BOP ICD code of Z03818-c19** will need to be added to the inmate's health problem list.   This marking will then display properly upon the inmate Exit Summary.   The BEMR Exit Summary/transfer paperwork should be provided to the bus LT/USMS to verify that a commercial lab test has been completed with a negative test result.

- **Holdover Sites/Bus Hubs:**

  o Holdover/ Bus hub sites should designate specific holdover quarantine areas in advance in numbers commensurate with anticipated levels and frequency of incoming inmates.

  o For BOP group transfers that have not mixed with Non-BOP groups and require holdover at a facility, the BOP groups can generally be placed directly into a holdover unit setting without a test in/out process and do not need to complete a full 14-day quarantine prior to moving on to their next destination.

  o These holdover groups should be housed separately from the new intake, post-exposure and prior to release/transfer* quarantine groups at that institution.

    *Note there is a distinction between inmates coming from another institution in holdover status waiting to "transfer"/continue on to their next destination vs. inmates that are originating from the holdover site and waiting to transfer.

  o The various holdover groups may be housed together, if necessary.

  o If a holdover site/bus hub is known to receive Non-BOP groups, they should consider having designated quarantine/isolation units for them and manage them as new intakes.

- Those inmates that are symptomatic and/or test positive must be placed in medical isolation and can be released after meeting CDC symptom- or time-based criteria for release from isolation into general population or transfer. If transfer is to occur more than 90 days from their initial symptom onset (symptomatic cases) or positive COVID-19 test (asymptomatic cases), the inmates will need to be quarantined and tested prior to transfer.

- Those who are asymptomatic and test negative will be placed in quarantine. When they complete quarantine and test-out:

  - Inmates who are expected to remain at the holdover site for a prolonged period of time can be released to General Population. If they are released to General Population, future transfers will require pre-transfer test-in/test-out quarantine.

  - For those inmates expected to transfer within a reasonable period of time, they should remain in quarantine until their transfer date. They should transfer within 14 days of the test-out negative result or be re-tested prior to transfer.

- If a holdover site/bus hub receives a mixed group of BOP and Non-BOP groups or BOP group that has previously mixed with a Non-BOP group, they must now all be managed as a Non-BOP group.

## DESIGNATED (FINAL RECEIVING) INSTITUTIONS:

Transferred inmates will undergo the same process as a new intake, to include intake screen and temperature check, COVID-19 testing and isolation vs new intake quarantine at the final designated facility.   One exception to this process is the inmate who has previously tested positive, has met the CDC's symptom- or time-based release from isolation criteria, and is within 90 days of the initial symptom onset or positive test. Such cases do not need to be quarantined upon arrival at the designated facility.

## Questions

If staff have questions about COVID-19, they may reach out to the agency at the following email box: COVID19Questions@bop.gov.

We appreciate your assistance and cooperation in this important matter.

# Himlie Declaration – Attachment 5

*Mostafa v. Barr, et al.*,
No. 20-cv-00694-PAB-NYW (D. Colo.)