**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00694-PAB-NYW

MOSTAFA KAMEL MOSTAFA,

      Plaintiff,

v.

MERRICK GARLAND, United States Attorney General, in his official capacity,
CHRISTOPHER WRAY, FBI Director, in his official capacity,
MICHAEL CARVAJAL, BOP Director, in his official capacity,
B. TRUE, ADX Warden, in his official capacity,
UNKNOWN SAMs OPERATIVES, in their official capacities,
MACMILLAN, ADX Facilities Department, in his official capacity,
FOLLOWS, ADX Medical Department Manager, in her official capacity,
PARRY, ADX Officer, in his individual capacity,
AVERIT, ADX Officer, in his individual capacity,
GARDUNO, ADX Lieutenant, in his individual capacity,
LOWE, ADX officer, in his official capacity,
NORJANO, ADX Officer, in his official capacity, and
WILLIAM, ADX Nurse, in his official capacity,

      Defendants.

---

**MOTION TO DISMISS PURSUANT TO RULES 12(b)(1) AND 12(b)(6)**

---

ADX inmate Mostafa Kamel Mostafa—the radical jihadist known as "Abu Hamza al-Masri"— fomented terrorism across the globe, spearheading a deadly hostage-taking scheme in Yemen and establishing a jihad training camp in a remote Oregon town. He supported al Qaeda and the Taliban. He urged his many followers to gratuitously kill *kaffirs*, or non-Muslims. He is the patriarch of a family that includes two known terrorists and at least one other criminal. Here, he claims that rules governing his communications, as well as conditions at ADX, violate the Constitution. All remaining claims in the Second Amended Complaint, ECF No. 61 ("SAC"), fail.

# BACKGROUND

***Mostafa's history of terrorism and inspiring terrorists.*** Mostafa is serving a life sentence for convictions for conspiracy to take hostages, providing material support for terrorism, providing material support for al Qaeda, and supplying goods and services to the Taliban. *United States v. Mustafa*, 753 F. App'x 22, 26-27 (2d Cir. 2018). The trial court found that Mostafa would continue to "support and inspire others to acts of violence." Sentencing Tr. (excerpt), Ex. 1 at 73:9-12.[1]

Mostafa, the jihadist former imam of London's Finsbury Park mosque, told his followers it was "okay" to kill non-Muslims "even if there's no reason for it," and that "[a]nyone can take a Kaffir, capture him, and enslave him, or 'even sell him in the market.'" *Mustafa*, 753 F. App'x at 27; *see also United States v. Mostafa*, 16 F. Supp. 3d 236, 258, 267 (S.D.N.Y. 2014). He was the mouthpiece for a terrorist group known as the Islamic Army of Aden. Trial Tr. (excerpts), Ex. 2 at 3476:16-22. He aided and abetted that group in kidnapping 16 non-Muslim tourists in Yemen, including two Americans, to attempt to compel the Yemeni government to release his followers from custody. *Mostafa*, 753 F. App'x at 27. Those followers included his stepson, Mohsin Ghalain, and his son, Mohammed, who was fleeing authorities at the time. Ex. 2 at 3502:2-3503:14, 3505:10-3506:6, 3506:17-19. Four hostages died in the kidnapping. *Mustafa*, 753 F. App'x at 27.

Mostafa sent followers to Oregon to set up a jihad training camp. *Mustafa*, 753 F. App'x at 42-43. He professed his "love" for Osama bin Laden and extolled him as a "hero." Ex. 2 at

---

[1] On a motion to dismiss, a court may consider documents incorporated by reference, documents referred to in the complaint that are central to the claim, and matters subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 20201). Publicly filed court records, including transcripts, are subject to judicial notice. *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

3515:25-3516:4, 3516:18-23, 3517:3-16, 3523:10-25; *see also Mustafa*, 753 F. App'x at 27-28. He

praised al Qaeda's murderous attacks on the World Trade Center and the USS *Cole*—the latter

being "something for Muslims to … rejoice" about. *Mustafa*, 753 F. App'x at 28; *Mostafa*, 2014

WL 1621277, at *2 (S.D.N.Y. Apr. 22, 2014); Ex. 2 at 3530:5-11, 3531:20-22. He sent a follower

to an Qaeda-run terrorist training camp in Afghanistan and urged his followers to support the

Taliban in Afghanistan. *Mustafa*, 753 F. App'x at 28, 32; *see also United States v. Mostafa*, 965 F.

Supp. 2d 451, 457 (S.D.N.Y. 2013). Mostafa spent eight years in prison in the United Kingdom—

where he was caught with a bomb-making manual—before being extradited to the United States in

2012. *Mustafa*, 753 F. App'x at 39; *Mostafa*, 965 F. Supp. 2d at 454-55.

 ***Mostafa's SAMs.*** The Attorney General has imposed Special Administrative Measures

("SAMs") on Mostafa pursuant to 28 C.F.R. § 501.3. Oliver Decl., Ex. 3 ¶ 5, Att. 1 (January 2021

SAMs). The SAMs detail Mostafa's history as a terrorist whose footprint spans the globe, from

Yemen to Oregon to al Qaeda and Taliban enclaves in Afghanistan. Att. 1 at 2-3. The SAMs

describe his inspirational "leadership of thousands of followers," at least four of whom have been

incarcerated at ADX under SAMs—including "Shoe Bomber" Richard Reid and Zacarious

Moussaoui, the "20th hijacker." *Id.* at 2; *United States v. Moussaoui*, 591 F.3d 263, 275 (4th Cir.

2012). Mostafa's "ability and willingness to incite others to commit violence, terrorism, and

murder," supported national security officials' conclusion that "communications made or received

by [Mostafa] could pose an operational threat, even though he is incarcerated." Att. 1 at 2, 4.

 The SAMs allow Mostafa to communicate in writing, by telephone, and via personal visits

with members of his immediate family, other authorized contacts (his grandson Belal and a

clergyman named Stephen Coles), and attorneys. *Id.* at ¶¶ 1.c, 2, 3. He may request additional

contacts who are evaluated "on a case-by-case basis." *Id.* at 10 n.7; Ex. 3, Att. 4, 10/30/2017 Belal modification; *id.* Att. 2, 7/20/2016 Coles modification. He can communicate with consular and government officials, *id.* Att. 1 ¶¶ 3.g., 11, and with other inmates during predesignated times. *Id.* ¶ 1.c.ii. He cannot communicate with three of his sons because they are themselves terrorists or other criminals: Mohammed, who was arrested in connection with the Yemen kidnapping plot; Imran, who has been incarcerated in the United Kingdom; and Sufyan, who was recently involved in fighting in the Syrian civil war. *Id.* ¶ 3.a.i.; *see also id.* Att. 3, 9/20/2016 Mohammed/Imran Modification; *id.* Att. 5, 7/29/2019 Sufyan Modification. Neither is he allowed to communicate with Mohsin Ghalain,[2] his step-son and co-conspirator in the Yemen kidnapping plot. SAC at 10 ¶ 11; Ex. 2 at 3477:11-3478:3, 3502:2-3503:14.

  ***Grounds for dismissal of remaining claims.*** In <u>Claim 1</u>, an official-capacity claim, Mostafa alleges that the SAMs violate his First Amendment rights. But the Tenth Circuit and courts in this district have repeatedly upheld such restrictions in cases like these, where there is a rational relationship between the restrictions and the plaintiff's crimes and his ongoing ability to harm national security. <u>Claim 2</u>, an Eighth Amendment claim challenging Mostafa's conditions of confinement, fails because he has not alleged that the conditions are inhumane. Moreover, the claim is not redressable because Mostafa has the prostheses he needs, and has been offered new ones. The Court should refrain from implying a damages remedy in <u>Claim 3</u>, an Eighth Amendment *Bivens* claim for alleged excessive force in which Mostafa sustained no injuries. Countenancing a damages remedy in a context where an inmate faces no constraints on his ability

---

[2] Because Ghailan is not in Mostafa's "immediate family," he is not listed as a prohibited contact.

to manufacture allegations could grind prison operations to a halt. <u>Claim 5</u>, an official-capacity deliberate indifference claim, cannot proceed. The first allegation, that Mostafa (who has been vaccinated against Covid) faces an increased risk of contracting Covid because of the presentation of his prepackaged religious foods, does not demonstrate deliberate indifference. Neither does the second allegation, that a nurse on one occasion did not properly bandage Mostafa, whose hands were blown off in an explosion in 1993. That claim also fails for lack of standing and ripeness.[3]

## ARGUMENT

### I.    The SAMs do not violate the First Amendment (Claim 1, SAC at 7-12).

Mostafa raises myriad allegations about the ways in which his SAMs allegedly violate the First Amendment, but his core contention is that the measures are not supported by his purportedly benign "background." SAC at 8 ¶ 5. He wants the Court to "terminate the SAMs." *Id.* at 38 ¶ 2. Mostafa has alleged no facts that show the absence of a rational connection between the SAMs, or any component of them, and the penological interest in protecting national security.

***Legal standards.*** In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This deferential standard reflects the principle that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948), *overruled on other grounds*, *McCleskey v. Zant*, 499 U.S. 467 (1991). *Turner* likewise guides the analysis of free exercise claims. *Kay v.*

---

[3] Within the next week, Defendants anticipate filing an early motion for partial summary judgment because certain claims are unexhausted.

*Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (court first evaluates whether prison rule "substantially burdened sincerely-held religious beliefs," then balances the *Turner* factors).

Based on *Turner*, the Supreme Court has repeatedly held that First Amendment rights are appropriately curtailed in prison and that "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). The *Turner* test is satisfied if the officials, in their judgment, believe that the restriction would advance the desired goal. *See Johnson v. California*, 543 U.S. 499, 513 (2005) (*Turner* does not require proof that policy advances the stated goal, but only that officials "might reasonably have thought" the policy would advance the goal); *Beard v. Banks*, 548 U.S. 521, 535 (2006) (upholding restriction even absent showing that it had "proven effective"). In conducting this analysis, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132. "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Id.*

To survive a motion to dismiss, it is Mostafa's burden to account for the "core holding" of *Turner* by alleging facts showing "that there is no legitimate, rational basis" for the restrictions. *Al-Owhali v. Holder*, 687 F.3d 1236, 1239, 1241 (10th Cir. 2012) (upholding dismissal of First Amendment SAMs challenge). "Government conduct that would be unacceptable, even outrageous, in another setting may be acceptable, even necessary, in a prison." *Gee*, 627 F.3d at 1185. Mostafa must allege specific facts showing that the anticipated, "usual justifications" do not have a rational connection to the challenged restrictions—facts "that might well be unnecessary in other contexts to surmount a motion to dismiss[.]" *Al-Owhali*, 687 F.3d at 1240.

The government has a "uniquely federal penological interest in addressing national security

risks." *Rezaq v. Nalley*, 677 F.3d 1001, 1014 (10th Cir. 2012). While prison administrators are

entitled to substantial deference, *Overton*, 539 U.S at 132, that deference is even greater in the

realm of national security, where "conclusions must often be based on informed judgment rather

than concrete evidence[.]" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-36 (2010). That

predictive judgment receives deference because "it is not reasonably possible for an outside

nonexpert body to review the substance of such a judgment." *Dep't of Navy v. Egan*, 484 U.S. 518,

529 (1988). Based on this legitimate interest in protecting national security, the Tenth Circuit and

courts in this district have repeatedly upheld SAMs restrictions nearly identical to the restrictions

challenged here. *See*, *e.g.*, *Gowadia v. Stearns*, 596 F. App'x 667, 673 (10th Cir. 2014)

(recognizing the "obvious and reasonable relationship" between the crimes and "measures the BOP

implemented to restrict … communications."); *Al-Owhali*, 687 F.3d at 1241; *Abdulmutallab v.

Barr*, No. 17-cv-02493-RM-KMT, 2019 WL 4463284 (D. Colo. Sept. 18, 2019); *Nicholson v.

Brennan*, No. 15-cv-01999-KLM, 2017 WL 4337896 (D. Colo. Sept. 28, 2017); *Salim v. Sessions*,

No. 13-cv-03175-RM-CBS, 2017 WL 11487131 (D. Colo. May 2, 2017). The same reasonable

relationship between the offenses and the measures imposed is true of Mostafa's SAMs.

> **B.      The SAMs do not violate Mostafa's free speech or association rights.**

> **1.      Element not alleged: Absence of a rational basis.**

As in the cases in which the Tenth Circuit and this Court have upheld SAMs restrictions,

there is an "obvious and reasonable relationship" between Mostafa's crimes and the restrictions

imposed in the SAMs. The Attorney General determined that there is a substantial risk that

Mostafa's communications or contacts with persons could result in death or serious bodily injury

to persons. Mostafa was involved in at least four terrorism plots. Ex. 3, Att. 1 at 2-3 (describing

Yemen hostage-taking, Oregon terrorist training camp, and Mostafa's support for al Qaeda and the

Taliban). The Attorney General noted Mostafa's "long held ties to senior-level terrorist leaders" and the sprawling network of terrorists Mostafa had spawned, including many who became ADX inmates. *Id.* at 2-3. The Attorney General considered Mostafa's demonstrated appeal to "thousands of followers," his "continued following by extremists," and his "willingness and ability to motivate [his] followers to engage in acts of violence, terror, and murder." *Id.* at 4. The restrictions the Attorney General implemented on Mostafa's communications are more than rationally related to the government's legitimate penological interest in protecting national security.

In the face of this overwhelming record, Mostafa's conclusory allegations are wholly insufficient to allege that the SAMs are not reasonably related to the penological interest of protecting national security. He attempts to portray himself as upstanding, SAC at 8 ¶ 5, but nowhere in his prolix complaint does he show, based on well-pleaded facts, that the government lacks any legitimate, rational basis for the restrictions. And even if Mostafa had told officials he will not engage in jihad in the future—which he does not allege—officials would not be obliged to believe him. *Turner* does not focus on whether the challenged restrictions are actually necessary, but on whether Defendants might rationally believe they advance the stated national security interests. *See Johnson*, 543 U.S. at 513; *Sperry v. Werholtz,* 413 F. App'x 31, 40 (10th Cir. 2011) (finding that it was irrelevant whether prison policy actually advanced legitimate interests, and that "[t]he only question" is whether the judgment of prison officials "was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests").

Because officials cannot know with certainty Mostafa's true beliefs, they must exercise predictive judgment, which receives substantial deference and must be upheld if there is any rational basis for the restrictions. *Overton*, 539 U.S. at 132; *Humanitarian Law*, 561 U.S. at 34-35.

Mostafa's allegations cast no doubt on the fact that Defendants might reasonably believe that the SAMs advance national security interests in light of his crimes, his exhortation to compliant followers to kill *kaffirs*, and the other facts detailed above. He fails to state a claim.

### 2. Element not alleged (individual measures): Absence of a rational basis.

So too are Mostafa's allegations insufficient to allege that any particular SAMs restriction is not reasonably related to the legitimate penological interest of protecting national security.

### *Rational basis for ban on communications with sons/stepson involved in terrorism*.

Mostafa complains that he cannot communicate with "three of my sons and my stepson": Mohammed, Sufyan, and Imran Mostafa and Mohsin Ghailan. SAC at 10 ¶ 11. There is plainly a rational basis for those restrictions. As discussed above, Mostafa conspired with Ghailan, his stepson, to carry out the kidnapping plot in Yemen. His son Mohammed was also in Yemen at the time of the kidnapping, wanted by the authorities and seeking to avoid capture. Ex. 2, 3505:10-3506:6, 3506:17-19. It is rational to restrict communications between a SAMs inmate and family members who have been involved in the same criminal enterprise. *Cf. Nicholson*, 2017 WL 4337896, at *5 (upholding restriction between SAMs inmate and son). Officials can rationally determine that eliminating communications between Mostafa and family members who share his proclivity for terrorism may prevent or deter Mostafa from attempting, through those family members, to incite yet more acts of terrorism. That goes not only for Ghailan and Mohammed, but also for Sufyan, who is known to have recently traveled to fight in Syria in a civil war in which many terrorist elements are involved. Ex. 3, Att. 1 at 4; *id.* Att. 5 (Sufyan Modification). There is similar support for the prohibition on Mostafa's communicating with his son Imran, who, like his father, has been imprisoned in the United Kingdom. *Id.* Att. 3. It is rational for national security officials to conclude that it is dangerous to open a communications pipeline between the jihadist

9

Mostafa and convicted criminals in the country where he first garnered thousands of followers. Mostafa's pleading does not attempt to address this clear national security rationale.

In sum, any claim challenging the bar on Mostafa's communications with his sons and stepson is not plausible because his pleading does not address the coherent security rationale for the restrictions. *See Al-Owhali*, 687 F.3d at 1241 (upholding dismissal of First Amendment claim where SAMs inmate did "not rebut in his pleadings" the government's "coherent explanation" that communications with his contacts could result in death or serious bodily injury).

***Rational basis for requiring that Mostafa obtain approval to communicate with his grandchildren.*** Mostafa apparently complains that he cannot communicate with seven of his eight grandchildren, SAC at 10 ¶ 11, but that fact likewise does not show the absence of a rational connection between that measure and the penological interest in protecting national security.

Mostafa must request that his grandchildren, who do not fall within the SAMs definition of immediate family, be added to his list of contacts. Ex. 3, Att. 1 at 10 n.7. He did that for his grandson Belal, who was approved. *Id.*, Att. 4. But Mostafa does *not* allege that he used this established procedure to request that he be allowed to contact his other seven grandchildren, or how national security officials responded. And some of those grandchildren may be the children of prohibited contacts—like Mostafa's co-conspirator Ghailan—who could serve as conduits for unauthorized communications with their parents. That would be an obvious legitimate penological justification for prohibiting communications with the children. Furthermore, the mere allegation that Mostafa cannot communicate with all of his grandchildren fails to demonstrate the absence of a rational basis for that rule. Children, of course, are highly vulnerable to influence. The government has a legitimate interest in preventing Mostafa from attempting to inspire his grandchildren, as he has inspired his sons and many others, to follow his path of terrorism.

***Rational basis for rejecting one piece of mail.*** Mostafa claims there are "too many" rejections of his mail, but his only nonconclusory allegation is that a single letter was rejected when he told his son not to pass a message to his grandson. SAC at 11 ¶ 11. His view is that this rejection showed overreach by national security officials. But Mostafa has not alleged facts showing that this mail rejection, or any other, lacked a legitimate, rational basis. Those charged with preventing Mostafa from inspiring deadly terrorist attacks interpreted the letter "as an exhortation to the recipient to forward the quoted language to the third party[.]" Ex. 3, Att. 1 at 3. As the SAMs explain, the implicit import of Mostafa's message was to encourage the recipient to convey a message to an unapproved contact without requiring Mostafa to follow the established process for requesting additional contacts. *See id.* at 10 n.7. There is an obvious, rational connection between requiring Mostafa to follow this rule and his strident commitment to violent jihad—including inspiring his own sons and stepson to commit crimes.

***Rational basis for the SAMs protocols regarding contacting attorneys.*** Mostafa mischaracterizes the SAMs, which impose no prohibition on his contacting lawyers—including "human rights" and "British lawyers." SAC at 10 ¶ 10. He can request permission to contact any attorney he chooses to discuss possible legal representation, and he has done so. Ex. 3, Att. 6, 3/16/2020 Attorney Swift Modification; *see also id.* Att. 1 § 2. Mostafa has not alleged that a specific request from him to contact an attorney has been denied. And there is plainly a legitimate, rational basis for including attorney communication protocols in the SAMs. *See United States v. Stewart*, 590 F.3d 93, 101-08 (2d Cir. 2009) (incarcerated terrorist used attorney to circumvent SAMs to transmit messages to foreign terrorists).

To the extent Mostafa attempts to plead an access-to-courts claim, he fails. He has not alleged that he has been frustrated in his ability to prepare or file a suit or prevented from achieving

a now-unobtainable result in past litigation. *See Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002). He is pursuing a plethora of claims here. And while the Supreme Court denied his petition for a writ of certiorari months ago, *see* 140 S. Ct. 274 (Oct. 7, 2019), the court in his criminal case recently ordered his multiple attorneys to file a motion for compassionate release on his behalf. *See Mustafa*, No. 04-cr-00356-AT (S.D.N.Y.), ECF Nos. 568, 576, 589.

**C.     The SAMs do not violate Mostafa's free exercise rights.**

Next, Mostafa presents a cursory laundry list of alleged "SAMs religious violations." SAC at 11 ¶ 12. These conditions are not imposed by the SAMs. Regardless, each subclaim lacks merit.

**1.     Group prayer: No subject-matter jurisdiction/absence of rational basis.**

*The claim is moot.* Mostafa claims to have "no communal prayer even once a week or a year (compulsory)." SAC at 11 ¶ 12. This subclaim is moot because the former prohibition on congregate prayer has been removed from the SAMs of all ADX inmates, including Mostafa. Ex. 3 ¶ 6 & Att. 7 (3/18/2021 modification). Like inmates in the ADX general population, SAMs inmates now have an opportunity to pray together while they are "at their regularly-scheduled outside recreation" multiple times per week. *Id.* ¶¶ 6-8 & Att. 8.

Because Mostafa has access to group prayer at least once a week, he "no longer suffers actual injury that can be redressed by a favorable judicial decision." *Ind v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1213 (10th Cir. 2015). "[G]ranting a present determination of the issue" will have no "effect in the real world"—the "crucial question" for mootness. *Brown v. Buhman*, 822 F.3d 1151, 1165-66 (10th Cir. 2016). The Court should dismiss this moot claim.

*No allegations showing absence of a rational basis.* Even if the claim were not moot, Mostafa has not alleged the absence of a legitimate, rational basis for limiting group prayer for

SAMs inmates at ADX to outdoor recreation times when the inmates are already out of their cells.

As an inmate, Mostafa has no entitlement to a particular form of group prayer under the Free Exercise Clause. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351-52 (1987) (under *Turner*, prison officials were not required to provide Jumu'ah, even though there were no alternative means of attending Jumu'ah). As Tenth Circuit precedent makes clear, even a complete prohibition on group religious services for maximum-security inmates does not violate the Free Exercise Clause in light of legitimate prison security interests. *Williams v. Miller*, 696 F. App'x 862, 863 (10th Cir. 2017). Given this holding, the more lenient rule allowing group prayer for SAMs inmates at outdoor recreation is clearly constitutional.

Mostafa does no more than allege that he cannot engage in group prayer, and that bare allegation is insufficient to rebut the obvious, rational connection between the SAMs prayer rule and the legitimate penological interest in protecting institutional security. The ADX houses "the most violent, dangerous, and disruptive inmates in the federal prison system[.]" *Hall v. Oliver*, No. 15-cv-01949-RBJ-MJW, 2017 WL 3723250, at *3 (Aug. 29, 2017). There is risk every time a correctional officer (or another inmate) comes into contact with ADX inmates. *United States v. Petty*, 856 F.3d 1306, 1308 (10th Cir. 2017) (inmate assaulted three ADX officers); *see also Williams*, 696 F. App'x at 863 (prohibition on group prayer "rationally connected to the safety and security risks associated with escorting maximum-security inmates to and from group activities"). The decision to manage that risk by limiting group prayer to regularly scheduled outdoor recreation times is a plainly rational approach under *Turner*. Mostafa alleges no free exercise violation.

### 2.     Imam: No allegations of substantial burden/absence of rational basis.

Mostafa, himself a former imam, complains that he has insufficient contact with an imam. SAC at 11 ¶ 12. This subclaim has nothing to do with SAMs, which do not prohibit contact with

BOP Religious Services personnel. *See* Ex. 3, Att. 1. The claim should not proceed.

Mostafa's allegations that he saw the BOP imam a short time each month before Covid and not at all since March 2020, SAC at 11 ¶ 12, are insufficient to allege a substantial burden on a sincerely held religious belief. Mostafa, who does not contend that other chaplains are unavailable, has not pleaded that not seeing an imam "(1) requires [him] to participate in an activity prohibited by a sincerely held religious belief, (2) prevents [him] from participating in an activity motivated by a sincerely held religious belief, or (3) places considerable pressure on [him] to violate a sincerely held religious belief[.]" *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014).

"[I]t is well-settled that the First Amendment does not require prison administration to provide inmates with the chaplain of their choice." *Hartmann v. Cal. Dep't of Corr.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (discussing cases and citing *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (observing that ministers do not need to be provided for every faith group represented in a prison)). Moreover, Mostafa can request that his SAMs be modified to allow him to contact a spiritual advisor of his choosing; indeed, he is already permitted to contact one clergyman. *See* Ex. 3, Att. 1 at ¶¶ 1.c, 2, 3; *id.* at 10 n.7; *see also id.* Att. 2. He can request contact with an imam, too.

Neither has Mostafa alleged facts showing the absence of a rational connection between limitations on his contact with an imam at ADX and any legitimate penological interest. Prisons have obvious, legitimate budgetary limitations that may impact their ability to recruit or retain clergy or religious volunteers in sufficient numbers to give every inmate the amount of contact with clergy he seeks. *See Ajaj v. Fed. Bureau of Prisons*, No. 15-cv-00992-RBJ-KLM, 2018 WL 4356787, at *6 (D. Colo. Sept. 13, 2018) (in rejecting imam-access claim under Religious Freedom Restoration Act, noting difficulties in recruiting and retaining full-time imams). Mostafa has not

14

alleged that BOP lacks a legitimate penological interest in hiring an imam who can meet its educational requirements for chaplains, who can pass a security check, and who is willing to work with ADX inmates. *See id.* Any claim concerning an imam fails.

### 3. Meals: No allegations of substantial burden/absence of rational basis.

Mostafa's cursory reference to "no feast meals allowed according to Islamic faith," SAC at 11 ¶ 12—another supposed deprivation unrelated to his SAMs—states no plausible claim. Mostafa does not attempt how this lack of access to "feast meals" imposes a substantial burden. He does not allege what foods he believes he must eat, or when; what foods he has requested but not received; or what (if any) steps he took to let prison officials know that he wanted those foods.

Neither has Mostafa alleged the absence of a rational basis for established BOP rules governing religious ceremonial meals. By policy, an inmate like Mostafa who has selected a certified religious menu for his daily meals, *see* SAC at 61, 1/23/2020 Modified Diet Request, is not allowed to participate in a religious ceremonial meal. 8/13/2019 Memorandum re: Ceremonial Meal Guidance, Ex. 4 at 1 (inmates on religious diets "will receive the Certified Food Menu … for the ceremonial meal"); *see also* Program Statement 4700.06, *Food Service Manual* (Sept. 13, 2011), at 24 (stating same rule), available at https://www.bop.gov/policy/progstat/4700_006.pdf; *Matthews v. Wiley*, 744 F. Supp. 2d 1159, 1172 (D. Colo. 2010) (BOP policies subject to judicial notice). His barebones allegation that he hasn't received "feast meals" is wholly insufficient to demonstrate that this rule lacks a rational basis. As the policy indicates, the rules surrounding ceremonial meals are meant to maintain "equity in menu design." *See* Ex. 4 at 2. Mostafa's failure to plead that this approach lacks a rational basis requires dismissal of the claim.

    **4.**  **Other allegations: No substantial burden/absence of a rational basis.**

The remaining extraneous, cursory allegations do not state plausible free exercise claims.

*Allegations about performing daily prayers.* Mostafa appears to contend that he cannot wash himself properly and therefore cannot "pray his minimum 5 times" per day. SAC at 11 ¶ 12. This is insufficient to allege a substantial burden because Mostafa pleads no facts concerning (a) the specific scope of the washing he believes he must do, or (b) why he cannot perform that washing in a cell that contains both a shower and sink. He certainly hasn't alleged a substantial burden on accomplishing the simple washing ritual described in BOP policy—each portion of which can be accomplished with a sink alone. *See* Technical Reference Manual 5360.01, *Inmate Religious Beliefs and Practices* (March 27, 2002), at p. 2 (describing handwashing, rinsing the mouth, sniffing water, and washing the face and feet), available at https://www.acfsa.org/documents/dietsReligious/FederalGuidelinesInmateReligiousBeliefsandPractices032702.pdf. Mostafa has not plausibly alleged, nor could he, that he cannot do these simple tasks using the means at his disposal for cleaning himself.

Neither is Mostafa's terse allegation about daily prayer sufficient to suggest the absence of a rational basis for not providing him "help" with the washing ritual. *See*, *e.g.*, SAC at 9, 11 ¶¶ 6-8, 12. To the extent he desires a personal servant to wash him five times a day, he has not alleged that prison officials lack a rational basis for refusing that extraordinary demand. The claim fails.

*Allegations about removal of body hair.* Mostafa's cryptic allegation concerning his inability to "remove hair from private areas," *id.* at 11 ¶ 12, states no claim. He has not alleged that his inability to remove this hair is connected to any religious belief, let alone how it imposes a substantial burden on a sincerely held belief. Nor has he alleged that government officials would

act irrationally in refusing an inmate assistance in removing hair from "private areas."

***Allegations about haircuts and beard.*** Mostafa contends he went without a haircut in "COVID time" and that he is unable to maintain a "long beard." *See id.* Here, again, Mostafa has alleged no facts that allow the Court to discern whether he has a sincerely held belief about having short hair and a long beard, or about how his current circumstances might burden that belief. Mostafa makes no allegations connecting his complaints about his hair and beard to the free exercise framework.[4] He pleads no free exercise violation on this, or any other, basis.

The Court should dismiss Claim 1.

## II.   Mostafa's conditions-of-confinement claim cannot proceed (Claim 2, SAC at 13-17).

This Eighth Amendment claim is premised on the contention that ADX conditions increase Mostafa's risk of contracting Covid. SAC at 13-17, ¶¶ 1, 4, 7, 13-14. Mostafa has not alleged constitutionally inhumane conditions, nor can he show that the claim is redressable.

### A.   Mostafa fails to allege an Eighth Amendment violation.

Mostafa must allege an "extreme deprivation[]" taken with a sufficiently culpable mental state. *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992). That requires allegations showing a deprivation that is "'objectively, sufficiently serious'" such that "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). He must also allege that a prison official has "a sufficiently culpable state of mind" that amounts to "deliberate indifference" to his health or safety. *Id.* at 834. "A prison official cannot be found liable under the Eighth Amendment for denying an inmate

---

[4] Mostafa's assertion that he is subject to "discrimination" because he cannot cut his own hair, SAC at 11 ¶ 12, is silly. The idea that any ADX inmate can have scissors is wholly implausible.

humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Mostafa's allegations must demonstrate a criminally reckless state of mind, a high standard that isolates those who seek to punish. "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id.* at 837, 839.

> ***Element not alleged: Objective deprivation.*** Mostafa has not alleged that he is exposed to objectively inhumane prison conditions. *Id.* at 838.

He alleges that Covid is "raging," SAC at 17, ¶ 13, but he pleads no facts plausibly indicating how that amounts to an objective deprivation, where he is fully vaccinated. He does not allege that he has ever been exposed to anyone with Covid, or that any inmate in his housing unit ever contracted it. Mostafa's vague allegations about "fittings," *see id.* ¶¶ 6-7, 9, 13-15, similarly fails to show a deprivation of constitutional magnitude. He has not alleged how being provided with custom-made prostheses plausibly demonstrates a denial of the minimal civilized measures of life's necessities. He asserts BOP is not complying with the recommendation of an "OT in 2013," *id.* ¶ 10, but he does not allege what that person recommended that he has not received. Similar vagueness marks his conclusory allegations concerning his cell in another prison. *Id.* ¶ 5. He does not plead specific facts plausibly demonstrating that his current ADX cell is the "opposite" of that one or explaining why BOP needs to "replicate" that cell in order to satisfy the Constitution. *Id.*

Mostafa asserts that "all" of his "medical & disability" records indicate that he is "in dire need" of assistance by persons to carry out basic daily tasks," *id.* ¶ 9, but he points to no specific record reflecting any such statement. Neither do his allegations plausibly demonstrate that he

18

cannot be self-reliant with the prostheses he has—including using those devices to pick up his clothes and place them in a laundry bag. *Id.* ¶ 8. And the allegation that one of the handicapped-accessible cells in his housing unit, cell 300, is a "dark, dangerous infected cell" where he "*use[d] to* get injured almost weekly," *id.* ¶ 13 (emphasis added), is utterly conclusory. There are no factual specifics concerning the "dangers" of this cell or how those conditions have injured him, nor has he alleged that he is likely to be housed in cell 300 for any significant period ever again.

In sum, Mostafa has not alleged facts showing that he faces conditions falling below the minimal civilized measure of life's necessities.

***Element not alleged: Subjective culpable intent.*** If the Court considers the subjective element, Mostafa has not alleged that any prison official was actually aware of, but chose to disregard, an excessive risk to his health or safety. *Farmer*, 511 U.S. at 839. There are no facts showing that any official believed that Mostafa faced an "excessive risk" to his health and safety, let alone that they then disregarded that risk.

Mostafa has not alleged that any BOP official acted with criminally reckless intent when it comes to Covid, where officials have ensured that he received a vaccination. He has also been provided prostheses that are designed to replace the function of his missing hands. SAC at 15, 17, ¶¶ 8, 13. This context permits no inference that any prison official possesses a subjective belief, rising to the level of criminal recklessness, that Mostafa is unable to function in his cell. Nor has he pleaded facts showing that any official is aware of his alleged "pain and agony" and "dire" conditions. *Id.* ¶¶ 9, 12, or his attempt "to avoid "bleedings and injuries." *Id.* ¶ 13. And if he intends to suggest that someone refused to treat his "alleged cuts and injuries," *id.*, he doesn't identify them or plead facts showing that they acted with culpable ill intent.

Mostafa also has not alleged that any official acted with a criminally reckless state of mind concerning his prostheses or the construction of his cell, including his shower, toilet, sink, or any other item. That includes his unit manager, who allegedly told Mostafa to clean his cell. *Id.* ¶ 13. He alleges no facts to support the contention that his unit manager "pushes staff to threaten him if he does not clean his cell." *Id.* And telling an inmate that he will be moved to a different cell in the same housing unit—a decision well within the unit manager's discretion—also evinces no criminally reckless intent. *Id.* In short, he does not allege that any official knew of facts, and actually inferred, that he faced a substantial risk of serious harm.

### B.      Element not met: Redressability of the claim.

To satisfy the case-or-controversy requirement of Article III, Mostafa must establish an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Mostafa cannot show that his claim is redressable: he has the prostheses he needs to be fully functioning; moreover, BOP stands ready to give him brand new prostheses.

BOP fitted Mostafa for prostheses for both arms, which he received in March 2013. Chorosevic Decl., Ex. 5 ¶¶ 7-8.[5] As the BOP's Director of Rehabilitation Services attests, Mostafa's prostheses are the most commonly prescribed in the United States and "are highly effective in allowing amputees to compensate for their lack of hands" *Id.* ¶¶ 14-15; *see also* Fellows Decl., Ex. 6 ¶¶ 7-8, 10 (describing items given to Mostafa to enhance function of prostheses). These devices allow Mostafa to perform all activities of daily living in his assigned

---

[5] The Court can consider evidence in support of a Rule 12(b)(1) motion without converting it to a summary judgment motion. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).

cell at the ADX, including brushing his teeth, combing his hair, opening jars and tubes, and cleaning his cell. Ex. 5 ¶¶ 10, 16, 19; Ex. 6 ¶ 9. Mostafa also accomplishes sophisticated tasks that "require[] significant dexterity and precision." Ex. 5 ¶¶ 20-22 (describing Mostafa's legible handwritten notes taped to cell walls). His prostheses have been found to function properly, indicating that "any claim from him of lack of independence was a result of underutilization of these essential devices." *Id.* ¶ 22; *see also id.* ¶¶ 9, 13 (discussing repair records).

With access to these high-functioning prostheses, Mostafa cannot show that his claim would be redressed by a favorable decision. Moreover, even if new prostheses were a medical necessity—which they are not, *id.* ¶ 19—an order directing BOP to provide them would have no effect. BOP officials stand ready and willing to provide him new prostheses, even though he has repeatedly refused this offer and obstructed efforts to evaluate him. Ex. 6 ¶¶ 11-20.

Neither can Mostafa show that any claim about his cell is redressable. His cell complies in all respects with the Architectural Barriers Act, 42 U.S.C. § 4151 *et seq*. McMullen Decl., Ex. 7 ¶¶ 5-7.[6] Mostafa's cell is more than double the size of standard ADX cells and contains numerous other amenities and safety features. *Id.* ¶¶ 7-8. Mostafa cannot show that these conditions have caused him an injury that can be redressed by a favorable judicial decision. *See* Ex. 6 ¶¶ 21-24. The Court should dismiss Claim 2 because it is not redressable.

## III.   There is no damages remedy for the alleged excessive force (Claim 3, SAC at 18-20).

Mostafa brings an Eighth Amendment *Bivens* claim against Garduno, Parry, and Averitt

---

[6] Mostafa characterizes cell 300 as "dangerous," SAC at 17 ¶ 13, but cells 300 and 511 are nearly identical. Ex. 7 ¶¶ 6-10. But ADX officials have accommodated Mostafa's preference and allow him to live in cell 511, which he leaves only for occasional cell searches. Mostafa has been housed in cell 300 less than two days since June 2020. Ex. 6, Att. 1 at 1.

("Officers"), who allegedly used excessive force on October 28, 2019, after Mostafa refused to cooperate with a medical assessment in connection with a hunger strike. SAC at 18-19; *id.* at 19 & Ex. 6, Att. 9 (incorporated hunger strike assessment).[7] On the well-pleaded facts here—including a hunger strike assessment showing the only injury he had was self-inflicted, Ex. 6, Att. 9 at 1-2— the Court should find that Mostafa has no damages remedy.[8]

Under Supreme Court authority, the Court should decline to imply a damages remedy under these circumstances. *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), held that expanding a *Bivens* remedy beyond the three scenarios already approved by the Supreme Court should be carefully scrutinized and generally rejected. *Id.* at 1857 (expanding *Bivens* "a 'disfavored' judicial activity"). To decide, the Court conducts a two-part inquiry: (1) does the claim arise in a "new context," and, if so, (2) should the court create a new *Bivens* remedy, considering whether (a) alternative remedies exist, and (b) "special factors" counsel hesitation in recognizing a new damages remedy. *Id.* at 1857-58. Mostafa must demonstrate *both* that there is no alternative remedial process and no special factors counseling hesitation *Id.* He can do neither.

### A.      Element not alleged: Absence of a "new context."

A claim presents a new context if it differs from the three previous *Bivens* cases recognized by the Supreme Court: (1) *Bivens*, 403 U.S. 388 (1971) (Fourth Amendment unreasonable search and seizure); (2) *Davis v. Passman*, 442 U.S. 228 (1979) (Fifth Amendment due process claim involving employment discrimination); and (3) *Carlson v. Green*, 446 U.S. 14 (1980) (Eighth Amendment failure to provide medical treatment). *Abbasi*, 137 S. Ct. at 1859. Whenever a "case is

---

[7] The Court can consider this assessment, which Mostafa refers to in his complaint and is central to his claim that excessive force was used. *See Tellabs*, 551 U.S. at 322.

[8] The Officers do not raise qualified immunity at this time but reserve their right to do so.

different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Abbasi*, 137 S. Ct. at 1859-60 ("modest extension" is still an extension). An inmate causing his own injury, then blaming correctional officers, Ex. 6, Att. 9, bears no resemblance to the three approved *Bivens* claims. *See id.* at 1865 ("new-context inquiry is easily satisfied").

This Court need not decide whether all excessive force claims present a new context, although many rulings within this district suggest that they do. *Abdo v. Balsick*, No. 18-cv-01622-KMT, 2019 WL 6726230, at *6 (D. Colo. Dec. 11, 2019) ("no question" that excessive force claim was new context).[9] *But see McCullon v. Parry*, No. 18-cv-00469-NYW, 2021 WL 877718, at *6-7 (D. Colo. Mar. 9, 2021); *Smith v. Trujillo*, No. 20-cv-00877-RBJ-NYW, 2021 WL 1799400, at *4-5 (D. Colo. Mar. 26, 2021), *adopted*, 2021 WL 1608829 (D. Colo. Apr. 26, 2021).[10]

The facts here—where Mostafa concurrently reported only a small, self-inflicted injury—

---

[9] *Accord, e.g.*, *Silva v. U.S.*, No. 19-cv-02563-CMA-MEH, 2020 WL 7706785, at *5 (D. Colo. Dec. 29, 2020) (new context where officer allegedly assaulted restrained inmate); *Millbrook v. Spitz*, No. 18-cv-01962-RM-KMT, 2019 WL 4594275, at *3-4 (D. Colo. Sept. 23, 2019) (new context where officer allegedly slammed inmate's head and shoulders against bars while he was handcuffed and stuck finger in inmate's anus); *Huerta v. Oliver*, No. 17-cv-00988-RBJ-KLM, 2019 WL 399229, at *15 (D. Colo. Jan. 31, 2019) (new context where officer allegedly injured by handcuffs with blackbox restraints), *adopted*, 2019 WL 954771 (D. Colo. Feb. 27, 2019).

[10] The Officers respectfully disagree with several aspects of the Court's new-context analysis in *McCullon* and *Smith*. The Supreme Court has emphasized that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020); *cf. McCullon*, 2021 WL 877718, at *7. Moreover, whether the Tenth Circuit has implicitly recognized the extension of *Bivens* excessive force claims in the Fourth Amendment context, *see McCullon*, 2021 WL 877718, at *7, is not dispositive of the key question of whether there are meaningful differences between a case and three specific Supreme Court cases. *Abbasi*, 137 S. Ct. at 1859. Neither is the existence of judicial precedent in the excessive force context dispositive of the new-context inquiry. *McCullon*, 2021 WL 877718 at *6-7. The Supreme Court emphasized that a single meaningful difference even in "almost parallel circumstances" is enough to establish a new context. *Abbasi*, 137 S. Ct. at 1859 (discussing differences in contexts between *Carlson* and *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001)).

unquestionably present a new context. The Court should proceed to step two.

   **B.     Elements not alleged: Absence of alternative remedies and special factors.**

   **1.     Mostafa has multiple alternative remedies.**

*Abbasi* held that the Judiciary should refrain from creating a new *Bivens* remedy if Congress has created "*any* alternative, existing process for protecting the [injured party's] interest." *See* 137 S. Ct. at 1858 (emphasis added). Under that standard, several alternative remedies exist.

   ***Federal Tort Claims Act.*** The FTCA offers a clear alternative remedy for an inmate challenging excessive force. *See Minneci v. Pollard*, 565 U.S. 118, 129 (2012) ("State-law remedies and a potential *Bivens* remedy need not be perfectly congruent."); *Malesko*, 534 U.S. at 69 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability."). Since *Abbasi*, judges on this Court and others have found that the FTCA is an alternative remedy to a *Bivens* claim. *Abdo*, 2019 WL 6726230, at *7; *see also, e.g., Ramirez v. Tatum*, No. 17 Civ. 7801, 2018 WL 6655600, at *5 (S.D.N.Y. Dec. 19, 2018) (finding no *Bivens* remedy for retaliation and excessive-force claims, and noting that availability of FTCA relief and "Congress's legislation in the area of prisoners' rights" counsel hesitation).

   ***Prison grievance system.*** The Supreme Court has made clear that an alternative remedy need not provide damages at all. *Abbasi*, 137 S. Ct. at 1865 (non-monetary relief like "an injunction requiring the warden to bring his prison into compliance … or some other form of equitable relief" are alternatives[11]). BOP's administrate remedy program provides an alternative

---

[11] Neither does *Abbasi* focus on whether an alternative remedy is "adequate"—a phrase that does not appear in the decision. *Cf. McCullon*, 2021 WL 877718, at *8. "[A]ny alternative, existing process" is sufficient to refrain from creating a new damages remedy. *See* 137 S. Ct. at 1858.

remedy to address allegations of excessive force by officers. *See Malesko*, 534 U.S. at 74 (inmates "have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program"); *K.B. v. Perez*, 664 F. App'x 756, 759 (10th Cir. 2016) (same); *accord, e.g.*, *Taylor v. Lockett*, No. 5:17-cv-00023, 2019 WL 764023, at *7 (M.D. Fla. Feb. 21, 2019) (collecting cases).

Via the administrative remedy program, Mostafa could bring his allegations about the Officers to executive-level BOP officials who were in a position to impose discipline, remove the Officers from Mostafa's housing unit, or fashion some other form of relief. This alternative remedy "has the added benefit of limiting judicial interference with prison management while maintaining a method of redress for valid constitutional claims." *Huerta*, 2019 WL 399229, at *16.

***Equitable relief.*** Mostafa also has the alternative remedy of seeking injunctive relief. *See Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231-34 (10th Cir. 2005) (recognizing that inmate can seek injunctive relief to address unconstitutional conditions and explaining there "is no reason to rely on a court-created remedy, like *Bivens*" when injunctive relief is available). Indeed, he has done that very thing here, seeking "*punishment and resolutions* against the assailant defendants," SAC at 39 § 4, which could take many forms: removing the Officers from Mostafa's housing unit or directing the Officers (and others) to undergo additional training, to name two possibilities. *See Abbasi*, 137 S. Ct. at 1865.

### 2.   Other special factors counsel hesitation.

Because Mostafa cannot meet his burden to show that he has no alternative remedies, the Court should deny a *Bivens* remedy. However, there are other special factors.

***Congress did not create a damages remedy.*** The Supreme Court observed in *Abbasi* that

there is "legislative action suggesting that Congress does not want a damages remedy" against individual federal officers because it considered prisoner abuse in the context of passing the Prison Litigation Reform Act of 1996 and has "been active in the area of prisoners' rights." 137 S. Ct. at 1865. Congress's decision in the PLRA to "not provide for a standalone damages remedy against federal jailers … suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Id.* at 1865; *see Schweiker v. Chilicky*, 487 U.S. 412, 423 (1998) (courts should refrain from implying a damages remedy where it appears that Congress's inaction "has not been inadvertent"). This Court should not act where Congress did not.

Separation-of-powers concerns are heightened in the prison context, where Congress is better suited than the Judiciary to "balance the challenges prison administrators and officers face in maintaining prison security against the expansion of the private right of action for damages." *Morgan v. Shivers*, No. 1:14-cv-7921-GHW, 2018 WL 618451, at *6 (S.D.N.Y. Jan. 29, 2018); *Bell v. Wolfish*, 441 U.S. 520, 548 (1979 ) ("the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial"), *Turner*, 482 U.S. at 84-85 (same). Because Congress chose not to make individual officers statutorily liable for excessive force claims, this Court should refuse a *Bivens* remedy.

*Extending* **Bivens** *here would compromise prison security by encouraging manufactured claims.* The Supreme Court recognized that the threat of personal liability could impede the proper functioning of BOP facilities by causing officials to alter their behavior and judgment to avoid harassing lawsuits against them personally, at the expense of institutional security and other critical prison-management decisions. *Id.* at 1863. The circumstances here demonstrate that implying a damages remedy would have a profound impact on BOP operations—incentivizing a contentious

inmate whose endgame is to be "terminate[ed]" from the ADX, SAC at 39 ¶ 3, to manufacture excessive force claims. On the other side, an officer's desire to avoid embroiling themselves (and their families) in long-running litigation may have the perverse effect of acceding to improper inmate demands or avoiding contact with certain inmates altogether. Neither result is consistent with sound correctional judgment and institutional security.[12]

In addition to interfering with correctional decision-making by individual officers, implying a damages remedy has other negative consequences for prison operations. "Claims against federal officials often create substantial costs, in the form of defense and indemnification," and "the time and administrative costs attendant upon intrusions resulting from the discovery and trial process are significant factors to be considered." *Id.* at 1856. That is why it rests with Congress "to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government." *Id.*

Each of these concerns readily satisfies the "remarkably low" threshold for special factors, *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009), and counsel against the creation of a *Bivens* remedy in this new context. The Court should dismiss Mostafa's excessive force claim.

**IV.     Mostafa's challenge to the "presentation" of his food fails (Claim Five, SAC 30-31).**

Mostafa contends that two correctional officers violated the Eighth Amendment by serving

---

[12] Refusing to expand *Bivens* does not mean that officers will escape liability or will not be deterred from using excessive force. An officer who uses excessive force can lose his job or be prosecuted for misconduct—as has happened on the Florence complex. *United States v. LaVallee*, 439 F.3d 670, 677 (10th Cir. 2006) (USP Florence officers prosecuted on charges of inmate abuse). Regardless, the Supreme Court has concluded that it is "for the Congress, not the Judiciary," to strike the proper balance between deterring constitutional violations and freeing federal officers to make necessary decisions. *Abbasi*, 137 S. Ct. at 1863.

his food in a manner that increases his risk of contracting Covid. SAC at 31 ¶ 9 (alleging that opening partially opened food packages with his teeth is "very hazardous … in Covid-19 time"); *see also* ECF No. 60 at 28-29 (limiting claim to "unsafe presentation" of food that allegedly puts Mostafa at risk of contracting Covid). These facts do not plausibly show that he is subjected to an extreme deprivation by any BOP official with a culpable mental state. *See* § II.A., *supra*.

     ***Element not alleged: Objective deprivation.*** In January 2020, medical personnel issued an order directing food service workers to open certain of Mostafa's prepackaged religious foods. SAC at 61 (order). Mostafa asserts that the "kitchen manager" has not "fully" complied, and that he "occasionally" finds "sharp razor pieces inside the food." *Id.* at 30 ¶ 7. But he alleges specific facts about only one incident, on September 20, 2020, when officers Loewe and Naranjo delivered a food tray containing the plastic covering. *Id.* at 59 ¶ 4. Mostafa demanded that the officers return the tray to the kitchen, but they refused. *Id.* ¶ 6.[13] That same evening, Mostafa received a disciplinary incident report for interfering with a security device (pushing his duress button) which, according to Mostafa, contained "lies" about his having deliberately broken his food tray. *Id.* ¶ 8; *id.* at pp. 53-54 (documents related to 9/20/2020 incident report).

     These allegations permit no inference that any risk of Covid deprives Mostafa of the minimal civilized measure of life's necessities. Not only is he fully-vaccinated, the Centers for Disease Control and Prevention have identified few incidents of surface transmission.[14] Further

---

[13] Mostafa asserts that Loewe and Naranjo "continuously" deprive him of evening meals, SAC at 59 ¶ 3, but his only non-conclusory allegation is about the September 20, 2020 incident.

[14] *See* https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html (discussing rarity of such transmission). Information published on a federal agency's website is subject to judicial notice. *Sierra Club v. United States Envt'l Protection Agency*, 964 F.3d 3d 882, 892 (10th Cir. 2020).

undermining his pleading are the extensive preventive measures ADX has implemented. ECF No. 52 at 6-7, 11-15; *see also* ECF No. 52-1[15] ¶¶ 8, 10-11, 15, 27, 29, 31, 33-35, 42, 44. BOP remains under modified operations. *See* https://www.bop.gov/coronavirus/covid19_status.jsp. As of May 28, 2021, there are no confirmed active cases of Covid among ADX inmates or staff. *See* https://www.bop.gov/coronavirus/index.jsp. And even if Mostafa's food is "occasionally" not "fully" opened or contains "fragments" of something, that is not a constitutional deprivation. *See*, *e.g.*, *Oliver v. Fuhrman*, 739 F. App'x 968, 970 (11th Cir. 2018) (occasional foreign objects in food not constitutional deprivation). He has set forth no facts showing officials failed to take steps "to ensure [his] *reasonable* safety" concerning Covid. *Farmer*, 511 U.S. at 844 (emphasis added).

   ***Element not alleged: Subjective culpable intent.*** If the Court considers the subjective element, Mostafa has alleged no facts showing that Officers Loewe or Naranjo—or anyone else— actually believed that he faced an excessive risk of catching Covid because of his food trays and chose to disregard that risk. Mostafa's only nonconclusory allegation shows that the September 20, 2020 incident was an isolated one unaccompanied by any malicious intent. The officers were not allowed to touch Mostafa's religiously-certified food. *See* SAC at 61. No criminally reckless intent is shown by their declining, on one occasion, to return a tray to the kitchen which they believed Mostafa purposely had broken.

   Mostafa thus has not alleged that any BOP official was aware of facts supporting an inference that he faced a substantial risk of catching Covid, let alone that any official drew that inference.  The claim thus fails on the subjective prong as well.

---

[15] The filings in this case are subject to judicial notice here. *Ahidley*, 486 F.3d at 1192 n.5.

**V.       Mostafa's claim about bandaging a wound fails (Claim Five, SAC at 32).**

Mostafa alleges that, on October 20, 2018, Williams[16] violated his Eighth Amendment rights by refusing to "secure or fit" a bandage. SAC at 31 ¶ 9.[17] This official-capacity claim, *see* ECF No. 60 at 35, cannot proceed.

**A.       Mostafa cannot meet his burden to establish subject-matter jurisdiction.**

***Element not met: Standing.*** On October 20, 2018, Mostafa reported to Williams that he had "minor bleeding" from a cut he allegedly sustained while cleaning his cell. Ex. 6, Att. 8 at 1; *see also Holt*, 46 F.3d at 1003. Mostafa refused to allow Williams to check his vitals, *id.*, but Williams was able to observe that Mostafa had "a superficial abrasion to his right forearm." *Id.* at 2. Williams cleaned the abrasion and noted that it did not appear to be actively bleeding: "Inmate refuses to have any bandage placed on abrasion. Any [sic] refuses any further care." *Id.*

No concrete, actual or certainly impending injury. Mostafa's minor wound from years ago does not demonstrate the "concrete, particularized, and actual" injury that confers standing to obtain prospective relief. *Clapper*, 568 U.S. at 409. Neither does this old "superficial abrasion" show a "*certainly impending*" injury. *Id.* (emphasis in original); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (injury must be "real and immediate threat" to satisfy "injury in fact" requirement). Mostafa cannot establish *any* injury, let alone one that meets these standards. No causation. Mostafa has not pleaded facts that plausibly show any current injury that is "fairly traceable" to any action by Williams. *Clapper*, 568 U.S. at 409. No redressable injury. Mostafa has

---

[16] Mostafa incorrectly refers to the medical provider as "William."

[17] Mostafa also references "bleeding" after the alleged excessive force incident, SAC at 32 ¶ 13, but does not contend that Williams was the medical provider on that occasion.

not alleged facts showing that this Court could issue an order for prospective injunctive relief that would redress his alleged injury. *Id.* Even if he could show a de minimis past injury attributable to Williams's care, which is not the case, an injunction controlling Williams's future conduct cannot redress a past injury that Mostafa has not alleged is ongoing. *United States v. Oregon State Medical Soc.*, 343 U.S. 326, 333 (1952) (injunction offers prospective relief against ongoing or future harm). Without an injury redressable by prospective injunctive relief, Mostafa cannot meet his burden to establish standing.

**Element not met: Ripeness.** To the extent Mostafa is speculating that he may one day have a wound that some ADX medical provider will refuse to bandage, such a claim is not ripe because it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300, 302 (1998).

Mostafa cannot establish that such a claim is constitutionally ripe. *Los Alamos Study Group v. Dep't of Energy*, 692 F.3d 1057, 1064 (10th Cir. 2012); *see also Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012) (ripeness doctrine both constitutional and prudential). To be ripe, the question must be "presented in clean-cut and concrete form." *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 119 F.3d 1437, 1443 (10th Cir. 1997). Here, there is no evidence of a concrete, actual, or imminent injury stemming from a future failure by Williams, who no longer works for BOP (or another medical provider), to refuse to dress a wound. Because Mostafa fails to set forth basic facts about his speculation, he appears to be seeking an advisory opinion based on unknown contingencies. *Morgan v. McCotter*, 365 F.3d 882, 891 (10th Cir. 2004) ("failure of certain contingent events may render a decision completely advisory").

Neither can Mostafa satisfy the prudential aspects of ripeness, which turn on "both the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). The hypothetical question of whether he may someday have another injury, and object to the care he receives, will turn on concrete facts that are currently unknown. Mostafa faces no hardship if he is required to raise that speculative future issue in a specific context.

> ### B.      Mostafa also has not alleged deliberate indifference.

*Element not alleged: Objective deprivation*. Mostafa first fails to allege a medical need that is "sufficiently serious"—that is, a condition that "has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farmer,* 511 U.S. at 834, 837; *see also* § II.A. *supra*. He claims that, on one occasion, Williams "refused *to secure or fit* the bandage on plaintiff['s] stump," SAC at 32 ¶ 13, but he alleges no facts from which a plausible inference can be drawn that Williams placed the bandage incorrectly, or that the wound was of sufficient severity to require a bandage at all. He alleges no long-term (or short-term) effects. Even if Mostafa believes that Williams handled the situation incorrectly, his disagreement with the provider's judgment demonstrates no violation of the Eighth Amendment. *Gee*, 627 F.3d at 1192; *Perkins v. Kansas Dep't of Corrs*., 165 F.3d 803, 811 (10th Cir. 1993) (same). And if Williams were wrong, that error would not amount to deliberate indifference, either. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (even "grossly negligent: medical judgment "is not subject to second-guessing in the guise of an Eighth Amendment claim."). The Court should dismiss the claim.

***Element not alleged: Subjective culpable intent.*** If the Court examines the subjective element, Mostafa has not pleaded that Williams acted with criminally reckless intent.

Mostafa seems to claim either that Williams should have provided a bandage, or that Williams didn't place the bandage properly. SAC at 32 ¶ 13. Neither iteration demonstrates criminally culpable intent by Williams. Whatever Mostafa's self-diagnosis, he has not alleged facts plausibly indicating that Williams saw the situation the same way *and* actually inferred that Mostafa faced a substantial risk of serious harm. Mostafa's sole nonconclusory fact about Williams's state of mind—that Williams asked, "Why did you cut/[illegible] your hands?" SAC at 32 ¶ 13—merely indicates that a medical provider sought to understand the source of an injury, assuming Mostafa had one. These allegations do not demonstrate that Williams possessed a criminally reckless state of mind animated by a desire to punish Mostafa. *See Farmer*, 511 U.S. at 837, 839. His failure to plead the subjective element also requires dismissal of the claim.

## CONCLUSION

The Court should dismiss the Second Amended Complaint (ECF No. 61). Respectfully submitted on May 28, 2021.

> MATTHEW T. KIRSCH
> Acting United States Attorney
>
> s/ *Susan Prose*
> Susan Prose, Assistant United States Attorney
> 1801 California Street, Suite 1600
> Denver, Colorado 80202
> Tel: (303) 454-0100
> Email: susan.prose@usdoj.gov
>
> Counsel for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on May 28, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

B. Willms
Senior Attorney
Federal Bureau of Prisons

and I hereby certify that I have directed personnel in the U.S. Attorney's office to mail the foregoing to the following non-CM/ECF participant by U.S. Mail:

Mostafa Kamel Mostafa
#67495-054
Florence Admax
U.S. Penitentiary
Inmate Mail/Parcels
P.O. Box 8500
Florence, CO 81226

s/ *Susan Prose*
U.S. Attorney's Office