[Carbon paper copies, signed]

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUN - 1 2021

JEFFREY P. COLWELL
CLERK

page 1 of 139

IN THE UNITED STATES DISTRICT Court.
FOR THE DISTRICT COURT OF COLORADO.

Civil Action No. 20-CV-00694-PAB-NYW.

Civil Case Name: Mostafa V. Monty Wilkson et.al

Plaintiff' Pro Se Motion Seeking Reconsidera-
tion OF The Recommedations In The
order [60] January 26, 2021

Submitted by:

Mostafa Kamel Mostafa
Reg No. 67495-054
ADX Florence Colorado

Respectfully Submit
MOSTAFA KAMEL MOSTA

Enclosed, Certificate of Service

Signed:
Date: April 5/20/2021
May 20, 2021

— Footnote —

1- Plaintiff had to submit the Carbon Paper Copies of this
motion, signed, because medical & SAM Department still refusing
to provide any disability pen or visabel ink manageable pen.

# Table of Content

|  | page |
|---|---|
| — Part one : | |
| General Notes And Foundation | 03 |
| — Part Two : | |
| Claims Identify with Rule 8 | 17 |
| Claim one | 20 |
| Claim Two | 22 |
| Claim Three | 23 |
| — Part Three : | |
| Claim four | 27 |
| Claim Five : | 31 |
| A — Diets | 31 |
| B — Denial of Medical Care | 33 |
| Medical Malpractice : | 39 |
| — Part four : | |
| Conclusion | 40 |
| — Exhibits (please follow coloured numbering of pages and exhibits). | 41 |
| — Certificate of Service. | 138 |

2

PART ONE: General Notes And Foundation                    3 of 138

1- The Honorable Madam Judge Nina Y. Wang Construed Doc[6a] Recommendations, and the endorsement by the Honourable chief Juke Brimmer Contained a well appriciated hard work. Not least when the plaintiff lack of Knowledge, poor & emotional phrazing shaped Many segments of his long [43-1] amended Complaint.

2- However such short coming from the plaintiff appeared to also, make him does not benefit from several principles, Concepts and Construed recommendations by the Court. Simply because they Could have been extended to other dismissed parts of the Claims as will be explained POST at their relevent portions

3- Therefore, this reconsideraing request is not an objection but rather refering to the Misconstrued as result of poor phrasing &/or Misrepresentation: in order to Conserve the Court's hard work and avoid unneccessary amendment or Supplement. Not least when:

(a) This respected Court is aware of the plaintiff's extra ordinary impairments & ADX impedements placed on him.

(b) The respected second Circuit permitts flexibility to much more able & Knowlegeable Claimants Such as: [Brown V. Smith 828 F2d 1493 (10 Cir 1987) holding "a complaint against federal officials that erroneously relies on §1983 Should be CONSTRUED as a Federal Question Action"] The plaintiff implores this court to enlarge its liberal methodology accordingly.

3

4- Similarly, as a Lay Termed uneducated request by the plaintiff to sue based on ADA. American Disability Act Discrimination against his type of Disability and other rules of disability, together with the pepered statement and indication of threats and retaliatory "we will make his life in prison very difficult", deprivation of items, help, full injections etc. Repeatedly Could have been as intended and mentioned though poorly construed according to the ADA Anti-retaliatory ~~And~~ Provision allowing to Sue individuals for damages &/or Compensations. See:

{ Shotz v. City of plantation, Fla. 344 F3d. 1161, 1179 (11 Cir. 2003) }
And Equal Protection

Respectfully, The plaintiff's continuous pain & daily injuries for body, sitting, teeth abrasion & Stress allows such Construe & liberal consideration.

5- In fact, that is why the plaintiff sued many of the Known & unknown defendants under both Capacities or only official Capacities as anti-retaliatory provision could be ~~proven~~ against them and allows protection and Compensation. As post in Claim 4 & Partial 3 & 5. Respectfully as asked in page 4 of his Amended 43-1 Claims (hereafter Am. 43-1) page 04 the violation of his 1, 4, 5, 6, 8, 14 and Covid-19 Amendments & rules They do have a place & mention in the Am 43-1, though poorly & not in formal syntax for the obvious reasons of no attorney or disability Compatible Law Library or mix with any knowlegeable inmates.

4

6- The respected Court has dismissed some claims and removed some defendants due to misphrasing and unexplained relative provided Remedy items on the 85 list the plaintiff provided attached to his Am-43-1. Only to summarize the grouped issues. as they are:

(i) Exhausted fully and some are repeated more than once

(ii) They contain the specifics of issues & defendants involvements & Capacity

(iii) In a quick skim read for some of their titles could prevent early dismissals at this stage.

Hivever, the Court explained that it is not the plaintiff's attorney nor the re-searching worker for any party, which is fair and respected.


7- However, the claims full proofs and involvement of personnel are therin as well as the attached and much clearer exhibits to this pro se. Respectfully hoping for restoring the connected integrated claims and reinstating. Defendants to prevent further paper work and/or future confusion or dismissals.

Respectfully. the respected Court should consider that:

(a) Plaintiff are not always told the names or Capacity of the violator(s) correctly and for that some courts took the side of the abundant of Cautions

(b) Also, falsification of Medical & housing records are the norm. ADX Foot Note

1. The Defendants Themselves Provided in their response to plaintiff TRO reconsideration [50], Provided list of 460 Remedies. The plaintiff only provided the relevent and fully exhausted 85 out of the 460.

6 of 139

For the Defendants see:
Satchell v. Dilworth 745 F2d 781, 786 (2nd Cir. 1984)
holding {"at best for purposes of discovery aimed
at identifying those of their subordinates who are
personally Responsible for the departmental actions
complained of").
    Respectfully this claim is in dire need of this
application: as the threats and Retaliatory and the
theme of Concerted efforts to harm the plaintiff for years
and to date are noticeable and Can be proven by future
means & litigations. Also, See
    "Bontkowski V. Jenkins, 661 F.Supp 576 N.D.ill 1987)
    (allegation of Conspiracy to deny medical Care stated
(a claim) aff'd 860 F 2d 1082 (7th Cir 1988)


    This 10th Cir. also, aware and prudent of falsification of
medical Records and awaits early dismissals based on Item 1
See : Green V. Branson. 108 F3d 1296, 1304 (10th Cir 1997)
noting {Claim of falsifications of medical records {
                  after a Use of force
And Generally; as will Show in this claim if no early
dismissals the large scale of the above as well as the "Shopping
around" to harm the plaintiff records. See Respectfully :
Sanders-El V. Spietman 38 F.supp 2d 438 n.1 (D. Md. 1999) (I will seam
that the law must entertain the possibility that health care providers in a
prison setting might bring Certain biases to their occupation")
    → Respectfully the threaten plaintiff's Situated in much worse.
—— Foot note ——
1. The plaintiff already notices and marked many falsifications & entrapments
inside the defendant's response to his TRO Reconsideration [58] but was
was allowed to receive it far out of reply date!                          6

8— Element of Exposing the plaintiff to Danger By Early Dismissals persist, in this case. And that's to say That the execution of the famous "Threat" will make his life very/difficult, I will still find plenty of space and personally to continue or worsen the ongoing harm.[2]

The supreme court as will as this circuit both have rulings to stop, prevent & deter against any of the many hazardous conditions the plaintiff subjected to since his extradition from England oct. 2012. See:

Supreme court Concurring with the 10th cir Judgement Simmat V. U.S: Bureau of prisons 413 frd 1225, 1231-32 (10th Cir 2005) {noting (That The federal prisoner could seek "an injunction" based on the federal courts' equity Jurisdiction to enforce the dictates of The Eighth Amendment).

9— In this case, Though the plaintiff still to date, does not really know what does that fully means, never the less, this respected Court recognized in it's [60] recommendation that the plaintiff asked in his relief sought essential certain items, fittings, treatment and deterent for his safety, health and hygiene ongoing violations by ADX & other departments therein. And The plaintiff addressed those issues in details in his TRO [39] & The reconsiderations [50] for injunction to release of implement The necessity requirements.

Foot Note.
1— In fact, one of the people who conveyed this version of The Threat added his own "advice". Mr. Sam schmidt Esq (Appeal attorney) said: "do not provoke them!"

2— Respectfully, consider that The plaintiff is only asking for the bare minimum of daily tasking in safety & hygiene and not live in pain or endless stress and to deter the abusers.

7

10 = As examples of the level of exposure to danger by early dismissals for "Claims 4" and much of 5 "The immediate reaction of ADX Kitchen personal & Medical staff to worsen the plaintiff's condition of feeding & safety & hygiene items, such as:

Food: Despite the fact that Kitchen Manager (Mr. Kundof) his assistants and the warden, never really complied with the "Therapeutic" diet to hold food out of packs & plastics and replace them inside easy safe containers and central office order to unit (C10) to return food to Kitchen if not, see (Exhibits 01 & 01A) unit managers removed the central office door note and Kitchen sends food trays all items mixed with the tuna fluids and sardine oil and C/oz can not sent to bank and drivers button does not answer or convey message and hot trays fully folded in 2 layers of it plastic. And the only response given to C10 Gautreaux to tell me that "They are not gone do it" and don't send food back, please see dates & details in Plaintiff request to Mr. Kundof and his assistant Nazorin (Tue May 4 301) who took it by hand saying "I will come to you today later" but never did (Exhibit 01B.)

It all means that Plaintiff has to extract the food content by mouth, open the nos/half opened items by his disabled teeth & dump and tave or dirt himself & place with oily stuff cold trays 4-6 days a week and hot trays 6 days every week (now for Years) but much worse after the dismissal of Claim 4 & 5 (Diet)

However, This respected Court had in [60] recognized similar, though worse exposure to danger, for one meal by Defendants %0 Lowe & Abigიena & Warden. Respectfully this issue is daily, from years

8

and now very likely to stay in full impurity against the def plaintiff's anti-retaliatory ADA provision and his 8th Amendment necessities. See also evidence of regulare & fully cautiousness involvement by Mr. Kundoff and manager Warden True in attached exhibit: 01 C₁ & 01 C2

11- Please, Respectfully construe that Exhibit 01 01A, B C are clear implicit admission and against acceptance. that the plaintiff as disable in solitary and all above has been left alone completely to open his Commissary unsafely And for years without opener, Hardly a item there that does not need fingers, or plaintiff teeth & stumps to open. Another evidence for deprivation of dis-ability need & Equal protection Amendment 14.

12- On the other hand, Other non early dismissal To claim one & Two have resulted in some safety. As on the same day The honourable Judge recommendation entered on site the Def. Warden Mr. True finally applied the repeated visiting Judge the honourable Mr. Hegarty plaintiffs several letter (s more) before, to keep the plaintiff in the less harmful cell 5.14 "(" will not required to be rotate cells every..... until such time as another cell can be adapted to reaccommodate his specific medical requirements." See Ex. 02. Please note that this is also an admission that the plaintiff was forced for years to To stay in a dangerous cell 300. And the last time he was forced in
Foot note
1. There are several other encounters with health manager Ms Follum prove the same detail post: Like deprivation of Covid test hygiene items, pens, Paper Gasses, long tooth brush for 10 month. etc. See Ex-01 D1, D2

October 2019 immediatly resulted in his FIRST and only food strike
See also exhibit E2 a1, a2, a3, a4, a5 one of many pre strike
request not to be placed in the more danger cell. Also E2 a6
⇒ The plaintiff Respectfully, is explaining with minimum
examples how an early dismissal has and could expose
him to incalcuble variety of danger unless the claims &
Defendants closely evaluated by the honourable Madam Judge and
the honourable Chief Judge, experienced eyes.

13 - EVIDENCE OF HIGH & MEDE1 LEVEL
OFFICIALS IN PLAINTIFF CLAIMS IMPLICATIONS
Also, as general and foundation for post points, this
respected Court should be furnished with the Origion
of the violations against the plaintiff and its evident
non-stop continuation to date. And its direct violation
To the Anti-Retaliatory provision And or violation
of Government law of: Administrative Procedure
ACT. Also, points of National interest all as below.

14 - Not only the above is documented therein. The 400
ptus Remedy work and the 85 list of the fully exhausted
once provide in Am. 43-1 Exhibit. But also in the enclosed
here, now; international summary of accounts of the
United Kingdom & Europe Courts with the highest
of Rank/Levels Defendants & their agencies and
ADx warden Wesley providing assurances to Secure
the extradition of the plaintiff and therein Admission
of full knowledge & awareness of the plaintiff's specific
needs Since 2007. See Exhibit 03 (2 page Table & 36 pages)

10

#11 of 138.

15. Exhibit 03 is an affidavit by plaintiff's New York Criminal Case attorney Ms. Lewis Esq. provided to U.K Court to prove the worthlessness of any U.S. Gov't assurances / undertaking to secure any extradition of a potential ADX or SAMs sought indictee.

However it also details the depth of knowledge of the specifics of the plaintiff's conditions & essential need for his safety, health and hygiene to conduct his every hour & day tasks (all exhibits therein referred to are available for discovery).

16- Despite making sworn statements and given many assurances at least 5 years before extradition, zero preparation or allowances were afforded to plaintiff's; when BOP received him he was locked up in solitary till now no help, fitting, items or safety. please see excerpts of details in the affidavit as follow:

(a) Essues of Treaties & Speciality assurances see pages 4, 5, 6, 9, 12, 14 and to the senior District Judge Tim Workman pages 8, 9 & 22 & 26

(b) ADX Warden Wiley's sworn statement excerpts page 9, 26, 27, 9, 26, 27, 28, 29, 31 based on his consultation with other higher & lower levels officials including Chief of Health Program.

~~Foot note~~

1 This respected court should notice that no cyber attacker to US had ever been extradited from UK or EU since plaintiff's extradition 2012 because of the above mentioned issue.

11

(c) — Evidence of Special Administrative Measures & FBI Operatives many years pre-extradition ¶10 and regarding Special daily need By Court & BOP ¶11 & 12.

(d) And similar assurances to UK High Court page 10 ¶30 Court quoting "US government has no dispute with the (plaintiff need &) discription" and ¶31 the Court "Trusted US Government" And "asserted 'daily nursing' assistance in activities of daily living"

Court quoting that Long term in ADX (more than a year for someone like plaintiff, Cooordination would amount to Torture' see ¶32 ¶34

(e) — Same undertaken and assurances US Govt Soothed The Eur Court of human rights repeatedly up to the last minute of extradition litigation see Ex(3) 11 ¶35 even suggesting "not to be detained in a Super Max or relatively short period" And during which "he will not suffer solitary isolation because he would receive care for his disability." ¶37, noting that "comprehensive health care and social care plan" and "regular daily support will be impossible at ADX"

— Foot note

    Respectfully notice that "Torture" in Court view is occurring even when help, fitting, items are afforded which is not the plaintiff case, thus legally worse! 12

17 - Respectfully, the plaintiff implores the court to consider not dismissing at this early stage the claims of 4 (fitting & item deprivation) and claim 5 (denial of medical care) based on "no evidence of certain defendants knowledge or participation on the claims; as this can only be determined when discovery & chain of command duty of the higher levels to lower levels regarding the abuse assurances & guidlines given to counts on behalf of the American nation

18 - The fact is, to date, the higher rank & lower rank simply locked up the plaintiff with out any help, fitting for his upper limb & amputee disability or any items he needs for safety, hygiene.

And forced and coearced him to do all his essential daily tasks under extreme cruel stressful and harmful conditions in total exposure to danger for years till now, simply by shopping around for compromised occupational thereapists or suppressing others reports. Causing injuries abrasion of plaintiff stumps, teeth and sleep deprivation due to pain, stress and non-stop anxiety. all against the rules & essence of law.

Seeing noting quoting and still ignoring abrasion of teeth, stumps at anytime were enough to know that plaintiff is suffering let alone the years of previous knowledge and assurances to counts as above.

13

19- Respectfully, in general, plaintiff's disability and health needs and conditions and that he had never been alone since his disability 1993 are well documented, undisputed by US Gov't and all its agencies as above. And the risk of exposure to danger if alone and/or without facility items, help or care is never disputed by any one including US Gov't as above.

"The fact that Risk was plausible Can support a finding that Defendant Knew" See Farmer v. Brennon S.Ct 1970 (1994)

Also
Bass v. Wallenstein 769 F.2d 1173, 1184-85 (7th Cir 1985) holding (Knowledge of deficiencies of Medical Care System administrators Could be held deliberately indifferent based on their knowledge)

See Also, Ex(04) Dental Care failure to provide care or address the cause of plaintiff teeth abrasion, to date, in the phrasing and Warden signed Remedy (exhausted)

And,
Chavez v. Cady (7th Cir 2000) (Holding that he (The plaintiff) did his part to let officers know he was suffering). Respectfully, Plaintiffs voluminous doc-umentation, records & Remedy are much stronger & Defendant's in claiming

— footnote 4 & 5 are disregarding all that to date

1 Accordingly ADX administrators, warden & SAMs operators & Senior Medical Team Defendants in this case are in a much worse position than described by the Supreme Court in Farmer.

using all Tactics & mainly shopping around
to screen their threat and retaliatory concerted
effort against the plaintiff by always shopping for any
"medical opinion" that suits their "make his life
in prison very difficult" plans & to circumvent
their undertaking to courts in UK & EU.

20. This respected 10th circuit does not allow defend
-ants to hide behind policies or "opinions" to ignore
plausible risk, let alone or much less, an acknowledged
documented one like in this case/claims
    see Mata v. Saiz 427 F.3d 745-757(10th Cir 2003)
( even if there is no violation of policy, the policies
may be evidence of the defendants knowledge of the
risk inherent in certain circumstances )
        Accordingly and respectfully claims 4 & 5 and
their relevant senior defendants should not be dismissed
at this early stage of fact finding & pin-pointing
more specifics in POSP claims 4 & 5, & citations.


21- Post Remedy Impedements:
        ADX & BOP are exercebating and using his disability
against him to deny and/or reject the remedies which
they do not want to commit to any reply & denying his
equal protection. Not only by not providing his disability pen or
only allowing him 1/3 table area of any ADX able inmate ~ 1 [3/4]²
but also, rejecting the remedies they don't want to answer claiming
that not all four pages are visable and that they will not accept photo
-copies all dispite agreement to do so since Jan. 2016 see Ex(4) I

15

Resulting many times that remedy papers returned back & forward 3 or 4 times till paper work is completely disintegrated as it has to be also handled by SANs sis staff & scanned each time please see Ex(A) B, C, D, E, F, G, H & I of Dental Care remedy 1007348-A1, A2, A3 & A4 and every time the central office comes with a different excuse, many remedies of the plaintiff & 400+ are the same.

22- Accordingly & Respectfully the plaintiff implore this respected Court not to accept defendant's claim of any "non exhausted" remedy before removing the BOP & ADX impedements & examine the paper work as the PLRA has become but additional undurely punishment: physically, mentally & financially upon the plaintiff please, See Miller V. Berkebile, 2008 WL 635552 *7-9 (N.D. Tex. March 10, 2008)

( Where official refuse to process grievances. Contrary to policy Prisoners were not required to take steps not prescribed in the policy to get around him, PLRA law applied in §2241 Case )

23- The plaintiff, Respectfully present the above points as Foundation & reasons to reinstate the dismissed parts of his claims. And also, to be considered should the Defendants seek early dismissals without furnishing the court with the real/full Facts; as such could disintegrate foot note the bulk of the Case.

The letter "A" means Remedy exhausted to Central office, & "An" means that plaintiff exhausted it four times but central office refuse to reply. 16

PART TWO

## 24 - Claims Sufficiently Identified With Rule 8

The plaintiff, Respectfully implore this respected court to consider the common factors linked & essential for construing any or all the claims, in sum:

(a) The plaintiff is severely disabled, sick, weak, never been without help, filling items for his disability since injury 1993 till extradited 2012 to us.

(b) The plaintiff had repeated threats by British & US. FBI "To make his life in prison very difficult"

(c) The plaintiff has and is always asking for no more the basic of any basics of life such as Toilet, shower, table, cleaning... in accordance with his specific disability & medical need safely as in claims 4 & 5.

(d) Not to be threatend or assaulted when peacefully complains or forced to withdraw from food to have a break from teeth, stripped body & psychological pain
& (d) Not to falsify and/or entrapped by records as in claim 3, 5

(e) & not to discriminate against his type of disability or using it as a main tool to coearce him to pain & harm himself to task his daily needs unaided.

(f) Not to be excluded as a disable from other inmates assured equal protection such as using/opening commissary package safely, using law lib for learning & due process, or visit, read, religious cleansing etc.

(g) Not to be exposed to danger for to deprivation of any or some of the above.

(h) not to torture him & many members of his family by no or non-meaningful contacts for years on end as in one 7

(J) The plaintiff's own & imposed on him impairments are so far proven not periodic but chronic and life threatening in his conditions. And more importantly, as in the foundation in part one well known and documented to and by the highest rank officials and it is their own responsibility to pass it on and act upon To their subordinate and that the 85 fully exhausted "Remedy (out of 400) are only a "refresher" to their "documented memory".

(K) The unusually compacted combination of all the above in one suit claim could amount to the even extraordinary (or unprecedented) and the plaintiff respectfully; accordingly, implores this respected Court to apply an extraordinary approach of liberally construed outcome. Notes an attorney for the helpless plaintiff but as the gate keeper for the merits & essence of U.S. law & human rights. Not least when the Court acknowledges that the Defendants also violated law/or rules but plaintiff did not mention (simply because the plaintiff do not know or ever planned to litigate).

25. Respectfully; and Accordingly the plaintiff implore from the Court to refine the hard work in The Doc [60] not by any mean of amendment but purely by considering the plaintiff Lay Terms and the scattered poorly emotional statements to the nearest possible intended point(s) of law as follow in the claims. 18

19 o/ 138

26 - Respectfully, The American Disability Anti-retaliatory provision Act to be considered/construed as it is the only conceiveable outcome of the Threats and disability needs denial and even reversals of purpos from upper to lower need amputee discrimatory to date, despite full knowledge about the precise needs of the plaintiff years before his arrival 2012 (as in foundation & EX 03). And because the plaintiff Wrote in his Lay Terms in Anex 43-1 page 4: Discrimination against my disability and Other ADA provisions and the threat (in his declaration) as well as the words, phrases of retaliations & Disabilities as all over his claims and remedy.

27 - The Lay terms mentioned by the plaintiff regarding: Financial punishments, odor or diminshing punishment, provide Compensations from non-officially sued in all account ... see relief sought §§ 2,3, 4 allows Compensatory under Bivens for non officially sued. But Anti-retaliat-ory provision of ADA allows Compensation also against defendants concerted effort against a disabled to be liable Under official Capacity. (unless immuned).

28 - Respectfully, the plaintiff invoked The ADA & its relevant specifics to his claims/Case, though he does not know their format or Syntax and not allowed to know or find out as he is impeded from law library, contacting ADA attorneys or obtain any ADA Documents by Staff. (unknown & known) Because the general rule of: A disabled only need to show that his disability needs have not been Provided & officials were told. Excluding a disable act provisions will raise to impossible burden. /9

32— Other important overlooked issue that many of the plaintiff allegations against SAMs, Known & unknowns defendants & ADx defendants are persistent since the plaintiff extraditions 2012. and/or his admission to ADX. And thus do not really need specifics as they are endemic and some are getting worse: like the Imam visits to date not allowed; Religious feast meals and items & fulfilling fire safety, hygiene and religious cleaning.

Respectfully SAMs unKnowns operatives are more responsible for the above than any one acknowledged by this respected Court as they are; the Compilers of any reports to renew and/or harden the conditions of SAMs including approval and/or denial of my SAMs phases like phase III which allows inmates limited mix with few inmates essential in plaintiff case to get some help and break for his teeth & stumps abrasion see list Ex-A Remedy item NO. 10 ID: 1024696-Fri (exhausted). refering to the unknown SAMs as "outside law enforcement agencies" See here attached Ex-(5) a, b


33—As for footnote "7" in Rec.13. the plaintiff, respectfully implores the Court to construe the threats by federal officials in the provision of anti-retaliatory against a disabled as ADA And accordingly, allow the reinstating of SAMs unknown defendants and possible damages/compensation against any uninformed sued as official Capacity defendant.

21

Claim Two

34— Respectfully, the plaintiff showed that the degredation, threat by H. unit manager in ¶15 & declaration of claim two as continuation of the "make his life difficult" original threat and directly exposing him to pain & danger (by moving him to the more dangerous cell 300); as well as the construction of cells 300 & 511 opposite to his need & type of disability as the obvious manifestation of the threatening & anti-retaliatory ADA provision & disability discrimin-ion issues to be construed at this early stage.

35— The discrimination against plaintiff's type of disability is repeatedly discussed in formal and informal complaints as in the Am. 43-1 EX.A list and remedies, ID ≥ including but not limited to : 877974A, fully exhausted and concluded in 8/14/17 denying any consideration for improvement, and again in Aug 25, 2020 insisting on "the appropriateness of designation to ADX" signed by H. unit manager Deft 04 & Deft 05 See attached here Ex (06) 1 & 2 and compare with warden True, Deft 4, admission of recent note that cell 300 had always been unsuitable as in here exhibit 02 attached.

36— Plaintiff, respectfully submits that in his Am 43-1 17) 15 he asserted one set of defendants for official capacity only : 1, 2, 3, 4 and the second set for both capacities Deft 06 Macmillin & 08 follows as marked in full list too. 22

and accordingly both Ms Follows & Mrs Macmillin (who could have a different naming) are subject to Biven. And that all sued under official capacity to be accommodated in the anti-retaliation ADA provision subject to Compensatory/damages (Unless immuned person) As for Ms Follows & Mr. Macmillen in both capacities subject to Biven and/or the above ADA anti-retaliation provision As well as the respected court recommendations.

37 —     Claim Three
Thankfully, the respected court ruled that claim three not subject to dismissal (summary one). However, may be due to Plaintiff's emotional phrazing important points were misunderstood and Respectfully, Could be reconsidered as some of his important fair rights, and accountability against many defendants have been overlooked.

38 — The plaintiff Presented his claim three in totality as concerted effort by the named defendants to intimidate and punish him for his peaceful protest of hunger-strike for Tricking him & moving him to the well Known to all us the more dangerous cell 300 And the defendants named done just that each according to his role: Some Threatened like Nurse Hedlston & Kept inciting throughout the entire strike to Use Physical Force & not to bring the team and though

23

24 of 138

and though he did not show him self when the others returned and assulted the plaintiff, Heddstone as mentioned in the claim himself participated in another physical attempt to restrain the plaintiff with another Lt (Gonzaliz) and one of the three assulant (Averet) and C/O Dye on the following Monday of the assult Thus to be construed as Continuous & norm of ADX & pattern of retaliation

    Respectfully Deft. Hedelstone should be reinstated
He also had the knowledge that the assult will happen.

34 - Other defendants participated by trying to trick the plaintiff with fake hand camera to avoid team present and proper documentation like Dr. Steret and his female nurse (who was filming) and though the plaintiff was assulted under the pretext of "getting samples" for the Dr. he neither asked them to stop nor provided any help or medic-ation/assessment after the assult & left plaintiff bleeding for hours till Team & female nurse Provided that. Respectfully, he had failed the plaintiff in his both Capacities & deeply participated See "Rules & citations for liability for force: bystanders, supervisors and Municipalities" DR. steret was more than that and he was filming & need to provide the recording to court, he is also the quater Dr. & refused to provide help or respond to Duress call after he retreated with

foot note

1 As the plaintiff only sustained only fatigue, abrasion and stress and did not bleed and it was not for more than 5 minutes, it is not a separate claim but prove & enhancement to claim 03. But he always shouts "You are not American" when plaintiff ask for his ADA rights

24

failing to report what he saw/filmed. See: ——

Estate of Davis toy Ostenfeld v. Delo (8th cir 1997)
    (noting that failure to report can be evidence
        of deliberate indifference) [2]  Also as the one who
brought the assailants to obtain his "samples" even by force
without the Team. See:      U.S. V. Serrata (10th Cir 2005)
        ( Affirming – officer's criminal conviction of
            civil rights violation for failing to intervene)
    Other citations also, allowed that such failure could
find Dr. Steret as one of the conspirators of the assault.
    Accordingly, Deft. 11. Dr. Steret should be reinstated
to be sued under both capacities.


    40- The plaintiff respectfully implores the cant to
apply the discussed previousely anti-retalitory ADA provision
as the assault entire context & incident is but a vivid
portion of the threats & retaliation and mistreat of a sick
and disabled harmed but not harmful prisoner, and
permit the essential injuctive measure(s) to protect 8th
Amendment. And the potential requested compensation/damages
allowence(s) against any/all defendants under any or both
capacities. Respectfully, construing that from the plaintiff's
Loy term (punishment or similar phrased terms) as the plaintiff is
    Footnote. totally isolated & impeded from any legal/Library access.
[1] plaintiff New York attorneys confirmed that even the (Hon.) Modern judge
Analisa Torres never received any force feeding video recorded.
[2] please note that such failure to report is also showed by Deft's:
Lt Armijo(20) & Guy (7); True(4) & Tutoilmundo(5)

41- Respectfully, reinstating Lt. Armijo, Deft (20) [1] For persistent refusal to do any incident report and his earlier confiscation of plaintiff's essential/all property coercing him to not protest peacefully saying his only following orders of Deft (05) unit manager, it is on medical records since 2005 to date that the plaintiff need to shower and change cloth once or twice daily plaintiff stayed weeks with the only cloths on his body. And not only refused to report but prevented reporting by removing the blood stains which is but participating in the conspiracy of destroying evidence to protect the assailants and the above rank violators. (notice please Lt. Armijo done the same to the same cell when the plaintiff was denied medical by nurse William, claim 5, again he refused to do any report and brought others to clean plaintiff's blood from walls only; it appears that he is an evidence destroyer Texter for ADX)

42- Defts (4) True & Deft (7) Guy spoke to plaintiff several times during his strike & their Friday rounds and received by internal mail & other copies of the same by hand, refusing to allow; the providing of cloth & property saying "eat first" and to launch any investigation. See attached (Ex of ABCDE) an example; footnote of many. Respectfully Defts 4, 5 & 7 should be reinstated.

---

[1] Respectfully, it appears that the Court's footnote #2 in [60] page 20 has been misunderstood & thus misconstrued. The plaintiff's context was that Lt. Armijo acted under the ADX & unit manager usual practice to take away all striker belonging. Though it is against the BOP known policy

26

# Claim Four  PART THREE

43 - Starting with the respected Court Finding that Plaintiff alleges Sufficient Facts to demonstrate the alleged harm is Sufficiently Serious. Rec. 25

Respectfully, Such correct Finding should invoke the more relevant to plaintiff's disability rules & laws since it only means for a disable in solitary the de-facto of exposure to constant long-term Danger.

And that essential safety needs for his disability & daily need have not been met. Thus the Plaintiff's first request For ADA and any Construed derivation from it including the anti-retaliatory provision should be applied.

44 - Respectfully, Plaintiff is not suing the Occupational therapist(s) for Malpractice nor for their expert disagreement. But suing the ADX Defendants for "Shopping Around" to choose & reject only what suits their own agenda of "making his (Plaintiff) life in prison very difficult", and now also, means very dangerous. However, the respected Court also, noted that "none of the foregoing items (Recommended by BOP OT Ms Deat) have ever been provided to Mr. Mostafa. Id" Rec. 22

Respectfully, Such is not a "disagreement with the O.T" but a ligitamit claim against the BOP & SAMs unknown & known violations for not even providing any of the little their own specialist recommended supports claim and proves the "Shopping Around" & wrong policy see also above foundation ))5, 8, 11, 19 & 20.

27

45 – Respectfully notice also, that Ex 02 regarding the dangerous Cell 300 (which the plaintiff stayed for years) is a strong evidence that ; and admission of :

(a) The person who built it Deft 6, Maccmillin subjected plaintiff to years of pain & cruelity and exposal him to danger. (See also) ¶2 (foundation above)

(b) That Deft 6 & Deft 4, True (who was AW when plaintiff was sent to ADX) never followed any disability guide-lines for partially sighted upper double amputee.

(c) The timing of acknowledging the cell danger also never based on any O.T assessment but only on the same date of this court recommendations entry Jan 26, 2021

Accordingly, any argument of refusing fittings or items was due to "following O.T" is evidently not true and futed in plaintiff case.

(d) The above also explains why BOP still refusing to produce FMC, Missoury's O.T report, if she wrote one, shortly before Designation to ADX & building the dangerous Cell. Also, explain the persistant non compliance with UK O.T and even Ms. Dest (BOP O.T) recommendations to date. All above proves that plaintiff never received fittings & items adequate care. And is to date coearced to do his daily basic needs under pain, stress & danger exertions. compromizing his hygien (as no subtitute for a disable toilet for upper amputee except degradation).

46 – Respectfully, the plaintiff claims could be construed as an ADA statute claims allowing compensations from the named defendants and not to be dismissed at this early stage as there is substantial discovery to support the claim & implicate the defendants.

There is no dowt That This court has done wonderful effort and been considering Construer in the recommedation However The Same, if applied Under The more precise Closed relevant issues Under the Disability Stative and anti retaliatory disability provision[1], Will refine and focus and protect The essence of law and allow fairness to all parties.

217- The lack of Knowledge of the plaintiff to articulate his argument, know the legal terms or write without pain or emotionally phrased rumbles-are by defacto The only outcome of his denied due process, directly & indirectly and should not be used against him, much less for the benefits of the violations; as he is:

(a) Impeded from Law library as disable who needs special mouse & higher surface to Compensate for his Short hand

(b) Precluded from Knowing who can help him, let alone contacting them

(c) Documents of ADA Stative & other guide-lines

(d) And has no attorney or advice

See also, please; impediments of writings in his pro-se Doc [86] & The honourable Motion Judge Nina y wang order [88] including entrapment medical record to provide wrong prosthetics or prove to Court his "non compliance" & deprivasion of pen, table, reading glasses ... [86] 99 4 To 12 .

foot note

[1] The Density of the disability issues, persistance of higher rank officials to deny essentials without any Subtitutes or explaination of how to go without it in Solitary for Years and undenable pre Knowledge & False assurances to Eu courts (as in above foundation) support such request.

29

48 — Also, the previousely 2013 provided prosthetics similar to what was offered recently, exerbating stumps pain and abresion as they absorbs sweat & salt almost impossible to use causing infectiones, unlike the UK one. Plaintiff window of using prosthetic in cleaning from 15 minuts to 5 minutes as never cleaned or enabling plaintiff to clean them since 2012. There are many rules & citations regarding all the above not available to plaintiff.

49 — Dept(04), True, Ms. Follows(08), Legal Dept (07) Guy as well as Remedy Dept. Manifested full detailed knowledge of the plaintiff conditions in their Response [52] to the Dept Plaintiff's TRO [39] & Reconsideration [50] yet never provided to date any relief or lifted any exposure to Danger by Covid! or lack of fitting items or help.

Nor responding to any of the many requests they recieved from plaintiff by mail and given to their hand. The recent encounter with Ms. Follows during round May 18, 2021 she said she "does not have any answer or reply to my requests to her or in writing" see EX# 08 a, b, 2, 3, C d, e, F, 2, 3 attached Re: Dental care, Pen, glasses, dangerous food & fut eye, Occupational therapist reports not provided, items for cleaning hygiene self & place      Ms Follows sometimes say "They did not order fullow"

Respectfully the court, at this stage at least, might need to Fact find who are "They" and based on "What" and what is the "Substitute" and "how" it could be used?

Foot note
[1] plaintiff was vaccinated only a month ago but no safety, hygiene items provided ever to date.

In SUM                                    31 of

50 - Respectfully for all the above, The plaintiff implores This respected Court not to dismiss claim Four or its defendants at this early stage, Refine its construed recommendation incorporating the disability statue & its anti-retaliatory provision and to provide the relief sought of protection against danger[1] in accordance with the necessities of ADA &/or Eighth Amendment.

1-(Diets)        Claim Five

51 - This respected court construed, based on good faith, that decisions to over ruling, or denying diets and or medications (1) have been made by a medically qualified person(s) (2) And that the decisions made did not or will not result on harm or inadequate healthcare. But unfortunately in most issues of this claim it is not the case

52- As for the salad tomatoe diet. The records are solid and authentic timely and purposed entries by qulified specialists and proven beneficials and adequate over the years even without pills/medication, While ADX decision to deny the salad diet is scientifically basless, Causing documented harmful out come and total inadequacy and made utterly by unqulified officials. Respectfully, it should be restored and that ADX Warden, medical and legal advisors to show their case for the denial of diet for all those years. Accordingly, it is not a situation of disagree-ment but medical adequacy V. adequacy and needs more fact finding and reconsideration at this stage

foot note

1 previousely also, requested in plaintiffs TRO [39] items, putting help or workable substitute.

31

Therapitic Diet                                            32 of 38

53- Which is not about the food but its safe present

-ation & accessability of food without plaintiff's further abrad-

-ing his teeth or stumps or dirtying himself and place only

emerged after the plaintiff's food strike on the same day of

the last visit of the Honourable Judge Hegarty and after his recomm-

-endation But never acted upon it or even provided

the plaintiff a copy, till he received a copy attached to an

answer from Regional office and thereon kept asking

unit manager, Kitchen manager Deft Kundoff almost every

round to act upon it for no avail Also, repeated

refusal dispite informing higher remedy office that the

Kitchen is complying, as in several remedy reply.


54- Plaintiff wrote and asked Warden True to activate

the diet and instruct Deft. Kundoff to provide safe unfragmentable

food trays, and showed both of them the fragments and tray

and food in plastic several times and including in the last

time plaintiff saw them together during round Fri 9/25/20

he showed both of them the fragmented tray, half opened pouches

and fish fluids mixed with food and said "you are making food

tool of torture could you please comply with the diet".

Deft 9, Kundoff said to warden True (4) "it will be very difficult"

then deft True said to plaintiff "we need to discuss with

legal Department" but nothing happened. Accordingly The plaintiff respectfully

implore to apply the same construed endangering situation by C/O Loave & C/O

Norjano (Deft 15 & 16) To Deft 4 True, 7 Guy, 8 Follows & 9 Kundoff and to include ADA

____ foot note statue & provisions & compensation As they failed to enforce the diet for years todate.

¹ His honour, examined plaintiff's teeth, cracked abraded stumps & food trays

and saw the fragmentable hot tray at cell door. Also back dated the diet note to a

day before his visit! See Ex. 02. Jan 23, 2020                              32

55- Also, To date The plaintiff's only way to get food out of pouches, like peanut butter, Jelly, creams etc is to chew the whol pouch often causes gum bleeds and excerbates teeth abrasion painfully.

As for the fragmented food trays (hot) many officers respond to divers & sometimes mange to convince Kitchen to replace, others like Deft's Loene, Norjano & Averett refuse even to know and threaten and/or punish plaintiff if he sought duress button. Notes on the door never really enforced or acted upon by Deft's 04, 07, 08, 09. They are the most harmful and indifferent.

Thus, respectfully, as explained before, Plaintiff's long term "Punishment" includes, but limited to compansation and/or damages and/or monetary relief from all defendants under ADA, its derivations or other Amendments provision Like anti-retaliatory provision under whatever capacity provide the sought relief.

## B- Denial of Medical Care

56- Respectfully, there is a relief for the allegation of threats and punishment and retaliation for using Duress summarized in Foot not 17 (Rec. 29) There is a compansatory relief under Anti retaliatory Provision in ADA and mistreatment of needy endangered disabled. Respectfully, could be construed & afforded.

57- Toe Nail Trimmings : It is noteworthy that podiatrist had only been cancelled & pain & injuries inflicted on plaintiff as soon as his admission to ADX Oct 2015, despite been order by the Regional office since 2013 and provided at all times in U.K since 2004 till extradition 2012. See Exhibit 09 remedy page for granted Remedy 788398-R1 . This respected court accepted the founded by dates & Remedy allegation of toe nail painfull or delys but construed that Plaintiff faild to alledge it was

33

"intentional or reckless" Rec. 31 Respectfully, such needs reconsidering

58 — There are different allegations raised against different defendants according to their actions, explained in details in their relevent Remedies but very concised in the amended claim only to save courts time, but sufficient to the Courts attention. Such as:

(a) PA Osagi sued for his inflecting pain and bleeding plaintiff almost every time and when plaintiff complain he repeats his bullying retaliatory statement "Why did you come to ADX" or "you should not be here". Thus not for the two weeks intervals but pain, injuries (exposing to danger of infection & amputee as recognized by this court) and bullying

Such is Sufficient to support claim against PA Osagi under ADA & anti-retaliatory provision and mistreatment of a disable (repeated by) And also the repeat and bullying clear manifestation of indifferent recklessness. Courts also held that receiving repeated pain during medical care equal to no care, and that also the case of Nurse Hedetsher Dept.(18) See

→ Estate v. Gamble  S. Ct 285 (1976)
   "The unnecessary and wanton inflecting of pain ....
   -Proscribed by the 8th Amendment. "-

→ Also, ADA claim to a similar  See: Allah v. Goord (S.D.N.Y) (if he is at risk of incurring serious pain injuries each time he attempts to take advantage of out side medical attention surely he is being denied the benefit...)

→ This respected circuit held that repeated/pattern of conduct by prison medical staff "may add up to deliberate indeference (10th cir 1980) Ramos v. Lamm.

34

(b) As for Defendants 9 follows, 11 Steret & 18 Hediston they are sued as in 2nd Amendment 35 16 for knowing and seeing and told by plaintiff that at the time he is in pain; can hardly walk because 9½ month not getting toe-nail traing (often asking them during force feeding filming to point the camera to his toenails to document the abuse) But they only used plaintiff's pain to blackmail him to go-out of strike "go out of food strike first" repeatedly daily sometimes And "One thing at the time" and even when strike finished Dec. 05, 2012 they still retaliated & delyed yet another 6 weeks and also, done with pain & isolating

⇒ 59—These facts can not be any other but intentional or reckless or both cruel & retaliatory please. Also, notice its elements of mistreating, intimidating a disabled in pain knowingly against ADA & 8th amendment and first amendment freedom, right to protest and that the long term of punishment" could be construed, as intended, to include Compensations. And "Respectfully, the claim & Defendants should be reinstated, at least at, this early state; as it is the norm ADX open secret to intimidate and retaliate from food strike protesters. See also, Rules of prolonged pain

⇒ And (10th cir 1990) Reed V. Dunham not allowing 2 hrs delay for stab wound.

⇒ And against, medical blackmail. "Denying medical care to make an arrestee confess support a claim" Calhoun V. Thomas (M.D. Ala 2005).

⇒ Durmer V. O'Carrol (3rd cir. 1993) (Delay of treatment for non medical reason could constitute indiference). Please, also note that plaintiff only asked for the reinstating of podiatrist because of the torturous inadequate, lacking tools experiance bulling exposing to danger substitute = No care!

35

60 - Dental Care

Here, the respected court construed the objective part of the eight Amendment but failed the plaintiff subjective componant However, Respectfully, The reasons to justify the failure in Martinez v. Boggs are all supportifed us to the plaintiff to succeed the subjective component and proven in ① plaintiff Remedies clear "find act" reply of denial or rejection or inform -ation only. ② Also, in the documented medical records of extradition agreed upon and The Under Taken by Alx Warden Wesley as in Foundation above & Ex 03 affidavit to court

Agree and acknowledge of his disability, The need of daily help. Those are facts in plaintiffs medical records will show in discovery. ③ Furthermore all the mentioned plaintiff Participated in resisting plaintiff's TRO [39] & Reconsideration [50] in their [52] extensive motion a year ago.

④ The several letters from plaintiff's attorney Ms Lewis to provide pouch opener, electric brush See for example Ex-10 a₁,a₂ To legal Dept. (Mr Guy Esq. Deft 7 acknowledged taken over from Ms. Klett Esq and got the letter) and (Ex-10 -b₁, b₂) denial of electric tooth brush by ADx medical & exhausted Remedy ⊖ chief dentist. Roberts in 2015 & 2017 + 2019 'legal & Ms follows in Ex-10-c₁, c₂)2 ; and to legal Dept April 2016 (Ex-10- d₁, d₂) for Good, feeling & Safety; See also, ⊖Remedy ignoring loss of teeth and admitting "No other treatment available" to treat your issue - signed by Warden True (Find act) Ex-10-b₃, b₄.

And Respectfully as early as 2016; Reporting ① broken tooth ② Coerced/forced to open packages with teeth ③ Seeking prevention from future - foot note _____ similar repeat See Ex 10-F₁, F₂ F₃ & may other available

† Also, all of Ex 02 and many of claim 4 above about forced to open pouches by teeth

36

See also Ex-10-g₁ & g₂ denying appointment & core   37 of 138

61- Respectfully, there is hardly any thing else could have been done to inform alert and seek prevention of further harm from the institution & the seed defendants.

As well as the obvious harm visable to any rational official to occure to any disabled no hands in Solitary for years without the need of the voluums documentation above. See please; SCICLUNA v. Wells (6ᵗʰ cir 202?) "... reasonable prison official ... should have known would subject him to personal liability)

62 - Respectfully, not only all above, but also, the plaintiff in his 2nd Amended Claim invoked his disability & confinement issues in the Dental Care incadequacy and the issue of repeatedly ignoring his broken teeth one after the other for the same coercing to open packages, 2ᵈ Am 34) 18 and could have been construed according to ADA Statute & provision for a claim allowing demages, and/or compensation and only requires that his disability has not been addressed sufficiently

63 - Accordingly, the plaintiff Respectfully implore the respected court to consider refining and accommodating his ADA in its construe together with the 8ᵗʰ Amendment and allow the non-summary dismissal of the Claim and defendants at this early stage as it does have considerable Prima face sound substance.

And more importantly and urgently to provide ADA with their responsibility towards the solitary confined disabled plaintiff to stop his pain of teeth, Gum, Provide the tools & measures sought in plaintiff relief for teeth dental care & te necessity of the 8ᵗʰ Amendment and ADA prisoners guideline statue & provission.   37

64 — Respectfully, the defendants inherited volumious and regular reminders and requests of stop the harm & exepoure to danger records & chosen always to "look the other way" even taking measure to apply & spend tax payer resources and damage the US nations world wide only to retaliate from the plaintiff and carry out their threat of "making his life-very difficult in prison". This respected court may find the truth and evidence of that from the entire case inter-connected pattern proving that this claim goes far & wider than the plaintiff and ordinary text book citation :

in  Johnson v. Wright 234 F. Supp. 2nd 352, 360 (SDNY 2002) quoting, Hathaway v. Coughlin, 37 F.3d 63 (2nd cir 1994)  "The mere fact that a prisoner received regular medical care does not preclude a finding of dilibirate indifference where the course of treatment was largely ineffective and [prison officials] declined to do anything more to attempt to improve [the prisoner] situation"

Respectfully, the plaintiff's case and conditions are more severe than the above prudent citation for his dental, medical, rehabilitation conditions and ADA provision denied to date exposing him to danger, pain, stress and harm hourly for years unknown or acceptable in any civilized world let alone U.S.A with its famous protective law and crate keeping courts & judges.

— Foot note —
1 It included leaning on lower rank staff to do their share against the plaintiff as in the last part of claim five & falsification and/or entrapment nature records providing paper work with no relief pattern.

38

## 4. "Medical Malpractice[1]" 39 of 138

65— The court dismissed this part of the claim as it fails to state an arguable claim for eight Amendment deliberate indifference.

Respectfully, the plaintiff explained that the clauses mentioned were the result outcome of the many denial medical & disability needs, i.e an indirect related to medical issues harmed him as a disable in the denial of essential disability & health matters & belonging by unit manager for almost 2 months as retaliation for his food strike which was also triggered by Dept. 5. unit manager moving him to the more dangerous cell 300 and stressing him before that (and threatened him after the ending the strike to move him back to it again if he does not clean (all well) saying " see you in court " & "take us to court " as in claim declaration and also claim 3

66- Respectfully, the respected Court could include in its provision to construe what the Def plaintiff invoked in his lay term Juris The ADA anti-retaliating provision and harmful mistreatment to a disable under stress & in his prolonged pain due to her persistent denial to his medically needed change of cloth. (Lt Armijo Deft 20 kept saying he is following her orders) if all that does not trigger 8th Am. Cruelty and denial of prescribed medical needs (cloth & items), it is certainly a gross abuse & prolonged exposure to danger under ADA statute anti & retaliatory provision allowing accountability and compensation/damages

—— Footnote ——

1. Please note that even plaintiff's choice of terms as uneducated; he is a law lay person hence, does not know true meaning or the legal adequacy of its use and thus; Respectfully I should not restrain a claim 9

and could be construed that way, especially when she is the main reason and persistant trigger for this painful complicated whole claim/suit, the strike and all its consequence consequency etc. certainly abusing her power against the disabled vulnerable plaintiff and cruelly & recklessly provoking him to make a court claim has already added pain to everyone but her sofar & wasted this court resource all above require a form of deterant to protect the plaintiff & all other involved parties from a repeat.

Accordingly, Deft 5, Tuttoilmundo should be reinstated.

-67- Similarly Deft. 22 C/o Hensen for degrade-ing & mistreating a disable prisoner who can not cover himself from out side cameras and by passers while in toilet adding degradation to plaintiff's already extra ordinary difficulty trying to "improvize" different ways to clean & cleanse himself after the non-disable toilet visits.

Respectfully C/o Dft. 22 Hansen should be reinstated and sued under the prison & disability antiretaliatory allowing compensation/damages

## Finally & Conclusion

68 - The plaintiff respectfully apologize for this long reconsideration which was long to avoide any further future new claim(s) or amendments or supplement or ask the court to appoint an ADA attorney for the impedement of ADX to litegate.

69 - Respectfully, this is a large case with extra ordinary issues & features and accordingly the court is implored to enlarge its liberal approach to a matching level to construe meaity and correct, when needed, misused terms, basis of claim(s) And to allow the ADA statue & anti-retaliatory provision to play the largest possible rule on the claim as it is the most needed & relevent here.

70 - To reinstate the sought claims & Defendants - Respectfully Submitted Plaintiff: /s/ 5/20/21

40



# Bureau of Prisons
## Health Services
### Modified Diet Request

Types of Diets:

| | | |
|---|---|---|
| ___ | Clear Liquid | Exp Date: |
| ___ | Low Fat | Exp Date: |
| ___ | Mechanical Soft | Exp Date: |
| ___ | Low Cholesterol | Exp Date: |
| ___ | Low Triglyceride | Exp Date: |
| ___ | Renal | Exp Date: |
| ___ | Full Liquid | Exp Date: |
| ___ | Sodium Controlled | Exp Date: |
| ___ | Snack | Exp Date: |
| ___ | Diabetic | Exp Date: |
| ___ | Calorie Controlled | Exp Date: |
| ___ | Other: | Exp Date: |

Comments:  All prepackaged religious food will be opened by food service workers in a certified foods kitchen and place into easy access containers.

_____
Sterett, Justin MD
Health Service Staff

__MOSTAFA, KAMEL MOSTAFA__        __67495-054__        __01/23/2020__
Inmate Name                                   Reg#                      Date

Plaintiff   Received from Regional office

Remedy i005223-A₁

Generated 01/23/2020 14:12 by Sterett, Justin MD        Bureau ___ M        Page 1 of 1

**Administrative Remedy Number 1005228-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal where you raise issues regarding food trays and how your meals
are delivered to you at the ADX.   You state your meals are to be opened
and the food items placed in different containers, and this does not
happen.   You claim some of the containers are only partially opened
and you have to use your teeth to open them.   You also claim the food
items are mixed with each other, making some of your food "messy,
slippery and unusable."   You request the rules be followed regarding
your meal trays.

A review of your appeals reveals, due to your physical limitations,
you have a Medical Duty Order from the Health Services Department
in regards to your meals.   Specifically, all packaged religious diet
food will be opened by Food Service workers in a certified foods
kitchen, and placed into easy access containers.   This office has
confirmed that staff at the ADX are aware of this accommodation.   If
this is not occurring or you encounter other issues with a specific
food tray, it is suggested you advise staff at that time, so the matter
can be immediately addressed and/or the food tray exchanged if
necessary.

This response is provided for informational purposes.


_____
Date   10/22/20

_____
Ian Connors, Administrator
National Inmate Appeals

Request for Safe food & Meals As Therapetic Diet

To: Kitchen Manager(s) Mr. Kundoff, Mazon
Mr. Kebirates

From: Disabled Inmate Mostafa   # -54
Reg No. 67495-054

May 3rd, 2021

(1) — I am still getting most of the food trays in plastic against my diabetic disability Therapetic Diet guide

(2) — Things have been gotten worse and messey in the last two weeks too. to the extend that again trays are full of the fish Fluids mixed with all food items.

Unit staff Can not help and whenever they contact Kitchen they get one answer saying "we are not going to take the fish out of pouches" I left many messages including Duress button.

as for example but not limited to of officers, of H unit delivered the above responses to me;

C/O Contreaux & C/O Romine Sat May 1st 2021 ←
and many other times before Thurs 4/29/21 ←

C/O Snyder (Oil sardine everywhere) Tus 4/27/21 ←
No orange peeled

C/O Dye (Black) #C/O Luther & Duress Wed 4/28/21 ←
Button

Could you please comply with my Therapetic Diet note and place food content inside a hard tray or provide my disability utensils & pouch opener.

Please, remember I can not Clean the place without burning my self & stumps and I do not have or allowed any cleaning items or help;

please, answer this request as it may be a Court Document if there is no end to the harm. Thanks

I/m   5/3/2021

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Ex- 01-G
COVID- Kitchen                                    44 of 58

---

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Mostafa, K. Mostafa     67495-054     H     ADX—Co;
　　　LAST NAME, FIRST, MIDDLE INITIAL　　REG. NO.　UNIT　　INSTITUTION

**Part A - REASON FOR APPEAL** Unfortunately, again Regional office is not well informed about the reality. Nor addressed the issue that the Diet is very clear that Food should be opened, free from any plastic and replaced in any eat containers; as it is dangerous otherwise for me. Till now, most of the items are only partially opened and not replaced in any easy eaten containers. Such is still compelling me to use my already very abraded teeth to open or complete the open. And now, is very hazardous in covid-19 time; as I am in solitary, disabled and deprived from help and disability items to open pouches or Cream.

11-02-20
DATE                                    SIGNATURE OF REQUESTER

---

**Part B - RESPONSE**

RECEIVED
NOV 16 2020
Administrative Remedy Section
Federal Bureau of Prisons

---

DATE

ORIGINAL: RETURN TO INMATE

GENERAL COUNSEL

CASE NUMBER: 1032022-A1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
　　　　　LAST NAME, FIRST, MIDDLE INITIAL　　REG. NO.　UNIT　INSTITUTION

SUBJECT: _____

DATE                        SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LVN                    PRINTED ON RECYCLED PAPER                    BP-231(13)
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　JUNE 2002

S/S please scan, return and sent to Medical Dept, Kitchen

To: 2nd : Whom it May Concern   5/4/2020

including Medical Dept, Kitchen, dietion and Warden

From: I/M   Mostafa # 67495-054   Unit H - Cell 511

Subject: Unmanageable Safety & Hygien issues in present Food Trays

1-   I am Severly disabled (no hand and vision impaired) and recently in Feb 2020 was assigned to a Theropy Diet and signed permission to open, in kitchen, my Koshe Food Items.

2-   However, since then multiple unmanageable safety an Hygiene developed make it very difficult, unsafe to handle or reach the food or consume it.

3-   For example (but not limited to): (a) Some items are not alway opened and I still have to use my stumps and teeth (b) even worse Most opened items are only partially opened and fluids, oil and content all mixed in the Styr tray, make everything Untouchable without dirting/clothe, cell, body and destroying the food itself) (c) over heated hot trays (at least 3x weekly) fragments parts of the tray to all size sharp razor parts, I can feel some in my mouth but not all (this issue is persistent i made many remedys) (d) When i ask for safer tray many times I do not and have to go without food.

Request:   As all above and I am now in Therapt diet Could you please get me my disability plates and tray and put the food in from Kitchen.

And, as for now, Temporary Measure to open all the food and place it inside a standard Kitchen Hand tray (no plastic or papers) until a decision is made about my disability. I am again becoming fearful and phobic of such dangerous difficult issues. Respectfully.

45

(EXPIDT. By Hand)   46 of 138

To SIS or Medical: Please scan & send to
Ms Follows and return to me copy or receipt
page one of Two

TO: MS. FOLLOWS                    Feb. 09, 2021
From: MOSTAFA #67495-054   H-511
Subject: Please comply with Court
          orders and Regional Resolution

1- Hello, Ms Follows: I still never
received the Assigned easy write easy
hold pen (Grip Bic) Nor you
allowed me as promised to buy
From Commissory
          Please remember This is in Record
since 2013 by Bop own O.T and
(Hon) Judge Forrest. And also, recently
endorsed by (Hon) N. Wang several times,
including DOC [59].

2- Please, find enclosed and Reinstab
the regional office order for
Toe-nails podiatrist   NO.

          788398-R1

3- I do not have any tooth brush
   since 8 month ago!

4- I still never received the O-T Point
report.     Thank you   Respectfully
             I'm          46

```
FLMCG              *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      12-10-2020
PAGE 006 OF        *              SANITIZED FORMAT                *      11:48:34

REMEDY-ID     SUBJ1/SUBJ2  -------------------ABSTRACT-------------------
              RCV-OFC    RCV-FACL    DATE-RCV       STATUS     STATUS-DATE

 788398-F1    26AM/       MEDICAL CARE - DELAY OR ACCESS TO
              NYM         NYM        07-30-2014      CLO
                                                                08-22-2014

 789658-F1    21AM/       UDC ACTION
              NYM         NYM        08-08-2014      CLD
                                                                08-22-2014

 757757-A1    22CM/13ZM   ADMINISTRATIVE DETENTION CONDITIONS / SAM ISSUES
              BOP         NYM        08-26-2014      CLO
                                                                04-09-2015

 792117-F1    17AM/       PHONE CALLS (EXCEPT LEGAL CALLS)
              NYM         NYM        08-28-2014      CLD
                                                                09-26-2014

 789658-R1    21AM/       UDC ACTION
              NER         NYM        09-02-2014      REJ
                                                                09-12-2014

 788398-R1    26AM/       MEDICAL CARE - DELAY OR ACCESS TO
              NER         NYM        09-15-2014      CLD
                                                                10-15-2014

 794455-F1    26AM/       MEDICAL CARE - DELAY OR ACCESS TO
              NYM         NYM        09-17-2014      CLG
                                                                10-21-2014

 789658-R2    21AM/       UDC ACTION
              NER         NYM        09-26-2014      CLD
                                                                10-24-2014

 796191-F1    26AM/       MEDICAL CARE, DELAY OR ACCESS TO
              NYM         NYM        09-30-2014      CLO
                                                                11-18-2014

 796427-F1    26AM/       MEDICAL CARE - DELAY OR ACCESS TO
              NYM         NYM        10-02-2014      CLO
                                                                11-19-2014

 792117-R1    17AM/       PHONE CALLS (EXCEPT LEGAL CALLS)
              NER         NYM        10-06-2014      CLD
                                                                11-05-2014

 803277-F1    33FM/33ZM   I/M ALLEGES HE WAS NOT PROVIDED ALL HIS BP-10 COPIES
              NYM         NYM        12-01-2014      CLO
                                                                12-11-2014

 789658-A1    21AM/       UDC ACTION
              BOP         NYM        12-05-2014      CLD
                                                                06-02-2015

 792117-A1    17AM/       PHONE CALLS (EXCEPT LEGAL CALLS)
              BOP         NYM        12-16-2014      VOD
                                                                01-30-2015

 792117-A2    17AM/       PHONE CALLS (EXCEPT LEGAL CALLS)
              BOP         NYM        12-16-2014      CLO
                                                                04-08-2016

 805135-F1    34ZM/       I/M ALLEGES STAFF COPIED HIS LEGAL PAPERS
              NYM         NYM        12-19-2014      CLD
                                                                01-09-2015


 G0002        MORE PAGES TO FOLLOW . . .
```

 



**U.S. Department of Justice**
Federal Bureau of Prisons

Federal Correctional Complex
Florence, Colorado
☒ *Administrative Maximum Security Institution*
☐ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

January 26, 2021

MEMORANDUM FOR:   ALL CONCERNED

FROM:                         B. True, Complex Warden

SUBJECT:                    Inmate Mostafa, Kamel Reg. No. 67495-054

Effective with the issuance of this memorandum, inmate Mostafa, Kamel Reg. No. 67495-054, will not be required to be rotate cells every 90 days while housed in H-Unit.

Until such time as another cell can be adapted to accommodate his specific medical requirements, Mostafa will remain in cell 511. However, the cell and all personal property will be thoroughly searched, at a minimum of once every thirty days.

Cell sanitation will be maintained and all contraband must be controlled. Staff will provide Mostafa with adequate supplies to ensure he is able to keep the cell clean and complies with institutional sanitation requirements. At no time will Mostafa be allowed to accumulate excessive or unauthorized property. If there is a question in regards as to what is authorized property, staff will consult the Operations Lieutenant, Unit Team, and/or Health Services staff to determine if it is allowable.



To: The respected Warden Mr. True     Sep. 23-2019
From: I/m Mostafa # 67495-054   Unit H-511

Subject: Request for Consideration Re: Cell move and cell lacks

    Welcome back to the institution, and thank you for advising me, last week to submit this request for your discretion and consideration; as I had already exhorted all avenues of remedy and requests for no avail, and can hardly cope with my on going hardships, including the subject of this request.

    I am the severely disable 61 yrs inmate you saw in Cell 511 (Disabled with no hands, blind in left eye & poorly sighted with many other health complications such as: skin problems, hyper-tension, diabetic, arthorisis and hyperhydroses ....).
    Admitted to ADX in oct 2015 to the faulty unsafe Cell 300 where I stayed continuouse for 2½ yrs. (currently potential phase II,

Since last year; I am subjected to Cell moves which causing me a lot of pain, anxiety and multiple injuries especially in Cell 300.

This request is summarized to (with your discretion):
    1 - Allow me to stay in the cell I am in now 511, as it is less harmful than Cell 300.
    2 - extend the eating/writing surface, for health and safty to 36" x 30"

- 1 -

EX.02.a.

The details of the reasons for the request are supported by my medical records, special needs and many remedies and can be summarized by (but not limited to) following :

(A) health & safty and hygiene during moving

(B) health, safty and hygiene lacking in Cell 300.

As for (A) moving :

During any move I encounter many harmful issues such as (not limited to):

1- Arms/stumps abrasion, bleeding, redness and pain during the need to pack, unpack and continuous work in a short period of time and overheating and exhaustion because of my limitation & no help.

2- Stress because of the above and several damage to my property and legal work as I can not handle properly

3- as well as misplacing important items to my health, hygiene, safty and functioning in my sorting and it could take days or weeks to go back to normal (with all the risk due to that)

4- I was injured several times and bled but when I asked for help I was mocked "why did you cut your hands". Other times "we have no discretion for you from management". Other time "You should be in a hospital!!".... there are remedies about that (No help)

-2-

50

moving cell continued:

5- The cell to move to either not cleaned or cleaned appropriately to unpack

6- Staff do not have or provide essential help/material to function after move such as velcro to shower curtains... etc and it could take days/weeks to obtain with all the risk to do it myself as disabled poor sighted

7- Many other reasons - (if needed)

(B) Issues of Cell 300

Several times I offered to avoid moving to Cell 300 even by offering to move and stay in the tunnel cells as they are less dangerous and more safe than the faulty 300 cell but I was refused.

Some of many of the faults (lack of health safety & hygiene) are as follow:

1- It has many sharp edges: iron discs meant to help me but causing bleeding injuries in the sink, shower and toilet flusher made of wrong material, size and place.

2- The cell is pitch dark day and night: one window is completely covered by the new fitted shower, the other is covered by the room leading to Rec(A) and no light switch near the bed. Such causes injuries & anxiety.

-3-

52 of 138          page 4/5

EX02 @4

and regresive skin conditions, as I have psoriasis and need
ultra violet lights/treatment especially on back lower
private area and can only get by sun from windows
or artificial ultra violet lamps. (Denied)
     I also get no help in applying any skin prescription

3- Problem of lights also, exacerbates my poor sight as I can
not position correctly my moves and balance, and sustain
injury and Continuous risk of falling which in itself
a worry some of how can I help myself than in confined

4 - The eating surface provided in cell 300 is a way far
   from the sink, 14 feet, where I need badly to eat close
   to avoid accidents, spellages and for more extra needed
   cell clean (I do not get any help for cell cleaning nor
      ADX Renve cleaning items Compatible with my prosthetics)

5. the gates above the cell 300 and leading to yard are directly
   hitting the wall where the bed is placed which is violating
   the minimum distance ascribed to a safe level of sound
   vibration units hence causes sleep deprivation.

Finally, the eating surface in the cell I am in now is near the sink
but can only take one food tray and less than half the size provided
to any able inmate and need extention to accommodate
two trays and three Prosthetics (5" each) i.e. 36" X 30".

                    - 4 -                              52

Page 5/5

For all the above mentioned, your considering discret
-ion is needed to approve this request to prevent
and/or mitigate the highly probable future injuries
or Health safty and hygiene issues.

My apology for the lengthy request; it ment to
help you to (I) help me in your professional
Consideration (s)

Please, File/document this request for my future
reference/revission and your chain of Command aware
-ness.

Thank you.

Respectfully Submitted

Handed to

I/M ——— #67495-054

Sep 23 - 2019

E-02-08

| BP-A0288 | **INCIDENT REPORT** |
|---|---|
| Dept. of Justice / Federal Bureau of Prisons | |

**Part I - Incident Report**

| 1. Institution: **FLORENCE ADMAX USP** | | Incident Report Number: **3331382** | |
|---|---|---|---|
| 2. Inmate's Name **MOSTAFA, KAMEL** | 3. Register Number **67495-054** | 4. Date of Incident **11-21-2019** | 5. Time **11:30** |
| 6. Place of Incident **Health Services** | 7. Assignment **UNASSGN** | 8. Unit **H** | |
| 9. Incident **307 -- REFUSING TO OBEY AN ORDER.** | | 10. Prohibited Act Code(s) **307** | |

11. Description Of Incident
(Date: **11-21-2019**    Time: **11:30** staff became aware of incident)

On November 21, 2019 at approximately 11:30 a.m. Inmate MOSTAFA, KAMEL, #67495-054 was housed in Health Services holding cell for observation due to being on a current strike. I gave Officer Mostafa a direct order to come to the cell door in order to receive and consume a nutritional supplement . This was due to inmate Mostafa's hunger strike reaching a point where there is a significant hazard to his health. Inmate Mostafa turned to look at me, acknowledging me, and shook his head no. I again gave inmate Mostafa a direct order to which he again refused. Due to Inmate Mostafa's refusal Calculated Use of Force team entered the cell to apply restraints and begin involuntary feeding procedures.

| 12. Typed Name/Signature of Reporting Employee **A. Troutman** | | 13. Date And Time **11-22-2019 06:00** | |
|---|---|---|---|
| 14. Incident Report Delivered to Above Inmate By (Type Name/Signature) *D. Padilla* | | 15. Date Report Delivered 12/6/19 | 16. Time Report Delivered 00:00  0645 |

Prescribed by P5270                                      Replaces BP-S288.052

55 of 138

EX-02 07

BP-A0288                          **INCIDENT REPORT**
Dept. of Justice / Federal Bureau of Prisons

## Part I - Incident Report

| 1. Institution: **FLORENCE ADMAX USP** | | Incident Report Number: **3331391** | |
|---|---|---|---|
| 2. Inmate's Name **MOSTAFA, KAMEL** | 3. Register Number **67495-054** | 4. Date of Incident **11-21-2019** | 5. Time **12:58** |
| 6. Place of Incident **Health services** | 7. Assignment **UNASSGN** | 8. Unit **H** | |
| 9. Incident **208 -- INTERFERING WITH SECRY DEVICES.** | | 10. Prohibited Act Code(s) **208** | |

11. Description Of Incident
    (Date: **11-22-2019**     Time:   **12:58** staff became aware of incident)

**On 11/21/2019 at approximately 12:58 Inmate MOSTAFA, KAMEL, #67495-054 was in health services in the Pro-straint chair following an involuntary hydration procedure due to hunger strike.  Inmate mostafa manipulated his Posey restraint on his right arm and managed to removed the restraint on his arm, defeating the restraints.  Inmate Mostafa then managed to removed the IV that was placed in his right arm preventing the fluids from entering his blood stream.   A calculated use of Force team had to be assembled due to the inmates actions to conduct a involuntary feeding procedure.**

| 12. Typed Name/Signature of Reporting Employee **A. Troutman** | 13. Date And Time **11-22-2019 06:00** |
|---|---|
| 14. Incident Report Delivered to Above Inmate By (Type Name/Signature) *D.Padilla* | 15. Date Report Delivered 12/6/19 |

16. Time Report Delivered **00:00** 06:00

Prescribed by P5270                                    Replaces BP-S288.052



Ex(3)i

Exhibit 3   Colored panel   56 of 138

IN THE CITY OF WESTMINSTER MAGISTRATES' COURT

BETWEEN:

GOVERNMENT OF THE UNITED STATES OF AMERICA

<u>Requesting State</u>

v

JULIAN ASSANGE

<u>Defendant</u>

DEFENSE BUNDLE
LINDSAY A. LEWIS STATEMENT AND EXHIBITS

| TAB | TITLE | DATE |
|---|---|---|
| | Statement of Lindsay A. Lewis | |
| | **Exhibits to Statement of Lindsay A. Lewis** | |
| 1 | *Curriculum Vitae* of Lindsay A. Lewis | July 17, 2020 |
| 2 | Complaint in *Mostafa v. Barr*, 1:20 Cv. 694 (PAB) (NYW), Docket # 1 | March 12, 2020 |
| 3 | Amended Complaint in *Mostafa v. Barr*, 1:20 Cv. 694 (PAB) (NYW), Docket # 9 | May 18, 2020 |
| 4 | Judgment of Justice Sullivan of the High Court in *Mustafa Kamel Mustafa v. United States*, [2008] EHWC 1357 | June 20, 2008 |
| 5 | Order of Senior District Judge Tim Workman, in *United States of America v. Abu Hamza*, in the City of Westminster Magistrate's Court | November 15, 2007 |
| 6 | Sworn statement by ADX Florence Warden R. Wiley | October 3, 2007 |
| 7 | Decision of the European Court of Human Rights in *Babar Ahmad and Others v. the United Kingdom* | September 24, 2012 |
| 8 | Submission by the Foreign and Commonwealth Office of the United Kingdom on behalf of the U.S. in *Mustafa v. United Kingdom* | November 13, 2008 |
| 9 | Judgment of Justice Ouseley of the High Court in *Abu Hamza and Others v. SOS for the Home Department*, [2012] EWHC 2735 (Admin) | May 10, 2012 |





| 10 | Letter from Jeffrey D. Allen, M.D., the Chief of Health Programs for the BoP and Dominique Raia, Senior Counsel to the BOP, to Assistant United States Attorney Edward Kim | January 2, 2015 |
|---|---|---|
| 11 | Sentencing Hearing Transcript in *United States v. Mostafa*, Case No. 04 Cr. 346 (KBF), Docket # 474 | January 9, 2015 |
| 12 | Judgment in the criminal case *United States v. Mostafa*, Case No. 04 Cr. 356 (KBF), Docket # 463 | January 12, 2015 |
| 13 | Letter from Lindsay A. Lewis, Esq., to the Honorable Katherine B. Forrest of the U. S. District Court, Southern District of New York | October 7, 2015 |
| 14 | Government Response to the October 7, 2015, letter from Lindsay A. Lewis, Esq., to the Honorable Katherine B. Forrest of the U. S. District Court, Southern District of New York, with Court Order | October 14, 2015 |
| 15 | Letter from Lindsay A. Lewis, Esq., to the Honorable Katherine B. Forrest of the U. S. District Court, Southern District of New York | January 14, 2012 |
| 16 | Letter from Lindsay A. Lewis, Esq., to the Honorable Katherine B. Forrest of the U. S. District Court, Southern District of New York | March 7, 2013 |
| 17 | Center for Constitutional Rights and Allard K. Lowenstein International Human Rights Clinic at Yale Law School, "The Darkest Corner," September 2017 | September 2017 |

Exhibit 3   Cobred

Ex(3) 1

50 0f 138

# IN THE WESTMINSTER MAGISTRATES' COURT

BETWEEN:

## THE GOVERNMENT OF THE UNITED STATES OF AMERICA

-v-

## JULIAN PAUL ASSANGE

## AFFIDAVIT OF LINDSAY A. LEWIS

I, LINDSAY A. LEWIS, hereby declare under penalty of perjury the following:

1.      I am an attorney licensed to practice law in New York State, and admitted to practice in a number of United States federal District Courts, Circuit Courts of Appeals, and the United States Supreme Court.  I have been practicing criminal defense law continuously since my admission to the Bar, in 2008, and my practice has always been concentrated in that field.  In addition, I have represented Mostafa Kamel Mostafa, an individual extradited to the U.S. from the United Kingdom -- who was tried and convicted in the U.S., and who has been housed since his extradition under Special Administrative Measures ("SAMs") and in solitary confinement, both at the Metropolitan Correctional Center in New York City, and for the last five years at the administrative maximum security facility (hereinafter "ADX") Florence -- by Criminal Justice Act appointment since October 2012, and as counsel specifically assigned to address Mr. Mostafa's prison and medical issues since February 5, 2015.  I was further appointed by the District Court for the Southern District of New York, January 14, 2020, to represent Mr. Mostafa in regard to any litigation pursuant to 28 U.S.C. §2241, challenging his conditions of confinement.  I make this Statement in the context of the above-captioned extradition case.

2.      This Statement is submitted in recognition of and compliance with United Kingdom Criminal Procedure Rules 33.2 and 33.3. I understand my duty to the Court under

58





those Rules, and am in compliance (as is this report) with them, and will continue such compliance.

## I. Professional Credentials

3.      I practice criminal defense law in the state and federal courts, primarily in New York, but also involving cases in other jurisdictions.  Throughout my career, my practice has included a wide range of matters, including terrorism, "white collar," "organized crime," drugs, sex offenses, cyber law, and capital eligible cases.  I have served on the Board of Directors of the National Association of Criminal Defense Lawyers since 2016, and am currently in my second consecutive term on that Board.  I also serve on the Board of Directors of the New York State Association of Criminal Defense Lawyers.  In addition to my Board positions, I am Co-Chair of Women in Criminal Defense Committee for both the National and New York State Associations of Criminal Defense Lawyers, a Co-Chair for the National Association of Criminal Defense Lawyers's *Amicus Curiae* Committee, and the Northeast Regional Delegate for the National Association of Criminal Defense Lawyers.

4.      I am also an active member of the Federal Bar Council's Sentencing and Alternatives to Incarceration Committee, and have been a Program Coordinator for that committee on panels with topics including the First Step Act and President Barack Obama's Clemency Initiative.  I have appeared as a speaker and panelist at legal, academic and other conferences, and I most recently spoke on the topic of the experiences of women in the U.S. prison system.

5.      I am a 2003 graduate of Vassar College and a 2007 graduate of the Benjamin N. Cardozo School of Law.  My complete credentials are listed in my *Curriculum Vitae*, a copy of which is attached hereto as Exhibit 1.

## II. Relevant Professional Experience

6.      In the course of my career, I have been involved as defense counsel, either at the trial or appellate level, and also as a consultant, in a significant number of other cases in various federal courts across the U.S.  I have also drafted or collaborated in the drafting of numerous expert reports and/or acted in a consulting capacity (on matters of U.S. federal criminal law) for







cases in the U.K. and Canada, and have represented individuals who have been extradited to the U.S. from other countries, including the U.K.

7.      I have visited clients at each of the federal detention facilities in New York, including the Metropolitan Correctional Center in Manhattan ("MCC"), on countless occasions over the last twelve years, beginning in the summer of 2008.  I have seen clients in not only the standard areas for legal visiting and segregated housing units, but also on 10-South, the most restrictive housing unit at MCC, designed to house inmates of the highest security level in solitary confinement, and also the unit in which Mr. Mostafa was housed for the duration of his pre-trial and trial confinement in the U.S.  I have been present in these facilities during lockdowns and have been exposed to the gas sprayed in inmate units to subdue inmates during an incident, and the effects thereof.

8.      I have also visited inmates at numerous other New York State jails and prisons, in New York City and other parts of the state, and, in the fall of 2019, I visited HM Wandsworth Prison in London.

### III. Legal Representation of Mostafa Kamel Mostafa

9.      As noted previously, I have represented Mr. Mostafa since his extradition to the U.S. in October 2012, both as defense counsel in preparation for and during his criminal trial in the Southern District of New York, *United States v. Mostafa Kamel Mostafa*, Docket No. 04 Cr. 356 (KBF), for terrorism-related offenses, and as counsel specifically appointed to address and litigate Mr. Mostafa's prison and medical needs.  Most recently, in January of this year, I was appointed by the District Court for the Southern District of New York to represent Mr. Mostafa in regard to litigation pursuant to 28 U.S.C. §2241, challenging his conditions of confinement, as well.

10.      In my capacity as Mr. Mostafa's counsel, I visited him countless times during his pre-trial incarceration at the MCC in Manhattan, from late 2012 until early 2015.  I am therefore familiar not only with the issues he faced during his pre-trial incarceration, but also with the conditions of his confinement therein.  I am also familiar with the terms of the SAMs that were imposed on Mr. Mostafa, January 3, 2013, just after his extradition, and which have remained in place since, and I have been subject to the restrictions the SAMs impose, which dictate many aspects of my legal representation of Mr. Mostafa.







11.   Following Mr. Mostafa's conviction, I no longer represented him in regard to his criminal case or subsequent appeals, but I have continued to represent him throughout sentencing, the Federal Bureau of Prisons (hereinafter "BoP") designation process, and since his ultimate designation to ADX Florence -- the administrative maximum facility, in Florence, Colorado -- in regard to any prison and medical issues, and therefore conditions of confinement issues that have arisen. In light of the fact that Mr. Mostafa is severely disabled – he is a double-upper-arm amputee, blind in one eye, and suffers from diabetes, hypertension, and a skin condition, hyperhidrosis -- these issues have been many and designated counsel to represent Mr. Mostafa with regard to these issues has been necessary. Counsel to address Mr. Mostafa's prison issues has also been necessary given that Mr. Mostafa has been housed throughout his time in U.S. custody in the most restrictive prison conditions possible. Not only has he been subject to SAMs, which as discussed **post**, limit his contacts not just with the outside world, but also with his family, other inmates and even his attorneys, but he has also continuously been held in solitary confinement. The conditions of his confinement, in conjunction with his medical needs, have led to many issues regarding the accommodations he has been provided, and the lack thereof, and the level of care he has received.

12.   Because Mr. Mostafa is being held pursuant to SAMs, my ability to discuss the issues he has encountered, conditions of his confinement and other matters related to his incarceration, that are relevant to Mr. Assange, is limited to what is in the public record and/or has *not* been conveyed to me directly by my client through legal mail or other communications. This impedes my ability to discuss his case in contexts such as this one, where the information I would otherwise disclose does not relate to national security or safety of the public or the ultimate purpose of the SAMs, but is relevant to another pending matter, and could be of use to the court in deciding that matter. It also prevents me from pursuing my client's interests to the fullest extent possible, because I must always be careful not to disclose any piece of information I am not permitted to. Given the consequences, I routinely err on the side extreme caution. Nonetheless, my direct knowledge of Mr. Mostafa's case, the circumstances of his incarceration in the U.S., and experience litigating on his behalf, is relevant to Mr. Assange's case, in particular in regard to the assertions the U.S. government has made in the context of his extradition.

## IV. Description of Materials Reviewed

*62 of 138*

*Ex 35*

13.     In preparing this Affirmation, I have reviewed materials provided to me by Mr. Assange's solicitors in the United Kingdom.  Those materials included the Superseding Indictment in Mr. Assange's case in the District Court for the Eastern District of Virginia, the various declarations of Assistant United States Attorney Gordon D. Kromberg, Affidavits of Joel Sickler, and the Affidavit of Kellen Dwyer.  I have also reviewed relevant statutes, regulations, and research materials (including case law) related to the issues discussed in this Statement, as well as the docket in Mr. Mostafa's case and related case materials.  I also rely on my more than twelve years of experience practicing criminal defense law in the U.S. federal courts, during more then eight of which I have also represented Mr. Mostafa.

### V. Relevant Issues

14.     This Statement addresses a number of aspects of my representation of Mr. Mostafa that are relevant to Mr. Assange's case, and in particular to the assertions the U.S. government has made in the context of his extradition, including:

(1)   the procedural history of Mr. Mostafa's case, both prior to and post extradition, and the assurances and representations that were made by the U.S. government to the English Courts and European Court of Human Rights during the extradition process;

(2)   the medical assessment and designation process Mr. Mostafa was subjected to following his U.S. conviction and sentencing, and prior to his ultimate designation to ADX Florence, to serve the life sentence imposed;

(3)   Mr. Mostafa's conditions of confinement pretrial and at ADX Florence, including his continuous incarceration throughout his time in U.S. custody, in solitary confinement;

(4)   Mr. Mostafa's detention pursuant to SAMs and the hardships he has suffered a result of that regime;

(5)   the quality of the medical treatment Mr. Mostafa has received while incarcerated at ADX Florence, and within the BoP;

*62*



(6) Mr. Mostafa's experience with the BoP administrative remedy process, in particular in relation to his ability to challenge the conditions of his confinement; and,

(7) Mr. Mostafa's efforts to challenge the conditions of his confinement in the U.S. courts.

## A. Procedural History and Circumstances of Mr. Mostafa's United States Criminal Case

15. Mr. Mostafa is currently serving a life sentence in U.S. BoP custody, following his October 5, 2012, extradition, from the United Kingdom to the U.S. to stand trial on a series of terrorism-related charges in the Southern District of New York, and subsequent May 19, 2014, conviction of those crimes.

16. From the time of Mr. Mostafa's extradition in late 2012, through his trial, and until after his sentencing in early 2015, he was detained at the Metropolitan Correctional Center (hereinafter "MCC"), a pretrial detention facility located in lower Manhattan, where he was housed in solitary confinement. Since January 3, 2013, he has also been subject to SAMs. His conditions of confinement at the MCC and the issues he faced therein as a result of his pre-trial detention, and detention during trial, while in solitary confinement, and subject to SAMs, are discussed in detail **post**.

17. Following Mr. Mostafa's January 9, 2015, sentencing hearing, he was temporarily transferred from pre-trial custody at the MCC in New York, where he had been held since his extradition to the U.S., to the Federal Medical Center (hereinafter "FMC") Springfield, for evaluation and assessment as to whether he should be designated to serve his sentence at an FMC, or some other non-medical facility. He was ultimately designated to serve his sentence at ADX-Florence, in the state of Colorado, and has been incarcerated there since October 8, 2015.

18. Since the time of Mr. Mostafa's sentencing, has has pursued a number of appeals and actions. Through his attorneys, Mr. Mostafa appealed his convictions and sentence to the Second Circuit Court of Appeals, which resulted in a October 23, 2018, Opinion reversing his convictions on Counts 7 and 8 of the Indictment against him, and affirming his convictions on the nine remaining counts of conviction. A motion for reconsideration, or reconsideration *en banc, i.e.,* by the full court, of that appeal, was filed by counsel December 6, 2018. The Second Circuit Court of Appeals denied that motion February 13, 2019.

Ex 3) 7                                                               64 of 138

19.    Mr. Mostafa's counsel next filed a Petition for Certiorari to the U.S. Supreme
Court, June 28, 2019, which was denied, October 7, 2019.  During that same time frame, on
April 29, 2019, Mr. Mostafa, himself, filed a motion to the district court *pro se*, pursuant to Rule
33 of the Federal Rules of Criminal Procedure, requesting a new trial.  The district court denied
that motion August 2, 2019, and that decision is currently being appealed by his defense counsel.

20.    While Mr. Mostafa maintains some limited means by which to further challenge
his convictions in the U.S., such as through a petition to vacate his sentence, pursuant to 28
United States Code (hereinafter "U.S.C.") §2255, which must be filed within one year of the
denial of his petition for certiorari to the Supreme Court, he has now largely exhausted his post-
trial remedies.

21.    Notably missing from this long list of post-trial motions and actions in the U.S.
courts over the past six years since Mr. Mostafa's conviction, are those relating to Mr. Mostafa's
conditions of confinement, which, as discussed **post**, are more difficult to challenge in the courts
because they require that Mr. Mostafa first exhaust a series of administrative remedies, internally
within the BoP, before he can involve counsel and pursue them through the U.S. court system.
Mr. Mostafa, has, however, as of March 12, 2020, filed a Complaint, attached hereto as Exhibit
2, and, as of May 18, 2020, an Amended Complaint, attached hereto as Exhibit 3, both in the
District Court for the District of Colorado, the jurisdiction in which he is housed, challenging the
conditions of his confinement at ADX Florence and the SAMs that have been imposed on him.
*See* Complaint, at 3.  Among other things, Mr. Mostafa alleges in the Complaint and subsequent
Amended Complaint, that he is housed in a cell which is not fitted for someone with his
disabilities and which causes him bodily harm, and that he does not receive proper medical or
dental care. *See id.*, at 9, 14, and 15.  He also challenges the need for his continued confinement
under SAM restrictions, and details how the SAMs negatively affect his ability to practice his
religion and to be in contact with both his family and lawyers. *See* Amended Complaint, at 6-7.
His Amended Complaint is currently pending before the court in Colorado.

**B.**    ***The Extradition Proceedings In Mr. Mostafa's Case And the Assurances and
Representations that Were Made by the U.S. Government to the English Courts and
European Court of Human Rights In the Context of Mr. Mostafa's Extradition***

64





22.     Underlying the more than eight years of process and procedure described *ante*, and Mr. Mostafa's designation to ADX Florence to serve his sentence under SAMs and in solitary confinement, were determinations by the English Courts and the European Court of Human Rights that Mr. Mostafa could be extradited to the U.S., because there was no real risk that his confinement conditions therein would violate Article 3 of the Convention for the Protection of Human Rights and Fundamental Freedoms (hereinafter "the Convention"). As discussed **post**, the conditions under which Mr. Mostafa is imprisoned clearly violate Article 3. These decisions, which resulted in Mr. Mostafa's extradition to the U.S. in late 2012, were based upon representations, sworn statements and assurances made by the U.S. government during extradition proceedings in the English Courts and the European Court of Human Rights as to the conditions of confinement Mr. Mostafa would, and would not, experience while in U.S. custody.

23.     Accordingly, an understanding of the extradition proceedings and assurances which led to Mr. Mostafa's extradition, as well as the subsequent positions and actions taken by the U.S. government, once Mr. Mostafa was in U.S. custody, is critical to a full understanding of his current circumstances, and is relevant to Mr. Assange's pending extradition proceedings as well.

### 1.   *Extradition Proceedings in the City of Westminster Magistrate's Court in 2007*

24.     While the U.S. government filed an Indictment against Mr. Mostafa April 19, 2004, and initially requested his extradition April 24, 2004, just three days before he was arrested and remanded into U.K. custody (where he remained until his extradition to the U.S.), extradition proceedings against Mr. Mostafa were delayed due to Mr. Mostafa's prosecution, conviction and sentence to a term of incarceration on charges in the U.K., and because of issues related to his medical condition. *See Mustafa Kamel Mustafa v. United States* [2008] EHWC 1357, at ¶ 2, attached hereto as Exhibit 4.

25.     Thus, Mr. Mostafa's extradition case was first heard in 2007 by Senior District Judge Tim Workman of the City of Westminster Magistrate's Court. Senior District Judge Workman thereafter issued an Order November 15, 2007, stating that he was "satisfied that the matters for which the United States of America seeks the defendant's extradition. . . would be compatible with the defendant's Convention Rights" and "proposing to send the matter to the Secretary of State for his decision on whether the defendant should be extradited to America."

65





*See* November 15, 2007, Order of Senior District Judge Tim Workman, in *United States of America v. Abu Hamza,* in the City of Westminster Magistrate's Court, at ¶¶ 47 & 48, attached hereto as Exhibit 5.

26.　　In reaching his decision that Mr. Mostafa's extradition would not be incompatible with the Convention, Senior District Judge Workman relied heavily upon a sworn statement by then-ADX Warden R. Wiley, attached hereto as Exhibit 6. While Senior District Judge Workman concluded that the conditions of ADX Florence could, if "applied for a lengthy indefinite period" properly "amount to inhuman and degrading treatment which would violate Article 3" of the Convention, *see id.*, at ¶ 43, he ultimately accepted the representations of Warden Wiley that this would not be the case with Mr. Mostafa. In so concluding, Senior District Judge Workman effectively rejected a report submitted by "an experienced United States Attorney," Bruce Malloy, which opined that "the defendant would be incarcerated at a supermax prison," in favor of Warden Wiley's account which he found "to be more accurate[,]" given that Warden Wiley was "more closely associated with the penal institution." *Id.*, at ¶¶ 40, 43, 44.

27.　　In that regard, Warden Wiley had explained under oath, in his statement, that after consultation with the Chief of Health Programs, it would be "highly unlikely" for a person with Mr. Mostafa's conditions and disabilities – namely, "type 2 diabetes, raised blood pressure, psoriasis, loss of sight in one eye and bilateral amputation of both forearms," that "required assistance with the activities of daily living" -- to be placed in at ADX Florence. See Sworn Statement of Warden Wiley, at 3, ¶ 5.

28.　　Indeed, as Warden Wiley specifically stated in his sworn statement, "[i]f it is determined that [Mr. Mostafa] cannot manage his activities of daily living, it is highly unlikely that he would be placed at the ADX but, rather, at a medical center." *Id.* Warden Wiley then referenced Sheikh Rahman, emphasizing, "I am aware of at least one other high profile convicted international terrorist who, due to various medical concerns, is presently housed at a Bureau medical facility." *Id.*

29.　　As a result of Warden Wiley's sworn statements, Senior District Judge Workman determined that Mr. Mostafa would not be permanently housed at Florence ADX, stating that, on the basis of [Warden Wiley's] evidence I am satisfied that the defendant would not be detained in these conditions [i.e., ADX] indefinitely; that his undoubted ill health and physical disabilities would be considered and, at worst, he would only be accommodated in these conditions [i.e., ADX] for a relatively short period of

9



time. Whilst I find these conditions offensive to my sense of propriety in dealing with prisoners, I cannot conclude that, in the short term, the incarceration in a supermax prison would be incompatible with his Article 3 Rights.

*See* Order of Senior District Judge Tim Workman, at ¶ 44 (emphasis added) (Exhibit 3-).

### 2. Extradition Proceedings in the High Court in 2008

30.     On the appeal of Senior District Judge Workman's Order (as well as the Secretary of State for the Home Department's subsequent decision ordering Mr. Mostafa's extradition pursuant to section 93(4) of the Extradition Act of 2003), the High Court of Justice, Queen's Bench Division, addressed essentially the same issues as were before Judge Workman. However, the High Court more clearly laid out Mr. Mostafa's medical conditions and needs in the context of its decision, noting that the U.S. government had no dispute with the description of Mr. Mostafa's medical conditions and related needs, and it also scrutinized an additional report by Professor Andrew Coyle relating to the conditions at ADX. *See Mustafa Kamel Mustafa v. United States* [2008] EHWC 1357 (hereinafter "High Court 2008 Opinion"), at ¶¶ 65-67 (Exhibit 4).

31.     In reviewing Professor Coyle's statement, the High Court observed that "a common thread" that ran through the report was the "potential adverse effect on the mental health of inmates of long term social isolation." *Id.* at ¶¶ 65-67. But, the High Court ultimately dismissed Professor Coyle's concerns on the basis that it trusted the U.S. government's commitment to properly treating Mr. Mostafa's medical and disability needs, stating that "unless [the] ADX-Florence regime ignores appellant's medical condition, and his need for nursing assistance," there would not be a risk of isolation since a nursing assistant (such as the one Mr. Mostafa saw multiple times a day while in custody in the U.K.) would be assisting in Mr. Mostafa's activities of daily living. *Id.* In asserting as much, the High Court essentially affirmed Senior District Judge Workman's finding, in reliance on Warden Wiley's sworn statement, that there was little risk of Mr. Mostafa spending any significant time at ADX. *See* September 24, 2012, Decision of the European Court of Human Rights in *Case of Babar Ahmad and Others v. the United Kingdom,* attached hereto as Exhibit 7, at ¶ 40 (noting that "[o]n the question of the compatibility of detention at ADX Florence with Article 3, the High Court relied in particular on the understanding of the prison warden, Mr Robert Wiley, to the effect that if, after a full medical evaluation, it was determined that the fourth applicant [Mr. Mostafa] could not manage his activities



of daily living, it would be highly unlikely that he would be placed at ADX Florence rather than at a medical centre").

32.    The High Court, however, affirmed the decision to extradite Mr. Mostafa under the condition that *if* Mr. Mostafa were to be held in ADX "a full and objective medical evaluation of the appellant's condition, and the effect of his disabilities on the ordinary daily living and his limited ability to cope with conditions at ADX Florence[,] would indeed be carried out." High Court 2008 Opinion, at ¶ 69 (Exhibit 4).

33.    The High Court also reiterated Senior District Judge Workman's concerns with the conditions of confinement at supermax facilities. However, because it viewed the commitments and promises made by the U.S. government as assurance that Mr. Mostafa would not be incarcerated at ADX, or if he was, it would be for a very short period of time, the High Court left for another day the final decision as to whether the conditions of confinement in supermax prisons would be viewed as torture or ill treatment that violated Article 3 of the Human Rights Convention. *Id.*, at ¶70.

34.    Nonetheless, the High Court made clear that such confinement, if permitted, "may well be" torture in violation of Article 3, and explained,

[n]aturally, the most dangerous criminals should expect to be incarcerated in the most secure conditions, but even allowing for a necessarily wide margin of appreciation between the views of different civilized countries about the conditions in which prisoners should be detained, confinement for years and years in what effectively amounts to isolation may well be held to be, if not torture, then ill treatment which contravenes Article 3.

*Id.*.

### 3.    *Extradition Proceedings in the European Court of Human Rights in 2012*

35.    Following the High Court's decision, Mr. Mostafa appealed his case to the European Court of Human Rights (hereinafter "ECtHR"). In that case, the Foreign and Commonwealth Office of the United Kingdom (hereinafter "FCO") filed a submission on behalf of the U.S., attached hereto as Exhibit 8, repeating that there was no dispute about Mr. Mostafa's medical condition, but asking, as a conduit for the U.S., that the ECtHR affirm the lower courts' decision on the basis that "the likelihood is the applicant will not be detained in a 'supermax' detention at all" and that, if he was, "such detention would be for a relatively short period given

Ex 3 12

the extent and nature of the applicant's ill health and physical disabilities." *Id.*, at ¶ 29. The FCO also adopted as fact that if Mr. Mostafa were to be held at ADX Florence for any period of time, he would not suffer social isolation because he would receive care for his disabilities, and that, if held there, it would be for a "relatively short time pending a medical evaluation, and [he] would then be transferred to a medical centre." *Id.*, at ¶¶ 30, 31. As discussed in detail **post**, none of these representations have proven to be true. Armed with these statements by the FCO, the ECtHR denied Mr. Mostafa's appeal. *See* September 24, 2012, Decision of the European Court of Human Rights in *Case of Babar Ahmad and Others v. the United Kingdom*, (Exhibit 7). In doing so, however, the ECtHR acknowledged that a "comprehensive health and social care plan" and "regular daily support" would be necessary for Mr. Mostafa, but such a comprehensive plan with the necessary supports would be impossible at ADX Florence and that his amputations "alone would appear to make detention at ADX impossible". *Id.*, at ¶¶ 217.

### 4.  *Extradition Proceedings in the High Court in 2012*

36.     In October 2012, Mr. Mostafa's extradition case came before the High Court a final time.  In that case Mr. Mostafa requested judicial review and a stay of extradition on the basis that new evidence established he was "unfit to plead." *See Abu Hamza and Others v. SOS for the Home Department*, [2012] EWHC 2735 (Admin), attached hereto as Exhibit 9, at ¶¶ 1, 18.iii.  The claim was based on several reports by Dr. Richard Taylor, a psychiatrist in the United Kingdom who evaluated Mr. Mostafa on a number of occasions and had concluded in his most recent, August 2012, report that Mr. Mostafa was "unfit to plead" because he would be unable to " follow legal proceedings" due to "problems with tension, concentration, and memory loss" that were the result of the fact that he "had developed clinical depression." *Id.*, at ¶ 131-134.  Dr. Taylor also recommended an assessment by a neuropsychologist and possibly an MRI.  *Id.*, at ¶ 134.  Mr. Mostafa was then seen by a neuropsychologist who also recommended an MRI be performed.  *Id.*  The High Court evaluated whether it would be either "unjust and oppressive" or, alternatively, a violation of Mr. Mostafa's Convention Rights to order his extradition and concluded it would not. *Id.*, at ¶¶ 144, 145.  The High Court thus refused to stay Mr. Mostafa's extradition, and he was thereafter extradited to the U.S. *Id.*, at ¶ 146.





37.    Notably, in the 2012 case, the High Court did not even address the issue of detention at ADX Florence as to Mr. Mostafa, although it did for the other applicants, noting, once again, the belief -- clearly based on representations by the U.S. government during the extradition process -- that "Abu Hamza does not face a real risk of more than a very short term of detention there." *Id, at* ¶ 17.[2]

### 5. *The Various Positions Taken and Representations Made By the U.S. Government Post-Extradition and Post-Conviction in the Context of Mr. Mostafa's Sentencing and The Designation Process*

38.    From the time of Mr. Mostafa's arrival in the U.S., whereby he was immediately placed in solitary confinement, shortly thereafter subjected to SAMs, and rarely, if ever, provided needed medical care or acceptable accommodations for his disabilities, it was clear that the U.S. government had no intention of abiding by the representations it made in extradition proceedings as to Mr. Mostafa's conditions of confinement while in U.S. custody. However, the U.S. government's change of position as to the long term plan for Mr. Mostafa, became evident after his conviction, during the sentencing proceedings in his case and the subsequent designation process.

39.    By the time of Mr. Mostafa's sentencing it was clear that Mr. Mostafa – who had received nursing care four to six times a day while in UK custody and had demonstrably continuously struggled to do his activities of daily living while in pre-trial custody in the U.S.[3] –

---

[2] Mr. Mostafa is occasionally referred to herein as "Abu Hamza" as he has been identified in court proceedings under that name at various points in time.

[3] One example in the public record of Mr. Mostafa's inability to perform activities of daily living, and of his need for assistance in doing so, was recounted during his sentencing hearing, where his inability to cut his own nails, in light of his disabilities, was discussed. As explained by defense counsel, the BoP had determined, after Mr. Mostafa filed a formal complaint within the prison, that Mr. Mostafa would be seen by a podiatrist every four weeks who would cut his toe nails, because he could not accomplish the task himself, and without such nail trimming Mr. Mostafa suffered the risk of infection." *See* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa,* 04 Cr. 346 (KBF), Docket #474, at 39-40 (Exhibit 11). Notably, this was raised, not as an example of a task of daily living that Mr. Mostafa could not perform, but, to demonstrate the BoP's inability to ensure that even this modest requirement could be met in a non-medical facility. At the time of Mr. Mostafa's sentencing, he had gone nine weeks without the proper care. *Id.*

Ex(S)14                                    71 of 138

could very well be designated to ADX Florence by the BoP. That became evident as a result of the BoP's own submission to the sentencing court, a letter signed by Jeffrey D. Allen, M.D., the Chief of Health Programs for the BoP, and Dominique Raia, Senior Counsel to the BOP, attached hereto as Exhibit 10, which left open the possibility for a permanent or extended designation to ADX Florence, and was in stark contrast to Warden Wiley's representations. *Id.,* at 1-2. It was also clear from representations by the U.S. government during Mr. Mostafa's sentencing hearing. *See, e.g.,* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa,* 04 Cr. 346 (KBF), Docket #474, at 31, attached hereto as Exhibit 11 (Assistant United States Attorney Edward Kim opined as to the ADX accommodations that would be provided "in the event that the BOP decides to designate the defendant to ADX"). Nonetheless, the U.S. government -- disregarding entirely the fact that Mr. Mostafa's designation to ADX Florence to serve a lengthy sentence was inconsistent with the representations the English Courts and European Court of Human Rights had relied upon in granting his extradition – told the sentencing court that "[t]he BOP is well-equipped to make the appropriate designation, and that [the] issue [of designation] should have no bearing on this proceeding." *See* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa,* 04 Cr. 346 (KBF), Docket #474, at 31.

40.     As set forth by defense counsel in Mr. Mostafa's Reply Sentencing Memorandum, in *United States v. Mostafa,* 04 Cr. 356 (KBF), Docket #462, at 3-4,

> [i]ndeed, we have no doubt that Mr. Mostafa would never have been extradited to the United States by the United Kingdom had the United States disclosed the scope of the SAMs that were to be imposed, or been forthright regarding the potential for an extended and possibly permanent designation to Florence ADX. . . . [A] life sentence, coupled with the Government's request for complete deference to the BOP . . . will leave in place the very real possibility that each day in prison will amount to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article 3 of the Convention for the Protection of Human Rights and Fundamental Freedoms.

*Id.*

41.     It is my position that this accurately represents not only the circumstances of Mr. Mostafa's extradition to the U.S., but also the realities of the conditions under which Mr. Mostafa now finds himself incarcerated. In addition, defense counsel argued to the sentencing court during sentencing proceedings that "this Court is required to take all actions in its power to

71

Ex(3)15                                                72 of 138

ensure compliance with the representations of the Executive Branch in procuring the defendant's

extradition." *See* Reply Sentencing Submission, at 10 (emphasis added); *see also* January 9,

2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346 (KBF), Docket

#474, at 28. Defense counsel elaborated that this, "includes ordering that Mr. Mostafa be

designated to a Federal medical facility," as opposed to merely making a recommendation as to

designation, "and that accommodations be made to his conditions of confinement that take into

consideration the needs of his physical disabilities and other health concerns." *Id.* ("under the

circumstances of this case where Mr. Mostafa was extradited from Europe after a hearing in both

the English courts and the European Court of Human Rights, . . . under the law, your Honor has

the authority to make an Order regarding his designation"). Nevertheless, the sentencing court

declined to take this approach. *Id.*

42.   Rather, the sentencing court took a hands off approach, and ultimately

"decline[d] [even] to make a particular recommendation to the BOP[,]" as well as to issue an

Order regarding designation. January 9, 2015, Sentencing Hearing Transcript in *United States v.*

*Mostafa*, 04 Cr. 346 (KBF), Docket #474, at 85. Based on conversations with BoP personnel,

the sentencing court simply concluded,

> [i]t is clear that what needs to occur and what will occur . . . before any designation, the
> defendant would get a full medical evaluation, which is really handled, as I understand it
> from my communications with the BOP, by a group of people with different areas of
> expertise, including security and behavioral issues along with the medical issues, and that
> all together the appropriate designation will be arrived at, which might be ADX, it could
> be some other federal facility, not a medical facility, and it could be a medical facility.

*Id.*, at 47.

43.   Indeed, the sentencing court refused to take control of the designation process

and made such statements despite the court's knowledge of Mr. Mostafa's difficulties in

managing his activities of daily living while in custody at the MCC, and the court's

determination during the hearing that Warden Wiley's statement regarding the impact that Mr.

Mostafa's ability to "manage his activities of daily living" would have on his prison placement

was "a *commitment that if he can't do his activities of daily living*, he will not be at the ADX."

*See* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346

(KBF), Docket #474, at 34 (emphasis added). The sentencing court also acknowledged that the

72

 

"Wiley statement . . . [had been] transferred into the subsequent statements of [Judge] Workman's opinion and then [Judge] Sullivan." *Id.*, at 88.[4]

44.     The sentencing court's only concessions as to defense counsel's requests were to recommend that the "BOP take into consideration" the evaluation of Mr. Mostafa by Dr. Benjamin Kligler, a medical doctor hired by defense counsel to assess Mr. Mostafa's disabilities and related needs, and that "an occupational therapist having experience with double amputees be part of the BOP team which evaluates the defendant." *See* Judgment in a Criminal Case, in *United States v. Mostafa*, 04 Cr. 356 (KBF), Docket #463, at 3, attached hereto as Exhibit 12.

45.     As discussed in greater detail **post**, since Mr. Mostafa's designation, and despite the representation of the government at his sentencing hearing that "in the event that the BOP decides to designate the defendant to ADX, he will be housed in an area that can accommodate his medical needs," *see* Sentencing Hearing Transcript, at 31 (Exhibit 11) Mr. Mostafa has not been held in a cell that is appropriate to his disabilities, he has not been given necessary or even adequate accommodations for his needs, let alone his daily needs, he remains subject to SAMs without any stepdown or relaxation of restrictions, and he has continually been housed in solitary confinement without access to daily nursing care.

46.     These circumstances, all of which are established in Mr. Mostafa's public filings, are not consistent with the assurances that the U.S. government made, and which the High Court and the European Court of Human Rights relied on. As was explained by defense counsel at sentencing, this case – in regard to both the assurances made, and the change in position by the U.S. government as to the suitability of ADX Florence to accommodate Mr. Mostafa's needs, that ultimately resulted in Mr. Mostafa's designation to ADX Florence – "will put the United States in a position where it may damage their ability for later extraditions." Counsel further noted, "[w]hile that is not my concern as Mr. M[o]stafa's attorney, it should be a concern to the [sentencing] court and to the government." *See* Sentencing Hearing Transcript, at 52-53. The

---

[4] Although the sentencing court also opined during the sentencing hearing, at 88 of the Sentencing Hearing Transcript, that "no one said that there would be no housing ever under any circumstances at the ADX [Florence]" and that she believed the extradition proceedings did not "com[e] close to a certain commitment that Abu Hamza would not be housed at any particular facility or would be housed at a medical facility[,]" these assertions do not undermine her finding of a commitment not to place Mr. Mostafa at ADX Florence if he could not manage his activities of daily living, nor her determination that the courts that decided Mr. Mostafa's extradition relied on Warden Wiley's statement in regard to where and how Mr. Mostafa would be designated.





unreliable nature of the U.S. government's assurances should likewise be a concern for the Court and authorities in the U.K. in determining whether to extradite Mr. Assange to the U.S.

**C.    Mr. Mostafa's Medical Assessment and Evaluation at FMC Springfield Prior to His Designation to Serve His Life Sentence at ADX Florence**

47.    Post-sentencing, Mr. Mostafa was temporarily placed at FMC Springfield, a federal medical center, for the purposes of evaluation. After Mr. Mostafa had been held at FMC Springfield for more than eight months, without any updates from the BoP as to whether an appropriate evaluation had been conducted, or any designation decision had been reached – and despite my efforts to obtain such information directly from FMC Springfield -- I wrote a letter to the sentencing court, October 7, 2015, attached hereto as Exhibit 13, requesting that

> the Court (1) obtain an update from the BoP[] as to the status of Mr. Mostafa's now eight-month long post-sentencing evaluation at FMC Springfield to determine his medical and prison needs, as well as the appropriate accommodations and designation facility to meet those needs; and (2) Order the BoP to release to counsel a copy of any Occupational Therapist Report that has been prepared in regard to Mr. Mostafa.

*Id.*

48.    A footnote to my letter noted that such update should include both "information as to whether the BoP has adopted the Court's recommendations that it take Dr. Benjamin Kligler's Report into consideration, and that Mr. Mostafa's medical team include an Occupational Therapist with experience treating double arm amputees" and also a "time frame, if one exists, for the completion of the evaluation and transfer to the designation facility[,]" which counsel had learned, only informally at that point, was to be ADX Florence. *Id.*

49.    The letter further noted that one reason for the requested updates was that "the Court's intervention is necessary to ensure that the BoP is honoring the various promises and representations made by the United States to the United Kingdom and the European Court of Human Rights . . . during the extradition proceedings that precipitated Mr. Mostafa's transfer to United States custody, and also to this Court during Mr. Mostafa's sentencing hearing." *Id.* Another reason, as set forth in the letter, was that the prolonged evaluation and designation process was impeding counsel's ability to send Mr. Mostafa discovery necessary to his ability to

 

assist in the preparation of his appeal; given that the "logistical considerations and costs involved in providing Mr. Mostafa with his discovery at FMC Springfield . . . made defense counsel reluctant to provide Mr. Mostafa with his discovery there if he w[ould] shortly thereafter be moved to another facility (such as ADX Florence)." *Id.*

50.     My letter also noted that I had included the request that the sentencing court Order the BoP to release to me a copy of any Occupational Therapist that had been prepared, because I had previously requested a copy of any Occupational Therapist's Report as to Mr. Mostafa from FMC Springfield directly, but was informed by legal counsel for FMC Springfield, as well as by the Warden for that facility, that in order to receive the Report I would either have to go through the Freedom of Information Act request process, which could take months, or seek a copy via Court Order." *Id.*

51.     In response to my letter, the government argued that such requests of the Sentencing court constituted an "invit[ation] to] the Court to involve itself in the BOP's classification and designation process" and "the Government respectfully request[ed] that the Court reject this invitation" as "outside of the Court's post-sentencing jurisdiction." *See* October 14, 2015, U.S. Government Response to Lindsay A. Lewis, Esq.'s October 7, 2015, Letter to the Sentencing Court, with October 14, 2015, Court Order, attached hereto as Exhibit 14. The government also noted that "in any event, the defendant fails to identify with any particularity any defect in the BOP's process." However, without any transparency as to the process that was taking (or ostensibly had taken) place, or the requested updates, there was no way that I could possibly have identified, and thus, raised any such defects with the court at that time.

52.     Nonetheless, the sentencing court "declined to involve itself in the issues raised in the defendant's letter," on the basis of "principally the reasons cited by the government." *Id.* Mr. Mostafa was subsequently designated to ADX Florence to serve out his life sentence and transferred to that facility. As I recall, I was never provided any further information from the authorities at FMC Springfield, the sentencing court, or the U.S. government as to the evaluation process, including whether it had involved the recommendations of the sentencing court that an occupational therapist having experience with double amputees was to be part of the BoP team which evaluated the defendant, and that Dr. Kligler's medical evaluation should be taken into consideration.

EX 5 19

76 of 138

**D.**   *Mr. Mostafa's Conditions of Confinement While in U.S. Custody*

**1.   Mr. Mostafa's Pre-Trial Confinement and Confinement During
His Trial at the Metropolitan Correctional Center In Manhattan**

53.     As would be the case with any inmate who is incarcerated in solitary
confinement and subjected to SAMs, Mr. Mostafa's conditions of pre-trial incarceration, and in
particular his isolation from the outside world, which included defense counsel in many respects,
vastly impeded his ability to assist in the preparation of his case.[5] Indeed, for Mr. Mostafa, these
issues began as soon as Mr. Mostafa arrived in the U.S, at the MCC in New York.

54.     For instance, between October 2012, when Mr. Mostafa was extradited to the
U.S. and January 2013, Mr. Mostafa was only able to have two legal calls with counsel, despite
my numerous attempts to schedule regular legal calls with Mr. Mostafa through the MCC legal
department. *See* January 14, 2013, letter from Lindsay A. Lewis, Esq. to the Honorable
Katherine B. Forrest, attached hereto as Exhibit 15.   This was notable as, unlike inmates who
were not detained in isolation, Mr. Mostafa was unable to reach counsel by phone in any other
manner, even just to request a legal visit.

55.     As a result of the SAMs imposed Mr. Mostafa was also unable to communicate
with his legal team over e-mail, which is otherwise a source of regular legal communication for
pre-trial inmates.   Nor were regular legal visits assured, both because inmates under SAMs are
housed in a special unit at the MCC which limits the number of legal visitors permitted on the
unit, where the visits are held, and due to other standard issues at detention centers, like

---

[5] As described in *Center for Constitutional Rights and Lowenstein International Human
Rights Clinic,* "The Darkest Corner," September 2017, available at
https://bit.ly/3i0WuT4, at 16,

> SAMs deprive defendants of the ability to participate in their own defense.
> One attorney described how these measures "dehumanize defendants and
> create a situation where they cannot exist in a defiant posture [to] fight the
> case," and ultimately "eliminate them as participants in their defense." This
> is particularly problematic, the attorney said, with respect to a defendant's
> right to testify: "The first time [a defendant] talk[s] to anyone besides me
> after two and a half years in solitary confinement is the jury. There is no way
> to prepare [him] for it. It really discourages the client from testifying."

76

77 of 138

Ex 20

lockdowns. As my March 7, 2013, letter to the Honorable Katherine B. Forrest, of the District
Court for the Southern District of New York, explained, although "the MCC legal department
represented to the Court that counsel could visit Mr. Mostafa anytime from 8 a.m. to 8 p.m., that
is not the case. In actual practice, counsel can be turned away from the MCC and prevented
from visiting a client for a number of reasons, which are often beyond the control of MCC and
certainly beyond counsel's control." *See* March 7, 2013 letter to Honorable Katherine B. Forrest
from Lindsay A. Lewis, Esq., attached hereto as Exhibit 16.

56.     Efforts to effectively communicate with Mr. Mostafa as well as to deal with issues
regarding his accommodations and conditions of confinement also took valuable time away from
the case itself, and the preparation of the client's defense. Such issues at times directly impacted
Mr. Mostafa's own ability to participate in his defense, such as when Mr. Mostafa was unable to
view discovery in his case because the computer provided by the government, on which he was
to do so, did not comport with his disabilities. *Id.* Fixing these issues and communicating with
both MCC and Judge Forrest proved to be draining for both counsel and Mr. Mostafa, and at
times, entirely unfruitful. Notably, in the more than two years Mr. Mostafa was detained at the
MCC, and despite repeated complaints, he was never provided with an appropriate toilet,
shower, or sink to accommodate his disabilities. Nor were many of his other medical and
disability needs ever adequately addressed.

57.     During Mr. Mostafa sentencing hearing, Mr. Mostafa, himself, described to the
court his conditions of pre-trial confinement, in light of the lack of appropriate accommodations
and the toll it had taken. As he explained therein, and is captured in the public record of that
hearing,

> the pretrial period in MCC has ... never been even mentioned in
> any of the human rights courts or the appeals. They are all talking
> about ADX-Max [Florence] and the posttrial [conditions of
> confinement]. The pretrial trial period has had a detriment[al]
> effect [o]n my ability to defend myself and to function. [For] [t]wo
> and a half years nearly now I [have been] ... coerced to do things
> no disabled [person] w[ould] ever [typically] be asked to do. In
> fact, the specialist service and doctors w[ould] say to the disabled
> [person in a typical situation], ["w]e know you can do that, but we
> don't want you to do it, because of the long-term effect, and it
> could cause this and it could cause that.["] That is not the default
> [at MCC]. For two and a half years I have been coerced to do"

77





> things which no disabled are supposed to do it and nobody can
> report that because the cuts, they heal themselves and, thank God,
> there is no infection. But the problem is, this is torture. At the end
> of the day, when the cuts happen, when the pain happens, when the
> anxiety happens, that is torture.

*See* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346
(KBF), Docket #474, at 63 (Exhibit 11).

### 2. Mr. Mostafa's Conditions of Confinement At ADX Florence

#### a. Conditions of Confinement Generally at ADX Florence

58.      ADX Florence was built in 1994 specifically as an "expedient" method for
controlling federal prisoners with life sentences through solitary confinement. Mark Binelli,
"Inside America's Toughest Federal Prison," *New York Times*, March 26, 2015, (hereinafter
"*America's Toughest Prison*,") available at nyti.ms/1D1rbRa. Inmates are detained in

> 12-by-7 foot cells with thick concrete walls and double sets of sliding metal
> doors (with solid exteriors, so prisoners can't see one another).  A single
> window, about three feet high but only four inches wide, offers a notched
> glimpse of sky and little else. Each cell has a sink-toilet combo and an
> automated shower, and prisoners sleep on concrete slabs topped with thin
> mattresses.

*Id.*

59.      The supermax was conceived of to "isolate and control" inmates by routinely
denying them the ability to converse for days, weeks, or months at a time and denying them fresh
air or even a view of the outdoors. Andrew Cohen, "How America's Most Famous Federal
Prison Faced a Dirty Secret," The Marshall Project, December 6, 2015, available at
bit.ly/2Yzzymr. As the former warden of ADX Robert Hood described the prison, "[t]his place is
not designed for humanity....When it's 23 hours a day in a room with a slit of a window where
you can't even see the Rocky Mountains — let's be candid here. It's not designed for
rehabilitation. Period. End of story." *Id.* As a result, people incarcerated at ADX Florence are
disproportionately mentally ill, and often physically ill as well. *See America's Toughest Prison.*

60.      Those inmates in the four "general population" units spend at least 22 hours per
day alone in their cells. As outlined in the Complaint in *Cunningham v. Fed. Bureau of Prisons*,
a class action lawsuit initiated several years ago in the District of Colorado by inmates at ADX





Ex(3) 22

730 of 130

Florence, the only relief from this solitary confinement comes a few days a week, when "they may be able to see and speak with a limited number of other prisoners during shared recreation periods lasting two hours." *Cunningham v. Fed. Bureau of Prisons*, No. 12 Cv. 1570 (RPM) (MEH), 2016 WL 8786871, (D. Colo. Dec. 29, 2016), aff'd, 709 F. App'x 886 (10th Cir. 2017), Complaint, at ¶ 25.   However, as discussed in greater detail **post**, such communications are not permitted for prisoners who are also detained under SAMs, as the conditions of the SAMs themselves prevent contact with the outside world, but also, critically, with other inmates – even in the already limited moments when human contact might be possible at ADX Florence.

61.     The physical and psychological effects of long-term solitary confinement are well-known. Indeed, an investigation by the Center for Constitutional Rights found that, "[i]n one study of pathology among solitary prisoners, every symptom of psychological distress measured was present in more than half of the prisoners interviewed, and some symptoms were present in nearly all. There is 'not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days . . . failed to result in negative psychological effects.'" Center for Constitutional Rights and Lowenstein International Human Rights Clinic, "The Darkest Corner," September 2017, (hereinafter "Darkest Corner") available at https://bit.ly/3i0WuT4, at 11.

62.     In ADX Florence specifically, the Complaint in *Cunningham* alleged that "[a]fter years of isolation, with no direct, unrestrained contact with other human beings, many prisoners experience a fundamental loss of even basic social skills and adaptive behaviors, and predictably find themselves paranoid about the motives and intentions of others." *Cunningham* Complaint, at ¶ 29.  This, however, is not the first time that such a conclusion about the effects of solitary confinement has been drawn. In 1890, the Supreme Court found that of the inmates housed in solitary confinement in Colorado's death row, "a considerable number of the prisoners fell, after even a short confinement, into a semifatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide, while those who stood the ordeal better were not generally reformed." *In re Medley*, 134 U. S. 160, 168 (1890). The Supreme Court has since continued to acknowledge the dangers of solitary confinement. *See*, e.g., *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J.,concurring), (noting the "human toll wrought by extended terms of isolation."), *Ruiz v. Texas*, 137 S. Ct.

79

 23 

1246, 1247 (Mar. 7, 2017) (Breyer, J., dissenting from denial of certiorari) ("prolonged solitary confinement "raises serious constitutional questions.").

63.     In a policy statement from 1995, the BoP claimed that,

> [a]ll Bureau facilities employ psychologists skilled in the screening, diagnosis, and treatment of mental disorders. Although the Bureau concentrates mental health resources at some institutions, all institutions, regardless of care level, are expected to provide services for inmates with mental illness.

Bureau of Prisons Program Statement, "Treatment and Care of Inmates With Mental Illness," available at bit.ly/2BKlUDS.

64.     These psychologists are supposed to ensure that mentally ill inmates are never designated to ADX Florence. As the BoP's procedures for transferring prisoners to ADX Florence state, prisoners "currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at… ADX." BoP Program Statement 5100.08, "Prisoner Security Designation and Custody Clarification," Chapter 7, p.18. *See also Cunningham* Complaint, at ¶ 44.

65.     The reality, however, is that many inmates with mental illness, were, and still are referred for placement at ADX Florence.  Mr. Mostafa is no exception.  Indeed, despite reports revealed during the 2012 High Court extradition hearing that Mr. Mostafa suffered from depression and required further evaluation, he was ultimately designated to serve his sentence at ADX Florence.

66.     As discussed above, in June 2012, thirteen inmates brought a class action lawsuit against the BoP alleging a longtime pattern of abuse and neglect of mentally ill inmates at the ADX Florence facility. *See Cunningham v. Fed. Bureau of Prisons*, No. 12 Cv. 1570 (RPM) (MEH), 2016 WL 8786871, (D. Colo. Dec. 29, 2016), aff'd, 709 F. App'x 886 (10th Cir. 2017).

67.     The *Cunningham* inmate plaintiffs demanded implementation of a constitutionally adequate program of mental health diagnosis and treatment, alleging that

> [d]espite its policies, the BOP regularly assigns prisoners with serious mental illnesses to ADX. That fact results from the BOP's routine disregard of its own prior mental health evaluations of prisoners it wishes to send to ADX and its woefully inadequate mental health screening evaluations when prisoners are transferred to ADX.

23



 Ex 3 24

81 of 138

*Cunningham* Complaint, at ¶ 4.

68.     Moreover, the Cunningham litigation established that even those inmates who do not arrive at ADX Florence with pre-existing mental illness are likely to develop mental illness as a direct result of their isolated incarceration at the facility. As the *Cunningham* Complaint explains,

> [a]s early as the 1960s electroencephalography (EEG) examinations demonstrated the slowing of brain waves of prisoners confined in isolation for longer than a week. A landmark study in the 1970s showed that subjects in solitary confinement often experienced impaired functioning of the brain waves associated with the ability to control emotions and key cognitive functions. Similarly, a 2011 study demonstrated that after only a week of solitary confinement, prisoners showed decreased EEG activity, indicative of increased stress, anxiety, and depression.

*Cunningham* Complaint, at ¶ 42. Thus, for the BoP to adequately address the problem of mental illness at ADX Florence, where inmates are generally housed for years at a time in isolation, and to preclude inmates with mental illness from suffering solitary confinement, they would essentially need to transfer all inmates out of solitary confinement who have been there for more than a short while.

69.     Over the course of four years of negotiations, the *Cunningham* plaintiffs reached a settlement with the BoP through which almost 100 inmates were transferred out of solitary confinement and into other BoP facilities. *See* Andrew Cohen, "How America's Most Famous Federal Prison Faced a Dirty Secret," *The Marshall Project*, December 6, 2015, available at bit.ly/2Yzzymr.

70.     The settlement is also lauded as a success by many because of its potential to lead to the humane treatment of mentally ill inmates within the BoP system. For example, under the settlement, inmates are to have screenings with mental health professionals "before an inmate is transferred [to ADX Florence], another when the inmate arrives, and another after the prisoner has been there a while." *Id.* And, "[i]f mental illness is detected, prison officials will either transfer the prisoner to a more suitable facility or treat the prisoner at ADX-Florence 'if his security needs cannot be managed anywhere else' in the federal prison system." *Id.* Thus, the *Cunningham* settlement is celebrated, most notably, for its ability to improve the lives of

81





mentally ill inmates by enabling them to leave ADX Florence, *not* by meaningfully improving conditions within ADX Florence for the mentally ill.

71.     The reality that the *Cunningham* settlement most benefits those who are eligible to leave the facility in favor of placement at another institution with better resources for mental illness, is exemplified by the District of Columbia's Corrections Information Council's October 31, 2018, "USP Florence Administrative Maximum Security (ADX) Inspection Report," (hereinafter "CIC Report"), available at bit.ly/3fxU9gS . Pursuant to the CIC Report, there are three available options within the BoP for an ADX Florence inmate who is mentally ill:  transfer to one of two secure mental health units, located at USP Atlanta, in Georgia, and USP Allenwood, in Pennsylvania, or, if these are both unavailable to the inmate because of security concerns, the Steps Toward Awareness, Growth, and Emotional Strength Program (hereinafter "STAGES") Unit at ADX Florence. *CIC Report,* at 14.

72.     The *CIC Report* finds that STAGES is "a residential treatment program designed to reduce disruptive behavior of incarcerated men with mental illness, borderline personality disorder and a history of self-harm, to enable them to move to general population." *CIC Report,* at 14. This is done, primarily, through, "a modified therapeutic community." *See* U.S. Department of Justice, "Report and Recommendations Concerning the Use of Restrictive Housing," January 2016, available at bit.ly/2CgUtSN, at 26. While in group therapy, many of the inmates are nonetheless kept in cages, as shown in the picture below.



*See* bop.gov/resources/news/20160324_secure_stages.jsp.

73.     However, even the inferior option of placement in group therapy through the STAGES program, as opposed to a transfer to one of the BoP facilities with a secure mental



 Ex 3 26

83 of 138

health unit, is not likely available to an inmate housed at ADX Florence under SAMs, because unlike other inmates in restricted units at the facility, there are strict guidelines regarding who SAMs inmates may, and may not, communicate with. As *Darkest Corner* reports, "SAMs prisoners are generally prohibited from communicating with other prisoners within the cellblock." *Darkest Corner* at 5. Thus, there is reason to conclude that such restrictions would prevent inmates held under SAMS from participating in group therapy, and thus the STAGES program.

74.    Moreover, inmates held under SAMs, like Mr. Mostafa, are housed in a special secure unit of ADX known as H-Unit which may result in still further limitations on an inmate's ability to benefit from any remaining available mental illness treatment options. If held under SAMs, and designated to ADX Florence, Mr. Assange would in all likelihood wind up in this unit as well.

75.    According to the *CIC Report*, if an inmate cannot participate in group therapy at ADX Florence, "Psychology Services offers limited individual therapy. When individual therapy is required, inmates can be brought out of their cells to the room on the unit used for legal visits. Staff reported that individual therapy is offered once per week on Fridays, and only up to five patients can be seen on one day." *CIC Report*, at 17. One inmate that the CIC spoke with said that, "[m]ental health makes rounds, but does not pull you out of cell. They will not stop at my cell." *CIC Report*, at 17. Accordingly, given the restrictions on SAMs inmates and the more stringent environment posed by the H-Unit, which vastly limits the ability of an inmate to leave their cell and to communicate with others, there is no guarantee that an inmate housed in the H-Unit would be eligible for individual therapy, due to security concerns and/or the logistics of providing therapy to such an inmate could cause ADX Florence staff to simply overlook them. Also, communications with a therapist would presumably be monitored if an inmate is housed under SAMs, as other SAMs inmate communications are, and this could dilute the quality and effectiveness of the care, particularly if an inmate is unwilling or afraid to speak freely under such conditions.

   **b.  *Mr. Mostafa's Conditions of Confinement at ADX Florence***

76.    Mr. Mostafa, who is incarcerated at ADX Florence under SAMs, described his conditions of incarceration in his recent Complaint (Exhibit 2).  As he explained therein, he has

 83

Ex (3) 27                                           of 138.

been housed in one of the two cells designed for wheelchair-bound inmates in H-Unit for the entirety of his confinement at ADX – notably, not the disability from which he suffers and entirely incompatible with his needs. *See Mostafa v. Barr*, 1:20 Cv. 694 (PAB) (NYW) (S.D. Col. March 12, 2020) ECF # 1, at 11 (hereinafter "Complaint") (Exhibit 2). Cell 300, in which Mr. Mostafa was housed for two and a half years, is a "modified large store room" that has no window and thus no natural light. *Id.* When another inmate, who required an accessible cell, was transferred into to the prison, an additional accessible cell -- that likewise did not take into account Mr. Mostafa's specific disabilities -- was constructed. *Id.* Neither cell in which Mr. Mostafa is confined has a proper toilet for his disabilities, nor a shower or sink with continuous water, which he also requires. *Id.*, at 12.   When he was held in cell 300, however, prison staff welded sharp round metal discs to the faucets, "to make it easy" for him but the discs cut into his stumps and caused bleeding. *Id.* Because he lacks a proper toilet, he is unable to clean himself properly, and he states that his hygiene has suffered. *Id.* He also states that he does not have a table that he is able to eat or write at, and that the safety railings in his cell are designed for someone in a wheelchair, and are at waist level, rather than designed for a partially sighted amputee. *Id.*, at 21. All of these problems are exacerbated by Mr. Mostafa's poor vision, which makes ambulating in a small and dark cell without any windows especially onerous. *Id.*, at 22-23.

77.     Additionally, since 2018, prison officials have routinely moved Mr. Mostafa between cell 300 and cell 511. *Id.* at 11. This move is extremely difficult for Mr. Mostafa physically, given that as a double-arm amputee, it is difficult for Mr. Mostafa to collect all his belongings and move them. *Id,*, at 12. This struggle is in addition to the psychological stress, which Mr. Mostafa describes. In his words, he experiences "an enormous daily stress, anxiety, fear of injury . . . and helplessness." *Id.*, at 10.

78.     Indeed, all of the struggles that Mr. Mostafa faces are compounded by the fact that he spends his entire day, each day in solitary confinement. As discussed **ante**, the stress and anxiety Mr. Mostafa experiences on a daily basis are common symptoms of solitary confinement.  Moreover, despite the obvious effects of prolonged solitary confinement on mental health, and Mr. Mostafa's documented psychiatric history, counsel does not have reason to conclude that he has received sufficient, or perhaps any, mental health care while at ADX Florence.

84

Ex(03)28



### 3. The Quality of the Medical Treatment Mr. Mostafa Has Received While Incarcerated at ADX Florence

79.     Mr. Mostafa's experiences pursuing medical treatment at ADX Florence and generally within the BoP are relevant to Mr. Assange's case, just as they are relevant in the case of any inmate who has a medical issue, or requires medical care while confined in the BoP. Indeed, in addition to his well-known disabilities, Mr. Mostafa also has a host of other medical issues for which he requires care and treatment. As the High Court described in Mr. Mostafa's 2008 case regarding his extradition, Mr. Mostafa suffers from,

> 'type 2' diabetes and raised blood pressure, for both of which he is prescribed appropriate medication, extensive psoriasis, hyperhydrosis (excessive sweating provoked by a neurological condition) which requires him to shower and change his clothes at least twice daily, blindness in the right eye, with poor vision in the left, and bilateral traumatic amputation of the distal third of both forearms for which prostheses are fitted. The stumps in both arms are subject to regular outbreaks of infection, which have been increasing in severity.

See *Mustafa Kamel Mustafa (Otherwise Abu Hamza) v. the Government of the United States and the Secretary of State for the Home Department*, Case No. CO/1748/2008, [2008] EWHC 1357 (Admin), High Court of the United Kingdom, Queens Bench Division, Order, dated, June 20, 2008, at ¶7 (Exhibit 4).

80.     As discussed **ante**, many assurances were made to Mr. Mostafa prior to his extradition to the U.S. regarding the standard of medical care he would be afforded to meet his needs. Those standards have yet to be met, and a failure to accommodate Mr. Mostafa's medical needs is an issue of constitutional significance.

81.     Indeed, the Eighth Amendment to the U.S. Constitution affords inmates protections against cruel and unusual punishment, and this has been explicitly applied to people incarcerated with physical disabilities and to medical care. See, e.g., *Shariff v. Coombe*, 655 F.Supp.2d 274 (SDNY 2009), (the Eighth Amendment extends to conditions of confinement and the effect those conditions have on disabled prisoners.); *Knop v. Johnson*, 667 F.Supp. 467, 479 (W.D.Mich. 1987) ("[e]xposing an inmate to a situation where he may be forced to defecate or urinate in his own cell without the presence of proper toilet facilities or a washbasin violates the basic human dignity the Eighth Amendment protects."); *Johnson v. Wright*, 234 F.Supp.2d 352,

85

Ex(03) 29

86 of 138

360 (SDNY 2002), quoting, *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) (the mere "fact that a [prisoner] received regular medical care does not preclude a finding of deliberate indifference where the course of treatment was largely ineffective and [prison officials] declined to do anything more to attempt to improve [the prisoner's] situation."); *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996) (prison officials must ensure that inmates receive adequate food, clothing, shelter, protection and medical care); *Whitnack v. Douglas County*, 16 F.3d 954 (8th Cir. 1994) (reasonably adequate sanitation and ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of prisoner protected by Eighth Amendment); *King v. Frank*, 371 F.Supp.2d 977 (W.D.Wisc.2005) (condition of inmate's confinement violates Eighth Amendment's prohibition against cruel and unusual punishment if it denies inmate civilized measure of life's necessities); *Estelle v. Gamble*, supra, 429 U.S. 97 (1976) (deliberate indifference to prisoners' serious medical needs constitutes cruel and unusual punishment); *LaFaut v. Smith*, 834 F.2d 389 (4th Cir. 1987) (prison officials violated Eighth Amendment by failing to provide disabled inmate with needed physical therapy and adequate access to facilities). 

82.     The Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990 also recognize that the need to accommodate disabled persons extends not merely to those that are at liberty but to incarcerated persons as well. *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998) (ADA); *Onishea v. Hopper*, 171 F.3d 1289 (11th Cir. 1999) (Rehabilitation Act); *Bonner v. Lewis*, 857 F.2d 559 (9th Cir.1988) (Rehabilitation Act); *Kaufman v. Carter*, 952 F.Supp. 520, 523-24 (W.D.Mich. 1996) (failure to provide accommodations so that bilateral amputee could gain equal access to bathrooms and showers while incarcerated implicated Rehabilitation Act, the ADA and the Eighth Amendment).

83.     Along these lines, 42 U.S.C. § 12182(b)(2)(A)(ii) explains that, for purposes of the ADA, discrimination in public accommodations includes:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."



EX(3)30

84.     Accordingly, Mr. Mostafa should be protected from discrimination as a result of his disabilities. As a federal inmate, he should receive modifications to mitigate practices which are unreasonably difficult for him, and which do not affect the national security of the United States. However, at ADX Florence arbitrary policies preclude Mr. Mostafa from receiving adequate medical care, and bureaucratic indifference makes fighting these conditions onerous and near impossible.

85.     For example, as a double-arm amputee, Mr. Mostafa has trouble brushing his teeth. *See* Complaint, at 14.  As he explains in his Amended Complaint, "the most painful physical pain (non stop) is the ADX policy of not allowing any dental work or replace damaged work done prior to ADX, such as but not limited to: bridges, crowns, implants, etc[.]" *Mostafa v. Barr*, 1:20 Cv. 694 (PAB) (NYW) (S.D. Col. May 18, 2020), ECF # 9, at 16 ("Amended Complaint"), attached hereto as Exhibit 3.  These problems are related to his other health concerns, and ADX Florence should provide some reasonable accommodation, which is all Mr. Mostafa asks for.  As Mr. Mostafa's Amended Complaint elaborates "all ADX dentist repeatedly explained to plaintiff . . . [is] that ADX policy afford[s] no repair ... not even allowed more than once a year cleaning nor plaintiff allowed electric/flossing brush to clean his teeth[.]" Amended Complaint, at 16.

86.     While the prison has denied his requests and delayed any relief, Mr. Mostafa reports that the problems with his teeth have been exacerbated. Amended Complaint, at 16. Because of his double arm amputations, and the lack of any assistance from prison staff with his daily needs, Mr. Mostafa is only able to open pouches of food by ripping them with his teeth. Over the course of the years he has been incarcerated, he reports that the nerves in his teeth have become severely damaged and he has lost several teeth. Amended Complaint, at 16.

87.     Mr. Mostafa's health has also suffered in other ways as a result of neglect by prison staff. For example, Mr. Mostafa is unable to cut his own toenails, apply prescribed cream to his body to treat his skin conditions, or clean his cell. *See* Complaint, at 15-16. These small tasks, which other inmates do not need assistance with, are impossible for Mr. Mostafa to accomplish safely on his own without special attachments for his prosthetics. As a result, Mr. Mostafa experiences frequent bleeding in his feet from sharp or overgrown toenails, injur[y] and bleeding when he is made to clean his cell, and his skin conditions have gone untreated. Complaint at 15-16.

87





88.     The consistent lack of attention paid by prison staff to Mr. Mostafa's needs demonstrates that the staff at ADX Florence is unable to, or at least unwilling to, accommodate inmates with disabilities or to adequately attend to medical issues. Despite promises by the BoP made to the English extradition courts to the contrary, Mr. Mostafa suffers daily from the conditions of his confinement and his lack of proper and necessary medical care.

E.     *Mr. Mostafa's Detention Pursuant To SAMs Throughout His Time in U.S. Custody*

89.     Despite the fact that prior to his extradition to the U.S., Mr. Mostafa had been incarcerated at HMP Belmarsh for many years as a standard risk, high profile inmate, in the general population (with access to other inmates as well as his family), he has been incarcerated under SAMs since just after his arrival in the U.S., and continuously, for the last nearly eight years. In order to best understand the conditions of confinement Mr. Mostafa has faced, and currently faces at ADX Florence, as a result of the fact that SAMs have been imposed in his case, and also the conditions that Mr. Assange would likely face if subjected to SAMs while in U.S. custody, a general overview of the SAMs regime is instructive.

90.     *The Center for Constitutional Rights'* comprehensive study of SAMs found that while SAMs can vary between prisoners, "the standard regulations severely restrict or altogether prohibit contact with other human beings, including other prisoners and visitors." *Center for Constitutional Rights and Lowenstein International Human Rights Clinic*, "The Darkest Corner," September 2017, available at https://bit.ly/3i0WuT4, at 5 (hereinafter "Darkest Corner"), attached hereto as Exhibit 16. Inmates subject to SAMs at ADX are "allowed only ten hours total outside of their cell per week, like general population prisoners. But this time is also spent alone, either in a small indoor room or in a cage hardly bigger than their cell. For many prisoners, the cage is too small to run or do anything but walk a few steps in each direction." *Darkest Corner*, at 6. Thus, most inmates under SAMs spend all day, every day, completely alone, and often for many years at a time.

91.     SAMs also severely limit an inmate's ability to stay in contact with family. For example, "[c]alls can only be made to approved 'immediate family members' and may be limited to one fifteen-minute call per month." *Id.* In Mr. Mostafa's case, as he notes in his Complaint in the District of Colorado, not even all of his children, or even his young grandchildren have been





approved. *See* Complaint, at 30 ("four of the plaintiff's sons are excluded from any communications, and all but one of all grandchildren are also excluded from any contacts (the oldest is 6 years old)").

92.     Mail is similarly restricted to those approved family members, "with the frequency limited to three 8.5 x 11 pieces of paper "once per week to a single recipient, at the discretion" of the BoP. This mail must also be "copied and analyzed by the FBI before it is delivered." *Id*.  This restriction poses significant hardship, especially on an inmate like Mr. Mostafa, who is only practically able to communicate with approved family members by phone or through letters (SAMs inmates are not permitted access to the prison inmate email system, which impedes both legal and social contact).  He must thus choose between family members since he is not permitted to write to all of them each week, and, as he notes in his Complaint in the District of Colorado, due to the delays posed by the inspection of mail to and from Mr. Mostafa, "[t]he real cycle of a letter and its answer is 6 months. 60 working days to send and 60 to receive [--]weekend and holidays not counted [--] thus only two meaningful letters per a year for a successful informative mail."  Complaint at 30.  Likewise, all calls and visits are contemporaneously monitored and recorded by the FBI. *Darkest Corner*, at 6.

93.     Among inmates, communication is completely prohibited, and this includes restriction of communal prayer. Inmates cannot communicate with the media, and cannot read or view any publication that is not approved by the BoP. *Id.*

94.     Communications are further restricted for anyone who has contact with an inmate subjected to SAMs. As discussed briefly **ante**, and explained in *Darkest Corner*, "[t]he government imposes what amounts to a 'gag order' on the few people who can contact the prisoner – that is, the prisoner's attorney and authorized immediate family members – prohibiting them from conveying any message from the prisoner to a third person." *Id*, at 5.   In practical terms, these restrictions serve the underlying purpose of the SAMs, such as those in Mr. Mostafa's case which are intended to prevent the dissemination of any communications by the inmate that might result in death or serious bodily injury to person, or  damage to property.  But they also restrict communications for no legitimate purpose whatsoever, such as when the communications at issue have no possible chance of causing the ills that the SAMs are intended to prevent, and the disclosure of which could otherwise be beneficial or useful.

95.     SAMs also guarantee a particularly harsh living environment for an inmate. For





instance, "SAMs prisoners at ADX are held in a separate section of the prison called the Special Security Unit ("SSU") or H-Unit. These prisoners are confined to cells that measure less than eight by ten feet, requiring them to eat their meals within an arm's length of their toilet." *Id.*, at 6. Mr. Mostafa specifically is housed in a 16 foot by 8 foot cell that has only one small window which is blocked by the shower. *See* Complaint at 11. As a result, his cell is dark and completely devoid of sunlight.

96. Nor are the restrictions of SAMs a short-term problem for those inmates on whom SAMs are imposed. "A 2013 count showed that eighty-two percent of prisoners placed under SAMs were under these restrictions for more than a year. Of those prisoners, thirteen had lived under SAMs for more than a decade." *Darkest Corner*, at 11. Moreover, the Attorney General need not justify an imposition of SAMs or their renewal. *See, e.g.,* Aviva Stahl, "Extreme Isolation for U.S. Prisoners Shields 'Torture' From Public View and Accountability," The Intercept, October 23, 2017, available at bit.ly/3g6B9pE (stating "there are essentially no checks on the attorney general's power to impose the onerous restrictions, nor evidentiary standards she is required to meet in order to do so)." Indeed, in Mr. Mostafa's case, SAMs have been imposed for eight consecutive years, and have not been relaxed in any manner. And, in fact, SAMs were re-imposed for the current year as of January 3, 2020.

97. The fact that these restrictions have been consistently maintained over the course of more than seven years, and Mr. Mostafa is now in his eighth year under SAMs, is significant given that the government asserts, in imposing the SAMs, that these are the least restrictive measures that can be tolerated in light of the risks that the inmate presents. In my opinion they are not, in that they are designed to prevent even contacts and communications that have no chance of leading to, or connection to, criminal activity or terrorist activity and that do not pose any risk of harm to any person or property.

98. It is also my opinion that any SAMs violations that have been alleged against Mr. Mostafa should not prevent the SAMs from being relaxed pursuant to the stepdown process that the government spoke of during Mr. Mostafa's extradition proceedings in the ECtHR, and which exist at ADX Florence. Indeed, the isolated instances of minor, or even essentially administrative, non-compliance over the span of many years that are alleged in Mr. Mostafa's case do not appear to compromise national security in any manner or run the risk of causing any harm.



Ex(3)34

99.    Indeed, one such violation, which Mr. Mostafa raised in the public record in the context of his Complaint in the District of Colorado, *see* Complaint, at 31, was that he had allegedly improperly tried to convey, in a letter to one of his sons, his love to his one year old grandson, who Mr. Mostafa is not permitted to speak to. It was, according to Mr. Mostafa, viewed as "an attempt to contact [a] third party (the plaintiff['s] one year old grandson)." *Id.* Such a violation does not go to the purpose of SAMs, which is to prevent the client from committing, soliciting or conspiring to engage in future criminal conduct, and namely terrorist activities which could result in death or serious bodily injuries. All such restrictions do is to impede an emotional connection between an already severely isolated inmate and his family. In fact, such contact should be encouraged and fostered for the good of the inmate and his family members. Nor should such a violation, even if proven, be used as a basis to renew the SAMs.

100.    But, challenging the SAMs is difficult, for counsel, and particularly so for inmates. As Mr. Mostafa explained to the sentencing court on the record during his sentencing hearing, "more than two-thirds of my letters to [my family members]. . . have been trashed, and I can't prove it because the [MCC staff did] not give me a receipt [for each documenting] . . . the date [I submitted the letters to be sent]." *See* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346 (KBF), Docket #474, at 67 (Exhibit 11). He also noted that he had "exhausted all [his administrative] remedies from the regional to the central [office] to the MCC itself. . . all the remedies [through to] the central office" without any recourse from the BoP. *Id.* He also commented, more generally, with regard to the SAMs that have been imposed on him, "the problem is, when they are administrated, they are loose. They are not watertight. There is bullying, and the more you complain, the more you get bullied." *Id.*

101.    There is no reason to conclude that SAMs imposed on Mr. Assange would be any less arbitrary, oppressive, or difficult to challenge, should the U.S. government determine, in its apparently unbridled discretion, that they are appropriate in his case.

**F.    *Mr. Mostafa's Experiences with the BoP Administrative Remedy Process And Efforts To Challenge the Conditions of His Confinement Both Within the BoP and In the U.S. Courts***

102.    The U.S. federal statute that governs challenges to an inmate's conditions of

Ex (3) 35

confinement is 28 U.S.C. §2241. Under this statute, if a detainee wishes to challenge the conditions of his confinement, the BOP's conduct, or, the SAMs that have been imposed in his case, he must do so collaterally in the district in which he is confined. *See Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) ("[a] motion pursuant to § 2241 generally challenges the execution of a federal prisoner's sentence, including such matters as ... computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions." (internal citation omitted)); *see also Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) (noting that a federal prisoner seeking to challenge his custody must "name his warden as respondent and file the petition in the district of confinement").

103.    But, even for Mr. Mostafa, whom I have been appointed as counsel to represent in litigation pursuant to 28 U.S.C. §2241, it is not as simple as just initiating a case in the court. In fact, I only recently asked the court to appoint me to litigate Mr. Mostafa's conditions of confinement in the U.S. courts, despite awareness for years that such issues with his confinement exist, because an action cannot be brought in the U.S. federal district court until *after* the inmate has exhausted the administrative remedy process within the BoP.   Indeed, Mr. Mostafa, himself, has only just this year, in his eighth year of confinement in the U.S., filed an action in court raising confinement conditions and his SAMs.  *See* Complaint and Amended Complaint (Exhibits 2 & 3).

104.    Inherent to the administrative remedy process are long timelines that inevitably lead to delay in exhaustion and the ability to pursue a matter in court.   The process is particularly unforgiving when the matter at hand is urgent or time sensitive. As *Darkest Corner* explains,

> exhausting the [administrative remedy process] requires prisoners to (1) raise the issue of concern informally with BOP staff, (2) wait for the staff's response, (3) obtain and file a Remedy Form, (4) wait for the prison's response to the request, (5) obtain and file a Regional Appeal Form, (6) wait for the BOP Regional Office's response, and (7) obtain and submit a Central Office Appeal Form. BOP officials may return without response any filing that fails to adhere to extensive regulations concerning form and timing. Attorneys may not submit these complicated requests or appeals on the prisoner's behalf.

*Darkest Corner*, at 19. BOP's Program Statement 1330.18 discusses ARP in detail. *See* https://www.bop.gov/policy/progstat/1330_018.pdf.

92

105.     In Mr. Mostafa's case this last requirement, that the inmate submit his requests himself, has been particularly challenging and has resulted in hardship for Mr. Mostafa.  As he notes in the context of his recent Complaint to the District Court for the District of Colorado, at 30, "[m]ost of the time plaintiff's remedy paperwork is rejected or returned because he can not press the pen hard enough to fill the four pages, no photo copies allowed to be sent as replacement, no carbon papers is provided no help and no consideration for his disability though it is well known and repeatedly mentioned to prevent rejection." *Id.*

106.     In addition, Mr. Mostafa's transfer from one BoP facility to another, despite the fact that his conditions of confinement issues and SAMs are essentially, if not entirely, the same in each facility, has also long-delayed his ability to litigate his confinement conditions and the SAMs that were imposed, in court.  Under the administrative remedy process, in the event of an inmate's transfer to a new facility, the process must begin anew, even if the issues remain unchanged. Thus, "while the [administrative remedy process] ostensibly affords prisoners an opportunity to redress issues related to their confinement, in practice it can prevent courts from conducting any substantive review of SAMs [and other confinement] conditions." *Darkest Corner*, at 19.

Dated: 17 July 2020
New York, New York

_____
LINDSAY A. LEWIS
Dratel & Lewis
29 Broadway Suite 1412
New York, New York 10006
(212) 732-0707
llewis@dratellewis.com

36



Ex(04)A                              pg 14 of 138

**BP-229 Response**                              Case Number:  1007348-F1

Your Request for Administrative Remedy dated February 14, 2020, and received in the Administrative Remedy office February 20, 2020, has been reviewed.  Specifically, you claim that you have been denied essential dental work.

A review of the issue raised in your Request for Administrative Remedy has been conducted.  The results of the review revealed you were evaluated in Dental Services on January 31, 2020, for severe abrasion of your lower front teeth.  The dentist explained the best option would be to seek assistance from your counselor to acquire sensitivity reducing toothpaste from the commissary as a palliative treatment as there is no other treatment available within Program Statement 6400.03, <u>Dental Services</u>, to properly treat your issue.

Accordingly, this response to your Request for Administrative Remedy is for informational purposes only.  In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response.  You will need to submit a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas  66101-2492.

_____                    3/11/2020
B. True, Complex Warden                     Date



(Disable inmate mustafa)   EX(4)B

~~ment of Justice~~
~~of Prisons~~

**Central Office Administrative Remedy Appeal** 956 150

*Dental Care   Dental   2 Exhibits Attached*

~~ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attach-~~
~~st be submitted with this appeal.~~

Mustafa, K. Mustafa        6 7 4 2 5 5 4    H      ADX. Co.
**LAST NAME, FIRST, MIDDLE INITIAL**      **REG. NO.**    **UNIT**        **INSTITUTION**

**t A - REASON FOR APPEAL** please also find enclosed counsel delay note and 2 exhibits. I must thank the Regional office for moving me to ADX to provide some ~~dentist~~ for long dental care. But unfortunately ADX and SAMs operatives as usual tried to circumvent the Regional office recommendation / endeavour and deflect their responsibility on me. Central office should prevent such endless unconstitutional tactics. Please note from ADX reply to my request (Fi) that the same very dentist takes not allowed to offer me any relief even pain killer (and in record since 2013). so ADX sent me 03 officers to intimidate me and bully me to refuse to see the dentist (never happened) (See attached exhibit B). Then all my requests to contact the dentist to get an appointment were intercepted and still lying to Regional office (see Exhibit 02).

Aug 5, 2020   Solution is needed from this respected high office I had been told by all dentists in FBOP they can't help
**DATE**                                          **SIGNATURE OF REQUESTER**

**Part B - RESPONSE**

ONE
CPG
1250

EX (4)-B

RECEIVED
AUG 2 5 2020
Administrative Remedy Section
Federal Bureau of Prisons

**DATE** *Warden Copy*
ORIGINAL: ~~RETURN TO INMATE~~

GENERAL COUNSEL
CASE NUMBER: *1007348 A1*

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
     **LAST NAME, FIRST, MIDDLE INITIAL**        **REG. NO.**      **UNIT**      **INSTITUTION**
SUBJECT: _____

**DATE**          SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

Ex(4):                                                                    96 of 88

Sis: please make me Two copies Then send to

<u>Request For Rebooking</u>

The Chief Dentist                          Wed 7-8-2020

From Mostafa # 67495-054     unit H-511

Regarding  "Dentist Cell Search" appointment
_____

Thank you for Calling me for your clinic
last Thursday which I could not make it,
reopening cell search again like on 6-25-20
The reason was that the medical C/O came
C/O Rodreguey and C/O menes were acting
very unprofessionaly and intimidating me; even
brought with them another C/O Averett who
attacked me with other C/O" oct 28 last year and
injured me.

C/O's said " you need to come to Dentist so
we can give your cell a good shake up"
And when I said that I just had one 3 days ago
and still couldn't put things back in place yet
They said " This one is even bigger shake up"
when I said "what the dentist has to do with cell
Searches" they tried to put me off coming to you
"he is only gune take photo of your mouth
you can refuse if you want to"
I AM Disabled and as I was getting dressed they
started bully me to decline then I asked for a senior
person then they said "you are refusing" and went off,
C/O Rodreguey done the same before with Dr Conroy. Thanks!
                                    Respectfully.
                                                            96

(Please see attached previous Request)

August 2020

TO: Respected Chief Dentist Mr. Robbert

From: Mostafa.   67495-054   #511

Subject: 2nd Request for an appointment
Regarding my BP10 assesment.

— I only received your note of July 2, 2020
yesterday at 4:20 PM friday from SIS Mr foster
almost 30 days July 31, 2020!

— It Seem that also my first request for
rebooking after medical c/o misconduct
has also been 'intercepted and never reached
You I wrote and sent it on Wed July 8, 2020
(See Copy attached)

— It is Consertal ADX to deny me dental
Care and misinform Remedy higher office

— Please make me a genuine appointment ASAP
and acknowledge a receipt of this request and
attachement. thanks   Respectfully
I/m  Most

EX(4)E

98 of 138

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: SEPTEMBER 22, 2020

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CENTRAL OFFICE

OCT 0 6 2020

TO  : KAMEL MOSTAFA MOSTAFA, 67495-054
      FLORENCE ADMAX USP    UNT: H    QTR: H05-511L
      PO BOX 8500
      FLORENCE,  CO 81226

FOR THE REASONS LISTED BELOW, THIS CENTRAL OFFICE APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID      : 1007348-A1    CENTRAL OFFICE APPEAL
DATE RECEIVED  : AUGUST 25, 2020
SUBJECT 1      : DENTAL CARE - DELAY OR ACCESS TO
SUBJECT 2      :
INCIDENT RPT NO:

REJECT REASON 1: YOU MAY ONLY SUBMIT ONE CONTINUATION PAGE, EQUIV. OF ONE
                 LETTER-SIZE (8.5 X 11) PAPER.  TEXT ON ONE SIDE.  THE
                 TEXT MUST BE LEGIBLE.

REJECT REASON 2: YOU DID NOT SUBMIT PROPER NUMBER OF CONTINUATION PAGES
                 WITH YOUR REQUEST/APPEAL.  2 - WARDEN'S LEVEL; 3 -
                 REGIONAL LEVEL; AND 4 - CENTRAL OFFICE LEVEL.  THE
                 NUMBER CITED INCLUDES YOUR ORIGINAL.

REJECT REASON 3: YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN
                 15 DAYS OF THE DATE OF THIS REJECTION NOTICE.







REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: DECEMBER 10, 2020

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CENTRAL OFFICE

TO  : KAMEL MOSTAFA MOSTAFA, 67495-054
      FLORENCE ADMAX USP    UNT: H    QTR: H05-511L
      PO BOX 8500
      FLORENCE,  CO 81226

**RECEIVED**

DEC 29 2020

ADX AW Office

FOR THE REASONS LISTED BELOW, THIS CENTRAL OFFICE APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID       : 1007348-A2      CENTRAL OFFICE APPEAL
DATE RECEIVED   : NOVEMBER 20, 2020
SUBJECT 1       : DENTAL CARE - DELAY OR ACCESS TO
SUBJECT 2       :
INCIDENT RPT NO:

REJECT REASON 1: YOUR APPEAL OF THE REJECTION IS UNTIMELY. RESUBMISSIONS ARE
                 DUE WITHIN: 5 DAYS (INSTITUTION); 10 DAYS (CCM OR REGIONAL
                 OFFICE); 15 DAYS (CENTRAL OFFICE). SUBMIT STAFF MEMO ON BOP
                 LETTERHEAD STATING REASON UNTIMELY FILING WASN'T YOUR FAULT.

REJECT REASON 2: SEE REMARKS.

REMARKS         : STAFF MEMO STATES YOU RECEIVED THE REJECTION
                  PACKET ON 10-07-2020, NOT RECEIVED BY CO UNTIL
                  11-20-2020.

Respectfully / pleas note you have misquoted
the dates ! I received the first rejection on 10-17-20
and sent on 10-26-20 Timely.

I have no control of C.O. logging dates.

please, answer the grievance, it is moderat,
and needed for long time.

(thanks) Tim

Ex (4) G

100 of 138

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: FEBRUARY 4, 2021 ?

Institutional Dates & loophole Tricks

FROM: ADMINISTRATIVE REMEDY COORDINATOR
CENTRAL OFFICE

RECEIVED
FEB 17 2021
ADX AW Office

TO : KAMEL MOSTAFA MOSTAFA, 67495-054
FLORENCE ADMAX USP UNT: H QTR: H05-511L
PO BOX 8500
FLORENCE, CO 81226

FOR THE REASONS LISTED BELOW, THIS CENTRAL OFFICE APPEAL IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID : 1007348-A3 CENTRAL OFFICE APPEAL
DATE RECEIVED : JANUARY 26, 2021
SUBJECT 1 : DENTAL CARE - DELAY OR ACCESS TO
SUBJECT 2 :
INCIDENT RPT NO:

REJECT REASON 1: YOU DID NOT PROVIDE A COPY OF YOUR INSTITUTION ADMINISTRATIVE REMEDY REQUEST (BP-9) FORM OR A COPY OF THE (BP-09) RESPONSE FROM THE WARDEN.

See BP9 Blue attached pages

REJECT REASON 2: YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN 15 DAYS OF THE DATE OF THIS REJECTION NOTICE.

REMARKS : N

→ The papers you asking for already enclosed and receipts see hand numbers 14 & 15
→ I am enclosing additional one for the one you claim see page

Delivered 2/19/2021

→ please notice your office has been playing delay tactical games to avoid answering clear abuse of dental Care for a disable
please, have more respect for your law & job!

100



REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: APRIL 16, 2021

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      CENTRAL OFFICE

**RECEIVED**

**MAY 05 2021**

**ADX AW Office**

TO   : KAMEL MOSTAFA MOSTAFA, 67495-054
       FLORENCE ADMAX USP    UNT: H    QTR: H05-511L
       PO BOX 8500
       FLORENCE, CO 81226


FOR THE REASONS LISTED BELOW, THIS CENTRAL OFFICE APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.


REMEDY ID      : 1007348-A4      CENTRAL OFFICE APPEAL
DATE RECEIVED  : MARCH 16, 2021
SUBJECT 1      : DENTAL CARE - DELAY OR ACCESS TO
SUBJECT 2      :
INCIDENT RPT NO:

REJECT REASON 1: ALL FOUR PAGES OF YOUR (BP-9) (BP-10) (BP-11) FORM MUST BE
                 LEGIBLE AND WORDED THE SAME. PHOTOCOPIES OF THE FORM WILL
                 NOT BE ACCEPTED.

REJECT REASON 2: SEE REMARKS.

REMARKS        : YOU NEED TO SUBMIT A COMPLETE AND LEGIBLE PACKET
                 FOR REVIEW. THE PAGES OF YOUR APPEAL ARE FALLING
                 APART AND PIECES OF PAGES PAPER CLIPPED TOGETHER.



MOSTAFA, Mostafa Kamel
Reg. No. 67495-054
Unit:_____H -Unit

## RESPONSE TO INMATE REQUEST TO STAFF MEMBER

This is in response to your Inmate Request to Staff Member dated January 7, 2016, and received in this office on January 11, 2016, wherein you state that Administrative Remedy No. 839647-A1, was rejected on the basis that all four pages of the BP-11 form must be legible and worded the same.

A review of the issue revealed that you will be permitted to submit photocopies of the BP-11 form to Central Office, and you may request ADX staff to submit a memorandum to be included with your BP-11 submission concerning the same. You are still required to complete the first page of the BP-11 form as this accommodation only pertains to your inability to submit the four carbon pages of the BP-11 form at this time. Additionally, please be advised that this does not apply to any submissions of BP-9 forms at the institution level or submission of BP-10 forms at the regional office level.

Specifically with regard to Administrative Remedy No. 839647-A1, you may resubmit the appeal to your counselor and request a memorandum to reflect this photocopy accommodation as stated above, be included with the resubmission.


K. Klett
CLC Attorney

Date  1/21/2016



**BP-229 Response**                                        Case Number:   1024696-F1

Your Request for Administrative Remedy dated May 29, 2020, and received in the Administrative Remedy office on June 4, 2020, has been reviewed.  Specifically, you are appealing the denial of your placement into Phase III.

A review of the issue raised in your Request for Administrative Remedy has been conducted.  The results of the review revealed that outside law enforcement agencies did not consent with approving your Phase III placement.  You were denied placement into Phase III because additional time is needed to determine whether you can function with additional privileges without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates, or others, including yourself; and/or posing a risk to public safety.  We encourage you to continue to participate in and complete all programs recommended by Unit Team; demonstrate positive behavior, including respectful and appropriate conduct towards staff and other inmates; and demonstrate an overall positive institutional adjustment to include, but not limited to, personal hygiene, and cell sanitation.  You will be reviewed for placement in the next phase, ordinarily six months from your current review, providing you continue to meet the eligibility requirements identified in Institution Supplement 5321.07(3)K, <u>Special Security Unit</u>.

Accordingly, your Request for Administrative Remedy is denied.  In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response by submitting a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas  66101-2492.

B. True, Complex Warden                           7/2/2020
                                                   Date



# SPECIAL SECURITY UNIT PHASE CONSIDERATION



July 16, 2020
DATE

MOSTAFA, Kamel Mostafa
INMATE NAME

67495-054                    H
REGISTER NUMBER        UNIT

July 2020
MONTH REVIEWED

☐   You have been approved for placement in the next Phase within the Special Security Unit.   Your Unit Manager will provide you with more details regarding this placement.


X   You have been denied placement into Phase III because additional time is needed to determine whether you can function with additional privileges without: posing a risk to institutional security and good order; posing risk to the safety and security of staff, inmates, or others, including yourself; and/or posing a risk to public safety.   We encourage you to continue to participate in and complete all programs recommended by the unit team; demonstrate positive behavior, including respectful and appropriate conduct towards staff and other inmates; and demonstrate positive overall institution adjustment to include, but not limited to, personal hygiene, and cell sanitation.   You will be reviewed again for placement in the next Phase ordinarily six months from your current review, providing you continue to meet the eligibility requirements identified in Institution Supplement 5321.07(3) J, Special Security Unit.   You may appeal this decision by utilizing the Federal Bureau of Prisons' Administrative Remedy Program.


_____
B. True, Complex Warden



Administrative Remedy Number 877974-A1
Part B - Response

This is in response to your Central Office Administrative Remedy
Appeal where you claim you are being discriminated against at the
ADX based on your type of disability.  You state you have no hands
and need disability accommodations, fittings and items to assist you
with daily functions.  You feel the Occupational Therapist failed
to conduct a proper assessment of your needs.  It appears you request
assistance with this matter and adequate accommodations.

The Warden and Regional Director adequately addressed your complaint
and we concur with the responses provided.  This office confirmed
that an Occupational Therapist conducted a thorough evaluation of
your living area on April 26, 2016.  Several recommendations were
made and changes have since been implemented.  We find the
institution is working diligently to accommodate your needs and will
continue to work with you for your specific concerns as they arise.
You also have access to the Health and Psychology Services
Departments for your medical and mental health needs.

This response is provided for informational purposes.

_____
Date

                                   _____
                                   Ian Connors, Administrator
                                   National Inmate Appeals



Your placement at the ADX is deemed appropriate at this time.  The ADX currently does not have any cases of COVID-19.  In the event you develop symptoms, please notify staff promptly to conduct an assessment.  Health services follows guidelines provided by the CDC and will manage your condition and symptoms appropriately based on guidelines.

8/20/20





**U.S. Department of Justice**

Federal Bureau of Prisons

*Assult by staff 999324-A* (Ex-A)

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: MOSTAFA · K · MOSTAFA   67495-054   H   ADX Colorado
LAST NAME, FIRST, MIDDLE INITIAL / REG. NO. / UNIT / INSTITUTION

**Part A - REASON FOR APPEAL**

The provided answer is not at all true nor assuring; I am still, since the assult, have to deal daily with some of the officers who assulted me and still getting other misconducts (retaliative) action and intemdation. You can also see the delay of delivering the answer to me as a [crossed out] sign of bad faith (I am severely disabled)

4-31-20
DATE

SIGNATURE OF REQUESTER

**Part B - RESPONSE**

( Original Red form )

( Exhausted )

Ex-A = 5 pages

**RECEIVED**

MAY 19 2020

Administrative Remedy Section
Federal Bureau of Prisons

_____
DATE

ORIGINAL: RETURN TO INMATE

GENERAL COUNSEL

CASE NUMBER: 999324 A1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL / REG. NO. / UNIT / INSTITUTION

SUBJECT: _____

_____
DATE

SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)
JUNE 2002

UPN LVN   PRINTED ON RECYCLED PAPER

108 of 138

**Administrative Remedy No. 999324-A1**
**Part B - Response**



This is in response to your Central Office Administrative Remedy
Appeal where you allege you were physically assaulted by staff at
the ADX on the tenth day of your hunger strike.  You state you were
injured, are vulnerable and still feel intimidated.  You request
further investigation be conducted.

The Warden and Regional Directly adequately addressed your complaint
and we concur with the responses provided.  As indicated, your
allegation has been referred to the appropriate authority for review.
A thorough review will be conducted and proper action taken as deemed
necessary.

This response is provided for informational purposes.


_____                    _____
Date                                        Ian Connors, Administrator
                                            National Inmate Appeals

SEP 0 1 2020

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

Attacked & injured

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: __Mostafa, K. Mostfa__ __67495-054__ __H__ __ADX Florence__
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A– INMATE REQUEST** An investigation is urgently needed for the attack on me, abuse, threats and left arm stump injured on Monday oct 28 2019 by Lt Garrado, C/o parry and C/o Ave, the the 3 staff came to my cell threatening me and said by saying its are me to go off my protest food strike to be treated as disable and sick.

They said they are going to strap me down very tight to the force feeding chair and don't care if you deficate, I felt unsafe and told them I need the Team as I am worry that they may break the needle in to my arm or causing me heart attack. But the three said no and each jumped on one of my limbs, I am 61 yr old sick and severly disabled (no hands to my arms), and at the time did not eat for to days very weak and exhausted, My left stump was greased and bled heavy the bandage stayed on for more than 3 weeks to be removed on Tue, NOV 19 see force feeding video then, when I wrote my BP8 C/o parry became more abusive very provocative and confrontational when every threw Fire-transymmy cell floor, then gave me two shots for keep saying I do not feel safe with you I need the team when blood samples taken, please prohibit this report

NOV 25, 2019 _____ the injustice against me (thanks)

      DATE                    SIGNATURE OF REQUESTER

**Part B– RESPONSE**

( Original blue Form )

EXOTC

Received
DEC 0 5 2019
Admin Remedy Office

_____      _____
DATE              WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**      CASE NUMBER: __999324-F1__

                                    CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

_____                        _____
DATE                                 RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP-229(13)
APRIL 1982
USP LVN      PRINTED ON RECYCLED PAPER





**BP-229 Response**                                       **Case Number: 999324-F1**

Your request for Administrative Remedy dated November 25, 2019, and received in the Administrative Remedy office on December 05, 2019, has been reviewed. In your request, you claim you were assaulted by staff as retaliation for being on hunger strike. Specifically, you claim on October 28, 2019, staff entered your cell and threatened you using foul language. Additionally, you claim staff assaulted you causing a cut to your arm. As relief, you request an investigation be conducted and staff be held accountable for their actions.

A review of the issue raised in your Request for Administrative Remedy has been conducted. The results of the review revealed all staff are expected to adhere to policies regarding the safety and fair treatment of inmates. Staff are expected to ensure all inmates are safe and not subject to any form of threat or assault. Officers are expected to understand these policies and ensure they are enforced when conducting daily operations. Additionally, staff are expected to act in a professional manner when carrying out daily tasks. Therefore, the information you have presented in your Administrative Remedy will be forwarded to the appropriate Bureau of Prisons component for review. However, inmates are not entitled to receive information regarding the outcome of an investigation.

Accordingly, this response to your request for Administrative Remedy is for informational purposes only. In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response. You will need to submit a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas  66101-2492.

_____                          2/6/2020
B. True, Complex Warden                            Date

To: STS members; please make me 2 copies then forward the e-mail.

Urgent.   ( EXOTE )   1150f138

To: The legal Dept.

Tue 10-29-2019

From: Mostafa # 67495-054     Unit H   Cell 300.

Re: Being attacked and injured by one Lt and two staff
    at the present of the doctor on Monday 10-28-19

The above mentioned incident took place at about 12:30 pm.
The doctor and his nurse (who had camera and were filming) were
at the door when Lt   and C/o Perry and C/o Averitt
opend the cell door of my disable cell 300 and pushed
me towards the bed then when I asked for the team
to come in order to provide samples of blood, urine needed
for food strike. the three took the matter in their hand
and suddenly attacked me, grabbed me to put me in the chair
and tie me but I fell on the floor and was pushed and
pulled by them till I was injured. then they all left me
including the doctor without care about my blood on the floor
or my state being dizzy as I did not eat for eleven or
10 days.

please, make sure that the main hall cameras and the hand
camera clips / footage are preserved for further investigation
as well as all my file regarding the food strike which started
oct 19, 2019.

please acknowledge receipt of this request and advise of your
action. ( thanks )

                              Respectfully requested

cc to Warden please.        I/m

Ex(8)a                                        12 of 138

To : Mr. Follows (Medical)              May 05, 2021

from Mostafa    #67495-054    Unit - H

Subject : Occupational Therapist & Report  Dec 16, 2020
_____

As we discussed more than once and your reply
to my BP 8 regarding the unprovided O-T report
of his Tele-assessment Dec 16, 2020. Could
you please, provide the report.  And explain
the following :

→ 1- Why The O-T & Technician in the
    assessement never came back to finish
    or Continue the assessment as it is
    recorded "we will be back"

→ 2- Who or what stopping them ?

→ 3- And if /whether you provided them with
    the list of Disability fitting = & item
    you said you "forgot to gave them before
    the Dec 16, 2020 assessment.

→ 4- Whether or not they provided for you to
    give me any clips video or illustrating
    material to explain & show how Can I
    do my daily task Selfly, hygienically an satisfaction
    without the required fitting & items or help. As
    I repeatedly asked you, & them on the assessment
                    thanks    respectfully =M=

Noted and received 12/17/202 0
AFollows ASA ADX
EXBO

1/3

1/30 of 138
①

TO: Respected Madam Follows Medical Dept

From: I/m Mostafa .K. Mostafa        Wed. Dec. 16. 2020
Reg :   67495-054      Cell 511

Subject: Today's Video Conference with Occupational
         Therapist and Prosthetic technician. Missouri.

~~~~ Thank you For Taking me today for your arranged
Video conference with the above mentioned two gentlemen

However, there are many issues pertaining the
matters and need swift attention Such as but not
limited to : ___The Setting___

① I was hoping you would allow an O.T from
my side to participate in the assessment. And I am
Renewing this request as my Attorney wrote to
You and legal department On December 03, of
Last year.    To have a balanced report.

② You may have noticed that the conference
started okey but as soon as serious issues mentioned
the Camera towards me started to move up Which
prevent the O.T to See me. And this Can only
keep happening if some of the people behind move are
misusing the remote control to prevent/stop
recording and disturb the conference.

③ As you know I am litigating many ADX
and special Administrative Remedy's Malpractice
endangering my life specially now in Covid-19
situation. And therefore, the court needs
every possible discovery.

I am therefore, respectfully requesting to provide
me with the following items :

page one
1/3

EX(8)b2                                    114 of 138 ②    2/3

(a) The video footage you took for my cell 511 on Friday 12/11/2020 to send to O.T. for today's assessment. Unedited please.

(b) The unedited copy of the video conference today to make sure that no words are misused/ignored or reported out of the context.

(c) The ADx security camera of the place of the conference, covering all the area including behind me wall to wall. For the court to examine the interference in the setting/camera to prove also, my case about similar previous S.A.M's malpractice during other assessment.

    Note: In case of security issues, please keep it ready for the court, discovery only to decide but do not edit nor distroy (Leave the court to decide this)

                    Conference Content
(4) I was hoping that the O.T is already in position of my lists of essential fittings any items for my daily safety health and hygiene. But since you never sent them less than 5% of these issues were discussed.

    Could you please send the lists to O.T ASAP before he writes his preliminary report.

(5) And as I mentioned supported by the cell video you took, That there is no single fittings in my cell suitable for my double upper imputed, all for wheel chair person. Could you please try to provide any fittings or

                                    Page Two

Ex(8)b3

115 of 138

③ 3/3

or items of the list to mitigate my suffering and high exposure to COVID-19 before any more assessments, such as toilet sink, shower table etc. and items: soap pumps, pen, electric tooth brush [for etc...

⑥ Could you please remind the gentlemen to provide illustration by video clips or photos for any task they think I am/or should be able to do safely without the fittings or items required.

Basically, to avoid any more Malpractice and/or security/SAMs interference in my case to endanger/harm me daily as for the past 8+ years.

Illustration done by an hyper disable amputee without help [or others] as himself now in Solitary. And in accordance with American Disability Act and USA court rulings against cruelty Malpractice and/or prolonged deliberate interference.

⑦ Also, please, for every ones' benefit including tax payers, please make sure that any newly made prosthetics are functional do not cause me harm/infections and do not need training to use, because of my age, Solitary and health complications.

Finally, thank you, and please, acknowledge receipt of this document and advise me of your decisions.

Respectfully submitted
I/M #OST, 67495054    12/16/2020
page three
115

EXHIBIT   Sts phone Scan & send to MB, Fellows -Medical Dept.

To: Ms. Fellows (Medical)                           May 05, 2021

From: Mostafa    # 67495-054

Subject: Exposure To Danger

Some of the many unprovided items . urgently needed

As Discussed yesterday during round, You said You
don't know why they did not order the items and
that you will Try to "have a look"

With all due respect Madam, I am hearing the
same for years without any relief and/or the reoccur-
rance of denying simple items for months.

Could you please, Provide and advise about the
denial of the following items:

→ 1- Cleaning hygiene for general ~~cell~~  (never provided)
       hand wash disability pump

→ 2- Disability build in Grip rubber         (never provided)
       disability ~~pen~~ @ I 2013 Recommended

→ 3- ~~Reading~~ eye glases Prescribed Oct 20, 2020
       & eye doctor visit

→ 4- Long handed ~~toothbrush~~ not provided for 10 months
       other inmates have one every week            (never
       and what happened to the electric disability raw   provided)

Could you please, help provide & advise about the
order "they" in the denial chain of command ?"

Thanks                                  Respectfully

                   I/m  Mst

Ex(8)d

To: Ms. Follows (Medical)                    May 6th, 21

From Mostafa   # 67495-054    unit 4

Subject Last blood sample & Covid-19

As you never provided any Covid-19
test despite requests & symptoms; Could
you please, Confirm or deny and provide
to me my last blood work's result and whether
or not I contracted Covid-19 During Yr 2020
& 2021.

If you don't provide the answer Then
Why? And why you can't provide the
detailed Blood work's result?

Thanks

Respectfully

Jm Noel

Ex(8)-e

To: Ms. Follows (Medical)            April 27, 21

From: Mostafa   # 67495-054   Unit-11

Subject: Long awaiting for medical Dental relief
And assessment.

please, Madam notice that I am getting no
reply to my Cop outs/Requests that I am sending
to you or the medical Department including
the ones I give you during your rounds,

    Could you please, speed up my
dental request for relief and the
, more than a year late, promised assessment
which was promised as soon as the "Covid
Situation permits"

       I know that other able inmates had
their assessments $ Reliefs in January 2021.

    Thank you

                    Respectfully

           I/m  Most

(PS) Please, mention to the Dentist my dire
      situation having to open all plastic
  pouches in ADX food & commissary by
  my altered damaged Teeth as I am
  in solitary & disabled.

                    Thanks

117

Ex(8)F                                    119  of 138

To: Ms Follows (medical)              May 10, 2021

From: Mostafa  #67495-054        unit FF

Subject: Continuous Exposure to Danger by
            Kitchen non-Compliance with my Diet

Dear Madam, (check with witness c/o Rose c/o Gautreary)
                  c/o Romine and others
       Could you please, try to enforce my Therapetic
Diet as if has never been really endorsed.

I am still receiving the hot food inside the
factory food black fragmentable plastic Containers
And it is also covered by two Layers of plastic

       I am eating many of these Sharp Razor or
Sharpest pointed fragments as I can not see them,
the large ones, I can feel and eject out

       I Hope I can show you to morrow the
Sunday egg Container disintegrated & fragmented.

⟹       Also, Kitchen refusing to take cold Tray content
out of the plastic (except the milk) I have to
extrakt by mouth all the inside from the small
opening the Kitchen punch on them. As will as
the Fish plastic sharp edged pouches, half opened
and all Their fluid mixed with all items.

⟹ Could you please, enforce the Diet or advise why not?
until my disability food items approved could
Your place all the food cold & hot, inside the
Standard hard ADX Trays without any plastic
I do not have any Teeth & fery the left mouth can
Clean the mess as you know.

⟹ Please, Provide a Copy of this to Warden True, Mr Kunjel
and legal Dept Mr Gry, I discussed the issues with them several
times    thank You         Resecthully  T/u            119

Ex(B)F2

UNICOR FEDERAL PRISON INDUSTRIES, INC.
LEAVENWORTH, KANSAS

(120 of 138)

**U.S. DEPARTMENT OF JUSTICE**   *See Attached*   **REQUEST FOR ADMINISTRATIVE REMEDY**
Federal Bureau of Prisons   *Exposure To Danger by food trays continues*

---

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

**From:** Mostafa, K. Mostafa _____ 67495-054  H 1  ADX Com
   **LAST NAME, FIRST, MIDDLE INITIAL**      **REG. NO.**      **UNIT**      **INSTITUTION**

**Part A– INMATE REQUEST** Please find my attached request to Kitchen Manger Kim off However, Today Tue 5-11-2021 during manger round The New Kitchen Mangers; Mr. Kipperdis & Mr. Mazor came to my door and conducted at my cell door a conference with Ms. Follows (Medical), Mr. Powell Esq (Legal) and The Rabbi. I showed them the fragmented hot tray with the razor sharp fragments which I ate some (unaware) as I could not see and I asked all of them to enforce & comply with my the therapetic Diet and place the food items out of plastics in easy eat container and to stop providing the Hot food inside fragmentable food trays, and thankfully they respectfully all agreed. Mr. Kipperdis asked me to again write another attached because he is "new to the issues" which I did and see copy attached & to be corrected later   My Request now Respectfully please make sure that the diet is truely a reality and document this conference 5-11-2021 with a written reply to this request so that my Exposure to danger by food END

DATE _____   SIGNATURE OF REQUESTER _____

**Part B– RESPONSE**

DATE _____   WARDEN OR REGIONAL DIRECTOR _____

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE      CASE NUMBER: _____

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____   _____   _____   _____
   **LAST NAME, FIRST, MIDDLE INITIAL**      **REG. NO.**      **UNIT**      **INSTITUTION**

Ex8x3

121 of 138

# FEDERAL CORRECTIONAL COMPLEX
## FLORENCE, COLORADO
### INFORMAL RESOLUTION FORM

See attached paper

**Notice to Inmate:** *Inmates have the responsibility to use this Program in Good Faith and in an Honest and Straightforward manner.*

Inmate Name: __Mostafa Kamel Mostfa__   Reg. No. 67495-054

Unit: _____   Date: __5/10/21__

NOTICE TO INMATE: Be advised, normally prior to filing a Request for Administrative Remedy, BP-229(13), **you must attempt to informally resolve your complaint** through your Correctional Counselor. Please follow the steps listed below: Continuous Feeding Misconduct & Exposure to Danger

1.  State your complaint (single complaint or a reasonable number of closely related issues): by Kitchen C/o Gautreaux, C/o Ms. Romine & C/o Rose are witnesses to the Continuous non compliance with my ~~dietetics~~ Therapeutic Diet and that Kitchen told them that they will not place fish out of its plastic pouches nor poured hot trans out of its plastics or plastic fragmentable Containers

    (If more space is needed, you may use up to one letter size (8 1/2 x 11) continuation page. You must also submit one copy of supporting exhibits, as exhibits will not be returned with the BP-229(13) response.)

2.  State what resolution you expect: I show Mr. Mazon and hoyed to him the Enclosed attached request to Comply with my diet but he said he need to Consult with other Kitchen Mangers but the exposing to danger still. So please start ASAP to Comply thanks

Inmate's Signature: _____   Date: 5/10/2021

Counselor's Signature: _____   Date: 5/11/2021

Department Involved: _____   Date Assigned: _____   Due Date: _____

Department's Response regarding Complaint: Due to allegations of staff misconduct this has been forwarded for review. Meals are prepared according to policy and procedure.

Department Head Signature: _____   Date: _____   Amount: _____

Unit Manager's Review: _____   Date: _____

Informally Resolved: _____   Date: _____

| | BP-8 ISSUED to Inmate | BP-8 RETURNED to Counselor | BP-9 ISSUED to Inmate | BP-9 RETURNED to Counselor | REMEDY CLERK |
|---|---|---|---|---|---|
| DATE | 5/4/21 | 5/4/21 | 5/11/2021 | | |
| TIME | | | | | |
| COUNSELOR | R | P | R | | |

FCC 1330.18C          Administrative Remedy Program          Attachment 1



```
FLMCG              *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *       12-10-2020
PAGE 006 OF              *          SANITIZED FORMAT                    11:48:34    (Ex-09)       122-4 138

REMEDY-ID    SUBJ1/SUBJ2 ------------------------ABSTRACT-----------------
             RCV-OFC      RCV-FACL     DATE-RCV        STATUS      STATUS-DATE

788398-F1    26AM/       MEDICAL CARE - DELAY OR ACCESS TO
             NYM         NYM          07-30-2014      CLO
                                                                  08-22-2014

789658-F1    21AM/       UDC ACTION
             NYM         NYM          08-08-2014      CLD
                                                                  08-22-2014

757757-A1    22CM/13ZM   ADMINISTRATIVE DETENTION CONDITIONS / SAM ISSUES
             BOP         NYM          08-26-2014      04-09-2015

792117-F1    17AM/       PHONE CALLS (EXCEPT LEGAL CALLS)
             NYM         NYM          08-28-2014      CLD
                                                                  09-26-2014

789658-R1    21AM/       UDC ACTION
             NER         NYM          09-02-2014      REJ
                                                                  09-12-2014

788398-R1    26AM/       MEDICAL CARE - DELAY OR ACCESS TO
             NER         NYM          09-15-2014      CLD          10-15-2014

794455-F1    26AM/       MEDICAL CARE - DELAY OR ACCESS TO
             NYM         NYM          09-17-2014      CLG
                                                                  10-21-2014

789658-R2    21AM/       UDC ACTION
             NER         NYM          09-26-2014      CLD
                                                                  10-24-2014

796191-F1    26AM/       MEDICAL CARE, DELAY OR ACCESS TO
             NYM         NYM          09-30-2014      CLO
                                                                  11-18-2014

796427-F1    26AM/       MEDICAL CARE - DELAY OR ACCESS TO
             NYM         NYM          10-02-2014      CLO
                                                                  11-19-2014

792117-R1    17AM/       PHONE CALLS (EXCEPT LEGAL CALLS)
             NER         NYM          10-06-2014      CLD
                                                                  11-05-2014

803277-F1    33FM/33ZM   I/M ALLEGES HE WAS NOT PROVIDED ALL HIS BP-10 COPIES
             NYM         NYM          12-01-2014      CLO          12-11-2014

789658-A1    21AM/       UDC ACTION
             BOP         NYM          12-05-2014      CLD
                                                                  06-02-2015

792117-A1    17AM/       PHONE CALLS (EXCEPT LEGAL CALLS)
             BOP         NYM          12-16-2014      VOD
                                                                  01-30-2015

792117-A2    17AM/       PHONE CALLS (EXCEPT LEGAL CALLS)
             BOP         NYM          12-16-2014      CLO
                                                                  04-08-2016

805135-F1    34ZM/       I/M ALLEGES STAFF COPIED HIS LEGAL PAPERS
             NYM         NYM          12-19-2014      CLD          01-09-2015

G0002        MORE PAGES TO FOLLOW . . .
```

*Podcast*

*Denied*

⟹ Ms. paula Trujillo

122



LAW OFFICES OF

# DRATEL & LEWIS

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006

TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: llewis@dratellewis.com

JOSHUA L. DRATEL
LINDSAY A. LEWIS
—
WHITNEY G. SCHLIMBACH

December 3, 2019

## BY ELECTRONIC MAIL

Krista Klett, Esq.
CLC Attorney
Federal Bureau of Prisons
United States Penitentiary
Administrative Maximum
5880 State Highway 67 South
P.O. Box 8500
Florence, Colorado 81226

       Re:   *Mostafa Kamel Mostafa*
              <u>Register No. 67495-054</u>

Dear Ms. Klett:

    I am writing to you on behalf of my client Mostafa Kamel Mostafa (Reg. # 67495-054), whom I represent by CJA appointment along with Sam Schmidt, Esq., and Michael Bachrach, Esq., to request on my client's behalf certain accommodations necessary to his ability to communicate with his lawyers and assist in his own defense and/or to prevent injury in light of his disabilities.

    Accordingly, Mr. Mostafa requires the following:

    (1)    permission to create a compact disc to send to his attorneys, as listed above;

    (2)    permission to print documents to send to his attorneys, as listed above;

    (3)    the installation of Microsoft Office on Mr. Mostafa's computer; and

    (4)    the provision of a "pouch opener" to prevent further injury to Mr. Mostafa's teeth, given that to date he has been forced to open pouches with his teeth and his has



LAW OFFICES OF
**DRATEL & LEWIS**

Krista Klett, Esq.
CLC Attorney
ADX Florence
December 3, 2019
Page 2 of 2

resulted in the loss of several teeth.

Please contact me if you have any questions regarding these requests, and please also confirm that these requests will be honored.

Very truly yours,

Lindsay Lewis

LAL/

Chief Dentist Dr. Robert,   Mon Oct 20, 2015

Mostafa Kamel   67485-...

(EX-10-b)   Unit H

Will You Kindly do a follow up to the dental work
You done on 10/20/15

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
5880 State Highway 67 South
Florence, CO 81226

Response: 10/27/15

I discussed your problem of having an adequate
toothbrush with Mr. Hanson (AHSA) and the
A W (Health). The HSA will follow up with you to
ensure a good working toothbrush.

Nixon Roberts, DDS
FCC Chief Dental Officer
FCC Florence, CO

Dr. N. Robert, DDS   ADX

EX-10-b

(Exhibit A page 16)

Ex 10-302

## UTILIZATION REVIEW COMMITTEE
## INMATE NOTIFICATION LETTER
## FCC FLORENCE
### Camp/FCI/USP/ADX

**Name:** Mostafa, Kamel    **Date:** 3/1/17

**Reg. Number:** 67495-054    **Housing Unit:** H05-511

## Requested Consult/Procedure

☐ General Surgery    ☐ Orthopedics    ☐ Gastroenterology    ☐ Ear, Nose, and Throat
☐ Ophthalmology    ☐ Prosthetics    ☐ Colonoscopy and/or EGD    ☐ Oral Surgery
☐ MRI    ☐ CT Scan    ☐ Cardiology    ☐ Urology
☐ Radiology    ☐ Nephrology    ☒ Other: _electric toothbrush + hole punch_

## Utilization Review Committee Decision

☐  The committee has referred your case to the Regional Office for final approval.
   You should be notified of your status within the next two months.

☐  The committee has APPROVED this request without modification.

☐  The committee has DENIED this request.
   ☐  You will be scheduled for further evaluation by a staff physician.
   ☐  You will be scheduled for further evaluation by a mid-level provider.
   ☐  You need to follow-up in sick call with any further issues.
   ☐  You will be referred to a specialty consultant.
   ☐  Your procedure is contraindicated due to unacceptable risk.
   ☐  You have been placed on the waiting list for: _____
   ☒  Other: _Not approved for electric toothbrush_
   **Re-submission of the request will be considered if medically indicated.

_____
Physician

MAR 01 2017

Copy Sent or Issued to Inmate On: _____
Copy Scanned Into BEMR                                    Form Last Updated: 11.19.10.TM



(Exhibit (10) 63
Ex 10-63
Denial of Dental Care)

Pg 63 # 2
127 of 138

**BP-229 Response**                                    Case Number: 1007348-F1

Your Request for Administrative Remedy dated February 14, 2020, and received in the
Administrative Remedy office February 20, 2020, has been reviewed. Specifically, you
claim that you have been denied essential dental work.

A review of the issue raised in your Request for Administrative Remedy has been
conducted. The results of the review revealed you were evaluated in Dental Services on
January 31, 2020, for severe abrasion of your lower front teeth. The dentist explained
the best option would be to seek assistance from your counselor to acquire sensitivity
reducing toothpaste from the commissary as a palliative treatment as there is no other
treatment available within Program Statement 6400.03, Dental Services, to properly treat
your issue.

Accordingly, this response to your Request for Administrative Remedy is for informational
purposes only. In the event you are not satisfied with this response and wish to appeal,
you may do so within 20 calendar days of the date of this response. You will need to
submit a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central
Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City,
Kansas 66101-2492.

_____                    ___5/11/2020___
B. True, Complex Warden                              Date

(Exhausted to Central
same answer/rejection)

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

Ex-10-64   Denied essential Dental Work & control

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Mostafa, K, Mostafa          67495-054        H        ADX Colorado
         LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

**Part A– INMATE REQUEST**

Due to severe pain in my worn out front teeth I was taken to the Dentist on Fri Jan 3-1-20 but I was not provided with any relief or pain killer or solution to the main cause of the problem.

I am severely disabled (no hands) in solitary under S.A.M. and thus have to use my teeth to do many of my daily tasks thus I lost many back teeth and can't use my back jaws & all my front teeth are in & in out and very painful sensitive & The Dentist said (as all dentist before him) that I need Crowns and other dental work but I can't do that because of AD-X

2-11-20
DATE          SIGNATURE OF REQUESTER

**Part B– RESPONSE**

EX-10-64

TO Mr. Holbrook (Counselor)

Could you please provide me with

o BP10    as This request has been
i Completely ignored by the institution
and it is illegal (Please write and register)
the complaint Number

_____                    _____
DATE                                WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: _____

**Part C– RECEIPT**                           CASE NUMBER: _____
Return to: _____—64—_____
           LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION
SUBJECT: _____

_____
DATE                    RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP–229(13)

*(Exhibit (10) C A page 5)*
*Ex 40 C*

LAW OFFICES OF
# DRATEL & LEWIS

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006

TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: llewis@dratellewis.com

JOSHUA L. DRATEL
LINDSAY A. LEWIS
—
WHITNEY G. SCHLIMBACH

December 6, 2019

## BY ELECTRONIC MAIL

Chris Synsvoll, Esq.
Legal Department
Federal Bureau of Prisons
United States Penitentiary
Administrative Maximum
5880 State Highway 67 South
P.O. Box 8500
Florence, Colorado 81226

Re:   *Mostafa Kamel Mostafa*
      *Register No. 67495-054*

Dear Mr Synsvoll:

I am writing to you on behalf of my client Mostafa Kamel Mostafa (Reg. # 67495-054), whom I represent by CJA appointment along with Sam Schmidt, Esq., and Michael Bachrach, Esq., to request certain accommodations for my client, and to provide you with two letters containing prior requests to the ADX legal department for other accommodations, in light of the fact that I communicated those requests to Krista Klett by email, April 18, 2019, and December 3, 2019, and it has come to my attention that she is no longer an attorney in the legal department at ADX Florence, and may never have received or conveyed those requests to the appropriate authorities.[1] As with previous requests, the accommodations requested herein are necessary, given Mr. Mostafa's severe disabilities, and/or to secure his right to counsel and ability to assist in his own defense.

Accordingly, in addition to those items discussed in the letters attached, Mr. Mostafa requires the following:

---

[1] The April 18, 2019, and December 3, 2019, letters are attached to the email containing this letter.




(1)   full access to his lawyers by legal mail, including both the ability to send mail and to receive it.  As per my client, Mr. Mostafa has been informed by ADX Florence staff that in light of his hunger strike he will not be afforded the ability to send or receive legal mail, in addition to restrictions on his ability to communicate with cleared family members by phone or mail.  To that end, Mr. Mostafa confirmed on December 4, 2019, that he did not receive time sensitive legal mail that I I sent to him November 12, 2019.  I am also concerned that he will be denied an important and time sensitive piece of legal mail that I mailed to him on December 3, 2019.  Indeed, regardless of Mr. Mostafa's disciplinary status within the facility, restrictions on his access to his attorneys and ability to participate in his defense, violate his Sixth Amendment right to counsel. Please ensure and confirm that such restrictions are lifted to the extent that they have been imposed.  I am also including as attachments to the email containing this letter, three forms which I sent to Mr. Mostafa by legal mail but that he has not received, and which directly impact his access to counsel of his choosing, to be provided to him directly to sign and send back to me; and

(2)   the ability to be seen by an occupational therapist of his legal team's choosing, to evaluate Mr. Mostafa along with any occupational therapist to be provided by the Bureau of Prisons.  While we strongly endorse any determination that Mr. Mostafa's ongoing issues with the inadequacy of his cell and accommodation to satisfy his needs as a disabled person, require additional assessment by an occupational therapist, the occupational therapists previously appointed by the Bureau of Prisons have failed to properly assess Mr. Mostafa's needs as a double upper arm amputee, and/or they have not been qualified to do so, and therefore we would like to bring in an occupational therapist with the required knowledge and expertise to accompany anyone appointed by the Bureau of Prisons.  If we have been misinformed that the Bureau of Prisons intends to have Mr. Mostafa re-evaluated by an occupational therapist, or there is any impediment to the arrangement we have suggested, we nonetheless request permission to have Mr. Mostafa seen by an occupational therapist of his choosing, and ask that this request, in its entirety, be conveyed to ADX Florence medical department, including Ms. Follows and Dr. Resto.

Please contact me if you have any questions regarding these requests, those referenced in the attached April 18, 2019, and December 3, 2019, letters, and/or the forms for Mr. Mostafa to sign, and please also confirm that these requests will be honored.

Very truly yours,

Lindsay Lewis

LAL/



LAW OFFICES OF

## JOSHUA L. DRATEL, P.C.
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006

TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

JOSHUA L. DRATEL
—
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

STEVEN WRIGHT
*Office Manager*

April 20, 2016

**BY ELECTRONIC MAIL**

Krista Klett, Esq.
CLC Attorney
Federal Bureau of Prisons
United States Penitentiary
Administrative Maximum
5880 State Highway 67 South
P.O. Box 8500
Florence, CO 81226

Re:     *Mostafa Kamel Mostafa*
          Register No. 67495-054

Dear Ms. Klett:

As per our discussion, this letter, submitted on behalf of Mostafa Kamel Mostafa (Reg. # 67495-054), whom I represent by CJA appointment along with Sam Schmidt, Esq., and Michael Bachrach, Esq., provides an itemized list of issues which the occupational therapist assigned to Mr. Mostafa's case should address when evaluating Mr. Mostafa's disability, accommodations and confinement conditions at ADX Florence.  I have also noted, where applicable, any prior limitations on the Bureau of Prisons's ability to make a recommended accommodation so that the occupational therapist is aware of the potential issue and can propose a suitable alternative if the preferred accommodation cannot be made for safety or security reasons.

Accordingly, the occupational therapist assigned to Mr. Mostafa's case should assess the following:

- the suitability of Mr. Mostafa's prosthetic devices, including

(1)      the need to avoid infection in Mr. Mostafa's limbs; and whether the existing prosthetics, and the amount of time Mr. Mostafa must wear them is the cause of




LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Krista Klett, Esq.
CLC Attorney
ADX Florence
April 20, 2016
Page 3 of 4

(2)     an assessment of the sink basin, which must be larger to accommodate Mr. Mostafa's ability to clean himself and other items such as his eating utensils; and

(3)     appropriate taps that provide a continuous water sauce, and which mix hot and cold together rather than requiring separate taps for each, and also which are covered with rubber to avoid injury to Mr. Mostafa's limbs;

- the suitability of the toilet in Mr. Mostafa's cell to his disability and in regard to his personal hygiene.  While at MCC New York, a toileting aid was recommended but the BoP did not permit the accommodation. Accordingly, some other solution, such as the installation of a bidet or other permanent toilet should be considered;

- the suitability of the bedding and a recommendation as to bedding that will not slip off the bed;

- the suitability of the physical space for a double lower arm amputee, as opposed to an individual in a wheelchair (which Mr. Mostafa is not), including but not limited to

    (1)     the placement of the table (which at present is not near the sink and therefore is of limited usefulness to Mr. Mostafa);

    (2)     the size of the table (which is too small to accommodate Mr. Mostafa given his disability, and also limits his ability to review paperwork relevant to his case, amongst other things);

    (3)     the lack of any place to hang clothes; and

    (4)     the low lighting in the cell, in particular in light of the fact that Mr. Mostafa is partially sighted;

- Mr. Mostafa's ability to eat, drink, and carry food, including

    (1)     Mr. Mostafa's ability to carry hot food and to do so safely;

    (2)     the need for a hard plate, tray, and hard cup to accommodate Mr. Mostafa's disability (and an assessment of what alternatives would be acceptable if these are not available for safety or security reasons, as was the case at MCC New York); and

    (4)     the need for eating utensils, such as a spork, that are consistent with Mr.



U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

*EX-10-F1 lost teeth & no prevention or relief 877295R1*

Type or use ball-point pen. If attachments are needed, four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

| From: | Mostafa, K, Mostafa | 67495-054 | 1703 | ADX Florence Colorado |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A - REASON FOR APPEAL** This answer don't provide any prevention for the loss my teeth while trying to open food pouches to eat, nor does it provide any relief!

Lost 4 teeth since my extradition to US 2012 and all dental work I had become I am coerced to use my teeth to open food pouches as I am disabled (NO hands) and in complete solitary since 2012 with no help to open food sealed packages. Dentists are not allowed to do any dental work such as: crown, bridges, caps, implants or provide essential items such as: electric tooth brush, water flossing and all these recommendations are trashed & offered, denture can not be for me with bare no hands; I can't put in or on or off or clean it or clean the gum! You are using the SAME to destroy my health and coerce me to harm my self!

| 2-31-16 | | /M.S./ |
|---|---|---|
| DATE | | SIGNATURE OF REQUESTER |

**Part B - RESPONSE**

( Exhibit 08 page 5 )

RECEIVED
JAN 19 2017
Administrative Remedy Section
Federal Bureau of Prisons

Exhibit 08 page 5

| | | | |
|---|---|---|---|
| DATE | | GENERAL COUNSEL | |

ORIGINAL: RETURN TO INMATE

CASE NUMBER: 877295 A1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____

| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|---|

SUBJECT: _____

| | | |
|---|---|---|
| DATE | | SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL |

BP-231(13)
JUNE 2002

IPN LVN

Administrative Remedy No. 877295-A1
Part B - Response

This is in response to your Central Office Administrative Remedy
Appeal wherein you assert your teeth have decayed as a result of
using them to open food packaging. You contend Bureau of
Prisons dentists are limited in the treatment they provide and
oral hygiene items are unavailable. You request no specific
relief.

We have reviewed documentation relevant to your appeal and,
based on our findings, concur with the manner in which the
Warden and Regional Director responded to your concerns at the
time of your Request for Administrative Remedy and subsequent
appeal. Our succeeding review of your medical record reveals on
November 21, 2016, you were seen for a treatment plan
examination. The dentist indicated you had five teeth that
required fillings and four other teeth that were recommended for
extraction. You have had routine dental treatment appointments
on December 23, 2016, and January 6, 2017, to address the
diagnosed problems. On January 6, 2017, you requested not to
have the four teeth extracted.

Should you re-consider the extractions, you are encouraged to
contact the dentist to continue your care. At that time, you
also may discuss the limitations of different tooth replacement
treatments, your nutritional concerns, and functional
limitations due to your disability.

The record reflects you have received dental/medical care and
treatment in accordance with evidence based standard of care and
within the scope of services of the Federal Bureau of Prisons.
You are encouraged to comply with proposed medical/dental
treatment so Health Services staff can continue to provide
essential care and to contact dental/medical personnel through
normal sick call procedures should your health condition change.

Considering the foregoing, this response is provided for
informational purposes only.

_____                    _____
Date                                       Ian Connors, Administrator
                                           National Inmate Appeals

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Re: Broken tooth and no prevention of similar future injuries*

Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.

From: _Mostin, K. Mostin_    _67495-054_    _ADX Florence Colorado_

LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

Part A— INMATE REQUEST _The answer ignores many facts and provides no solution to the on going problem. Such as the broken tooth had split to 2 halves as I was eating. I am better [...] item using my teeth as I do since I was extradited Oct 2012. I lost 3 teeth since and all my dental work done in England without any replacement or plan to do so. And that I am opening similar items nearly every day as I am severely disabled with hands and in complete solitary with no help because of the [...] There is no plan to avoid more broken teeth as Bop refusing to allow me help or replacements. I was told by the dentist on 4-16-16 there are two more loose back teeth and only two could be fixed if you was not in Bop? as Bop policy doesn't allow dental work such as; implant, bridges, crowns, capping etc which I would have no problem to do out even when I offered to pay it was not allowed. The only solution would be offered in an plan is to pull someone now more teeth to do a 'denture' which I can't ever use a [...] Dentures and it's dangerous [...] excepted in [...] and to prevent chocking and infection I was told the same by dentists in MCC New York and medical center in this [...] Springfield. I am now No. 99 on the list and since Oct 2015 and even [...] was taken to [...] 9-22-16 my conditions! Please allow me help in repairing my disabilities my worsening not in trying implant, bridges crowns [...] me dental_

SIGNATURE OF REQUESTER _(Mostin K.)_

Part B— RESPONSE

RECEIVED
SEP 23 2016
ADX AW Office

DATE _____

WARDEN OR REGIONAL DIRECTOR _____

If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE    CASE NUMBER: _____

Part C— RECEIPT

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

DATE _____

RECIPIENT'S SIGNATURE (STAFF MEMBER)

**Administrative Remedy No. 1043332-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal, wherein you claim you were denied proper dental
treatment. For relief, your quest an appointment with a
dentist.

We have reviewed the documentation related to your appeal and,
based on information gathered, concur with the manner in which
the Warden and Regional Director addressed your concerns at the
time of your Request for Administrative Remedy and subsequent
appeal.  As such, our succeeding review reveals no reason to
reverse the decisions rendered, or elaborate further with
similar conclusions as those which have already been provided in
the previous levels of this appeal.

Accordingly, this response is for informational purposes only.

_2/22/21_
Date

Ian Connors, Administrator
National Inmate Appeals

Ex-10    Dental Care Deprivation    I043332-A1

U.S. Department of Justice                           **Central Office Administrative Remedy Appeal**

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Mostafa K. Mostafa        67495-054        H        ADX-Co.
      LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

**Part A - REASON FOR APPEAL** The answer ignored most of the original issues of this complaint. And even worse claimed that I refused treatment for no reasons in 2015 and 2017.
— So please provide the dental treatment
— the records should show that I am severely disabled in Solitary Confinement since 2012 and that the treatment offered then was not compatible at all with my (No arms) disability & Confinement. And when I asked how can I fit in/out or clean the offered denture there were no answer or alternative whatsoever
12-1-20  the only choice was implant but ADX & SMU refused
      DATE                                                  SIGNATURE OF REQUESTER

**Part B - RESPONSE**

Ex-10 @
v2

RECEIVED
DEC 14 2020
Administrative Remedy Section
Federal Bureau of Prisons

      DATE                                          GENERAL COUNSEL
ORIGINAL: RETURN TO INMATE            CASE NUMBER: 1043332-A1

**Part C - RECEIPT**
                                                      CASE NUMBER:
Return to:
          LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION
SUBJECT:

      DATE                                SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

# Certificate Of Service

The under signee certifies that he had Submitted this Reconsideration motion to ADX, SIS, Staff on May 20, 2021 at 7:00 Am With sufficient Stamps and correct addressed to Denver District Court of Colorado, large envelope. And within the time limit allowed by the Court

Plaintiff Prisoner:
M. Ostafa Kamel Mostafa
Reg. # 67495-054

Signed:

Date : May 20, 2021

**Name:** Mustafa K. Smith

**Reg No.:** 67495-054

**U.S. Penitentiary Max.**

**P.O. Box 8500**

**Florence, CO. 81226-6500**

CMZ1-67495054-0520.M0.028

Special mail to court

5/20/2021

POSTAGE DAK.
REVENUE PROTECTION UNIT
DENVER, CO 80266

OFFICE OF THE CLERK
United States District Court
Alfred A. Arraj Courthouse
901-19 th St. Room A105
Denver, CO. 80294-3589






UNITED STATES POSTAGE
$ 000.000
PITNEY BOWES
02 1P
0001126313
MAY 25 2021
MAILED FROM ZIP CODE 81226
U.S. OFFICIAL MAIL
PENALTY FOR
PRIVATE USE $300

