page 1 of 320

In The United States Court
For The District Court Of Colorado

July 16, 2021

Civil Action No.: 20-CV-00694-PAB-NYW.
Case Name : Mostafa V. Garland. et .al.

Plaintiff Pro.se Response To Defendants [#96]

Motion To Dismiss And Court Order [# 108]
Extension.

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUL 22 2021

JEFFREY P. COLWELL
CLERK

Respectfully Submitted by:
Plaintiff prisoner: Mostafa Kamel Mostafa
Register Number: 67495-054
ADDRESS : Florence. ADX MAX, P.o.Box 8500
          Florence. Colorado, 81226.

Signed :                Date : July 16, 2021.

* Please, allow some singed carbon copies in replacement of originals,
due to the lack of soft clear ink disable Pens.                    01

# Table of Content

pages

1- Nature & Navigation of This Motion                    1-B → 2

2- Flaws & Dis information in Defendant's
   Foundation for Arguments; pages 1 → 5        2 →

3- Reasons for Claim one to Remaine entirely

4- Claime Two:
   (a) Flaws of Deft's claims,
       arguments and Declarations
   (b) The Reasons for claim Two to
       remaine in its entirety

5- Claim Three:
   (a) Flaws of Deft's claims
       arguments
   (b) Reasons for claim Three to
       remaine in its entirety

Conclusion                                               57
List of exhibits                                         58
Exhibit                                                  59
Certificate of Service                                   357

                                                         1A

Page 1B

## Nature, Navigation And Declaration of This Motion

First: The undersignee plaintiff Mostafa declare under the rules and penality of Perjury that the entire Motion is correct & accurate. And that he has to resort to this Format to respond to the many of declarations & augements in Defendant's [96] in an optimized Manneable to him and respected Court Fashion ([108] is over 320 pages).

Second: All Remedies Exhibited and/or refered to are fully exhausted according to rules & citations unless otherwise is stated for a purpose.

Third: Pages 2 To 14 had been written before he requested or received Court [# 108] allowing extension hence, The need to implore this respected Court to accept the page numbering before Page 02 (Post) and to Forgive and/or overlook Variance Therein;
( To Spare him painful rewriting)

Fourth: Respectfully, this court Could Consider the Deft's [96] as a defacto of Reconsideration To Court [60] Recommendations; hence according to their own Citations should only be granted under very Special Circumstances, which Respectfully is more appropriate to plaintiff for The consequencial danger &/or life threatening conditions still imposed by Defts.

t.B

FIFTH : The Defendants [96] manifested in their Exhibits monopoly of entire plaintiff's records and used them selectively for "self serving" declarations, arguments, even severing many of the records from their real and/or full context while denying the plaintiff any document or allowing him to print out from his criminal case discovery any of his needed supportive documents. Accordingly, for this unequal deliberate misconduct, as well as the unused unreliability of such presentation (also proven post herein) this respected prudent Court need to be provided with more evident balanced contextual fact finding material before granting early summary dismissal.

Sixth : The respected Court should notice that Deft's presentation & citations are not really applicable to such complicated & compounded plaintiff case and conditions; i.e. not like for like (as this respected Court noted in its construing for SAM claim one for issues of disability in Sibley).

The Defendant citations & arguments, in most if not all presentation, quoting from single free cases and fringes of the core of Plaintiff's dense situation. Such as but not limited to :
Re: SAM his openness with all including authority; being vindicated in UK from measure charges & allegations by US who never conducted any investigations or has paper work; never disappeared or ever use other than his details, no coded messages ever, or harmed any one in US; as well as the compound issues of disabilities and grantees to UK & EU courts
Next page Two (are [108] order)                    1C

Disinformation In [96] pages 1→5 And Foundation   page 2/

1— On June 2nd, 2021 The plaintiff (There after PIff) received a volumous nearly 300 conjested pages of Defendant's (Here after : Depts) request for dismissal of the plaintiff claims.

However, The document [96] Contained and offered baseless Mis & Disinformation, false claims and declaration, selective and misuse of records and clear bad faithed entrapment documentation.

2— The same had happened in previous presentat -ion resulted in Denying PIff his reconsideration of TRO previously because he recieved then, theirs out of date to respond. This time the PIff implores the Court to allow him the oppertunity and the time to respond by or before July 16 2021 To provide Comprehensive declaration suported by document & exhibits proving to fabrication and falsification of many of the Dept's relied upon declarations and/or argument.

3— Granting part or full dismissal to Depts based on their Doc [96] presentation and lopsided documentation is, though in good faith, like allowing them to make and Mark Their homework resulting in a blank cheque to continue to oppress and expose the plaintiff to danger every hour of his solitary. Not least when ADX persistantly refuse to provide PIff of any requested existing documents, reports about his claims.   2

page 3/

4— The plff's New-york attorney just sent to him a CD of what was recently obtained from top medical records, however to date ADX is keeping the CD and not providing any access to discovery room at and even when allowed still need sometimes to fill and comments about Deft's gapped selective presentation [96]

5— However, at this stage, this respected court is entitled and deserves even a short crisp reasons & examples of why it is essential to respond to Deft [96] and the time sought. By addressing the first four pages: The Deft's introduction & categorization to their argument and some important claims and/or stipulations in the provided Exhibits far from reality; As follows:

6— Provoking the Court against the plaintiff quoting severed out of context statements and untrue false ones and illegal accusations against members of his family; such as:

(i) "a family that includes Two known terrorists" page 01.
non of Afi family ever assigned or labbled as terrorist even the two who went to Yemen, all eight children were visiting the plff during his & yes awaiting extradition in London open visits & eating together. UK Gov't & all human rights monitors acknowledged the two tortured in Yemen and endured Cangeroo Trial; no restriction of any kind to date against them.

First Note

01— After many remedies & attorney's letters ADX made some adaptations to allow plaintiff to use computer discovery room but still not enabled to use law library computer to date (no adaptations)

page 4

(ii) The Depts need to explain: based on what plff family members and friends who lived with him and visited him for 8½ yrs in his UK established residence suddenly became "dangerous" and fair game to be called "terrorist" and stopped from communicating with plff as soon as his extradition took place? & in a country that he never been or knows anyone! Till the last day in London prison the plaintiff was only "standard risk but high profile famous not high risk certainly never exceptional risk as treated in ADX!

[98]
7- As in plff reconsideration (may be [94]) exhibit 03. US Gov't assured UK & Eu Court that SAMs & designation to ADX will be very unlikely, and at worse it will not exceed one year and plff during which will be placed in medical facility provided help daily care.

page 2
8- In foot note 1 Deft quoted that they are allowed to use documents, records, transcripts...yet they are not allowing the plff the same and also, severing the excerpts from their time & context, such as severing the answer for a question in 1995 about people enter Islamic state without permission or clear evident good motive during times of war or disorder. The "Market" comment.

Or the: expressed his "love" for Bin Laden; never provided the court of its place on trial because it is also severed out of context which was that plff loved him for his struggle against the Russians and Arab tyrants but can't love him more than the Truth or more than the

4

page 5/

Afghan nation (in the context and argument

That his action resulted in the distruction of their lives and country and the pretext of occuping Iraq) and other severed statements. (As in trial Direct) Please notice their trial paging jumps to sever the context

9- Also, excerpts from sentencing by the Honorable Madam judge Forrest and Exhibits 1 [96] are the direct result of prosecutors Lying to the Judge, in secret Conferences, not classified, nor was the plaintiff allowed to attend them during which The Court and Compromised trial attorneys misled the trial judge to deny the, then, defendant mostafa indispensible documents Prove his innocent non secrative activities in the Yemen matters and the other charges. And now an important large Segment of his Rule 33 new trial application in the 2nd Circuit please see enclosed Exhibit One and its attachments and excerpts regarding:

(A) Issues of Responding to Court Brief to Deny Rule 33 misleading the 2nd Cir (attch. 1 cover page & table of Content of 2 pages

(B) Att. O2 Excluding mostafa from Conferences and even attempt to mislead 2nd Cir. about the issues and bad faithed motive(s) (3 pages ¶¶ 8 → 17)

(C) Att O3: Exclusion resulted in unfair/wrong Conviction of Yemen Counts (¶¶ 20 → 33) 3 page

5

page 6/

(D). Att. 04 : US. Gov't never conducted any investigation about Yemen ever todte since it took place 1988 and only panicked for it in 2002 when plaintiff was campaigning to prevent any "War till full joint internationt investigation conducted (See Red marked in att. 04, one page) 02 and only secured convictions by using the British investigation & field work and reports but denied most of the essential parts of work that resulted in 1999 decision by scotland yard "no enough evidence to charge and tried to courts in US & UK. But as in plaintiff [99] reconsideration EX. 03 UK & EU Courts stressed hard during extradition litigation that all reports & evidence must be used in US trial because no prema face were allowed in extradition.

Foot Note

02 = Plff is a British civil Engineer. with Hon degree and post graduate studies and also, had 500 pages research in the late eighties regarding the manner & collapse of frame structures when subjected to earth quakes or explosion called "Dynamics of plain Frame" could still be in Brighton university UK and in short shows the imposibility of Collapse of 911 3 towers in the manner and time they did. Especially when the structural core of the both, steel towers never been touched by the planes! and as said in his trial and many interviews from early days of 911 that only simultanious removal of all vertical structural support could result in a concentric collapse ie explosive partially controlled demolision to Kplace.

— Also, explained in trial & several times that his alleged Co-Conspirator (Taliban secretary of state Mutawakel) endeavored and met and warned US embassadori and CIA person in March 2001 telling them that taliban intellegence found out There will be →

page 7/

___ Foot Note ___

02 continue ... a big anytime soon attack by planes in New York but the US officials were only interested to recruit him to work for them.

And infact plaintiff Knew this piece of information when he received a call from Afghanistan on Friday Sept. 07, 2001 from two old friends, not even from any particular islamic group, but try to "share" the "commonly" spread news in Kabul, then, that a "big attack" very soon. The plff, as disable was using the speaker phone and two other people heared the same. And the plaintiff endeavored to reach the Secretary of taliban Mutawakil to tell him the worrying news and on Sunday Sept. 09 got an answer from one of his assistants "not to worry Mutawakil met US embassador on March and ..." as above and that nothing will happen.

But it did and when Mutawakil was arrested by US. and moved around he was released and even given official job in the new US, appointed Afghan government to keep him chose not to talk about 2001 March meeting. The plaintiff was denied to use him as witness or to get any of his detention paper work.

It was also, common Knowledge in Afghanistan that Al Queda, in 2000, found out that 6 of their members were Jordanians working for Jordan intelligence on behest of CIA, and they were responsible for receiving the "new comers visiting" to keep their personal passports, money, till they leave and earnings their calls to families. Al Queda wanted to Kill them but taliban (to show good will) sent them unharmed to Jordan.   7

Foot Note —                                    Page 8/

02 Continue ... But that can only mean that can only mean that the German Hamburg cell who travelled and offered their services to "fly the 911 planes" has also handed their passport & details to the CIA agents and Alqueda plans were well known since early 2000!

CIA & other intelligence agencies are not red faced virgins when it comes to orcastrate false pretext to war or invade; as proven; president Jonson admitted lying about Vietnam war and now, in public domain "operation North wood" to pretext invasion of Cuba to continue the war if US need/had to end Vietnam war is a detailed CIA crime; planned when President Bush 40 was in CIA and offered to Nixon but he refused it instantly.

It proposed that families of agencies of intellegence to board a plane which will land after in US Military base and fly again without pilot or any passengers then hit by US "Cuban look" missile then blame & invade Cuba!

Through the media and appealing to British Royal institution of Civil Engineer, the plaintiff (who use to be a member of) repeatedly urged FBI not to speed recycle the steel of the towers or the planes reckages till full international investigation. Not least, when FBI head, then Mark Muller who over saw Pan-am locker be plane crash ordered to keep every shred of it and reconstructed it four times and it is still to date kept since 1988! So why not 911 planes & steel ?!

                                                        8

pag 9/.

'10 — Deft's claim in page 3 that plff was caught in UK prison with a "~~bomb making manual~~" is both ~~false and illegal~~; misleading & disrespectful to this court because : (A) it has been already been identified by 2nd Cir. in the direct appeal as error; should have never been mentioned to Jury.

(B) There is no ~~any~~ paper work to show any of it let alone authenticated one. No interview (UK), report or any extjudication or discipline or even mention about it; unheard of till mentioned suddenly on trial in cross of Plaintiff who challenged the prosecuter to provide any of the above to him, Court & Jury and he failed and retreated and when had to reply to direct appeal The only excuse was "the defence did not object". this court should ask the SAM unknowing Foot note Defts about its paper work and darkness to lie to this court.

02 continue... the plaintiff was and is asking The deliberately avoided but essential Questions including :

who was the responsible for facility maintenance for the towers & planes and any subcontractor (s) and logging paper work during the 24 months pre to 911 attack? Who/why drained the water off pipes & fire hydrants which was enough to self put off any fire; if ever heated/exploded? (pipes) And ~~similar~~ technical issues.

It is therefore never far fetched that Alqaeda attackers were coached only to be filmed entering the planes and their role ended up there & then.

The plaintiff deeply apologize for the ~~too long~~ foot note & decloraptiring issues therein. But it could ~~prevent~~ more wars and ~~real~~ victims of the current disorderly world.   (9)

page 10

11- Similarly, linking plff to "20th Hijacker" or "Shoe Bomber" whom he never saw in real to date, and only saw Moussani first time when arrived at ADX and was told by others about his identity (as he changed from his newspaper photos and became crazy).

In fact This respected court should, even in close classified format, evaluate such reckless claims as The Cancer of lying about Iraq WMD is now in SAMs

12- In page #2, lying to this count about being "a mouth piece for Terrorist Group known as Islamic Army of Aden"! The count is implored to hold the SAMs unknowns & knowns operatives to account and discipline their loose & reckless false. The plff was only the mouth piece from mid 1998 to mid 1999 They were never designated Terrorist then, before and untill middle of 2002 See UN Designating list & US list, and never ever to date linked or associated to Al Qaeda in any list or anology.

Furthermore, at the time, in Europe and Britian in particular, being a mouth piece to any political active armed or un armed group was the norm and even encouraged by intellegence to avoid "surprizes" and save much resources in reducing monitoring as Well as occasionally ask The mouthpiece for "Favour" like as they asked plff to try to free westerners Kidnapped in Kashmir Pakistan in M15 report meeting May 27, 1997 and other places. Not to forget that Irish Republican Army IRA mouthpiece Jerry Adams and other mouthpiece persons in UK & EU were very active at the same time.

page 11

13- In the same page 3 The lying about praising The world Trade center attacks" while all the interviews context, when not altered, or severed, about the mentioned above in first note 02 and that the attackers being used to harm Islam while told they are in self defense (several lectures & tape live interviews are available ; some pre-recording non-live could be severed out of context) other tape titles fabricated to entrap plff but no real tape or any true recording for it nor it exist in any plff tape lists.


14- Refering to Ms. Quin Taped interview in page 3, she asked for 10 minutes interview in the mosque to discuss some of here kidnapping in Yemen, was welcomed offered more than an hour, allowed to tape and was the only USa person who investigating the circumstance of the kidnapping, provided a copy of the interview tape to FBI 1999 They politely told her to have "a good day" not intrested till 2002 as above, she went back to Yemen & visited & interviewed plff children and others in prisons, read reports & court notes and wrote a book the publisher refused her conclusion that "I don't think that Abu Hamza knew about the kidnapping before it happened" but she honstly and honorvibly kept her opinion in the drafts intact & mostafa was not allowed to ask that in trial about the publisher or conclusion which was compatible with scottland yard conclusive report. During her meeting with plaintiff he asked her "why did not any of you use your personal phones

11

as I asked Abu Hassan to do me this favour *page 12*
Till I buy air time to the satellite phone? She said
we left them at the hotel we wanted to have
a break from civilization.

15 - Claim that plff provided material support
to Alqaeda is false (page 2) alledged material is
specified as a person named Abbasi for two counts
9 & 10 and conviction resulted from lying to
Trial judge & concealing the essential reports and
UK & EU court documents from court and jury
and that the alleged person was released without any
charge from GTMO and compensated by UK
MOOK and his testimony that Govt main witness
Ujaama tricked him to travel with him & left
him at the border in pakistan was concealed by FBI
and now in Rule 33 raw trial request see
See phone EX. 1 att. 05 (3 pages) and other
FBI concealment documents. All prove how
SAMs personal/mis use classifications to impede defendants
and tarnish courtrooms reputation particularly the
"make his life in prison very difficult" type of defendant.

16 - Page 5 saying misleading statement without context
" Mostafa whose hands were blown off, 1993 ** ". As document
-ed in Pakistani High Court & media then, Mostafa won a big case
against Pakistani Govt not to deport Arab vetrons to their tyrant rulers
And the high court judge recommended that he to liase with Govt or Army
for the details, and as in his trial testimony, Mostafa was injured trying
to save others lives and treated in Lahor Military hospital before <
returning to England

12.

page 13

17- Issues of Claims & Exhibits in [96]

Claim 1   For all the above, Deft request to dismiss Claim 1 should not be summary dismissed as it showed most of claims therein need more & thorough examination & Deft has no explanation that Plff clear record of no violation before jailed in UK many years at liberty, inside 8½ Yrs awaiting extradition and 8yrs in US ever caused any danger. Plff well known to only use his real detail speak openly, no secrets never disobeyed any court or bail rule .... and it is only US Crov't who broke its pledge, to EU. UK courts.

Also, SAMs is severely effecting his disability rights against ADA and used as retaliatory tool to deprive him & endanger him and always impeded him defending himself in courts, obtaining needed documents or beneficial law library.   And that SAMs operatives declaration to courts about him not truthful as in [68]. And that SAMs records are always divorced from reality

Defts [96-3]
18 See for example Ex. 3 A Oliver Decl (# 9) 6,7 claiming that (a) congregational prayer was offered (b) Plff refused to acknowledge that he received notification of it.   Which is not true; plff received it only on April 28, 2021 signed it and gave it back to SIS Ms. Turner and asked for Two copies which are enclosed here Two identical copies Ex 2 att.1 .

Mockery offer

plff even discussed with Mr. Oliver Twice: How it could be done within the offered time for it in Rec for all them long after the time of the morning prayer 4:20AM

13

con't Note

page 14

and long before the time of the next (noon) prayer or Friday prayer 1:00 PM? And he never to date provided any answer. And no one to date had ever benefitted from it as it is only court paper decoration (empty plate for the hungry). Also no Imam ever came till 2018 tVery 3 minuts every 2 weeks and only came once during the Pandemic March 2020 to March 2021 two minuts to say "good bay"!
Again records divorced from reality. See Ex.2 #2
Prayer Time Tbl

19 - in ⑧ 8 of [96]-3 Mr. Oliver, Dec: he said that inmate could pray in group also in the inside recreat -ion the which is impossible never and could never happen in this unit as only one inmate placed in at the time 1
And claiming that plff declines Rec and only done 10 times out of 115 times (Jan → May, 2021) is True but due to decline of health and lack of safety support and poor vision after contracting COVID-19 as well as deprived of his medical glasses prescribed Oct. 20, 2020 to date. Plff can't stand for 2 Hrs no place to sit or hold sitting and/or rising from the grounds previously caused nasty cuts to Plff stumps
⇒ 20 - Which is a clear proof that SAMs harm and expose plff to danger & use his disability to deprive him & deny him equal right/protection in violation of ADA, 14 Amendment and degrade him & embarrasse him before the eyes of inmate and ADX staff. Since extradition 2012;
in lay terms; retreating to one's cell is less stressful though its SAM, upon SAM, in reality.

14

✳ [At this point plaintiff Thankfully Received] Page 15
Court order [108] Allowing Extension of Time
[Enabling More Ability To Address & Exhibit]

To ~~Incorporate~~ the previous portion with the rest
of the following, paging & paragraph numbers will continue
and referred to when needed to avoid repeat.

21✳ As for Claim one SAMs, The Def's [96] legal
argument about SAMs (17 pages of 31) depends
heavily upon Mr. A. Oliver declaration and
10 attachments (Ex. 3 : 96-3 107 page) which cont
-ained many inaccuracies and dis information
which could annull most of the argument raised
and/or its Citations. Accordingly, the plff has
to quickly go through each attachment, one
~~per~~ Paragraph for each attachment.

22- Generally, Respectfully, the Court is invited to
notice that : Every hardships imposed in SAMs is
Real and lasting while every relaxation or ease
offered is : not real, dummy offer or even Mock-
ery and/or mainly to Mislead Courts to
believe that the SAMs are Compatible with
what the republic & nation stand For/preach
to the World.
      And, though the 4 pages declaration by Mr.
oliver is under penalty (some of which proven wrong as
above), The attachments by SAM's staff are not.

15

Page 16

23 - Re: [96-3] Att. 01 SAMs Jan 21, pages 8, 9, 10 of 107, Contained in "Back Ground" alleged "Facts" That had nothing to do with True ~~documented~~ Facts.

A part of That Plff was convicted 2017 and the Plff Family in 2013 used speakerphone³, The rest are Fabricated, Twisted and related to others imposed on Plaintiff. OR entrapment to justify renew SAMs such as Aug 2011 alleged Arabic conversation, Ticket was rewritten by Unit Manager in MCC New York Ms. Elderdge and ordered CO Silvia to sign it (who admitted that) and Cameras prove its fabrication. Similarly:

(A) Finsbury Park Mosque proven also to liase with local authority to help accommodate homeless the Mosque. And liase and support other nearby places of worship Churches and near Synagogue. It was widely reported in UK media including Jewish chronicle 2002 that plaintiff strongly and swiftly condemned the attack on the near by Synagogue. And that Rabbi Joseph and Rev. Stephen Cole (both Friends & regular Visitors of The Mosque) Provided supportive testimony for the Plaintiff during his UK trial 2006 (Trial was for allegations not even chargeable in US. but ordered by Tony Blair in a cabinet meeting to send plaintiff to US with any criminal record).

(B) Also, Supporters of Sharia Organization had clear and true

Foot note:

03 = Plff Family told him they needed to do that because Time then is 15 minutes and there are many of them to avoid Repeat of greetings to optimize call time.

page 17

disclaimer in its website and publication that it is: not Structured, does not enrole members or accept any donation nor it promote any other organization (As in discovery)

(C) The SAMs also, in its reckless allegations[4] mentioned names with lies to justify SAMs, knowingly lie:

(i) Moussaoui & shoe bomber Reid as "follower" no Shred of evidence of any meeting, contact or with any of them

(ii) Abbassi to "Al Qaeda" US GTMO court proves its a lie and as above UK compensate him 2100K,

(iii) Ujaama Govt trial Corrupt witness threatened to testify with "more than the truth", escaped and recaptured with worse Threating to lie in court. as above

(iv) AL~Libi alleged "Al Qaeda commander". Now, for many years it became Common Knowledge that neither he or his Co-Camp Leader Abu Zubida (water boarded 50 times) ever been Al Qaeda or followed Ben Laden, even Govt expert on trial admitted that.

While lying to Jury in plff trial that AL-Libi was killed 2001 fighting US forces; the SAMs saying he was Caught on the Pakistan Border fleeing then died in Libyan prison 2008 (which is also past truth and most lie).

Foot Note.

o4 = the standard of allegation below Tabloid and could be good Acid Test by this respected Court to prove by itself or special Counsel the misuse of authority and/or dishonesty in imposing SAM 17

page 18

The Documented Truth About AL-Libi

→ He was used by CIA to provide Fabricated reasons to US & UK leader Bush & Blair to invade Iraq

→ He is the most renditioned & Tortured sent to Egypt, Syria ... in Coffin.

→ In 2002 President Bush and Collin Powel repeatedly announced to public & media as well as the evaluating Iraq war Committy that " Iban El Shiek AL-Libi" told us about the co-operation/help between SADDAM and Al Qaeda [5]

→ When about to die after many years of exhaustion in 2009 (when his name started to appear in co-defendant to plaintiff Count Kassir) he was "allegedly" sent to Libian Tyrant Gathaffi then pronounced died.

This plaintiff enhanced his Campaign "not to war" before Europa all thorough investigation, as soon as CIA & Bush & Blair started mobilizing what they said AL-Libi said about Saddam. Plaintiff used media, including US media for example one full hour LIKE inter-view "live" in MSNBC 2002 with one of 911 surviver host titled " The Iron mosque" and many other which drove both US & UK Gov't mad & I said people need to hear from AL-Libi direct before sending people to die & Kill.

Foot Note.

05 = CIA Recorded Tapes documented that Ibn El Shekh AL-libi during repeated "enhanced Introgation" "admitted" that ! But notes said he was only repeating what is said to him and adding what pleases the introgators to stop hurting him. Later CIA Current director admitted that she ordered the destroyment of evidence of AL-libi

18

Page 19

(V) Convicted alleged plaintiff' co-conspirators: Haron and Kassir, document and trial notes showed that they had stolen the corrupt court witness (Jiane Fox from plaintiff's rubbish bin & without his knowledge tried to use his name & fame to control others.

(Att. of Conclusion):

All the above names & contexts are still in Litigative stage in Rule 33 appeal 2nd cir. 19-2520 and subject to persistant refusal of SAMs & US Gov't refusal to provide the concealed documents and comply with Brady rules. Accordingly, Deft [96-3 Att 01] above is one of many "Self serving" Twisted Statement till SAMs or US Gov't provide Documents to Belie what plff Stated above, below and other places in this motion.

24- Re [96-3 Att 2] Allowing contacts with Rev. Stephen Cole. He himself had contacted plff attorney Ms. L. Lewis and she written to Gov't and was approved without any remedy. He is the leader/preacher of the church close to F.P. Mosque and regular visitor always liaised with plaintiff for community social work, protested against closure of the mosque, supported/defended plff when preached outside the gates of the mosque even Friday. (2003 Jan — till arrested May 2004) continued to visit and write to plff till extradition 2012. Since his last Letter mid 2019 and writing that he will liase with plff family & Disability rights group all communications stopped!

19

page 20

25 - *[ 96-3 Att.3] SAMs, Modification to pre-
-clude plff Two sons Mohamed & Imran Sept
2016 occurred/appeared after many formal and informal
complains of misuse of SAMs as their letters to
me were not provided to me and my letters to them
either "lost" or rejected long before the SAMs proci
-tion Modification (maybe in retaliation) see enclosed plff Ex-03
A & B Exhusted    There are admission of wrongly rejection.

26 - Re [96-3 Att 4] Allowing the only (one of & nine)
Grandson, 5x's Belal SAM Modification. As soon as SAMs
phone monitors heard on the phone that his mum devored
his father and took him to Moroco for good and the
regeime there will not allow them to content plff, he
was approved & SAM Modified, only to look good
to Law while exerting extra retaliative stress on plff
Not one single call or letter to or from him since establition.
(No Remedy exchausted for approving him)

27 - Re [96-3 Att.5] Modifying SAMs July 29, 2019
To prohibit Contact with plff son Sufyan who
is married and have 2 sons, and now, in Holand-EU.
SAMs claimed they heard plff saying on the phone
that Sufyan fighting in syria, which is a lie. And
when plff challenged SAM to provide a copy of the
call they refused fearing experure of their lie and should
be requested for This case discovery for profing SAM
Misuse. Also, see enclosed ADX legal dept response EX 4.

20

Page 21

28 - Re: [96-3 Att 6] SAMs Modification to allow legal contact with attorney Charles Swift ex March 16, 2020 = Please, notice the following:

(i) He is the only legal allowed due requesting since 2012; many others ignored or denied

(ii) The Timing of Modification after plff launched his legal civil action in Colorado!

(iii) To date, plff does not know if Mr Swift has received his certified mail or not, or has responded or not but to date no contact whatsoever

(iv) The Cumulative Knowledge/experience of SAM staff about attorneys allows them to know whom to approve, deny or ignore his request i.e. to deny the inmate the benefit sought/hoped from contact

(V) A more needed request to contact a law professor Jules who's expert in disability human rights and criminal law was bluntly rejected after a full year of Remedy exhaustion though he is approved for SAMs & ADX Jan-Dec. 2016 See enclosed Ex. 5 A, B, C, D all level Remedy

29 - Re [Re 96-3 Att 7, Att 8, Att 9] All Regarding Modifying SAMs to allow Group prayer during Rec only"! Proven to be a Mockery offer as above") 18 & 19. & Ex. 02 ATT/6 2

30 - Re: [96-3 Att 10] Regarding Praying in the inside Rec. And that PLFF does not use Rec...see explanation above") 19 # 20 due to health & depravation of Equal Protection for disabled. 21

page 22

31- The conclusion of [96-3] #SAMs

It is clear from the overall content of the ten attachments that there are serious deliberately precluded information & documents (though all in public domain) the court need to consider. And when the above add. to Fact that UK & U.S.A. entered a very strange one-sided extradition treaty (without any from (criminal) fakey required for U.K citizens) in 2003. known in UK media as "Hamza's Treaty" i.e: Tailored for Plff, it became clear the political interference in Plff case and the "Bad Faith" in imposing SAMs on him; not to protect innocents or any thing or one other than the "Fabricators of reasons to invade Iraq via [o6] Afghanistan and their ability in the future to repeat same [the]

⇒ 32 - Defendant's Claim One Legal Argument According to above (and more in discovery) and enclosed herein exhibits is Morally Futed, Meritless and is exposing Us nation to danger in its narrow minded short sighted Tactics As follow:

33- Morally: USA pledges and preaches to keep its promises, not least when made on behalf of American nation and even worse inside court rooms of its close allies UK & E.U.: Whatever Judge, during litigations, told or lead to believe, or construed as an undertaken, must be respected not circumvented; let alone apposed & Reversed.

___ Foot Note ___

o6 = Respectfully Plaintiff is not trying to pose as Peace maker, but as always, and Islamically ordered; Truth & Justice seeker come what may. Also, please you can Check in: DIA 911 Community 2002; DITSUM No. 04(?) (DITSUM No. 044-02) Document

23/

34.— In this ptff 'case, since his maltreatment May 7, 2014 UK current for us extradition and for 8½ yrs litigation Courts & Judges at all level were led to, be Misled, believe and accept that the ptff, unlike the other four sought for extradition in the mixed case, does not have risk for going to ADX max or subjected to SAMs.

And the worse case, which is very unlikely, he could for only very short period (no more than one year)     And even such short period "short period" Would be in a medical facility, daily care four Tasks Assumed as in U.K 8:00 Am to 8:00 pm) And, accordingly the risk of isolation psychological impact would also, be short & mitigated by intense contact with daily care helper (s) ..→

similarly, contact with family (assumed as in England with no hint of objection by us litigators ever) would also, mitigate such "short period" hence
⇒ No risk of SAM, ADX And that Daily Care help by staff is to continue as in to 8½ yrs before

see
Ex. 06 , Att. 02 (ADX Warden Wiely Declaration
Ex.06 , Att 03 (Final hearing by UK high court & ruling See in particular paragraphs : ¶¶ 14 #48 (no risk in ) ; ¶ 22 (adhere to obligations) and asserted in ¶¶ 28→32 , ¶¶ 45→47 (false presentation for step down). ¶55 (violation of Article 3). ¶¶ 130, 134 – 137 (psychological & memory impairment of ptff, needs MRI scan in US); sleep deprivation ¶¶135 – 143 (in UK once every hour); then in ADX Hi unit every ½ hour !

23

24

EXO6. Att.01, is an affidavit by plff attorney Ms. Lindsay Lewis Esq, navigating through court documents and authentic material to highlight the broken undertakings and to prevent the same for other sought extradites like Wiky-Leak Mr. Assange.

35- In the same week of the High Court, plff was extradited oct 06 2012 put under SAMs, locked up in Solitary in an non-disabled cell, with no help whatsoever nor any documentation of his daily injuries, or any item to help him even teeth brush or hair brush---, no psychological treatment followed up of.      And that

36- No other of the four extradites has been under SAM, or any of the restrictive measures or harm as the Plf whatsoever.
     US litigators and officials deceived court & Judges and lolled their tongues to them once plf extradited. Respectfully, this court has the mandate & ability to use extradition and/or rule of speciality to restore justice & US reputation
                    conclusion of & morally D &
⟹ More importantly to examine the faith/Bad faith of "making plf life difficult[3] by asking[1] if US ever objected or asked UK to limit/stop plf contacts with family & friends[2], other inmates even once during plf 8½ awaiting extradite[3] Foot Note    and based on what it has now become National Security issue?
①F=, To the extent that Plf had to write to Trial judge for MRI scan on modern horses but to no avail as in New york: 04- Cr. 358 KBF. Docket 272 Ecf and now in Rule 33, new trial Point 2 of 8 points 2nd. Cir. Docket 19-3520.
②8= Open visits, eating with "family", Provided in Long barton jail star River to cook in group & eat helped by inmates & nurse.                                                    24

(25)

Respectfully. The above point shifts the burden of "national security" claim/pretext heavily on the lying to Court SAM imposers. Not least of no violation what soever. New 17 yrs from Plf 1st let alone to extend the fabric from to harm plf, deny essential care, help, fittings, items, access to Law material[s]

37. Deft's Legal Argument is now the Real danger of Exposing US Citizens to "National Security" hazards Also

(a) Even before Mc lewis statement and haulting the extradition of Mr J. Assange. Other Eu, UK and Irish Courts denied extradition to US of anyone is even a potential SAM, ADX or solitary person (Plf gave some exhibits of names/articles to this Court in his TRO request and Reconsideration[50])

(b) Most of the denied extraditions benefitted EU, UK alleged Cypher attackers or Hackers against USA, never even spent a day of jail awaiting conclusion of their Case (except Assange, because he escaped before).

Accordingly, the Deft's legal argument if Prevailed it only means that imposers of SAMs can also trick US Judges not only UK & EU. Consequentially the extraditee can never ever benefit from any undertaken by US. Such encourages More Cyber attacks and more denial of extraditions. on Foot Note.

(9) Any claim of violations by those who lied to court were all proven falsified, silly & childish, retaliatory. Nothing from other than SAM operatives. For 8½ yrs in UK plf has been never been high risk.
(10) Plf Afforded Lap top Send/receive CD to UK attorney 8 ½ yrs. 25

38- Dept's Argument technically confuted, based on the above proves wrong/inadmissible attachments of [96-1,2 and 3] and not like for like citations. Because, as this court prudently recognized in its construed [Doc 60] that this case has extra issues than the normal cases with regard to SAM, and designation because of disability. Respectfully, and now, rule of specialty and assurances for extradition can only enhance this respected court conclusion. And also, as follow;

39- Citations provided in [96] SAMs claim pages 5-16 are collections of several cases often addressing only one or two of the many interactive degeneration issues in plff's complicated SAM & designation case. Accordingly, addressing few fringes of this case.   And more importantly, security wise non of the persons subjected to SAMs therein is as the plff; open to everyone, never hid or scoped or used encrypted messages, or any other than own authentic identification phone, e-mail, many interviews with UK intelligence & scotland yard, exonerated by them from the major yemen charges; never linked to Alquaeda or any designated group till alleged suddenly by US as above ... etc. non of SAMs imposers or leader can deny any of this list and much more. Accordingly, citations for Depts are not the like for like.

40- Plff. is deprived because of SAM from searching for the right context and relevance of Dept' citation as he is, as disable, prevented from access to law lib Equal right Protected for any inmate violated his First and 5 &6 Amendment it and ADA access. and have no knowledge or attorney or books about SAMs. 26

27/

even denied to print out document from his own other legal cases or procure other on public domain to prove lies & wrongs in SAMs papers or allegations. See enclosed Ex. 07. Att. 01 is documents & communications showing that SAM & disability notation are interlined in denying Plf basic legal rights. mentioned above.

Even page 5/5 = the offer from McGuy legal dept ADA to help was withdrawn when SAM staff refused as Mr. Oliver (sis) stated i.e. no relief to date for law lib or doc. print obtain.

41- Plf. Also made full exhausted remedy for Access to Computers @ 851171-A1 and discrimination against his type of disability & needs @ 877974-A1

42- Att. 02 about rejecting legal book twice without rejection notes and delay in retaliation for his only food stick of 2016 Remedy 1027838A. All to be added to denial of printable legal content (as above enclosed) Remedy 875413-A1 and many more in discovery.

43- Accordingly Deft's Claim that SAMs does not impede or impair Plf ability to defend/participate in his legal efficiency or violates his First 5, 6 Amend and ADA is Flawed. It resulted in unfair (still disputed) conviction in 2014 and now in impairing and impeding Plf ability to litigate this case". And More important →

Foot Note

Please note that the above is coupled by denial of ready/writing material, LED's pens even eye operation or reading glasses or stationary to organize paper work.

27

44 - The Deft's citations in general are not orderly nor directly focused on the specifics of the claim. for orderly this repeated count approach is, in its construed [60] shown (as 10th Cir. ruled) that it is evaluating the prison rules burden on substantial rights, first before balancing Turner Factors, while most of the Deft's citation & analogy are about the second step i.e the balance first ! [96] pages 5,6,7

45 - Deft's Arguing the legitimacy of losing rights & privileges because of SAM while PHI claim is about receiving physical & psychological and legal harm because SAM and the fact that it is never mentioned in any of its papers The Special Care of disability in Solitary

46 - Trying to justify SAM for "National security" is technically out of date "MOOT" because US (as above) never asked / litigate UK or EU to limit the PHI rights / privileges during 8½ yrs awaiting extradition which proved vividly and undeniably that US and all of its allies never even Contemplated "National security risk" and as proven, The burden of otherwise is well placed on the SAMs imposers and now "Moot" unless solid evidence, otherwise will be irrational not suitable for contrary

47 - Using Citations such as SAM & measures should stay in place even (... absent showing that it had "proven effective") [96] 6 , or [96] 7 8. Ra 249 V. Nalley ... Any arguments That "officials do not know Mostafa true beliefs ... ...) are 28

pg 29/

are also confirmed; SAMs operative self serving as officials only know what SAM operatives tell them, and it is proven that several essential for pltf proofs of innocence had been and is concealed [12]. Accordingly, Respectfully, the pltf proved by behavior and records (not just words like SAMs) that he should pass the 10th Cir threshold of burden, and that [60] "there is no legitimate rational basis" for restrictions" Owhali v. Holder (10th Cir. 2012) [96], 6

And that there is an important difference between Defts Argument for imposing/keeping SAMs even when no "concrete evidence" [96] 7; And Keeping/imposing SAM, like here, when its alleged reason are "moot" and/or there are reasonable rational reasons for its unnecessity.

18— The above conclusion/analogy should also cover the the offered "Rational Basis" by defendants to keep/Justify the SAMs & or its restrictions as in Argument 2 [96] 9,10,11,12,13 and 14.

However, there are points to be shortly raised to refute the denial by defts of misuse of SAMs for instance but not limited to: (A) Approve step on then deny after see Ex.8 Att. 01 (B) Denial of some discussed above and that contacts were denied even before they were placed on SAMs like Mohammed & Imran But also, denying full contact see EX.8 Att 02. Even partially Contact Ex. 8 Att 03 First Note.

[12] for instance, in scotland yard report "Yemen operation" vindicated the pltf and also contained several information refuting SAMs allegation such as in the 1999 arrest for Yemen and taking pltf property it included Royal Military Academy Sensitive several drawings (GPS coordinates) Southwest and Higham Strat envoy Office, and clearly returned back to pltf who had them since 1989 never received Alaeed or any one.

29

Page 30

The respected court should notice and ask: Why SAM staff waited till Sep 2016 to notice that sons, step son are "terrorists"? and what are their evidence? And if, as the case here it is one of the many retaliatory measures?!

49- Other family retaliative misuse of SAMs: as the continuous missing of family mailed visiting (none till now! See Ex. 08 Att 04 as an example; Pltf youngest Daughter Marwa (Final Year computer engineer) And the rejection, followed by fabricated reason to renew SAM, of Pltf letter to his son Othman Mustafa (Project manager Civil Engineer Chartered) and the prohibited love for Pltf 1 yr old then, grandson. Ex. 08 Att 05. The justification for the rejection of the letter and renewal of SAM for it, given by Deft's [96], 11; is unbelievably retarded and when it is a product of professional lawyers' pen it could be "a contempt of court standards of moral logic!

50 - Prison general policy is to encourage family contact and facilitate that. Courts inspired wardens to use their discretion even for SAMs sometimes. See Ex. 09 Att 01. But lately & since the begining of this decade ADX Restraint has been tightened and many inmates suffered. Some decided to protest peacefully by chained intensive food strikes to die or get their natural right to family contact; till ADX was exhausted and inmates peacefully un-manageable. See Ex. 09. Att. 2; warden Wiley to "manage" one inmate (convicted of African 2 embassies) requested and allowed 30

page 31

To Contact total of 28 extended family member in Africa. And that the usual 60 working days (always becomes 90 readdays) for a non English letter to be only Ten. Though he was in the H-Unit it was permitted with no harm till SAMs was lifted from him.

Respectfully, The point is clear, That most of the SAMs are unnecessary and/or exaggarated and misused stressing inmate, and family and Sometimes result in "better to die God Strikes" And this respected court could prudently examine and question SAMs operatives (even through special Advocates & think tanks reliable experianced personals) To evaluate the source, reliability and proportionality of the Measures and direction of Conduct

51— SAMs is also, misused in special mail from & to Courts (as this very respected court seen in several pause missing / delayed mail) Also, Consulate /Embassy Mail (no contact or delivery signature collected since 2017) and Pltf never received any mail/calls from UK consulate since 2018. See EX·10 "yet another irrational & example of delaying. Pltf Can not iniciate a call or Known about in/out mail

52— Legal Mail SAM misuse is endemic, harmful & never stops & changes its form and excuses to date. And several letters E-mails from attorneys to ADX legal Dept about it & remedy from Pltf usually completely ignored (to avoid liability) Pltf Can not send/recieve any E-mail to attorney or initiate a call or know if his letters reached or not till attorneys allowed a call ; another impediment for legal work to succeed! See lots of many examples in EX·11. legal Mail  Also, Proven that E96 J, 11 & 12 False Re:
31

Pge 32?

(a) Contacting attorney : on prisoners abuse, and from Label Remedy.
(b) failing to plead access to court as it is repeatedly pleaded in the form of : (i) Denied human rights lawyers like above
(ii) Delay, & missing Mail to court & Attorneys
(iii) Denying access to legal computers & Law lib and rejecting & returning legal books.
(iv) Denying reading & writing items, fitting; table pen (disable), eye operation and even prescribed reading glasses to date since oct 20, 2020 See EX. 12 eye glasses ...
The above & much more papered all over the claims are back and front doors for denying access, or meaningful access to courts because of Misuse of SAMs si designation.

53 - Group Prayer claim is not "moot" as proven above. Comparing the Mockery offer with ADX provided Prayer time table and Rec. time and Conditions of single person in single Cage & direction to Makkah issue. Hence Deft's [96], 12 & 13 argument is moot. And because the prohibition of essential Group prayer was not proposed or alert -ed U·K & Eu Courts nurtured acceptance that it is against Article 3 not least when over a year! (one of the rule of specialty about this claim (case) Nor US requested us to stop the plaintiff participat- -ing / afforded group prayer during 8½ yrs awaiting extradition for the suddenly alleged "national security" out of time, purpose "moot" dorm!

54 - Imam Sub claims in Deft's [96], 13 they alleged that the insufficient access to Imam "nothing to do with SAM" is not at all true Please see EX. 13 4 pages Remedy regarding: 32

pg 33

The persistant denial of Imam, Fittings & items needed for ritual hygiene and religious needs. Remedy: 862521-A#. the subclaim is about the repeated denial of Imam who can explain to management the essentials of religious cleansing and grooming needed for a Muslim to pray and the deprivation of that the Pltf suffering from and as mentioned: Toilet Br disable with no hands, hair brush & trimmer to manage and grow the beard & rid of Private area hair i.e Islamic Grooming. i.e the Imam, Faith & ADX management. Because the Imam & Fitting & items for faith for this disabled in solitary are all the direct impact of SAM.

55- And that in units other than SAMs, when there is no Imam ADX allows inmates to agree on Imam from among them to lead the prayer, they all exchange books & call family and/or other to find a rule of specific religious issue or e-mail or help one another if one is sick or can not groom himself And all that denied for SAM Inmates. Accordingly, the Pltf situation satisfies conditions: 2 and 3 of Yellowbear V. Lampert (10TH Cir. 2014) as in Deft' [96] .14.

56- During the short existance of the offred (2019-2020) Imam Dr. Shuaib the Pltf repeatedly raised the issue of cleansing & grooming & Fitting & items (toilet, trimmer, brush) and he raised the issues but to no avail and when Pltf told him in his last visit in March 2020 that he should provide a statement and/or be a witness in court, he was stopped from coming to H unit for more than a year only to came 2021 & say goes by !     33

Page 34

57— Islam is one of the Major Ibrahimic faith. It has many obligatory intensed regular timely practice & rituals, and preperation for that. And PHP has many special needs of help & fillings & items and searches for religious opinions chaplin other than of the same faith are not equiped or accepted by ADX or SAMs to push for fitting or items.

And several times declined to get involved; other than the monthly time prayer hand out they can not help PHP in any of the sincerely held belief and/or practice he posses.

Accordingly the claim is legitimate, and persists as the SAMs shadow.

—58— Respectfully, the issues regarding the Imam above are sufficient to rebut the dismissive arguments in [96] Dept's 16, 17 regarding the prayer, it needed cleansing & growing brushing hair and hair trimmer" (noting that he never asked nor can use a scissor but need electric Batteries trimmer).

And Depts admitted that without the Imam/Islamic expert in rituals & prayers the mentioned claim will only be concieved as "Mostafa's Criptic allegation" [96], 16!

Moreover, Dept's quoting the washing before the prayer, [96], 16 reflects the abject lack of knowledge; as none of what's quoted could be done before cleansing with water the person private area back & front (the issue of disable toilet for no hands) and prosthetic that does not bend like hands i.e. does not reach the rear area!

60— In general SAMs has become out of control out of date and created a home land US GTMO cuba and is further going on the wrong direction of what US preaches to the civilized world. And courts have become the Last Gate Keeper available.

34

Claim one Conclusion                    page 35

61 - Finally, for SAMs claim, it does impair the plaintiff in every aspect and expose him to danger and it is clear and well established that plaintiff conditions of detention and communications in U.K 8½ yrs is more than sufficient and balanced as standard risk communicating with all family & friends and receiving 8 hours daily nurse care never caused or posed any danger as well as the 2nd 8½ yrs in US.

62 - Respectfully, with such a 17 yrs in jail and 3 before at liberty established clean safe record The plff burden of prove has been solid and consistence and can not be ignored or construed opposite to its fact by unfounded claim of suspicion as in Deft's argument. Accordingly SAMs should be removed. And claim one remain in't entirety.

Result of SAM No Iman (Deft (96))

63 -                   Food Cermonial Meal ( Ex# 4 )
The memorandum should have attachment of examples or standard offered food items. It also confusing the issue between certified meal as "non ritual" while in fact it is religious and as ritual as cermonial meal [Remedy Ex#4]

      The problem is for years on end now in ADX muslim inmates ever received True lamb or beef meal all process food but in the Eid of Sacrifice "AIADHA" it is mandatory that muslim eat & give proper meat. But even, as advised in the Ex. 4, inmates who want cermonial meal go out of certified meal (Halal) or Kosher) They never get any Islamically meat even once While Jewish inmates in passover they get 7 days outside food & meat

                                                                35
plaintiff simply denied & exhausted   EX#4

64 - Response for Deft's Argument for Claim [96]   page 36

Deft's request should be denied and this respected court should not grant Summary dismissal for the following reasons:

First(s) mainly based on medical records and selectively chosen; Certain several records from context and reality as will show first

Also, this respected 10th Cir. does not recommend that at this stage. Please See: Green v Branson 108 F3d 1296, 1304 (10th Cir 1997) noting, as in here (claim of falsifications of medical records after use of force).

And generally, as will show here, and when discovery of concealed are presented, "The shopping around records" to justify denying plf his medical and disability rights. See: Sanders-EL v spietman 38 F Supp 2d 438 and (D. Md (1999) ("it will seem that the law must entertain the possibility" that health care providers in a prison setting might bring certain biases to their occupation).

65 - (cont): The citations and argument based on: false, & distorted, severed to give incorrect context and/or denial of records exist and favour the truth ... are then based on wrong not suitable for courts as they all "the Fruits of Poison Tree".

※ Respectfully; the plaintiff implores this Court to accept only few of the many needed to be corrected/exposed disinformation, statement & records in Deft [96] claim two. It is only because To Save the Court longer paper work at this stage; as every half line of Defts and/or proved Declarations made in average ~ 4 pages of exposing and exhibiting material. Therefore only some will be shown to Court; the full will be at main case stage or If this court allows in a subsequent Supplement.

And also as advised on the Forms claim that this stage more for claims facts not citations or exhibits. Plf, though forced to respond to Deft's Exhibits

36

66- Third : That the pltf did not use the technical terms the professional lawyers use to communicate with parties and courts.[16] However, even without knowing or seeing documents prove beyond doubt that pltf was/still impeded from Law Computers & legal material ; this respected court endeavored and thankfully construed many of this plaintiff urgent grievances.

Post / below will be exhibits & documents prove that much of the pltf inability to use proper legal terms or help the court better understand his claims are the direct result of denying him as a disabled inmates. Accordingly this third point is "Deff self inflected" not the denied pltf burden.

67- Accordingly, First : Determining the existing facts of : The physical conditions of pltf disability, conditions of Detention and environment ... Must be illustrated to the court before the legal argmt. as this is the best & shortest way to explain the misinformation in [96], then pltf endeavor to remove the harm and alert ADX officials; then their responses and ignoring the pltf ; then, some of the harm/injuries & Result and similar related issues to prove the flaws of the primise of the Deffs. the merits of Argument in [96].

68- Exhibit 15. Attachments (enclosed here) proves the above and with only essential comments to serve the court prudent as follow

Att. 01 : Plaintiff disability photos (taken 2017 for his family but was not suitable as redness of stumps & abrasion though in an early average day. Also, visibly impaired) Also short enough unbrushed beard. And his prosthetic type & Limitation

Foot Note
= such is understood from the format and terminologies Deft [96] stated that pltf never mentioned; though is clear mentioned in SAc by facts and lay terms from a non professional.

37

page 3 #

58 continue ... Att. 02 Disability Cells Drawings, sketches
and comments Regarding how dl made for lower and upper
amputee and risk involved, the missing needed fittings & why?
the stress & degradation, degenerating continuous condition such as
no toilet, eating setting on toilet, shower, sink harm &
problems itself explain misinformation and wrong stipulations
and wrong conclusions given in declarations such as but
not limited to "prosthetic are enough substitute for hands"!

→ Also, proves that plaintiff is coerced to harm or exert himself
to do his needed task or go without in his solitary without help falling ...

→ Also, it shows and proves that Cells 3001 & 511 are Not identical
with regards to the Plaintiff disability & exposure to risk or harm

→ And that as shown & accepted that prosthesis are not for
use in Showers, waters or for human waste the plaintiff
has to negotiate all the needed sharp edges with his own stumps.

→ And More importantly, as admitted by Mr McMullen
in his declaration that Security reasons are the justification
for not provided the Lever faucets/Tape and continuous Water
i.e SAMs & ADX Designation [96-7] Same reasons given for
denying the electric tooth brush & other Fitting toilet, pen etc
such is the Core Legitimacy of this Claim 2 and claim one.

→ Also, Same reference [96-7] page 3 false claim that
the lower level of shower head to substitute for no disable
Toilet as ptf can "use for cleaning" See drawing 3D showing
That Lower head is : 1- 5⅛ feet high up 2- no up warsh
water at the needed level 3- Area needed to clean Can not be
reached by stumps or even prosthetic does not bent like hand
Accordingly and for other mentioned on Attg drawings his declaration flawed

page 39/

→ Also, Re: Rail it proves the Discrimination against MFG type of disability Mr. McMullen in [96-7],3 stipulated that he provided rail but see the 3D Drawing Shower Att.2 here, it is clear it is of double upper amputee accessability used or even known to him. As upper double amputee: 1- Can not and not in need of wheel chair level low rail 2- nor can he use or hold on to vertical rail only used for wheel chair to pull himself up. 3 the only need & useable safety rail for upper is chest level horizontal rail to hang on by the under arm area - especially for a visually impaired, like plff. and the flooded floor from 3 min non stop water & no water stop end (as in drawing) hence all arrangements and fittings are for a wheel chair person & wheel chair code

§ q-           Similarly, and more to follow added reason, the flaws and irreliability of [96-5] Declaration & Exhibits/attachment by; Captain occupational therapist P. Chorosevic who only assessed plaintiff 12-15 minutes while shackled and tied to restrained chair, never allowed to perform or to be shown how to do tasks informed and surrounded by one or two representatives from each ADX department. His main assessment based on "don't give him any thing as the prosthetics are substitute for hands" (quoted by meaning) which is not legal as in post citation. And proves that he had never dealt know about double upper amputee need. He also has nothing to show for that in his declaration of experience or qualification See [96-5] 2-5 or his unknown or acceptable, & couldn't during the short strange "assessment" setting. Ignoring what he knew and also reminded by plff attorney, the issues to address See Ex. 15 Att. 3 letters our attorney to ADX legal Dept. (He acknowledged seen) Re: items, fittings, help and prosthetic issues and access to computers ... He never done.      39

70- Among the many harm he caused by his ^page 40/
assessment as above and:

(i) Justifying the ~~consequences~~ consequences of doing fifty items
or help which to go without, or harm Pltf himself and need to
stay in Prosthetic most of the time, he dismissed that as a
cause of abrasion, redness or infections. Instead he made him-
self a physician saying unheard of diagnosis that the soreness
of the stumps are due to diabetic and Pltf eating too much
sugar but he named only the food items that the Prison provide
and the Pltf did not eat them! (except the honey which is bought
and used as medicine not food) And never, or can, explained why
the soreness is only at stump's area then. It was a blank
cheque to ADX to deny all remedy grievances regarding
disability quoting his "assessment" see [96-5] 18 & AH-12

(ii) By denying the Lever faucets in shower & sink and increase
ing the time flooding the cell, exposing Pltf to slip (no safety
rail) endless time to dry floor by towels & feet and inability to
scoop water when pressure is low and being burned by hot water
from sink when pressure is high. And still negotiating Short
thumb Push faucet

(iii) He justified no help needed in 916 with his des-
cription that the Prostheses can do every thing including
washing dishes, using scissors, driving a car...! (Not only
unheard of but the provided here drawings & sketches
clearly prove that wrong from basic visual scan
geometry and material of the described tasks and items.)
Respectfully, He avoided saying that Pltf was ever taking
out of the cuffs, shackels or the strap chair or asked to perform any task

Page 41

or even asked or allowed to put on his prosthesis.

The pltf confirm that he repeatedly asked the OT to provide him with video clips and/or any illustration to show him how to do the "everything with the prosthetic" but he ignored him and suddenly ended the assessment. 5 minutes later pltf was freed from the strapping chair & shackles.

(iv) OT ignored & concealed other O.T's reports he knew about and saw in pltf medical records as he admitted having access to all records see declaration[96-5] 9 # & 5. Such as BOP own O.T Ms. Deat & her 3 long visits with pltf and MCC prosthese technician though her recommendation never been implemented, but his hasty 12 minutes assessment & "very large" report allowed ADX to also ignore it

Respectfully, this is overt dishonesty and sign of irreliability and "shopping around" and sufficient him this stage at least to dismiss based on such standard of records & practice    please see enclosed here, Ms. Deat 2013 report of visits & recommendation ignored because of "security"   causing the harm to date. Ex.15. Att.04. and of MCC legal dept response to her report to pltf's attorney she recommend may things in agreement with small amount of uk of forded daily care such as the need to get help not to harm/cut feet by wearing socks using prostheties (acknowledging seeing cuts & scars on feet. etc

OT Choroservic also, concealed pltf's visiting Dr Benjamin Kligler with its essential health, safety & hygiene recommendation please see Ex15. Att.05: warning against further amputation.

41

Page 42

(V) Also, Appears that he Concealed from deff's attorneys other important documents & Reports as he Kept wondering asking that Pltf's claims are baseless like O.T set above and UK thinly help existence & records (See sample enclosed Ex-15-Att-6)

(VI) He used Fabricated Report inserted in his Att-11 Carrys the Name of FMC O.T. Trupp. Dated April 8, 2015 while in fact she never made any assessment or allowed to do any; The Pltf Attorney Ms. Lewis Esq had to write to the Hon. Madam Judge Forrest on oct 07, 2015 to compel FMC to do the assessment and/or to provide any report if any, to make sure the ADX designation is proper. But SAM and FBI wrote to the judge not to interfere and to forget her own Recommendations in Sentencing! See Ex-15 Att-7, here, O.T. Trupp showed up for 2 minutes at the cell door saying she Can't do any of the promised sessions because of the security situation, she never observed/discussed any task with Plaintiff.

FMC officials wrote back to Mr Lewis Esq She need to go to F.O.I. For the information about the report i.e if any. done

Respectfully, All medical records provided in [96] should be used at hold, not used for early dismissal or Decisive legal argument, till Jumps/gaps and context are filled by discovery material of the full context & sequence of the records, as it is clear by now it was misused the baseless designation to ADX and since then to deny Pltf his need Privilege, items or help.

Foot Note
When plaintiff arrived in FMC Feb. 2015, soon after O.T Trupp called him of he was cuffed her, Surrounded by 8 security staff she said "me and you will be sending a lot of time to work" during the only meeting 8 my nutes but she only showed up again for 2 minutes at the Cell door only to say she can't because same

page 43

71 - As example of subsequent use of O.T chorosevic
April 20, 15 Report by BOP and ADx to deny essentials and
continue discrimination against PH type of disability.

And first Dealing with him as an able minute
in a large Wheelchair or Cell. See some of the enclosed
statements in denied Remedies (Few of many, all exhausted)
Ex. 15. Att 08 = Denying toilet, Items, Phase II for help.
Electric Tooth brush = Pouch opener = considering correct
Types of disability ...

72 - Few examples of the Physical & psychological harm
as consequency of the Report. Please, see EX. 15 Att 09
Such as: Another broken teeth while opening Fish pouch, Rewill,
progressive teeth & Crum abrasion need for removing most
teeth for Denture can't be used by this disability 17. regular
strung infections ignored & not treated to avoid medical record
-ing (O.T chorosevic deliberately jumped records of Mcc Proven
Severe infection from overwering prosthetic & recur injections
and treatment by P.A Ramos, before & after the attachement he
offered of: P.A Reumos 2013 Mcc New york.    Help Stopped for
applying Skin cream immediately after O.T report despite years
of helps and admission of unreachable area on the back & lower
only Provide the cream & refusing to document the no help or why
to date.

Fust Note
17 = Dentist S. Robert done recent thorough assessment & gave that
result & fact she acknowloop in second visit to cell to see prosthetic and
Reasons for Speedy PH mentioned mouth used June 30, 21 said Many Dentist
recommended Electric brush but denied. she will search for denture soon

43

Page 44

73 — O.T Chorosevic recommendations are not for an upper double amputee As follow:

A — The washing mitt with belt (See photos in [96-5] page 5/8 Together with the cylinder frame were offered to plaintiff some of his inquiries 1993 by an OT assistant in UK but the same OT told here, rightly so, that they are not for arm amputees but for persons with weak hands to allow them bigger diameter of friction and the Mitt for soap bars or shampoo to be tied around the wrist without what it will never stay in place especially when it gets heavy and slippery with soap. the PTTf photo Ex 15. Att.4 as well as the drawing of the prosthetic shows the impossibility of securing the Mitt on his stump or the need for the cylinder or how it fits inside the small gap of opening! OT himself acknowledged that he notices pain in one of PTTf Prosthetics [96-5] 912. And who and how PTTf will tighted the mitt belt in shower? But the desired grip pen in the photos is the needed item ordered by OT Mce 2012 and judge Forrest to even this isn't to be provided but never to date.

B — The towels provided sewn together with long sharp razor velcros cut & bleed PTTf backs shoulder the first & last time he tries to dry himself with them The desired and needed is a towel gown.

C — The intercom water timing as explained above food the cell What is needed and prescribed since 2004 importance is Lever faucet as also in fire and control to stop water from waste or flood or burn. Accordingly, and respectfully note the needed are denied, always the harmful is always provided to make his life regretful.

74 — Finally for O.T Chorosevic report proofed wrong and biased and unprofessional is the very admission by ADX official that cell 300L is not suitable for PTTf disability

Page 45/

And such is also, to prove that Mr. McMillen declaration and assessment and the legal arguments by Deft's based on all of that are ~~they~~ at least for early dismissal.

⟹ Another Admission, also asserted by central office, is that the plaintiff needed help to open pouches, plastics and food out of all of that to be placed inside canvuse containers. That's to stop the fast decay & damage to Pltf teeth, Gum & strings. Respectfully notice that such help is only allowed for Prison Kitchen food; Pltf still to date suffering and struggling with other similar issues like commissary. Hence it is a two ways admission & relief is sought. 1@

Please See Exhibit 15, Att. 10.

## 75 = Recent O.T(s) issue/Decision

On July 01, 2021 during managers round Pltf asked Ms Fellow, (Medical Dept) why O.T. Missoury video assessment is not continued as OT promised to come back (Mr. Bennet did Dec 16, 2020)? She said: "we are trying to get a new one, and this time you will be shown (by illustrations) how to do what." Pltf said: as I always requested: clips, photos ...? She said Yes.

Respectfully notice from [46] I provided medical record that also OT Bennet is not mentioned why he did not / was not allowed to resume the new 16 assessment of pltf & Court provided with his notes/report and only technicians/manufacturers are discussing prosthetic issues without his prescription & specification?!
~~First Note.~~

8= Deft's legal argument wanting to ~~to~~ dismiss claims or such claims if some relief is provided as "moot" contradict several courts citations and principle saying: but it mean that the relief sought earlier was reasonable; and claims proceeds. Respectfully this is also sought ~~to prevent repeat or retaliations.~~

45

page 46

76- Response to some of Ms. Follows [96-□]'s exhibit & declaration. And Falsification there in.

In short this exhibit [96-6] is a Typical manifestation of 10th Cir 1997 warning of early dismissal based on medical record as falsification "found after use of force" Green v. Branson. However, to avoid lengthy response for each & every falsification &/or misleading presentation, the Pltf will only address Two of most important to the legal arguments. i.e Two falsification, Two entrapment recording, Two disinformation, Two denied medical necessity. as follow:

77- Falsification of medical records of the assult on Pltf by offices during his food strike to intimidate him out of it, injuring and bleeding him (as in claim 3 SAC). Ms. Follows Claimed and attached medical record saying, in [96-6] Att. 9, 33 & 34, that Pltf told medical & enforcement when they finally came 8:37 p.m that he "self inflected the injury on himself", and medical told him not to "harm himself"

Such far fetched recording and falsification is deliberate and corrupt and concerted effort to mislead the court. The Pltf told medical & Lt. Armijo (Dept. 20) to make incident report of the assult & injury but he refused. Pltf made complains & sent to ADX legal Dept. requesting the same to no avail. See Ex. 16. Att. 01

78- Falsification of medical records of refusing to stop bleeding and bullieng Pltf instead by nurse william in Ms. Follows [96-6] Att. 29, 30, 31 Recorded 10/20/18 stating falsely that Pltf was treated in sore and refused treatment. incident of bleeding while using rough pad to clean Cell 311 on cell rotation.

The truth is Pltf. start bleeding from staring badly blood flowing from many small Cut. Pushed duress button nurse william came threw a bandage on Cell Floor from door food slot when Pltf asked him to be cured & strong so he can unpack he said "why did you cut your hand?"

page 47

and went away [20], never conducted any medical work. See Ex. 16. Att. 02 Remedy account of Truth.

77 - Example of Two entrapment recording ; Ms. Follcar claimed in her declaration [96-6] 9 15-20 that plaintiff "repeatedly complained about his prosthetic and worked ..." , "refused to have new ones or elbow cast" "prefire repair to U.K old prosthetic". The Truth is Pltf never refuses any non harmful help or medication as he is in badly need of any. The detail ; Ms. follows does not have a single record or request that pltf sent for new prosthetic and stopped asking for new prosthetic since the last one done 2013 causing repeated infection unless new type/function Supervised by the authorized qualified for that occupational therapist not a technician acting on his own. Also, pltf learned painful lesson in Jan 16 → Oct. when his prosthetic was sent for repair nearly its approval, returned after many months unrepair & had more damage need to be sent back and at some stage was assume "lost" my stressing a difficult time. See Ex. 16. Att. 03 (Repair).

In the mentioned incident ; the repair Known to Ms follows & the technician was very simple which is the change the cord from one prosthetic To another less than 5 min work, no special tol/skill need also, risking staying without prosthetic for long time is not an option in Solitary and while need to write to Court illegal.

→ More importantly, the prosthetic type offered would not work. nor OT & specialist Keith [Mr Bennett] would agree about because it needs hand sock ; can not be used by a double amputee Also it will Block the ventilat- foot Not -ing holes of the prosthetic (As in sketches provided).

Please, note on side point that this is also, proves why pltf. has to use in string to clean (not the prosthetic as water gets in rots the inside of it and rusts the metal area and can not be cleaned and increase chance of infection Also cleaning material & items are missing for skin stumps

47

80-And if pltf agreed about it & did not/couldnot   Pag 78/

The entrapment recording would say to the Court "he wanted OTK and still does not want to use" it". Clearly the whole issue is to make pltf look not reasonable to the Court and/or confiscate his only creable to write pwithetic for more impedent. Notice also that Mr. future Continously, refusing to provide the monthly needed rubber ring: Replt (Two fully exhausted Remedy and one in midle about that)

81 - She also, refuses to convey to OT the needed list of items and format needed for useful preparation before the assesment like The standard OT Chart(s) of Drowable "pre" comprehe assesment to prevent Malpractice & repeated mistakes of the past See EX 16. Att 04

82- Other entrapment recording such as : requesting stool sample swap when pltf say he needs some help its recording or refusing See EX. 16. Att. 5. (Nurse Heckleton Dept 18)
     Also, Same male Nurse agreed to tell pltf when he will come to do nail trimming ; to soak his nails/toes to reduce risk of the many previous pinching/bleeding incidents for entrapment he would come suddenly without notice and when asked to allow some time for soaking he will record refuse (More than 5 Remedies Re: pinch/bleeding)

83- Not recording the Prolonged denied medical essential need Such as: facilitating the skin cream help; last recorded 2/8/16 she maintained the denial practice before her start at ADX, but stopped recording the requested help See Ex. 16. Att 10 which is also her own Ex [96-6] Att 10. "Respectfully the above is a sufficient for the point
     Also, Denial without records or acknowledgement of request like denying prescribed glasses EX. 16 Att 7

48

Page 49

84 — Second: According to above examination of

The Deft [96] Declarations & Attiment, The court, Respectfully should Consider that The foundation & Sources for Deft attorneys arguments & citation are based on distorted, irrelevble and even many falsified documentation and biased self serving opinion and conclusion. Thus, Respectfully should not result, at this stage, to summary dismissal based on such record, as I/we advised (and others) above ) 64.

Respectfully, the legal argument derived from such record and standard by Deft attorneys could be, if not exactly, The Fruit of the poison Tree" not suitable for this respectful Court consideration at least till more fact finding procedure.

Argument:

85 — Third: Deft [96] legal argument:

→ Generally as above points proved is confuted, not least when the Admissions by ADX officials of the insuitability of Cell 300b for having pltf type of disability (where he stayed and tried dangerously and exhausthy for Years) . And the need for help to open packages of food ... etc (albeit excluded Commissary & other packages not yet included i.e the need for this claim to procede).

86 — Also, the new arrangement by ADx to bring yet another O.T for a Comprehensive assessment.

And the respectable madam Dentist S. Robert conclusion after a total of 2hrs assessment (2 sessions) that The Type and design of the prosthetic pltf posses Can't be used for dentures. (among other observations she still searching for answers.

87 — logically and even legally, the less that 15 min, Most assessment, to a tied to restraining chair & shocked stint to End, pltf, by OT. Chonosevic is simply, inexcusable for this huge report!

49

page 50 of 357

especially when his report claimed wrongly, and even illegally that the prosthese are substitute for hands was embraced and harshly acted upon by AD'x denying him of the basics and causing the damages mentioned above.

88- It is well known, documented and fully accepted legally that ptf had all the help, fittings, items while he has even better prostheses than he has now & Us a Extredirion litigators fully accepted & never challenged that during the 8½ yrs. Only after extradition some ptf's & Bop elements for their own retaliatory "make his life in prison very difficult" motto/reasons, decided to tarnish ptf & Courts reputation!

89- Howeve, Courts, ADA and politicians refused such/similar claim from OT chaosevic and the legal argument based upon it in 96] through out the entire claim twis argument about the imaginary "skills and Dextership" that deserve/justify the denial of necessities s pHP.       For example: ADA Amendments Act stated in:
42 USC. § 12102 (4)(A) ...(E)(i) The determination of whether an impairment substantially limits a Major life activity shall be made without regard to the alternative effects mitigating measures such as—
(I) Medication..., equipment, orophone,..., prosthetics including limbs and devices....  (II) Use of assistive technology
(III) reasonable accommodations or auxiliary aids or services or
(iv) learned behavioral or adaptive neurological modifications.
, Foot note ————
⇒ Major life activit defined of/include but not limited to:..., performing Manual tasks, seeing... eating,... thinking... and working.  (B) operation of major Bodily functions.  Congress approved all above
Quoting from Prisoners Magazine!                                          50

page 51/

accordingly, the bulk of Deft's argument is flawed conflicted.

90 - Also; the proposition that when a relief provided makes the claim "moot" is not accepted by many, if not most courts; instead, and to close the loop holes of indifference and/or planned harm, it is considered as part of the reasonability of the sought relief and does not necessarily dismiss the claim, not least when the delayed relief caused harm and or stressing exertion to do [go] without it. As stated by ★ Prudent Court "... able to do so only by virtue of ... caused, exceptional and painful exertions in the case of amputee prisoner: -Schmitt V. Odell (D. Kan; 1999)

                    Conclusion (claim two SAC)

91 - In sum, Deft' [96] defends and litigates for the continuation of the hard condition imposed on this unique case pltf. Respectfully Summary dismissal for claim two will be construed and acted upon in ADX or other places as provision/approval to continue and/or worsen the pltf situation and could raise the relief bar to almost impossibility.
            Accordingly and respectfully claim Two of SAC
      Should not sustain a Summary dismissal. Respectfully, Redress and/or Compensatory/financial issues are sought and is explained below here.

                ( Claim Three SAC )

92 - Deft' [96] Denying the pltf claim in his key team Excessive force ... 21, 22 is unreasonable, as pltf (no weapon or allowed access to [could be con use]) described what he felt of; the shock [2,2] fat gene exhaustion and fear to [say] die. Some of this still felt to date.; while weak and pausing no threat whatsoever; County claimed attacking a [hand cuffed] man on the floor as improvished and compensated inmates. here is worse first note.
The law & Rules of BOP is stick officers should not enter an inmate cell during a pod strike and refused to provide samples without the enforcer team and Camera recording and [precaution & debriefing] to team. let alone threat, come ck and do the threat and attack, impoverishing old sick disabled [inmates.] these are multi layered shocks [could have control had attack]

page 52/

93— The Pltf never new about the falsification of medical records about "self-inflicted", as 10th cir. warned about and anticipated, and is here, until he saw that in Doft [96] Ex.6 pg. and explained above with records of remedy and another place letters to legal Dept.

Infact, such falsification adds another remedy(s) for disciplinary and compensation for conspiracy as well as the ADA provision for retaliatory, identical to here. Furthermore the letters & remedy replies are proof that officials are fully aware of the Pltf grievances as well as the falsifications of the records; as they never-ever stressed the issue of Self—inflicted Injury at any level of the remedy as they can never commit to Sign a document ordering a Known lie (another proof of the Pltf truthful accounts. + Finally, the Pltf felt and still feel that the injury (specially the psychological trauma part of it as week disabled with known underlying serious conditions.) is excessive. And as it is a relative term in circumstances it should be left entirely to the educated court. And that the financial remedy sought for This claim, 2nd claim and any of the claims, whatever its unknown to Pltf syntax/terminology are also left entirely to the hard work skillful construing of this court; the Pltf can only indicate what he meant/mean by his poorly phrases occasionally adding a newly learned term

94— Doft /stating  page 22 & 23 / "element not alleged" is contested, as explained above as rephrasing, explaining or adding newly learned terms s ease the difficult construing court work are new words not new context.

95— in page 24 [96] Doft discussing absence of alternative and to rigidly stick to the law beyond ...; Respectfully, in event in this special Case, as one has no level of legal knowledge is proven to be due to SAM and legal disability access to Law its books about SAM & ADA allowed to Pltf   52

page 53

as explained in claim one & Two above. And more, importantly, the US merit's of law is not to burden any party beyond its limits.

96— The Deft's in 25 said that Pltf has another avenue to Bop officials to impose discipline u.ete. Respectfully, this is exactly what pltf tried to do, among other attempts but it does not work for the level of concerted ADX official's effort to supress/stop any of that especially for SAMS inmates within less than a week from the assault, the Pltf send to Bop inmates highest office urgent need for remedy, another copy of that and letter to the Bop inspector general. And a copy of That and letter motion to the respected (Hon) Michael Hegarty who acknowledged during his last visit jan 2020 That he received or written a copy of Pltf first claim to this court. Pltf strongly believes that the only reason that the judge received the mail was because he will insist and could investigate if was asked about the mail. No evidence that the other officials received the mail or they are truely an available Venue for relief for SAMS inmate as stipulated by Deft's! (Copies of the letter/lengthy available if needed &/or in discovery)

97—The rest of Deft's argument for 3rd claim is unreal or available for ADX SAMS inmate, without professional attorney However, the claim that "implying damages remedy would have profound impact on Bop operation" page 26 is self confuted; infact it will protect the Bop reputation and deter irresponsible staff, see here above Fotnote 22) & a how officers repeatedly kept breaking and violating the basic code of Bop & SAMS unit operational procedures and falsification of records to cover up and corrupt other non evolved staff. No one has asked for the termination of any lawful establishment but only the abuse of power is making it Unit at home level (TMo illegally) misusing the good faith assumed of them by courts and US citizens. 53

more retaliation                              page 54/

¶98- Furthermore, undisciplined violators officers/official always have Tendency to retaliate and Emboldened, yes, one of the assistants in Claim Three still violates and retaliate from Doff in different ways and share others in his misconduct. See above Ex.16. Att-01 ✗5 (one page from a remedy) where c/o Averett (Deft 13) intimidating Ptff with threat of "really cell shake up" (means damaging property) if he goes for his dental appointment. Other exhausted remedies about him with (Deft.15.) c/o Loewe for another food tray endangering plaintiff Remedy# 1027831-A[23] (Refusing to apply diet notes on the door).
     And that persistant retaliatory violations are the essence of Bivens Claim to deter such mentality.


99 - Deft's [96] IV.27 "Presentation of food fails" claim 5, (SAC 30-31) Argument is confuted by the above point 98 and that also officer involved there in are also have culpable mental state even in other than food endangering ptff issues such as allowing hot water to burn him and again refusing to call nurse or help See for example exhausted Remedy enclosed Ex.17. Att-01 central office avoiding to even Mention 1)Deft-15. Loewe 2) name for his misconduct about hot water burning ptff.
     Respectfully, as a side though important point, this hot water burn Remedy could also assist the court when examining the setting issue of claim Two.
     And another proof of intent of harming ptff and threatening him from reporting in the issued Ticket for using duress button by Deft Loewe[5]

─── Foot Note ───────────
23 = please notice that this food tray misconduct, though exhausted Remedy, but it is not the one on the SAC for Dfts 15 (Loewe) ±16 (Viyano) However, please consider it as persistant retaliatory conduct from The 3 DMs.

54

page 55/

and Deft 16 (Nbrjano) and later the ticket was even approved and enhanced as a DHO disciplinary by Deft 4. Warden True (paper work enclosed in SAC. Respectfully, the above is sufficiently evident for proving culpable mentality to harm the Pltf by all the mentioned by name above. See Ex. 17. Att 2 : Sample of Remedy Ticket & GO7And that Deft's argument is flawed. Also, their statement about Pltf fully vaccinated from Covid is misleading, because these incidents in SAC was during the rage of Covid Sep-20-20 while Pltf had to negotiate everything with his mouth Teeth unvaccinated without any Covid Protective hygiene (event to date) only fully vaccinated recently in May 2021.

And Kitchen Manager Deft 29 Kirchoff persistent refusal to comply is proven by remedy & paper work and timely recording. The danger was and still real as Pltf still have to open commissary & even all the Kitchen small item (Sugar, salt, coffe ...) all by mouth causing damage and sickning Covid still.


101- It also, appears that Deft's argument regarding "Fragment of Something" is okey to be swelled as long as it is only "occasionally" "is not unconstitutional" page 29 . Lacks understanding the difference between :[a] harmful fragments, like here small sharp sugar like fragment, such could Kill or destroy organs, and non harmful ones
         [b] the conditions of the subject of fragment such as able and vision sound # to a disabled and vision impaired, like here
         [C] the subject who already have a warning signs and medical directions to protect him and violated, like here, and another who is not.  Accordingly & Respectfully Deft analogies are flawed and confuted and should be ignored/denied

55

102- Daft. Argument about Claim Five The Bandage Fails as:

[a] Falsification of the record had certainly occurred as discussed and remedy exhibited in Ex-15 ...in dealing with Follows Declarations and attachment [96-6]: WDX nurse Williams himself made the medical note entry and self served himself.

[b] The fully exhausted Remedy provided clearly in the four levels of request & reply indicated to bleeding for clearing the moved to cell 3301 (the more Danger) in order to be able to impeach (stumps were already burned from parking) so the reasons for injury and abrasion develops to wide bleeding cracks is too plausible, and happened.[24] But nurse williams just throw a wide sticker bandage through the door feeding area and when PHP asked him to secure it tight to continue his cell work he refused right under the following & recording medic cameras (should have been kept as asked for by PHP) then PHP showed him the blood on his cloth, the floor and shown once he was dismissive, refused and bullied plaintiff saying "why did you cut/lose your hands"

[C] If the records were genuine their content alleged should have shown at any or all Remedy levels, but they never did. Can only mean, the records were altered more than once and either the remedy investigators responded to the PHP according to the original bi-annual records or they are/became lately after the court claims done what the jo cir warned about Foot Note falsification of medical & nurse after Attack. We have

:= usually PHP can not use any cover to his stump as he needs to mark and wipe them till the time, but in cell move injuries and blood can easily (as happened) damage & reach paperwork, court doc, religious items and a secure tight wrapped white bandage is the only solution in cell move injuries.

[CT] ptf is not discussing injury caused by williams see 57
but, ignored, excoroclated, and used to bully a stressed tired in need of help disabled person. Williams added psychological harm bigger and much lasting than the physical one and are against the law & disability rules of mistreating a disable and retaliatory for "daring to seek the help needed" not just the rude thrown to cell floor bandages

103 → Also, the argument that "no future failure by williams" is uncertain and insufficient as he could come back or ptf go to his place in a move. But the main worry, now after the falsification of records, is that his bad influence continue through his helper to falsify the records, excluding it from remedy, and as now ptf experiencing several & frequent injuries to his feet toe nails and pain & entrapment false records by his colleague such as Dept 18 nurse Hailstone.

104- The deliberate indifference Dept. claim ptf did not alleged (page 33) is infact vividly alleged in lay terms as it is the truely & logically least of the deliberate intended harm and bully alleged. And the intent of harm is in the language used as well as the action "how did you cut your hand" is normal but "why did...." is punitive, cruel and carefully studied and performed.     Conclusion
105-       The respected Court Should allow the
       second amendment to proceed and not subjected to Sum-
mary dismissal.       Respectfully Submitted on July 16, 2021
                       Plaintiff prisoner Mostafa K. Musky

57

List of Exhibits (Ex.   )

pg 59/320 Pages

1. Ex. 1 Attachments: 1, 2, 3, 4 & 5.
   Excerpts from Rule 33 abusers.

2. Ex. 2: Group Prayer Mockery Offer Att: 1 & 2.

3. Ex. 3: A & B Mail Wrongly rejected to sons.

4. Ex. 4: CD phone call record request rejection (son Sam).

5. Ex. 5 (A,B, C D) Denying Legal Contact Pro. J. Noble.

6. Ex. 6: Att: 01, 02, 03 Misleading Eu & UK Courts
   (to secure extradition) & ADX Warden Wiley Declaration.

7. Ex. 7 ° Att 1 & 2: Access to Legal Computers & Legal Books.

8. Ex. 8: Att: 1, 2, 3, 4 & 5 Family Contact,
   Denials, Confusion, Retaliations & Stress.

9. Ex. 9. Att: 1 & 2 Re: BOP & ADX Parenting Conflicts.

10. Ex. 10: UK Consulate Contacts relay then Severed.

11. Ex. 11: Legal Mail Problems

12. Ex. 12: Eye Operation & Reading glasses Deny Delay.

13. Ex. 13: Denying: Imam, Filling & items for Religious.

14. Ex. 14: Denial of Islamic Ceremonial Meals.

15. Ex. 15: 1st Attachments for claim Two & OT Chovasenic       227
    [96] Exhibit responses: Att 01 (picture), Att 2 Sketches, Att 3 letters to Att
    Att 4 OT Deat, Att 5 Dr. Naylor, Att 6 UK Gove, Att 7 BOP & AM, Judge
    Consent, Att 8, Disability, Att 9, Physical harm, Att 10 ADX Admission.

16. Ex. 16: Attachments for Response to Follows 3 exhibit [96 & 8]:       292
    (7 attachments) Att 01 Falsifications Assault, Att 2, AM Illnesses, Att 3
    prison Medic Appric Cost, Att 4    Att 5 Jool Sams Record, Att 6 No
    Is Krin medication, Att 7 Denied prescription & Records.

17. Ex. 17 Att 01 Deft 15, Att 2, Deft 15 & 16 intent, A       315

59

Exhibit One = Ex.01
Attachment 01 (2 pages)

Exh AtL1 2

Page 02 of 32

61

# Table Of Content

19-2520 2nd Cir

page

1 - The Reason And Format
Of this Pro-Se                                        03

2 - Gov't Argued Repeatedly Issues
Never Raised In Deft's Rule 33 Motions
Should Be Disgarded As "MOOT"                          4→9

3 - Gov't Repeatedly Stipulated and provided
untrue Statements opposite to Case Records             5

4 - Gov't Argument Regarding: Intrest of Justice
And Extraordinary Circumstances, Supported
The Relief Sought by Defendant's Arguments             09

5 - Ineffectiveness Of Defense Counsel are:
Many, Irreparable And Documented And likely
to permit the Relief Sought In Rule 33 OR 2255
And A New Fair Trial Likely Acquittal                  13

6 - The Gov't failed to Adress The issues objectivly
And Confused Issues To Both Courts.                    21

7 - Conclusion.                                        23

8 - Exhibits & Certificate of Service                  24-32

Foot note                                         The

EX.1 Att 02 · 1/2

63

8 — The Gov't ignored at both levels of the court the fact and argument that excluding the Deft from April 23, and May 07, 2014 Court Conferences resulted and/or allowed the expert to stray far and wide and long beyond his expertise and that the Gov't admitted that during a Side bar only known by Deft after trial 2 weeks when received transcripts. See Deft Br. App: A 134 ¶¶ 5, 6   And Tr 1342 - 44 and Tr 1404 where the expert was even allowed to link the Deft. close associates in Bosnia to the 911 attack in his missed testimony portion. Tr 3155 - 56

9 — The Argument of how expert witness Kholman destroyed the Deft trial and originated from the preclusion of Deft from attending April 23, 2014 Conference is enclosed in Deft Br. App: A 129 → 139

10 — The Gov't raised irrelevantly the issue of the appropriateness of excluding the Deft from classified conferences. And unbelievably claimed that the Deft "is not clear" about which Conferences he was excluded from!  But even worse and not at all benefit to this court injected a confusing example of what/which Conference(s) it could be! See G.Br [FF] 17,6

11 — The truth and evidence is that Deft specified several times at all levels that the Conferences are not classified ones and they are April 23, 2014 before the Court & Jury or any of Kholman starting

Exh Ht 2, 3/3

page 06 of 32
64

Tr 1057 → Tr. 1072      and even on Pd Br : 29, 30

In confusing the issue the Gov gave example
of the end of Day April 23, 2014 Tr. 1278 which
was after the expert finished his First Direct and
Was a classified and irrelevent to this motion
(please Notice The sequence of Trial Numbering)
However, it appear that the same Trick would
not work for the May 07, 2014 because there
was only One Conference on that day !

12- Thus the Gov. Argument in these issues is futted
distraction. As above and that never at anytime
that the Defendant Knew, or being informed
about these conferences or any of their
Content. as the Gov't stipulated in G. Br [72] 17

13 - In Fact as soon as Deft read the Transcript he
Wrote This application of Rule 33 ; 22 pages
see 372 R ECF. 372 which contained also the
Exhibit II
request to Change Counsel. And was
Construed by Hon Madam Judge Forrest
for both requests. And based on it were
the two extensions of time granted by both
Honourable Madam Judges Forrest And Torres
please See DOC 372 and at the end titled "Bombshell"

14 The Gov't never objected at any Time of these
rules and thus all repeated claim in G. Br Regarding The
14 Days should be waived irrelevent.

6

page 07-07-32

65

Ex. 1  Am 2 . 3/3

15. In fact, when the Deft raised the issues about the preclusion from April 23 & May 7 conferences and the unseparated witness expert Kholmann test-imony and to his appeal attorneys and they did not raise them in the main appeal or oral argu-ment, Deft Mostafa included his present attorneys in his application for inefficient Counsel 2255 extencion of time (Till the Conclusion of this Rule 33 litigation). And they honourably took no offence on that, and made the application themselves and was Granted.

16- Accordingly the Gov't Claim & Arguments about the Deft' never Complaint about these issues or they are repeated and/or denied before are both futed and untrue. And that inefficient Counsel occured in both levels regarding the above mentioned matters.

Bad Faith Exclusion ? :

17- Also, the Defendant letters to the honourable Judge Forrest raising many of the issues that took place during the two conferences and Seeking to Fact find them long before the Conferences took place, could alert this respected court to the plausible bad faith behind the Deft's, exclusion.

please See Dft' Br. Appx A.173 (Exhibit 02) and A186 (Exhibit 05)

April 16, 2014

Page 04 of 32
67

Ex.1  Alt.3  ½

20- And as an example of techced plain error only and newly discovered by the deft after trial is the plain Error (as identified / construed) By Supreme Court and compatible with its many ruling of this respected Circuit, is the undetermined unseperated by segment protective Juys instruction to Jury as explaind briefly above in §§ 7, 8 and 9 and how it is an extra ordinary issue and error, as it was never found or argued during the trial or in this circut. And its necessity to be identified as Juge Plain Error for the integrity of this Court' Established rulings and the Supreme Court It has become : Extra ordinary And Interest of Justice

21 - And as an example of expert straying far, long and widely beyond his expertise as admitted by prosecuter Mr. McGinley Esq during side bar is the testimony about Bosnia as above § 8. And Also about 1 the 2 life sentencings for Count 1 & 2 Yemen conspiracy his "Doubl rank hearsay as Mr. McGinly Esq. Also, admitted that the expert source for his testimony is the other prisoner, Govt cooperating Terrorest, Book during the secret Conference April 23, 2014 as above Both of these straying testimony responsibilitys Lye between the (two) Judge, Mr. McGinley Esq and The Defendant's attorney especially when the witness never produced or challenged to produce single shred of evidce

9

Page 11 of 52

EX.1 Att 3. 2/3

May 07, 2014 conference exclusion   68

25- Especially, When the Transcripts of the Trial which the Defendant recieved for the first time two weeks after trial in a CD, revealed that the Gov't lied to the Trial Judge about the nature and Content and even the existance (at the begining) of the Security MI5 U.K Reports which led her to exclude them. And no one including Defence Counsel ever Mentioned The bigger more Comperhensive report by Scotland-Yard (9. pages) to U.K Home security "operation Yemen Advice" Concluding after : Fieldwork 1999 Dept house searches, arrest and interogation 5 days that "no enough evidence to charge" See ECF Docket 549 Exhibit 08) Which According to this Respected Circuit ruling deprivation of Documents see Deft Br.App A140 → #147.

26- Accordingly, The Deft. Respectfuly states that the Court argument regarding issues of MI5 and Law Enforcement were argued the During trial and appeal is baseless because, as above, what was argued in reality was the result of Misinformed Judge and inviolation of Brady and this Circuit Ruling as above and even Supreme Court There in Gov't argued this point avoiding the main issues and facts and rules see G.Br [72] 16. Clearly Gov't delibratly Created an interest of Justice Complicated point.

11

EX.1 Att3 3/3

32- Also, the "Mi5" & "Operation Yemen Advise" during 1997 to september 2000 clearly indicated that the Deft had his own organization "Supporters of Sharriah" and non of its mentor or Member ever linked to Al Qaedere.

And that these important relevent to trial report were Confrontational and the Yemen operation exclusively introgetory with imprisoning, searching ... and non at all "a good" act as Govt misinformed Counts.

And as discussed in Rule 33 "if they are mixed the 'its matter of Jury" the same Juge Forrest said as the many citations & Rule and as they are reports from and to officals they are Subject to Brady as this Circuit Ruled See Deft Br. Appx A|140 → A147. for citations and anology

33- Also, The violations of excluding the Deft from May 7, 2014 which addressed mainly Yemen issues and the misinforming to the judge about the reports explained and could even have been easily construed at District level, that the concealment of these report from the Judge (partially) and Jury (totally) has destroyed and deprived the Deft main line of Defense and substantial amount of Other infor mation/Discovery therein regarding Counts 1 & 2 Yemen resulted to two life sentences in the Trial & Appeal too See Gilmore anology. Respectfully, the Concealment of the report is the issue. (even if the judge allowed them redacted would have mitigated the violations). However as explained they are: Relevent and easily construed to satisfy the four components to grant new trial XX

Ex't - AttA ½

This respected Circuit should notice, know anway be even challenged prosecutors about any effort, logging documentation, records us law inforcement done about the 1998 Yemen Kidnapping timely. The answer is zero the US Gov't has nothing to show for it. Never even when Deft was arrested, integrated then released without Charge 1999 there was no US monitoring or objection; no "interest" of justice whatso ever.

37- But when the Deft tried tirelessly to stop/slow the pace of Wars & Iraq invasion and repeatedly asked for inside investigation first about the Collaps of the towers of 911 and disapperance of all planes black boxes ... etc both sides of the "war hungry" of the Atlantic Signed the extradition treaty (no primae facea) And the US Gov't will use the "yemen report advice" and UK Documents, use it selectively and deprived the Deft witnesses, Documents and imposed SAMs, using Deft disability & memory impairment ... etc to secure the Conviction occured!

But a fair New Trial allowing the necessary documents, witness (if trial started) will likely to result the dropping of the charges of yemen and/or Acquittal. even without the Deft need to take the stand to compensate for ineffeciency or Gov't experts Straying & showing "Queda" all over the place!

SLs                  EX·1 At·05 1/3
                      — ABASSI charges —

43. Adding to that, Regarding Counts 7-10, this circuit reversed Counts 7 & 8 single handed (no initial help of Deft attorney) Where the main third witness was again the Threatend (Ujaama), The Defendant was not allowed at any time to produce document to prove that the Main subject/Core of the Charges Abbassi was: 4 Yrs in US Custody, released Without any charges or restrictions and Compensated $100K.

Deft. was not allowed ~~to~~ or helped by his attorneys during Trial or appeal to show the Courts the declaration Statement, Signed at attorney office in London, proves Ujaama's Lies and the pressure on him by US prosecutors in Cuba Guntanamo to entrap the Deft Mostafa if he Wanted to be released.

44- Deft attorney & Gov't had these statement years before trial. and again received another copies for the entire UK-EU. files and the folder Abbasi & Ujaama When UK Defendant's attorney visited him and his trial attorneys Shortly after Deft's extradition 2012.

And Despite Deft's attorney's Trial Travel to London They never offered Abbassi a Tele-link to Court to testify and left the Deft. Without any witness, expert, Document or meaningful Support his defense. Mr. Abbassi is free and active in internet in London.

45- Respectfully, The Deft. implores this Circuit to see the extraordinary Limitations (many against 2nd Cir citations) And the likely of Case dismissed or Aquittal in New Trial.
                                                                    80

Page 21 of 32   74

Ex.1 Apt 5  3/3

## Inefficient Counsel

46 - As above the prosecutors had benefitted great deal from trial defence attorney, to the extent that (adding to the above and many more to show in a 2255, if any) Many points raised in the direct appeal, to this circuit, about Gov't unfair to deft. issues, appeared in trial, Gov't had no answer but "The Defense did not object."

And respectfully, that speak for itself the interest of Justice!

## In SUM :

47 - The Gov't Agrument about "untimely" & "limitation to new evidence" is Moot and incorrect. See attached Exhibit 11 (6 pages and the order of Docketed 372) sent Timely & Dated May 26, 2014 and ruled on June 06, 2014 [Contioned as Construed as timely & opened for all relevent issues] and extended Twice without any Objection from The Gov't.

48 - Gov't narrowed the Term New evidence without allowing for the eccessive suffocation imposed by its S.A.Ms & his inability to obtain or even print for the Court own Material denied to him by Gov't or imposed ineffective counsel. And thus trying to use the Syntax of Rules against its essence.

Foot note

1  It is also, note worthy that its now a well established fact that the Leaders of "Kalden Camps", ABU ZUBIDA & ALIBI, where Abbasi Alledgally went to, Never been related to Al-Qaeda or followed Ben Laden to Sudan; This fact known & Documented before Deft trial. ~21

Exl A#5  3/3

49- Gov't avoided the central issues and injected un-argued ones by the Dept's at both levels. And Also, distracting incorrect Statements and irrelevant Confusing examples.

50- The content and all arguments at this respectful 2nd circuit revealed some issues of "extraordinary nature" and points of "interest to Justice" reaches beyond this motion. And no one had raised its bar to that but the Government itself, as explained before.

51- To the extent that this respected circuit now, could be the last hope for "gate keeper", not only for this case/motion but also, and more importantly, for the Supreme Court as well as its own, rules and citations at least regarding Experts testimonies, discipline & Conduct. And Brady and existing reports & Documents admissibility. The respected 2nd circuit reaffirming the existing established rules will prevent a Confusing precedent in courts and Prosecuter's Conduct in the future. And by allowing the Deft a New Trial.

52- Also, Two of The Gov't witnesses have Contacted Deft's attorney Mr. Bachrach Esq. Regarding important information favourable to Deft that They give to the Gov't but the Gov't refused to use/or provide it for trial (as Mr. Bachrach Wrote to (Hon) Judge Torres to extend the time to file 2255 which will be huge, if needed)

22

76

EX. 2    Att. 1    (2 identical pages)

Plus one page Time Table
for 5 daily prayers

Acknowledgement of SAM
Modification of
Group Prayer.

**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
☒ *Administrative Maximum Security Institution*
☐ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

---

Office of the Warden                    Florence, CO 81226

March 18, 2021

NOTICE TO: KAMEL MOSTAFA MOSTAFA, REG. NO. 67495-054

FROM:        B. True, Complex Warden

SUBJECT:   **Notification of Modification of Special Administrative Measures (SAM)**

Pursuant to the authority of the Attorney General, as set forth in Provision 1(b) of the original SAM, a modification of your SAM has been made. Following consultation with Office of the Deputy Attorney General for the Criminal Division, the Office of Enforcement Operations (OEO) hereby modifies all currently authorized SAM as follows:

1.     In Section 5 ("Religious Visitation"), a subsection "a.," which prohibits group prayer with other inmates, is deleted.

2.     Section 5 is now reflected in the SAM as:

5)     <u>**Religious Visitation**</u> – If a USMS/BOP/DF- or ATF-approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

Should it be necessary to impose a prohibition on group prayer for a particular SAM inmate, a specification request to modify that inmate's SAM to include such a prohibition must to submitted to OEO, with justification, for review and approval by the Criminal Division.

All other SAM provisions for you will continue in full force and effect for the remainder of the current authorization period of one year, subject to further direction.

Received: April 28, 2021

Kamel Mostafa Mostafa
Reg. No. 67495-054

**"Sensitive But Unclassified"**

*Ex. 2 Att 52 pages ii*

*81*

Florence, United States

**⚲ Monthly Prayer Times in Florence**

Print 🖶

May 2021

Ramadan 1442 - Shawwal 1442

*Handwritten annotations across columns: "Start", "End Dawn prayer", "NO prayer? between fajr 6:12 AM Noon", "START Noon Prayer", "End Asr prayer", "NO PRAYER DURING REC (May 13-31?)"*

| May | Ramadan | Day | Fajr | Sunrise | Dhuhr | Asr | Maghrib | Isha |
|---|---|---|---|---|---|---|---|---|
| 01 | 19 | Sat | 04:41 AM | 06:03 AM | 12:58 PM | 04:47 PM | 07:53 PM | 09:14 PM |
| 02 | 20 | Sun | 04:40 AM | 06:01 AM | 12:58 PM | 04:47 PM | 07:54 PM | 09:16 PM |
| 03 | 21 | Mon | 04:38 AM | 06:00 AM | 12:58 PM | 04:47 PM | 07:55 PM | 09:17 PM |
| 04 | 22 | Tue | 04:37 AM | 05:59 AM | 12:58 PM | 04:47 PM | 07:56 PM | 09:18 PM |
| 05 | 23 | Wed | 04:36 AM | 05:58 AM | 12:57 PM | 04:47 PM | 07:56 PM | 09:19 PM |
| 06 | 24 | Thu | 04:34 AM | 05:57 AM | 12:57 PM | 04:48 PM | 07:57 PM | 09:21 PM |
| 07 | 25 | Fri | 04:33 AM | 05:56 AM | 12:57 PM | 04:48 PM | 07:58 PM | 09:22 PM |
| 08 | 26 | Sat | 04:31 AM | 05:55 AM | 12:57 PM | 04:48 PM | 07:59 PM | 09:23 PM |
| 09 | 27 | Sun | 04:30 AM | 05:54 AM | 12:57 PM | 04:48 PM | 08:00 PM | 09:24 PM |
| 10 | 28 | Mon | 04:30 AM | 05:54 AM | 12:57 PM | 04:48 PM | 08:00 PM | 09:24 PM |
| 11 | 29 | Tue | 04:28 AM | 05:52 AM | 12:57 PM | 04:49 PM | 08:02 PM | 09:27 PM |
| 12 | 30 | Wed | 04:26 AM | 05:51 AM | 12:57 PM | 04:49 PM | 08:03 PM | 09:28 PM |
| **May** | **Shawwal** | **Day** | | | | | | |
| 13 | 1 | Thu | 04:25 AM | 05:50 AM | 12:57 PM | 04:49 PM | 08:04 PM | 09:29 PM |
| 14 | 2 | Fri | 04:24 AM | 05:49 AM | 12:57 PM | 04:49 PM | 08:05 PM | 09:30 PM |
| 15 | 3 | Sat | 04:23 AM | 05:48 AM | 12:57 PM | 04:49 PM | 08:06 PM | 09:32 PM |
| 16 | 4 | Sun | 04:22 AM | 05:48 AM | 12:57 PM | 04:50 PM | 08:06 PM | 09:33 PM |
| 17 | 5 | Mon | 04:20 AM | 05:47 AM | 12:57 PM | 04:50 PM | 08:07 PM | 09:34 PM |
| 18 | 6 | Tue | 04:19 AM | 05:46 AM | 12:57 PM | 04:50 PM | 08:08 PM | 09:35 PM |
| 19 | 7 | Wed | 04:18 AM | 05:45 AM | 12:57 PM | 04:50 PM | 08:09 PM | 09:36 PM |
| 20 | 8 | Thu | 04:17 AM | 05:44 AM | 12:57 PM | 04:50 PM | 08:10 PM | 09:38 PM |
| 21 | 9 | Fri | 04:16 AM | 05:44 AM | 12:57 PM | 04:51 PM | 08:11 PM | 09:39 PM |
| 22 | 10 | Sat | 04:15 AM | 05:43 AM | 12:58 PM | 04:51 PM | 08:12 PM | 09:40 PM |
| 23 | 11 | Sun | 04:14 AM | 05:42 AM | 12:58 PM | 04:51 PM | 08:12 PM | 09:41 PM |
| 24 | 12 | Mon | 04:13 AM | 05:42 AM | 12:58 PM | 04:51 PM | 08:13 PM | 09:42 PM |
| 25 | 13 | Tue | 04:13 AM | 05:42 AM | 12:58 PM | 04:51 PM | 08:13 PM | 09:42 PM |
| 26 | 14 | Wed | 04:12 AM | 05:41 AM | 12:58 PM | 04:52 PM | 08:15 PM | 09:44 PM |
| 27 | 15 | Thu | 04:11 AM | 05:40 AM | 12:58 PM | 04:52 PM | 08:15 PM | 09:45 PM |
| 28 | 16 | Fri | 04:10 AM | 05:40 AM | 12:58 PM | 04:52 PM | 08:16 PM | 09:46 PM |
| 29 | 17 | Sat | 04:09 AM | 05:39 AM | 12:58 PM | 04:52 PM | 08:17 PM | 09:47 PM |
| 30 | 18 | Sun | 04:09 AM | 05:39 AM | 12:58 PM | 04:53 PM | 08:18 PM | 09:48 PM |
| 31 | 19 | Mon | 04:08 AM | 05:38 AM | 12:59 PM | 04:53 PM | 08:18 PM | 09:49 PM |

83

Ex 3. A & B        2 pages

Rejecting SONs Mail
        Before  SAM

85

**Administrative Remedy Number 877975-A1**
**Part B - Response**

EX.3. B

This is in response to your Central Office Administrative Remedy Appeal where you claim mail to your two sons was improperly rejected and your Special Administrative Measures.

As you are aware, you are currently subject to a SAMs pursuant to 28 C.F.R. § 501.3 and have been advised that Bureau of Prisons (BOP) staff neither impose nor rescind SAM restrictions, but inform you of the SAM requirements and ensure the measures are followed.  Staff can facilitate specific requests relating to the restrictions and to that effect, BOP staff will consult with other entities when appropriate, in an attempt to resolve or accommodate such concerns.

A review of this matter reveals the Warden adequately addressed the issues raised in your appeal and we concur with the response provided. As you were informed the correspondence was improperly rejected.  We note since filing your appeal your SAM was has been modified on September 19, 2016 and renewed on December 22, 2016 to include prohibiting you from communicating with your two sons.

In regards to your SAMs being abused, you did not specifically address this issue during your lower level appeals; therefore we will not address it as part of this remedy.  If you continue to have issues concerning SAMs abuse, you will need to file a separate appeal, starting at the local level.  We find no further relief is warranted

Based on the foregoing, this response is provided for informational purposes.

3|8|17
_____
Date

Fairly  Exhausted

(\(
_____
Ian Connors, Administrator
National Inmate Appeals

**RESPONSE TO INMATE REQUEST TO STAFF MEMBER**

*EX. 04*

**Name:   Mostafa Kamel Mostafa**

**Register Number:   67495-054**                    **Unit:   H (ADX)**

This is in response to your request to staff in which you request a copy of a phone call you had with your son.   You assert that you were previously provided such material at MCC New York.

A review of the issue has been conducted.   The review revealed that I am unable to provide a copy of the phone call to you.   You must submit a request to the Bureau of Prisons' Freedom of Information Act (FOIA) Office.   Unless subject to a court order or court-ordered discovery, the FOIA office is the only entity authorized to release such material.   I requested that the recording of the call be copied and maintained.

I trust this addresses your concerns.

I. Guy, Attorney

August 30, 2019
Date

U.S. DEPART~~MENT OF JUST~~ICE     **REQUEST FOR ADMINISTRATIVE REMEDY**
Federal Bureau o~~f Prisons~~

Reg Important Legal Contacts     ( violated disability rights)

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Mostafa, K. Mostafa     67495-054     H03     ADX Florence Colorado
     LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

Part A– INMATE REQUEST In the enclosed BP-8 I had applied to contact a legal firm and gave one of the employer who is already cleared by and acting as S.A.M attorney's, prof. J. Stopel. And that I had applies and followed my request repeatedly since Jan 2016 but keep told to wait until "approved". Now, you have given me the same delaying unjustified answer, you said you had made contact with the attorney and the firm (Center for Constitutional Rights) and will provide it "when it is approved".
3. Any modification a.Z? when it is approved".
Could you please kindly provide me of a numbers of your attempt to contact the firm and/or the S.A.M authorities since my first request in Jan 2016 or the result of each attempt. Please note my appeal date is very close and had already been extended once but none of the purposes of its extention has been met by ADX authorities! I had, and still suffered of serious, ineffective attorney, legal representation and nearly all my Disabilities
8/30/16 rights are violated, this firm can ans are dealing with
     DATE     both in respects of my grievances an     SIGNATURE OF REQUESTER     free easy up

Part B– RESPONSE

↳ Disability rights are violated **RECEIVED**

Ex. 05A

**SEP 08 2016**

**ADX AW Office**

~~DATE~~

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE     CASE NUMBER: 875413-F1

Part C– RECEIPT     CASE NUMBER: _____

Return to: _____
     LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

     DATE     ✦     RECIPIENT'S SIGNATURE (STAFF MEMBER)

~~USP LVN~~     ~~BP-229(13)~~

*Ex·05B*                    *Page 80 [crossed out]*        *90/357*

**BP-229 RESPONSE**

**Case Number: 875413-F1**

Your Request for Administrative Remedy dated August 30, 2016, and received in this office on September 8, 2016, has been reviewed. You state you submitted a request for modification of your Special Administrative Measures (SAM), to contact attorney, Jules Lobel. You state your appeal date is close and you need to contact this attorney.

A review of the issues raised in your Request for Administrative Remedy has been conducted. The terms and conditions of your SAM specifically outline the individuals with whom you are permitted to communicate, as well as the procedure for requesting additional contacts. Under the SAM, requests for additional contacts are submitted to the agencies responsible for oversight of the SAM. Your request to communicate with this individual for purposes of requesting representation has been forwarded to the appropriate agencies for review and consideration. You will be notified of the decision once the Federal Bureau of Prisons is notified by the appropriate agencies of the outcome of your request. With regard to your statement concerning a pending appeal, investigation reveals there are three attorneys of record for you in that matter.

Accordingly, this response to your Request for Administrative Remedy is for informational purposes only. In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response by submitting a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas 66101-2492.

_____          _____9/19/16_____
Jack Fox, Warden                          Date

*1st & 2nd level*
*Disabilities issues raised in BP9 ignored.*

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**

Ex. 5 C

Page 91

**Regional Administrative Remedy Appeal**
**Part B - Response**

**Administrative Remedy Number:** 875413-R1

This is in response to your Regional Administrative Remedy Appeal received in this office on September 26, 2016, in which you allege staff misconduct.   Specifically, you state you submitted a request for modification of your Special Administrative Measures (SAMs) to allow you to contact attorney Jules Lobel.   You state your appeal date is close and you need to contact this attorney.

A review of the information presented in your Regional Administrative Remedy Appeal and the Warden's response dated September 19, 2016, has been completed.   A review of the current SAMs and modification details the terms and conditions of your SAM are specifically outlined.   It describes the individuals with whom you are permitted to communicate, as well as the procedure for requesting additional contacts.   Under the SAM, requests for additional contacts are submitted to the agency responsible for oversight of the SAM.   Your request to communicate with this individual for purposes of seeking representation has been forwarded to the appropriate agencies for review and consideration.   You will be informed of the decision once the Federal Bureau of Prisons is notified by the appropriate agencies of the outcome of your request.   With regard to your statement concerning a pending appeal, a review reveals there are three attorneys of record for you in that matter.

Based on the above information, this response to your Regional Administrative Remedy Appeal is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534.   Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

10-17-16
_____
Date

_____
Sara M. Revell, Regional Director

(3rd level)

Disabilities issue ignored in the arguments

**Administrative Remedy Number 875413-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal where you request to have your Special Administrative Measures
(SAM) modified to allow you to have contact with a specific attorney.
You imply your right to defend yourself is being hindered by your
SAM restrictions.  You seek a fair solution to this matter.

As you are aware, you are currently subject to a SAMs pursuant to
28 C.F.R. § 501.3 and have been advised that Bureau of Prisons (BOP)
staff neither impose nor rescind SAM restrictions, but inform you
of the SAM requirements and ensure the measures are followed.  Staff
can facilitate specific requests relating to the restrictions and
to that effect, BOP staff will consult with other entities when
appropriate, in an attempt to resolve or accommodate such concerns.

As indicated by the Warden and Regional Director, your request for
SAM modification was forwarded to the appropriate agency for review
and consideration.  It appears further information maybe needed
regarding this request and you should follow-up with your Unit Team
to receive an update on this specific request.  However, you
currently have three attorneys on record that you are approved to
communicate with in regards to your pending legal matters.  We
encourage you to continue working with staff at ADX Florence to
accommodate any of your needs in the future and address any further
concerns you may have.

This response is for informational purposes only.


_____                    _____
Date                                         Ian Connors, Administrator
                                             National Inmate Appeals

93

Ex. 6   Att 1, 2 & 3

Misleading Extradition

Courts: UK & EU

EX: 06  ATT. 01  #36                    94

<u>IN THE CITY OF WESTMINSTER MAGISTRATES' COURT</u>
BETWEEN:

GOVERNMENT OF THE UNITED STATES OF AMERICA

<u>Requesting State</u>

v

JULIAN ASSANGE

<u>Defendant</u>

DEFENSE BUNDLE
LINDSAY A. LEWIS STATEMENT AND EXHIBITS

| TAB | TITLE | DATE |
|---|---|---|
|  | Statement of Lindsay A. Lewis |  |
|  | **Exhibits to Statement of Lindsay A. Lewis** |  |
| 1 | *Curriculum Vitae* of Lindsay A. Lewis | July 17, 2020 |
| 2 | Complaint in *Mostafa v. Barr*, 1:20 Cv. 694 (PAB) (NYW), Docket # 1 | March 12, 2020 |
| 3 | Amended Complaint in *Mostafa v. Barr*, 1:20 Cv. 694 (PAB) (NYW), Docket # 9 | May 18, 2020 |
| 4 | Judgment of Justice Sullivan of the High Court in *Mustafa Kamel Mustafa v. United States*, [2008] EHWC 1357 | June 20, 2008 |
| 5 | Order of Senior District Judge Tim Workman, in *United States of America v. Abu Hamza,* in the City of Westminster Magistrate's Court | November 15, 2007 |
| 6 | Sworn statement by ADX Florence Warden R. Wiley | October 3, 2007 |
| 7 | Decision of the European Court of Human Rights in *Babar Ahmad and Others v. the United Kingdom* | September 24, 2012 |
| 8 | Submission by the Foreign and Commonwealth Office of the United Kingdom on behalf of the U.S. in *Mustafa v. United Kingdom* | November 13, 2008 |
| 9 | Judgment of Justice Ouseley of the High Court in *Abu Hamza and Others v. SOS for the Home Department*, [2012] EWHC 2735 (Admin) | May 10, 2012 |


( I )

Ex 6· Att· 01   II/36

95

| 10 | Letter from Jeffrey D. Allen, M.D., the Chief of Health Programs for the BoP and Dominique Raia, Senior Counsel to the BOP, to Assistant United States Attorney Edward Kim | January 2, 2015 |
|----|---|---|
| 11 | Sentencing Hearing Transcript in *United States v. Mostafa*, Case No. 04 Cr. 346 (KBF), Docket # 474 | January 9, 2015 |
| 12 | Judgment in the criminal case *United States v. Mostafa*, Case No. 04 Cr. 356 (KBF), Docket # 463 | January 12, 2015 |
| 13 | Letter from Lindsay A. Lewis, Esq., to the Honorable Katherine B. Forrest of the U. S. District Court, Southern District of New York | October 7, 2015 |
| 14 | Government Response to the October 7, 2015, letter from Lindsay A. Lewis, Esq., to the Honorable Katherine B. Forrest of the U. S. District Court, Southern District of New York, with Court Order | October 14, 2015 |
| 15 | Letter from Lindsay A. Lewis, Esq., to the Honorable Katherine B. Forrest of the U. S. District Court, Southern District of New York | January 14, 2012 |
| 16 | Letter from Lindsay A. Lewis, Esq., to the Honorable Katherine B. Forrest of the U. S. District Court, Southern District of New York | March 7, 2013 |
| 17 | Center for Constitutional Rights and Allard K. Lowenstein International Human Rights Clinic at Yale Law School, "The Darkest Corner," September 2017 | September 2017 |





*Ex.06 · Att.01*

**IN THE WESTMINSTER MAGISTRATES' COURT**

**BETWEEN:**

**THE GOVERNMENT OF THE UNITED STATES OF AMERICA**

-v-

**JULIAN PAUL ASSANGE**

---

**AFFIDAVIT OF LINDSAY A. LEWIS**

---

I, LINDSAY A. LEWIS, hereby declare under penalty of perjury the following:

1.      I am an attorney licensed to practice law in New York State, and admitted to practice in a number of United States federal District Courts, Circuit Courts of Appeals, and the United States Supreme Court.  I have been practicing criminal defense law continuously since my admission to the Bar, in 2008, and my practice has always been concentrated in that field.  In addition, I have represented Mostafa Kamel Mostafa, an individual extradited to the U.S. from the United Kingdom --  who was tried and convicted in the U.S., and who has been housed since his extradition under Special Administrative Measures ("SAMs") and in solitary confinement, both at the Metropolitan Correctional Center in New York City, and for the last five years at the administrative maximum security facility (hereinafter "ADX") Florence -- by Criminal Justice Act appointment since October 2012, and as counsel specifically assigned to address Mr. Mostafa's prison and medical issues since February 5, 2015.  I was further appointed by the District Court for the Southern District of New York, January 14, 2020, to represent Mr. Mostafa in regard to any litigation pursuant to 28 U.S.C. §2241, challenging his conditions of confinement.  I make this Statement in the context of the above-captioned extradition case.

2.      This Statement is submitted in recognition of and compliance with United Kingdom Criminal Procedure Rules 33.2 and 33.3. I understand my duty to the Court under



those Rules, and am in compliance (as is this report) with them, and will continue such compliance.

## I. Professional Credentials

3.      I practice criminal defense law in the state and federal courts, primarily in New York, but also involving cases in other jurisdictions.  Throughout my career, my practice has included a wide range of matters, including terrorism, "white collar," "organized crime," drugs, sex offenses, cyber law, and capital eligible cases.  I have served on the Board of Directors of the National Association of Criminal Defense Lawyers since 2016, and am currently in my second consecutive term on that Board.  I also serve on the Board of Directors of the New York State Association of Criminal Defense Lawyers.  In addition to my Board positions, I am Co-Chair of Women in Criminal Defense Committee for both the National and New York State Associations of Criminal Defense Lawyers, a Co-Chair for the National Association of Criminal Defense Lawyers's *Amicus Curiae* Committee, and the Northeast Regional Delegate for the National Association of Criminal Defense Lawyers.

4.      I am also an active member of the Federal Bar Council's Sentencing and Alternatives to Incarceration Committee, and have been a Program Coordinator for that committee on panels with topics including the First Step Act and President Barack Obama's Clemency Initiative.  I have appeared as a speaker and panelist at legal, academic and other conferences, and I most recently spoke on the topic of the experiences of women in the U.S. prison system.

5.      I am a 2003 graduate of Vassar College and a 2007 graduate of the Benjamin N. Cardozo School of Law.  My complete credentials are listed in my *Curriculum Vitae*, a copy of which is attached hereto as Exhibit 1.

## II. Relevant Professional Experience

6.      In the course of my career, I have been involved as defense counsel, either at the trial or appellate level, and also as a consultant, in a significant number of other cases in various federal courts across the U.S.  I have also drafted or collaborated in the drafting of numerous expert reports and/or acted in a consulting capacity (on matters of U.S. federal criminal law) for

3/36

cases in the U.K. and Canada, and have represented individuals who have been extradited to the U.S. from other countries, including the U.K.

7.     I have visited clients at each of the federal detention facilities in New York, including the Metropolitan Correctional Center in Manhattan ("MCC"), on countless occasions over the last twelve years, beginning in the summer of 2008.  I have seen clients in not only the standard areas for legal visiting and segregated housing units, but also on 10-South, the most restrictive housing unit at MCC, designed to house inmates of the highest security level in solitary confinement, and also the unit in which Mr. Mostafa was housed for the duration of his pre-trial and trial confinement in the U.S.  I have been present in these facilities during lockdowns and have been exposed to the gas sprayed in inmate units to subdue inmates during an incident, and the effects thereof.

8.     I have also visited inmates at numerous other New York State jails and prisons, in New York City and other parts of the state, and, in the fall of 2019, I visited HM Wandsworth Prison in London.

### III. Legal Representation of Mostafa Kamel Mostafa

9.     As noted previously, I have represented Mr. Mostafa since his extradition to the U.S. in October 2012, both as defense counsel in preparation for and during his criminal trial in the Southern District of New York, *United States v. Mostafa Kamel Mostafa*, Docket No. 04 Cr. 356 (KBF), for terrorism-related offenses, and as counsel specifically appointed to address and litigate Mr. Mostafa's prison and medical needs.  Most recently, in January of this year, I was appointed by the District Court for the Southern District of New York to represent Mr. Mostafa in regard to litigation pursuant to 28 U.S.C. §2241, challenging his conditions of confinement, as well.

10.     In my capacity as Mr. Mostafa's counsel, I visited him countless times during his pre-trial incarceration at the MCC in Manhattan, from late 2012 until early 2015.  I am therefore familiar not only with the issues he faced during his pre-trial incarceration, but also with the conditions of his confinement therein.  I am also familiar with the terms of the SAMs that were imposed on Mr. Mostafa, January 3, 2013, just after his extradition, and which have remained in place since, and I have been subject to the restrictions the SAMs impose, which dictate many aspects of my legal representation of Mr. Mostafa.

*4/36*

11.     Following Mr. Mostafa's conviction, I no longer represented him in regard to his criminal case or subsequent appeals, but I have continued to represent him throughout sentencing, the Federal Bureau of Prisons (hereinafter "BoP") designation process, and since his ultimate designation to ADX Florence -- the administrative maximum facility, in Florence, Colorado -- in regard to any prison and medical issues, and therefore conditions of confinement issues that have arisen.  In light of the fact that Mr. Mostafa is severely disabled – he is a double-upper-arm amputee, blind in one eye, and suffers from diabetes, hypertension, and a skin condition, hyperhidrosis -- these issues have been many and designated counsel to represent Mr. Mostafa with regard to these issues has been necessary.  Counsel to address Mr. Mostafa's prison issues has also been necessary given that Mr. Mostafa has been housed throughout his time in U.S. custody in the most restrictive prison conditions possible.  Not only has he been subject to SAMs, which as discussed **post**, limit his contacts not just with the outside world, but also with his family, other inmates and even his attorneys, but he has also continuously been held in solitary confinement.  The conditions of his confinement, in conjunction with his medical needs, have led to many issues regarding the accommodations he has been provided, and the lack thereof, and the level of care he has received.

12.     Because Mr. Mostafa is being held pursuant to SAMs, my ability to discuss the issues he has encountered, conditions of his confinement and other matters related to his incarceration, that are relevant to Mr. Assange, is limited to what is in the public record and/or has *not* been conveyed to me directly by my client through legal mail or other communications.  This impedes my ability to discuss his case in contexts such as this one, where the information I would otherwise disclose does not relate to national security or safety of the public or the ultimate purpose of the SAMs, but is relevant to another pending matter, and could be of use to the court in deciding that matter.  It also prevents me from pursuing my client's interests to the fullest extent possible, because I must always be careful not to disclose any piece of information I am not permitted to. Given the consequences, I routinely err on the side extreme caution.  Nonetheless, my direct knowledge of Mr. Mostafa's case, the circumstances of his incarceration in the U.S., and experience litigating on his behalf, is relevant to Mr. Assange's case, in particular in regard to the assertions the U.S. government has made in the context of his extradition.

### IV. Description of Materials Reviewed

5/36

13.     In preparing this Affirmation, I have reviewed materials provided to me by Mr. Assange's solicitors in the United Kingdom.  Those materials included the Superseding Indictment in Mr. Assange's case in the District Court for the Eastern District of Virginia, the various declarations of Assistant United States Attorney Gordon D. Kromberg, Affidavits of Joel Sickler, and the Affidavit of Kellen Dwyer.  I have also reviewed relevant statutes, regulations, and research materials (including case law) related to the issues discussed in this Statement, as well as the docket in Mr. Mostafa's case and related case materials.  I also rely on my more than twelve years of experience practicing criminal defense law in the U.S. federal courts, during more then eight of which I have also represented Mr. Mostafa.

## V. Relevant Issues

14.     This Statement addresses a number of aspects of my representation of Mr. Mostafa that are relevant to Mr. Assange's case, and in particular to the assertions the U.S. government has made in the context of his extradition, including:

(1)     the procedural history of Mr. Mostafa's case, both prior to and post extradition, and the assurances and representations that were made by the U.S. government to the English Courts and European Court of Human Rights during the extradition process;

(2)     the medical assessment and designation process Mr. Mostafa was subjected to following his U.S. conviction and sentencing, and prior to his ultimate designation to ADX Florence, to serve the life sentence imposed;

(3)     Mr. Mostafa's conditions of confinement pretrial and at ADX Florence, including his continuous incarceration throughout his time in U.S. custody, in solitary confinement;

(4)     Mr. Mostafa's detention pursuant to SAMs and the hardships he has suffered a result of that regime;

(5)     the quality of the medical treatment Mr. Mostafa has received while incarcerated at ADX Florence, and within the BoP;

6/36

(6)     Mr. Mostafa's experience with the BoP administrative remedy process, in particular in relation to his ability to challenge the conditions of his confinement; and,

(7)     Mr. Mostafa's efforts to challenge the conditions of his confinement in the U.S. courts.

A.     ***Procedural History and Circumstances of Mr. Mostafa's United States Criminal Case***

15.     Mr. Mostafa is currently serving a life sentence in U.S. BoP custody, following his October 5, 2012, extradition, from the United Kingdom to the U.S. to stand trial on a series of terrorism-related charges in the Southern District of New York, and subsequent May 19, 2014, conviction of those crimes.

16.     From the time of Mr. Mostafa's extradition in late 2012, through his trial, and until after his sentencing in early 2015, he was detained at the Metropolitan Correctional Center (hereinafter "MCC"), a pretrial detention facility located in lower Manhattan, where he was housed in solitary confinement.  Since January 3, 2013, he has also been subject to SAMs.  His conditions of confinement at the MCC and the issues he faced therein as a result of his pre-trial detention, and detention during trial, while in solitary confinement, and subject to SAMs, are discussed in detail **post**.

17.     Following Mr. Mostafa's January 9, 2015, sentencing hearing, he was temporarily transferred from pre-trial custody at the MCC in New York, where he had been held since his extradition to the U.S., to the Federal Medical Center (hereinafter "FMC") Springfield, for evaluation and assessment as to whether he should be designated to serve his sentence at an FMC, or some other non-medical facility.  He was ultimately designated to serve his sentence at ADX Florence, in the state of Colorado, and has been incarcerated there since October 8, 2015.

18.     Since the time of Mr. Mostafa's sentencing, has has pursued a number of appeals and actions.  Through his attorneys, Mr. Mostafa appealed his convictions and sentence to the Second Circuit Court of Appeals, which resulted in a October 23, 2018, Opinion reversing his convictions on Counts 7 and 8 of the Indictment against him, and affirming his convictions on the nine remaining counts of conviction.  A motion for reconsideration, or reconsideration *en banc, i.e.,* by the full court, of that appeal, was filed by counsel December 6, 2018.  The Second Circuit Court of Appeals denied that motion February 13, 2019.

7/36

19.     Mr. Mostafa's counsel next filed a Petition for Certiorari to the U.S. Supreme Court, June 28, 2019, which was denied, October 7, 2019. During that same time frame, on April 29, 2019, Mr. Mostafa, himself, filed a motion to the district court *pro se*, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, requesting a new trial. The district court denied that motion August 2, 2019, and that decision is currently being appealed by his defense counsel.

20.     While Mr. Mostafa maintains some limited means by which to further challenge his convictions in the U.S., such as through a petition to vacate his sentence, pursuant to 28 United States Code (hereinafter "U.S.C.") §2255, which must be filed within one year of the denial of his petition for certiorari to the Supreme Court, he has now largely exhausted his post-trial remedies.

21.     Notably missing from this long list of post-trial motions and actions in the U.S. courts over the past six years since Mr. Mostafa's conviction, are those relating to Mr. Mostafa's conditions of confinement, which, as discussed **post**, are more difficult to challenge in the courts because they require that Mr. Mostafa first exhaust a series of administrative remedies, internally within the BoP, before he can involve counsel and pursue them through the U.S. court system. Mr. Mostafa, has, however, as of March 12, 2020, filed a Complaint, attached hereto as Exhibit 2, and, as of May 18, 2020, an Amended Complaint, attached hereto as Exhibit 3, both in the District Court for the District of Colorado, the jurisdiction in which he is housed, challenging the conditions of his confinement at ADX Florence and the SAMs that have been imposed on him. *See* Complaint, at 3. Among other things, Mr. Mostafa alleges in the Complaint and subsequent Amended Complaint, that he is housed in a cell which is not fitted for someone with his disabilities and which causes him bodily harm, and that he does not receive proper medical or dental care. *See id.,* at 9, 14, and 15. He also challenges the need for his continued confinement under SAM restrictions, and details how the SAMs negatively affect his ability to practice his religion and to be in contact with both his family and lawyers. *See* Amended Complaint, at 6-7. His Amended Complaint is currently pending before the court in Colorado.

**B.**     ***The Extradition Proceedings In Mr. Mostafa's Case And the Assurances and Representations that Were Made by the U.S. Government to the English Courts and European Court of Human Rights In the Context of Mr. Mostafa's Extradition***

103

8/36

22.      Underlying the more than eight years of process and procedure described **ante**, and Mr. Mostafa's designation to ADX Florence to serve his sentence under SAMs and in solitary confinement, were determinations by the English Courts and the European Court of Human Rights that Mr. Mostafa could be extradited to the U.S., because there was no real risk that his confinement conditions therein would violate Article 3 of the Convention for the Protection of Human Rights and Fundamental Freedoms (hereinafter "the Convention"). As discussed **post**, the conditions under which Mr. Mostafa is imprisoned clearly violate Article 3. These decisions, which resulted in Mr. Mostafa's extradition to the U.S. in late 2012, were based upon representations, sworn statements and assurances made by the U.S. government during extradition proceedings in the English Courts and the European Court of Human Rights as to the conditions of confinement Mr. Mostafa would, and would not, experience while in U.S. custody.

23.      Accordingly, an understanding of the extradition proceedings and assurances which led to Mr. Mostafa's extradition, as well as the subsequent positions and actions taken by the U.S. government, once Mr. Mostafa was in U.S. custody, is critical to a full understanding of his current circumstances, and is relevant to Mr. Assange's pending extradition proceedings as well.

### 1.  *Extradition Proceedings in the City of Westminster Magistrate's Court in 2007*

24.      While the U.S. government filed an Indictment against Mr. Mostafa April 19, 2004, and initially requested his extradition April 24, 2004, just three days before he was arrested and remanded into U.K. custody (where he remained until his extradition to the U.S.), extradition proceedings against Mr. Mostafa were delayed due to Mr. Mostafa's prosecution, conviction and sentence to a term of incarceration on charges in the U.K., and because of issues related to his medical condition. *See Mustafa Kamel Mustafa v. United States* [2008] EHWC 1357, at ¶ 2, attached hereto as Exhibit 4.

25.      Thus, Mr. Mostafa's extradition case was first heard in 2007, by Senior District Judge Tim Workman of the City of Westminster Magistrate's Court.  Senior District Judge Workman thereafter issued an Order November 15, 2007, stating that he was "satisfied that the matters for which the United States of America seeks the defendant's extradition. . . would be compatible with the defendant's Convention Rights" and "proposing to send the matter to the Secretary of State for his decision on whether the defendant should be extradited to America."

*See* November 15, 2007, Order of Senior District Judge Tim Workman, in *United States of America v. Abu Hamza,* in the City of Westminster Magistrate's Court, at ¶¶ 47 & 48, attached hereto as Exhibit 5.

26.     In reaching his decision that Mr. Mostafa's extradition would not be incompatible with the Convention, Senior District Judge Workman relied heavily upon a sworn statement by then ADX Warden R. Wiley, attached hereto as Exhibit 6.  While Senior District Judge Workman concluded that the conditions of ADX Florence could, if "applied for a lengthy indefinite period . . . properly amount to inhuman and degrading treatment which would violate Article 3" of the Convention, *see id.*, at ¶ 43, he ultimately accepted the representations of Warden Wiley that this would not be the case with Mr. Mostafa.  In so concluding,  Senior District Judge Workman effectively rejected a report submitted by "an experienced United States Attorney," Bruce Malloy, which opined that "the defendant would be incarcerated at a supermax prison," in favor of Warden Wiley's account which he found "to be more accurate[,]" given that Warden Wiley was "more closely associated with the penal institution."  *Id.*, at ¶¶ 40, 43, 44.

27.     In that regard, Warden Wiley had explained under oath, in his statement, that after consultation with the Chief of Health Programs, it would be "highly unlikely" for a person with Mr. Mostafa's conditions and disabilities – namely, "type 2 diabetes, raised blood pressure, psoriasis, loss of sight in one eye and bilateral amputation of both forearms," that "required assistance with the activities of daily living" -- to be placed in at ADX Florence.  See Sworn Statement of Warden Wiley, at 3, ¶ 5.

28.     Indeed, as Warden Wiley specifically stated in his sworn statement, "[i]f it is determined that [Mr. Mostafa] cannot manage his activities of daily living, it is highly unlikely that he would be placed at the ADX but, rather, at a medical center" *Id.*   Warden Wiley then referenced Sheikh Rahman, emphasizing, "I am aware of at least one other high profile convicted international terrorist who, due to various medical concerns, is presently housed at a Bureau medical facility." *Id.*

29.     As a result of Warden Wiley's sworn statements, Senior District Judge Workman determined that Mr. Mostafa would not be permanently housed at Florence ADX, stating that,

> on the basis of [Warden Wiley's] evidence I am satisfied that the defendant would not be detained in these conditions [i.e., ADX] indefinitely, that his undoubted ill health and physical disabilities would be considered and, at worst, he would only be accommodated in these conditions [i.e., ADX] for a relatively short period of

time. Whilst I find these conditions offensive to my sense of propriety in dealing with prisoners, I cannot conclude that, in the short term, the incarceration in a supermax prison would be incompatible with his Article 3 Rights.

*See* Order of Senior District Judge Tim Workman, at ¶ 44 (emphasis added) (Exhibit 3-).

### 2. *Extradition Proceedings in the High Court in 2008*

30.     On the appeal of Senior District Judge Workman's Order (as well as the Secretary of State for the Home Department's subsequent decision ordering Mr. Mostafa's extradition pursuant to section 93(4) of the Extradition Act of 2003), the High Court of Justice, Queen's Bench Division, addressed essentially the same issues as were before Judge Workman. However, the High Court more clearly laid out Mr. Mostafa's medical conditions and needs in the context of its decision, noting that the U.S. government had no dispute with the description of Mr. Mostafa's medical conditions and related needs, and it also scrutinized an additional report by Professor Andrew Coyle relating to the conditions at ADX. *See Mustafa Kamel Mustafa v. United States* [2008] EHWC 1357 (hereinafter "High Court 2008 Opinion"), at ¶¶ 65-67 (Exhibit 4).

31.     In reviewing Professor Coyle's statement, the High Court observed that "a common thread" that ran through the report was the "potential adverse effect on the mental health of inmates of long term social isolation." *Id.* at ¶¶ 65-67.  But, the High Court ultimately dismissed Professor Coyle's concerns on the basis that it trusted the U.S. government's commitment to properly treating Mr. Mostafa's medical and disability needs, stating that "unless [the] ADX Florence regime ignores appellant's medical condition, and his need for nursing assistance," there would not be a risk of isolation since a nursing assistant (such as the one Mr. Mostafa saw multiple times a day while in custody in the U.K.) would be assisting in Mr. Mostafa's activities of daily living. *Id.*  In asserting as much, the High Court essentially affirmed Senior District Judge Workman's finding, in reliance on Warden Wiley's sworn statement, that there was little risk of Mr. Mostafa spending any significant time at ADX.  *See* September 24, 2012, Decision of the European Court of Human Rights in *Case of Babar Ahmad and Others v. the United Kingdom,* attached hereto as Exhibit 7, at ¶ 40 (noting that "[o]n the question of the compatibility of detention at ADX Florence with Article 3, the High Court relied in particular on the understanding of the prison warden, Mr Robert Wiley, to the effect that if, after a full medical evaluation, it was determined that the fourth applicant [Mr. Mostafa] could not manage his activities

of daily living, it would be highly unlikely that he would be placed at ADX Florence rather than at a medical centre").

32.     The High Court, however, affirmed the decision to extradite Mr. Mostafa under the condition that *if* Mr. Mostafa were to be held in ADX "a full and objective medical evaluation of the appellant's condition, and the effect of his disabilities on the ordinary daily living and his limited ability to cope with conditions at ADX Florence[,] would indeed be carried out." High Court 2008 Opinion, at ¶ 69 (Exhibit 4).

33.     The High Court also reiterated Senior District Judge Workman's concerns with the conditions of confinement at supermax facilities. However, because it viewed the commitments and promises made by the U.S. government as assurance that Mr. Mostafa would not be incarcerated at ADX, or if he was, it would be for a very short period of time, the High Court left for another day the final decision as to whether the conditions of confinement in supermax prisons would be viewed as torture or ill treatment that violated Article 3 of the Human Rights Convention. *Id.*, at ¶70.

34.     Nonetheless, the High Court made clear that such confinement, if permitted, "may well be" torture in violation of Article 3, and explained,

> [n]aturally, the most dangerous criminals should expect to be incarcerated in the most secure conditions, but even allowing for a necessarily wide margin of appreciation between the views of different civilized countries about the conditions in which prisoners should be detained, confinement for years and years in what effectively amounts to isolation may well be held to be, if not torture, then ill treatment which contravenes Article 3.

*Id..*

### 3.   *Extradition Proceedings in the European Court of Human Rights in 2012*

35.     Following the High Court's decision, Mr. Mostafa appealed his case to the European Court of Human Rights (hereinafter "ECtHR"). In that case, the Foreign and Commonwealth Office of the United Kingdom (hereinafter "FCO") filed a submission on behalf of the U.S., attached hereto as Exhibit 8, repeating that there was no dispute about Mr. Mostafa's medical condition, but asking, as a conduit for the U.S., that the ECtHR affirm the lower courts' decision on the basis that "the likelihood is the applicant will not be detained in a 'supermax' detention at all" and that, if he was, "such detention would be for a relatively short period given

the extent and nature of the applicant's ill health and physical disabilities." *Id.*, at ¶ 29. The FCO also adopted as fact that if Mr. Mostafa were to be held at ADX Florence for any period of time, he would not suffer social isolation because he would receive care for his disabilities, and that, if held there, it would be for a "relatively short time pending a medical evaluation, and [he] would then be transferred to a medical centre." *Id.*, at ¶¶ 30, 31. As discussed in detail **post**, none of these representations have proven to be true. Armed with these statements by the FCO, the ECtHR denied Mr. Mostafa's appeal. *See* September 24, 2012, Decision of the European Court of Human Rights in *Case of Babar Ahmad and Others v. the United Kingdom,* (Exhibit 7). In doing so, however, the ECtHR acknowledged that a "comprehensive health and social care plan" and "regular daily support" would be necessary for Mr. Mostafa, but such a comprehensive plan with the necessary supports would be impossible at ADX Florence and that his amputations "alone would appear to make detention at ADX impossible". *Id.*, at ¶¶ 217.

### 4.   *Extradition Proceedings in the High Court in 2012*

36.     In October 2012, Mr. Mostafa's extradition case came before the High Court a final time.  In that case Mr. Mostafa requested judicial review and a stay of extradition on the basis that new evidence established he was "unfit to plead." *See Abu Hamza and Others v. SOS for the Home Department*, [2012] EWHC 2735 (Admin), attached hereto as Exhibit 9, at ¶¶ 1, 18.iii.  The claim was based on several reports by Dr. Richard Taylor, a psychiatrist in the United Kingdom who evaluated Mr. Mostafa on a number of occasions and had concluded in his most recent, August 2012, report that Mr. Mostafa was "unfit to plead" because he would be unable to " follow legal proceedings" due to "problems with tension, concentration, and memory loss" that were the result of the fact that he "had developed clinical depression." *Id.*, at ¶ 131-134.  Dr. Taylor also recommended an assessment by a neuropsychologist and possibly an MRI. *Id.*, at ¶ 134.  Mr. Mostafa was then seen by a neuropsychologist who also recommended an MRI be performed. *Id.*  The High Court evaluated whether it would be either "unjust and oppressive" or, alternatively, a violation of Mr. Mostafa's Convention Rights to order his extradition and concluded it would not. *Id.*, at ¶¶ 144, 145.  The High Court thus refused to stay Mr. Mostafa's extradition, and he was thereafter extradited to the U.S. *Id.* ,at ¶ 146.

13/36

37.    Notably, in the 2012 case, the High Court did not even address the issue of detention at ADX Florence as to Mr. Mostafa, although it did for the other applicants, noting, once again, the belief -- clearly based on representations by the U.S. government during the extradition process -- that "Abu Hamza does not face a real risk of more than a very short term of detention there." *Id, at* ¶ 17.[2]

### 5.    The Various Positions Taken and Representations Made By the U.S. Government Post-Extradition and Post-Conviction in the Context of Mr. Mostafa's Sentencing and The Designation Process

38.    From the time of Mr. Mostafa's arrival in the U.S., whereby he was immediately placed in solitary confinement, shortly thereafter subjected to SAMs, and rarely, if ever, provided needed medical care or acceptable accommodations for his disabilities, it was clear that the U.S. government had no intention of abiding by the representations it made in extradition proceedings as to Mr. Mostafa's conditions of confinement while in U.S. custody. However, the U.S. government's change of position as to the long term plan for Mr. Mostafa, became evident after his conviction, during the sentencing proceedings in his case and the subsequent designation process.

39.    By the time of Mr. Mostafa's sentencing it was clear that Mr. Mostafa – who had received nursing care four to six times a day while in UK custody and had demonstrably continuously struggled to do his activities of daily living while in pre-trial custody in the U.S.[3]–

---

[2] Mr. Mostafa is occasionally referred to herein as "Abu Hamza" as he has been identified in court proceedings under that name at various points in time.

[3] One example in the public record of Mr. Mostafa's inability to perform activities of daily living, and of his need for assistance in doing so, was recounted during his sentencing hearing, where his inability to cut his own nails, in light of his disabilities, was discussed. As explained by defense counsel, the BoP had determined, after Mr. Mostafa filed a formal complaint within the prison, that Mr. Mostafa would be seen by a podiatrist every four weeks who would cut his toe nails, because he could not accomplish the task himself, and without such nail trimming Mr. Mostafa suffered the risk of infection. *See* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346 (KBF), Docket #474, at 39-40 (Exhibit 11). Notably, this was raised, not as an example of a task of daily living that Mr. Mostafa could not perform, but, to demonstrate the BoP's inability to ensure that even this modest requirement could be met in a non-medical facility. At the time of Mr. Mostafa's sentencing, he had gone nine weeks without the proper care. *Id.*

14/36

could very well be designated to ADX Florence by the BoP.  That became evident as a result of the BoP's own submission to the sentencing court, a letter signed by Jeffrey D. Allen, M.D., the Chief of Health Programs for the BoP, and Dominique Raia, Senior Counsel to the BOP, attached hereto as Exhibit 10, which left open the possibility for a permanent or extended designation to ADX Florence, and was in stark contrast to Warden Wiley's representations.  *Id.*, at 1-2.  It was also clear from representations by the U.S. government during Mr. Mostafa's sentencing hearing.  *See, e.g.,* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346 (KBF), Docket #474, at 31, attached hereto as Exhibit 11 (Assistant United States Attorney Edward Kim opined as to the ADX accommodations that would be provided "in the event that the BOP decides to designate the defendant to ADX").  Nonetheless, the U.S. government -- disregarding entirely the fact that Mr. Mostafa's designation to ADX Florence to serve a lengthy sentence was inconsistent with the representations the English Courts and European Court of Human Rights had relied upon in granting his extradition – told the sentencing court that "[t]he BOP is well-equipped to make the appropriate designation, and that [the] issue [of designation] should have no bearing on this proceeding."  *See* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346 (KBF), Docket #474, at 31.

40.     As set forth by defense counsel in Mr. Mostafa's Reply Sentencing Memorandum, in *United States v. Mostafa*, 04 Cr. 356 (KBF), Docket #462, at 3-4,

> [i]ndeed, we have no doubt that Mr. Mostafa would never have been extradited to the United States by the United Kingdom had the United States disclosed the scope of the SAMs that were to be imposed, or been forthright regarding the potential for an extended and possibly permanent designation to Florence ADX. . . . [A] life sentence, coupled with the Government's request for complete deference to the BOP . . . will leave in place the very real possibility that each day in prison will amount to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article 3 of the Convention for the Protection of Human Rights and Fundamental Freedoms.

*Id.*

41.     It is my position that this accurately represents not only the circumstances of Mr. Mostafa's extradition to the U.S., but also the realities of the conditions under which Mr. Mostafa now finds himself incarcerated. In addition, defense counsel argued to the sentencing court during sentencing proceedings that "this Court is required to take all actions in its power to

15/36

ensure compliance with the representations of the Executive Branch in procuring the defendant's extradition." *See* Reply Sentencing Submission, at 10 (emphasis added); see also January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346 (KBF), Docket #474, at 28. Defense counsel elaborated that this, "includes ordering that Mr. Mostafa be designated to a Federal medical facility," as opposed to merely making a recommendation as to designation, "and that accommodations be made to his conditions of confinement that take into consideration the needs of his physical disabilities and other health concerns." *Id.* ("under the circumstances of this case where Mr. Mostafa was extradited from Europe after a hearing in both the English courts and the European Court of Human Rights, . . . under the law, your Honor has the authority to make an Order regarding his designation"). Nevertheless, the sentencing court declined to take this approach. *Id.*

42.     Rather, the sentencing court took a hands off approach, and ultimately "decline[d] [even] to make a particular recommendation to the BOP[,]" as well as to issue an Order regarding designation.  January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346 (KBF), Docket #474, at 85.  Based on conversations with BoP personnel, the sentencing court simply concluded,

> [i]t is clear that what needs to occur and what will occur . . . before any designation, the defendant would get a full medical evaluation, which is really handled, as I understand it from my communications with the BOP, by a group of people with different areas of expertise, including security and behavioral issues along with the medical issues, and that all together the appropriate designation will be arrived at, which might be ADX, it could be some other federal facility, not a medical facility, and it could be a medical facility.

*Id.*, at 47.

43.     Indeed, the sentencing court refused to take control of the designation process and made such statements despite the court's knowledge of Mr. Mostafa's difficulties in managing his activities of daily living while in custody at the MCC, and the court's determination during the hearing that Warden Wiley's statement regarding the impact that Mr. Mostafa's ability to "manage his activities of daily living" would have on his prison placement was "a *commitment* that if he can't do his activities of daily living, he will not be at the ADX." *See* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346 (KBF), Docket #474, at 34 (emphasis added).  The sentencing court also acknowledged that the

15

16/36

"Wiley statement . . . [had been] transferred into the subsequent statements of [Judge] Workman's opinion and then [Judge] Sullivan." *Id.*, at 88.[4]

44.     The sentencing court's only concessions as to defense counsel's requests were to recommend that the "BOP take into consideration" the evaluation of Mr. Mostafa by Dr. Benjamin Kligler, a medical doctor hired by defense counsel to assess Mr. Mostafa's disabilities and related needs, and that "an occupational therapist having experience with double amputees be part of the BOP team which evaluates the defendant." *See* Judgment in a Criminal Case, in *United States v. Mostafa*, 04 Cr. 356 (KBF), Docket #463, at 3, attached hereto as Exhibit 12.

45.     As discussed in greater detail **post**, since Mr. Mostafa's designation, and despite the representation of the government at his sentencing hearing that "in the event that the BOP decides to designate the defendant to ADX, he will be housed in an area that can accommodate his medical needs," *see* Sentencing Hearing Transcript, at 31 (Exhibit 11) Mr. Mostafa has not been held in a cell that is appropriate to his disabilities, he has not been given necessary or even adequate accommodations for his needs, let alone his daily needs, he remains subject to SAMs without any stepdown or relaxation of restrictions, and he has continually been housed in solitary confinement without access to daily nursing care.

46.     These circumstances, all of which are established in Mr. Mostafa's public filings, are not consistent with the assurances that the U.S. government made, and which the High Court and the European Court of Human Rights relied on. As was explained by defense counsel at sentencing, this case – in regard to both the assurances made, and the change in position by the U.S. government as to the suitability of ADX Florence to accommodate Mr. Mostafa's needs, that ultimately resulted in Mr. Mostafa's designation to ADX Florence – "will put the United States in a position where it may damage their ability for later extraditions." Counsel further noted, "[w]hile that is not my concern as Mr. M[o]stafa's attorney, it should be a concern to the [sentencing] court and to the government." *See* Sentencing Hearing Transcript, at 52-53. The

---

[4]  Although the sentencing court also opined during the sentencing hearing, at 88 of the Sentencing Hearing Transcript, that "no one said that there would be no housing ever under any circumstances at the ADX [Florence]" and that she believed the extradition proceedings did not "com[e] close to a certain commitment that Abu Hamza would not be housed at any particular facility or would be housed at a medical facility[,]" these assertions do not undermine her finding of a commitment not to place Mr. Mostafa at ADX Florence if he could not manage his activities of daily living, nor her determination that the courts that decided Mr. Mostafa's extradition relied on Warden Wiley's statement in regard to where and how Mr. Mostafa would be designated.

unreliable nature of the U.S. government's assurances should likewise be a concern for the Court

and authorities in the U.K. in determining whether to extradite Mr. Assange to the U.S.

**C.**  ***Mr. Mostafa's Medical Assessment and Evaluation at FMC Springfield Prior to
His Designation to Serve His Life Sentence at ADX Florence***

47.  Post-sentencing, Mr. Mostafa was temporarily placed at FMC Springfield, a

federal medical center, for the purposes of evaluation. After Mr. Mostafa had been held at FMC

Springfield for more than eight months, without any updates from the BoP as to whether an

appropriate evaluation had been conducted, or any designation decision had been reached – and

despite my efforts to obtain such information directly from FMC Springfield -- I wrote a letter to

the sentencing court, October 7, 2015, attached hereto as Exhibit 13, requesting that

> the Court (1) obtain an update from the . . . BoP [] as to the status
> of Mr. Mostafa's now eight-month long post-sentencing evaluation
> at FMC Springfield to determine his medical and prison needs, as
> well as the appropriate accommodations and designation facility to
> meet those needs; and (2) Order the BoP to release to counsel a
> copy of any Occupational Therapist Report that has been prepared
> in regard to Mr. Mostafa.

*Id.*

48.  A footnote to my letter noted that such update should include both "information

as to whether the BoP has adopted the Court's recommendations that it take Dr. Benjamin

Kligler's Report into consideration, and that Mr. Mostafa's medical team include an

Occupational Therapist with experience treating double arm amputees" and also a "time frame, if

one exists, for the completion of the evaluation and transfer to the designation facility[,]" which

counsel had learned, only informally at that point, was to be ADX Florence. Id.

49.  The letter further noted that one reason for the requested updates was that "the

Court's intervention is necessary to ensure that the BoP is honoring the various promises and

representations made by the United States to the United Kingdom and the European Court of

Human Rights . . . during the extradition proceedings that precipitated Mr. Mostafa's transfer to

United States custody, and also to this Court during Mr. Mostafa's sentencing hearing." *Id.*

Another reason, as set forth in the letter, was that the prolonged evaluation and designation

process was impeding counsel's ability to send Mr. Mostafa discovery necessary to his ability to

assist in the preparation of his appeal, given that the "logistical considerations and costs involved in providing Mr. Mostafa with his discovery at FMC Springfield . . . made defense counsel reluctant to provide Mr. Mostafa with his discovery there if he w[ould] shortly thereafter be moved to another facility (such as ADX Florence)." *Id.*

50.     My letter also noted that I had included the request that the sentencing court Order the BoP to release to me a copy of any Occupational Therapist that had been prepared, because I had previously requested a copy of any Occupational Therapist's Report as to Mr. Mostafa from FMC Springfield directly, but was informed by legal counsel for FMC Springfield, as well as by the Warden for that facility, that in order to receive the Report I would either have to go through the Freedom of Information Act request process, which could take months, or seek a copy via Court Order. *Id.*

51.     In response to my letter, the government argued that such requests of the Sentencing court constituted an "invit[ation to] the Court to involve itself in the BOP's classification and designation process" and "the Government respectfully request[ed] that the Court reject this invitation" as "outside of the Court's post-sentencing jurisdiction." *See* October 14, 2015, U.S. Government Response to Lindsay A. Lewis, Esq.'s October 7, 2015, Letter to the Sentencing Court, with October 14, 2015, Court Order, attached hereto as Exhibit 14. The government also noted that "in any event, the defendant fails to identify with any particularity any defect in the BOP's process." However, without any transparency as to the process that was taking (or ostensibly had taken) place, or the requested updates, there was no way that I could possibly have identified, and thus, raised any such defects with the court at that time.

52.     Nonetheless, the sentencing court "declined to involve itself in the issues raised in the defendant's letter," on the basis of "principally the reasons cited by the government." *Id.* Mr. Mostafa was subsequently designated to ADX Florence to serve out his life sentence and transferred to that facility. As I recall, I was never provided any further information from the authorities at FMC Springfield, the sentencing court, or the U.S. government as to the evaluation process, including whether it had involved the recommendations of the sentencing court that an occupational therapist having experience with double amputees was to be part of the BoP team which evaluated the defendant, and that Dr. Kligler's medical evaluation should be taken into consideration.

М4

19/36

**D.      *Mr. Mostafa's Conditions of Confinement While in U.S. Custody***

>    ***1.  Mr. Mostafa's Pre-Trial Confinement and Confinement During
>    His Trial at the Metropolitan Correctional Center In Manhattan***

53.      As would be the case with any inmate who is incarcerated in solitary
confinement and subjected to SAMs, Mr. Mostafa's conditions of pre-trial incarceration, and in
particular his isolation from the outside world, which included defense counsel in many respects,
vastly impeded his ability to assist in the preparation of his case.[5]  Indeed, for Mr. Mostafa, these
issues began as soon as Mr. Mostafa arrived in the U.S, at the MCC in New York.

54.      For instance, between October 2012, when Mr. Mostafa was extradited to the
U.S. and January 2013, Mr. Mostafa was only able to have two legal calls with counsel, despite
my numerous attempts to schedule regular legal calls with Mr. Mostafa through the MCC legal
department. *See* January 14, 2013, letter from Lindsay A. Lewis, Esq. to the Honorable
Katherine B. Forrest, attached hereto as Exhibit 15.   This was notable as, unlike inmates who
were not detained in isolation, M. Mostafa was unable to reach counsel by phone in any other
manner, even just to request a legal visit.

55.      As a result of the SAMs imposed Mr. Mostafa was also unable to communicate
with his legal team over e-mail, which is otherwise a source of regular legal communication for
pre-trial inmates.  Nor were regular legal visits assured, both because inmates under SAMs are
housed in a special unit at the MCC which limits the number of legal visitors permitted on the
unit, where the visits are held, and due to other standard issues at detention centers, like

---

[5] As described in *Center for Constitutional Rights and Lowenstein International Human
Rights Clinic*, "The Darkest Corner," September 2017, available at
https://bit.ly/3i0WuT4, at 16,

>    SAMs deprive defendants of the ability to participate in their own defense.
>    One attorney described how these measures "dehumanize defendants and
>    create a situation where they cannot exist in a defiant posture [to] fight the
>    case," and ultimately "eliminate them as participants in their defense." This
>    is particularly problematic, the attorney said, with respect to a defendant's
>    right to testify: "The first time [a defendant] talk[s] to anyone besides me
>    after two and a half years in solitary confinement is the jury. There is no way
>    to prepare [him] for it. It really discourages the client from testifying.

20/36

115

lockdowns. As my March 7, 2013, letter to the Honorable Katherine B. Forrest, of the District Court for the Southern District of New York, explained, although "the MCC legal department represented to the Court that counsel could visit Mr. Mostafa anytime from 8 a.m. to 8 p.m., that is not the case. In actual practice, counsel can be turned away from the MCC and prevented from visiting a client for a number of reasons, which are often beyond the control of MCC and certainly beyond counsel's control." *See* March 7, 2013 letter to Honorable Katherine B. Forrest from Lindsay A. Lewis, Esq., attached hereto as Exhibit 16.

56.    Efforts to effectively communicate with Mr. Mostafa as well as to deal with issues regarding his accommodations and conditions of confinement also took valuable time away from the case itself, and the preparation of the client's defense. Such issues at times directly impacted Mr. Mostafa's own ability to participate in his defense, such as when Mr. Mostafa was unable to view discovery in his case because the computer provided by the government, on which he was to do so, did not comport with his disabilities. *Id.* Fixing these issues and communicating with both MCC and Judge Forrest proved to be draining for both counsel and Mr. Mostafa, and at times, entirely unfruitful. Notably, in the more than two years Mr. Mostafa was detained at the MCC, and despite repeated complaints, he was never provided with an appropriate toilet, shower, or sink to accommodate his disabilities. Nor were many of his other medical and disability needs ever adequately addressed.

57.    During Mr. Mostafa sentencing hearing, Mr. Mostafa, himself, described to the court his conditions of pre-trial confinement, in light of the lack of appropriate accommodations and the toll it had taken. As he explained therein, and is captured in the public record of that hearing,

> the pretrial period in MCC has . . . never been even mentioned in any of the human rights courts or the appeals. They are all talking about ADX Max [Florence] and the posttrial [conditions of confinement]. The pretrial trial period has had a detriment[al] effect [o]n my ability to defend myself and to function. [For] [t]wo and a half years nearly now I [have been] . . . coerced to do things no disabled [person] w[ould] ever [typically] be asked to do. In fact, the specialist service and doctors w[ould] say to the disabled [person in a typical situation], ["w]e know you can do that, but we don't want you to do it, because of the long-term effect, and it could cause this and it could cause that.["] That is not the default [at MCC]. For two and a half years I have been coerced to do

116

21/36

things which no disabled are supposed to do it, and nobody can
report that because the cuts, they heal themselves and, thank God,
there is no infection. But the problem is, this is torture. At the end
of the day, when the cuts happen, when the pain happens, when the
anxiety happens, that is torture.

See January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346

(KBF), Docket #474, at 63 (Exhibit 11).

### 2. *Mr. Mostafa's Conditions of Confinement At ADX Florence*

### a. *Conditions of Confinement Generally at ADX Florence*

58.     ADX Florence was built in 1994 specifically as an "expedient" method for

controlling federal prisoners with life sentences through solitary confinement. Mark Binelli,

"Inside America's Toughest Federal Prison," *New York Times*, March 26, 2015, (hereinafter

"America's Toughest Prison,") available at nyti.ms/1D1rbRa. Inmates are detained in

12-by-7 foot cells with thick concrete walls and double sets of sliding metal
doors (with solid exteriors, so prisoners can't see one another). A single
window, about three feet high but only four inches wide, offers a notched
glimpse of sky and little else. Each cell has a sink-toilet combo and an
automated shower, and prisoners sleep on concrete slabs topped with thin
mattresses.

*Id.*

59.     The supermax was conceived of to "isolate and control" inmates by routinely

denying them the ability to converse for days, weeks, or months at a time and denying them fresh

air or even a view of the outdoors. Andrew Cohen, "How America's Most Famous Federal

Prison Faced a Dirty Secret," The Marshall Project, December 6, 2015, available at

bit.ly/2Yzzymr. As the former warden of ADX Robert Hood described the prison, "[t]his place is

not designed for humanity....When it's 23 hours a day in a room with a slit of a window where

you can't even see the Rocky Mountains — let's be candid here. It's not designed for

rehabilitation. Period. End of story." *Id.* As a result, people incarcerated at ADX Florence are

disproportionately mentally ill, and often physically ill as well. *See America's Toughest Prison.*

60.     Those inmates in the four "general population" units spend at least 22 hours per

day alone in their cells. As outlined in the Complaint in *Cunningham v. Fed. Bureau of Prisons*,

a class action lawsuit initiated several years ago in the District of Colorado by inmates at ADX

22/56

Florence, the only relief from this solitary confinement comes a few days a week, when "they may be able to see and speak with a limited number of other prisoners during shared recreation periods lasting two hours." *Cunningham v. Fed. Bureau of Prisons*, No. 12 Cv. 1570 (RPM) (MEH), 2016 WL 8786871, (D. Colo. Dec. 29, 2016), aff'd, 709 F. App'x 886 (10th Cir. 2017), Complaint, at ¶ 25.   However, as discussed in greater detail **post**, such communications are not permitted for prisoners who are also detained under SAMs, as the conditions of the SAMs themselves prevent contact with the outside world, but also, critically, with other inmates – even in the already limited moments when human contact might be possible at ADX Florence.

61.     The physical and psychological effects of long-term solitary confinement are well-known. Indeed, an investigation by the Center for Constitutional Rights found that, "[i]n one study of pathology among solitary prisoners, every symptom of psychological distress measured was present in more than half of the prisoners interviewed, and some symptoms were present in nearly all. There is 'not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days . . . failed to result in negative psychological effects.'" Center for Constitutional Rights and Lowenstein International Human Rights Clinic, "The Darkest Corner," September 2017, (hereinafter "Darkest Corner") available at https://bit.ly/3i0WuT4, at 11.

62.     In ADX Florence specifically, the Complaint in *Cunningham* alleged that "[a]fter years of isolation, with no direct, unrestrained contact with other human beings, many prisoners experience a fundamental loss of even basic social skills and adaptive behaviors, and predictably find themselves paranoid about the motives and intentions of others." *Cunningham* Complaint, at ¶ 29. This, however, is not the first time that such a conclusion about the effects of solitary confinement has been drawn. In 1890, the Supreme Court found that of the inmates housed in solitary confinement in Colorado's death row, "a considerable number of the prisoners fell, after even a short confinement, into a semifatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide, while those who stood the ordeal better were not generally reformed." *In re Medley*, 134 U. S. 160, 168 (1890). The Supreme Court has since continued to acknowledge the dangers of solitary confinement. *See*, e.g., *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J.,concurring), (noting the "human toll wrought by extended terms of isolation."), *Ruiz v. Texas*, 137 S. Ct.



1246, 1247 (Mar. 7, 2017) (Breyer, J., dissenting from denial of certiorari) ("prolonged solitary confinement "raises serious constitutional questions.").

63.    In a policy statement from 1995, the BoP claimed that,

> [a]ll Bureau facilities employ psychologists skilled in the screening, diagnosis, and treatment of mental disorders. Although the Bureau concentrates mental health resources at some institutions, all institutions, regardless of care level, are expected to provide services for inmates with mental illness.

Bureau of Prisons Program Statement, "Treatment and Care of Inmates With Mental Illness," available at bit.ly/2BKlUDS.

64.    These psychologists are supposed to ensure that mentally ill inmates are never designated to ADX Florence. As the BoP's procedures for transferring prisoners to ADX Florence state, prisoners "currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at... ADX." BoP Program Statement 5100.08, "Prisoner Security Designation and Custody Clarification," Chapter 7, p.18. *See also Cunningham* Complaint, at ¶ 44.

65.    The reality, however, is that many inmates with mental illness, were, and still are referred for placement at ADX Florence.  Mr. Mostafa is no exception.  Indeed, despite reports revealed during the 2012 High Court extradition hearing that Mr. Mostafa suffered from depression and required further evaluation, he was ultimately designated to serve his sentence at ADX Florence.

66.    As discussed above, in June 2012, thirteen inmates brought a class action lawsuit against the BoP alleging a longtime pattern of abuse and neglect of mentally ill inmates at the ADX Florence facility. *See Cunningham v. Fed. Bureau of Prisons*, No. 12 Cv. 1570 (RPM) (MEH), 2016 WL 8786871, (D. Colo. Dec. 29, 2016), aff'd, 709 F. App'x 886 (10th Cir. 2017).

67.    The *Cunningham* inmate plaintiffs demanded implementation of a constitutionally adequate program of mental health diagnosis and treatment, alleging that

> [d]espite its policies, the BOP regularly assigns prisoners with serious mental illnesses to ADX. That fact results from the BOP's routine disregard of its own prior mental health evaluations of prisoners it wishes to send to ADX and its woefully inadequate mental health screening evaluations when prisoners are transferred to ADX.

24/36                                    114

*Cunningham* Complaint, at ¶ 4.

68.   Moreover, the Cunningham litigation established that even those inmates who do not arrive at ADX Florence with pre-existing mental illness are likely to develop mental illness as a direct result of their isolated incarceration at the facility. As the *Cunningham* Complaint explains,

> [a]s early as the 1960s electroencephalography (EEG) examinations demonstrated the slowing of brain waves of prisoners confined in isolation for longer than a week. A landmark study in the 1970s showed that subjects in solitary confinement often experienced impaired functioning of the brain waves associated with the ability to control emotions and key cognitive functions. Similarly, a 2011 study demonstrated that after only a week of solitary confinement, prisoners showed decreased EEG activity, indicative of increased stress, anxiety, and depression.

*Cunningham* Complaint, at ¶ 42. Thus, for the BoP to adequately address the problem of mental illness at ADX Florence, where inmates are generally housed for years at a time in isolation, and to preclude inmates with mental illness from suffering solitary confinement, they would essentially need to transfer all inmates out of solitary confinement who have been there for more than a short while.

69.   Over the course of four years of negotiations, the *Cunningham* plaintiffs reached a settlement with the BoP through which almost 100 inmates were transferred out of solitary confinement and into other BoP facilities. *See* Andrew Cohen, "How America's Most Famous Federal Prison Faced a Dirty Secret," *The Marshall Project*, December 6, 2015, available at bit.ly/2Yzzymr.

70.   The settlement is also lauded as a success by many because of its potential to lead to the humane treatment of mentally ill inmates within the BoP system. For example, under the settlement, inmates are to have screenings with mental health professionals "before an inmate is transferred [to ADX Florence], another when the inmate arrives, and another after the prisoner has been there a while." *Id.* And, "[i]f mental illness is detected, prison officials will either transfer the prisoner to a more suitable facility or treat the prisoner at ADX-Florence 'if his security needs cannot be managed anywhere else' in the federal prison system." *Id.* Thus, the *Cunningham* settlement is celebrated, most notably, for its ability to improve the lives of

mentally ill inmates by enabling them to leave ADX Florence, *not* by meaningfully improving conditions within ADX Florence for the mentally ill.

71.     The reality that the *Cunningham* settlement most benefits those who are eligible to leave the facility in favor of placement at another institution with better resources for mental illness, is exemplified by the District of Columbia's Corrections Information Council's October 31, 2018, "USP Florence Administrative Maximum Security (ADX) Inspection Report," (hereinafter "CIC Report"), available at bit.ly/3fxU9gS . Pursuant to the CIC Report, there are three available options within the BoP for an ADX Florence inmate who is mentally ill:  transfer to one of two secure mental health units, located at USP Atlanta, in Georgia, and USP Allenwood, in Pennsylvania, or, if these are both unavailable to the inmate because of security concerns, the Steps Toward Awareness, Growth, and Emotional Strength Program (hereinafter "STAGES") Unit at ADX Florence. *CIC Report,* at 14.

72.     The *CIC Report* finds that STAGES is "a residential treatment program designed to reduce disruptive behavior of incarcerated men with mental illness, borderline personality disorder and a history of self-harm, to enable them to move to general population." *CIC Report*, at 14. This is done, primarily, through, "a modified therapeutic community." *See* U.S. Department of Justice, "Report and Recommendations Concerning the Use of Restrictive Housing," January 2016, available at bit.ly/2CgUtSN, at 26. While in group therapy, many of the inmates are nonetheless kept in cages, as shown in the picture below.



*See* bop.gov/resources/news/20160324_secure_stages.jsp.

73.     However, even the inferior option of placement in group therapy through the STAGES program, as opposed to a transfer to one of the BoP facilities with a secure mental

health unit, is not likely available to an inmate housed at ADX Florence under SAMs, because unlike other inmates in restricted units at the facility, there are strict guidelines regarding who SAMs inmates may, and may not, communicate with. As *Darkest Corner* reports, "SAMs prisoners are generally prohibited from communicating with other prisoners within the cellblock." *Darkest Corner* at 5. Thus, there is reason to conclude that such restrictions would prevent inmates held under SAMS from participating in group therapy, and thus the STAGES program.

74.     Moreover, inmates held under SAMs, like Mr. Mostafa, are housed in a special secure unit of ADX known as H-Unit which may result in still further limitations on an inmate's ability to benefit from any remaining available mental illness treatment options. If held under SAMs, and designated to ADX Florence, Mr. Assange would in all likelihood wind up in this unit as well.

75.     According to the *CIC Report*, if an inmate cannot participate in group therapy at ADX Florence, "Psychology Services offers limited individual therapy. When individual therapy is required, inmates can be brought out of their cells to the room on the unit used for legal visits. Staff reported that individual therapy is offered once per week on Fridays, and only up to five patients can be seen on one day." *CIC Report*, at 17. One inmate that the CIC spoke with said that, "[m]ental health makes rounds, but does not pull you out of cell. They will not stop at my cell." *CIC Report*, at 17. Accordingly, given the restrictions on SAMs inmates and the more stringent environment posed by the H-Unit, which vastly limits the ability of an inmate to leave their cell and to communicate with others, there is no guarantee that an inmate housed in the H-Unit would be eligible for individual therapy, due to security concerns and/or the logistics of providing therapy to such an inmate could cause ADX Florence staff to simply overlook them. Also, communications with a therapist would presumably be monitored if an inmate is housed under SAMs, as other SAMs inmate communications are, and this could dilute the quality and effectiveness of the care, particularly if an inmate is unwilling or afraid to speak freely under such conditions.

**b.  *Mr. Mostafa's Conditions of Confinement at ADX Florence***

76.     Mr. Mostafa, who is incarcerated at ADX Florence under SAMs, described his conditions of incarceration in his recent Complaint (Exhibit 2).  As he explained therein, he has

122

27/36

been housed in one of the two cells designed for wheelchair-bound inmates in H-Unit for the entirety of his confinement at ADX – notably, not the disability from which he suffers and entirely incompatible with his needs. *See Mostafa v. Barr*, 1:20 Cv. 694 (PAB) (NYW) (S.D. Col. March 12, 2020) ECF # 1, at 11 (hereinafter "Complaint") (Exhibit 2). Cell 300, in which Mr. Mostafa was housed for two and a half years, is a "modified large store room" that has no window and thus no natural light. *Id.* When another inmate, who required an accessible cell, was transferred into to the prison, an additional accessible cell -- that likewise did not take into account Mr. Mostafa's specific disabilities -- was constructed. *Id.* Neither cell in which Mr. Mostafa is confined has a proper toilet for his disabilities, nor a shower or sink with continuous water, which he also requires. *Id.*, at 12. When he was held in cell 300, however, prison staff welded sharp round metal discs to the faucets, "to make it easy" for him but the discs cut into his stumps and caused bleeding. *Id.* Because he lacks a proper toilet, he is unable to clean himself properly, and he states that his hygiene has suffered. *Id.* He also states that he does not have a table that he is able to eat or write at, and that the safety railings in his cell are designed for someone in a wheelchair, and are at waist level, rather than designed for a partially sighted amputee. *Id.*, at 21. All of these problems are exacerbated by Mr. Mostafa's poor vision, which makes ambulating in a small and dark cell without any windows especially onerous. *Id.*, at 22-23.

77.     Additionally, since 2018, prison officials have routinely moved Mr. Mostafa between cell 300 and cell 511. *Id.* at 11. This move is extremely difficult for Mr. Mostafa physically, given that as a double-arm amputee, it is difficult for Mr. Mostafa to collect all his belongings and move them. *Id,*, at 12. This struggle is in addition to the psychological stress, which Mr. Mostafa describes. In his words, he experiences "an enormous daily stress, anxiety, fear of injury . . . and helplessness." *Id.*, at 10.

78.     Indeed, all of the struggles that Mr. Mostafa faces are compounded by the fact that he spends his entire day, each day in solitary confinement. As discussed **ante**, the stress and anxiety Mr. Mostafa experiences on a daily basis are common symptoms of solitary confinement. Moreover, despite the obvious effects of prolonged solitary confinement on mental health, and Mr. Mostafa's documented psychiatric history, counsel does not have reason to conclude that he has received sufficient, or perhaps any, mental health care while at ADX Florence.

28/36

### 3.   The Quality of the Medical Treatment Mr. Mostafa Has Received While Incarcerated at ADX Florence

79.     Mr. Mostafa's experiences pursuing medical treatment at ADX Florence and generally within the BoP are relevant to Mr. Assange's case, just as they are relevant in the case of any inmate who has a medical issue, or requires medical care while confined in the BoP. Indeed, in addition to his well-known disabilities, Mr. Mostafa also has a host of other medical issues for which he requires care and treatment. As the High Court described in Mr. Mostafa's 2008 case regarding his extradition, Mr. Mostafa suffers from,

> 'type 2' diabetes and raised blood pressure, for both of which he is prescribed appropriate medication, extensive psoriasis, hyperhydrosis (excessive sweating provoked by a neurological condition) which requires him to shower and change his clothes at least twice daily, blindness in the right eye, with poor vision in the left, and bilateral traumatic amputation of the distal third of both forearms for which prostheses are fitted. The stumps in both arms are subject to regular outbreaks of infection, which have been increasing in severity.

*See Mustafa Kamel Mustafa (Otherwise Abu Hamza) v. the Government of the United States and the Secretary of State for the Home Department*, Case No. CO/1748/2008, [2008] EWHC 1357 (Admin), High Court of the United Kingdom, Queens Bench Division, Order, dated, June 20, 2008, at ¶7 (Exhibit 4).

80.     As discussed **ante**, many assurances were made to Mr. Mostafa prior to his extradition to the U.S. regarding the standard of medical care he would be afforded to meet his needs. Those standards have yet to be met, and a failure to accommodate Mr. Mostafa's medical needs is an issue of constitutional significance.

81.     Indeed, the Eighth Amendment to the U.S. Constitution affords inmates protections against cruel and unusual punishment, and this has been explicitly applied to people incarcerated with physical disabilities and to medical care. See, e.g., *Shariff v. Coombe*, 655 F.Supp.2d 274 (SDNY 2009), (the Eighth Amendment extends to conditions of confinement and the effect those conditions have on disabled prisoners.); *Knop v. Johnson*, 667 F.Supp. 467, 479 (W.D.Mich. 1987) ("[e]xposing an inmate to a situation where he may be forced to defecate or urinate in his own cell without the presence of proper toilet facilities or a washbasin violates the basic human dignity the Eighth Amendment protects."); *Johnson v. Wright*, 234 F.Supp.2d 352,

124

29/36

360 (SDNY 2002), quoting, *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994), (the mere "fact that a [prisoner] received regular medical care does not preclude a finding of deliberate indifference where the 'course of treatment was largely ineffective and [prison officials] declined to do anything more to attempt to improve [the prisoner's] situation.' "); *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996) (prison officials must ensure that inmates receive adequate food, clothing, shelter, protection and medical care); *Whitnack v. Douglas County*, 16 F.3d 954 (8th Cir. 1994) (reasonably adequate sanitation and ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of prisoner protected by Eighth Amendment); *King v. Frank*, 371 F.Supp.2d 977 (W.D.Wisc.2005) (condition of inmate's confinement violates Eighth Amendment's prohibition against cruel and unusual punishment if it denies inmate civilized measure of life's necessities); *Estelle v. Gamble*, supra, 429 U.S. 97 (1976) (deliberate indifference to prisoners' serious medical needs constitutes cruel and unusual punishment); *LaFaut v. Smith*, 834 F.2d 389 (4th Cir. 1987) (prison officials violated Eighth Amendment by failing to provide disabled inmate with needed physical therapy and adequate access to facilities).

82.     The Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990 also recognize that the need to accommodate disabled persons extends not merely to those that are at liberty but to incarcerated persons as well. *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998) (ADA); *Onishea v. Hopper*, 171 F.3d 1289 (11th Cir. 1999) (Rehabilitation Act); *Bonner v. Lewis*, 857 F.2d 559 (9th Cir.1988) (Rehabilitation Act); *Kaufman v. Carter*, 952 F.Supp. 520, 523-24 (W.D.Mich. 1996) (failure to provide accommodations so that bilateral amputee could gain equal access to bathrooms and showers while incarcerated implicated Rehabilitation Act, the ADA, and the Eighth Amendment).

83.     Along these lines, 42 U.S.C. § 12182(b)(2)(A)(ii) explains that, for purposes of the ADA, discrimination in public accommodations includes:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."

30/36

84.     Accordingly, Mr. Mostafa should be protected from discrimination as a result of his disabilities. As a federal inmate, he should receive modifications to mitigate practices which are unreasonably difficult for him, and which do not affect the national security of the United States. However, at ADX Florence arbitrary policies preclude Mr. Mostafa from receiving adequate medical care, and bureaucratic indifference makes fighting these conditions onerous and near impossible.

85.     For example, as a double-arm amputee, Mr. Mostafa has trouble brushing his teeth. *See* Complaint, at 14.  As he explains in his Amended Complaint, "the most painful physical pain (non stop) is the ADX policy of not allowing any dental work or replace damaged work done prior to ADX, such as but not limited to: bridges, crowns, implants, etc[.]" *Mostafa v. Barr*, 1:20 Cv. 694 (PAB) (NYW) (S.D. Col. May 18, 2020), ECF # 9, at 16 ("Amended Complaint"), attached hereto as Exhibit 3.  These problems are related to his other health concerns, and ADX Florence should provide some reasonable accommodation, which is all Mr. Mostafa asks for.  As Mr. Mostafa's Amended Complaint elaborates "all ADX dentist repeatedly explained to plaintiff . . . [is] that ADX policy afford[s] no repair ... not even allowed more than once a year cleaning nor plaintiff allowed electric/flossing brush to clean his teeth[.]" Amended Complaint, at 16.

86.     While the prison has denied his requests and delayed any relief, Mr. Mostafa reports that the problems with his teeth have been exacerbated. Amended Complaint, at 16. Because of his double arm amputations, and the lack of any assistance from prison staff with his daily needs, Mr. Mostafa is only able to open pouches of food by ripping them with his teeth. Over the course of the years he has been incarcerated, he reports that the nerves in his teeth have become severely damaged and he has lost several teeth. Amended Complaint, at 16.

87.     Mr. Mostafa's health has also suffered in other ways as a result of neglect by prison staff. For example, Mr. Mostafa is unable to cut his own toenails, apply prescribed cream to his body to treat his skin conditions, or clean his cell. *See* Complaint, at 15-16. These small tasks, which other inmates do not need assistance with, are impossible for Mr. Mostafa to accomplish safely on his own without special attachments for his prosthetics. As a result, Mr. Mostafa experiences frequent bleeding in his feet from sharp or overgrown toenails, "injur[y] and bleeding" when he is made to clean his cell, and his skin conditions have gone untreated. Complaint at 15-16.

126

31/36

88.     The consistent lack of attention paid by prison staff to Mr. Mostafa's needs demonstrates that the staff at ADX Florence is unable to, or at least unwilling to, accommodate inmates with disabilities or to adequately attend to medical issues. Despite promises by the BoP made to the English extradition courts to the contrary, Mr. Mostafa suffers daily from the conditions of his confinement and his lack of proper and necessary medical care.

**E.      *Mr. Mostafa's Detention Pursuant To SAMs Throughout His Time in U.S. Custody***

89.     Despite the fact that prior to his extradition to the U.S., Mr. Mostafa had been incarcerated at HMP Belmarsh for many years as a standard risk, high profile inmate, in the general population (with access to other inmates as well as his family), he has been incarcerated under SAMs since just after his arrival in the U.S., and continuously, for the last nearly eight years.  In order to best understand the conditions of confinement Mr. Mostafa has faced, and currently faces at ADX Florence, as a result of the fact that SAMs have been imposed in his case, and also the conditions that Mr. Assange would likely face if subjected to SAMs while in U.S. custody, a general overview of the SAMs regime is instructive.

90.     *The Center for Constitutional Rights'* comprehensive study of SAMs found that while SAMs can vary between prisoners, "the standard regulations severely restrict or altogether prohibit contact with other human beings, including other prisoners and visitors." *Center for Constitutional Rights and Lowenstein International Human Rights Clinic*, "The Darkest Corner," September 2017, available at https://bit.ly/3i0WuT4, at 5 (hereinafter "Darkest Corner"), attached hereto as Exhibit 16. Inmates subject to SAMs at ADX are "allowed only ten hours total outside of their cell per week, like general population prisoners. But this time is also spent alone, either in a small indoor room or in a cage hardly bigger than their cell. For many prisoners, the cage is too small to run or do anything but walk a few steps in each direction." *Darkest Corner*, at 6. Thus, most inmates under SAMs spend all day, every day, completely alone, and often for many years at a time.

91.     SAMs also severely limit an inmate's ability to stay in contact with family. For example, "[c]alls can only be made to approved 'immediate family members' and may be limited to one fifteen-minute call per month." *Id.*  In Mr. Mostafa's case, as he notes in his Complaint in the District of Colorado, not even all of his children, or even his young grandchildren have been



approved. *See* Complaint, at 30 ("four of the plaintiff's sons are excluded from any communications, and all but one of all grandchildren are also excluded from any contacts (the oldest is 6 years old)").

92.     Mail is similarly restricted to those approved family members, "with the frequency limited to three 8.5 x 11 pieces of paper "once per week to a single recipient, at the discretion" of the BoP. This mail must also be "copied and analyzed by the FBI before it is delivered." *Id.* This restriction poses significant hardship, especially on an inmate like Mr. Mostafa, who is only practically able to communicate with approved family members by phone or through letters (SAMs inmates are not permitted access to the prison inmate email system, which impedes both legal and social contact). He must thus choose between family members since he is not permitted to write to all of them each week, and, as he notes in his Complaint in the District of Colorado, due to the delays posed by the inspection of mail to and from Mr. Mostafa, "[t]he real cycle of a letter and its answer is 6 months. 60 working days to send and 60 to receive [--]weekend and holidays not counted [--] thus only two meaningful letters per a year for a successful informative mail." Complaint at 30. Likewise, all calls and visits are contemporaneously monitored and recorded by the FBI. *Darkest Corner*, at 6.

93.     Among inmates, communication is completely prohibited, and this includes restriction of communal prayer. Inmates cannot communicate with the media, and cannot read or view any publication that is not approved by the BoP. *Id.*

94.     Communications are further restricted for anyone who has contact with an inmate subjected to SAMs. As discussed briefly **ante**, and explained in *Darkest Corner*, "[t]he government imposes what amounts to a 'gag order' on the few people who can contact the prisoner – that is, the prisoner's attorney and authorized immediate family members – prohibiting them from conveying any message from the prisoner to a third person." *Id*, at 5.   In practical terms, these restrictions serve the underlying purpose of the SAMs, such as those in Mr. Mostafa's case which are intended to prevent the dissemination of any communications by the inmate that might result in death or serious bodily injury to person, or  damage to property.  But they also restrict communications for no legitimate purpose whatsoever, such as when the communications at issue have no possible chance of causing the ills that the SAMs are intended to prevent, and the disclosure of which could otherwise be beneficial or useful.

95.     SAMs also guarantee a particularly harsh living environment for an inmate. For

instance, "SAMs prisoners at ADX are held in a separate section of the prison called the Special Security Unit ("SSU") or H-Unit. These prisoners are confined to cells that measure less than eight by ten feet, requiring them to eat their meals within an arm's length of their toilet." *Id.*, at 6. Mr. Mostafa specifically is housed in a 16 foot by 8 foot cell that has only one small window which is blocked by the shower. *See* Complaint at 11. As a result, his cell is dark and completely devoid of sunlight.

96. Nor are the restrictions of SAMs a short-term problem for those inmates on whom SAMs are imposed. "A 2013 count showed that eighty-two percent of prisoners placed under SAMs were under these restrictions for more than a year. Of those prisoners, thirteen had lived under SAMs for more than a decade." *Darkest Corner*, at 11. Moreover, the Attorney General need not justify an imposition of SAMs or their renewal. *See, e.g.,* Aviva Stahl, "Extreme Isolation for U.S. Prisoners Shields 'Torture' From Public View and Accountability," The Intercept, October 23, 2017, available at bit.ly/3g6B9pE (stating "there are essentially no checks on the attorney general's power to impose the onerous restrictions, nor evidentiary standards she is required to meet in order to do so)." Indeed, in Mr. Mostafa's case, SAMs have been imposed for eight consecutive years, and have not been relaxed in any manner. And, in fact, SAMs were re-imposed for the current year as of January 3, 2020.

97. The fact that these restrictions have been consistently maintained over the course of more than seven years, and Mr. Mostafa is now in his eighth year under SAMs, is significant given that the government asserts, in imposing the SAMs, that these are the least restrictive measures that can be tolerated in light of the risks that the inmate presents. In my opinion they are not, in that they are designed to prevent even contacts and communications that have no chance of leading to, or connection to, criminal activity or terrorist activity and that do not pose any risk of harm to any person or property.

98. It is also my opinion that any SAMs violations that have been alleged against Mr. Mostafa should not prevent the SAMs from being relaxed pursuant to the stepdown process that the government spoke of during Mr. Mostafa's extradition proceedings in the ECtHR, and which exist at ADX Florence. Indeed, the isolated instances of minor, or even essentially administrative, non-compliance over the span of many years that are alleged in Mr. Mostafa's case do not appear to compromise national security in any manner or run the risk of causing any harm.

34/36

99.     Indeed, one such violation, which Mr. Mostafa raised in the public record in the context of his Complaint in the District of Colorado, *see* Complaint, at 31, was that he had allegedly improperly tried to convey, in a letter to one of his sons, his love to his one year old grandson, who Mr. Mostafa is not permitted to speak to. It was, according to Mr. Mostafa, viewed as "an attempt to contact [a] third party (the plaintiff['s] one year old grandson)." *Id.* Such a violation does not go to the purpose of SAMs, which is to prevent the client from committing, soliciting or conspiring to engage in future criminal conduct, and namely terrorist activities which could result in death or serious bodily injuries. All such restrictions do is to impede an emotional connection between an already severely isolated inmate and his family. In fact, such contact should be encouraged and fostered for the good of the inmate and his family members. Nor should such a violation, even if proven, be used as a basis to renew the SAMs.

100.    But, challenging the SAMs is difficult, for counsel, and particularly so for inmates. As Mr. Mostafa explained to the sentencing court on the record during his sentencing hearing, "more than two-thirds of my letters to [my family members]. . . have been trashed, and I can't prove it because the [MCC staff did] not give me a receipt [for each documenting] . . . the date [I submitted the letters to be sent]." *See* January 9, 2015, Sentencing Hearing Transcript in *United States v. Mostafa*, 04 Cr. 346 (KBF), Docket #474, at 67 (Exhibit 11). He also noted that he had "exhausted all [his administrative] remedies from the regional to the central [office] to the MCC itself. . . all the remedies [through to] the central office" without any recourse from the BoP. *Id.* He also commented, more generally, with regard to the SAMs that have been imposed on him, "the problem is, when they are administrated, they are loose. They are not watertight. There is bullying, and the more you complain, the more you get bullied." *Id.*

101.    There is no reason to conclude that SAMs imposed on Mr. Assange would be any less arbitrary, oppressive, or difficult to challenge, should the U.S. government determine, in its apparently unbridled discretion, that they are appropriate in his case.

**F.      *Mr. Mostafa's Experiences with the BoP Administrative Remedy Process And Efforts To Challenge the Conditions of His Confinement Both Within the BoP and In the U.S. Courts***

102.    The U.S. federal statute that governs challenges to an inmate's conditions of

35/36

130/357

confinement is 28 U.S.C. §2241. Under this statute, if a detainee wishes to challenge the conditions of his confinement, the BOP's conduct, or, the SAMs that have been imposed in his case, he must do so collaterally in the district in which he is confined. *See Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) ("[a] motion pursuant to § 2241 generally challenges the execution of a federal prisoner's sentence, including such matters as ... computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions." (internal citation omitted)); *see also Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) (noting that a federal prisoner seeking to challenge his custody must "name his warden as respondent and file the petition in the district of confinement").

103.   But, even for Mr. Mostafa, whom I have been appointed as counsel to represent in litigation pursuant to 28 U.S.C. §2241, it is not as simple as just initiating a case in the court. In fact, I only recently asked the court to appoint me to litigate Mr. Mostafa's conditions of confinement in the U.S. courts, despite awareness for years that such issues with his confinement exist, because an action cannot be brought in the U.S. federal district court until *after* the inmate has exhausted the administrative remedy process within the BoP.  Indeed, Mr. Mostafa, himself, has only just this year, in his eighth year of confinement in the U.S., filed an action in court raising confinement conditions and his SAMs.  *See* Complaint and Amended Complaint (Exhibits 2 & 3).

104.   Inherent to the administrative remedy process are long timelines that inevitably lead to delay in exhaustion and the ability to pursue a matter in court.   The process is particularly unforgiving when the matter at hand is urgent or time sensitive.  As *Darkest Corner* explains,

> exhausting the [administrative remedy process] requires prisoners to (1) raise the issue of concern informally with BOP staff, (2) wait for the staff's response, (3) obtain and file a Remedy Form, (4) wait for the prison's response to the request, (5) obtain and file a Regional Appeal Form, (6) wait for the BOP Regional Office's response, and (7) obtain and submit a Central Office Appeal Form. BOP officials may return without response any filing that fails to adhere to extensive regulations concerning form and timing. Attorneys may not submit these complicated requests or appeals on the prisoner's behalf.

*Darkest Corner*, at 19. BOP's Program Statement 1330.18 discusses ARP in detail. *See* https://www.bop.gov/policy/progstat/1330_018.pdf.

Ex. b  Att 62

36/56

131

105.    In Mr. Mostafa's case this last requirement, that the inmate submit his requests himself, has been particularly challenging and has resulted in hardship for Mr. Mostafa.  As he notes in the context of his recent Complaint to the District Court for the District of Colorado, at 30, "[m]ost of the time plaintiff's remedy paperwork is rejected or returned because he can not press the pen hard enough to fill the four pages, no photo copies allowed to be sent as replacement, no carbon papers is provided no help and no consideration for his disability though it is well known and repeatedly mentioned to prevent rejection." *Id.*

106.    In addition, Mr. Mostafa's transfer from one BoP facility to another, despite the fact that his conditions of confinement issues and SAMs are essentially, if not entirely, the same in each facility, has also long-delayed his ability to litigate his confinement conditions and the SAMs that were imposed, in court.  Under the administrative remedy process, in the event of an inmate's transfer to a new facility, the process must begin anew, even if the issues remain unchanged. Thus, "while the [administrative remedy process] ostensibly affords prisoners an opportunity to redress issues related to their confinement, in practice it can prevent courts from conducting any substantive review of SAMs [and other confinement] conditions." *Darkest Corner*, at 19.

      Dated: 17 July 2020
      New York, New York

      LINDSAY A. LEWIS
      Dratel & Lewis
      29 Broadway Suite 1412
      New York, New York 10006
      (212) 732-0707
      llewis@dratellewis.com

Ex. 06: Att. 02    1/14

ADX
Warden Warden Before Extradition

# EXHIBIT F

**Exhibit F**

EX. 01   ATT. 02   $\frac{2}{14}$

P46

IN THE MAGISTRATE COURT
AT WESTMINSTER

THE UNITED STATES OF AMERICA,

v.

ABU HAMZA,

## DECLARATION OF R. WILEY

1.    I, R. Wiley, hereby declare that I am the Warden at the United States Department of Justice, Federal Bureau of Prisons ("Bureau") facility known as the United States Penitentiary, Administrative Maximum ("ADX"), located in Florence, Colorado. I have held this position since May 2005. I have been employed by the Bureau, in positions of increasing responsibility, since May 1984.

2.    It is the policy of the Bureau (and the ADX) to treat all inmates humanely and with decency, consistent with our obligation to ensure the safety of others at the institution (staff and inmates). Bureau staff shall not discriminate against inmates on the basis of race, religion, national origin, sex, disability, or political belief. This includes the making of administrative decisions and providing access to work, housing and programs.

3.    The ADX is a high security, facility housing maximum custody sentenced inmates in single occupancy cells. Maximum custody is the highest custody level that can be assigned to an inmate. This is the only facility of its type in the Bureau, although there are many other United State Penitentiaries. This 490-bed facility opened in 1994. The missions of the ADX are to: (1) assist the agency in maintaining the safety of both staff and inmates, while eliminating the need to increase the security of other penitentiaries; and (2) confine





**Exhibit F**

**Exhibit F**

3/14

P47

inmates under close controls while providing them opportunities to demonstrate progressively responsible behavior; participate in programs in a safe, secure environment; and establish readiness for transfer to a less secure institution. The ADX does not have the mission of housing inmates who are un-sentenced and pending trial.

4. Accordingly, if Abu Hamza were extradicted to the United States, he would not be incarcerated at the ADX pending trial. A federal criminal defendant is only eligible for incarceration at the ADX following a conviction and sentencing.

5. I am aware that Abu Hamza has some medical concerns. Specifically, I am aware that he has type 2 diabetes, raised blood pressure, psoriasis, loss of sight in one eye and a bilateral amputation of both forearms that necessitates assistance with the activities of daily living. I am advised by the Chief of Health Programs for the Bureau that an individual presenting with these types of medical concerns would likely be incarcerated in a Bureau medical facility, at least initially, following his conviction and sentencing. After a full medical evaluation, a determination would be made regarding the most appropriate placement for him, considering the level of medical care and security controls needed. If it is determined that Abu Hamza cannot manage his activities of daily living, it is highly unlikely that he would be placed at the ADX but, rather, at a medical center. I am aware of at least one other high profile convicted international terrorist who, due to various medical concerns, is presently housed at a Bureau medical facility.

6. The ADX houses less than one-third of one percent of the Bureau's overall inmate population; 95 percent of the inmate population was transferred to the ADX from other facilities, while only 5 percent are direct court commitments. The Bureau ensures, through careful case reviews, that the ADX is used for only those offenders who need the

2

213

**Exhibit F**

i35

Exhibit F

4/14

P 48

controls available here.

7.      The decision to place an inmate at the ADX is a classification decision – which is actually a behavioral prediction – made utilizing the Bureau's classification system. The Bureau's classification system provides basic objective criteria and individual factors for assessing the security needs of each individual inmate. The Program Statement which provides the basic objective criteria for designating inmates to the ADX is 5100.08, Inmate Security Designation and Custody Classification. This Program Statement is available for review on the Internet at www.bop.gov.

8.      The authority to designate an inmate to a particular institution is vested solely in the Federal Bureau of Prisons. *See* 18 U.S.C. § 3621.

9.      The inmates housed at the ADX meet one or both of two basic criteria: (1) the inmate's conduct in other correctional institutions created a risk to the institutional security and good order, posed a risk to the safety of staff, inmates or others, or to public safety; and/or (2) as a result of the inmate's status either before or after incarceration, the inmate could not be safely housed in the general population of a regular correctional facility.

10.     The Bureau's classification system does not allow for an inmate to be housed at the ADX solely based on the nature of the crime he committed before incarceration. Nor does the Bureau have any specific policy in regard to where al Qaeda inmates serve their time. Only those offenders who clearly need the security controls available at the ADX are housed there. As mentioned, the designation of an inmate to the ADX is a classification decision premised on recommendations that a particular inmate needs additional controls to ensure the safe and secure operation of correctional facilities and to promote public safety.

11.     This close scrutiny of inmates for designation to the ADX is reflected in the

3

214

Hamza s2 echr annex_053

Exhibit F

**Exhibit F**

136

5/14

P49

designation of inmates who have convictions for terrorism activities and/or ties to international terrorism. I am aware that 195 persons are currently in the custody of the Bureau who have convictions for terrorism activities and/or ties to international terrorism. It was determined that only 38 need the additional security controls of the ADX. The remaining 157 are housed throughout the Bureau at various other facilities, including, medical centers and medium and high security facilities.

12.     A newly committed/sentenced inmate is afforded multi-level reviews prior to his placement at the ADX. Specifically, staff at the Designation and Sentence Computation Center prepares a designation packet. The designation packet is then sent to the Federal Bureau of Prisons' North Central Regional Office. Once the referral packet arrives at the North Central Region, the packet is reviewed by staff and forwarded to the Regional Director. If the North Central Regional Director concludes that ADX placement is inappropriate, the process terminates. If the North Central Regional Director approves the designation, the newly committed inmate is designated and transferred to the ADX.

13.     An inmate's incarceration at the ADX does not impact his sentence duration.

14.     Generally, the status of inmates are reviewed in three ways: Classification, Program Review, and a Progress Report.

15.     Classification and Program Review refers to the procedure whereby an inmate's case is formally reviewed by the Unit Team. These meetings are generally referred to as "team" and the inmate is present. Team meetings are intended to give staff and inmates the opportunity to discuss issues in an open format. This is the inmate's opportunity for individual attention and he or she should be encouraged to ask questions and discuss concerns.

215

**Exhibit F**

30

Exhibit F

6/14

137

P50

16.    Classification is the initial team meeting whereby a careful review of the case and inmate's history are discussed and relevant programs are recommended. The purpose of the meeting is to clearly define for the inmate: (1) sentence information, including financial obligations; (2) educational programs; (3) security/custody levels; (4) release plans; and (5) work assignments. These programs reflect the needs of the inmate and are stated in measurable terms.

17.    Generally, initial classification occurs within four weeks of an inmate's arrival at his designated institution.

18.    Subsequent team meetings are referred to as Program Reviews. These meetings are held at least once every six months (every three months for inmate's with less than one year remaining to serve) and are conducted to monitor and evaluate the inmate's progress in all program areas. Program participation is discussed in relation to the schedule developed at initial classification. New and/or revised goals are developed as necessary.

19.    A progress report is the principal document used by the Unit Team to evaluate the behavior and activities of inmates. The progress report is a detailed comprehensive account of an inmate's case history, prepared by the Case Manager at prescribed intervals during the inmate's confinement. Generally, the Case Manager composes the progress report with input from other unit staff, work detail supervisors, and education instructors.

20.    The progress report reflects the inmate's past status, assess his current status, and offers an indication of anticipated accomplishments. It is to reflect an evaluation of the inmate's past status, an assessment of his or her current status, and potential for future performance. This could include the inmate's continued participation in a program, and what they plan to do at the completion of the program, or if they plan to use what they have learned

216

Hamza §2 echr annex_053

Exhibit F

Exhibit F

7/14

138

P51

upon their release. Information is also provided on the inmate's relationship with others (both staff and inmates), particularly with respect to attitude, punctuality, etc.

21.    A progress report is required, at a minimum, once every three years. At the ADX, the inmates are provided with a copy of the most current progress report. Upon request, an inmate may read and receive a copy of any progress report retained in the inmate's central file.

22.    Upon arrival at the ADX, the inmate has the opportunity to raise any concerns he has about his designation/transfer/incarceration at the ADX, during his initial classification.

23.    The inmate may also challenge his transfer through the Bureau's Administrative Remedy Program, which is set forth in Program Statement 1330.13, Administrative Remedy Program.

24.    The procedure requires that an inmate first address his complaint to the Warden. If dissatisfied with that response, the inmate may appeal his complaint to the Regional Director. If dissatisfied with the Regional Director's response, the inmate may appeal to the Director, National Inmate Appeals, in the Office of the General Counsel in Washington D.C. Generally, an inmate has not exhausted his remedies until he has sought review at all three levels.

25.    Under this procedure, inmate complaints must be made within specific time frames. Ordinarily, a complaint must be made within 20 days of the time the incident complained of occurs. Failure to raise a complaint in a timely manner can result in lack of review. Procedures also exist to allow an inmate to bypass the initial level of review at the institution if there is some indication that the complaint is of a sensitive nature. Such

217

Exhibit F

**Exhibit F**

8/14

P52

complaints may be filed directly with the Regional Director.

26.    Inmates incarcerated at the ADX are able to seek review of any issue relating to of his confinement before the United States District Courts.

27.    The ADX has nine housing units, which allows the Bureau to employ a phased housing unit/privilege system.  (None of these units are reserved just for Islamic inmates.) This stratified system of housing inmates is used to provide inmates with incentives to adhere to the standards of conduct associated with a maximum security custody program.  As inmates at the ADX demonstrate periods of clear conduct and positive institution adjustment, they may progress from the General Population Units, through Intermediate and Transitional Units, to finally, the Pre-Transfer Unit located at the United States Penitentiary, High Security, Florence, Colorado, with increasing degrees of personal freedom and privileges at each stage. The types of privileges afforded to the inmates are determined by their housing unit assignments in this layered program. It will take an inmate a minimum of 36 months to work his way through the layered system of housing.  The minimum stay in a General Population Units is twelve months, the Intermediate Program six months, Transitional Program six months, and the Pre-Transfer Unit twelve months.  It is the goal of the ADX to transfer inmates to less secure institutions when the inmate demonstrates that a transfer is warranted and he no longer needs the controls of the ADX.

28.    The security needs of the inmates housed at the ADX require very restrictive procedures for movement of the inmates, interaction with staff, other inmates, recreation, visitation, and programming.  However, the central operating philosophy of this institution is to allow inmates as much unrestrained movement and program access within the institution as possible, consistent with staff and inmate safety.

7

218

Hamza s2 echr annex_053

**Exhibit F**

Exhibit F

P.53

29.    All inmates at the ADX are single celled. Cells are generally side-by-side and allow communication between inmates by yelling, or using the air ventilation as a voice conduit. Each cell has a light, which the inmate may turn on and off as needed.

30.    A current, basic description of several of the housing units from most to least restrictive is as follows:

a.    The Control Unit (B-Unit) houses the most dangerous, violent, disruptive and assaultive inmates in the Bureau's custody. Each cell in the Control Unit is approximately 87 square feet, which does not include the sallyport area of the cell, which is 175 square feet. Each cell has a solid outer door and an inner grill. Each cell solid outer door as a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. Admission to the Control Unit is governed by 28 C.F.R. § 541.40, et seq., and Program Statement 5212.07, Control Unit Programs. The inmates housed in the Control Unit receive a minimum of 7 hours of out of cell exercise per week. The inmates recreate individually in secure single recreation areas. The inmates consume their meals in their cells. The inmates receive one monthly social telephone call and may receive up to five social visits per month. Shower stalls are located within the cells.

b.    The Special Security Unit (H-Unit) currently only houses those inmates who have Special Administrative Measures imposed on them, pursuant to 28 C.F.R. §§ 501.2 and 501.3, or restrictions imposed by a court, pursuant to 18 U.S.C. § 3582(d). The placement of an inmate in this unit at the ADX is a classification decision. Each cell in the Special Security Unit has approximately 75.5 square feet of living space and do not have a sallyport or a shower. Each cell has a solid outer door. Each cell solid outer door as a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. The inmates housed in the Control Unit receive a minimum of 5 hours of out of cell exercise per week. The inmates recreate individually in secure single recreation areas. The inmates consume their meals in their cells. The inmates receive one monthly social telephone call and may receive social visits.

c.    The Special Housing Unit (Z-Unit) is a short-term housing unit for both inmates in Disciplinary Segregation, who have been found guilty of prohibited acts while at the ADX, and those in Administrative Detention, who have pending internal investigations, transfer or have other temporary administrative needs. Admission to the Special

8.

219

Exhibit F

141

10/14

P54

Housing Unit is governed by 28 C.F.R. § 541.2, et seg., and Program Statement 5270.07, Inmate Discipline and Special Housing Units. The placement of an inmate into the Special Housing Unit is a classification decision. Each cell in the Special Housing Unit is 87 square feet, which does not include the sallyport area of the cell, which is 17 square feet. Each cell has a solid outer door and an inner grill. Each cell solid outer door is a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. These inmates receive a minimum of 5 hours of out of cell exercise per week. The inmates recreate individually in secure single recreation areas. The inmates consume their meals in their cells. The inmates receive a minimum of one monthly social telephone call and may receive up to five social visits per month. Shower stalls are located within the cells.

d.   Each of the four General Population Units (D, E, F, G-Units) houses those inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others or the secure and orderly operation of the institution. The placement of an inmate in one of these units at the ADX is a classification decision premised on recommendations that a particular inmate needs additional controls to ensure the safe and secure operation of correctional facilities and to promote public safety. Each cell in the High Security Unit is 87 square feet, which does not include the sallyport area of the cell, which is 17 square feet. Each cell has a solid outer door and an inner grill. Each cell solid outer door is a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. These inmates receive a minimum of 5 hours of out of cell exercise per week. The inmates recreate individually in secure single recreation areas. The inmates consume their meals in their cells. The inmates receive one monthly social telephone call and may receive up to five social visits. Shower stalls are located within the cells.

The Intermediate and Transitional Units (J, K-Unit) prepare inmates for transitioning from Phase I of the General Population Unit program to an open, general population facility. The advancement of an inmate to the next phase of the Step-Down Program is a classification decision. Each cell in J and K-Units has approximately 75.5 square feet of living space and do not have a sallyport or a shower. Each cell has a solid outer door. Each solid outer door is a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. These inmates receive a minimum of 15 or 20 hours of out of cell exercise per week, depending on which phase of the Step-Down Program they are in. The inmates recreate in groups. The inmates in the intermediate phase of the program consume their

9

220

Exhibit F

Hamza s2 echr annex_053

Exhibit F

11/14

P55

meals in their cells. The inmates in the transitional phase eat their meals out on the range with other inmates. The inmates in the pre-transfer phase eat their meals in the Inmate Dining Room at the ADX. The inmates receive anywhere from 3 - 4 social telephone calls per month, depending on which phase they are in the program. Shower stalls are not located within the cells. Inmates in the pre-transfer phase of the program may leave the unit, under a staff escort, to purchase items from Commissary.

31.    All inmates are provided with access to both indoor recreation and outdoor recreation. Inmates who choose to go to outside recreation have access to sunlight and fresh air five days a week.

32.    Inmates in B, D, E, F, and G units have individual black and white televisions in each cell, which provide 24-hour select broadcast channels (60 Channels), channels for closed circuit institutional programming (Recreation, Education, Religious Services, and Psychology), radio stations, and digital music channels.

33.    Inmates in H-Unit also have individual black and white televisions in each cell, which provide fewer than 24-hour select broadcast channels. They are also provided with similar channels for closed circuit institutional programming and digital music channels.

34.    All inmates at the ADX have contact with other persons on a daily basis. The Warden, Associate Wardens, Captain, and Department Heads perform weekly rounds so that they can visit with each inmate. Correctional officers perform regular rounds throughout all three shifts on a daily basis. A member of an inmate's unit team visits him every day, Monday through Friday, except on holidays. Inmates receive regular visits from medical staff, education staff, religious services staff, and psychology staff when they perform their rounds, and upon request if needed. Inmates also have access to medical and mental health visits upon request.

35.    All inmates have access to educational opportunities. To meet the diverse

10

221

Exhibit F

Hamza s2 echr annex_053

38

143

Exhibit F

13/14

P56

educational needs of the inmate population, the Education Department provides adult basic and secondary education; English as a Second Language; high school equivalency (GED); and post-secondary, release preparation, adult continuing education and parenting courses. All courses are via a closed circuit television system, with a monitor in each cell, except post-secondary education. They are open to all inmates who wish to participate. On a regular basis, teachers provide one-on-one assistance to inmates.

36.     In addition, the Education Department provides the inmate population with access to law and leisure library services. Each housing unit is provided a basic law and leisure library for informational and recreational purposes, respectively. The main law library is housed in the Education Department and is accessible to all inmates. Library technicians make daily rounds to all housing units to deliver leisure and law materials. Official testing is completed monthly for those inmates who have met the testing eligibility requirements and are recommended by the teachers. Testing is completed on an individual basis.

37.     Recreational activities that reduce inmate idleness and provide a positive use of leisure time, are also available to the inmate population. These include weekly leisure games via closed circuit television system, weekend brain teasers, arts and crafts, wellness programs, a weekly movie program and special holiday activities. The institution provides religious services for all faiths and community volunteers augment ADX Florence's chaplaincy program. However, all religious activities are broadcast to the inmate population via closed circuit televisions.

38.     The inmates are afforded medical and dental care services. The Health Services Department at FCC Florence consists of a 51-position cadre of medical professionals and ancillary staff. Health Services staff provides a broad spectrum of medical

14

222

Exhibit F 

Exhibit F

13/14

P57

and dental care, consistent with outpatient community health care standards. Inmates with major medical concerns may be treated in a local hospital, or are transferred to one of the Bureau's Medical Centers.

39.     A substance abuse program is available to all inmates. The substance abuse program coordinated by Psychology Services consists of drug awareness and education programs provided via closed circuit televisions. Follow-up programming is available for those with sufficient motivation to undertake individualized treatment plans and long-term follow-ups with their unit counselors.

40.     Psychology services are available to all inmates through the Psychology Department. The Psychology Department provides a full range of services, including evaluation, psychotherapy, and other treatment programs, such as smoking cessation, stress and anger management, and alternatives to criminal lifestyles program, within the context of the ADX structure.

41.     All inmates may receive non-contact legal visits. All inmates may send and receive general and special correspondence.

42.     The Bureau provides inmates requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practices within the constraints of budget limitations and the security and orderly running of the institution and the Bureau through a religious diet menu.

12

**Exhibit F**

Hamza's2 echr annex_053

38

**Exhibit F**

145

P58

Pursuant to the provisions of 28 U.S.C. 1746, I declare under penalty of perjury

that the foregoing is true and correct to the best of information, knowledge, and belief.

Executed on this 3rd day of October, 2007, in Florence, Colorado.

R. Wiley
Warden
United States Penitentiary, Administrative Maximum

224

Hamza s2 echr annex_053

**Exhibit F**

**Mr John McGuinness QC** (instructed by **Crown Prosecution Service**) for **Director of Public Prosecutions**

Hearing dates: 2, 3 & 4 October 2012

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

Ex. 06. Att. 03 ___1___ pages
                   44

U.K. High Court of Justice



147

Ex-06 Att-03-2/44

<u>Neutral Citation Number:</u> [2012] EWHC 2736 (Admin)

<u>Case Nos: CO/10214/2012, CO/10190/2012, CO/10416/2012, CO/10393/2012,</u>
<u>CO/10556/2012</u>

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**DIVISIONAL COURT**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: 05/10/2012</u>

Before :

**PRESIDENT OF THE QUEEN'S BENCH DIVISION**
**and**
**MR JUSTICE OUSELEY**

- - - - - - - - - - - - - - - - - - - - -

Between :

Abu Hamza, Khalid Al Fawaz, Abdel Bary, Babar      **Claimants**
Ahmad, Talha Ahsan
- and -
Secretary of State for the Home Department      **Defendant**

- - - - - - - - - - - - - - - - - - - - -

**Mr Alun Jones QC and Mr Ben Brandon** (instructed by **Sonn Macmillan Walker**) for the
**Claimant Abu Hamza**
**Mr Edward Fitzgerald QC and Mr Malcolm Hawkes** (instructed by **Quist Solicitors**) for the
**Claimant Al Fawaz**
**Ms Phillippa Kaufmann QC and Mr Ben Cooper** (instructed by **Birnberg Peirce &**
**Partners**) for the **Claimant Babar Ahmad**
**Mr Hugh Southey QC and Mr Ben Cooper** (instructed by **Birnberg Peirce & Partners**) for
the **Claimant Abdel Bary**
**Mr James Eadie QC, Mr Ben Watson and Ms Heather Oliver** (instructed by **Treasury**
**Solicitor**) for the **Secretary of State for the Home Department**
**Ms Clair Dobbin** (instructed by **Crown Prosecution Service**) for **The Government of the**
**USA (Abu Hamza)**
**Mr James Lewis QC** (instructed by **Crown Prosecution Service**) for **The Government of the**
**USA (Al Fawaz & Abdel Bary)**
**Mr Patrick O'Connor QC** (instructed by **Ward Hadaway**) for **Mr Karl Watkin, Interested**
**Party**
**Mr Jeremy Johnson QC** (instructed by **Metropolitan Police Solicitor**) for **Commissioner of**
**the Metropolitan Police**

**The President of the Queen's Bench Division:**

This is the judgment of the court.

## INTRODUCTION

1.  Each of the five claimants is the subject of an extradition request issued by the Government of the United States of America in order that each of them may stand trial in that country for terrorism related offences. Each has brought separate claims for judicial review and for stays of their extradition, raising different issues in each case, except for an issue common to four of them relating to the prison conditions they would experience at ADX Florence, Colorado.

2.  These proceedings are the latest and, if we refuse permission, the last, in a lengthy process of appeals and applications that has continued for some 8 years in the case of two and 6, 13 and 14 years in the case of three. The background procedural facts of each individual may briefly be summarised as follows.

*Al Fawaz and Abdel Bary*

3.  Al Fawaz's extradition was requested in September 1998, some 14 years ago. The District Judge ruled on 8 September 1999 that his extradition could proceed. His appeal to the High Court by way of an application for a writ of *habeas corpus* was rejected on 30 November 2000.

4.  Abdel Bary's extradition was requested in July 1999. The District Judge ruled on 25 April 2000 that his extradition could proceed. His appeal to the High Court was dismissed on 2 May 2000.

5.  Both of those proceedings are governed by the old law applicable under the Extradition Act 1989.

6.  Both Al Fawaz and Abdel Bary appealed to the House of Lords where their appeal was dismissed on 17 December 2001, with the court finding that the claimants were liable to extradition to the United States on the existence of a *prima facie* case of conspiracy to murder, of which the most terrible manifestation was the bombing of two US Embassies in East Africa, in which over 200 people were killed and 4,500 injured. After several representations to the Secretary of State between November 2001 and December 2005, the Secretary of State rejected both claimants' representations on 12 March 2008, finding that the United States' assurances could be relied on and that the claimants were not at risk of the death penalty.

7.  Al Fawaz and Abdel Bary subsequently applied for judicial review of the Secretary of State's decision. On 7 August 2009 Scott Baker LJ found that there was effective judicial oversight of 'supermax' prisons and considered that neither of the claimants' cases crossed the Article 3 threshold. Although a point was certified for the Supreme Court in relation to the compatibility of ADX prison conditions with Article 3, on 16 December 2009, the Supreme Court refused permission to appeal.

*Abu Hamza*

Judgment Approved by the court for handing down.                    Abu Hamza & Others v SoS for the Home Department

4 /ACC

8.      Abu Hamza's extradition was requested by the United States on 21 May 2004, now
        over eight years ago.  The case against him is that he conspired to take hostages in the
        Yemen, to set up a terrorist training camp in Oregon and to give other support to
        terrorists.  He was arrested in London on 5 August 2004.  Abu Hamza served seven
        years' imprisonment after being convicted of offences in the United Kingdom.
        Thereafter extradition proceedings were resumed, with the Senior District Judge
        ruling on 15 November 2007 that his extradition could take place.  The Secretary of
        State ordered his extradition on 7 February 2008.  The High Court rejected Abu
        Hamza's appeal on 20 June 2008 and also refused on 23 July 2008 to certify a point of
        law that would permit an appeal to the House of Lords.

*Babar Ahmad*

9.      Babar Ahmad was arrested in London on 5 August 2004.  The case against Babar
        Ahmad is that through websites operated from the UK and a mirror website in the US
        and by extensive e-mail correspondence, he solicited funds for terrorism for the
        Taliban and other Mujahideen.  A material part of that effort was directed at the
        United States.  The most serious allegation is communication with an enlistee in the
        US Navy when on patrol, his encouragement of that person and the possession of
        details of the vulnerability of a US battle formation in the Straits of Hormuz; the
        allegation is to the effect that the enlistee was encouraged to betray his fellow crew
        members and his country.

10.     The CPS declined in 2004 to prosecute on the basis that there was insufficient
        evidence in the UK for a successful prosecution.  He was charged in the United
        States.  On 17 May 2005 the Senior District Judge ruled that his extradition could
        proceed.  On 15 November 2005 Babar Ahmad's extradition was ordered.  Babar
        Ahmad's appeal to the High Court was rejected on 30 November 2006.  On 6 June
        2007 the House of Lords refused leave to appeal.

*Talha Ahsan*

11.     Talha Ahsan's extradition was requested on 15 September 2006.  The case against
        him is similar to that against Babar Ahmad.  The Senior District Judge ruled on 19
        March 2007 that his extradition could proceed.  The Secretary of State then ordered
        his extradition on 14 June 2007.  His appeal was refused by the High Court on 14
        April 2008, and a month later that court refused to certify a point of law that would
        permit an appeal to the House of Lords.

*The claimants' ECtHR Appeals*

12.     Each of the claimants, after the decision of the UK courts permitting extradition,
        applied to the ECtHR.

13.     On 6 July 2010 the European Court of Human Rights declared admissible the five
        claimants' complaints concerning detention at ADX Florence "supermax" prison and
        the imposition of Special Administrative Measures (SAMs) if convicted.  Under Rule
        39 of the Rules of that Court, the court indicated to the UK Government that it would

Judgment Approved by the court for handing down.     Abu Hamza & Others v SOS for the Home Department

5/44

be desirable in the interests of justice not to extradite the claimants until further notice.

14.     The following issues were declared inadmissible by the Court.   Abu Hamza's complaint in respect of ADX Florence was deemed inadmissible, with the court finding that as a result of his medical conditions there was no real risk of his spending more than a short period in ADX Florence.  The court further declared inadmissible each of the claimants' complaints based on Articles 6 and 8 in respect of detention at ADX Florence.

15.     Following the court's admissibility decision the Government of the United Kingdom and the claimants filed observations with the court.  The court also received third-party comments from various non-governmental organisations.  On 10 April 2012 five judges of the Fourth Section of the Court dismissed each of the five claimants' cases. On 24 September 2012 the petition for the claimants' case to be referred to the Grand Chamber was refused.

16.     As a result of that decision, and with the bar to extradition and the Rule 39 order now being removed, each of the five claimants has brought proceedings before this court to challenge the refusal of the SSHD to delay or prevent their surrender to the United States.

*Nature of the challenges in this court*

17.     The four claimants other than Abu Hamza have sought to argue before us that the prison conditions they would face at ADX Florence 'super max' prison in Colorado would be incompatible with Article 3 of the European Convention on Human Rights. Abu Hamza does not face a real risk of more than a very short term of detention there.

18.     The individual challenges are as follows:

    i)      Al Fawaz seeks to challenge the order that exists for his surrender.  He submits that new evidence casts doubt on the existence of a *prima facie* case against him and on the US Government's good faith in continuing to seek his extradition.  Proof of a *prima facie* case was required under the 1989 Act.

    ii)     Abdel Bary also submits that new evidence has arisen to cast doubt as to whether there is a *prima facie* case against him.  In addition he contends that because of a deterioration in his psychiatric condition, extradition would be a breach of Article 3.

    iii)    Abu Hamza seeks an injunction to give him time to seek to re-open the statutory appeal under Rule 52.17 of the Civil Procedure Rules 1998 that was determined against him on 20 June 2008.  He submits that new evidence has arisen which shows he is unfit to plead, and that this issue should be resolved before his surrender to the US authorities.

    iv)     Babar Ahmad and Talha Ahsan have each made submissions arguing that their extradition cannot take place as there exists the possibility of a domestic prosecution in the United Kingdom, and of the possibility of a private prosecution under the Terrorism Act 2000.  The decisions of the DPP on the

Judgment Approved by the court for handing down.          Abu Hamza & Others v SoS for the Home Department

6/44

question of prosecution, and of the DPP very recently in refusing consent to a private prosecution are said to be unlawful; they too are challenged. Each of these possibilities they submit means that they should not be extradited, and instead that UK based legal action should take precedence. Mr Karl Watkin, a private individual, has sought to prosecute Babar Ahmad and Talha Ahsan in the UK for terrorist offences for which the consent of the DPP is required. It has very recently been refused. He is an interested party to the claimants' challenge to that refusal of consent.

v)    Mr O'Connor QC, on Mr Watkin's behalf, disavowed any intent to challenge the decision of the Senior District Judge given on Thursday morning (4 October 2012) to refuse to issue summonses for a private prosecution by Mr Watkin of Babar Ahmad and Talha Ahsan for solicitation to murder, an offence the private prosecution of which does not require the consent of the DPP. The Senior District Judge doubted whether the evidence provided was sufficient for that particular offence but also held that the application for the summonses was an abuse of the process of the court as an attempt to intermeddle with the extradition process.

*Observations*

19.    Before turning to the decision in each particular case it is important to make seven general observations.

20.    First, as is apparent from what we have set out in summary, each of these claimants long ago exhausted the procedures in the United Kingdom. They then applied to the European Court of Human Rights on a number of matters. That failed. There can be no doubt that each has, over the many years, either taken or had the opportunity to take every conceivable point to prevent his extradition to the United States.

21.    Second, there is an overwhelming public interest in the proper functioning of the extradition arrangements and the honouring of extradition treaties. It is also in the interests of justice that those accused of very serious crimes, as each of these claimants is in these proceedings, are tried as quickly as possible as is consistent with the interests of justice. It is unacceptable that extradition proceedings should take more than a relatively short time, to be measured in months not years. It is not just to anyone that proceedings such as these should last between 14 and 8 years.

22.    Thirdly, it is necessary to emphasise the importance of finality in litigation and the particular importance of that principle in extradition cases because of the public interest in an efficient process, the need to adhere to international obligations and to avoid a recurrence of the delays which have so disfigured the extradition process in the past and to which successive appeals over time can subject it.

23.    Fourth, a necessary part of finality in litigation is that all parts of a case should be raised on the first occasion on which they properly can be raised; where subsequent events or significant evidence are said to give rise to a need for further consideration, they must be deployed as soon as possible and not withheld until any preceding action has concluded.



24. Fifth, all of the applications were raised at the end of last week or the beginning of this week. We have been provided with over 15 files and have heard argument from those instructed on behalf of the claimants and from Mr Eadie QC and Mr Watson for the Secretary of State over three days on the applications now raised. Each of the claimants has therefore had a very full opportunity to put his application to the court so that we can consider whether there is anything to go forward. As was made clear by Mr Eadie QC at the conclusion of the second day of the hearing, if we refuse permission or refuse the stays, as these applications are all in criminal causes or matters, there is no appeal from our decision and the Secretary of State will be free to make arrangements for the extradition of each of the claimants. That position was not contested.

25. Sixth, we have carefully considered all of the arguments and the full judgment which we will give is necessarily long as it has had to examine all the points made. We considered that we should deliver that judgment orally as soon as we had reached our decision as the claimants and the Secretary of State are entitled to know whether these proceedings come to an end and extraditions can take place or, whether, in the case of each applicant there is a matter which justice requires to be further considered and the extradition halted.

26. Finally, as we will observe in the course of our judgment in relation to Abu Hamza, there may well be a need to reconsider the inter-relationship of the statutory appeal scheme, the ability to re-open appeals and the role of judicial review. As has happened elsewhere, there may be real dangers in the structure of a scheme which not only has a statutory appeal procedure but which has become complicated by judicial review proceedings which can be used to re-open or raise again issues that have already been decided.

27. The order in which we will deal with the claims and issues is:

    i)      Prison conditions

    ii)     Khalid Al Fawaz

    iii)    Abdel Bary

    iv)     Abu Hamza and

    v)      Babar Ahmad and Talha Ahsan


I    **PRISON CONDITIONS: DETENTION IN CIRCUMSTANCES OF MAXIMUM SECURITY AT ADX, FLORENCE, COLORADO**

28. We deal with this issue first as it is a common issue to all but one of the claimants, Abu Hamza, for reasons we have explained.

29. The claimants before this court contend that:

Case No. 1:20-cv-00694-PAB-MDB   Document 119   filed 07/22/21   USDC Colorado   pg 144
of 326
Judgment Approved by the court for handing down.                     Abu Hamza & Others v SoS for the Home Department

i) The Fourth Section of the ECtHR in its judgment of 10 April 2012 misunderstood the evidence provided to it about conditions at ADX Florence, Colorado. In particular it made an error as to the length of time that those who would be subject to SAMs could serve in solitary confinement in the Special Security Unit.

ii) The ECtHR should have accepted the evidence which the claimants had submitted on that issue.

iii) The ECtHR should not have refused to admit the evidence submitted by the claimants in response to evidence submitted by the UK Government; in effect the ECtHR acted unfairly and breached Article 6 ECHR.

30. As each of the four claimants was likely to be subject to SAMs, this court should examine the evidence afresh. If it did so, it should come to the conclusion that the Fourth Section had been wrong and that this court should now consider the claimants' evidence and find that the conditions would amount to a breach of Article 3. This was so despite the fact that the claimants had raised these points in their petition to the Grand Chamber so as to have this error corrected or their evidence accepted; their petition was refused. Whether extradition is sought under the 1989 Act or 2003 Act, the Secretary of State has a reserve power notwithstanding the conclusion of the statutory processes, to stay extradition where it would breach human rights. This court also cannot act in a way which would breach human rights. It is that specific and limited jurisdiction that is invoked for these purposes. We say a little more about it in relation to other claims.

*(i)    The position in law as to solitary confinement as determined by the judgment of the ECtHR*

31.    In its judgment of 10 April 2012 the Fourth Section concluded at paragraphs 209-212:

> "209. Whilst prolonged removal from association with others is undesirable, whether such a measure falls within the ambit of Article 3 of the Convention depends on the particular conditions, the stringency of the measure, its duration, the objective pursued and its effect on the person concerned.
>
> 210. In applying these criteria, the court has never laid down precise rules governing the operation of solitary confinement. For example it has never specified a period of time beyond which solitary confinement will attain the minimum level of severity required for Article 3 … The court has however emphasised that solitary confinement, even in cases entailing relative isolation cannot be imposed on a prisoner indefinitely.
>
> 211. Equally, although it is not for the court to specify which security measures may apply to prisoners, it has been particularly attentive to restrictions which apply to prisoners who are not dangerous or disorderly; to

restrictions which cannot reasonably be related to the purported object of isolation; and to restrictions which remain in place after the applicant has been assessed as no longer posing a security risk …

212. Finally in order to avoid any risk of arbitrariness resulting from a decision to place a prisoner in solitary confinement, the decision must be accompanied by procedural safeguards guaranteeing the prisoner's welfare and the proportionality of the measure."

32. At paragraph 213 the court went on to stress that special attention must be paid to the availability and duration of outdoor exercise and the conditions in which prisoners might take it. The court at paragraph 215 emphasised that the detention of a person who is ill may raise issues under Article 3 and the lack of appropriate medical care may amount to treatment contrary to that provision. It added:

"In particular, the assessment of whether the particular conditions of detention are incompatible with the standards of Article 3 has, in the case of mentally ill persons, to take into consideration their vulnerability and their inability, in some cases, to complain coherently or at all about how they are being affected by any particular treatment… There are three particular elements to be considered in relation to the compatibility of an applicant's health with his stay in detention: (a) the medical condition of the prisoner, (b) the adequacy of the medical assistance and care provided in detention, and (c) the advisability of maintaining the detention measure in view of the state of health of an applicant."

The argument before us proceeded on the basis that no challenge was made to the general legal principles.

33. After setting out those general principles and having set out in a manner to which we will refer the detailed evidence before it, the ECtHR examined the particular facts and concluded that on the facts there would be no violation of Article 3. As we have set out, it is contended that the errors that were made were in the application of the principles to which we have referred to those facts and to the receipt of evidence.

34. It is therefore necessary first to set out the evidence that was before the ECtHR and then to examine whether that court made an error, whether it should have accepted the claimants' evidence and whether it acted unfairly and in breach of Article 6 in declining to accept some of the evidence submitted by the claimants.

*(ii)   The evidence submitted by the UK Government*

35. As is usual in the practice of the ECtHR, after the court's decision on the admissibility, the UK Government submitted observations in which it set out its evidence, its detailed analysis of the facts and the law relevant to the issues before the court. It supported that analysis with extensive evidence and information from the United States authorities and in particular the Department of Justice (DoJ) and the



Federal Bureau of Prisons (BoP). Included within those observations sent on 7 December 2010 were statements by Louis J Milusnic, an associate warden at the ADX at Florence, Colorado whose statement was in large part directed to the conditions for those inmates subject to SAMs and housed in the Special Security Unit and a statement by Ms Patricia Rangel, Manager for the General Population Unit at ADX Florence, Colorado. Her statement was directed in large part to the conditions in the General Population Unit.

36.    The two statements therefore put before the court constitute evidence about two differing regimes at ADX Florence, Colorado, namely (1) the regime applicable to those subject to SAMs who were housed in the Special Security Unit (H Unit) and those, a few of whom might be subjected to SAMs, in the General Population Unit. The court summarised that evidence at paragraphs 83-87 in respect of the conditions in the Special Security Unit for those subject to SAMs and at paragraph 88 for those in the General Population Unit.

37.    It is not necessary to set out the evidence of each in full as the error alleged to have been made by the Fourth Section only goes to the progress that an inmate could make, such progress being relevant to the time and conditions under which an inmate might be detained in solitary confinement and the degree of that solitary confinement.

38.    The statement of Mr Milusnic made clear that the inmates in the Special Security Unit who had been given SAMs were subject to a three phase programme. Phase 1 the most stringent, Phase 2 less stringent and Phase 3 less stringent again. His statement made clear that there could be progression from Phase 1 to Phase 2 and Phase 2 to Phase 3 through six monthly reviews attended by the inmates. His statement set out that there were 12 prisoners in phase 1, 11 in Phase 2 and 4 (all convicted of terrorist activity) who had advanced to Phase 3. The importance of Phase 3, as is apparent from the statement and is recorded in paragraph 84 of the judgment of the ECtHR, is that in Phase 3 group recreation was permitted five days a week in groups of four, the number of non-legal telephone calls was increased to four, inmates ate one meal together and engaged in recreational activities together for one and a half hours a day.

39.    In the General Population Unit, according to the statement of Ms Rangel, there were four regimes:

i)    The General Population which was housed in four units. As is set out in Ms Rangel's evidence and recorded at paragraph 88 of the court's judgment one of the features of those in the General Population Unit was that meals were delivered and eaten in the cells.

ii)    The Intermediate Unit which was part of what was known as the "Step Down Programme" where inmates were subject to a less stringent regime. As an example, set out in her statement and recorded in the judgment of the court, meals were provided to inmates by groups meaning that each group was allowed out of their cells one at a time to collect meals but they had to return to their cells to eat.

iii)    The Transitional Unit. This was again a less stringent regime where inmates were unrestrained when out of their cells and permitted to eat their meals with other inmates assigned to the group.

iv)     The Pre Transfer Unit where more association was permitted.

It is quite clear from the evidence, as fully recorded in the judgment of the ECtHR, that the Special Security Unit regime and the General Population Regime were different but each permitted progress from a more stringent regime at the outset to a somewhat less stringent regime at the end, such lack of stringency being reflected in a greater degree of association and therefore a lessening in the degree of isolation and solitary confinement.

*(iii)   The evidence submitted by the claimants*

40.    The claimants responded in May and June 2011 to those observations.  In their evidence as originally submitted and submitted in May and June 2011, evidence was provided as to the time spent at ADX Colorado.  This included a survey by Mr Mark Donatelli, a lawyer who had conducted a survey that found that at least 43 inmates of ADX Florence had spent 8 years or more in lock-down conditions there or in other prisons; this is referred to at paragraph 101 of the judgment of the ECtHR.  It also included evidence from Professor Rovner of Denver University's clinical programme which is referred to at paragraph 101 of the judgment.  In her statement of 27 May 2011, Professor Rovner set out details of the length of time four of the clinical programme's clients had spent at the ADX.  She instanced the case of Mr Rezaq who was kept in isolation for 13 years before he was allowed to progress to and through the Step Down Programme and that other clients had spent nine years, seven years and nine years before being admitted to the Step Down Programme.  She also gave details of the time six other Arab/Muslim prisoners with SAMs spent in solitary confinement in the Special Security Unit.

*(iv)   The further evidence submitted by the UK Government and questions asked by the ECtHR*

41.    On 6 June 2011 the ECtHR invited the UK Government to make a further response.  That response was sent on 27 September 2011.  Included within that response were letters from the DoJ dated 22 September 2011 and 26 September 2011 which included the response of the BoP.  Some of those observations covered specific questions that the court had raised including, as is set out in paragraph 93 of the judgment of the ECtHR, questions as to how long inmates had spent in the Special Security Unit Programme and each phase of that programme.  As the information provided by Ms Rangel's statement did not set out the numbers, in contradistinction to the statement of Mr Milusnic to which we have referred at paragraph 38 above, the ECtHR asked how many inmates were in each phase of the Step Down Programme.  The court also asked in respect of both the General Population Programme and the Special Security Unit Programme how long each inmate had spent at ADX and how long they had been in each phase of the programmes and how many inmates had completed the programme.

42.    It is quite clear, in our view, from the way the questions were phrased, that the ECtHR understood and drew a distinction between the Special Unit Security Programme and the Step Down Programme.

43.    The first letter from the United States DoJ (that dated 22 September 2011) set out more details of ADX Florence.  It set out information about the General Population

and information about the availability of the Step Down Programme. At page 11, paragraph 4 it stated:

> "Generally, inmates with SAMs are housed in the Special Security Unit and do not have access to the ADX Florence General Population and Step-Down Programme. The inmates housed in the Special Security Unit are provided a programme similar to the ADX Florence General Population and Step-Down Programme which was detailed in [Mr Milusnic's statement].
>
> Please note three things. First, not every inmate with a SAM is required to be housed at ADX Florence. Currently seven inmates with SAMs are housed at other BoP institutions.
>
> Second, since 2003 the BoP vacated or did not renew SAMs for 13 inmates. Of those 13 inmates, seven were transferred from ADX Florence to other institutions or released from BoP custody. The inmates who were transferred to other institutions did not go through the Step-Down Programme. Thus Rovner's assertion the Step-Down Programme is the "only way to leave the ADX" is incorrect. The remaining six inmates entered ADX Florence's General Population.
>
> Third it is possible that an inmate with a SAM could be housed at ADX Florence's General Population. In such a case the inmate could have access to the Step Down-Programme. The restrictions contained in the SAMs determine where an inmate with a SAM is housed."

44.   In the second letter (that dated 26 September 2011) the US authorities answered the specific questions raised by the court. It set out the numbers in the Special Security Unit Programme as of 30 September 2011: namely there were 17 prisoners in Phase 1, 9 in Phase 2 and 6 in Phase 3, making the Unit which could house 32, full. It also set out the figures for the General Population, the total there was 252 prisoners with 32 in the Intermediate Unit, 32 in the Transitional Unit and 25 in the Pre Transfer Unit. The letter said that the US Government could not provide information as to how long inmates had spent in each phase of the Special Security Unit Programme and in each phase of the Step Down Programme, giving reasons why it could not do so. The information in the letters is referred to in particular at paragraphs 94 and 97 of the judgment of the ECtHR.

45.   After receipt of those letters, the ECtHR sought further information and explained what it needed to know. The response was provided in a letter of 24 October 2011 from the US DoJ. After repeating its objections about providing information, the DoJ and BoP had randomly selected 30 inmates who were currently in the General Population or the three phases of the Step Down Programme and gave figures based on that number; a schedule was appended which showed in respect of each of those thirty the time spent in the General Population Unit, times (if any) spent in the other units and whether there had been prior SAMs. The letter made clear that they would not provide any further information about those in the Special Security Unit.



*(v)     The claimants' response and the court's decision on the response*

46.    In response to the provision of that information Birnberg Peirce & Partners, on behalf
of the claimants, wrote to the ECtHR on 22 November 2011 commenting upon the
information supplied.  The letter pointed out that because of the failure to provide data
on SAM prisoners, essential information was withheld about the likely fate awaiting
the claimants if they were extradited, and in particular concerning the likely and
potentially indefinite time which they risked spending in highly restrictive conditions
applicable to those who were subject to SAMs.  They pointed out that data provided
by the BoP to Human Rights Watch demonstrated that inmates who had been in ADX
and under SAMs had in many cases been held in isolation for periods for up to a
decade; they referred in a footnote to the consolidated evidence before the court.

47.    The letter stated that the claimants had in response to the statistics provided on 24
October 2011 by the US DoJ and BoP assembled statistical data based on a far larger
sample of 124 prisoners.  As the letter made clear, the data was said to demonstrate
the years 110 of the 124 inmates had been held at ADX.  It was contended that their
larger statistical sample showed that 69 inmates had remained at ADX for longer than
five years and six months with 3 inmates having remained at ADX for more than 16
years and 14 inmates for more than 15 years.  They appended a chart which it was
contended graphically highlighted the unreliability of the claim that the data presented
by the US authorities was representative.

48.    On 7 December 2011 the Registrar returned the observations on the basis that the
court had not asked for them.

*(vi)    The judgment of the Fourth Section*

49.    In its judgment on 10 April, the Fourth Section of the ECtHR made its findings in
relation to the application of the principles to the case of these claimants at paragraphs
218-224.  It first held that there was no dispute that the physical conditions at ADX
Florence met the requirements of Article 3.  The essence of the complaints was
principally directed at the lack of procedural safeguards before placement at ADX and
ADX's restrictive conditions and lack of human contact.  The court rejected at
paragraph 220 the lack of procedural safeguards.

50.    It then turned at paragraphs 221-224 to the second main complaint, the restrictive
conditions and lack of human contact.  At paragraph 221, the court set out its
conclusion that there was nothing to suggest the US authorities would not continually
review their assessment of the security risk posed by the claimants, if convicted.  The
court added:

> "Moreover as the [DoJ]'s most recent letter showed, the United
> States authorities have proved themselves willing to revise and
> to lift the [SAMs] which have been imposed on terrorist
> inmates thus enabling their transfer out of ADX to other, less
> restricted, institutions."

51.    At paragraph 222 the court stated:

> "The Court also observes that it is not contested by the
> Government that conditions at ADX Florence are highly
> restrictive, particularly in the General Population Unit and in
> **phase one** of the Special Security Unit." (Emphasis added.)

The court then continued:

> "It is clear from the evidence submitted by both parties that the
> purpose of the regime in those units is to prevent all physical
> contact between an inmate and others, and to minimise social
> interaction between inmates and staff. This does not mean,
> however, that inmates are kept in complete sensory isolation or
> total social isolation."

The court found that the inmates were not kept in total sensory isolation or total social
isolation for the reasons it set out. It concluded:

> "All of these factors mean that the isolation experienced by
> ADX inmates is partial and relative."

52.    At paragraph 223, which is the part of the judgment where the ECtHR is said to have
shown it misunderstood the evidence, the court stated:

> "The Court would also note that, as it emphasised in *Ramirez
> Sanchez*, cited above, § 145, solitary confinement, even in
> cases entailing relative isolation, cannot be imposed
> indefinitely. If an applicant were at real risk of being detained
> indefinitely at ADX, then it would be possible for conditions to
> reach the minimum level of severity required for a violation of
> Article 3. Indeed, this may well be the case for those inmates
> who have spent significant periods of time at ADX. **However,
> the figures provided by the United States' authorities,
> although disputed by the applicants, show that there is a
> real possibility for the applicants to gain entry to the step
> down or special security unit programs.** First, the
> Department of Justice's letter of 26 September 2011 shows that
> while there were 252 inmates in ADX's General Population
> Unit, 89 inmates were in the step down program. The figures
> provided in that letter for the special security unit program,
> when compared with the November 2010 figures given by
> Mr Milusnic, demonstrated that inmates are progressing
> through that program too. Second, Ms Rangel's declarations
> show that inmates with convictions for international terrorism
> have entered the step down program and, in some cases, have
> completed it and been transferred to other institutions.
> Ms Rangel's declaration is confirmed by the *Rezaq et al v.
> Nalley et al* judgment of the District Court where the
> petitioners, all convicted international terrorists, had brought
> proceedings to obtain entry to the step down program but, by
> the time the matter came to judgment, had completed the
> program and been transferred elsewhere." (emphasis added)

In complaining about the passage which we have emphasised in bold, it was
contended on behalf of the claimants that the court was wrong when it said that there
was a real possibility for the claimants to gain entry to the Step Down or Special
Security Unit Programmes. It showed that the Court had thought that entry to the
Special Security Unit was earned as a potential route to leave ADX conditions.

### (vii)   The appeal to the Grand Chamber

53.     Coincidentally, on the last day that was possible, the claimants applied to the Grand
        Chamber under the rules of ECtHR for the case to be referred to the Grand Chamber.
        In the detailed and persuasive submissions advanced by Edward Fitzgerald QC, Ben
        Cooper, John Jones and Gareth Peirce on behalf of the claimants, the claimants put
        forward as one of their grounds the contention that the Fourth Section had
        misinterpreted the evidence provided by the DoJ and BoP. It was submitted that the
        Section had fundamentally misconstrued the data submitted by the DoJ and BoP, that
        the Section had misunderstood the function of the Special Security Unit, and that the
        Section had accepted answers from the UK Government that were on their face
        inconsistent. The submission set out other grounds which were critical of the
        passages in the judgment to which we have referred. In addition to making those
        arguments, it was also contended on behalf of the claimants that the Fourth Section
        had failed to give the degree of anxious scrutiny demanded by an investigation of
        Article 3 and it had failed to apply the standards of Article 6 to the receipt of evidence
        advanced by the claimants. The rejection we have referred to at paragraph 48 had
        been, they contended, a violation of Article 6 and a violation of the principle of
        equality of arms. The claimants would have shown that the statistics provided by the
        DoJ and BoP were wrong if this evidence had been admitted.

54.     On 24 September 2012, the Grand Chamber declined the application that the case be
        referred to it.

55.     Having set out the procedural history it is now possible to return to the three
        arguments advanced on behalf of the claimants as to why this court should hold that
        the conditions to which these claimants would be subjected at ADX Florence were, on
        the evidence which should have been before the Fourth Section, such that they would
        be a violation of Article 3.

### (viii) Our conclusion on the alleged error of the ECtHR

56.     As to the first contention made by the claimants which we have set out at paragraph
        29, it is in our view clear, from the way in which the ECtHR set out the evidence and
        from the detailed description of the evidence, that the court was looking at (1) the
        distinction between the position in the General Population Programme and the
        transition to Intermediate, Transitional or Pre Transfer which is applicable to the
        General Population and (2) the distinction in the Special Security Unit programme
        between Phase 1 and the transition to Phases 2 and 3. That in our view is evident
        from the careful way in which the court set out the evidence and in particular from the
        passages at paragraphs 222 and 223 which we have set out above. The passage in
        paragraph 223 is referring in each instance to the way in which a prisoner can
        progress through stages towards removal from ADX. It is not necessary to pass
        through the General Population Unit Step Down Programme in order to be transferred
        from the Special Security Unit to another prison, though progress through the Special

Case No. 1:20-cv-00694-PAB-MDB   Document 119   filed 07/22/21   USDC Colorado   pg 152
of 326

Judgment Approved by the court for handing down.   Abu Hamza & Others v SOS for the Home Department

14/44

151

Security Unit does not mean that the prisoner will then be transferred; and the court does not suggest otherwise.

57.   Moreover the court in setting out the figures distinguished between the General Population Unit and the Special Security Unit.  As the court stated, the figures provided by Mr Milusnic in his statement of December 2010 and the figures set out in the letter of 26 September 2011 showed that there were progressions through the Phases of the Special Security Unit Programme.  The court in its use of the words "through that programme" plainly showed that it had in mind the distinction between the General Population Unit and the Special Security Unit and that in each there was progress.

58.   We are therefore entirely satisfied not only that the ECtHR did not fall into the error alleged in its judgment, but also the judgment contains a careful and clear elucidation of the facts which correctly reflected the evidence before it.  There is a minor error in the third sentence of paragraph 96 where the words "or Special Security Unit" appear to have been included in error, but such a minor error in no way vitiates the conclusion we have reached.

*(ix)   Our conclusion as to whether the court should have accepted the evidence submitted by the claimants*

59.   As we have set out at paragraph 40 above, extensive evidence was submitted by the claimants which the court received and summarised in its judgment as we have set out.  It is quite clear, in our view, that as the court set out the evidence of Mr Donatelli, of Professor Rovner and of the NGOs in the judgment, it must have had that evidence in mind when it considered the conclusions of fact which it reached in paragraphs 221-224 of the judgment.  We ourselves have looked carefully at that evidence in the light of the submissions made by Mr Fitzgerald QC to the effect that, on the evidence submitted by the claimants, there was a real risk that they would spend a long period in solitary confinement with no end in sight and in effect the real risk of indefinite detention in solitary confinement.  That, it was submitted, would be a breach of Article 3.

60.   It is clear, in our view, from the analysis set out by the court that the court looked in detail, not at the overall time a person would spend at ADX Florence, but at the periods of time that were likely to be spent in the differing conditions of restricted confinement as part either of the General Population Programme or part of the Special Security Unit Programme.  We can see no reason for saying that the court was not entitled on its detailed analysis to come to the conclusion it did, particularly in the light of the fact that the evidence submitted on behalf of the claimants and received by the court did not draw the careful distinction as to the time spent in different parts of the programme and the possibilities of advancement which the evidence from the DoJ and the BoP had supplied.

61.   Given the general principles set out by the court and the evidence before it, we can see no basis for contending that the court should have come to a different conclusion.

Judgment Approved by the court for handing down.                    Abu Hamza & Others v SoS for the Home Department

15/44                                                                        152

*(x)*     *Conclusion on the court's refusal to accept further evidence from the claimants*

62.    We turn to the third and final contention of the claimants, namely that the court had
violated the basic principles in Article 6 and other basic principles of justice in its
decision, to which we have referred at paragraph 49 above, not to receive the further
material submitted by the claimants.

63.    In our view it would be a very serious step for this court to take if it were to conclude
that the Fourth Section had violated the principles of Article 6 and other fundamental
principles of fairness when it refused to receive the further materials supplied by the
claimants.  Nonetheless it is a step which we could be entitled to take if circumstances
justified us in so doing.

64.    Although no reason is given by the court, the decision of the court seems to us to be
explicable on three distinct bases.  First, a court is always entitled to come to the view
that the exchange of evidence with one party responding to points made by another
must at some stage come to an end.   Second, and in our view of much more
importance, is the fact that much of the additional material was an analysis of the
evidence that was already before the court.  Third, as to the new evidence which was
comprised in the statistical data that the claimants put forward, there was no detailed
explanation of the basis of that statistical data set out in a way it could be verified and
analysed.  Moreover the data did not distinguish between the overall time spent at the
ADX and the time sent on different parts of the Programmes.  It is difficult for us to
conclude, on the basis of the materials before us, that that data is reliable or in any
way casts doubt upon the evidence supplied by the DoJ and the BoP.

65.    It seems to us, therefore, that there are reasons why the court took the view that it did,
though it did not explain them.  It is impossible for us to conclude that the way in
which the court reached its decision violated Article 6 or other fundamental principles
of justice.

*(xi)*    *Consequences of the decision of the Grand Chamber*

66.    Submissions were made to us as to the principles upon which the Grand Chamber
would consider a case and the significance of the Grand Chamber's refusal to hear the
appeal from the Fourth Section.  Article 43.2 states:

> "A panel of five judges of the Grand Chamber shall accept
> requests if the case raises a serious question affecting the
> interpretation or application of the Convention or the protocols
> thereto, or a serious issue of general importance."

67.    In guidance issued by the court, a more detailed explanation of Article 43 is given.  It
seems to us that given the very considerable significance of the decision of the Fourth
Section, to the Government of the United Kingdom and to extradition arrangements in
general, this was a case within the remit of Article 43 as explained in the guidance.
Therefore we can safely conclude that the decision of the Grand Chamber not to refer
the case to it is of considerable significance.

68.    We were referred to Rule 80 and Rule 81 which provide for circumstances in which
an application could be made to the Fourth Section to revise or correct its judgment,

Judgment Approved by the court for handing down.                    Abu Hamza & Others v SoS for the Home Department

16/44

153

but neither was really applicable to the facts of this case. However what is significant, in our view, is the refusal of the Grand Chamber to hear the appeal.

*(xii)   The position in this court*

69.    In the light of s.2 of the Human Rights Act 1998, we are not, as a matter of UK law, bound by the decision of the ECtHR. It is our duty merely to take it into account. It was submitted on behalf of the Secretary of State that in the light of the clear and exhaustive consideration given by the Fourth Section to the issues, we should accept its decision. Mr Fitzgerald QC urged us to treat the decision, even if we rejected the submissions made as to errors and breaches of Article 6, as a "floor but not a ceiling". In other words what the court was setting out was the minimum standards and we were entitled to review the evidence and come to our own view.

70.    It is not necessary for us to consider the extent to which this court could or should depart from a decision of the ECtHR on the facts of a particular case, as in our view we see no reason whatsoever to disregard the conclusion reached by the Fourth Section in relation to a breach of Article 3. Their analysis is clear and cogent, and we see no reason to depart from it.

*(xiii)  Conclusion*

71.    For these reasons, therefore, we have concluded that no evidence has been produced which provides an arguable case that the ECtHR erred in its conclusions on prison conditions and Article 3, and that we should ourselves reach a different conclusion. This general ground therefore fails. We will return to the specific position of Abdel Bary when we consider his case – see paragraphs 110-118 below.

## II   AL FAWAZ

72.    We have referred at paragraph 6 to the very serious crimes with which Al Fawaz is charged and to the fact the extradition proceedings were begun 14 years ago.

*(i)    The application made by Al Fawaz*

73.    The Grand Chamber's decision to refuse Al Fawaz's petition for referral of the Fourth Section decision in April 2012 was sent out in the early evening of 24 September 2012. Subsequent representations from Al Fawaz's solicitors dated 24 September 2012, running to 15 pages, were received by the Treasury Solicitor on 25 September 2012 shortly after 8am. Evidently these had been in preparation for some time before the Grand Chamber decision. Mr Raja, principal of Quist solicitors, acting for Al Fawaz, said that the timing of the Grand Chamber decision had been unexpected and caught them in mid preparation of further representations. The then sudden imminence of extradition had meant that the representations had to be submitted quickly. They had not been storing up arguments seeking only to deploy them as each successive stage in proceedings failed.

74.    That may be so on this occasion, however coincidental the timing might initially appear to be. Had there been no adequate explanation and had the representations been withheld while the Grand Chamber decision was pending that would have been an abuse of the process of the Court. We note, however, Mr Alun Jones QC for Abu

Hamza said that the Grand Chamber decision had been expected by everyone for late September 2012.

75. Those late representations were rejected by the Secretary of State in the letter of 28 September 2012. An application was then made for a judicial review of her decision. This, like Abdel Bary's, is a case under the 1989 Extradition Act. The Secretary of State's powers which Al Fawaz invoked are those which arise under para. 8 of Schedule 1 to that Act. It is said that the refusal to withdraw the Extradition Order is an unlawful exercise of the discretion.

*(ii)   The statutory framework and the test that now has to be satisfied*

76. Before turning to the merits of submissions made on behalf of Al Fawaz it is necessary to say a little about the statutory framework within which these submissions fall to be considered. By virtue of s.1(3) and para. 7 to Schedule 1 to the 1989 Act, it is the function of the Magistrate and not of the Secretary of State to decide on sufficiency of evidence for extradition: see also *Norgren v Home Secretary* [2000] EWHC 143 QB paras.41-44.

77. The way in which the Magistrate was required to approach the assessment of whether there was sufficient evidence to amount to a *prima facie* case for extradition purposes was set out in *ex parte Osman* [1991] 1 WLR 277 at 299(H), cited in para.16 of *Re Eidarous and Abdel Bary* [2001] EWHC 798 (Admin).

78. The only power of the Secretary of State which could be engaged at this late stage is accepted to be the discretionary power under para. 8(2) of Schedule 1 to the 1989 Act to withdraw an Extradition Order and refuse extradition when, in the light of a significant change in circumstances or sufficiently compelling new evidence, it would be wrong, unjust or oppressive, or incompatible with ECHR rights for extradition to continue. A refusal by the Secretary of State to exercise that discretion to withdraw an Extradition Order can only be shown to be unlawful on public law grounds. It cannot be unlawful for the discretion to withdraw an Extradition Order not to be exercised, after the conclusions of the Magistrates' Court and Divisional Court that a *prima facie* case exists, unless new evidence of a sufficiently compelling nature comes to light, making it clear that there is now no *prima facie* case. The Secretary of State's refusal to exercise the discretionary power to withdraw an Extradition Order at this stage cannot be challenged on the mere basis that there is an alteration in the state of the evidence. It is not for her to be invited to perform, or perform again, the function of the Magistrate.

79. It is not remotely enough to contend that a piece of new evidence strengthens an argument of the requested person or raises a question mark over a piece of prosecution evidence or the credibility of a prosecution witness. It is not enough to *"cast doubt"*, in a phrase considerably overused in this context, on an established *prima facie* case. The previously established *prima facie* case has to be shown not sensibly now to exist, if a refusal to exercise the discretion to withdraw an Extradition Order is to be successfully challenged. This is quite apart from any arguments about abuse of process.

Case No. 1:20-cv-00694-PAB-MDB   Document 119   filed 07/22/21   USDC Colorado   pg 156 of 326

Judgment Approved by the court for handing down.                    Abu Hamza & Others v SOS for the Home Department

18/44                                                                        155

*(iii)   The prima facie case and the course of the proceedings*

80.   It was in 1999 that the District Judge concluded that a *prima facie* case had been made out that Al Fawaz with Abdel Bary had conspired with Osama Bin Laden and others to commit acts of terrorism against US citizens, of which the murderous bombing in 1998 of the East African Embassies was an outcome.

81.   Al Fawaz challenged that decision by way of an application for *habeas corpus* which the Divisional Court rejected in 2000; *R (Al Fawaz) v Governor of Brixton Prison* [2001] I WLR 1234, and his appeal to the House of Lords was dismissed in 2001, [2002] 1AC 556.

82.   Thereafter, many further representations were made on his behalf to the Secretary of State as to why he should not be extradited.   All were rejected, including those relevant to the *prima facie* case, set out in a 56 page letter undated, but written on 12 March 2008.   This too, was challenged unsuccessfully in 2009 in *Re Eidarous and Bary* (above).   A further application to the Supreme Court was rejected in 2009; this precipitated the application to the ECtHR a few days later.

*(iv)   The case now advanced*

83.   The factual points now relied on were said to be new evidence which "*cast doubt*" on or "*undermined*" the *prima facie* case and the good faith of the requesting State.   A large application for disclosure was made in order to make good those points, with the support of what were described as two expert reports by Mr Nicholas Fielding, an investigative journalist, who also provided a witness statement dated 1 October 2012. Much of this was little more than a commentary on existing material which concluded, quite without relevance, that there never was a *prima facie* case.   Mr Fitzgerald QC however helpfully distilled the voluminous papers down to three points:

   i)      There had been a proposal to remove Al Fawaz's name from the UN 1267 Consolidated List of Terrorists established pursuant to a UN Security Council Resolution, a listing which was said to draw on the same essential allegations as relied on in the extradition process.

   ii)     It was said that a person called Al Faqih had been removed from that same list, thus undermining the *prima facie* case, though he was alleged by Al Fawaz to be a significant conspirator central to the case against Al Fawaz.

   iii)    It was said that an MI6 debrief in 2000 of another person, Kherchtou, alleged to have been closely involved with Osama Bin Laden in the 1990s, which had newly come to light, made no mention of Al Fawaz.   From this silence, it was said that positive evidence could be inferred that Al Fawaz had no role in the bombings or the conspiracy and that the UK knew it.   It was in support of that, that widespread disclosure was sought.

84.   We take these points in turn.



*(v)*     *Al Fawaz's name on the Consolidated List*

85.     Al Fawaz remains on the Consolidated List. It was contended on his behalf that telexes leaked in August 2011 through Wikileaks, the authenticity of which the Secretary of State and the US Government did not accept, showed that his was one of a large number of listed names in respect of which the US Government pressed the sponsors of the names on the list for up to date information to justify their continued presence on the list, so that if there had been no recent information about these activities, such names could be removed. The US DoJ wrote on 27 September 2012 saying it had never actively sought his delisting and that Al Fawaz remained on the list.

86.     The matter ends there – that is no basis upon which the Secretary of State could lawfully have exercised her discretion to withdraw the Extradition Order. The continuing request for extradition belies whatever inference Al Fawaz seeks to draw from the telexes. It is no more than a point he can raise at trial in his arguments. It does not begin to show the absence of a *prima facie* case or that the extradition and prosecution are being pursued without good faith in some way. And, even if authentic, the telex merely shows that those listed but inactive over some years may be delisted. It says nothing about liability for past activities. There are obvious reasons why Al Fawaz may have been less active over the last few years.

*(vi)*     *Al Faqih*

87.     The significance of the delisting of Al Faqih depends entirely on his significance in the case against Al Fawaz. The name "Al Faqih", submits Mr Lewis QC, for the Government of the United States, became no more than a name on a cloned credit card used to buy satellite phone time; there was no point in his being retained on the list. But more importantly Mr Lewis showed by reference to his opening note before the District Judge in 1999 and by reference to the District Judge's decision and the Divisional Court Judgment that Al Faqih did not rate a mention in the case against Al Fawaz at all. Mr Lewis's further researches showed no more than one passing reference to Al Faqih in the printed case before the House of Lords.

88.     The assertion by Mr Fielding in his report that the case has been affected significantly because a crucial relationship had been undermined is hopelessly adrift from the reality of the role which Al Faqih played in the *prima facie* case. It is in reality a completely irrelevant point. We have not thought it necessary to set out the very extensive basis for the *prima facie* case against Al Fawaz – that can be seen from the decision of the Divisional Court to which we have already referred.

*(vii)*     *The de-brief of Kherchtou*

89.     Third, the evidence provided by Mr Fielding of the de-brief of Kherchtou by MI6 cannot possibly undermine the clear *prima facie* case. Kherchtou, according to Mr Fielding was cross examined in the New York trial of East African Embassy bombers in 2000, by which time he had already been de-briefed. A book was published in 2011 by Ali Sufan, said to be a former FBI special agent, which referred to this de-brief. It is however Mr Fielding who reports that Kherchtou produced very little in 2000 to implicate Al Fawaz in the embassy bombings, although Kherchtou was said to be an important witness.

Judgment Approved by the court for handing down.                    Abu Hamza & Others v SoS for the Home Department

20/44

90.    The significance of the absence from Kherchtou's evidence in 2000 of comment on the involvement of Al Fawaz with Osama Bin Laden after the early 1990s is a point which could and should have been made years earlier, and did not need Mr Fielding's recent reports.

91.    This absence of inculpatory evidence from one witness cannot possibly so undermine the *prima facie* case as to warrant, let alone require, the exercise by the Secretary of State of her discretion under para.8 of Schedule 1 to the Act.  This argument did not go to the reliability of a once anonymous witness denoted as CS/1, though to the extent it might bear on it,   Mr Lewis pointed out that the Divisional Court had concluded in 2000 (some 12 years ago) that there was a *prima facie* case with or without the evidence of CS/1.  In paragraph 64 of the judgment of Buxton LJ, the court commenced its consideration of whether there was a *prima facie* case against Al Fawaz without even relying on CS/1.  In subsequent paragraphs up to paragraph 71 the court spelt out the evidence against Al Fawaz quite apart from the evidence of CS/1.  In paragraph 71 the court had no hesitation in saying that that evidence and the context of the overall evidence called for an explanation by Al Fawaz, even though each item and the whole might be susceptible of an innocent explanation.  In its present state, the evidence pointed sufficiently strongly to his involvement in the conspiracy to amount to a *prima facie* case to be met at trial.  The judgment was explicitly endorsed by the House of Lords in [2002] 1 AC 556 at paragraph 44.

92.    The Kherchtou evidence and its non-inculpation of Al Fawaz cannot possibly undermine those findings.  Further challenges to the *prima facie* case were rejected by the Divisional Court in 2009, years after Kherchtou's evidence had been given.  That case concerned a challenge to the Secretary of State's decision on 12 March 2008 in which among other matters the question of a *prima facie* case was again reviewed, albeit not on the grounds now put forward.

93.    Accordingly, the *prima facie* case has been examined carefully by a Divisional Court on two occasions.  Nothing has subsequently occurred which does more than, taken at its highest, give Al Fawaz the opportunity to raise a query.  Looking at the *prima facie* case as described in those two decisions, the Kherchtou silence is of no consequence for the existence of a *prima facie* case.

94.    We have also considered a note dated 3 October 2012 prepared by Mr Fawaz's solicitor taking issue with the way in which Mr Lewis described the *prima facie* case.  We mention it to show that we have considered it – nothing in it goes to the strength of the *prima facie* case as has been concluded to exist on two previous occasions by the Divisional Court.

*(viii)  The application for disclosure*

95.    Al Fawaz also makes on paper a very extensive application for disclosure in reliance on Mr Fielding's report.  There is nothing in that application to suggest any non compliance by the United States or domestic authorities with their duties of disclosure.  The witness statement of Miss Kundert on behalf of the CPS asserts that the duties have been complied with.  She says that the CPS with the assistance of Counsel had undertaken a disclosure exercise which involved considering materials held by the Security Service and the Secret Intelligence Service.  The CPS is satisfied that their disclosure obligations in these extradition proceedings were complied with

21/44

in relation to materials held by the United Kingdom. There is no general duty of disclosure in extradition proceedings though the requesting State should disclose material which is plainly exculpatory.

96.   We are wholly unpersuaded that Al Fawaz can show any failure in the duty of disclosure of significant exculpatory material, such as could suggest that there was no *prima facie* case. There plainly is a *prima facie* case. If any more specific disclosure point arises in the United States that is an issue for the Trial Court. Indeed the full width of the application was not seriously pursued by Mr Fitzgerald, especially in the light of the refusal of Al Fawaz before the Magistrates' Court to pursue some issues to which the application relates with the witnesses who did attend. Some rather overheated allegations by Al Fawaz's solicitors in respect of that were not pursued by Mr Fitzgerald QC.

*(ix)   Conclusion*

97.   The application is in our judgment hopeless. We therefore have no hesitation in refusing permission.

## III:   ABDEL BARY

98.   The US seeks extradition of Abdel Bary for conspiring with Osama Bin Laden to commit acts of terrorism against US citizens, with a particular focus on the 1998 bombings of two US embassies in East Africa in which 224 people were killed and 4,500 injured. The proceedings began 13 years ago.

*(i)   The challenge on the basis of new evidence*

99.   Abdel Bary contends that the Secretary of State's refusal in a letter dated 27 September 2012 and maintained in a letter of 1 October 2012 not to extradite him, and her conclusion that nothing in his representations of 26 September 2012 precluded her from extraditing him to the United States, is unlawful on two core grounds. The first is the contention that the Secretary of State ought to reconsider whether under the applicable Act, the Extradition Act 1989, there remains a *prima facie* case against him, and arguably ought to conclude that doubt had been cast on it and that it had been undermined. The second contention relates to a deterioration in his psychiatric condition. We consider each separately and consider first the issue as to whether there remains a *prima facie* case.

*(ii)   The course of the proceedings*

100.   As long ago as April 2000 the Senior District Judge was satisfied that a *prima facie* case had been made out against Abdel Bary. Abdel Bary's challenge to that decision by way of the then usual route of an application for *habeas corpus* was rejected in 2001; re *Eidarous and Abel Bary* [2001] EWHC Admin 798. The appeal to the House of Lords with that of *Al-Fawaz* was dismissed: *R (Al-Fawwaz) v The Governor of Brixton Prison* [2002] 1AC 556.

101.   A lengthy series of representations was made on the claimant's behalf to the Secretary of State which was finally rejected in March 2008. Judicial Review of that decision

Judgment Approved by the court for handing down.                    Abu Hamza & Others v SoS for the Home Department

22/44                                                                                  159

was dismissed in 2009.  Five days after the Supreme Court refused leave to appeal, an application was lodged with the ECtHR.

102.    We have already set out the statutory framework within which this submission falls to be considered at paragraphs 76-79 above.

*(iii)   The new evidence relied on*

103.    Abdel Bary made a number of submissions on paper about the strength of the existing evidence which could not possibly support the necessary contention as to the absence of a *prima facie* case.  He also submitted that two trials relating to those involved in the bombings had taken place in the United States without him being mentioned. That cannot avail him.

104.    The main point made by Mr Southey QC for Abdel Bary is that there is evidence from a co-operating witness Sajid Badat, given in March 2012, to the effect that Osama Bin Laden's group, Al Qaeda, had not merged with the Egyptian Islamic Jihad (EIJ) group until 2001, which was after Abdel Bary's arrest.  Abdel Bary was said to be a member of the EIJ group so the inference of a guilty association could not be drawn on the basis of his EIJ membership before 2001.  It was said that when Ayman Al Zawahiri (AAZ), its leader, signed up to Osama Bin Laden's declaration in 1998, he did not represent all of the EIJ group membership.

105.    First, it was not part of the prosecution case that the guilty association arose by virtue of a merger between Al Qaeda and EIJ at a date earlier than 2001.  The prosecution case was that there was a close operational relationship between the 2 groups in the late 1990s.  AAZ's signing of Osama Bin Laden's 1998 declaration is part of the evidence for that, but there is no basis for the necessary contention that a gulf exists between inferences of guilty association which can be drawn from the full merger in 2001 and those which could be drawn from a close operational relationship before the merger, which relationship is not undermined by Abdel Bary's new evidence.  His argument before us appears to have been that the merger and the close operational relationship were the same events or relationship.  They plainly are not.  The latter preceded the former.  The supposed new point does not deal with the close operational relationship in the late 1990s.

106.    Moreover, Abdel Bary's arguments simply tackle one piece of evidence and do not grapple, as they have to do if they are to succeed, with the overall picture of the evidence against him, as Mr Lewis QC for the United States convincingly demonstrated.  Evidence of Abdel Bary's membership of the EIJ group was no more than supportive, rather than crucial evidence, of participation in the conspiracy given the evidence of his actual deeds.  It is unnecessary to set all of that out from the Divisional Court judgment.  The evidence of CS/1 never stood alone as the basis for the US evidence of Abdel Bary's involvement in the conspiracy nor as the basis for the existence of the conspiracy.  The Divisional Court judgment between paragraphs 17 and 32, and 36 make all of that perfectly clear.

107.    It is clear that there was a *prima facie* case then and still is.  The main point made by Mr Southey QC is of no significance.  There is nothing either to show that the case in relation to the timings of the receipt of faxes concerning the bombing has been undermined.

160
357

23/44

108.   Mr Southey QC sought to suggest that a mere weakening of the *prima facie* case, which still remained a *prima facie* case, was nonetheless relevant to a consideration of the proportionality of extradition under Article 8 ECHR, especially when measured against Abdel Bary's major depressive disorder. That is misconceived. No authority to suggest that it was relevant was cited to us. There is a very considerable difference between the relevance of the gravity of an offence and the strength of the evidence to prove that offence. The strength of a case is not relevant to proportionality – the gravity of the offending alleged is. Were it otherwise the relevance of the strength of the case to proportionality would be a route whereby in any extradition case in which proportionality was an issue, a Court would be obliged to examine the strength of the evidence. That would be wholly contrary to the scheme of the 1989 and even more so of the 2003 Acts.

109.   We therefore conclude this ground is hopeless and could not conceivably succeed. We turn to the second ground – the psychiatric condition of Abdel Bary.

*(iv)*   *The psychiatric condition of Abdel Bary*

110.   It is very clear from psychiatric reports which go back to 2004 that over a number of years Abdel Bary has experienced symptoms indicating a major depressive disorder which have been exacerbated by the very many years which he has spent in custody awaiting extradition.

111.   In the course of the proceedings before this court in 2009, his psychiatric condition (which was summarised at paragraph 13 of its decision) was one of the significant factors relied upon in support of the contention that to order his extradition would entail a breach of his Article 3 rights, as ADX Florence, Colorado had no proper facilities for dealing with someone with his severe depressive condition.

112.   In the application to the ECtHR, this point was raised and considered by the court. Evidence was adduced on behalf of Abdel Bary and the other claimants as to the lack of proper psychiatric facilities at ADX Florence, Colorado. Evidence was submitted on behalf of the United Kingdom from the BoP that there was proper psychological and psychiatric care available, including the evidence of Dr Zohn which is summarised at paragraph 90 of the decision of the court. The court concluded at paragraph 224 that to the extent that Abdel Bary and others relied on the diagnosis of mental health problems:

> "The Court notes that those mental health conditions have not prevented their being detained in high-security prisons in the United Kingdom. On the basis of Dr Zohn's declaration, it would not appear that the psychiatric services which are available at ADX would be unable to treat such conditions. The Court accordingly finds that there would not be a violation of Article 3 in respect of these applicants in respect of their possible detention at ADX."



113.   We were provided in this court with a further psychiatric report from Dr Richard Latham who had last given the report relied on in the ECtHR in 2010. That report was the result of an interview by Abdel Bary through a videolink for 30 minutes on 1 October 2012. The report sets out in considerable and helpful detail his medical

Case No. 1:20-cv-00694-PAB-MDB   Document 119   filed 07/22/21   USDC Colorado   pg 162

Judgment Approved by the court for handing down.   Abu Hamza & Others v SoS for the Home Department

24/44

161.

records and observes that Abdel Bary continues to experience symptoms of a major depressive disorder. It draws attention to the fact that he is on suicide watch. On the basis of a description of the conditions at ADX, Colorado, which is based more on the evidence put forward by the claimants to the ECtHR than on the evidence of Dr Zohn (which was accepted by the ECtHR) Dr Latham sets out his view that the conditions to which he would be subjected at the ADX facility would constitute actual harm and significantly increase the risk of suicide or irreversible psychological harm.

114.   We were also helpfully provided by Mr Cooper with a complaint brought before the US Federal District Court in Denver which set out in detail evidence that contradicted that of Dr Zohn and asserted that in practice there was no proper psychiatric care at the ADX facility.

*(v)     Our conclusion on the significance of his psychiatric condition*

115.   It is clear to us that there has been no material change in the psychiatric condition of Abdel Bary. The decision of this court in 2009 makes clear that there was a suicide risk then, but this court considered that there would be no breach of Article 3. The issue was again considered by the ECtHR which again concluded that there would be no breach of Article 3. That court rejected the evidence of the claimants and preferred the evidence of Dr Zohn. That court therefore decided on the facts against all the claimants, including Abdel Bary, in relation to the provision of psychiatric care at the ADX facilities. As the conclusion of Dr Latham in his most recent report  is not based on the findings made by the ECtHR, it cannot form the basis of a significant material change of circumstances. The fact that Abdel Bary is now on suicide watch was said by Mr Cooper on his behalf to be the significant change.  In the context of the claimant's history and the submissions presented in the past, we cannot agree.

116.   Although, as we have explained, we are not bound by the decision of the ECtHR, it cannot be right in the light of general principles of finality to which we have referred that a person can exhaust the appeals in this jurisdiction, then go to the ECtHR and when he has failed on the facts in that court, seek to re-open them in this court in the absence of very clear and very compelling evidence that circumstances have changed so that extradition would now breach his human rights.  It cannot be in the overall interests of justice to re-open the facts relating to the availability of psychiatric services at ADX Florence, Colorado in the absence of a compelling change of circumstance. On that basis, the new medical opinion of Dr Latham and the fact that Abdel Barry is on suicide watch is nowhere near sufficient.  This ground of the application therefore fails.

117.   We would add that we received this morning (5 October 2012) a letter from the Home Office stating that Abdel Bary was being subjected to the heightened regime applicable to all five of the claimants rather than on suicide watch. All five had been placed on that regime because of the stressful circumstances for them during the current week and not because of an increased risk of suicide.

*(vi)    Conclusion*

118.   The application by Abdel Bary for permission therefore fails as it has no prospect of success. It and any application for a stay is dismissed.

## IV     ABU HAMZA

*(i)     The allegations*

119.    The allegations against Abu Hamza can be summarised as follows:

   i)    In December 1998 Abu Hamza conspired to take hostages in the Yemen and procured Abul Hassan and others to commit the offence of hostage taking in the Yemen.

   ii)   Between October and December 1999 Abu Hamza provided funds, knowing they would be used for terrorism/jihad in Afghanistan.

   iii)  Between October 1999 and April 2000 Abu Hamza conspired to set up a training camp in Oregon to train people to fight in Afghanistan.

   iv)   Between June 2000 and December 2001 Abu Hamza provided funds and other property for persons to go to Afghanistan, knowing that such funds and property would be used in connection with terrorism including training in Al Qaeda camps.

   v)    Between March and April 2001 he conspired to invite a person to receive training in the use of explosives in Afghanistan.

*(ii)    The request for extradition*

120.    Over eight years ago, on 24 May 2004, an extradition request was submitted by the United States, Abu Hamza having been indicted in the United States on 19 April 2004.  The request was certified by the Home Secretary on 25 May.  On 27 May 2004 Abu Hamza was arrested.

*(iii)   The trial of Abu Hamza in the United Kingdom*

121.    On 18 October 2004 Abu Hamza was charged with various offences in the United Kingdom of which he was convicted in February 2006.  The offences included six counts of soliciting murder.  He was sentenced to seven years imprisonment.  His appeal to the Court of Appeal was dismissed in November 2006.

*(iv)    The extradition proceedings*

122.    In November 2007, nearly five years ago, the Senior District Judge after an extradition hearing under Part 2 of the Extradition Act 2003 sent his case to the Secretary of State.  In February 2008 the Secretary of State ordered his extradition.

123.    On 20 June 2008 this court dismissed his appeal and refused to certify any point of law of general public importance – see *Mustapha (Hamza) v Government of the United States of America and Another* [2008] 1 WLR 2760.  As regards the courts of the United Kingdom his challenge to extradition was at an end.

26/44

*(v)*     *The application to the European Court of Human Rights*

124.    On 1 August 2008 Abu Hamza lodged his application with the ECtHR. He applied
        for and obtained relief under Rule 39 preventing his extradition. As we have set out,
        the issues raised were very wide-ranging.

*(vi)*    *The application to stay the extradition*

125.    The essence of the application that has been made on behalf of Abu Hamza is that he
        should not be extradited, as the Secretary of State erred in her decision to refuse to
        reconsider his extradition on the basis that he was not fit to plead. It is therefore
        necessary to consider the legal position and the evidence.

126.    There was a dispute between the Secretary of State and Mr Alun Jones QC on behalf
        of Abu Hamza as to the basis of the court's jurisdiction. It was the submission of Mr
        Jones QC that the appropriate remedy in this case was an application to re-open the
        appeal and that was the basis of his application. If we follow that course, then it
        would be for the court to assess under the Act whether the mental condition of Abu
        Hamza was such that it would be unjust or oppressive to extradite him.

127.    It was the contention of the Secretary of State made by Mr Eadie QC that the only
        jurisdiction available to the court was a review of the ongoing obligation of the
        Secretary of State as a public authority under the Human Rights Act to withdraw the
        extradition order where there had been a material change of circumstances which
        would make it a breach of Abu Hamza's Convention rights to extradite him. He
        relied on the decisions of this court in *McKinnon v The Government of the USA*
        [2007] EWHC 762 (Admin), *McKinnon v The Secretary of State* [2009] EWHC 170
        (Admin) and *Taylor v The Governor of HM Prison Wandsworth* [2009] EWHC 1020
        (Admin).

128.    We do not consider it necessary to resolve this issue at this hearing as our conclusion
        is the same whichever test is applied, though we can see considerable force in Mr
        Jones' submission on that point. As we have already commented, the prevalence of
        judicial review in extradition proceedings with their clear statutory framework
        appears to be adding significantly to the delays that are occurring.

129.    If the question arises as to whether it is unjust or oppressive to extradite Abu Hamza
        in his present circumstances, it is well established that if there is an issue as to fitness
        to plead, in general that issue should be determined by the courts of the state where he
        is to be tried, save in an exceptional case where there is no prospect that a court could
        find a person fit to plead or there are other exceptional circumstances, such as where
        the prospects of recovery might justify a short postponement of his extradition: see *R
        (Warren) v The Secretary of State* [2003] EWHC 1177 and *Dewani v South Africa*
        [2012] EWHC 842 (Admin). In the circumstances of this case, therefore, it is
        necessary, if this is the correct approach, to consider whether there is an issue of
        fitness to plead and, if so, whether the circumstances of this case warrant re-opening
        the appeal concluded in 2008. This would cover both human rights and whether it
        would be unjust or oppressive to extradite him

130.    If, on the other hand, we adopt the approach advanced by Mr Eadie QC, we have to
        consider the arguability of a review of the Secretary of State's decision that the

27/44

164

extradition of Abu Hamza will not breach his human rights, and decide that human rights issue for ourselves on the review. We therefore turn to consider the facts.

*(vii)   The facts: Abu Hamza's psychiatric history*

131.   As long ago as 4 July 2005 Dr Richard Taylor, a psychiatrist whose post in the NHS is at the North London Forensic Science Service, Camlet Lodge Regional Secure Unit, wrote a report on Abu Hamza's psychiatric condition. He wrote further reports in May 2007, May 2008 and most recently on 2 August 2012.

132.   Each of these reports sets out at considerable length an account of what he was told by Abu Hamza about his condition, the way Abu Hamza said he had been treated at Belmarsh in the light of his disabilities and his treatment by the media. Dr Taylor's report of 4 July 2005 recorded that Abu Hamza's preoccupation with his physical disability was compounded by signs of clinical depression. Those signs were manifested in impaired concentration, low mood, sleeping difficulties and an increasing preoccupation with his sense of being persecuted by the British and American authorities and by the media. Dr Taylor concluded that the sense of persecution was an additional psychological stresser which was having a further impact on his mood. He expressed a view about fitness to plead. Although Abu Hamza understood the charges and the plea, his total preoccupation with his physical condition and his depressed mood made his ability to follow court proceedings or instruct counsel borderline. He went on to express the view that having regard to Article 6 of the Convention, Abu Hamza could not adequately participate in his trial, given the particular combination of physical disability, medical problems, mental state and the conditions pertaining in the high secure unit at HMP Belmarsh.

133.   In the report of May 2008, just before the hearing of Abu Hamza's appeal in this court, Dr Taylor noted that the complications of Abu Hamza's physical health appeared to have a negative impact on his mental health, although Abu Hamza was clearly a man with robust psychological defences. Dr Taylor understood, however, that solicitors and counsel appeared to have difficulties taking instructions from him, as he appeared to have lost his motivation to prepare his defence, feeling that his case was a foregone conclusion. Dr Taylor repeated in essence the observations he had made in 2005 in relation to pressure from the media.

134.   Dr Taylor was instructed to prepare a further report in May 2012 following the reporting of signs of memory loss. Because of difficulties in obtaining access to Abu Hamza, his report was delayed until 2 August 2012. In that report Dr Taylor concluded that Abu Hamza was not currently fit to plead in accordance with the criteria set out in *R v Pritchard* (1836) 7 Car & P 303 and the more recent authorities. That was because he would not be able to follow legal proceedings in the light of his current problems with tension, concentration and short term memory loss. The basis of that opinion was that Abu Hamza had developed clinical depression of at least moderate severity which was exacerbated by chronic sleep deprivation. He had a detectable impairment of attention and concentration in short term memory. He required anti-depressant medication and his depression would be unlikely to improve as long as he continued to be subjected to hourly waking and chronic sleep deprivation. He recommended an examination by a clinical neuropsychologist saying he had identified a suitably qualified colleague; he added, "He may also need further investigation such as an MRI brain scan." Following that report one of his solicitors

Judgment Approved by the court for handing down.    Abu Hamza & Others v SoS for the Home Department

wrote on 10 August 2012 to ask the Home Secretary not to remove Abu Hamza until his condition had been investigated. His other solicitor wrote on 20 August 2012 to HMP Belmarsh asking for arrangements for an MRI scan.

135.   A neuropsychologist was then instructed. He was Dr D Nathaniel-James, a private consultant, who had been Head of Neuropsychology for one of the largest NHS trusts. He was currently a senior lecturer in neuropsychology and clinical psychology at the Royal Free and University College Hospitals. He wrote two reports, one dated 6 September 2012, and the other 27 September 2012. His conclusion in his second report was as follows:

> "The report will show that notwithstanding the findings of the neuropsychological assessment, [Abu Hamza] suffers with short-term memory and concentration difficulties on a day to day basis due to depression and sleep deprivation. The report argues that additionally there may be underlying organic changes to his brain and thus an MRI brain scan should also be performed. The report concludes that currently [Abu Hamza] is unfit to plead but this needs to be reviewed following appropriate treatment and the curtailment of the practice leading to the noted sleep deprivation."

The report set out in detail the methodology used. It also set out the results of what was described as "the test of memory malingering". That test was designed to identify people who were perhaps not applying themselves to the best of their ability during the course of their other assessments and thus demonstrating less than satisfactory engagement or effort. The test appeared difficult but could be performed almost without error even by people with severe brain damage.

136.   Abu Hamza performed below the normal range on this test. The report commented that this meant that it was not possible to comment on the extent of any underlying cognitive impairment. Although it did not negate the presence of underlying impairment it did mean that one could not reliably comment on the basis of those objective tests.

137.   Dr Nathaniel-James concluded that an MRI scan should be carried out on the basis that:

> "It thus would be pertinent and indeed standard practice to carry out an MRI scan of his brain as part of a good clinical practice regime in suspected cases of early cognitive decline."

He expressed the opinion that Abu Hamza suffered from short-term memory and concentration difficulties on a day to day basis due to the pressure of sleep deprivation. He added that he agreed that Abu Hamza was unfit to plead.

*(viii) The Secretary of State's decision*

138.   Although the last report of Dr Nathaniel-James was not before the Secretary of State, the Secretary of State concluded on the evidence before her that taking the medical reports at their highest she did not consider that they were sufficient to demonstrate

that there was a real risk that the extradition of Abu Hamza would violate his Convention rights.

*(ix)   Is it too late to take the point?*

139.   It was submitted on behalf of the Home Secretary that this was a point taken with a view to avoiding extradition. If there had been anything in the mental state of Abu Hamza, given his history of clinical depression, this was a point that should have been properly investigated at an early stage and seeking to delay extradition by asking for a brain scan should not be permitted in the circumstances.

140.   It is evident from the documentation placed before the court that those acting for Abu Hamza took action as soon as Dr Taylor reported his conclusion on fitness to plead and the need for a possibility of a brain scan. The possibility that Abu Hamza might be unfit to plead arose from signs observed for the first time in May 2012, and not earlier despite regular visits by a psychiatrist. We do not therefore think it would be fair to dismiss the complaint made on this peremptory basis. It is to be noted that those instructed have acted in good faith and that many of those representing Abu Hamza, including Mr Alun Jones QC and his junior, are doing this *pro bono*.

*(x)   Is there a basis for concluding that extradition at this point in time would be unjust or oppressive?*

141.   As we have set out above, we will first consider the position on the basis of the law which Mr Alun Jones QC invited us to apply, namely whether we should re-open the appeal and find it would be unjust and oppressive to extradite Abu Hamza at this time. The question essentially turns on whether there is a case of fitness to plead and the relevance of the MRI brain scan.

142.   It is well established that it is for a court to determine whether a person is fit to plead on the basis of the medical evidence before it. Fitness to plead is not generally for us to determine, since we are not the Court of trial, as we have explained at paragraph 129. If, however, we were to apply the criteria set out in *R v Pritchard* as interpreted in the more recent authorities, we would have little doubt in concluding, on the basis of what is set out in the experts' reports provided on his behalf, that Abu Hamza was fit to plead as a matter of the law of England and Wales.

143.   However generally it is for a court in the state where a person is to be tried to determine whether a person is fit to plead. The evidence before us suggests that there may be two causes of the symptoms which are said to give rise to possible unfitness to plead – (1) his sleep deprivation and the physical conditions he has been held in at HMP Belmarsh, or (2) a degenerative condition in his brain. If it is the first, then that condition is remediable by a change of conditions which can be effected in the United States. If anti-depressant medication is necessary to remedy his symptoms, there is no basis for contending that that is unavailable in the United States, given the medical evidence that was before the ECtHR and the conclusions of the Fourth Chamber. If, however, any potential unfitness to plead was emerging from a degenerative condition of the brain, then the sooner he is put on trial the better, as delay can only in such circumstances put at risk a trial that is necessary in the interests of justice.

144.   There is nothing to suggest that on either basis it would be unjust or oppressive to order his immediate extradition.

*(xi)   Would extradition violate his Convention rights?*

145.   It would have to be established that there had been a material or significant change in circumstance that was of a kind that would render it unlawful to carry out the extradition.   It must inevitably follow, given our conclusion in relation to the lower test of whether it would be unjust or oppressive, that the evidence simply does not establish that the extradition would be a breach of his Convention rights.

*(xii)   Our conclusion*

146.   In our judgment, therefore, there is no basis on which the order of his extradition should be stayed.

## V   BABAR AHMAD AND TALHA AHSAN

### (A)   The course of the proceedings

*(i)   The allegations*

147.   The case against Babar Ahmad and Talha Ahsan by the US Prosecutor is that they conspired to provide material to support terrorists, to kill or injure those overseas, to launder money to support the Taliban and others, including the Chechnya Mujahideen and to solicit others to commit crimes of violence. They did this by:

   i)   operating websites from premises in the UK including the Azzam website and a mirror website in the USA from 1997 to 2004 through internet service providers (ISP) in Las Vegas, Nevada and Trumbull, Connecticut and an Alabama company.  The websites were used to solicit funds and other property to assist the Taliban and other Mujahideen in terrorism and murder, to remit those funds and to publicise the works of Osama Bin Laden.

   ii)   The evidence relied on against them indicates that a material part of their activity was directed at those in the United States; one example was the provision of a standard form letter for US citizens to use to disguise the transmission of funds.  Another is an allegation that specific individuals in the United States worked with Babar Ahmad to make contributions to the Mujahideen.

   iii)   An address book recovered through search warrants issued in the United States revealed successful solicitation of donations sent from a residence in Connecticut for transmission to the Chechnya Mujahideen which is alleged to have been responsible for many notorious terrorist attacks in which many were killed.

148.   By far the most serious allegation was the possession of classified US naval plans and communication with a US naval enlistee.

   i)   A computer file was found in premises used by Babar Ahmad in the UK which contained a document discussing a US naval battle group, each of its member

3V44

ships including the USS Benfold, the battle group's planned movements and a drawing of the group's formation when it was to pass through the Straits of Hormuz in 2001. The document noted that the battle group was tasked with enforcing sanctions against Iraq and conducting operations against Afghanistan and Al Qaeda. The document stated that the battle group was scheduled to pass through the Straits of Hormuz on 29 April 2001 and explicitly described the group's vulnerability to terrorist attack including, for example, that the group had nothing to stop a small craft with RPG, except their Seals stinger missiles.

ii)     The e-mail accounts operated through the ISP, Yahoo, included e-mail exchanges with an individual who described himself as an enlistee in the US Navy on active duty in the Middle East. The e-mail header indicated the individual was communicating from the USS Benfold at the time. One of the e-mails sent in July 2001 described the reaction of officers and other enlistees to a briefing given on the ship to help personnel protect against terrorist attacks similar to the March 2001 attack on the USS Cole. The e-mail praises those who attacked the USS Cole and the men who had brought honour by fighting jihad in Afghanistan and elsewhere. The response from the Azzam publications e-mail account praised the enlistee's comments and encouraged the enlistee to keep up the missionary work for Islam and psychological warfare. The enlisted person was found guilty on 5 March 2008 in a US Federal Court of disclosing national defence information to persons not entitled to receive it on the basis of this betrayal of his shipmates and country. He was sentenced to the statutory maximum of 10 years and his appeals have been dismissed. Although the jury found him guilty of providing material support for terrorists, the judge found that on the version of the statute then in force he was not technically guilty.

149.    According to the documents provided by the United States Government, part of the evidence came from search warrants executed in the United Kingdom to which we will refer and part from search warrants executed in the United States.

*(ii)    The investigation in the United Kingdom*

150.    The search warrants executed in the United Kingdom were executed on 2 December 2003. Babar Ahmad and Talha Ahsan were arrested. A police investigation ensued. We were told they gave no comment interviews to the police.

151.    After the execution of the search warrants, the police were in contact with the CPS later in 2003. Further discussions took place between the police and the CPS on 4 February 2004. On 6 April 2004 an evidence file was submitted to the CPS which analysed the 32 most significant exhibits that had been seized. A meeting then took place on 15 April 2004 between Detective Chief Inspector Boutcher who was the senior investigating officer and Ms Hemming, Head of Special Crime and Counter Terrorism at the CPS, with others present. The meeting lasted three hours due to the volume of material that was considered. At the meeting the CPS asked for further material to be submitted.

152.    That further material was submitted on 5 July 2004. That material comprised material that had been retrieved from floppy disks seized during the searches.

Judgment Approved by the court for handing down.                Abu Hamza & Others v SOS for the Home Department

32/44

153.   Not all the computer files were provided as there were a number which had been
       encrypted and the police had not succeeded in decrypting them.  There was therefore,
       we were told, no purpose in providing that material to the CPS.  Nor was all the other
       material provided, as there was a considerable amount of material that was not
       relevant to the prosecution decision in respect of Babar Ahmad.  However the CPS
       were provided with the key evidence including the information about the movements
       of the US Navy battle group to which we have referred at paragraph 148.i), details of
       signals and methods used to contact covert operatives in Pakistan, a document that
       discussed sending an individual to Afghanistan and Pakistan, covert methods and data
       encryption and e-mail exchanges regarding covert travel to Pakistan and Afghanistan.
       The police had tried to obtain information that linked Babar Ahmad to the websites,
       but the websites had been taken down and they were not able to obtain that linking
       evidence.  That was significant in the light of the no comment interviews given by
       Babar Ahmad and Talha Ahsan.

154.   On 14 July 2004 the CPS decided not to prosecute as there was insufficient evidence.
       They so advised the police.

*(iii)   The commencement of the extradition proceedings*

155.   Shortly after the decision had been made by the CPS, a criminal complaint was signed
       by a United States Magistrate on 28 July 2004 charging Babar Ahmad with the
       matters we have outlined.  The same day the US Magistrate signed a warrant for the
       arrest of Babar Ahmad.

156.   On 29 July 2004 the US requested the provisional arrest of Babar Ahmad for the
       purposes of extradition.  On 5 August 2004 a provisional warrant for his arrest was
       issued.

157.   On 1 October 2004, some eight years ago, a full extradition request for Babar Ahmad
       was made by the United States.  That was accompanied by an affidavit of Robert
       Appleton, an Assistant US Attorney for the District of Connecticut and an affidavit
       from Craig Bowling, a special agent and computer investigative specialist employed
       by the Department of Homeland Security.  The two affidavits set out in detail the
       evidence against Babar Ahmad, some of which we have summarised.  On 6 October
       2004 Babar Ahmad was formally indicted in the United States.

*(iv)   The review by the CPS of the police papers in relation to Babar Ahmad for the
       purposes of extradition.*

158.   On 20 and 21 January 2005 a representative of the CPS attended the Metropolitan
       Police and reviewed all of the documentation of the searches of the four addresses that
       related to Babar Ahmad.  A number of documents were requested which were
       supplied to the CPS.  The purpose of the review was to ensure the CPS was satisfied
       that all due consideration had been given to all of the documents prior to the full
       extradition hearing for Babar Ahmad that was to take place on 2 and 3 March 2005.

*(v)    The extradition proceedings*

159.   On 17 May 2005 after the extradition hearing, the Senior District Judge sent Babar
       Ahmad's case to the Secretary of State.  Representations were then made and

Abu Hamza & Others v SoS for the Home Department

exchanges occurred with the United States. On 15 November 2005 the Secretary of State ordered Babar Ahmad's extradition.

160.   In response to a letter written by Babar Ahmad's then solicitor in connection with the appeal from those decisions, the CPS confirmed again that the CPS had advised in July 2004 that there was insufficient evidence for prosecution.

161.   Babar Ahmad's appeal was heard in this court together with an appeal of Haroon Aswat. The major focus of both the appeal of Babar Ahmad and Haroon Aswat was their contention that, if they were extradited there was a real prospect that they would be tried by a military tribunal, even though the Government of the United States had given assurances that each would be prosecuted before a Federal Court. Other points taken included the contention on behalf of Babar Ahmad that there was no extradition offence and that he was likely to be, if convicted, subjected to SAMs at ADX Florence, Colorado in breach of Article 3 of the Convention.

162.   In a detailed reserved judgment delivered on 30 November 2006 by Laws LJ, with which Walker J agreed, the appeal was dismissed: see [2006] EWHC 2927 (Admin). On 6 June 2007 the House of Lords refused Ahmad leave to appeal. Four days later on 10 June 2007 Ahmad lodged an application with the ECtHR.

*(vi)   September 2006: The decision to prosecute Babar Ahmad was again questioned*

163.   After the conclusion of the proceedings in the UK, Babar Ahmad's MP wrote on 27 September 2006 to the then Attorney-General Lord Goldsmith QC about his extradition. In his reply on 24 October 2006, the Attorney-General stated that the CPS had concluded in 2004 that there was insufficient evidence to prosecute Babar Ahmad. A copy of that reply was provided to Birnberg Peirce who wrote to the Attorney General on 24 November 2006 setting out the reasons why the CPS might not have taken into account a number of features of Babar Ahmad's position which might lead to a different conclusion. On 19 December 2006, Ms Hemming of the CPS replied reaffirming that there had been insufficient evidence to prosecute and the position was unchanged.

*(vii)   The extradition proceedings in respect of Talha Ahsan*

164.   On 28 June 2006 Talha Ahsan was indicted in the United States. On 2 July 2006 the United States requested his provisional arrest for the purpose of extradition. Talha Ahsan was arrested shortly thereafter.

165.   On 15 September 2006, a full extradition request for Talha Ahsan was submitted by the US. We were told by Miss Kaufmann QC that the basis of the request was in all material respects the same as that applicable to Babar Ahmad

*(viii)   Representations on behalf of Talha Ahsan to the CPS in 2007*

166.   On 18 January 2007 the United Kingdom and the United States through their respective Attorneys General signed a document entitled "Guidance for Handling Criminal Cases with Concurrent Jurisdiction between the United Kingdom and the United States of America".

167.   On 9 March 2007 those acting for Talha Ahsan contacted the CPS asking for information about any discussions between the prosecuting and investigating agencies in the UK and the authorities in the US in respect of Talha Ahsan's case, relying on the guidance document signed on 18 January 2007.   On 14 March 2007 the CPS replied to those acting for Talha Ahsan stating that the guidance document had no application to Talha Ahsan's case.

*(ix)   The extradition hearing and appeals in the case of Talha Ahsan*

168.   After an extradition hearing the District Judge on 19 March 2007 sent Talha Ahsan's case to the Secretary of State.   After representations had been considered, the Secretary of State ordered his extradition on 14 June 2007.

169.   An appeal was made to this court in respect of his extradition and at the same time an application was made for judicial review of the decision of the DPP not to have considered domestic prosecution.  This was dismissed by this court on 10 April 2008: see [2008] EWHC 666 (Admin); we return to that decision at paragraph 194 below. This court refused to certify a point of law of general public importance.

170.   On 5 December 2008 Talha Ahsan lodged his application with the ECtHR.

*(x)   The issue of prosecution raised again in 2010*

171.   The issue of prosecuting Babar Ahmad and Talha Ahsan was again taken up by Birnberg Peirce on 6 July 2010 when they wrote to the new Attorney-General Mr Dominic Grieve QC about that and other issues.  The response to the letter was from the Home Office on 20 August 2010.  It was suggested that if there were issues to be raised that precluded the UK from extraditing them, those issues should be raised in the proceedings in the ECtHR.

172.   Thereafter, the response of Babar Ahmad and Talha Ahsan in the ECtHR filed in May 2011 raised the issue of the appropriate forum for their prosecution. The submission is recorded in paragraph 165 of the judgment of the ECtHR, but at paragraph 166, the court held that the question of appropriate forum for prosecution did not arise for examination in the present case.

*(xi)   The action of Birnberg Peirce in and after November 2011*

173.   Prior to that decision, whilst the proceedings before the ECtHR were continuing, Birnberg Peirce wrote on 7 November 2011 to the DPP a long and detailed letter asking that a reconsideration take place of the decision previously taken that insufficient evidence existed to prosecute Babar Ahmad in the United Kingdom and that there was in consequence thereafter no reason to give consideration to a prosecution of his alleged co-accused, Talha Ahsan.  The letter set out over some 13 pages the evidence that it was contended existed against Babar Ahmad and Talha Ahsan.   The letter suggested that that evidence gave rise to offences under the Terrorism Act 2000 and referred to cases where the CPS had brought prosecutions on similar cases since 2003.   The letter drew attention to what were described as "national forum considerations" and the relevance of that to the proceedings before the ECtHR.  It also drew attention to the significant personal difficulties and medical condition of both Babar Ahmad and Talha Ahsan.

Judgment Approved by the court for handing down.                    Abu Hamza & Others v SoS for the Home Department

35/44

174.   On 22 November 2011 Ms Hemming replied on behalf of the CPS. The letter stated that "a small number of documents seized by the Metropolitan Police were submitted for advice in 2004". It went on to state, as we have set out, that the CPS had decided in 2004 that on the material provided to them there was insufficient evidence to prosecute. It drew attention to the fact that the extradition proceedings had concluded and domestic prosecutors did not have the evidence in relation to either Babar Ahmad or Talha Ahsan.

175.   On 21 March 2012, Birnberg Peirce replied expressing surprise that only a small volume of material had been considered and asking a number of questions as to the documents provided by the police. On 27 April 2012, shortly after the judgment of the ECtHR, Birnberg Peirce wrote a further lengthy letter setting out a number of matters and asking the CPS to consider whether the evidential test had been met.

176.   Correspondence was also addressed by Birnberg Peirce to the police. In July 2012, the police reviewed all the material held on Babar Ahmad and others to identify whether there was scope for bringing a prosecution. The conclusion was reached that there was no evidence sufficient to support a prosecution in the United Kingdom. It was not considered that any further material had been generated which would support a prosecution. The police therefore decided not to refer any further material to the CPS.

*(xii) The launch of a private prosecution by Mr Karl Watkin*

177.   Mr Watkin, a businessman who has said he has been concerned about the lack of reciprocity in the extradition arrangements between the UK and the US, as a result of a meeting in May 2012 with his solicitors, Ward Hadaway, asked them to consider whether a private prosecution could be brought against Babar Ahmad and Talha Ahsan.

178.   After considering the papers, they contacted Birnberg Peirce who took very short statements from Babar Ahmad and Talha Ahsan dated 5 and 20 August 2012 respectively. Babar Ahmad stated that the websites had been taken off line in June 2002 and that he confirmed " that I continued to be involved in the administration of both websites until a date of which I am no longer certain of in Spring 2002". Talha Ahsan confirmed that a number of items provided by the police to US prosecutors and relied on by them were his and that he had made use of computers taken from his home and his father's work premises by police in February 2006. It appears that the statements were sought to provide evidence of the link between Babar Ahmad and Talha Ahsan and the websites.

179.   On 5 September 2012 Ward Hadaway wrote to the DPP stating that they had been instructed by Mr Watkin to commence a prosecution against Babar Ahmad and Talha Ahsan for an offence of soliciting murder under s.4 of the Offences Against the Person Act 1861 and for a number of offences under the Terrorism Act 2000. They sought the consent of the DPP for prosecutions for the offences under the Terrorism Act 2000 (as was required under the Act) and informed the DPP that they had sent a draft summons for the offence under s.4 of the 1861 Act to the Westminster Magistrates Court, as that did not require the DPP's consent. The letter set out a detailed case as to why the evidential test had been met and other factors which supported the bringing of a prosecution. It was made clear that if consent was refused,

Judgment Approved by the court for handing down.                    Abu Hamza & Others v SoS for the Home Department

the decision would be judicially reviewed. A file of documents accompanied the letter; included were the statements taken from Babar Ahmad and Talha Ahsan in August 2012 by Birnberg Peirce.

*(xiii) The decision of the DPP on the request by Birnberg Peirce and the private prosecution*

180.   On 1 October 2012, the DPP made a public statement setting out his decision on the request by Birnberg Peirce and the private prosecution; he declined to consent to the private prosecution making clear that the evidential test had not been met.

*(xiv) The decision of the District Court on the summons under s.4*

181.   On 3 October 2012 the Senior District Judge issued a ruling on the application by Mr Watkin for a summons under s.4. The District Judge concluded that there was insufficient evidence and that:

> "In this case I am satisfied that the purpose of these proposed proceedings is to stop or delay extradition of two named proposed defendants to the USA. The application is made many years after the events complained of. It appears to have the co-operation and support of the proposed defendants themselves. It comes as almost all other ways of resisting extradition have been exhausted. The application is an abuse of the process of the court."

**B. The argument and our conclusions**

*(i)    The submissions on behalf of Babar Ahmad and Talha Ahsan*

182.   Ms Kaufmann QC for Babar Ahmad and Talha Ahsan submitted that the Secretary of State should be prevented from fulfilling her duty under s.118 of the Extradition Act 2003 to extradite them to the US because the DPP had given an arguably unlawful decision in refusing to prosecute them in the UK for at least some of the offences for which their extradition was sought. The DPP could lawfully decide that they should be prosecuted in the UK. Were the DPP to reach a lawful decision that they should not be tried here, they could then be extradited. Meanwhile, since the unlawful decision that they should not be prosecuted here might be followed by a lawful decision that they should be tried here, their removal should be stayed. A lawful decision that they should be prosecuted here would be followed by a decision that they should be charged, and the extradition then would be stayed until the conclusion of the criminal proceedings. Conviction or acquittal would prevent extradition on those charges which had been tried here. But extradition might then follow pursuant to another warrant for trial in the US for those offences which had not been tried here. Although Ms Kaufmann QC accepted that some of the offences for which their extradition was sought could not or could not realistically be tried in the UK, she contended that subsequent proceedings might be susceptible of challenge as extradition after a trial here might be unfair or otherwise unlawful.

183.   Such an approach would reflect what Ms Kaufmann QC submitted was the primacy of domestic criminal proceedings contained in the 2003 Act. More importantly, where Article 8 of the ECHR was engaged by an extradition decision, as here, the undoubted

37/44                                                              174

duty of the Secretary of State and of the court not to act in breach of human rights, might be breached if extradition took place when the remedying of an unlawful refusal to prosecute could lead to domestic prosecution and hence to the prevention of what would have been shown to be a disproportionate interference with Article 8 rights. The Secretary of State, however, was not in a position to make a lawful decision using her reserve power implicit within s.118 until a lawful decision on prosecution had been made by the DPP.

*(ii)*   *The submission on behalf of the Secretary of State and the US Government*

184.   Mr Eadie QC for the Secretary of State contended that even if the DPP's decision not to prosecute were flawed on public law grounds, and even if it were possible for the DPP to prosecute Babar Ahmad and Talha Ahsan in the United Kingdom for some or all of the extradition offences, it would not be right for this court to stay extradition preventing the Secretary of State fulfilling her duties under the Act.

185.   First, the structure of the Extradition Act 2003 provides very limited powers for the Secretary of State once, as here, the statutory extradition process has been concluded. This duty is set out clearly in s.118 which provides that the person must be extradited to the category 2 territory within a period of 28 days, starting on the day on which the decision of the relevant court on the appeal becomes final. Hence there is a very limited basis upon which the Court can intervene to prevent her complying with her duty to extradite Babar Ahmad and Talha Ahsan.

186.   Second, there is therefore no more than a residual power in the Secretary of State to intervene or a residual jurisdiction in the court to intervene. It arises only where the extradition would breach human rights by reference to material or circumstances not previously considered and which could not previously have been raised. So any challenge based on the potential for prosecution here cannot be based simply on whether Babar Ahmad and Talha Ahsan could be tried in the United Kingdom for the extradition offences. It has to be put on the basis that the potential for prosecution in the United Kingdom makes extradition a disproportionate interference with human rights, probably under Article 8 ECHR. A very strong case is required for interference with Article 8 rights to be so severe if extradition (especially for offences of this gravity) is to be refused on the grounds that it is a disproportionate interference with Article 8 rights.

187.    Ms Dobbin, in agreement, submitted on behalf of the US Government that the only significance of an unlawful decision not to prosecute, and the possibility of a lawful decision to prosecute being made, leading to a charge and to the stay in extradition, and its prevention on those charges which have been tried, is in the possible impact which that might have on Babar Ahmad and Talha Ahsan's human rights, and Article 8 in particular.

188.   Third, Mr Eadie submitted that Babar Ahmad and Talha Ahsan overstated the position in saying that the structure of the Act gives primacy to domestic prosecution, such that the possibility of prosecution in this country can or should lead to a stay of extradition. The 2003 Act makes no such general provision. On the contrary, the Act specifically provides for the point at which domestic criminal proceedings will take primacy. Section 88 provides for a stay of extradition proceedings if the requested person is "*charged*" with an offence in the United Kingdom. The bar does not apply

at any earlier stage in the process of a possible prosecution.  It would be contrary to the scheme of the Act for a court, merely faced with a challenge to the lawfulness of a refusal by the DPP to prosecute or to the police to provide evidence to the DPP to order the Secretary of State not to extradite a person, and even more so to prevent her from fulfilling her explicit statutory duty under s.118 which has now arisen.

189.   Fourth, the question of how a possible domestic prosecution should affect the extradition process has been considered in *R (Bermingham) v DPP* [2006] EWHC 200(Admin) [2007] QB 727.  The Divisional Court held that the Extradition Act 2003 did not make the question of which country's courts should try an offence, either an issue for the Secretary of State or for the court considering extradition orders, whether at first instance or on appeal.   Indeed, neither court nor the Secretary of State possessed any discretion to further the extradition process or not to do so; if the specified conditions were satisfied, extradition had to be ordered, and if not satisfied, then not; para. 57 per Laws LJ.  Whatever might have been the position under the 1989 Act, there was no such power or discretion under the 2003 Act which governs these two cases. Paragraph 59 of the judgment explains that it is only by reference to the impact on a person's human rights that such an issue can arise.

190.   The court in *Bermingham*, at paragraph 36 of the judgment, had considerable reservations about judicial review of a decision not to prosecute.  We add that it is particularly difficult to see that such a decision would engage the human rights of the person whom it is decided not to prosecute.  The court also held in paras. 65 and 74 that there were additionally particular reasons why a court should not review a decision not to investigate. It would constitute the DPP and his decision-making process the decision-maker on forum, and then on judicial review of his decision would introduce issues which the statute leaves only for consideration to the extent that it would breach human rights.  It would introduce a possible prosecution in the UK as a new bar to extradition,   which is not part of the statute at all, and is indeed contrary to the express statutory regime.

191.   In paragraph 71 of its judgment, the court warned against allowing requests to investigate to become the means whereby the statutory extradition process, with its timetable and structures, should be held up at any stage.

192.    Ms Kaufmann QC submitted that Mr Eadie QC's arguments did not really take on board how she put her case, that an arguably unlawful decision had been made, and the stay was sought so that a lawful decision to prosecute might be made, with all the consequences which that might have for the avoidance of a disproportionate interference with the Article 8 rights of Babar Ahmad and Talha Ahsan.  There was a real distinction between the decision in *Bermingham,* which related to investigation, and the decision to prosecute.

*(iii)   Our conclusion on the application of Babar Ahmad and Talha Ahsan*

193.    We accept the submissions of Mr Eadie and Ms Dobbin as to the structure of the Act.  There is no sound distinction to be drawn between what was said in *Bermingham* in relation to investigation and the position in relation to prosecution, which was after all the subsequent step to which the claimants in *Bermingham* hoped that investigation would lead.  The same applies to allowing challenges to refusals to prosecute or to consent to private prosecutions, to intervene to halt the extradition process.  It would

Judgment Approved by the court for handing down.    *Hamza & Others v SOS for the Home Department*

198.    The new evidence of the potential for a decision to prosecute being reached and of disproportionality in extradition would have to be clear and compelling. The court should be astute to recognise the potential for such challenges to amount to an abuse of process. This more exacting approach is required the more so where the DPP has taken his decision rather than where he is still actively considering it.

199.    This case illustrated the ease with which a misunderstanding of the facts, for good reason or bad, can be presented as a basis for late proceedings and for what are in reality quite untenable assertions about what happened in the prosecutor's decision-making process.

*(v)    Our conclusion on the private prosecution*

200.    These arguments also effectively address the main points which Mr O'Connor QC for Mr Karl Watkin, the would-be private prosecutor sought to make as an Interested Party to the challenge to the refusal by the DPP to consent to his prosecuting Babar Ahmad and Talha Ahsan for terrorist offences. He submitted that the decision was unlawful since the DPP had to reach a lawful decision on his application, and had failed to do so. Although expressed a little differently, the failings were the same: a failure to consider evidence available in the UK, and to request the US to provide the evidence which it had, a request which he said might or might not be acceded to. He accepted that a lawful decision not to consent and not to prosecute those offences in this country could be made.

201.    Mr O'Connor's submission was that the right to undertake a private prosecution where the CPS had failed or refused to do so, or were simply not interested in doing so, was an important right of a citizen: see *R (Gujra) v CPS* [2012] 1 WLR 254, *Gouriet v UPW* [1978] AC 435, *R (Law Society) v Lord Chancellor* [2011] 1 WLR 234. However that right must be rather qualified in a case where statute provides that the consent of the DPP is required in the first place, and where the granting of consent by the DPP would lead to his taking over the prosecution as his policy on private prosecutions requiring his consent makes clear. The fact that his submissions on the DPP's failings in his decision-making process are made on behalf of a private prosecutor does not make them greater failings than when asserted on behalf of the would-be Defendants. In so far as his status goes to discretion, the scope for that to be of assistance to him is much reduced by the need for consent and the consequences of its grant for who would conduct the prosecution. And on the facts, the scope for the exercise of a more favourable discretion is rather limited in view of the plain aim of his intervention, which is to prevent extradition through the holding of a trial in the UK.

202.    Although the DPP applies both parts of his test to such a decision (sufficiency of evidence and public interest in prosecution), nothing in his Code for Prosecutors suggests that he is under a duty to approach that issue by seeking disclosure of material held by third parties. The sort of steps which the Code envisages being taken in respect of the reliability of evidence should not be misread as applying to the sort of request for material from the US which Mr O'Connor said the DPP should make. Mr O'Connor was unable to point to any such policy or obligation in the policies he referred to. In reality he relied on no more than the general public law duty that a decision-maker had to take reasonable steps to obtain the material necessary for a rational decision. Those steps have, as we have set out, plainly been taken.



3²/44

risk late requests to prosecute, and to challenges to a refusal delaying or thwarting the concluded extradition process. The principles and the concerns which late challenges on those grounds to the extradition process create are obviously closely allied.

194. This was also the view of the Divisional Court in *R (Ahsan) v DPP and Government of the United States of America* [2008] EWHC 666 (Admin), to which we have referred briefly at paragraph 169. This court considered a challenge by Talha Ahsan to the decision of the DPP not to discuss and consider with the prosecution authorities in the US whether he should be tried in the UK for these offences on the basis the decision was unlawful. The DPP was said to have ignored the Guidance agreed between the Attorneys-General for the US and England and Wales to which we referred at paragraph 166. Birnberg Peirce, Babar Ahmad's solicitors, had submitted to the CPS that the case was much more suitable for trial in England than in the US. In paragraph 36 Richards LJ pointed to the close parallels between that argument and the arguments in *Bermingham*: and applied what Laws LJ had said at paragraphs 70-71, saying that Talha Ahsan's reliance on the guidance as a means of securing a decision on forum by the DPP was a similarly impermissible attempt to circumvent the statutory extradition process. In *R (McKinnon) v SSHD* [2009] EWHC 2021 (Admin) at paragraphs 50-55. Stanley Burnton LJ also warned against challenges to a refusal to prosecute becoming an impermissible collateral challenge to a decision to extradite.

195. We must emphasise again that the statutory process has concluded. It has been long and thorough. Putting to one side the argument that the factors now relied on are in effect nothing new or substantial in any event, and could not affect the DPP's decision, the court is being asked to exercise what, after the conclusion of that process, is very much a reserve power, since human rights issues should be raised as bars to extradition within the process which has now concluded and not after its conclusion.

196. The scope for abuse of the process is very great. The issue of forum, which is not an extradition consideration as such for the courts or DPP, may be presented through what will be in very many cases the device of a human rights argument. The scope for delay is obvious, especially if a merely arguable case that the DPP has erred in a prosecutor's decision, and that a different decision might be taken which might have an impact on human rights, leads to a stay in the concluded extradition process while judicial review proceedings take their course.

197. The stay would be preventing the fulfilment of the duty to remove, a duty which has not been suspended by any charges being laid against Babar Ahmad and Talha Ahsan or even a positive decision to prosecute. If the stay is not justified in the end, it would have required the Secretary of State to breach her statutory duty, and her international obligations. The exercise of that reserve power therefore requires new and compelling facts and evidence to be presented, which could not have been presented before. The impact on the operation of the extradition process and the statutory duties requires a quality and significance of the evidence and prospects of success which are sufficiently strong to justify the delay. We do not consider this case to be arguable anyway, but a more exacting approach should be required in these circumstances.

Judgment Approved by the court for handing down.                    Abu Hamza & Others v SOS for the Home Department

*(vi)      The failure to raise the point at an earlier stage*

203.    As we have set out earlier in this judgment, it is incumbent on a party to raise all points which are available to it at one hearing. That is a general principle of universal application and of central importance to the proper administration of justice: see *Barrow v Bankside Agency Ltd* [1996] 1 WLR 257 at 260, *BA v Home Office* [2012] EWCA Civ 944 at 26. It is plain, in our view, that the issue of sufficiency of evidence on which to prosecute is based solely upon material that was available to Babar Ahmad and Talha Ahsan in 2004, as the substance of Miss Kaufmann QC's argument has been based upon the evidence submitted in support of the extradition of Babar Ahmad in 2004. It is in our view plain that if there was a point about the failure to prosecute that should have been raised in the case of Babar Ahmad in this court in 2006. In the case of Talha Ahsan, the position is even more compelling. His application for judicial review was based upon issues relating to the DPP's obligations to take domestic prosecutions. This point should have been raised in those judicial review proceedings. It is far, far, far too late to raise it now.

204.    We reject the suggestion that the point on evidence only became available at a late stage. The point on evidence was available from 2004; nothing has changed as regards the evidence. The only other factor relied upon as providing a change is the prosecution of a number of further cases which are referred to in the letter of 7 November 2011 from Birnberg Peirce to the DPP. We were very helpfully provided with a note by Ms Hemming setting out the position in each of those cases. Her evidence, which we accept, was that in each case there was an open and active domestic police investigation and the cases referred to the CPS and subsequently prosecuted met the full Code test. In relation to each case the CPS was able to prove possession and attribution, timing (where it was important) and all the other elements of each offence that appeared on the indictment. In some cases computer evidence from abroad was obtained, but that was not necessary in each case as there was sufficient physical or other reliable admissible evidence of attribution and possession. We accept that evidence. There is nothing new.

*(vii)     The merits of the decision of the DPP*

205.    We have been provided, as we have set out, with a detailed explanation of why the decision was taken not to prosecute. It is clear that the necessary evidence was not available to the police in this country to link Babar Ahmad and Talha Ahsan to the websites and the other material matters. That information, being available in the United States as the ISPs were based there, enabled the US Prosecutor to put forward the necessary linking evidence

206.    In any event, we can see a very powerful case for the DPP to have declined to prosecute in all the circumstances. As we have set out by far the most serious allegation was related to actions taken by the two claimants in respect of the US Navy. In an age where the internet can be used in one country to inflict serious damage upon another country, there are very strong factors favouring prosecution in the country to which the real damage is directed, as it was in this case. In our judgment there can be no possible criticism of the CPS for the decisions that they have taken in this case. The arguments advanced by Miss Kaufmann QC and on behalf of Mr Watkin have no real foundation on the underlying facts.

Case No. 1:20-cv-00694-PAB-MDB   Document 119   filed 07/22/21   USDC Colorado   pg 180 of 326

Judgment Approved by the court for handing down.                    Abu Hamza & Others v SOS for the Home Department

207.   Finally it was suggested by Mr O'Connor QC that the evidential lacuna could be filled by a request made by the DPP to the US authorities to provide the necessary evidence. As we observed in the course of argument, it is, in our judgment, entirely unrealistic to think that the Federal Prosecutor who has been seeking the extradition of these two claimants for eight years and six years respectively would now provide materials which would in effect impede that extradition.  The argument is based on a premise that is, in short, entirely unrealistic.

## VI   CONCLUSION

208.   We have therefore concluded that each of the claimants' applications for permission to apply for judicial review or for a re-opening of the statutory appeals must be dismissed. It follows that their extradition to the United States of America may proceed immediately.

209.   Permission is given to cite this judgment in court.

210.   We are immensely grateful to all members of the many legal teams for very hard and capable work at very short notice.

## POST SCRIPT:  THE POSITION OF MR KARL WATKIN

211.   The Senior District Judge described the issue of proceedings by Mr Karl Watkin as an abuse of process.  We have received a detailed explanation of his action.

212.   We accept that Mr Watkin appears to have acted as a matter of principle and out of concern for the rule of law.  However it remains difficult to understand why he intervened at what was obviously the very end of the proceedings in an attempt to frustrate the due process of law and the extradition that had been considered and approved by so many courts.

213.   It is also difficult to understand how many of the steps taken by him or on his behalf could have been taken for a purpose other than to assist Babar Ahmad and Talha Ahsan avoid extradition to face serious charges of terrorism directed at the US.  It also remains difficult to understand why the arguments advanced to this court were persisted with when it became clear what had been done by the DPP and the true nature of the extradition.

214.   The proceedings were plainly an abuse of process.  However in the light of the submissions made as to why he acted in the way he did, we will not comment further. A very much more stringent view will be taken if anyone else seeks to follow his example.

189/357

Ex. 07   Att. 01   1/5

Communications to have

Access to Computers

**Lindsay Lewis**

| | |
|---|---|
| **From:** | Lindsay Lewis |
| **Sent:** | Thursday, May 18, 2017 11:38 AM |
| **To:** | Krista Klett |
| **Subject:** | Mostafa Kamel Mostafa, Reg #67495-054 |

Hi Krista,

I hope you are well. My client, Mr. Mostafa, has informed me that while Counselor Holbrook approved the provision o
modified mouse that is flat, not curved,  and speakers for the computer Mr. Mostafa needs to use to review discovery
and case materials about four months ago, these have not yet been provided and therefore Mr. Mostafa cannot look a
the case materials he needs to in order to pursue his appeal.

Can you please provide me with an update on the provision of these accommodations?

Thanks,

Lindsay Lewis
Attorney
Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, New York 10006
TEL (212) 732-0707
FAX (212) 571-3792
llewis@joshuadratel.com

1

Ex.07 Att.01   3/5   182

To: Mr. Guy ESQ Legal Dept.        July 28,2020
From: Mostafa # 67495-054      H-511

Subject: Discovery Computer Issues.

Following a conversation last Thursday
Could you please arrange with Computer Dept-
What myself and my attorney requested several times
which are:

1) Allow me to compile a CD to my attorney
   and the same to Govt and court

2) To allow and facilitate print out of some
   documents to send copies to the same parties.

3) To install the full version of "Word document"
   to enable me to read/open important
   files I can not read/open or do legal
   work without.

Please, acknowledge Receipt of this request and
comment if possible or advise   (thanks)
                              Respectfully I/m fost.

; sis staff please send by mail and E-mail and provide a copy
, thanks                    #/5                    Aug 18, 2020   (183)

To: Computer Dept And legal Dept/Mr. Guy Esp.

From: I/M Mostafa # 67495-054   H-511

Subject: Disability and legal status need Computer
arrangement(s); installations to enable me

My attorney wrote to you several times about the above
the latest was Dec 3 and Dec 6, 2019 and also Emails
I also, done the same to Computer and legal Dept
but no answer or relief provided. The last time was after
long discussion with Mr. Guy Esp at my cell, followed
(as advised) by yet another written request (copy enclosed)
July 28, 20 which was never ever answered.

Again, my legal cases are still active, always have dead-
lines and am severely disabled (no hands and vision
impaired & can not use law library or send Documents to
Court or attorney could you please respond to this request
and do the following at your nearest Convenience ;

① Provide me with a Laptop with my discovery in
and install word document and latest Acrobat

② Install a flat mouse in law library so I can
try to follow up my Criminal Appeal and Civil
Case (I do not have Counsel or access to legal help)

③ Allow me to Compile CDs to Court and/or
attorney   ④ To Type & print material to
The same to enable easy legal Timely. Thanks
Please, respond ASAP.   Respectfully I/M [signature]

## RESPONSE TO INMATE REQUEST TO STAFF MEMBER

**Name:**  Mostafa Kamel Mostafa

**Register Number:**  67495-054                      **Unit:**  H (ADX)

This is in response to your request to staff in which you request to make a CD; print out documents; and have a full version of Word installed on the legal computer.

A review of the issues raised has been conducted with the following results:

1.  You request to be allowed to compile a CD to send to your attorney.   You are advised that you may print documents in accordance with BOP and Institution policies and send those to your attorney.   The inmate law library computer does not have the ability to make CDs.

2.  You request to be allowed to print documents to send to your attorney.   You may print information from your legal research in accordance with BOP and Institution policies. Specifically, FLM 1315.07K, , Legal Activities, Inmate, states, "The cost of all copies and prints is 15 cents ($0.15) per page, double sided is 30 cents ($0.30). Indigent inmates (inmates not having a balance of $6.00 for 30 days) and have a verified need for limited reproduction of legal materials and demonstrate materials are essential to meeting an imminent court deadline or time sensitive legal issue will be provided up to 20 pages of legal materials per week.   Inmates will be required to submit an Inmate Request for Printed Pages or Copies Without Funds form, and sign a BP-199 form, Request for Withdrawal of Inmate's Personal Funds."

   If the information that you need to print is contained on an e-discovery disc that is maintained by your Correctional Counselor, then you can make arrangements with him to view the disc and the institution will assist in facilitating your printing.   You are advised to work with your Correctional Counselor if this is the case.

3.  Inmates are not provided with computers or typewriters to do legal work.   They are advised to write their legal work.   In accordance with FLM 1315.07K, , Legal Activities, Inmate, inmates at the ADX may obtain a list of typing services from the Education Department, these services are at no-cost to the government.   In accordance with your SAM, any use of a typing service by you, would be subject to approval by your SAM monitors and a modification would need to be issued prior to communication with anyone not already approved under your SAM.

   If you need to view documents from an e-discovery disc that is maintained by your Correctional Counselor then you may work with him to view the disc.   If the discovery computer is unable to view/open a file then please advise your Correctional Counselor and the issue can be investigated. However, inmates are generally only able to view PDF files on the discovery computer, any e-discovery files should be in the PDF format.

I trust this addresses your concerns.

_____                                    August 18, 2020
I. Guy, Attorney                                                        Date



185

Ex. 07 - Att. 02   $\frac{1}{4}$

Reporting legal book without note in retaliation

Department of Justice
al Bureau of Prisons

Legal Book (1027 838 - R) 3/4

**Central Office Administrative Remedy Appeal**

187

or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attach-
. must be submitted with this appeal.

Mostafa -k Mostafa                    G-7495-054        H        ADX. Co
LAST NAME, FIRST, MIDDLE INITIAL              REG. NO.           UNIT        INSTITUTION

**A - REASON FOR APPEAL** Unfortunately, the Regional office just rubber
stamped the lies in the ADX answer. And never explained
the documented cheque prove that the money was taken
from my account on oct 13- 2019 and That the book way
returned at least once to the publisher and finally,
after my family in london contacted them they present it
and I get it on mid May 2020 8+ months after
please, investigate, thoroughly and honestly to prevent
these unlawful misuse of SAMs and
- 25 - 20   retaliative measures for bad strike!        108
DATE   and future answer (Thanks)   SIGNATURE OF REQUESTER

**B - RESPONSE**

Exet, All 02 3/4

RECEIVED

DEC 10 2020

Administrative Remedy Section
Central Bureau of Prisons

_____                    _____
DATE                                GENERAL COUNSEL

GINAL: RETURN TO INMATE             CASE NUMBER: 1027833A1
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
**C - RECEIPT**                     CASE NUMBER: _____

n to: _____
        LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

ECT: _____

_____                    _____
DATE                                SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

PRINTED ON RECYCLED PAPER                                    BP-231(13)
                                                            JUNE 2002
/N

**Administrative Remedy No. 1027838-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal, wherein you claim your publication was improperly rejected.
For relief, you request an investigation.

We have reviewed documentation relevant to your appeal and, based
on the information gathered, concur with the manner in which the
Warden and Regional Director addressed your concerns at the time
of your Request for Administrative Remedy and subsequent appeal.
As indicated in the lower level responses, your publication was
delivered and there is no rejection notice on file.  You provide
no information to support your claim that staff acted outside the
scope of their duties or contrary to established policy or procedures.

Accordingly, this response is for informational purposes only.

_____
Date

_____
Ian Connors, Administrator
National Inmate Appeals

190/57

Ex.08 Family Contacts
Denial, Confusion, Retaliation
Stressing Plaintiff & Family

Ex. 08    Att 01 . 1/1    List of Approved

Allowing Step Son
Mohsin and denying
2 Sons Imran & Mohamed

Kamel Mustafa, #67495-054
Page 2

Ex B: Att.01   1/2

**Approved Contacts:**

| | Name | Relationship | Authorized contact |
|---|---|---|---|
| 1 | Mohammed Kamel Mostafa | Brother | Phone, Visit, Write |
| 2 | Ola Kamel Mostafa | Sister | Phone, Visit, Write |
| 3 | Faikah Kamel Mostafa | Sibling | Phone, Visit, Write |
| 4 | Najat Mostafa | Wife | Phone, Visit, Write |
| 5 | Mohsin Ghalain | Stepson ← | Phone, Visit, Write |
| 6 | Marwa Mostafa Kamel | Child | Phone, Visit, Write |
| 7 | Mariam Mostafa Kamel | Child | Phone, Visit, Write |
| 8 | Sufyan | Child | Phone, Visit, Write |
| 9 | Yasser Mostafa Kamel | Child | Phone, Visit, Write |
| 10 | Othman Mostafa Kamel | Child | Phone, Visit, Write |
| 11 | Hamza Mostafa Kamel | Child | Phone, Visit, Write |
| 12 | Stephen Coles | Clergyman | Phone, Visit, Write |

**Effective September 19, 2016, sons Mohammed Mostafa Kamel and Imran Mostafa will not be permitted to have any contact (NO PHONE, VISIT, or WRITE).**

Allowed Consular communications and visits.  Contact Legal Department to coordinate.

Extension December 2015.  "Prior to permitting any Consular contact, the FBI will verify the Consular representative's credentials with the DOS." As of 3/1/2016, Consular contacts are permitted with Susan Truscot, Consul (UK Consulate - Houston), June Everett, support staff (UK Consulate – Houston) and Mark Smithson, support staff (UK Consulate – Miami).

"Sensitive But Unclassified"

*Ex. 08 Att. 02 p/o*
*Request for full contact with sons & stepson*

192

**Administrative Remedy Number 876153-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal where it appears you seek a more detailed response to your request for modification of your Special Administrative Measures (SAM) to communicate with your sons and step-son.  You state the prior responses are very general and do not address many of your issues or provide proper advice.  You seek a "sound answer/relief," to your administrative remedy.

As you are aware, you are currently subject to a SAMs pursuant to 28 C.F.R. § 501.3 and have been advised that Bureau of Prisons (BOP) staff neither impose nor rescind SAM restrictions, but inform you of the SAM requirements and ensure the measures are followed.  Staff can facilitate specific requests relating to the restrictions and to that effect, BOP staff will consult with other entities when appropriate, in an attempt to resolve or accommodate such concerns.

A review into this matter reveals you inquired about communication with your sons and a step-son, as you claim you were allowed to communicate with these individuals prior to your extradition.  As indicated above, institution staff consulted with the appropriate agency in regard to your requests.  You were advised in both the BP-9 and BP-10 responses of the specific reasons you were not authorized to communicate with the individuals in question.  We find more detailed information is neither required nor necessary.  However, any further inquiries or clarification regarding this matter should be addressed directly to your Unit Team.  In addition, you should consult your Unit Team for any advice/guidance you seek regarding your SAM or communication privileges.

This response is provided for informational purposes.

1|4|17
_____                   _____
Date                                    Ian Connors, Administrator
                                        National Inmate Appeals

*Request for full contact with sons*

U.S. Department of Justice

Federe  Bureau of Prisons

**Central Office Administrative Remedy Appeal**

*(2/10)*  Wrongly SAM Modification  876153-A1  143

Type or use ball-point pen.  If attachments are needed, submit four copies.  One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Mostafa, K. Mostafa   67495-054   H63   ADX Florence Colorado

LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A - REASON FOR APPEAL**  The answer provided from regional office is very general; doesn't address many of the issues or provide a proper advice.

please read my BP9 & BP10 carefully and provide a sound answer/relief.

thanks

12-03-16

DATE

SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

DEC 1 8 2016

Administrative Remedy Section
Federal Bureau of Prisons

DATE

GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE     CASE NUMBER: 876153-A1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____

LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

DATE     SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)

.S..Department of Justice
ederal Bureau of Prisons
orth Central Regional Office



194

**Regional Administrative Remedy Appeal
Part B - Response**

dministrative Remedy Number:  876153-R1

his is in response to your Regional Administrative Remedy Appeal received in this office on
ctober 21, 2016, in which you request your Special Administrative Measures (SAM) be modified to
low contact with two of your sons and one step-son.

/e have reviewed your appeal and the Warden's response dated September 29, 2016.  The United
tates Attorney General (USAG), pursuant to 28 C.F.R. § 501.3, has imposed SAMs in your case.
ne USAG may impose SAMs if there is a substantial risk that a prisoner's communications or
ntacts with persons could result in death or serious bodily injury to persons or substantial damage
 property that would entail the risk of death or serious bodily injury to persons.  These SAMs
dinarily may include housing the inmate in administrative detention and/or limiting certain privileges,
cluding, but not limited to, correspondence, visiting, interviews with representatives of the news
edia, and use of the telephone, as is reasonably necessary to protect persons against the risk of
ts of violence or terrorism.   While the Bureau of Prisons (BOP) neither imposes nor rescinds
AMs, it implements the restrictions and can accommodate specific requests relating to the
strictions.   Additionally, the BOP consults with other entities, when appropriate, in an attempt to
solve a concern.   As indicated in the Warden's response, your SAMs were modified by the Deputy
ssistant Attorney General on September 19, 2016, to prohibit contact with two of your sons due to
eir participation in criminal activity for which they were convicted and imprisoned.   As to your
ep-son, step-children are not considered "children" under the definition of "immediate family" as set
rth in the SAM.   Any request for additional non-legal contacts may be submitted for consideration
 a case by case basis by the agency responsible for oversight of the SAM.

ased on the above information, your Regional Administrative Remedy Appeal is for informational
rrposes only.

you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal
ureau of Prisons, 320 First Street, NW, Washington, DC 20534.   Your appeal must be received in
e Office of General Counsel within 30 days from the date of this response.

 11-18-16

ate

Sara M. Revell, Regional Director

U.S. Department of Justice

87-6153.F1 (4)   **Regional Administrative Remedy Appeal**   195

Federal Bureau of Prisons   Re: Denying communication with 3 of my immediate family member

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Mostofa, K. Mostofa   67485-054   #03   APX Florence Colorado
       LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.        UNIT        INSTITUTION

**Part A - REASON FOR APPEAL** The answer in the BP9 is confusing and not accurate! I was not allowed to contact the three sons since 2012 when I was first extradited; eventhough it wasn't mentioned in the SAM before the so called "Modification" sept 19, 2016 - which is in itself the proof that the S.A.M administrators are liers and morally corrupt. If you see the date of my BP9 and BP8 and the dates of rejection of the letters to my sons you can clearly see that rejections were much earlier than the "modification". Furthermore, all my letters to them were trashed before without any notes! their letters to me were trashed to but about 20 letters had been returned to Iman between 2013 - 2015 again without a reject note! I was always told verbally before any call that they shouldn't even be in the place of the call (their house)

10-13-16   again all these dishonesty is against the false assumanists
DATE        maintain my extradition and (fuel) SIGNATURE OF REQUESTER   reel to cable

**Part B - RESPONSE**

RECEIVED
OCT 21 2016
REGIONAL [illegible] OFFICE
NORTH CENTRAL [illegible]

_____          _____
DATE                                       REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE          CASE NUMBER: 8 161 53 F

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
            LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.       UNIT       INSTITUTION

SUBJECT: _____

_____          _____
DATE                                       SIGNATURE, RECIPIENT OF REGIONAL APPEAL

BP-230(13)
JUNE 2002

**BP-229 RESPONSE**  **Case Number: 876153-F1**

Your Request for Administrative Remedy dated September 9, 2016, and received in this office on September 12, 2016, has been reviewed. You state you have been prohibited from contacting two sons and one step-son since your extradition in October 2012. You request contact with these individuals.

A review of the issues raised in your Request for Administrative Remedy has been conducted. The terms and conditions of your Special Administrative Measures (SAM) specifically outline the individuals with whom you are permitted to communicate, as well as the procedure for requesting additional contacts. Review of the SAM dated and signed by the Deputy Assistant Attorney General on December 22, 2015, and currently in effect, you were permitted non-legally privileged telephone, non-legally privileged mail, and non-legally privileged visits with "immediate family members." Footnote 7 defines "immediate family members" as "the inmate's (USMS/BOP/DF- or FBI-verifiable) spouse, children, parents, and siblings," which would include your two sons. However, review of your file reveals your SAM was modified by the Deputy Assistant Attorney General on September 19, 2016, to prohibit contact with two of your sons due to their participation in criminal activity for which they were convicted and imprisoned. The modification indicates one son was previously incarcerated and the other son is currently incarcerated. Prior to this modification, the 2015 SAM extension did not prohibit such contact.

With regard to contact with a step-son, step-children are not considered "children" under the definition of "immediate family" as set forth in the SAM. As outlined in the SAM, any requests for additional non-legal contacts may be submitted and will be considered on a case-by-case basis by the agencies responsible for oversight of the SAM.

Accordingly, this response to your Request for Administrative Remedy is for informational purposes only. In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response by submitting a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas 66101-2492.

_____
Jack Fox, Warden

_9-29-16_
Date

Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.

From: Mostafa K. Mostafa 6/10 67495-054 H    ADX Florence Colorado

**LAST NAME, FIRST, MIDDLE INITIAL** — **REG. NO.** — **UNIT** — **INSTITUTION**

**Part A— INMATE REQUEST** — The answer provided in the BP-8 shows clearly that no one actually read it! I am denied contacts to 3 of my sons; all are immediate members of my family. Imran & Mohamed Mostafa and Mohsin Gaitan (step son). No mentioning in my SIAM that I can not contact them. Yet I am not also/allowed to contact them since my extradition oct **2012**! These dishonest tactics are against my extradition memo of understanding & assurances given. Also against what is presented to USa Judges to approve the SAM on me. I was allowed visits and 3communications with them and all my family & friends during my 8½ yrs in England Jails awaiting extradition to U.S. please stop exaggerations and playing with SAM tools!

9/9/16    **DATE** _____    **SIGNATURE OF REQUESTER**

**Part B— RESPONSE**

RECEIVED

SEP 12 2016

ADX AW Office

_____ **DATE** _____    **WARDEN OR REGIONAL DIRECTOR**

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**    **CASE NUMBER:** 876153-F1

**CASE NUMBER:** _____

**Part C— RECEIPT**

Return to: _____
**LAST NAME, FIRST, MIDDLE INITIAL** — **REG. NO.** — **UNIT** — **INSTITUTION**

SUBJECT: _____

_____ **DATE** _____    **RECIPIENT'S SIGNATURE (STAFF MEMBER)**

USP LVN    PRINTED ON RECYCLED PAPER    BP-229(13)
APRIL 1982





**U.S. Department of Justice**
Federal Bureau of Prisons

*United States Penitentiary –*
*Administrative Maximum*

Florence, Colorado  81226

September 9, 2016

MEMORANDUM FOR   D. Nelson, Inmate Systems Manager

FROM:                            J. Cabel, H Unit

SUBJECT:                       Inmate Mail Rejection:  MOSTAFA 67495-054

The attached correspondence is submitted for rejection for the following reason(s):

Mail item 16-036-003 has been **DENIED** by the FBI for National Security Concerns.

Re: Eid Card to My son Mohamed Mostafa

199

Bismillah & Assalamu alaikum
my dear Son Mohammed and
his family Sawsan, Yassin & Yahya.

- Eid Mubarak & Praying to Allah that
you are all well, best of Ramadan & Emran

- I was suddenly told that there
are no "official restrictions" to
communicate with you, even tho
last lost & yrs were a "journal over",
I raised my eyebrows to the Caliph
(they have not come back down yet!)

- But thinking positively and practically though
to drop you a line, wish my annual
laconism advice as So, and so unusual
open both ears widely but not like
before (one for in the other out the
but both for in and effort to outline
do going indelibly)

- minaudic (at you and still as ever worthy
about your future (and now my grand-
ones even too. Be of Yassin and Yahya
I am getting mixed feelings about what
I mean always for. My joy, festivities are
better than ever, such mixed up and now
more responsible father and (married
nice lady [so now] from a great respectably
family too [please don't laugh or lean and great
saying too old! but from your great the marriage
and appreciate this help & gift from Allah

to you. I remember, I'm nice looking Reality
children are not a gift to material tho
either you've take your fortune for
kick down work side to All before the
half of you do not deserve Allah's right for sure
a great gift. They can also be a proper
social security you if your mums
at your celibate you of their nums,
you would do as you are without
then educated on a good skilled profession
a Nar knows best.

You can see how my situation
been very difficult without the (could have
and loss of my mum died and your god-
siblings MashAllah. even though to he my
dad. mum (who grew you and looked after your
even 2 weeks for my uncle Mohammad, we some
for money & love and
forever!! I've free !! Then I am getting
hand free !!

- Also I heard you are now singing "to amin
songs." in happy occasions !! Kind of you
are dying to ask me if you can do Islamic
Dancing & too ? And the answer is a straight
Neeooweeoweew... Just a thing !!
don't you dare, I really wished you and
Allah's knowledge bond to make you sing the
Creators word the Quran, not the creations
nastily !

- Any way try to act positively and responsibly
your life to fulfill more than our own like
everyone one...

- I know its too much setting a final contact tho
always & yes, but that's still for so hard !

 

EX·8·Att 2

**U.S. Department of Justice**
Federal Bureau of Prisons

*United States Penitentiary –*
*Administrative Maximum*

*Florence, Colorado 81226*

September 16, 2016

MEMORANDUM FOR   D. Nelson, Inmate Systems Manager

FROM:                        J. Cabel, H Unit

SUBJECT:                 Inmate Mail Rejection:  MOSTAFA 67495-054

The attached correspondence is submitted for rejection for the following reason(s):

Mail item 16-033-003 **DENIED** by FBI for National Security concerns.

(EID Card for my Son Imran Mostfa)
Recieved on Sept 20 2016





*202*

*EX.8    Att.3    (1/2)    Partial Contact*

**Administrative Remedy Number 879409-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal where you request a modification of your Special
Administrative Measures (SAM) to allow communications with your
sons.   You appear to disagree with the reason provided for the denial
of your request.

As you are aware, you are currently subject to a SAMs pursuant to
28 C.F.R. § 501.3 and have been advised that Bureau of Prisons (BOP)
staff neither impose nor rescind SAM restrictions, but inform you
of the SAM requirements and ensure the measures are followed.   Staff
can facilitate specific requests relating to the restrictions and
to that effect, BOP staff will consult with other entities when
appropriate, in an attempt to resolve or accommodate such concerns.

A review of this matter reveals you raised the same issue and request
in remedy number 876153.   You have been advised in this instant
remedy and in 876153 that the institution consulted with the
appropriate agency in regard to your request.   The reviewing agency
had security concerns and determined communications with your sons
would not be approved.   We concur with the responses you were
provided and find no need for further review.

This response is provided for informational purposes.

_1/30/17_
Date

_JD_
Ian Connors, Administrator
National Inmate Appeals *RME*

*Different    Request for even partial contact    Denied*

879409-R1                    2½                          203

**U.S. Department of Justice**                    **Central Office Administrative Remedy Appeal**

Federal Bureau of Prisons   Denying Contact with 2 Sons even long before S.A.M Modified

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: _Most L. K. Mostofa_ _____ _67495-054_ _#03_ _ADX Florence_
          LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          Colorado
                                                                                      INSTITUTION

**Part A - REASON FOR APPEAL** The Regional office answer is evading to main issue of
Denying contacts with the same sons since I came 2012 and took
all our letters without rejection notes. Only when I insisted receipt
to trace my letters to them & follow the law they were added to
the S.AM but with prove that the bond was always active without
Also, this issue is not a "repeat" of another request as the one
Claimed; the other issue was to contest the ban completely, this
issue is to consider any contact even partial contact; such
letters even phone calls or visits. They are inconsidered till the
end of remedies or civil case; therefore, the answer provided
is evasive and not thoughtful! Please, process
12-15-16   and advise about the two issues. The SAM is very
     DATE   harsh even without the any trick   SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

JAN  3 2017

Administrative Remedy Section
Federal Bureau of Prisons

_____ DATE                    GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE         CASE NUMBER: 879409-A1

**Part C - RECEIPT**
                                   CASE NUMBER: _____

Return to: _____
            LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

_____ DATE          SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

                                                                              BP-231(13)

204

EX. 08   Att. 04   1/8

Daughter Marwa Visiting form

Repeatedly Trashing Visiting forms.

[ Only Two Sofar allowed
   but Can't travel without Male Cares
   wife & Daughter Marian ]

205

# FEDERAL CORRECTIONAL COMPLEX
## FLORENCE, COLORADO
### INFORMAL RESOLUTION FORM

**Notice to Inmate: Inmates have the responsibility to use this Program in Good Faith and in an Honest and Straightforward manner.**

Inmate Name: Mystafa K-Mostfa          Reg. No. 67495-054
Unit: H-03                             Date: 9-9-16

**NOTICE TO INMATE**: You are advised that normally prior to filing a Request for Administrative Remedy, BP-229(13), **you must attempt to informally resolve your complaint** through your Correctional Counselor. Please follow the steps listed below: Loosing/ignoring Family's applications to visit !

1.  **State your complaint (single complaint or a reasonable number of closely related issues):**
For the 2nd time now some of my family's applications to visit me are lost or ignored. This time Mr. Legat the Counselor at the time I acknowledged the receive of 3 apps from my Wife and two daughters to visit, Four over 3 weeks ago (receive) to approved my wife and daughter Marien But 40 news about my younger daughter Marwa Mostfa. Since then, I am asking SIS and unit members about her app a decision but no one giving any answer or explaination. I need both please.

(If more space is needed, you may use up to one letter size (8 1/2 x 11) continuation page. You must also submit one copy of supporting exhibits. (Exhibits will not be returned with the response to BP-229(13) responses.))

2.  **State what resolution you expect:** Please give me the information about my daughter Marwa apps and on the Decision made as soon as you can I never had a visit for four years.

Inmate's Signature: _____   Date: 9-9-16

Counselor's Signature: _____   Date: 9-9-16   9-27-16

Department Involved: _____   Date Assigned: _____   Due Date: _____

**Department's Response regarding Complaint:** Your familys applications were recieved and sent to sis for final approval. Once they are approved they will be added to your list. Please allow inmate extra time prior attempting to informally resolve.

Department Head Signature: _____   Date: _____
Unit Manager's Review: H.E.S   Date: 9-27-16
Informally Resolved: _____   Date: _____

| | BP-8 ISSUED | BP-8 RETURNED | BP-9 ISSUED | BP-9 RETURNED | REMEDY CLERK |
|---|---|---|---|---|---|
| DATE | 9-6-16 | 9-12-16 | 9-27-16 | 1-30-16 | |
| TIME | | | | | |
| COUNSELOR | | | | | |

FCC 1330.18B          Administrative Remedy Program          Attachment 1

DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

*Re: Missing Visiting form (application)*

206

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| | | | |
|---|---|---|---|
| Mostafa, K. Mostafa | 67495-054 H | | ADX Florence Colorado |
| LAST NAME, FIRST, MIDDLE/INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST**  Regarding the missing visiting/or ignoring my daughter Maruwa Mostafa; the answer in the BP8 is not relevant. Because the counselor at the time (4 months ago) acknowledged receiving 3 apps and he put them in processing. Then, two months after that I received the Clearance of my wife Najat and my other daughter Mariam Mostafa, but nothing about my daughter Maruwa and her application! And every time I ask unit staff, including SIS staff, about the matter or the app, they are not a clue! This situation keep happening for the last 4 y's with any of my 9 children, even before I came to ADX. It is noteworthy that I had my wife and two daughters, including Maruwa, and my son Othman Mostafa were all cleared twice, in New York and Springfield Missouri. Now I'm told to start again the games starting again against me and my family. I am now one year in ADX and my visiting list is shrunk to two. I never had any visits since my extradition 2012.

Against all ordinance & loud to ————

2-29-16

DATE

SIGNATURE OF REQUESTER

**Part B– RESPONSE**

_____     _____
DATE                             WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

FIRST COPY: WARDEN'S ADMINISTRATIVE REMEDY FILE     CASE NUMBER: 877976-F1

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
          LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

_____     _____
DATE                             RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP-229(13)
APRIL 1982

207



**BP-229 RESPONSE**                                   **Case Number: 877976-F1**

Your Request for Administrative Remedy dated September 29, 2016, and received in this office on September 30, 2016, has been reviewed. You request to know if your daughter, Marwa Mostafa, has been approved on your visiting list.

A review of the issues raised in your Request for Administrative Remedy has been conducted. The review revealed we have not received a visiting application for your daughter, Marwa Mostafa. Upon receipt of the visiting application it will be processed and reviewed. If approved, your visiting list will be updated and you will be provided a copy of your updated visiting list.

Accordingly, this response to your Request for Administrative Remedy is for informational purposes only. In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response by submitting a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas 66101-2492.

_____                    ___11/16/16___
Jack Fox, Complex Warden                    Date

208

Department of Justice
ral Bureau of Prisons

**Regional Administrative Remedy Appeal**

Re: Missing Visiting Form (Application 877976 F1

or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

Mostafa, K. Mostafa    67495-054    A    Florence Colorado ADX

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

A - REASON FOR APPEAL My daughter Mona had been cleared one after a long struggle with similar situation of my Forms as soon as the was cleared they prefer to stop my field medical center knowing how I had start depart, then more than a year ago, Bop sent me again to ADX here and I am still juggling with the "missing" Forms. This visiting form was one of three in a certified Post per extend and Confirmed by Counselor Liggett 3 visiting my received sent to him, when he moved to another apt. The three became 2 only, Because of these tricks I never had any visits since my extradition from UK -25-16 Oct 2012 I can't understand why every time BOP move me to (another) institution I have to start from the start cleary support

—25—16 Oct 2012

DATE    SIGNATURE OF REQUESTER

B - RESPONSE

RECEIVED    Dec 7, 2016
REGIONAL DIRECTOR'S OFFICE
NORTH CENTRAL REGION

_____    _____
DATE                REGIONAL DIRECTOR

ssatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar of the date of this response.

IGINAL: RETURN TO INMATE    CASE NUMBER: 87976-R1

C - RECEIPT    CASE NUMBER: _____

rn to: _____
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

JECT: _____

_____    _____
DATE                SIGNATURE, RECIPIENT OF REGIONAL APPEAL

BP-230(13)

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**



**Regional Administrative Remedy Appeal**
**Part B - Response**

---

**Administrative Remedy Number:**   877976-R1

---

This is in response to your Regional Administrative Remedy Appeal received in this office on December 7, 2016, in which you claim your daughter has been previously cleared to visit.   For relief, you request to have your daughter added to your approved visiting list again.

We have reviewed your appeal and the Warden's response dated November 16, 2016.   Several areas are considered when determining whether someone is an appropriate visitor.   Those areas include, but are not limited to, criminal history and whether the person could present a security concern if allowed to visit.   It is within each Warden's discretion to approve or deny visitors. According to the provisions of Program Statement 5267.09, Visiting Regulations, the Warden may restrict visiting to ensure the security and orderly operation of the institution.   As indicated in the Warden's response, the institution has not received a visiting application for your daughter.   Once an application is received, staff will complete the required background inquiries.   If approved, your visiting list will be updated accordingly.

Based on the above, your Regional Administrative Remedy Appeal is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534.   Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

12/19/16
Date

Sara M. Revell, Regional Director

Department of Justice ~~Central~~ **Central Office Administrative Remedy Appeal**

Bureau of Prisons  Daughter's Visiting form 877976-R1

use ball-point pen.  If attachments are needed, submit four copies.  One copy each of the completed BP-229(13) and BP-230(13), including any attach-
must be submitted with this appeal.

Mostafa K. Mostafa        67495-054      H8      ADX Florence
Colorado

LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

. - REASON FOR APPEAL  Again the answer ignored the fact that my Daughter
va Mostafa was among 3 otha form and in a registed slend
I was told by Counselor Liggett that he received the 3 forms.
family has been trying to visit me since my extradition
n England 2012 Yet never had a single visit; because
his kind of continuous deliberate games and hurdles,
e whenever I mange to clear some members of my
dy in one of the prisons I am moved too, the now
on say that I have to start again! As if the FBOP
not have shared information so same regulations:
31-17 ~~Families~~ Please, Stop this on going ~~birthy~~ to ———— /Most
DATE         Families so inmates and Proud Citizens  SIGNATURE OF REQUESTER

B - RESPONSE

```
RECEIVED

JAN 24 2017

Administrative Remedy Section
Federal Bureau of Prisons
```

DATE                                      GENERAL COUNSEL   877976-A1

GINAL: RETURN TO INMATE                   CASE NUMBER:

C - RECEIPT                               CASE NUMBER:

n to: _____
         LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

JECT: _____

DATE                                      SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

VN



Administrative Remedy No. 877976-A1
Part B - Response

This is in response to your Central Office Administrative Remedy Appeal where you challenge the denial of visiting privileges for your daughter.  For relief, you request your daughter be added to your visiting list.

Program Statement 5267.08 <u>Visiting Regulations</u> states, the Warden must establish controls in developing and administering visiting regulations and may restrict inmate visiting when necessary to ensure the security and good order of the institution.  The approval of visiting privileges falls within the discretionary authority of the Warden.  The Warden and Regional Director adequately addressed your issues.  As was explained, staff members have not received a visiting application from your daughter at this time.  Once the application is received, it will be reviewed.  We concur with this decision and the responses provided.

Accordingly, your appeal is denied.


Date

Ian Connors, Administrator
National Inmate Appeals



212

Ex.08   Att   05   (1/9)

Rejecting Mail   Then Use it to
Renew SAM

Re: Grandson 1 Yr old, Then; Ahmed Uthman Mostafa

Request for Reconsideration (3/9)   Exhibit (one page)

(213)

TO: SIS And/or FBI                    8-22-18

From: Mostafa  # 67495-054      unit H   Cell 511

Re: Rejected outgoing mail Item No. 18-043-006

Today I received a rejected outgoing mail item and rejection note. The note (enclosed) states :

"In the letter, you tell your family to not tell a third party that you love and miss him because it is against the rules. This statement is considered to be a violation of the SAM encouraging your family to relay a message to other people who not currently on your approved list of authorized contacts.) End

With respect, I would like you to reconsider your decision because of (but not limited to) the following:

① The outgoing mail only consists of 3 of my prison photos with writing on the back for three of my sons. And the phrase mention was in two of the photos; one to my son Jimmar and the other to my son Sufyan; they both in airines and have one son each of one year old. And you are referring to these two grand sons of one year old as "third party"!

② The phrasing written and your correctly translated is fully on line with the SAM; as it say do not tell them (their one year old sons). And I love & miss them As SAM Inmate am reminded to advise their relatives of the rules hence the phrasing.

③ The reality is that stating that it is "considered ... encouraging ... to relay a message ..." is unreality in conceivable, even impossible because that: the phrase is clear Not to And even if they wanted to do the opposite of the clear phrase then I am not convey anything to a one year old babies. Clearly S.A.M is not a tool to practice unfounded cruelties and/or insane stipulations, the agents know every member of my family and their ages!
              For all the above and more, please reconsider your decision and allow the 3 photos.  Respectfully submitted



2 4 United States Government

# memorandum

*United States Penitentiary*
*Administrative Maximum*
*Florence, Colorado  81226*



te:       August 20, 2018

om:       A. Oliver, Language Specialist

:         Mostafa, Kamel   #86552-083

**BJECT:       Rejection of Outgoing Letter, Inmate Mostafa, K. #67495-054**

e attached letter marked by SIS staff as 18-043-006-O has been denied by the FBI due to unapproved
rd-party communications.   In the letter, you tell your family to not tell a third party that you love and
ss him because it is against the rules.   This statement is considered to be a violation of the SAM,
couraging your family to relay a message to other people who not currently on your approved list of
horized contacts.

e letter is being returned to you.   Received   Wed 8-22-78

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY** (215)

A-9 Unreasonable Rejection of outgoing Mail Item 18-043-006

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Mustafa K. Mustafa    67450154 H    ADX Florence

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST** The enclosed BP8 says that this rejection can't be solved at this level (Please See attached BP8 and attached exhibit for reconsideration). The reason provided for rejection is very misleadingly phrased and or overt manifestation of abuse of power and or it is S.A.M.:

1 - The Item 18-043-006 was not a letter but 3 prison photos with short comments at the Back.

2- The rejection states "you asked your son not to tell third party that you love them and missing them and continued "we understand that it means to tell"

3- The agent then reversed my direct order of "Not to tell" and made it "Tell" Also I reserved the advise giving to S.A.M inmate the advise their family to comply as the families do not have a copy of the S.A.M nor understand such an unusual oppression not least when all my family born in USA and

4- The agent ignored (dishonestly) that the alleged "this party is my one years old grand sons (Ahmed and Omar) who can not be told or understand any message! and that the alleged content of the message poses to violation... Please allow...

DATE 9-21-18    SIGNATURE OF REQUESTER [signature]

**Part B– RESPONSE**

> Received
> SEP 2 4 2018
> Admin Remedy Office

DATE _____    WARDEN OR REGIONAL DIRECTOR _____

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**    CASE NUMBER: 955150-F1

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

DATE _____    RECIPIENT'S SIGNATURE (STAFF MEMBER) _____

BP–229(13)
APRIL 1982

USP LVN

`

`

216

**BP-229 Response**                                            **Case Number: 955150-F1**

Your Request for Administrative Remedy dated September 21, 2018, and received in the Administrative Remedy office September 24, 2018, has been reviewed. Specifically, you claim a letter you wrote to your son was wrongfully rejected. As relief, you request the rejection be reconsidered, as you did not direct someone to do something, which would violate the Special Administrative Measures.

A review of the issue raised in your Request for Administrative Remedy has been conducted. The results of the review revealed the Federal Bureau of Investigation agent reviewing your mail understood you telling your family specifically to not tell an unauthorized third party that you love and miss them because it was against the rules, is in itself relaying a message to the third party. By telling your family this, you are essentially telling your family you would tell the person you love and miss them if you were allowed to.

Accordingly, your Request for Administrative Remedy is denied. In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response by submitting a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, 400 State Avenue, Tower 11, Suite 800, Kansas City, Kansas 66101.

_____                    11/2/18
Andre Matevousian, Complex Warden                  Date

**Regional Administrative Remedy Appeal**

U.S. Department of Justice

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Mostafa, K. Mostafa     67415-054     H     ADX - Colorado.

      LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

**Part A - REASON FOR APPEAL**

Please, check the insanity of the answer and its incompatibility with the merits and reasons of SAM, with all the paper work, and acknowledge, that the alleged "Third Party" is my one year old grand Son, who is incapable of sending or receiving any messages. And Stop using the SAM as a bulling tool in the hand of concentrating Camps mind set operatives.

11-10-18

DATE            SIGNATURE OF REQUESTER

**Part B - RESPONSE**

DATE            REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

THIRD COPY: WARDEN'S ADMINISTRATIVE REMEDY FILE        CASE NUMBER: _____

**Part C - RECEIPT**

                                        CASE NUMBER: _____

Return to: _____

       LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

DATE            SIGNATURE, RECIPIENT OF REGIONAL APPEAL

BP-230(13)
JUNE 2002

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office** 

**Regional Administrative Remedy Appeal**
**Part B - Response**

**Administrative Remedy Number:**   955150-R1

This is in response to your Regional Administrative Remedy Appeal received in this office on November 23, 2018, in which you claim a letter you wrote was wrongfully rejected.   For relief, you request for your rejection to be reconsidered as you believe you did not violate any of your Special Administrative Measures (SAMs).

We have reviewed your appeal and the Warden's response dated November 2, 2018.   The United States Attorney General (USAG), pursuant to 28 C.F.R. § 501.3, has imposed Special Administrative Measures (SAMs) in your case.   The USAG may impose SAMs if there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons or substantial damage to property that would entail the risk of death or serious bodily injury to persons.   These SAMs ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism.   While the Bureau of Prisons (BOP) neither imposes nor rescinds SAMs, it implements the restrictions and can accommodate specific requests relating to the restrictions.   Additionally, the BOP consults with other entities, when appropriate, in an attempt to resolve a concern.   As indicated in the Warden's response, the Federal Bureau of Investigations reviewing agent determined you telling your family to relay a message to an unauthorized third party was violating the rules of your SAM's.   Accordingly, the institution's decision is supported.

Based on the above, this response to your Regional Administrative Remedy Appeal is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534.   Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

12/7/18
_____
Date

_____
J. E. Krueger, Regional Director

RECEIVED

DEC 2 6 2018

ADX AW Office

**U.S. Department of Justice**

*SAM Misuse (8A)*

**Central Office Administrative Remedy Appeal** 219

Federal Bureau of Prisons

955150

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: Moshtra.K. Mistra _____ 67495054 __ H __ ADX Florence Co.

LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.       UNIT       INSTITUTION

**Part A - REASON FOR APPEAL** The regional answer is nothing short of helping concentrating camp mind set operatives to entrap the inmate in order to renew the S.A.M. and they did renew it. Please, do proper investigation as the remedy system is but a complete dysfunctional rubber stamp.

The SAM operatives admitted (and have in records) that:
1 - The alleged "Third party" is my one year old grand son. And,
2 - I wrote: "Don't tell him..." but the SAM tyrant said the opposite
3 - The message itself and the alleged third party does not pause any threat to any creature in our beloved geology.
4 - The SAM has been imposed only for security reasons, but not for power hungry, skewed minded operatives to use it as a bulling tool against inmates and their family new borns,
5 - The operatives on my SAM are either unqualified or dishonest with little or no respect to the law of US.

12-31-18

DATE       SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED
JAN 28 2019
Administrative Remedy Sec'

_____       _____
DATE                           GENERAL COUNSEL

SECOND COPY: REGIONAL FILE COPY       CASE NUMBER: 955150·A1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____

LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.       UNIT       INSTITUTION

SUBJECT: _____

_____       _____
DATE                           SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)

**Administrative Remedy No. 955150-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal where you allege staff at ADX Florence used your Special
Administrative Measures (SAM) restrictions to improperly reject
your outgoing mail.  You contend neither the letter nor the
recipient imposed any security concerns and this action is an
abuse of authority.  You request review and reconsideration of
this matter.

The Warden and Regional Director adequately addressed your
complaint and we concur with the responses provided.  Safety and
security is paramount and you were advised why the outgoing mail
in question was rejected.  The Warden is authorized to reject
any incoming/outgoing mail that could be detrimental to the
institution or the public.  In addition, this correspondence was
properly reviewed by the appropriate authority pursuant to your
SAM.  While you disagree with this assessment and decision, we
find the outgoing mail was rejected in compliance with Bureau
policy and the provisions of your SAM.

Accordingly, your appeal is denied.

_____                _____
Date                                   Ian Connors, Administrator
                                       National Inmate Appeals

211

Ex. 09   Att 01   ½

Recommendation of BOP Director Re:
Parenting

U.S. Department of Justice

Federal Bureau of Prisons

(Ex. AH.1)

Office of the Director                                    Washington, DC 20534

June 19, 2013

MEMORANDUM FOR ALL BUREAU INMATES

FROM:     Charles E. Samuels, Jr., Director
          Federal Bureau of Prisons

SUBJECT:  Parenting

As Director of the Federal Bureau of Prisons (BOP), I want to reaffirm the agency's commitment to helping you prepare to reenter society following release from prison. For those of you with children, this preparation includes building parenting skills.

Regardless of the state of your relationship with your children before you came to prison, we understand that incarceration creates new parenting challenges. The staff in the BOP are committed to giving you opportunities to enhance your relationship with your children and your role as a parent. For example, we offer parenting programs at all institutions. I encourage you to take advantage of these programs. The BOP also offers many opportunities to communicate with your children and your family, through telephone calls, electronic messages, and letters. In addition, I hope your family is able to bring your children to visit you—there is no substitute for seeing your children, looking them in the eye, and letting them know you care about them.

I suggest that you not let mistakes you may have made in the past prevent you from being an important role model for your children. You can show them that people who make mistakes and bad decisions can overcome challenging obstacles with the right attitude and commitment. You can also demonstrate that through hard work, people can achieve great things such as education, jobs, and treatment. You can reinforce your children's strengths and help guide them when they are veering off course.

I hope that you use your term of incarceration to acquire the skills needed to live successfully in the community, and this includes building a strong relationship with your children. We are here to help you prepare to successfully release from prison and become a productive and law abiding citizen. Take advantage of the many programs that are available; get help in overcoming problems you have faced; and improve skills you have acquired previously. I challenge each of you to use each day to make a positive difference, and to bring that positive difference to the lives of your children.

EX. 9 . Att. 02  $\frac{1}{3}$   Re:

ADX Warden Weily Requesting &
Recommending SAM inmate to
contact over extended family members in
Africa (28 people) and . . . . to help
"manage" the inmate .

Recommendation for Modification of SAM for Inmate
MOHAMED, Khalfan, Register Number 44623-054
October 15, 2008
Page 2

serious bodily injury to persons, or substantial damage to property that would entail the
risk of death or serious bodily injury to persons.

## II. NON-LEGAL COMMUNICATION (MAIL, TELEPHONE, and VISITS)

Inmate Mohamed again requests that in addition to his immediate family, he be
permitted non-legal communication with his sister-in-laws, brother-in-laws, nieces, and
nephews. Inmate Mohamed frequently corresponded with these individuals prior to the
modification. While the Attorney General has determined this restriction is reasonably
necessary to protect persons against the risk of death or serious bodily injury, it is
again our determination, based on sound correctional judgment, that inmate Mohamed
should be permitted to communicate with these individuals to effectively manage this
inmate.

The Bureau encourages social communication that is directed to socially useful goals.
An inmate communicating with members of his family maintains the morale of the
inmate and develops a closer relationship between the inmate and family members.
Permitting inmate Mohamed to communicate with these individuals improves the
morale of this inmate by allowing him to develop and maintain close relationships with
members of his family. Therefore we again recommend inmate Mohamed's SAM be
modified to permit him to communicate with these individuals. Please be advised that
we again queried the FBI to determine if they have any concerns with inmate
Mohamed's communicating with these individuals and they have not taken a position.

As discussed last year, the impact on institution resources of this recommended
modification that this would create is minimal. This institution has two full-time linguists
reviewing non-legal communication for inmates housed at this institution who have
been convicted of, charged with, associated with, or linked to terrorist activities by law
enforcement. These staff translate all non-legal communication. The Federal Bureau
of Prisons and the Federal Bureau of Investigation (FBI) would be able to timely and
effectively monitor this inmate's non-legal communication. This requested modification
strikes the necessary balance between ensuring maximum use of the tools available to
us to identify potential threats to institutions, the public, and/or national security with
maintaining the inmate's morale through development of closer relationships with
members of his family.

Inmate Shah also requests that the time frames for the review of all of his mail be limited to
ten days for letters written in a language other than English. We recommend the Office
of General Counsel contact OEO, USAO/SDNY, and FBI to determine if this
modification is appropriate. We oppose any modification that would shorten the
amount of time the FBI can review his correspondence if a proper review of the mail
could not be conducted.

US005221



Ex 9. AH 2

02/3

**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
☒ *Administrative Maximum Security Institution*
☐ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

Office of the Warden

*Florence, CO 81226*

October 15, 2008

MEMORANDUM FOR  KATHLEEN M. KENNEY, ASSISTANT DIRECTOR/GENERAL
COUNSEL, GENERAL COUNSEL AND REVIEW DIVISION

THROUGH:      Michael K. Nalley, Regional Director, North Central Region

FROM:         R. Wiley, Warden

SUBJECT:      Annual Review & Recommendation for Modification of SAM
              MOHAMED, Khalfan, Register Number 44623-054

As you are aware, the Special Administrative Measures (SAM) for the above-
referenced inmate will be reviewed for extension on or about November 24, 2008. In
accordance with Institutional Supplement FLM 5321.06H(1), H-Unit Programs, an
annual review of the inmate's SAM and overall adjustment at this institution was
conducted. During this review, recommendations were obtained from staff and the
inmate concerning the SAM and current conditions of confinement. In addition, staff
reviewed requests, grievances and/or administrative remedies submitted by inmate
Mohamed throughout the year, disciplinary information from throughout the year,
correspondence to/from inmate Mohamed, types of educational materials requested,
types of leisure materials requested, and participation in the various programming
offered by the institution. Based upon this review, we recommend the SAM for this
inmate be extended for another year with the following modifications:

I.     RENEWAL

We recommend the Federal Bureau of Prisons' (Bureau) Office of General Counsel
contact the Office of Enforcement Operations (OEO), United States Attorney's Office
for the Southern District of New York (USAO/SDNY), and the Federal Bureau of
Investigation (FBI) to determine if there continues to be a substantial risk that the
inmate's communications or contacts with other persons could result in the death or

US005220

216

Ex 10          1/7

Consulate   Contacts  feling / severed)

217

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

*Ex. 10 · (217)*

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Mostofa Kamel Mostafa MKM | 67495054 | H/B | ADX Florence
LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION

**Part A– INMATE REQUEST** As you can see from the enclosed BP8 that it was submitted on on 3/15/16 However I only received back answer, and accompanied with this form, on April the 8th, 2016!

However, I have no reason to believe that unit team is not trying to get me in contact with the British consulate. But I need that to be confirmed in writing in a formal paper and preferably with some of the dated effort done by unit team. It is all because my family & attorneys been told that the consulate is trying to contact me but not allowed found I need to prove to the foreign office that it is not the ADX fault and that unit team had and still trying to establish the contact. (thanks)

4/10/16
DATE | SIGNATURE OF REQUESTER

**Part B– RESPONSE**

RECEIVED

APR 15 2016

ADX AW Office

_____
DATE | WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE** | CASE NUMBER: 858903-F1

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION

SUBJECT: _____

_____
DATE | RECIPIENT'S SIGNATURE (STAFF MEMBER) | BP–229(13)
APRIL 1982

USP LVN

218

**BP-229 RESPONSE**                                    **Case Number: 858903-F1**

Ex. 10

Your Request for Administrative Remedy dated April 10, 2016, and received in this office April 15, 2016, has been reviewed. Specifically, you allege your attorneys and family members have been told the British Consulate has been trying to contact you but they were not allowed.

A review of the issue raised in your Request for Administrative Remedy has been conducted. The results of the review revealed you are approved contact with the British Consulate. Efforts to coordinate a telephone call with the British Consulate have been ongoing. Specifically, on March 4, 2016, the Legal Counselor provided the information of the procedures and application required for visits and telephone calls with you. A response from the British Consulate was received on March 29, 2016, requesting confirmation that the forms received were the correct forms required. The Legal Counselor confirmed the information the same day. As of April 20, 2016, there has been no further communication from the British Consulate in an effort to coordinate the telephone call. On April 20, 2016, the Legal Counselor requested an update, from the British Consulate, on the status of coordinating a telephone call. We are currently awaiting a response. Upon receiving a response from the British Consulate, a telephone call will be coordinated.

Accordingly, this response to your Request for Administrative Remedy is for informational purposes only. In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response by submitting a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas 66101-2492.

_____                        4·26·16
Jack Fox, Complex Warden                          Date

219

858903-FI

U.S. Department of Justice
4/28/16  HB
Federal Bureau of Prisons

(4/1)



**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Mostafa Kamel Mostafa MKM     67495-054     H-B     ADX Florence Colorado -

LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

Part A - REASON FOR APPEAL   While I do appreciate the answer & effort made by ADX member staff to establish "contact" between myself and the British Consulate, I need to prove to my attorneys & fed family the negligence of the British Foreign office in conducting their obligation to British Citizen. I am therefore, obligated to prove that with further confirmation from Regional office to prove beyond doubt the error of the British Foreign office.

(many thanks)

4-28-16   (please find BP8 & BP9 answers enclosed)     [signature]

DATE                               SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____     _____
DATE                               REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE     CASE NUMBER: _____

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

_____     _____
DATE                               SIGNATURE, RECIPIENT OF REGIONAL APPEAL

UPN LVN                               BP-230(13)
                                      JUNE 2002

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**



**Regional Administrative Remedy Appeal**
**Part B - Response**

---

**Administrative Remedy Number:**   858903-R1

---

This is in response to your Regional Administrative Remedy Appeal received in this office on May 9, 2016, in which you allege the British Consulate has attempted to contact you, while housed at the Administrative Maximum Penitentiary (ADX) in Florence, Colorado, but you were not allowed to communicate with the British Consulate office.   For relief, you request arrangements be made in order for you to communicate with the British Consulate.

We have reviewed your appeal and the Warden's response dated April 26, 2016.   As stated in the Warden's response, you are currently approved to have contact with the British Consulate.   As such, efforts to coordinate a telephone call with the British Consulate have been ongoing.   Specifically, on March 4, 2016, ADX legal staff provided the information regarding the procedures and application required for visits and telephone calls with you.   A response from the British Consulate was received on March, 29, 2016, requesting confirmation that the forms received were correct, which were confirmed the same day by ADX legal staff.   Additionally, your unit team is currently waiting for a response from the British Consulate to arrange a telephone call.   Once a response is received, a telephone call will be coordinated.   You are encouraged to work closely with your unit team regarding this issue.

Based on the above, this response to your Regional Administrative Remedy Appeal is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534.   Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

_6-1-16_
Date

Sara M. Revell, Regional Director

*Please, INS inmate is 44 they could sign in No names '911*

U.S. Department of Justice

Federal Bureau of Prisons

(6) 7

**Central Office Administrative Remedy Appeal**

858903 - R1

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: MOSTAFA K MOSTAFA    67495-054    H    ADX Florence Colorado
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL**  The answer indicates that the last effort was made to contact the British Consulate was March 29-2016. I have no reason to believe otherwise, but some member of my family, being told that the delay is not from the foreign office but from the prison, would appreciate to remain and or continue the effort. I also, in the past, had experienced 8 month delay from receiving some important letters from the Consulate in new york and made a complain about it before. I hope this time is different & better than previous etc.

6-14-16
DATE    SIGNATURE OF REQUESTER

**Part B - RESPONSE**

> RECEIVED
>
> JUN 2 2 2016
>
> Administrative Remedy Section
> Federal Bureau of Prisons

_____    GENERAL COUNSEL
DATE

ORIGINAL: RETURN TO INMATE    CASE NUMBER: 858903-A1

**Part C - RECEIPT**    CASE NUMBER: _____

Return to: _____
      LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL
DATE

BP-231(13)

212

**Administrative Remedy No. 858903-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal wherein you claim the British Consulate has attempted to contact you; however, you were not allowed to communicate with that office.

We have reviewed documentation relevant to your appeal and, based on the information gathered, concur with the manner in which the Warden and Regional Director addressed your concerns at the time of your Request for Administrative Remedy and subsequent appeal. This office confirmed you had phone contact with the British Consulate on November 16, 2016 and December 30, 2016. Additionally, you sent mail to the British Consulate on August 5, 2016, September 6, 2016 and January 31, 2017. You also received mail from the British Consulate on December 28, 2016. We encourage you to continue working with staff at ADX Florence to address any further concerns you may have.

Accordingly, this response is for informational purposes only.


2\10\17
Date

Ian Connors, Administrator
National Inmate Appeals

213

Ex. 11    legal Mail    problems (1/4)

214

LAW OFFICE OF

# MICHAEL K. BACHRACH

224 WEST 30TH STREET, SUITE 302
NEW YORK, N.Y. 10001
--------------
TEL. (212) 929-0592 · FAX. (866) 328-1630

MICHAEL K. BACHRACH *
* admitted in N.Y., MN and D.C.

2/4

http://www.mbachlaw.com
michael@mbachlaw.com

May 7, 2020

*[handwritten:] Received from sis Foster May 14, 2020 4:00 PM*

Legal Mail
Open in Presence of Inmate Only

Mostafa Kamel Mostafa (#67495-054)
USP Florence ADMAX
P.O. Box 8500
Florence, CO 81226

*[handwritten:] Received from SES Foster May 14, 2020*

Re: United States v. Mustafa,
19-2520 (2d Cir.)

Dear Mr. Mostafa,

Sorry that it has been a little while since my last correspondence.  I have been waiting to ~~receive your UK case files from your son before writing again, so that I can finally have all of the files that you wanted me to see while discussing your appeal.  Your son mailed the files to me in March and they finally arrived today.  Talk about postal delays!  Unfortunately, your son sent the files on a password protected USB drive, but did not send me the password so that I could open it.  I have emailed him for the password and hope to be able to open the files shortly.~~

Additionally, I received a call from the Government yesterday.  It appears that ADX has a number of letters that you had sent me that still had not been sent out by their legal department.  The issue appears to now be resolved, but suffice it to say I have not received anything from you since mid-March, so I am still waiting for whatever letters you sent me since then.  I will schedule a legal call with you as soon as I receive your letters and the USB password from your son.  It makes no sense for us to talk sooner since I will not have seen yet what you and your son have sent me.

Do not worry about the deadline for filing your opening brief on appeal.  The Second Circuit has told me that they will not schedule your filing deadline until I have received all of the files that I need to draft your appeal, as well as final copies of the type-written versions of your pro se briefs.

I hope you remain healthy and well, and that the COVID-19 virus has not affected you or any of your loved ones.

*[handwritten note in margin:] Note*

*[handwritten:] Inmate declares that issue of letters was not solved & issues had to be only discussed over the phone & not to risk wasting time & other stray mail. Aug 15, 2020*

Yours sincerely,

Michael K. Bachrach

Krista

Ex. 11  3/4

>>> Lindsay Lewis <LLewis@joshuadratel.com> 12/11/2015 3:09 PM >>>

Hi Krista,

I spoke with Mostafa today and wanted to raise a few issues.

(1)  I sent him legal mail on November 23rd and he has not received it.  It was a letter and legal documents.  I also sent some redwells and pads for him to take notes on his discovery and to organize his legal papers.  Can you please let me know if you received that package?  Also, if those items are not permitted, or if they should go through you instead in future, please let me know that too,

(2)  Mr. Mostafa would like us to arrange so that all mail to his family and from his family goes through his counsel, Sam Schmidt.  Of course, we want it to be clear that this is not legal mail so that staff at ADX can screen it accordingly.  It is our understanding that other inmates do this as well.  Can we send through you or is there some other way to accomplish this?  Please advise.

Thanks,

Lindsay Lewis
Attorney
Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, New York 10006
TEL (212) 732-0707
FAX (212) 571-3792
llewis@joshuadratel.com

216

**Lindsay Lewis**

| | |
|---|---|
| **From:** | Lindsay Lewis |
| **Sent:** | Monday, January 04, 2016 12:29 PM |
| **To:** | 'Krista Klett' |
| **Subject:** | RE: Mostafa Kamel Mostafa -- Reg #67495-054 |

Hi Krista,

Sorry for the delay in getting back to you on this. I checked our files and I've never received anything back from ADX or Springfield, despite sending Mostafa mail on Sept 4, 2015, Oct 16, 2015, and November 23, 2015. Thus, my last correspondence with him was not Nov 4th, but considerably later. To my knowledge, Mostafa has received none of this mail.

Given the issues with mail from us, I remain concerned about family mail as well. He has not yet sent mail to his family for fear they would not receive it until they were approved. But, he also has not received mail from his family.

Thanks,

Lindsay

Lindsay Lewis
Attorney
Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, New York 10006
TEL (212) 732-0707
FAX (212) 571-3792
llewis@joshuadratel.com

**From:** Krista Klett [mailto:KKlett@bop.gov]
**Sent:** Monday, December 28, 2015 10:34 AM
**To:** Lindsay Lewis
**Subject:** Re: Mostafa Kamel Mostafa -- Reg #67495-054

Good morning Lindsay,

I checked with the mail room and reviewed the log books, only to find the last piece of incoming legal mail received for Mostafa was November 4, 2015. Was this correspondence returned to you?

With regard to Mostafa's request to send general correspondence through an attorney, I am not aware of any SAM inmates permitted to mail general correspondence in this manner. I understand Mostafa stated he had issues in the past with general correspondence at other institutions, but barring any issues at the ADX, general correspondence should be sent/received in accordance with BOP policies and his SAM. As of this date, I am not aware that Mostafa has sent any general correspondence to his family.

1

217

EX.12        1/3

Denial / Delay of Reading
glasses & Eye operation

**U.S. DEPARTMENT OF JUSTICE**
Federal Bureau of Prisons

REQUEST FOR ADMINISTRATIVE REMEDY

_Denial of Prescription eye Glasses & Eye Door_

218

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: __Mostafa K. Mostafa__    __67495-054 H__    __ADX   Co__
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A– INMATE REQUEST**   Please, see enclosed the usual unanswered BP8
Regarding the Denial of Eye Doctor and the eye glasses he
prescribed on last year October 20, 2020.
However, I saw the eye doctor on Fri May 7, 2021 two day
ago and he confirmed that I need eye operation ASAP
He also stated that the repeat of more than 6 month
deprivation of subscribed eye glasses is beyond him saying
Once I prescribe them I am not in any control.
This is the third time my prescribed glasses are denied for over 6 min
could you, please, provide to glasses and facilitate the eye operation
May __7,__ 2021 ASAP Respectfully Requested

__May 7, 2021__    _[signature]_
DATE    SIGNATURE OF REQUESTER

**Part B– RESPONSE**

2/3

_____    _____
DATE    WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**    CASE NUMBER: _____

CASE NUMBER: __1080502 F__

**Part C– RECEIPT**
Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____    _____
DATE    RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP–229(13)
APRIL 1982
USP LVN

219

**BP-229 Response**    Ex. 12    3/3    Case Number: 1080502-F1

Your Request for Administrative Remedy dated May 9, 2021, and received in the Administrative Remedy office May 12, 2021, has been reviewed. Specifically, you claim you have been denied prescription eye glasses. You also claim, you were visited by the eye doctor on Friday, May 7, 2021, and that the eye doctor ordered an eye operation to occur as soon as possible. As relief, you request to be provided with the recommended eye operation and to be provided glasses.

A review of the issue raised in your Request for Administrative Remedy has been conducted. The results of the review revealed on May 7, 2021, you were evaluated by the optometrist. During that appointment, the optometrist noted a prescription was written for glasses on October 20, 2020, and that you had not received the glasses yet. Additionally, the optometrist ordered surgery for a cataract removal. Your glasses have been ordered and once they are received, they will be provided to you. Lastly, you are currently pending consult for cataract removal surgery.

Accordingly, this response to your Request for Administrative Remedy is for informational purposes. In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response. You will need to submit a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas 66101-2492.

_____    6/30/21
B. True, Complex Warden                Date

*Not fully exhausted yet but for the point of the argument*

220
39

Ex. 13 · 1/4     Re: Remedy: 862521-A1

Denied Imam And Fitting &
Items For Ritual Hygiene And
Religious Needs

FCC1330.16A
**Administrative Remedy Program**
**Attachment 1**

*Iman Ex 13 3/4*

## FEDERAL CORRECTIONAL COMPLEX
## FLORENCE, COLORADO
## INFORMAL RESOLUTION FORM

Inmate Name: **Mostafa**                          Reg. No.: **67495-054**
Unit: **H-B**                                            Date: **5-05-16**

**NOTICE TO INMATE**: You are advised that normally prior to filing a Request for Administrative Remedy, BP-229(13), you must attempt to informally resolve your complaint through your Correctional Counselor. Please follow the three steps listed below: *Muslim Chaplin (Imenn)*

1. **State Your complaint:** I had not seen any Imam since 2014. before that I was seeing one every month. I am not allowed any congregational prayers, or utility for Islamic need (Clensing and hygiene as a sanitary divider, proteins. such as padding, hair brush, water I am having to compramise my faith, shorten my beard ...ete with no qualified advice for me or recommendations to the management here. and i am in complete Isolation with no help or daily care. (If more space is needed, you may use up to one letter size (8 1/2 x 11) continuation page. You must also submit one copy of supporting exhibits. (Exhibits will not be returned with the response to BP-229(13) responses.))

2. **State what actions you have made to informally resolve your complaint:** I wrote many remedies before I came to ADX and after (I wrote to 8 of 5P 9) and I had the answer on early this year that there is an Imam some where but has not started his post. My Relo was not processed because of lack of Coordination and conflict of advice. I am now told to start again at this level.

3. **State what resolution you expect:** please provide one Imam on weekly basis and allow me to perform my worshipping & clean obligation (body beard and clothing-) according to to Islamic faith and compatible with my disability. thanks

Inmate's Signature: _____                Date: **5-05-16**

**Correctional Counselor's Comments (Steps to Resolve):** *Religious Services is in the process of searching for an Imam as a staff Chaplain as well as locating a possible volunteer or contractor. The Religious Services Department does provide a generous book and video library to assist you with your religious pursuits and a Chaplain performs rounds on a weekly basis to address your needs.*

Counselor's Signature: **N. Bael** ___           Date: **5/9/16**
Unit Manager's Review: _____              Date: **5/11/16**
Informally Resolved: _____                Date: _____

| | BP-8 ISSUED | BP-8 RETURNED | BP-9 ISSUED | BP-9 RETURNED | REMEDY CLERK |
|---|---|---|---|---|---|
| **DATE** | 5/5/16 | 5/6/16 | 5/11/16 | 5/13/16 | |
| **TIME** | | | | | |
| **COUNSELOR** | N/B | N/B | N/B | N/B | |

*scanned to Religious Services 5/6/16*

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: _Mostafa K. Mostafa_  REG. NO. _67495-054_  UNIT _H-03_  INSTITUTION _ADX Florence Colorado_

LAST NAME, FIRST, MIDDLE INITIAL

**Part A - REASON FOR APPEAL** The answer given regarding the needed Imam doesn't address any of the mentioned issues; just rubber-stamping the never ending neglect and abuse. And particularly in my case as a severely disabled inmate (with no hands) in solitary and deprived of 90% of my needed fittings and items to do my basic tasks of the day including the religious ones and in complete solitary since oct 2012, with no help. Such as not afforded any access to a disabled toilet to clean myself normally or naturally to worship my body & clothing; essential for my 5 prayers daily. Nor, I am afforded any disable hair brush to clean and tidy my hair and beard in the shower and the other times; I had to go against my beliefs and shortening my hair & beard because of the oppress...ion and cruel treatment with no Imam to explain or...

9/16/16 ...current the on-going abuse and many other religious...

DATE ...issues. please stop the oppression.   SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

SEP 26 2016

Administrative Remedy Section
Federal Bureau of Prisons

---

DATE

ORIGINAL: RETURN TO INMATE

**Part C - RECEIPT**

GENERAL COUNSEL

CASE NUMBER: _862521-A1_

CASE NUMBER: _____

Return to: _____
              LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION
SUBJECT:_____

DATE                    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)

223

**Administrative Remedy No. 862521-A1**
**Part B - Response**   Ex. B 4/4

This is in response to your Central Office Administrative Remedy Appeal, wherein you to be provided with access to an Imam to meet your religious needs.

We have reviewed the documentation related to your appeal and, based on the information gathered, concur with the manner in which the Warden and Regional Director addressed your concerns.  Program Statement 5360.09, Religious Beliefs and Practices, states the Bureau of Prisons provides inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices, consistent with the security and orderly running of the institution and the Bureau of Prisons.  Our office contacted Chaplaincy Services staff at your institution and was advised they are currently working with Chaplaincy Services at another institution to have their Imam provide services to the Muslim faith group at your institution.  Due to the location of the facility, it has been proven to be difficult to recruit Islamic religious volunteers and/or contractors, including an Imam.  The Chaplaincy Services Department at FCC Florence has made numerous attempts and continues to make great efforts to actively recruit the services of an Imam.

We encourage you to continue working with the institution Chaplaincy Services Department staff to address any religious needs you may have.

Accordingly, this response is for informational purposes only.

_____   3/24/17
Date

_____
Ian Connors, Administrator
National Inmate Appeals

And Again almost 1½ yrs from start BP8 Ignoring persistantly my religious need to clean & groom Islamically as a disable Toilet - Brush - Cloth - Hair & body removal ...

224

1/3

Ex 4 (3 pages)
Remedy For Cermonial
Meal [Central office]
(1030118-A1)

**U.S. Department of Justice**

Federal Bureau of Prisons

*Sermonial Meal Eid*

**Central Office Administrative Remedy Appeal**

*Ext 2/3*

*225*

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: __Mostafa K. Mostafa__  __67495-054__  __H__  __ADX-CO__
      LAST NAME, FIRST, MIDDLE INITIAL   REG. NO.   UNIT   INSTITUTION

**Part A - REASON FOR APPEAL** The answer entails that Muslims are not entitled to any annual Sermonial meal; against Muslim faith and US Constitution. As the unanimous rule of all sects of Muslim concur that a Muslim is/must have an animal meat on 4 days of Eid of Sacrifice of (Abraham and his son).

Our Jewish Brotheren, who are always always on Ceremonial meal do have several days of different food for their feast such as the Pass-over for a whole week. I have only asked the same Constitutional right since extradited from UK to US 2012 but always denied that right. Please revere US Constitution and provide the relief sought. M

__8-27-20__                                    __[signature]__
DATE                                           SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED
SEP 0 9 2020
Administrative Remedy Section
Federal Bureau of Prisons

_____          _____
DATE                          GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE    CASE NUMBER: __1030118-A1__

**Part C - RECEIPT**

                              CASE NUMBER: _____

Return to: _____
          LAST NAME, FIRST, MIDDLE INITIAL   REG. NO.   UNIT   INSTITUTION

SUBJECT: _____

_____                    _____
DATE                                    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

226

Exst 4    3/3    [ED].

**Administrative Remedy No. 1030118-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal where you claim you did not receive a ceremonial meal. For relief, you request to be served proper ceremonial meals.

We have reviewed documentation relevant to your appeal and, based on the information gathered, concur with the manner in which the Warden and Regional Director addressed your concerns at the time of your Request for Administrative Remedy and subsequent appeal. As detailed in Program Statement 4700.06, Food Service Manual, Religious Ceremonial Menu is derived from items regularly available on the National Menu.  No other foods are authorized for ceremonial meals.  You do not provide any evidence staff members acted contrary to established policy and procedures or outside the scope of their duties.

Accordingly, your appeal is denied.

_____                    _____
Date                                     Ian Connors, Administrator
                                         National Inmate Appeals



Exhibit 15 . Att. of
plaintiff & his prosthetic $\frac{1}{3}$

Inmate: Mostafa Kamel Mostafa
Reg No. # 67495-054

ADX Florance, unit H
2017 photos on the yard.

Shows: Disability, left eye
          blind and some of
          the skin conditions

Oct. 2017

Ex 15 Att.1 Plaintiff's ⬛sthetics & ignition 3/3

Figure 1
(amputation)

Fig. 2 Split Hook
Prosthetic not waterproof

Missing
Stump

holes for reducing
Heat

hard
Material

Split
Hook

Wire Cord to open
Hook by pulling

shoulder
Harness
to pull
the cord

Maximum opening when
cord is pulled = 12 mm or 1/2"

Fig. 3
Stump inside

sereral wide rubber rings

Side view

(Nonfrictionable items could fly out of its grip)

Danger : Can cut & injure Plaintiff body if used for
unsuitable tasks (like to wear sock or clean). Can not be opened
near the body because the cord will be relaxed at now.

Notice ① Limited use a for short time as plaintiff has
excessive over heating and sweating Hyperhydrosis
and skin (stump abrasion & soreness)

② Can not get it wet as it smells & rust.

③ Does not reach near back body to cleanse
after toilet and it does not bend

⇒ Mechanism of Use :

①⭑ The Harness go to Shoulder and to be stretched forward
if need to split the hook to pick a pen or spoon

② once the object is between the 2 sides of the hook the
Shoulder relax the cord and the rubber rings contract
back to its original size and close the hook on the object (Pen
Spoon)

Ex. 15. Alt. 02      1/4      $\frac{230}{35-1}$

Cells Drawings, Sketches
& Comments of Illustations

3/4

PLN

Continuous window & control shower on side

14' 11"

10' 6"

shower

Drain

USMCFP Springfield
D01-019L

INMATE
CELL

154 SQ. FT.

Please, Note: Still warm viewing railings but for just temporary place still warm viewing railings than the officials constructed ADA' 300 and even 5'11 excluding by built for wheel chair

2 1/2x size
Table / Bed
Sink

fit grue
shelf

window
Toilet sink
& Shelf sink
Window
Closet

window



Ex. 15. Att. 2  (4/4)



234

a stopgap to try to get him access sooner—is this also something the occupational therapist can look into and work through with you?

Thanks,

*Ex. 15. Att. 03*
*Plff Attorney' Letters to ADX Legal Dpt*
*Issues to OT*

⅛

Lindsay Lewis
Attorney
Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, New York 10006
TEL (212) 732-0707
FAX (212) 571-3792
llewis@joshuadratel.com

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.



LAW OFFICES OF
## JOSHUA L. DRATEL, P.C.
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
...
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

STEVEN WRIGHT
*Office Manager*

JOSHUA L. DRATEL
...
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

April 20, 2016

**BY ELECTRONIC MAIL**

Krista Klett, Esq.
CLC Attorney
Federal Bureau of Prisons
United States Penitentiary
Administrative Maximum
5880 State Highway 67 South
P.O. Box 8500
Florence, CO 81226

                Re:    *Mostafa Kamel Mostafa*
                       Register No. 67495-054

Dear Ms. Klett:

        As per our discussion, this letter, submitted on behalf of Mostafa Kamel Mostafa (Reg. # 67495-054), whom I represent by CJA appointment along with Sam Schmidt, Esq., and Michael Bachrach, Esq., provides an itemized list of issues which the occupational therapist assigned to Mr. Mostafa's case should address when evaluating Mr. Mostafa's disability, accommodations and confinement conditions at ADX Florence. I have also noted, where applicable, any prior limitations on the Bureau of Prisons's ability to make a recommended accommodation so that the occupational therapist is aware of the potential issue and can propose a suitable alternative if the preferred accommodation cannot be made for safety or security reasons.

        Accordingly, the occupational therapist assigned to Mr. Mostafa's case should assess the following:

*       the suitability of Mr. Mostafa's prosthetic devices, including

        (1)    the need to avoid infection in Mr. Mostafa's limbs, and whether the existing prosthetics, and the amount of time Mr. Mostafa must wear them is the cause of

236

Ail.03  3/6

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Krista Klett, Esq.
CLC Attorney
ADX Florence
April 20, 2016
Page 2 of 4

his current infection in his limbs;

(2)     whether there is some way to reduce the need for Mr. Mostafa to wear his prostheses, and which takes into account that he currently wears his prosthetics more frequently than he should because he suffers abrasions when he uses his limbs for daily tasks without the prosthetic devices.  Thus, the occupational therapist should recommend alternatives to use of a prosthetic device to accomplish tasks other than those such as writing, eating, picking up small items, and putting on and taking off his socks for which Mr. Mostafa should reasonably be required to use his prosthetics;

(3)     Mr. Mostafa's ability to clean his prostheses without assistance, and whether he should be provided assistance to do so as a necessary accommodation;

(4)     the fittings as to the left prosthetic, which slips when Mr. Mostafa wears it; and

(5)     whether any other changes to the prosthetics must be made to bring them in line with Mr. Mostafa's needs;

•   the suitability of Mr. Mostafa's shower conditions, and accommodations should be made which provide

(1)     an appropriate soap pump, which can be permanently affixed to the wall in the shower;

(2)     an appropriate faucet with rubber surrounding the metal to avoid injury;

(3)     appropriate taps that provide a continuous water sauce (rather than requiring Mr. Mostafa to hold them down whilst showering);

(4)     a shower chair that is suited to someone with Mr. Mostafa's disabilities, such that it does not require him to push the chair up and down, leading to injury;  and

(5)     Mr. Mosafa the ability to dry himself after the shower;

•   the suitability of the sink in Mr. Mostafa's cell to his disability, including

(1)     an assessment of the current faucet, which must be higher and at least several inches away from the edges of the sink so that Mr. Mostafa can use it to wash his arms and face given his disabilities;

See enclosed Remedy ignoring infection

237

4/6

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Krista Klett, Esq.
CLC Attorney
ADX Florence
April 20, 2016
Page 3 of 4

    (2)      an assessment of the sink basin, which must be larger to accommodate Mr. Mostafa's ability to clean himself and other items such as his eating utensils; and

    (3)      appropriate taps that provide a continuous water sauce, and which mix hot and cold together rather than requiring separate taps for each, and also which are covered with rubber to avoid injury to Mr. Mostafa's limbs;

• the suitability of the toilet in Mr. Mostafa's cell to his disability and in regard to his personal hygiene. While at MCC New York, a toileting aid was recommended but the BoP did not permit the accommodation. Accordingly, some other solution, such as the installation of a bidet or other permanent toilet should be considered;

• the suitability of the bedding and a recommendation as to bedding that will not slip off the bed;

• the suitability of the physical space for a double lower arm amputee, as opposed to an individual in a wheelchair (which Mr. Mostafa is not), including but not limited to

    (1)      the placement of the table (which at present is not near the sink and therefore is of limited usefulness to Mr. Mostafa);

    (2)      the size of the table (which is too small to accommodate Mr. Mostafa given his disability, and also limits his ability to review paperwork relevant to his case, amongst other things);

    (3)      the lack of any place to hang clothes; and

    (4)      the low lighting in the cell, in particular in light of the fact that Mr. Mostafa is partially sighted;

• Mr. Mostafa's ability to eat, drink, and carry food, including

    (1)      Mr. Mostafa's ability to carry hot food and to do so safely;

    (2)      the need for a hard plate, tray, and hard cup to accommodate Mr. Mostafa's disability (and an assessment of what alternatives would be acceptable if these are not available for safety or security reasons, as was the case at MCC New York); and

    (4)      the need for eating utensils, such as a spork, that are consistent with Mr.

238

5/6

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Krista Klett, Esq.
CLC Attorney
ADX Florence
April 20, 2016
Page 4 of 4

Mostafa's disability;

- Mr. Mostafa's ability to clean his cell given his disabilities, as well as an assessment of the injuries he would suffer without assistance in cleaning his cell;

- Mr. Mostafa's ability to brush his teeth, and his request for an electronic toothbrush and/ or "water flosser;"

- Mr. Mostafa's ability to cut his nails without assistance;

- Mr. Mostafa's need for a hairbrush that meets his requirements and ADX's safety concerns including his need for a hairbrush to stand in for a hand to clean himself in the shower;

- Mr. Mostafa's need and ability to clean his eyeglasses;

- a reasonable accommodation to permit Mr. Mostafa to put on and take off socks when he is not using his prostheses;

- the suitability of the current organizational tools (such as paper clips, etc.) that are available to Mr. Mostafa to organize his legal papers, in light of his disabilities; and

- the suitability of the computer setup currently available to Mr. Mostafa in light of his disabilities.

In addition, please have the occupational therapist take into account when evaluating Mr. Mostafa any items not on this list, but which Mr. Mostafa raised in letters to you and the unit manager in the months of December, January, and, March, as well as those issues Mr. Mostafa will raise with the occupational therapist upon his or her visit. Ideally, I would also like to speak with the occupational therapist before he or she meet with Mr. Mostafa.

Please contact me if you have any questions or concerns regarding this list, and please notify me after the occupational therapist has assessed Mr. Mostafa so we can discuss the conclusions he or she has reached and discuss any issues with the implementation of his or her suggestions.

Very truly yours,

Lindsay Lewis

LAL/

**Lindsay Lewis**

| | |
|---|---|
| **From:** | Lindsay Lewis |
| **Sent:** | Thursday, May 12, 2016 1:44 PM |
| **To:** | Krista Klett |
| **Subject:** | Re: Mostafa Kamel Mostafa -- Reg #67495-054 |

Thank you for letting me know. Will I be able to take a look at it as I was when he was evaluated previously?

Thanks!

Lindsay

Sent from my iPhone

On May 12, 2016, at 1:40 PM, Krista Klett <KKlett@bop.gov> wrote:

> He was evaluated on April 26, 2016, and we are waiting for the report.
>
> >>> Lindsay Lewis <LLewis@joshuadratel.com> 5/11/2016 3:42 PM >>>
> Hi Krista,
>
> Has Mr. Mostafa been seen yet by an occupational therapist? Any idea whether I would be able to talk to this person? Very eager for any update.
>
> Thanks so much,
>
> Lindsay
>
> Lindsay Lewis
> Attorney
> Joshua L. Dratel, P.C.
> 29 Broadway, Suite 1412
> New York, New York 10006
> TEL (212) 732-0707
> FAX (212) 571-3792
> llewis@joshuadratel.com

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

240/#357

Ex. 15 · Att. 04      1/9

Bop. Occupational therapist Ms. Deat
Visits, Assessments & Report
2019
And

Mcc New York Legal Dept.
acknowledgement to plaintiff's Attorney.

*[handwritten: Page 2⁴]*

*[handwritten annotation at top: 2/9 prosthetic & need for Stumps Rest & ventilation]*

## Occupational Therapy Assessment

Patient: Mr. Mostafa

Occupational Therapist: Katherine Deats, M.Ed., OTR/L

Patient was seen on three occasions, March 27, 2013, April 2, 2013 and April 16, 2013, in order to evaluate Mr. Mostafa's accommodations and confinement conditions at the Metropolitan Correctional Center (MCC).

**Visit on March 27, 2013**

On March 27, access to Mr. Mostafa's cell was given and the following was seen:

1. There was a narrow metal shower stall with buttons for hot and cold water, and a shower caddy that was not adhered to the wall.
2. There was a plastic shower chair with a back that was placed outside the shower stall.
3. There was a small metal sink that was connected to a toilet.
4. There was a pump bottle for soap, placed on the sink.
5. A large cup with handles was in the sink.
6. A cinderblock chair and desk was attached to the wall.
7. A thin, plastic covered mattress was on top of a cinderblock structure.
8. The bed was made and a laptop was on top of the bed.
9. Examples of patient's writing were seen on his desk. Writing was noted to be block style and neat.
10. There were Styrofoam trays with covers on the floor and on the desk.
11. Small packets of condiments were open and emptied; empty candy wrappers were also observed.

This therapist was informed that the patient is given wipes along with regular toilet paper. Writer was also informed that two 'sporks' made of plastic were given to patient, one with a long handle, and the other with a loop at the end.

Following visit to patient's cell, Mr. Mostafa was seen by this writer in the medical examining room with Dr. Anthony Bussanich, Jane Okoth, and a prison guard (outside the room). Mr. Mostafa was cuffed on his upper arms and above his ankles. His old prosthesis was viewed by therapist along with one of his new prosthesis. His old prosthesis has a leather interior, with holes for air flow, and a metal terminal device with a flat rubber interior. The new prosthesis has a plastic interior with holes for air flow, with a plastic coated terminal device with small ridges on the flat interior. He is currently using one of his old prosthesis and one of his new ones. In addition, there was a regular toothbrush and long handled hairbrush in the bag with his prostheses.

*[handwritten annotation at bottom: Holes for Air Flow]*

*[handwritten annotation at bottom right: No hand sock can be worn on stump as it will block the holes ... etc]*

242

3/4

Mr. Mostafa reported the following health conditions: Hyperhidrosis (excessive sweating), partially sighted, diabetic, psoriasis and hypertension.

Mr. Mostafa complained about new prosthesis and stated that he is unable to wear the new one for more than 10 minutes because of the plastic interior. He claims that due to his hyperhidrosis, he sweats excessively which causes the plastic prosthetic to slip, resulting in skin irritation. Mr. Mostafa then listed the below complaints regarding his cell and the lack of accommodations made considering his disability. His complaints are as follows:

1. He would like a hairbrush with no curve.
2. He is unable to get friction when using provided utensils.
3. He has difficulty eating off the foam trays and would like a plate with a plate guard or lip in order to better scoop food onto the utensil.
4. He would like a longer eating utensil.
5. He has difficulty pulling up his sock and reports that the sock's material slips out of hook on his new prosthetic. He stated he is able to pull up a sock with his old prosthesis but the metal cuts his skin. Healed red marks were observed on his lower left limb.
6. He states he is unable to use the regular toothbrush and would like an electric toothbrush. Claims that the regular toothbrush provided cannot reach his back teeth.
7. He reports being unable to perform proper bowel hygiene. He is unable to reach behind in order to wipe himself properly. He believes the angle of the new prosthesis is incorrect.
8. He reports that showering is difficult because he is unable to push buttons for water simultaneously which results with either hot or cold water. He would like levers in the shower instead of buttons, with a continuous water flow.
9. He states that basic Activities of Daily Living are very difficult due to psoriasis and overall skin sensitivity.
10. He requested a toilet with continuous water flow (like a bidet) for self-cleaning after toileting and softer, more durable toilet paper.
11. He claims that shower caddy, provided by MCC, falls.
12. He states that the sink is too small.
13. He says that his bedding slides because of the plastic mattress.
14. He reports that he does not like prison clothing. He would prefer thinner, easier to manage apparel.


Visit on April 2, 2013

Another visit was requested by MCC and this writer in order to observe Mr. Mostafa using both his old and new prosthetic. Mr. Mostafa and this writer met in the medical examining room with Dr. Anthony Bussanich, Jane Okoth, and a prison guard (outside the room).

Once his arm cuffs were removed, Mr. Mostafa was observed donning his old prosthetic independently. He demonstrated writing a few words, using a standard pen, with his old prosthetic and was able to pull



247

4/9

up his sock. He was asked to don the new prosthetic but refused, stating that use of the new prosthetic causes swelling within two to three minutes of wearing it. He stated he was concerned that this would cause a subsequent infection. He indicated that he suffered an infection in 2007, when his bone became infected and he required an operation to remove the infection.

Mr. Mostafa's skin integrity was noted to be poor, especially toward the distal end of both his right and left limbs. At the time of the meeting he was receiving cream for his psoriasis which appeared to be helping with the skin irritation. The redness and swelling of the left limb, noted at the time of the first visit, appeared to be improving with current treatment provided by MCC medical staff. Mr. Mostafa was able to demonstrate range of motion of both his limbs. He was observed to have good range of motion within all planes of movement (without prosthesis).

Mr. Mostafa, wearing old prosthetic, placed the new prosthetic under his upper arm in order to demonstrate that, in his opinion, the new one does not adequately grip a pen or his utensils. He was given a piece of foam that is used to improve grip and build up handle diameter to place over both implements, but he claimed that he was still unable to grip either the pen or utensil with enough grip strength for the new prosthetic to be functional.

**Visit on April 16, 2013**

A final visit was requested by this writer with the prosthetist, Garrett Pascavage, who fabricated the new prosthetics for Mr. Mostafa. Mr. Pascavage and this writer were given time in a conference room to discuss the prosthetics in detail. At this time, Mr. Pascavage explained that the plastic interior of the prosthetics are made of Proflex with Silicone which is intended to reduce microbes, which is easy to clean, and which provides improved grip. We discussed the issue of Mr. Mostafa's hyperhidrosis and the possibility of him wearing a liner to protect his skin, to decrease sweating, and to assist with airflow. Mr. Pascavage stated that he offered a liner to Mr. Mostafa who refused to place the liner on his limb, stating it would not work. Mr. Pascavage demonstrated that the Terminal Device of the prosthetics he fabricated has a voluntary opening. In order to have adequate pinch force to grip items, this style of Terminal Device is most commonly used. Mr. Pascavage then demonstrated how to use a pen with the prosthetic and was able to use the pen to make marks on a pad of paper. He then demonstrated how to use the eating utensil he fabricated for Mr. Mostafa. He was able to grip the utensil and demonstrated using the edge to simulate cutting food. When the implements are placed at an angel, there was no slippage observed. This therapist requested that Mr. Pascavage pull up his sock, which he was able to demonstrate as well.

Mr. Pascavage and this writer then met with Mr. Mostafa in the medical examination room, along with Dr. Anthony Bussanich, and one or two prison guards (outside the room). Both his old and new prostheses were in the examination room and Mr. Mostafa was able to don both prostheses independently.

Mr. Mostafa and Mr. Pascavage discussed in detail the comparison between the larger holes of his old prosthesis and that of the smaller holes on the new prosthesis. Mr. Pascavage explained that larger holes can be drilled within the plastic interior to provide increase air flow to reduce sweating and



decrease skin irritation. Mr. Mostafa also discussed his preference for leather as opposed to plastic. It was explained that plastic is more hygienic, easier to clean and will have greater durability. Mr. Mostafa also indicated his displeasure with the small groves added to the flat interior of the Terminal Device, stating that it could cause dirt and debris to get stuck and could cause infection. Mr. Pascavage stated that he can remove the ridges.

Mr. Pascavage was contacted by this writer on 4/19/13 and he stated to this writer in a phone conversation that he will drill larger holes in the interior plastic lining of the prosthetics. Mr. Pascavage can provide Mr. Mostafa with silver liners to be worn over his limbs in order to increase grip with the plastic interior and to decrease sweating. Mr. Pascavage can provide multiple liners so that they can be rinsed and reused when clean. Mr. Pascavage also stated that he will remove the ridges on the interior of the Terminal Device as Mr. Mostafa requested.

**Recommendations**

In this therapist's clinical opinion, Mr. Mostafa was provided with adequate solutions to his complaints with the prosthetics fashioned by Mr. Garrett Pascavage. The following should be considered in order for Mr. Mostafa to be able to perform Activities of Daily Living using his new prosthesis:

1. Liners can be offered to be placed over his limbs before donning his new prosthesis in order to protect his skin and reduce sweating.
2. The plastic interior of Mr. Mostafa's new prosthesis should have larger holes drilled in order to increase air flow.
3. The small ridges on the interior of the Terminal Device should be removed in order to be more easily cleaned.
4. The plastic 'spork', fabricated by Mr. Pascavage, is suitable for eating.
5. The pen provided by MCC with a built in grip, is adequate for use by Mr. Mostafa using the new prosthesis, given time to practice and when placed on an angle for improved grip.
6. The Terminal Device has a flat surface on the interior with a Plasticine cover that, with practice, can be suitable for use by Mr. Mostafa.
7. Mr. Mostafa can learn to use his new prostheses with practice and, if provided, with suggested adaptive equipment (which will be itemized and listed in bold within this report).
8. **Mr. Mostafa can benefit from a soap pump that is affixed to the sink with a suction cup.**
9. **Mr. Mostafa's shower should have a grab bar installed**.
10. MCC stated that it has provided Mr. Mostafa with plastic buttons in the shower and the sink so that he can more easily access water when showering and using the sink. These accommodations are reasonable.
11. When this writer entered Mr. Mostafa's cell, his bed was made and in order. Given that this writer was informed no one else had entered patient's cell that day, it was concluded that the bed was made independently by Mr. Mostafa. He does not require alternate bedding.
12. Mr. Mostafa's MCC issued clothing is reasonable.



*This page (NOT for this motion)*

Lindsay Lewis, Esq.
Re:  MOSTAFA, Mostafa, Federal Register No. 67495-054
May 16, 2013
Page Three

Ms. Deats recommends a sock aid to assist him in putting on his socks.  MCC New York *? never* provided Mr. Mostafa the recommended device yestderday.

Ms. Deats did not recommend a toilet with a hose or spout function.  She did recommend a toileting aid; however, the recommended device posed a safety concern and, thus, will not be provided.  Instead, MCC New York provided Mr. Mostafa a bed pan-type item yesterday to allow him to clean his genitalia and backside after he has used the toilet.  This item will be maintained in his cell.

Ms. Deats did not address the issue of Mr. Mostafa opening his food, as raised in your May 6, 2013 email.  It will be brought to her attention for consideration at her next visit.

**Additional Issues**

Mr. Mostafa will be provided a 30 minute call at 2:00 pm, today, May 16, 2013.  MCC New York will provide 30 minute calls to Mr. Mostafa and other similarly-situated inmates when staff schedules and institutional safety and security permit.

MCC New York is looking into the status of Mr. Mostafa's non-legal correspondence.  As you know, the SAM allows the FBI fourteen days to review non-legal mail written entirely in English and sixty days to review non-legal mail written in any other language.  MCC New York staff is following up with the FBI to see if there is any incoming non-legal mail still pending.

**Conclusion**

MCC New York continues to consider ways to accommodate Mr. Mostafa's conditions.  I hope this has addressed some, if not all of your concerns.  If you have any questions or concerns, please feel free to email me or call me at (646) 836-6455.

Sincerely,

Adam M. Johnson
Supervisory Attorney
MCC New York

cc:    John Cronan and Edward Kim, AUSAs, via email

Enclosures

245

6/29

13. **In order for Mr. Mostafa to carry hot food safely, MCC should provide him with a tray**.

14. Mr. Mostafa ability to consume hot beverages was not discussed with this writer. Upon entering his cell, instant coffee was observed in a bag that was nearly empty thereby indicating that he is able to consume hot beverages with the cups provided by MCC.

15. **Mr. Mostafa would benefit from a hard plastic plate with a built up side so that he is able to scoop food onto his utensil.**

16. Mr. Mostafa can learn to eat with the utensil fabricated for him by Mr. Pascavage.

17. Upon entering Mr. Mostafa's cell, it was reasonably clean and therefore indicates that Mr. Mostafa is able to clean his cell independently.

18. Mr. Mostafa was provided with a standard toothbrush, which he should be able to use to adequately brush his teeth.

19. Mr. Mostafa should have his nails cut by the medical staff at MCC as deemed appropriate by the staff.

20. Mr. Mostafa described a hairbrush brought over from the UK that better meets his needs. If possible, it should be provided to him.  Otherwise the hairbrush provided by MCC could be used by Mr. Mostafa.

21. Mr. Mostafa can reasonably clean his eating utensils in the sink, using soap and hot water.

22. Mr. Mostafa can reasonably clean his eyeglasses with water and dry them using toilet paper.

23. Mr. Mostafa has been provided with a shower bench and a shower caddy in order to adequately wash himself in the shower.  **Mr. Mostafa could benefit from a shower caddy that hangs from the grab bar so that is does not fall to the floor of the shower.**

24. **Mr. Mostafa should be provided with a sock aid so that he can put on socks without damaging his skin.**

25. **Mr. Mostafa can benefit from a toileting aid. (Buckingham Easywipe).**

As stated, a list of items that have been recommended will be included in this report.  Company names will be included to assist in meeting Mr. Mostafa's additional needs.

_____

Katherine Deats, M.Ed., OTR/L

License Number: 009954-1

5



**U.S. Department of Justice**

**Federal Bureau of Prisons**

Legal Department

*Ex. 15 · Att · 04   7/9*

Metropolitan Correctional Center
150 Park Row
New York, New York 10007
(646) 836-6300, (646) 836-7665 (Fax)

May 16, 2013

SENT VIA EMAIL
Lindsay Lewis, Esq.
Law Offices of Dratel & Mysliwiec
2 Wall Street, 3rd Floor
New York, New York     10005

Re:     **MOSTAFA, Mostafa**
       **Federal Register No. 67495-054**

Dear Ms. Lewis:

I write to update you regarding Mostafa Kamel Mostafa, Reg. No. 67495-054, currently housed at the Metropolitan Correctional Center, New York (MCC New York).   Specifically, I write to inform you of the findings of Occupational Therapist Katherine Deats, attached hereto, who assessed Mr. Mostafa's various concerns on March 27, April 2, and April 16, 2013.

Ms. Deats considered your Mr. Mostafa's complaints, as well as the varied issues raised in your correspondence, in her assessment of his accommodations.   Overall, she was satisfied with the measures taken thus far and only has a few suggestions.

**Prosthetic Device**

As discussed in her report, Ms. Deats assessed Mr. Mostafa's use of his prosthetic devices on April 2 and 16, 2013.   On the latter occasion, she did so with Mr. Garrett, the prosthetist. At that visit, it was decided that the following alterations would be made to his new prosthetic devices.

- He would increase the diameter of the vent holes on the prosthesis to allow adequate "breathing" of his residual limbs.
- He would install leather on the prosthetic liners despite there being no evidence that his skin irritation resulted from the composite plastic liners.
- He would remove the textured contact surfaces of the hooks to leave a flat cleanable surface.

Lindsay Lewis, Esq.
Re:   MOSTAFA, Mostafa, Federal Register No. 67495-054
May 16, 2013
Page Two

Ms. Deats noted that Mr. Mostafa will need practice to learn to use his new prosthetic
devices.   She will be returning to see him next week to begin teaching him to use the new
prostheses.   Ms. Deats will advise MCC New York as to how long it will take for him to
learn to use the new devices.   Once this training process is complete, he will only be
permitted to use his new prostheses, and his old prosthetic will be placed in storage.

**Cell Accommodations**

For the most part, Ms. Deats found the majority of his accommodations appropriate,
including his pen, spork, clothing, and bedding.   Ms. Deats found the added buttons to his
shower and sink taps reasonable.

Ms. Deats recommended a soap pump that can be affixed to the sink with a suction cup.
MCC New York is in the process of ordering one that will be compatible with the sink in his
cell.

Ms. Deats determined that Mr. Mostafa's shower chair and shower caddy were reasonable,
but recommended installation of a grab bar in the shower.   MCC New York is considering
this addition, but is currently consulting with her as to the proper location in the shower for
the bar.

Ms. Deats noted that his cell was clean and his bed was made.   While MCC New York
cleans his cell for him, she noted he is capable of making his own bed.

Ms. Deats recommended a tray to assist him in carrying his food safely.   MCC New York is
considering providing him with a cardboard or Styrofoam tray for this purpose.   However,
Ms. Deats recommendation of a hard plastic plate cannot be accommodated based on
institutional security concerns.   The Styrofoam containers will soon be replaced with
environmentally friendly containers that have a sturdy enough side to allow Mr. Mostafa to
scoop his food with his utensil.

Ms. Deats found his issued toothbrush reasonable for him to maintain oral hygiene.
Yesterday, MCC New York provided him a new toothbrush with softer bristles to help
prevent him from cutting his gums while brushing.

Ms. Deats indicated Mr. Mostafa should have his nails cut by medical staff as deemed
appropriate.   He has recently had them cut and is pending a future consultation with a
podiatrist.

Ms. Deats indicates the hairbrush he has is sufficient.   However, per our email
correspondence, MCC New York will examine the hairbrush he had while incarcerated in the
United Kingdom and consider permitting it if it meets institutional security concerns.

Lindsay Lewis, Esq.
Re:  MOSTAFA, Mostafa, Federal Register No. 67495-054
May 16, 2013
Page Three

Ms. Deats recommends a sock aid to assist him in putting on his socks.   MCC New York provided Mr. Mostafa the recommended device yestderday.

Ms. Deats did not recommend a toilet with a hose or spout function.   She did recommend a toileting aid; however, the recommended device posed a safety concern and, thus, will not be provided.   Instead, MCC New York provided Mr. Mostafa a bed pan-type item yesterday to allow him to clean his genitalia and backside after he has used the toilet.   This item will be maintained in his cell.

Ms. Deats did not address the issue of Mr. Mostafa opening his food, as raised in your May 6, 2013 email.   It will be brought to her attention for consideration at her next visit.

**Additional Issues**

Mr. Mostafa will be provided a 30 minute call at 2:00 pm, today, May 16, 2013.   MCC New York will provide 30 minute calls to Mr. Mostafa and other similarly-situated inmates when staff schedules and institutional safety and security permit.

MCC New York is looking into the status of Mr. Mostafa's non-legal correspondence.   As you know, the SAM allows the FBI fourteen days to review non-legal mail written entirely in English and sixty days to review non-legal mail written in any other language.   MCC New York staff is following up with the FBI to see if there is any incoming non-legal mail still pending.

**Conclusion**

MCC New York continues to consider ways to accommodate Mr. Mostafa's conditions.   I hope this has addressed some, if not all of your concerns.   If you have any questions or concerns, please feel free to email me or call me at (646)836-6455.

Sincerely,

Adam M. Johnson
Supervisory Attorney
MCC New York

cc:   John Cronan and Edward Kim, AUSAs, via email

Enclosures

Ex. 15. Att. 05. i/5
Doctor Kligler Assessment.

Dr. B. Klig

## EXHIBIT D

**Exhibit D**

2/5

250
357

**Benjamin Kligler MD MPH**
**245 Fifth Avenue second floor**
**NY NY 10016**

December 15, 2014

Client Name:                    Mustafa Kamel Mustafa
Date of Evaluation:         December 4, 2014

<u>Clinician's Qualifications</u>
        I am a Family Practitioner, Board-Certified in 1994 and currently licensed in the state of New York. I have a Primary Care practice at the Mount Sinai Beth Israel Center for Health and Healing and teach on the Faculty of the Mount Sinai Beth Israel Department of Family Medicine. I have previously taught in the Family Medicine residencies at Montefiore Hospital in the Bronx and Lutheran Hospital in Brooklyn. I received my M.D. from Boston University in 1990 and also hold a Masters in Public Health from the same institution. Over the past ten years I have done approximately twenty-five asylum or human rights-related evaluations through Physicians for Human Rights.

<u>Records Reviewed</u>
        I received and reviewed medical records covering Mr. Mustafa's time at the Metropolitan Correctional Center as well as records from his previous detention in England.

<u>Conditions of Interview</u>
        On December 4, 2014 I conducted a detailed clinical interview and physical examination on Mr. Mustafa in the Secure Housing Unit at the Metropolitan Correctional Center. The interview lasted approximately 40 minutes and the exam lasted approximately 20 minutes.

<u>Relevant History/Overview</u>
        Mr. Mustafa's medical history as it pertains to this evaluation is significant for a double upper extremity amputation, total loss of vision in the left eye, severe psoriasis, diabetes, and hyperhidrosis.  In 2007 he reports an additional amputation following a bone infection in his left arm related to chronic abrasions from a poorly-fitting prosthesis.

        This particular combination of medical conditions causes him specific difficulties in managing his disability which are somewhat unique. The severity of his psoriasis makes it difficult for him to find prostheses that fit well without causing skin irritation and potential skin breakdown from excessive moisture. As such he must deal with many of his activities of daily living including washing and toileting without the use of his prostheses. When he uses his stumps for tasks such as manipulating a faucet or moving an object, he runs the risk of abrasion and damage to the skin on his arms because the skin integrity is already compromised by his psoriasis. If he does get such an abrasion, his risk of infection in the area is increased further by his inability to properly clean an

**Exhibit D**

I

2544

Ex. 15. Att. 06        1/3

Sample of Daily needed & printed

Daily help Ordered by U.K Gov't

O T(s)  ≠ undisputed in Courts

even by US Extradition attorney

And in F.BOP Medical Records

Nursing attendance 3 to 6 times a day:
o  food collected and often other form of assistance (often arranging eating position)
o  help with "hygiene" and getting dressed
o  help with shower and cream once a day but not consistent
o  cleaning cell, changing bed sheets, washing plates and doing laundry

**Days on which no shower / cream:** 24/11/04; 25/11/04 and 26/11/04 (cream on arms and legs); 28/11/04; 01/12/04; 04/12/04; 09/12/04 (spur locked); 13/12/04 (cream applied); 14/12/04 (cell locked); 16/12/04 (legal visit all day);

**Nursing care reduced because spur locked:** 26/11/04; 06/12/04; 09/12/04; 14/12/04;

**Nursing care not documented:** 29/11/04;

**Complaint:** 07/12/04, 12/12/04 (asked to see dr) re toe nails not cut – remains outstanding.

| 18/12/04 | client changes cell | |
|---|---|---|

**18/12/04 to 03/01/ 05**

Nursing attendance at least 4 times a day: twice am then lunch and dinner:
o  shower and cream once a day on average
o  assistance re meals limited to collecting food
o  cell cleaned, bed sheets changed, plates washed, laundry made and clothes ironed (generally am)
o  more nursing attendance when visits as client assisted re strip searches.

**No shower and cream:** 18/12/04 (legal visit); 19/12/04; 22/12/04; 23/12/04 (visits am and pm); 30/12/04 (legal visit all day); 31/12/04

**Nursing care not documented:** 20/12/04; 24/12/04;

**Occasions when further assistance:** 29/12/04 (socks)

**Complaint:** 29/12/04 re toe nails not cut;

**04/01/05 to 27/01/05**

Nursing attendance between 4 and 6 times a day:
o  Nivea cream applied on specific parts of body once every other day
o  Showers: unclear whether assisted but notes say whether taken or not
o  Food collected lunch and dinner
o  Cell, bed sheets and laundry assistance maintained
o  Also cleaning "utensils" on daily basis
o  Escorted for visits to assist with strip searches
o  Sometimes extra assistance re opening cans and dressing

**Days on which no cream:** 04/01/05; 10/01/05 to 14/01/05; 20/01/05; 24/01/05; 25/01/05;

**Days on which no shower** (unclear whether assisted): 14/01/05 (refused by client for phone call instead); 15/09/11; 16/01/05 (offered but client declined – only feet washed); 19/01/05; 21/01/05; 23/01/05 (client refused);

EVEN AT COURT (~~Exhibit of page 4~~) page of 256

Att.06 3/3

spur locked); 14/06/05; 15/06/05 (legal visit); 17/06/05 (Muslim prayer); 18/06/05; 22/06/05 (legal visit); 27/06/05 (legal visit); 30/06/05 (visits);

**Days on which cream to certain parties of body:** 10/02/05 (hands and feet); Notes to suggest that care plans in place (03/02/05)

**Days on which nursing care not documented:** 19/05/05; 02/06/05

**Missing notes:** 27/05/05;

**Other:** 14/05/05 doctor advises brown bread re diabetes; 27/06/05 (altercation between prison officer and nurse where nurse felt intimidated; incident reported to SO Sergeant on duty);

| 30/05/05 | Nurse raises with SO that doctor advised 2 showers (spur locked on that day so nursing care reduced) but told that not enough staff to offer 2 showers and should speak to police officer or Governor | |
|---|---|---|
| 08/06/05 | doctor again says 2 showers a day and that will write to Governor | |
| 05/07/05: | start of client's trial in Old Bailey | |

**05/07/05 to 13/07/05**

Nursing attendance:
o Help with dressing
o Shower and cream every morning
o Escorting to and from Court
o Making hot drinks and assisting with meals during court attendance
o No cleaning of room / changing of sheets

**Days on which cell cleaned and bed sheets changed:** 07/07/05; 10/07/05 (not attending court);

**Days on which nursing care reduced as spur locked:** 12/07/05

**Missing nursing notes:** 08 and 09/07/05;

**Other:** 11/07/05 cell infected with ants – client assisted in cleaning

**14/07/05 to 28/09/05**

Nursing attendance: 5 times a day + escorting to and from visits:
o Food collected lunch and dinner; hot drinks made for him am, lunch and dinner at least.
o Assistance re domestic matters: cell cleaned, bed sheets changed and utensils washed daily; laundry and ironing done roughly weekly
o Escorted for visits to assist with strip searches
o Shower and cream daily; dressing (not always mentioned)
o Assistance re changing cells on 19/07/05; 26/08/05
o Assistance re cell searches: 07/09/05; 27/09/05;
o Other:



257

Ex. 15 . Att. 07          1/11     →

BOP & SAM :
  1 - Ignoring US Court Recommendation
  2 - Asking Judge not to interfer again
  3 - Fabricated Reported ADX Designation
        (No Report) Assessment
  4 - Then use OT Report of 12 min
        to Deny Plaintiff Health, safety
        & Hygiene necessity.

*"Political non Medical Designation"*

25%

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: JDratel@JoshuaDratel.com

A71.07
2/11

JOSHUA L. DRATEL                                            STEVEN WRIGHT
                                                            *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

October 7, 2015

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:    *United States v. Abu Hamza al-Masri (Mostafa Kamel Mostafa),*
       04 Cr. 356 (KBF); 15-211

Dear Judge Forrest:

This letter is submitted on behalf of defendant Mostafa Kamel Mostafa, whom Sam
Schmidt, Esq., Michael Bachrach, Esq., and I represent in the above-entitled case, respectfully
requesting that the Court (1) obtain an update from the Bureau of Prisons (hereinafter "BoP") as
to the status of Mr. Mostafa's now eight-month long post-sentencing evaluation at FMC
Springfield to determine his medical and prison needs, as well as the appropriate
accommodations and designation facility to meet those needs;[1] and (2) Order the BoP to release
to counsel a copy of any Occupational Therapist Report that has been prepared in regard to Mr.
Mostafa.[2]

_____

[1] The update should include information as to whether the BoP has adopted the Court's
recommendations that it take Dr. Benjamin Kligler's Report into consideration, and that Mr.
Mostafa's medical team include an Occupational Therapist with experience treating double arm
amputees. The update should also include a time frame, if one exists, for the completion of the
evaluation and transfer to the designation facility.

[2] I previously requested of FMC legal counsel a copy of any Occupational Therapist's
Report as to Mr. Mostafa from FMC Springfield directly, but have been informed by legal
counsel as well as the Warden there that in order to receive the Report I must either go through
the FOIA request process (which can take months, and may not produce any results) or seek a

259

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

3/11

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
October 7, 2015
Page 2 of 3

The reasons for this request are two-fold.  On the one hand, the Court's intervention is necessary to ensure that the BoP is honoring the various promises and representations made by the United States to the United Kingdom and the European Court of Human Rights ("ECHR") during the extradition proceedings that precipitated Mr. Mostafa's transfer to United States custody, and also to this Court during Mr. Mostafa's sentencing hearing.  This is particularly important given information we have received today from our client that Mr. Mostafa has been designated to ADX Florence.

On the other hand, defense counsel has been waiting until the BoP's evaluation of Mr. Mostafa is complete, and he is designated to a permanent facility, to send him the discovery in his case so he can assist in the preparation of his appeal.  However, as more than eight months that have passed since Mr. Mostafa was first sent to FMC Springfield for evaluation without access to his discovery, I have been working with Adam Powell, Esq., legal counsel at FMC Springfield, and the government, to ascertain the best way to provide Mr. Mostafa with access to discovery at that facility.  Given that FMC Springfield is, as Mr. Powell explains "not a pretrial facility" and they are unaccustomed to providing inmates with access to discovery – and according to Mr. Powell have never done so before – the logistical considerations and costs involved in providing Mr. Mostafa with his discovery at FMC Springfield have made defense counsel reluctant to provide Mr. Mostafa with his discovery there if he will shortly thereafter be moved to another facility (such as ADX Florence).

In particular, Adam Powell, Esq., legal staff at FMC Springfield, in consultation with the computer department at the facility, has advised me that only a copy of the hard drive containing the discovery will be accepted by FMC Springfield, and that as a condition of acceptance, defense counsel must agree to the destruction of the external hard drive when Mr. Mostafa is moved to another facility.

Thus, should defense counsel wish to provide Mr. Mostafa with an external hard drive containing the discovery in his case, we will have to make a copy of the hard drive and send it through the proper channels at FMC Springfield in the hopes that it will be vetted by the computer staff and made available to Mr. Mostafa for review before he is moved to another facility, at which point the copy of the hard drive will be destroyed.[3]  Presumably, we would then

_____

copy via Court Order.

[3] It should also be noted that Mr. Mostafa's disabilities make it extremely difficult for him to conduct discovery review, even with access to the external hard drive, under the current conditions for his review of discovery at FMC Springfield.  As things are now configured, Mr. Mostafa must reach through a hole in his cell door to grab hold of the mouse attached to the desktop computer.  Once he has pulled the mouse towards him to manipulate it, he does not have

**Exhibit D**

315

area of skin infection. Both to avoid infection and in light of his hyperhidrosis and
psoriasis, however, he requires showers daily, at a minimum, and ideally as often as
twice a day. He also requires a change of clothing twice daily. Finally, his underlying
diabetes puts him at risk of a mild skin infection becoming much more severe. The
condition of his stumps is such that the bone is extremely close to the skin surface, and a
moderate skin infection in this area in the context of underlying diabetes could easily lead
to an infection in the bone, which in turn could require further amputation. This is a
particularly difficult, unique combination of medical circumstances which make it even
more imperative for Mr. Mustafa to have adequate accommodation in his living quarters
for his disability.

Specific concerns

At the time of our visit Mr. Mustafa reported a number of concerns related to his
medical conditions and to what he feels is a lack of adequate accommodation for his
disability in his living quarters. These are detailed below:

1. A major concern was a difficulty in cleaning himself effectively after toileting because
of his disability. He reports that the toilet is extremely shallow and so it is difficult to
keep his genital area dry and clean when relieving himself. This in combination with his
psoriasis creates problems with infection and skin irritation in the genital area which is
extremely uncomfortable. He reports that the shower is too small to enable him to bend
over sufficiently to wash his buttock area and that this contributes to the cleanliness
problem. With the nature of his disability he does require some type of bidet or spray
function on the toilet to allow for adequate cleaning after bowel movements. His access
to water for washing in general is a major issue, as the taps he has access to cannot be
operated effectively with his stumps.

2. He has difficulty in putting on socks because of the type of prosthesis he currently has:
he is required to use the hook on the prosthesis to pull the sock up and sometimes this
causes injury to the underlying skin and subsequent infection.

3. Because of the difficulty in using his prostheses, he often has to perform tasks using
his stumps—for example if he needs to do cleaning in his cell but is unable to hold a
brush, he will use his stumps to do the cleaning. This results in frequent abrasions to the
skin in the area of his stumps which put him at risk for infection.

4. He frequently must use his teeth to hold an object due to this same issue with his
prostheses. He has experienced a number of broken teeth and feels that his upper teeth
are becoming sharper and potentially at risk for further breakage due to the need to use
them instead of an adequate prosthesis for certain activities of daily living.

5. He reports that due to his hyperhidrosis he needs to change clothing more often than is
typical to prevent the moist clothing from irritating his psoriatic skin areas. This also
leads him to have to wash his clothes more frequently which again leads to further risk of
abrasion and skin breakdown on his arms. He feels if he had the specific clothing with

2

**Exhibit D**

elastic closures which he previously had access to which accommodates his disabilities this would prevent much of this difficulty.

6. He reports that the stress from these difficulties in managing his daily activities lead to increased blood pressure, as well as to poor sleep. He has noted that his blood pressure tends to be extremely high during the time period in which he is required to change cells due to the difficulty of packing and unpacking his belongings without the use of his hands or an adequate set of prostheses. When these periods of elevated blood pressure have required medication, he reports experiencing dizziness related to this medication.

7. He reports that the lack of sunlight and poor ventilation in his quarters contribute significantly to exacerbation of his skin problems, which in turn increases the risk of infections.

8. He reports that the shackles typically used on his stumps are poorly fitted and cause repeated abrasions.

9. He reports additional difficulty in putting socks on due to his fungal toenail condition. This in turn leads to more risk of abrasion from the hooks on his prostheses leading to potential infection risk as described above.

<u>Physical Findings</u>
        On physical examination I found a blood pressure of 145/79. Mr. Mustafa was not in any acute distress at the time of the exam.

        On head and neck exam, he has poor dentition with multiple missing and broken teeth. He also has extremely sharp upper incisors on the right side. He has a deformity of the left pupil and no vision in that eye.

        His heart and lung exams are normal.

        On musculoskeletal exam he is a double upper extremity amputee. Especially on the left upper extremity the bone is palpable immediately below the skin of the amputation; there is minimal subcutaneous tissue in this area. He has mild swelling and crepitus in the left knee consistent with osteoarthritis.

        On skin exam he has extensive areas of psoriasis on upper and lower extremities, trunk, and buttocks. These areas are combinations of individual plaques and areas of confluence. There are no specific areas of infection or skin breakdown visible but there is extensive erythema in all areas. He has two small (5mm) abrasions on the right upper arm in the area near the shackle contact on that side. He has 3 abrasions approximately 5mm in size in the area of his left upper extremity stump and 2 of similar size on the right side.

        He has onychomycosis of the first and second toes on the right foot and the first toe on the left foot; other toes may be involved as well.

**Exhibit D**

5/5

Conclusions

Based on my interview and evaluation of Mr. Mustafa, I feel that the lack of adequate accommodation for his disability in his current location, as well as inadequate prostheses and/or health aide assistance to accomplish tasks associated with daily living, is putting him at significant risk for additional complications related to his condition and potentially at risk of the need for further amputation as well. I believe he should be held in quarters that allow for adequate accommodation and assistance to obviate the need for him to use his stumps for activities of daily living as he is currently required to do.

Recommendations

In light of the fact that Mr. Mostafa is unable to accomplish the tasks associated with daily living under his present level of accommodation and given his present prosthetic devices without putting himself at a significant risk of further complications and infection or even amputation, Mr. Mostafa should be transferred to a facility where he will have the daily assistance of a "home" health aide. He should also be provided proper accommodations for his unique disabilities, which would include, among other items, a shower, toilet and sink suited to the needs of a double upper extremity amputee, in the event that he is ever left to accomplish tasks of daily living without the assistance of an aide. An occupational therapist familiar with the needs of double upper extremity amputees should be appointed to review the accommodation and medical issues unique to Mr. Mostafa that are raised herein and to advise Bureau of Prisons staff as to the nature and construction of the accommodations required. Even if Mr. Mostafa is provided with sufficient accommodations for his disabilities and the assistance of a "home" health aide, he must nonetheless have daily access to medical attention and care.

Respectfully Submitted,

Benjamin Kligler, M.D., M.P.H.
Associate Professor of Family Medicine
Albert Einstein College of Medicine

4

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
October 7, 2015
Page 3 of 3

have to make another copy of the external hard drive to provide to Mr. Mostafa at his designated facility.

Accordingly, given the uncertainty as to the time frame for Mr. Mostafa's transfer to his designated facility, as well as our lack of any information as to the status and/or findings of his evaluation at FMC Springfield, and the concomitant need to enable Mr. Mostafa to assist in the preparation of his appeal through access to his discovery, it is respectfully requested that the Court Order the Bureau of Prisons to provide counsel with the Occupational Therapist's Report, if any does exist, as well as an update as to his medical evaluation at FMC Springfield.

Respectfully submitted,

Lindsay A. Lewis

LAL/

cc:    John Cronan
       Edward Kim
       Assistant United States Attorneys

---

access to a flat surface, such as a table, to rest the mouse on. At another facility, he would potentially have access to a table and/or a designated laptop. The lack of access to a table also makes it extremely hard for him to take notes while reviewing his discovery. In addition, if he wishes to gain access to the computer's keyboard, such as to type in search terms that would enable him to more easily navigate the contents of discovery, he must reach through a gate with bars rendering any typing almost impossible to accomplish with his prosthetic devices.

261



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

Ex·15·, At 67    5/11

October 14, 2015

**BY ECF AND ELECTRONIC MAIL**
The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007
ForrestNYSDChambers@nysd.uscourts.gov

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: OCT 14 2015

Re:   <u>United States</u> v. <u>Mustafa Kamel Mustafa, a/k/a "Abu Hamza"</u>
      <u>04 Cr. 356 (KBF)</u>

Dear Judge Forrest:

    The Government writes in response to defense counsel's letter to the Court dated October 7, 2015, requesting that the Court order the Bureau of Prisons ("BOP") to provide an update on the status of the BOP's post-sentencing evaluation of the appropriate prison designation for the defendant, and to provide a copy to defense counsel of any occupational therapist report prepared in regard to the defendant's prison designation.

    The Court has already sentenced the defendant, and the Court's post-sentencing role is closely circumscribed. With respect to prison designations, courts "have long recognized that the classification and designation of inmates is a matter within BOP's sole discretion." *United States* v. *Jones*, 869 F.Supp.2d 373, 377 (E.D.N.Y. 2012); *see United States* v. *Williams*, 65 F.3d 301, 307 (2d Cir. 1995) ("A sentencing court has no authority to order that a convicted defendant be confined in a particular facility, much less placed in a particular treatment program; those decisions are within the sole discretion of the Bureau of Prisons."); *Pugliese* v. *Nelson*, 617 F.2d 916, 925 (2d Cir. 1980) ("[J]udicial intervention into the classification of prisoners for monitoring and control purposes would almost inevitably involve the federal courts in the day-to-day operations of our prison system, which are better left to the expertise of prison administration authorities."). "That recognition reflects the reality [that] the judicial review of a classification decision is, if not completely unavailable, severely curtailed." *Id.*; *see also United States* v. *Huss*, 520 F.2d 598, 602 (2d Cir. 1975) ("[E]xcept where specific statutory authority exists, the place and conditions of confinement are in the first instance, matters of executive rather than judicial branch authority").

262

6/11

Hon. Katherine B. Forrest
October 14, 2015
Page 2

Here, the defendant invites the Court to involve itself in the BOP's classification and designation process. Under the above principles, the Government respectfully requests that the Court reject this invitation. Such involvement is outside of the Court's post-sentencing jurisdiction, and, in any event, the defendant fails to identify with any particularity any defect in the BOP's process. To the extent the defendant desires to challenge the conditions of his confinement or the BOP's conduct, he must do so collaterally in the district in which he is incarcerated. not before this Court. *See Jiminian* v. *Nash*, 245 F.3d 144, 146 (2d Cir. 2001) ("A motion pursuant to § 2241 generally challenges the execution of a federal prisoner's sentence, including such matters as . . . computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions." (internal citation omitted)); *see also Rumsfeld* v. *Padilla*, 542 U.S. 426, 447 (2004) (noting that a federal prisoner seeking to challenge his custody must "name his warden as respondent and file the petition in the district of confinement").

As to the unrelated issue of the defendant's access to discovery in preparation for his appeal, the Government has conferred with defense counsel about this issue. The Government will work with defense counsel to ensure that the defendant has access to his discovery at his permanent prison facility.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:      /s/ Ian McGinley
John P. Cronan / Edward Y. Kim
Ian McGinley
Assistant United States Attorneys
Tel.: (212) 637-2779 / -2401 / -2257

cc:   Michael Keith Bachrach, Esq.; Sam A. Schmidt, Esq.
Lindsey Lewis, Esq.
*By e-mail*

Ordered

For principally the reasons cited by the Government herein, the Court declines to involve itself in the issues raised by the defendant's Letter of Oct. 7, 2015.

10/14/15   K.B. For (USDJ)

:263

indsay Lewis  FX15.  A11.07  7/11

**rom:** Lindsay Lewis
**ent:** Tuesday, September 08, 2015 5:36 PM
**o:** 'kklett@bop.gov'
**ubject:** Mostafa Kamel Mostafa-- Reg #67495-054
**ttachments:** #463Judgment.1-12-2015.pdf; MKM SentencingMemo_FINAL.pdf;
ExD_Dr.BenjaminKliglerReport.pdf

/ls. Klett,

hank you so much for taking the time to speak with me today and for your willingness to follow up with FMC
pringfield to see what steps they have taken to evaluate my client, Mr. Mostafa, including inquiry into whether Mr.
/lostafa has been seen by an occupational therapist with experience dealing with double arm amputees, and whether
he has prepared a report as to Mr. Mostafa's needs.  To my knowledge, Mr. Mostafa has only ever been seen by an
iccupational therapist for a few minutes on one occasion where she failed to delve into any of his issues (but rather told
ıim they would do so on subsequent visits) and then during a second chance meeting she declined to evaluate him at
ll.  I have heard conflicting accounts as to whether she prepared a report based on this cursory review of Mr. Mostafa's
ıeeds, and would be very curious to see any report that has been prepared.  I am also  available any time to discuss next
teps in terms of evaluating Mr. Mostafa for designation purposes.

ıs stated on the phone, attached here are:

(1) The judgement in Mr. Mostafa's case in which the sentencing judge, the Hon. Katherine B. Forrest,
recommended that the BoP review the report of Dr. Benjamin Kligler and have Mr. Mostafa evaluated by an
occupationsl therapist with experience dealing with double arm amputees;

(2) The sentencing submission on Mr. Mostafa's behalf with recounts many of the extradition and sentencing issues
surrounding Mr. Mostafa's disabilities;  and

(3) The Report of Dr. Benjamin Kligler, attached as exhibit D to the Defendant's Sentencing Submission.

'lease let me know if you need any additional documentation or if there is anything else I can do.

look forward to hearing from you.

'hanks,

.indsay Lewis
\ttorney
oshua L. Dratel, P.C.
!9 Broadway, Suite 1412
Jew York, New York 10006
'EL (212) 732-0707
:AX (212) 571-3792
lewis@joshuadratel.com

1

**Lindsay Lewis**          *(Repeat by me)*

| | |
|---|---|
| **From:** | Lindsay Lewis |
| **Sent:** | Tuesday, September 08, 2015 5:36 PM |
| **To:** | 'kklett@bop.gov' |
| **Subject:** | Mostafa Kamel Mostafa-- Reg #67495-054 |
| **Attachments:** | #463Judgment.1-12-2015.pdf; MKM SentencingMemo_FINAL.pdf; ExD_Dr.BenjaminKliglerReport.pdf |

*Repeat*

Ms. Klett,

Thank you so much for taking the time to speak with me today and for your willingness to follow up with FMC Springfield to see what steps they have taken to evaluate my client, Mr. Mostafa, including inquiry into whether Mr. Mostafa has been seen by an occupational therapist with experience dealing with double arm amputees, and whether she has prepared a report as to Mr. Mostafa's needs.  To my knowledge, Mr. Mostafa has only ever been seen by an occupational therapist for a few minutes on one occasion where she failed to delve into any of his issues (but rather told him they would do so on subsequent visits) and then during a second chance meeting she declined to evaluate him at all.  I have heard conflicting accounts as to whether she prepared a report based on this cursory review of Mr. Mostafa's needs, and would be very curious to see any report that has been prepared.  I am also  available any time to discuss next steps in terms of evaluating Mr. Mostafa for designation purposes.

As stated on the phone, attached here are:

(1) The judgement in Mr. Mostafa's case in which the sentencing judge, the Hon. Katherine B. Forrest, recommended that the BoP review the report of Dr. Benjamin Kligler and have Mr. Mostafa evaluated by an occupationsl therapist with experience dealing with double arm amputees;
(2) The sentencing submission on Mr. Mostafa's behalf with recounts many of the extradition and sentencing issues surrounding Mr. Mostafa's disabilities;  and
(3) The Report of Dr. Benjamin Kligler, attached as exhibit D to the Defendant's Sentencing Submission.

Please let me know if you need any additional documentation or if there is anything else I can do.

I look forward to hearing from you.

Thanks,

Lindsay Lewis
Attorney
Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, New York 10006
TEL (212) 732-0707
FAX (212) 571-3792
llewis@joshuadratel.com

1

**indsay Lewis**

| | |
|---|---|
| om: | Krista Klett <KKlett@bop.gov> |
| ent: | Monday, August 29, 2016 3:06 PM |
| o: | Lindsay Lewis |
| ubject: | Re: Mostafa Kamel Mostafa-- 67495-054 |

iood afternoon Lindsay,

 computer was installed where he can view the screen directly in front of him.  The mouse is on a flat surface and is able
 access the onscreen keyboard.  The mouse is wireless so he can move it to any position he would like.  If there are
dditional concerns, please submit those in writing to the Warden's attention.

rista

rista L. Klett
LC Attorney
EDERAL BUREAU OF PRISONS
nited States Penitentiary
dministrative Maximum
880 State Highway 67 South
.O. Box 8500
lorence, CO 81226
EL: (719) 784-9464  Ext. 6112
AX: (719) 784-5285

ENSITIVE/PRIVILEGED COMMUNICATION
he information contained in this electronic message and any and all accompanying documents constitutes sensitive
1formation.  This information is the property of the U.S. Department of Justice. If you are not the intended recipient of
1is information, any disclosure, copying, distribution, or the taking of any action in reliance of this information is strictly
rohibited.

>> Lindsay Lewis <LLewis@joshuadratel.com> 8/19/2016 8:21 AM >>>
i Krista,

hope you're having a good summer.

Vhen I last spoke with my client, Mr. Mostafa, he advised me that the modifications and accommodations necessary
 his ability to review discovery and prepare for his appeal have not been met.  Setting aside all of the cell
ccommodation issues for the moment (though they are equally pressing) and just focusing on discovery review, I am
old that Mr. Mostafa still has not been provided a keyboard which is critical to his ability to review process.  The
omputer screen remains too far away and needs to be placed directly in front of him (not off to the side).  He needs a
at surface on which to navigate the mouse, and the mouse itself needs a flat top.  The wiring for the mouse has to be

1

**Lindsay Lewis**

| | |
|---|---|
| **From:** | Lindsay Lewis |
| **Sent:** | Friday, August 19, 2016 10:22 AM |
| **To:** | Krista Klett |
| **Cc:** | Michael Bachrach; lawschmidt@aol.com |
| **Subject:** | Mostafa Kamel Mostafa-- 67495-054 |

Hi Krista,

I hope you're having a good summer.

When I last spoke with my client, Mr. Mostafa, he advised me that the modifications and accommodations necessary to his ability to review discovery and prepare for his appeal have not been met.  Setting aside all of the cell accommodation issues for the moment (though they are equally pressing) and just focusing on discovery review, I am told that Mr. Mostafa still has not been provided a keyboard which is critical to his ability to review process.  The computer screen remains too far away and needs to be placed directly in front of him (not off to the side).  He needs a flat surface on which to navigate the mouse, and the mouse itself needs a flat top.  The wiring for the mouse has to be on the right side.  My understanding is that the occupational therapist did not address any of these issues.  I will be addressing the various other issues that the OT failed to resolve, but given the current time frame for the appeal, I'd like to know when these accommodations can be made.

Thanks,

Lindsay

Lindsay Lewis
Attorney
Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, New York 10006
TEL (212) 732-0707
FAX (212) 571-3792
llewis@joshuadratel.com

1

265

9/11

**indsay Lewis**
_____

| | |
|---|---|
| **om:** | Lindsay Lewis |
| **ent:** | Wednesday, April 20, 2016 8:39 PM |
| **o:** | 'Krista Klett' |
| **c:** | Sam Schmidt; michael@mbachlaw.com |
| **ubject:** | RE: Mostafa Kamel Mostafa, #67495-054 |
| **ttachments:** | Klett1.For Occupational Therapist.pdf |

rista,

hanks so much for these updates.  As discussed, attached is the letter for you to share with the occupational therapist
ʋho will see Mostafa.  If possible, I would still like the chance to speak with the occupational therapist, as well.  Please
eep me posted on any further developments with the computer and other accommodations, and please let me know
 you have any questions about any of the items I've mentioned in my letter.

hanks again,

indsay

indsay Lewis
ttorney
ɔshua L. Dratel, P.C.
9 Broadway, Suite 1412
ew York, New York 10006
EL (212) 732-0707
AX (212) 571-3792
ʹewis@joshuadratel.com

**rom:** Krista Klett [mailto:KKlett@bop.gov]
**ent:** Wednesday, April 20, 2016 5:39 PM
**o:** Lindsay Lewis
**ubject:** Re: Mostafa Kamel Mostafa, #67495-054

he password issue has been resolved - the drive needs to be formatted for the hard drive.  Computer Services is
ʋorking on that on Friday.  The computer screen has already been moved to be head on and the mouse is wireless.

>> Lindsay Lewis <LLewis@joshuadratel.com> 4/20/2016 12:31 PM >>>
i Krista,

was just reviewing my notes from our call and wondered whether you had been able to obtain the password for the
rives or resolve that issue where it seemed a password was required on the machine Mr. Mostafa has access to?

lso, I plan to speak with the government today about the laptop.  If we cannot achieve that, is it possible to find him a
ʦation to use the computer where the mouse would be on the left in the short term, but in the long term where he
ʹould be able to view the screen and work on the computer head on? We do not anticipate that his appeal will be
ʹoved back and so computer access is very important now.  Approval of a laptop could take months and so I would like

1

**Lindsay Lewis**    *Re: Allen Ass comp & Mceder Lapp Top* 10/11

| | |
|---|---|
| **From:** | Lindsay Lewis |
| **Sent:** | Wednesday, April 20, 2016 2:32 PM |
| **To:** | Krista Klett |
| **Subject:** | Mostafa Kamel Mostafa, #67495-054 |

Hi Krista,

I was just reviewing my notes from our call and wondered whether you had been able to obtain the password for the drives or resolve that issue where it seemed a password was required on the machine Mr. Mostafa has access to?

Also, I plan to speak with the government today about the laptop. If we cannot achieve that, is it possible to find him a station to use the computer where the mouse would be on the left in the short term, but in the long term where he would be able to view the screen and work on the computer head on? We do not anticipate that his appeal will be moved back and so computer access is very important now. Approval of a laptop could take months and so I would like a stopgap to try to get him access sooner—is this also something the occupational therapist can look into and work through with you?

Thanks,

Lindsay Lewis
Attorney
Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, New York 10006
TEL (212) 732-0707
FAX (212) 571-3792
llewis@joshuadratel.com



1

367

Few Ex.15  Att.08  X11

Examples: Health safety & hygiene or help
        Essentials denied based on
    O.T Chorosevic 8→12 min
assessment  April 20, 2015  ADX.

— Discrimination
— Electric tooth brush and items opener
        to prevent more teeth abrasion / break

← List of filling & items 2016
        and in Covide 2020/2021

← Toilet for D. upper computer

← Phase III for inmates help

← Tools for cleaning disability attachment

**U.S. DEPARTMENT OF JUSTICE**   ~~(Exhibit 15-p#2/11)~~                     **REQUEST FOR ADMINISTRATIVE REMEDY**

Federal Bureau of Prisons   Re: Discrimination against any type of Disability & filling list

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*   ADX Co

**From:** Mostafa .K. Mostafa          67495-054      H03         Colorado -

          LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT          INSTITUTION

**Part A– INMATE REQUEST** The answer in the BP 8 & 9 has been repeated for the past months; say always that management is on the process of providing me with ... do not interfere with the safety of ADX. However, this answer is wrong and unconstitutional Because: ① this BP 8 & 9 is about the fittings, the hard work & items. ② The filling in the cell now are all for a wheelchair person and level of a wheel chair person not a person of 6'3". ③ all filling are made for a p... with full use of his hands but i am a disable with no hands and blind in... eye with poor vision in the other, and for one full year now in ADX I am ... pain, risk, continuous injuries and anxiety for the discrimination aga... my disability in the filling and design and management as well as the previou... before I was deported to ADX ④ I am in solitary and S.A.M is used to degrade... use my disability against me to allow me to defend my self or doing my daily t... safely and reasonably, depriving me of my type of disability, toilet, shower, ...ing... ⑤ I was asked to provide the med filling on Nov. 2015 and I did, but nothing til... 9-29-16 ⑥ this is but cruel treatment against the law as you are not ... ⑦ you knew my condition since 2011 & provided all the ... and ensured ...

**DATE** 9-29-16                          SIGNATURE REQUESTER ~~(repeated)~~

**Part B– RESPONSE**

RECEIVED

Exhibit 15-7 page 2 Att. to 8

SEP 30 2016

ADX AW Office

**DATE** _____                    **WARDEN OR REGIONAL DIRECTOR** _____

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this respon...*

**ORIGINAL: RETURN TO INMATE**                   CASE NUMBER: 877974-F

                                                 CASE NUMBER: _____

**Part C– RECEIPT**

**Return to:** _____   (78)   _____   _____   _____

          LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT          INSTITUTION

**SUBJECT:** _____

**DATE** _____                    **RECIPIENT'S SIGNATURE (STAFF MEMBER)** _____

                                                                        BP-229
                                                                        APRIL

( Exhibit 15 AHB page 3)

**Administrative Remedy Number** 877974-A1
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal where you claim you are being discriminated against at the
ADX based on your type of disability.  You state you have no hands
and need disability accommodations, fittings and items to assist you
with daily functions.  You feel the Occupational Therapist failed
to conduct a proper assessment of your needs.  It appears you request
assistance with this matter and adequate accommodations.

The Warden and Regional Director adequately addressed your complaint
and we concur with the responses provided.  This office confirmed
that an Occupational Therapist conducted a thorough evaluation of
your living area on April 26, 2016.  Several recommendations were
made and changes have since been implemented.  We find the
institution is working diligently to accommodate your needs and will
continue to work with you for your specific concerns as they arise.
You also have access to the Health and Psychology Services
Departments for your medical and mental health needs.

This response is provided for informational purposes.

_____                _____
Date                                   Ian Connors, Administrator
                                       National Inmate Appeals

Fully Exhausted Remedy

*(Exhibit 9 and 8 - page 4 OF 11)*

*Hygiene*



# UTILIZATION REVIEW COMMITTEE
# INMATE NOTIFICATION LETTER
# FCC FLORENCE
# Camp/FCI/USP/ADX

**Name:** Mostafa, Kamel   **Date:** 13/1/17

**Reg. Number :** 67495-054   **Housing Unit:** HOS-5U

## Requested Consult/Procedure

☐ General Surgery     ☐ Orthopedics     ☐ Gastroenterology     ☐ Ear, Nose, and Throat
☐ Ophthalmology      ☐ Prosthetics     ☐ Colonoscopy and/or EGD   ☐ Oral Surgery
☐ MRI                ☐ CT Scan         ☐ Cardiology           ☐ Urology
☐ Radiology          ☐ Nephrology      ☒ Other: _electric toothbrush / hole punch_

## Utilization Review Committee Decision

☐   The committee has referred your case to the Regional Office for final approval.
    You should be notified of your status within the next two months.

☐   The committee has APPROVED this request without modification.

☐   The committee has DENIED this request.
    ☐   You will be scheduled for further evaluation by a staff physician.
    ☐   You will be scheduled for further evaluation by a mid-level provider.
    ☐   You need to follow-up in sick call with any further issues.
    ☐   You will be referred to a specialty consultant.
    ☐   Your procedure is contraindicated due to unacceptable risk.
    ☐   You have been placed on the waiting list for: _____
    ☒   Other: _Not approved for electric tooth brush_
**Re-submission of the request will be considered if medically indicated.

_____
Physician

MAR 01 2017

Copy Sent or Issued to Inmate On: _____
Copy Scanned Into BEMR

Form Last Updated: 11.19.10.TM

42

Chief Dentist Dr. Robert.
Mostofa Kamel

67405.
Unit H

Could you kindly do a follow up to the dental work you done last week.

United States Penitentiary
Administrative Maximum (ADX)
Health Services Department
5880 State Highway 67 South
Florence, CO 81226

Response: 10/27/15

I discussed your problem of having an adequate toothbrush with Mr. Hanson (AHSA) and the AW (Health). The HSA will follow up with you to ensure a good working toothbrush. Thanks

Nixon Roberts, DDS
FCC Chief Dental Officer
FCC Florence, CO

Dr. N. Robert , DDS ADX

Exhibit #52   Att8 page 50 of 11
5/11

-48-

(Exhibit: 15     Att-B page 5 / 242
page 6, 11

MOSTAFA, Mostafa Kamel
Reg. No. 07495-054

Unit:  FLM/H UNIT

## RESPONSE TO INMATE REQUEST TO STAFF MEMBER

This is in response to your Inmate Request to Staff Member, which is dated November 29, 2015, and received in this office on December 1, 2015.  You provide a list of requested items you are seeking to accommodate your physical disabilities.

At this time, each individual request is being reviewed.  You will be notified once decisions have been made concerning each request.

K. Klett, Attorney Advisor
CLC Colorado

Date: 12 / 1 , 2015

37

273

**Central Office Administrative Remedy Appeal**

7/11  Re: Access to Disabled Toilet - 844737-R1

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: [blacked out] R. K. Mosin    67-495-054    H    FPA Florence, Colorado.

LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL** The answer by regional office confirm the DISCRIMINATION and cruelty against me as a double upper amputee (No hands) in complete solitary confinement with no help of any kind because of the SAM imposed against me. OEvery disable in the world with No hant is entitled to access to a disable toilet, so he does not have to touch the dirt or stay without proper cleaning. the guarantees and assurances to English and US courts on behalf of the US citizen and in had been but has and decaying ③Also the Remedies for the past 4 yrs since my extradition from 2012 had been but churning, dysfunctional and dishonestly with my disability issues it is much worse than Guantanamo, I need a disable toilet and hygiene items.

6-01-16    [signature]

DATE    SIGNATURE OF REQUESTER

---

**Part B - RESPONSE**

RECEIVED

JUN 15 2016

Administrative Remedy Section
Federal Bureau of Prisons

---

DATE    GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE    CASE NUMBER: **844737-A1**

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

DATE    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)

**Administrative Remedy Number 844737-A1**
**Part B - Response**



This is in response to your Central Office Administrative Remedy Appeal where you claim you have not been provided an adequate means to maintain your personal hygiene at the ADX.   You feel as a double amputee in solitary confinement, you are being discriminated against.   You request a bidet be installed in your cell for sanitation and hygiene.

The Warden and Regional Director adequately addressed your complaint and we concur with the responses provided.   As advised, your cell is designed to meet all Architecture Barrier Act (ABA) standards. We find the institution has worked diligently to accommodate your needs and will continue to work with you for your specific concerns as they arise.   Any further personal hygiene issues should be directed to your Unit Team for appropriate action.   You also have access to the Health and Psychology Services Departments for your medical and mental health needs.

We find your claim of discrimination is not supported.   However, in order to complete exhaustion in remedies involving claims based on disability discrimination, you have 180 days of the Bureau's final administrative decision under the administrative remedy procedure, to file a complaint under 28 C.F.R. § 39.   Complaints should be submitted to the: EEO Officer, Federal Bureau of Prisons, Central Office 320 First Street, NW, Washington, D.C. 20534.

This response is provided for informational purposes.

_____
Date

_____
Ian Connors, Administrator
National Inmate Appeals

(Denying Twist for Double upper Amputee )

**Administrative Remedy No. 1024696-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal where you challenge the decision to deny your request for
placement in Phase III in the Special Security Unit (SSU) at the
ADX. You claim in order to advance, you are being asked to
complete sanitary and physical tasks without help and despite
your disability. You further claim other inmates that have
advanced to Phase III did not have any courses like you. You
feel this "program" is dysfunctional, demotivating and bullying
against your disability, and stops you from seeking help from
other inmates. You allege discrimination and appear to seek
advancement to Phase III.

As indicated by the Warden and Regional Director, it was
determined you were not appropriate for Phase III advancement at
this time. You were advised of the reasons for this decision
and we concur with the responses you were provided. You will
continue to be reviewed for SSU Phase advancement pursuant to
current policies and review procedures. Please continue to work
with your Unit Team regarding further Phase advancement and/or
other programming issues. In addition, each case is reviewed
for Phase advance on an independent basis and we find your claim
of discrimination is not supported.

Your Unit Team are aware of your physical limitations and
accommodations have been provided to you in various ways. If
you are indicating you need assistance completing assigned
courses or a specific task, it is suggested you advise your Unit
Team of your specific need at that time, so appropriate action
can be taken to assist and/or accommodate you further.

Accordingly, your appeal is denied.


_____                    _____
Date                                     Ian Connors, Administrator
                                         National Inmate Appeals

*Exhibit 95. Att-8  10/11*   *page 55A*

**BP-229 Response**                    Case Number:  1024696-F1

*(Fully Exhausted Remedy) No Relief*

Your Request for Administrative Remedy dated May 29, 2020, and received in the Administrative Remedy office on June 4, 2020, has been reviewed.  Specifically, you are appealing the denial of your placement into Phase III.

A review of the issue raised in your Request for Administrative Remedy has been conducted.  The results of the review revealed that outside law enforcement agencies did not consent with approving your Phase III placement.  You were denied placement into Phase III because additional time is needed to determine whether you can function with additional privileges without posing a risk to institutional security and good order; posing a risk to the safety and security of staff, inmates, or others, including yourself; and/or posing a risk to public safety.  We encourage you to continue to participate in and complete all programs recommended by Unit Team; demonstrate positive behavior, including respectful and appropriate conduct towards staff and other inmates; and demonstrate an overall positive institutional adjustment to include, but not limited to, personal hygiene, and cell sanitation.  You will be reviewed for placement in the next phase, ordinarily six months from your current review, providing you continue to meet the eligibility requirements identified in Institution Supplement 5321.07(3)K, Special Security Unit.

Accordingly, your Request for Administrative Remedy is denied.  In the event you are not satisfied with this response and wish to appeal, you may do so within 20 calendar days of the date of this response by submitting a BP-230(13) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas  66101-2492.

_____                    7/2/2020
B. True, Complex Warden                     Date

*Requested to Compete with gale inmates without help or Tools*

*55A*

**Administrative Remedy No. 977505-A1**
**Part B — Response**

This is in response to your Central Office Administrative Remedy Appeal wherein you allege deliberate indifference against a disabled person with no hands. You contend you have been in a secured housing unit since 2012 and suffer injuries on a weekly basis trying to clean your cell. You further contend your current prosthetics are not conducive for cleaning without special attachments and special cleaning tools. For relief, you request special attachments and special cleaning tools for your prosthetics.

We have reviewed documentation relevant to your appeal and, based on our findings, concur with the manner in which the Warden and Regional Director responded to your concerns at the time of your Request for Administrative Remedy and subsequent appeal. Our succeeding review reveals on September 12, 2019, you were evaluated and measured by Prosthetics for protective sleeves to assist with rubberized or textured friction to protect the bilateral stumps. Once the protective sleeves are completed, they will be issued to you by Health Services. If you are having issues, you need to request sick call for your complaints. Your primary care team will continue to make recommendations as needed. As recommendations are made, a course of treatment will be determined. Given this, we shall defer diagnostic testing and treatment interventions to the Health Services staff at the local level.

Based on this information, there is no evidence to substantiate your claim of deliberate indifference on the part of medical staff; therefore, we find no rationale warranting further review of your claim.

The record reflects you have received medical care and treatment in accordance with evidence based standard of care and within the scope of services of the Federal Bureau of Prisons. You are encouraged to comply with proposed medical treatment so Health Services can continue to provide essential care and to contact medical personnel through routine sick call procedures should your condition change.

Considering the foregoing, this response is provided for informational purposes only.

RECEIVED

NOV 06 2019

ADX AW Office

_____
Date

_____
Ian Connors, Administrator
National Inmate Appeals

53

278

EX.15. Att.09    1/10

physical & psychological harm

Due to Denial of essentials based on

Exampl   d.T Chorosevic Report.

— Broken teeth
— mouth Gum teeth infection
— Teeth abrasion—
— stumps abrasion & infection
— stopping applying skin creams.



# UTILIZATION REVIEW COMMITTEE
## INMATE NOTIFICATION LETTER
## FCC FLORENCE
## ADX

**Name:** _Mostafa Kamel_   **Date:** _6/3/21_
**Reg. Number:** _67495-054_   **Housing Unit:** _H05-511_

## Requested Consult/Procedure

General Surgery        Orthopedics        Gastroenterology        Ear, Nose, and Throat
Ophthalmology        Prosthetics        Colonoscopy and/or EGD        Oral Surgery
MRI        CT Scan        Cardiology        Urology
Radiology        Nephrology        X Other _Dentistry_

## Utilization Review Committee Decision

The committee has referred your case to the Regional Office for final approval.
You should be notified of your status within the next two months.

The committee has APPROVED this request without modification.

The committee has DENIED this request.
    You will be scheduled for further evaluation by a staff physician.
    You will be scheduled for further evaluation by a mid-level provider.
    You need to follow-up in sick call with any further issues.
    You will be referred to a specialty consultant.
    Your procedure is contraindicated due to unacceptable risk.
    You have been placed on the waiting list for: _____.
    Other: _____.
**Re-submission of the request will be considered if medically indicated.

Physician _____

Copy Sent or Issued to Inmate On: _6|8|21_
Copy Scanned Into BEMR

Form Last Updated: 11.19.10.TM

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

Re: Broken tooth and no prevention of similar future injuries.

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Mostafa, K. Mostafa        67495-054 #        ADX Florence Colorado
LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

Part A– INMATE REQUEST  The answer ignores many facts and provides no solution to the on-going problems. Such as the broken tooth had split to 2 halves as I was opening a Beam little Quick item using my teeth as I do since I was extradited Oct 2012. I lost 3 teeth since & all my dental work done in England without any replacement or plan to do so & that I am opening similar items nearly every day as I am severely disabled with & end in complete solitary with no help because of the S.A.M.!

It is no plan to avoid more broken teeth as BoP refusing to allow me help or repair it. I was told by the dentist on 4-16-16 there are two more loose back teeth and and I could be fixed if "you was not in BoP" as BoP Policy doesn't allow dental work such as implant, bridges, crowns, capping etc which I would have no problem to do outside when I offered to pay it was not allowed! The only solution would be offered in an ADX is to "yet remove many more teeth to do a "Denture" which I can't ever use & we no hands and its dangerous and excluded in England to prevent chocking and infec & told the same by dentists in USC New York and medical center in this joy springfield. I am now No. 99 on the list and since Oct 2015, and even if I was taken tomorrow 22-16 my conditions! Please allow me help in repairing my broken teeth and allow me dental & above are the only options, which are increasing my disabilities and worsening care including implant, bridges crown... etc        SIGNATURE OF REQUESTER (Mostafa)

Part B– RESPONSE

RECEIVED
SEP 23 2016
ADX AW Office

Exhibit 158A-1169 Page 3/10

_____ DATE _____        WARDEN OR REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE        CASE NUMBER: 877295-F1

Part C– RECEIPT        69        CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL        69    REG. NO.        UNIT        INSTITUTION

SUBJECT: _____

_____ DATE _____        RECIPIENT'S SIGNATURE (STAFF MEMBER)

Administrative Remedy No. 877295-A1
Part B - Response

This is in response to your Central Office Administrative Remedy
Appeal wherein you assert your teeth have decayed as a result of
using them to open food packaging. You contend Bureau of
Prisons dentists are limited in the treatment they provide and
oral hygiene items are unavailable. You request no specific
relief.

We have reviewed documentation relevant to your appeal and,
based on our findings, concur with the manner in which the
Warden and Regional Director responded to your concerns at the
time of your Request for Administrative Remedy and subsequent
appeal. Our succeeding review of your medical record reveals on
November 21, 2016, you were seen for a treatment plan
examination. The dentist indicated you had five teeth that
required fillings and four other teeth that were recommended for
extraction. You have had routine dental treatment appointments
on December 23, 2016, and January 6, 2017, to address the
diagnosed problems. On January 6, 2017, you requested not to
have the four teeth extracted.

Should you re-consider the extractions, you are encouraged to
contact the dentist to continue your care. At that time, you
also may discuss the limitations of different tooth replacement
treatments, your nutritional concerns, and functional
limitations due to your disability.

The record reflects you have received dental/medical care and
treatment in accordance with evidence based standard of care and
within the scope of services of the Federal Bureau of Prisons.
You are encouraged to comply with proposed medical/dental
treatment so Health Services staff can continue to provide
essential care and to contact dental/medical personnel through
normal sick call procedures should your health condition change.

Considering the foregoing, this response is provided for
informational purposes only.

3/6/17
_____
Date

_____
Ian Connors, Administrator
National Inmate Appeals

Department of Justice

Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Loss of teeth & no prevention or relief 877295 R1

use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachust be submitted with this appeal.

| Mostafa K. Mostafa | 67495-054 | 1403 | FLX Florence Colorado |
|---|---|---|---|
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

- REASON FOR APPEAL: *This answer doesn't provide any prevention for the losing teeth while trying to open food pouches to eat, nor does it provide any relief...*

*DATE* *1-16*  *SIGNATURE OF REQUESTER*

**RESPONSE**

Exhibit 15 & Attach page 5/10

RECEIVED

JAN 19 2017

Administrative Remedy Section
Federal Bureau of Prisons

Exhibit 08 page 5

| DATE | | |
|---|---|---|
| RIAL: RETURN TO INMATE | GENERAL COUNSEL CASE NUMBER: 877295 | |

RECEIPT

CASE NUMBER: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |
|---|---|---|---|

| DATE | SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL |
|---|---|

BP-231(13)
JUNE 2002

Exhibit 16 8th of page 6/10   page 68/81 283

**BP-229 RESPONSE**                    **Case Number:  877295-F1**

Your Request for Administrative Remedy dated September 22, 2016, and received in this office on September 23, 2016, has been reviewed.  You allege medical staff have offered no solution for your broken teeth.  You further allege you have requested implants rather than dentures, but have been disapproved.  For relief, you request dental work including implants, bridges, or crowns.

A review of the issue raised in your Request for Administrative Remedy has been conducted.  The results of the review revealed you were evaluated by the dentist on September 16, 2016, for your dental complaints.  You made the medical decision to refuse any dental work at that time and wanted to keep your teeth as long as possible.  The dentist addressed your concerns regarding your disability and dentures.  You were informed that your case would be further discussed with the Chief Dental Officer.  The dentist has developed a treatment plan, which has been sent to the Regional Dental Officer for review and recommendations.  Once a treatment plan is approved, you will be notified by dental staff of your options and treatment plans.  If you have further concerns prior to this determination, please submit a Request to Staff Member to further address your concerns with the dentist.

Accordingly, this response to your Request for Administrative Remedy is for informational purposes only.   In the event you are not satisfied with the response and wish to appeal, you may do so within 20 calendar days of the date of this response by submitting a BP-230(10) to the Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex, Tower II, 8th Floor, 400 State Avenue, Kansas City, Kansas 66101-2492.

_____          ___10/20/16___
Jack Fox, Complex Warden                        Date

68

Administrative Remedy No. 864128-A1
Part B - Response

*Ex 15, Att 09   7/10*

*Infection as in fitting, items, help*

This is in response to your Central Office Administrative Remedy
Appeal wherein you allege medical negligence with regard to your
disability.  Specifically, you assert medical staff have delayed
treatment of an infection in your amputated arms and are using
your solitary confinement status and disability to harm and
torture you.  For relief, you request proper fitting disability
items.

We have reviewed documentation relevant to your appeal and,
based on our findings, concur with the manner in which the
Warden and Regional Director responded to your concerns at the
time of your Request for Administrative Remedy and subsequent
appeal.  There is no evidence to suggest medical treatment was
delayed or negligent.

Your request for proper fitting disability items was not raised
in the previous levels of this administrative remedy; therefore,
it will not be addressed in this response.  You must first
present this concern at the institution level and then may
appeal the response thereto if you are not satisfied with the
response.

Lastly, we note your allegations of medical staff using your
solitary confinement status and disability to harm and torture
you; however, you did not support this contention by offering
any credible evidence.  Rather, you provided a general statement
not substantiated by facts.  Therefore, we find no rationale
warranting further review of your claim.

The record reflects you have received medical care and treatment
in accordance with evidence based standard of care and within
the scope of services of the Federal Bureau of Prisons.  You are
encouraged to comply with proposed medical treatment so Health
Services can continue to provide essential care and to contact
medical personnel through routine sick call procedures should
your condition change.

Considering the foregoing, this response is provided for
informational purposes only.

_____
Date

_____
Ian Connors, Administrator
National Inmate Appeals

Department of Justice

Federal Bureau of Prisons

Re: Infection negligence. 864128 A2

**Central Office Administrative Remedy Appeal**

285

Att.9 8/10

For use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attach-must be submitted with this appeal.

Mostafa K. Mostafa                    67495-054 H        ADX Florence Colorado.

LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

**A - REASON FOR APPEAL** Again, the regional office answer ignores the wide gap seen in my sick note and the P.A. very late show up time and that I had my and finish a whole tube of anti-biotic from commissary till I got it then he showed up! and only to tell me that this will happen often because I am in solitary confinement and continuous dirty tank and abrasion will cause it. Also, refusing to give me his apology answers but ask me to cross it and how can I ?! the answer also feel my repeated request to the female nurse on duty to help and that said "I can't write prescriptions, you should eat potine and rest" these behaviour are not using my solitary & disability to harm me torture me then I have no other name or discription for it. the rubber-stamp answers are only incouraging more negligence in 6/16 full impunity. It is clear even from P.A. behaviour and cruelty that I need help and proper fittings and disability items and so please investigate this wide ____

DATE                                    SIGNATURE OF REQUESTER (thanks)

**B - RESPONSE**

Att.09   8/10

RECEIVED

AUG 23 2016

Administrative Remedy Section
Federal Bureau of Prisons

DATE                                    GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE              CASE NUMBER: 864128

**C - RECEIPT**

                                        CASE NUMBER: _____

Return to: _____

LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

SUBJECT: _____

DATE                    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)
JUNE 2002

| Inmate Name: | MOSTAFA, KAMEL MOSTAFA | | | Reg #: | 67495-054 |
|---|---|---|---|---|---|
| Date of Birth: | | Sex: M | Race: WHITE | Facility: | FLM |
| Encounter Date: | 08/28/2017 12:27 | Provider: | Osagie, A. MLP | Unit: | H03 |

**PLAN:** *Plaintiff Ex 15, Att. 09* *3/0* (handwritten)

**New Medication Orders:**

| Rx# | **Medication** | **Order Date** | **Prescriber Order** |
|---|---|---|---|
| | Clobetasol Propionate Cream 0.05% | 08/28/2017 12:27 | 60 g Topically  Three times a week x 180 day(s) -- Apply a small amount topically to the affected area three times a week on Mondays, Wednesdays and Fridays -- 4 x 60g tubes/month |

*(handwritten) No help with O.T Chordsema report to date*

**Indication:** Psoriasis NOS

**Disposition:**
Follow-up at Sick Call as Needed
Follow-up at Chronic Care Clinic as Needed

**Patient Education Topics:**

| **Date Initiated** | **Format** | **Handout/Topic** | **Provider** | **Outcome** |
|---|---|---|---|---|
| 08/28/2017 | Counseling | Compliance - Treatment | Osagie, A. | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** Yes
**Telephone/Verbal Order:** No

Completed by Osagie, A. MLP on 08/28/2017 14:33
Requested to be cosigned by  Oba, D. MD.
Cosign documentation will be displayed on the following page.

# Bureau of Prisons
# Health Services
# Clinical Encounter

287

| | | |
|---|---|---|
| Inmate Name: MOSTAFA, KAMEL MOSTAFA | | Reg #: 67495-054 |
| Date of Birth: ██████ | Sex: M   Race: WHITE | Facility: FLM |
| Encounter Date: 08/28/2017 12:27 | Provider: Osagie, A. MLP | Unit: H03 |

Mid Level Provider - Medication Reconciliation encounter performed at Housing Unit. *Def. Ex. 15, AT09*

**SUBJECTIVE:**

**COMPLAINT 1**      **Provider:** Osagie, A. MLP

**Chief Complaint:** Medication Reconciliation

**Subjective:** Pt. was seen at the Library today for medication renewal. He is afflicted with psoriatic lesions and needs Clobetasol cream renewed. He reports that he receives 30g tube of the cream per week, but it is just not enough to cover his lesions, so he is requesting increased amount of Clobetasol and wants his refills sent on time. He does admit that the cream has been effective in controlling his lesions. This was discussed with the Chief Pharmacist who agrees to dispense increased quantity per written prescription.

**Pain:** Not Applicable

**OBJECTIVE:**

*ADX   Stopped help for cream medication after OT Report! Large area can not be reached   See Back*

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 08/28/2017 | 14:13 FLX | 66 | Via Machine | Regular | Osagie, A. MLP |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 08/28/2017 | 14:13 FLX | 152/84 | Left Arm | Standing | Wrist | Osagie, A. MLP |

**Exam:**
**General**
**Affect**
Yes: Cooperative, Anxious
**Appearance**
Yes: Appears Well, Alert and Oriented x 3
No: Lethargic, Acutely Ill
**Skin**
**General**
Yes: Dry, Skin Intact
**Lesions**
Yes: Present, Plaques, Scaling
**Lesion Location**
Yes: Elbow, Antecubital Space, Upper Back, Mid-Back, Lower Back, Buttock, Scrotum, Anterior Thigh, Lateral Thigh, Posterior Thigh, Lateral Ankle, Medial Ankle

**Comments**
Psoriatic lesions noted on back, elbows, buttock, thighs and ankles.

**ASSESSMENT:**

Psoriasis NOS, 696.1 - Current

288

EX. 15. Att. 10: 1/4

Warden Safety order Jun 26, 2021

No. Cell Move

To Non-disable Cell 300 L Till Suitable Cell is made



**U.S. Department of Justice**
Federal Bureau of Prisons

Federal Correctional Complex
Florence, Colorado
☑ *Administrative Maximum Security Institution*
☐ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

January 26, 2021

MEMORANDUM FOR:     ~~ALL CONCERNED~~

FROM:     B. True, Complex Warden

SUBJECT:     Inmate Mostafa, Kamel Reg. No. 67495-054

Effective with the issuance of this memorandum, inmate Mostafa, Kamel Reg. No. 67495-054, will not be required to be rotate cells every 90 days while housed in H-Unit.

Until such time as another cell can be adapted to accommodate his specific medical requirements, Mostafa will remain in cell 511. However, the cell and all personal property will be thoroughly searched, at a minimum of once every thirty days.

Cell sanitation will be maintained and all contraband must be controlled. Staff will provide Mostafa with adequate supplies to ensure he is able to keep the cell clean and complies with institutional sanitation requirements. At no time will Mostafa be allowed to accumulate excessive or unauthorized property. If there is a question in regards as to what is authorized property, staff will consult the Operations Lieutenant, Unit Team, and/or Health Services staff to determine if it is allowable.

# Bureau of Prisons
## Health Services
### Modified Diet Request

3/A

Types of Diets:

| | | |
|---|---|---|
| ___ | Clear Liquid | Exp Date: |
| ___ | Low Fat | Exp Date: |
| ___ | Mechanical Soft | Exp Date: |
| ___ | Low Cholesterol | Exp Date: |
| ___ | Low Triglyceride | Exp Date: |
| ___ | Renal | Exp Date: |
| ___ | Full Liquid | Exp Date: |
| ___ | Sodium Controlled | Exp Date: |
| ___ | Snack | Exp Date: |
| ___ | Diabetic | Exp Date: |
| ___ | Calorie Controlled | Exp Date: |
| ___ | Other: | Exp Date: |

Comments:    All prepackaged religious food will be opened by food service workers in a certified foods kitchen and place into easy access containers.


_____
Sterett, Justin MD
Health Service Staff

MOSTAFA, KAMEL MOSTAFA                 67495-054                    01/23/2020
Inmate Name                                  Reg#                          Date



**Administrative Remedy Number 1005228-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal where you raise issues regarding food trays and how your meals
are delivered to you at the ADX.   You state your meals are to be opened
and the food items placed in different containers, and this does not
happen.   You claim some of the containers are only partially opened
and you have to use your teeth to open them.   You also claim the food
items are mixed with each other, making some of your food "messy,
slippery and unusable."   You request the rules be followed regarding
your meal trays.

A review of your appeals reveals, due to your physical limitations,
you have a Medical Duty Order from the Health Services Department
in regards to your meals.   Specifically, all packaged religious diet
food will be opened by Food Service workers in a certified foods
kitchen, and placed into easy access containers.   This office has
confirmed that staff at the ADX are aware of this accommodation.   If
this is not occurring or you encounter other issues with a specific
food tray, it is suggested you advise staff at that time, so the matter
can be immediately addressed and/or the food tray exchanged if
necessary.

This response is provided for informational purposes.


_____10/22/20_____
Date

_____JC_____
Ian Connors, Administrator
National Inmate Appeals

292

Ex. 16. Att. 01        1/5

Response to Fabrication of medical Record For Assault
(Remedy For Assault       999324 Ai...)
                And    Retaliation after : 1034590---

DEPARTMENT OF JUSTICE    ~~Attacked & injured~~   2/5   **REQUEST FOR ADMINISTRATIVE REMEDY**   293

~~ral~~ Bureau of Prisons

~~m:~~ Mostafa, K. Mostafa          67495-054          H          ADX Florence

LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**~~rt~~ A– INMATE REQUEST** An investigation is urgently needed for the attack on me, abuse, threats and
~~aum~~ stump injured on monday oct 28, 2019 by Lt Garrado, c/o parry and c/o Aveythi.
The 3 staff come to my cell threatening me, used foul language to scare me to go
~~r~~ my protest food strike to be treated as disable and sick.
"They said they are going to strap me down very tight to the Force feeding chair
~~dou't care?~~ "even defecate". I felt unsafe and told them I need the Team as I
worry that they may break the needle in to my arm or causing me heart attack
~~at~~ the time. said no and each jumped on one of my limbs. I am 61 yrs old
~~h~~ and severely disabled (no hands to raise my arms) and at the time did not eat for
~~days,~~ very weak and exhausted. my left stump was greased and I told Pennoly the
~~nurse~~ stayed on for more than 3 weeks to be examined on Tue. Nov 19. See Force feeding
~~ies~~ then, when I wrote my BP8 c/o parry became more abusive very provocative
~~d~~ confrontational and even threw food trays on my cell floor, then gave
~~me~~ two ~~shots~~ for Kcp saying I do not feel safe with you. I need the
~~team~~ when ~~blood~~ samples taken + please, investigate, report   ~~[signature]~~
Nov. 25, 2019   the incident and reverse the
          injustice against me (thanks)

DATE          SIGNATURE OF REQUESTER

**~~rt~~ B– RESPONSE**

Received
**DEC 0 5 2019**
Admin Remedy Office

_____          _____
DATE          WARDEN OR REGIONAL DIRECTOR

~~is~~satisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

CASE NUMBER: 909324-H1

**ORIGINAL: RETURN TO INMATE**          CASE NUMBER: _____

**~~art~~ C– RECEIPT**

~~turn~~ to: _____   LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

~~B~~JECT: _____

_____          _____
DATE          RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP-229(13)
APRIL 1982