**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00694-PAB-NYW

MOSTAFA KAMEL MOSTAFA,

      Plaintiff,

v.

MERRICK GARLAND, United States Attorney General, in his official capacity,
CHRISTOPHER WRAY, FBI Director, in his official capacity,
MICHAEL CARVAJAL, BOP Director, in his official capacity,
B. TRUE, ADX Warden, in his official capacity,
UNKNOWN SAMs OPERATIVES, in their official capacities,
MACMILLAN, ADX Facilities Department, in his official capacity,
FOLLOWS, ADX Medical Department Manager, in her official capacity,
PARRY, ADX Officer, in his individual capacity,
AVERIT, ADX Officer, in his individual capacity,
GARDUNO, ADX Lieutenant, in his individual capacity,
LOWE, ADX officer, in his official capacity,
NORJANO, ADX Officer, in his official capacity, and
WILLIAM, ADX Nurse, in his official capacity,

      Defendants.

---

### REPLY IN SUPPORT OF MOTION TO DISMISS [ECF. NO. 96]

---

Mostafa points to no justification for allowing any claim to proceed. The thrust of his argument is that the United States must manage his confinement as if he were innocent of the heinous crimes of terrorism he has committed—including crimes in collaboration with his own children. He shoves under the rug the history of his long campaign of radical jihad against the United States and his expressed approval of killing *kaffirs*, improperly attempts to amend his complaint by raising a plethora of new allegations, and fails to refute the arguments that compel dismissal of his claims. These tactics fail to salvage his claims, all of which should be dismissed.

I.      **Mostafa's SAMs are reasonably related to protecting national security and therefore do not violate the First Amendment (Claim 1). Mot. at 5-17.**

      A.      **Mostafa has not demonstrated that limiting his associations is irrational.**

The Court should dismiss Mostafa's allegations that his SAMs violate his First Amendment rights by limiting his communications and associations. His response, like his amended complaint, fails to rebut any of the justifications for the SAMs. To state a claim, he must plead factual allegations, accepted as true, that show the stated justifications do not have a rational connection to the challenged restrictions. *Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012). It is impossible for him to meet his burden—to demonstrate no legitimate, rational basis—without "rebut[ting] in his pleadings" the government's justifications. *Id.* at 1241. He does not come close, especially under the highly deferential standard of *Turner v. Safley*, 482 U.S. 78 (1987), which holds that a prison restriction is valid if reasonably related to legitimate penological interests. *Id.* at 89. This deference is even higher here, because judicial deference "pervades the area of national security." *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992). And Mostafa bears the burden to disprove the validity of the restrictions. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Mostafa fails to meet his heavy burden. He does not contest that national security is a legitimate penological interest. *Rezaq v. Nalley*, 677 F.3d 1001, 1014 (10th Cir. 2012). Neither does he rebut any of the Attorney General's detailed justifications for the SAMs, including Mostafa's convictions for multiple crimes of terrorism (including the deadly Yemen hostage taking in which he involved his son and step-son) and his success in motivating his many followers to "engage in acts of violence, terror, and murder." ECF No. 96-3 at 8-10. Based on this voluminous evidence, the Attorney General concluded there is a substantial likelihood that Mostafa would

continue to attempt to radicalize others and to incite terrorism and violence. *Id.* And the relevant inquiry under *Turner* is not whether the restrictions actually advance national and prison security, but rather whether a rational official "might reasonably have thought" they do. *See*, *e.g.*, *Johnson v. California*, 543 U.S. 499, 513 (2005).

Here, because a rational person could find a connection between the restrictions and Mostafa's crimes, exhortations to kill non-Muslims, and inspiration for a global throng of jihadists, the SAMs are lawful. *See*, *e.g.*, *Gowadia v. Stearns*, 596 F. App'x 667, 673 (10th Cir. 2014) (SAMs lawful where there is "reasonable relationship" between the crimes and restrictions). None of his arguments allows him to meet his heavy burden under *Turner*:

***The circumstances of Mostafa's extradition have no bearing on the SAMs national-security assessment.*** Mostafa claims that his extradition to the United States was secured under false representations about his future confinement, Rsp. *passim*, but even if that were true,[1] it is wholly irrelevant to the question of whether government officials can rationally conclude that his SAMs are reasonably necessary to protect national security, in light of his criminal conduct, known influence among terrorists, and well-established jihadist proclivities. Regardless of his path to the United States and ADX, national-security officials must manage him so as to prevent him from harming others. His pleading is deficient because he has not alleged that the SAMs, or any specific SAMs provision, fail to meet the highly deferential *Turner* standard.

***Mostafa's opinions about security risks do not show the absence of a rational basis for limiting his contacts.*** Mostafa asserts the SAMs are based on "lies," "entrapment," and "corrupt"

---

[1] Mostafa cannot use this case to enforce nonbinding representations concerning his extradition.

witnesses, Rsp. *passim*, but national-security officials are not obliged to countenance his self-serving justifications.[2] Deference is due to the judgment of national-security officials, not the *post hoc* rationalizations of a convicted terrorist (or his criminal defense attorney). Rsp. at 27-28; *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-36 (2010) (decisions of Executive Branch officials on "sensitive and weighty interests of national security" entitled to deference); *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (predictive judgment of national-security officials receives deference because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment"). National-security officials act rationally when they manage Mostafa as the dangerous convicted terrorist substantial evidence shows him to be, rather than as an innocent who preaches to the United States about its "moral[]" obligations. Rsp. at 25-27.

Neither do the officials violate Mostafa's rights when they decline to overlook the known crimes and dangerous propensities of his family, including the sons and stepson with whom he is barred from communicating. National-security officials have information showing that these sons conspired with Mostafa to carry out the Yemen kidnapping (Mohammed and Ghailan); served time in prison for multiple crimes (Imran); and joined forces with other terrorists to fight in Syria (Sufyan)—none of which Mostafa can rebut.[3] *See* ECF No. 96-3 at 10, 30, 38; *see also United States v. Mustafa*, 753 F. App'x 22, 27 (2d Cir. 2018). Nor has Mostafa alleged irrational decision-

---

[2] Mostafa speculates he will be granted a new criminal trial, *see*, *e.g.*, Rsp. at 8, 15, 22, but prison officials may lawfully rely on an existing criminal judgment rather than an inmate's personal belief that his convictions will be overturned.

[3] Mostafa wasn't denied a copy of the recording of the phone call revealing Sufyan's ties to terrorism, Rsp. at 23, but told to submit a FOIA request, which he never did. *Id.* at 79. Further, in prohibiting communications with Sufyan, the FBI relied on voluminous open-source reporting. ECF. No. 96-3 at 38; *see, e.g.*, https://www.telegraph.co.uk/news/2017/04/01/abu-hamzas-son-stripped-british-passport-waging-jihad-syria.

making in the requirement that he complete an established process to receive permission to communicate with his grandchildren, which the facts show he has done in only one case (resulting in approval of that grandson).[4] *See* 96-3 at 34; Mot. at 10 (explaining assessment that grandchildren may serve as conduits for unauthorized communications). And his pleading does not even attempt to rebut the obvious national-security interest in preventing him from influencing vulnerable children to follow in his footsteps. Mot. at 10. Where significant information emphasizes the risks of communications between a terrorist and his like-minded family, Mostafa's mere denials, Rsp. at 23, fall short of alleging that the restrictions lack a rational basis.

Indeed, *Mostafa himself* confirms the officials' assessment that strictly limiting his contacts is reasonably necessary to prevent his communications from jeopardizing national security. He ascribes to himself deep knowledge of the actions of an international playbook of terrorists, living and dead. *Id.* at 9-12 (claiming connections with former Taliban Secretary of State, al Qaeda cells, and people with advance knowledge of the 9/11 attacks). Given his deep historical knowledge of terrorists and terrorist networks—and his acknowledged status as a "high profile famous" person (Rsp. at 7) who has incited others to radical action—it is reasonable for national-security officials to exercise their predictive judgment to conclude that, absent the SAMs, Mostafa would share his accumulated knowledge with likeminded persons, including members of his family.

**Mostafa's view that one mail rejection was "unbelievably retarded" does not satisfy his burden under Turner.** As the motion noted, Mostafa's complaint identifies only one rejected letter, Mot. at 11, and that is the only letter he discusses in the response. Rsp. at 33. His opinion is

---

[4] Mostafa complains this grandson doesn't write to him, Rsp. at 23, but that shows no defect in the approval process. Claims about contacting other grandchildren are unexhausted. ECF No. 102 at 4.

that rejecting the letter because it conveyed a message to a grandchild who is not an approved

contact is "unbelievably retarded," *id.*, but he is not a national-security official who must try to

prevent him from inculcating a taste for terrorism in the next generation of his descendants. *See*

Mot. at 10. His silly comment fails to demonstrate that the officials could not believe their security

assessment was reasonable. And if Mostafa wants to communicate with this grandchild, he should

use the appointed request process, submit the required information, and see the process through. To

the extent he believes a particular denial is improper, he may exhaust his administrative remedies

and, if still aggrieved, challenge that denial. But a single denial of a letter to an unapproved contact

(for whom he did not seek approval) is not a basis to conclude the SAMs restrictions are illegal.

> ***The United States is not required to adopt another country's purported judgment about
> Mostafa's risks.*** Mostafa claims not to have been considered an "exceptional risk" in the United

Kingdom, where he was found with a bombmaking manual in his high-security prison cell. Rsp. at

6-7, 12, 31; *Mustafa*, 753 F. App'x at 39 (upholding admission of testimony about manual). Just as

national-security officials need not defer to Mostafa's views, neither are they required to accept

those of officials of a country in which Mostafa successfully hatched and executed a deadly

kidnapping plot and a scheme to have his jihadist followers infiltrate the United States.

> ***Mostafa has failed to allege that SAMs attorney protocols are irrational or limit his
> access to courts.*** Mostafa now complains about "misuse" of special mail and access to the law

library, and that he was denied contact with an attorney who is not mentioned in his complaint.

Rsp. at 24, 34-35.[5] But none of his allegations, old or new, demonstrate an impediment to filing

---

[5] Mostafa wasn't denied contact with this attorney; he was simply told that more information was
needed to process the request, which he does not claim to have provided. Rsp. at 83.

suit or the existence of some now-unobtainable result in past litigation. Mot. at 11-12 (discussing standards for access-to-courts claim). Records show he is currently represented by six attorneys in the criminal trial court, *see United States v. Mustafa*, No. 04-00356 (S.D.N.Y.), and by an attorney in his bid to have the Second Circuit order a new trial. *Id.*, No. 19-02520. And he has not even attempted to allege that national-security officials have no legitimate, rational basis for including attorney communication protocols in the SAMs, where history shows such communications can jeopardize security here and abroad. *United States v. Stewart*, 590 F.3d 93, 101-08 (2d Cir. 2009).

> ***Mostafa's allegations about disability do not show that the SAMs lack a rational basis.***

Mostafa tries to sneak in claims that are not found in his complaint, including a claim under the Americans with Disabilities Act. Rsp. at 16-17, 24, 29-30. This Court has denied his motion to reinstate these claims, ECF No. 138, and it should not allow him to improperly amend his complaint now. *Abdulina v. Eberl's Temp. Servs.*, 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015).

Moreover, national-security officials are not required to consider an inmate's physical disability in the SAMs analysis, and to impose such a requirement would violate the SAMs regulation—the sole purpose of which is to evaluate whether "there is a substantial risk that a prisoner's *communications or contacts*" could result in death or injury to others. 28 C.F.R. § 501.3(a) (emphasis added). Mostafa's physical condition—which clearly does not affect his ability to talk and to write—in no way negates the conclusion, based on an extensive record, that SAMs are reasonably necessary to protect national security. Complaints about ADX conditions should be raised in an Eighth Amendment conditions-of-confinement claim, as Mostafa does in Claim 2, and not conflated with the assessment of national-security risks underlying the SAMs.

> ***Mostafa misconstrues the* Turner *standard*.** Mostafa fundamentally misunderstands the

*Turner* test, as he reveals in asserting that the burden should be on "the SAMs imposers." Rsp. at 31. That is not the law. Nor is his opinion that other SAMs inmates are more dangerous than him (or have been recommended for fewer restrictions) relevant, *id.* at 29, 33, where there is a clear explanation for each of the restrictions on Mostafa's communications. *Turner* is not a least-restrictive-means analysis. *See* 482 U.S. at 90-91. If it were otherwise, courts would be inundated with claims challenging prison restrictions because every inmate would claim that another is worse than him. The Supreme Court held that the reasonableness test is necessary so that prison officials, and not the courts, make these difficult judgments. *Id.* at 89. Here, where history confirms Mostafa's dangers, it is not for courts to determine his relative risks compared to other criminals.

In sum, Mostafa's burden was to allege facts that show the officials could not rationally believe the SAMs restrictions advanced their national-security interests. His allegations fall far short of that mark. Any First Amendment right-of-association claim should be dismissed.

**B.     Mostafa has not alleged that religious-privileges rules lack a rational basis.**

**1.     The group-prayer claim Mostafa brought is moot, and he has not alleged the absence of a rational basis for the new rule.**

Mostafa's group-prayer claim, which is unexhausted, is very narrow. He complained that he doesn't have access to group prayer "once a week or a year." SAC at 11. But since the March 2021 global modification of SAMs, which removed the prior prohibition on all group prayer, ECF No. 96-3 at 45, 47, 49. Mostafa can now engage in group prayer whenever he is allowed to engage in group activities. This enables Mostafa and other inmates to pray together at all outdoor recreation times, which occur multiple times per week. Mot. at 12. As a result, because Mostafa has at least weekly access to group prayer, his claim is moot.

8

Mostafa identifies no error in that analysis of the claim he actually pled. Instead, he seeks to bring a different claim, complaining that he is unable to pray *all five* daily Muslim prayers in congregation with other inmates. The Court should not allow this claim to proceed because it is unpled and unexhausted. But it also fails to state a claim under the deferential *Turner* standard, where even a *complete prohibition* on group religious services in a maximum-security prison does not violate the Free Exercise Clause in light of legitimate prison security interests. *Williams v. Miller*, 696 F. App'x 862, 863 (10th Cir. 2017). The far more lenient approach here—allowing SAMs inmates to pray together whenever they can engage in congregate activity (i.e., at outdoor recreation)[6]—clearly does not violate the Constitution.

Mostafa has not alleged that prison officials lack any legitimate penological interest in protecting institutional security by allowing group prayer only during times and places designated for group activity. In a prison designed to house inmates who "pose unusual security and safety concerns," *Rezaq*, 677 F.3d at 1014, Mostafa fails to allege that correctional officers do not face unique risks and burdens when they come into physical contact with ADX inmates and that there is no reasonable basis for limiting moves in H Unit to established recreation times. Notably, many officers who would conduct the dozens of daily escorts for five daily prayers would be "*kaffirs*" who, by Mostafa's lights, are "okay" to sell and kill. *Mustafa*, 753 F. App'x at 258. In the face of these legitimate risks, Mostafa's pleading shows no unreasonableness in the chosen rule.

The line the officials have drawn also clearly promotes national security in Mostafa's case. The inspirational power of a convicted terrorist preacher, whose forte is using religion to incite

---

[6] During indoor recreation, for security reasons, inmates in Mostafa's unit recreate alone and thus cannot engage in congregate activities—secular or religious.

terrorism, presents obvious dangers in a group-prayer setting. The judgment about how to balance the risks without unacceptably jeopardizing security in the volatile ADX environment is a plainly rational choice that satisfies *Turner*. Mostafa has not plausibly alleged otherwise.

### 2. Mostafa's other religion allegations fail to state a constitutional claim.

***Imam Mostafa's purported lack of access to an imam.*** Mostafa's allegations are insufficient to allege either a substantial burden on a sincerely held religious belief or the absence of a rational basis for there not being an imam on the Florence Complex at this time.

First and foremost, "the First Amendment does not require prison administration to provide inmates with the chaplain of their choice." *Hartmann v. Cal. Dep't of Corr.*, 707 F.3d 1114, 1122 (9th Cir. 2013); *see also* Mot. at 14. But even if there were such a constitutional entitlement, the indisputable fact is that Mostafa *is* an imam who has never hesitated to opine on a host of issues to his myriad followers, from telling them that non-Muslims can be killed or sold in the market to urging them to "rejoice" about the al Qaeda-directed murder of American sailors. *Mustafa*, 753 F. App'x at 258; *United States v. Mostafa*, 2014 WL 1621277, at *2 (S.D.N.Y. Apr. 22, 2014). And Mostafa makes clear that he demands an imam not because of any belief he harbors, but to support his quest to overturn the rules he dislikes: "The subclaim is about the repeated denial of imam who can *explain to management*" Mostafa's point of view. Rsp. at 36. His lack of immediate access to an imam to recruit as a litigation ally indicates no burden on a religious belief, nor has he alleged such a burden by not having another imam to discuss "cleansing & grooming" issues. *Id.*

Mostafa's claim also fails the rational-basis prong of the analysis. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007). He does not attempt to rebut the obvious rational reasons that prevent BOP facilities from always employing an imam, no matter how assiduously officials seek

one. *See Ajaj v. Fed. Bureau of Prisons*, No. 15-cv-00992-RBJ-KLM, 2018 WL 4356787, at *6 (D. Colo. Sept. 13, 2018). The claim fails.

> **Ceremonial meals for an inmate who selects a certified religious diet.** Mostafa has not alleged that the BOP rule governing ceremonial meals lacks a rational basis. Per that rule, inmates like Mostafa, who have selected a certified religious diet because of their professed belief that they must consume *only* religiously-certified food, are provided their standard religiously-certified food tray on their ceremonial day. By implementing this rule, the BOP ensures that Mostafa receives food in accordance with his expressed religious beliefs. *See* Mot. at 15 (discussing policies).[7]

> **Washing and shaving Mostafa's "private areas" for him.** In these unexhausted claims, Mostafa asserts he must clean his "private area back and front" before praying, and that his "private areas" must be shaved. Rsp. at 36-37; SAC at 11 ¶ 12. Assuming he believes these things, he has not alleged that he faces a substantial burden about washing, where he has a shower in his cell and can stand in it as long as wants. And for neither claim has he alleged that BOP officials lack a rational basis for declining to provide him with another individual, whether staff or inmate, to perform the burdensome and physically dangerous tasks of assisting him with a washing ritual five times a day and with shaving his body hair. To the extent he seeks to have his own "electric batteries trimmer, *id.* at 37, a request which tacitly acknowledges he can perform fine-motor skills, he has not alleged that BOP lacks a rational basis for prohibiting a device with components that can be broken apart and used to make weapons by Mostafa or other ADX inmates.

> **Short hair/long beard.** Mostafa hasn't alleged how BOP's inability to provide him a haircut in "COVID time," SAC at 11, offends some sincerely held religious belief, but even if he

---

[7] Mostafa incorrectly claims that exceptions are made for Jewish inmates. Rsp. at 38. Passover imposes more restrictive dietary requirements that are not met with the standard kosher menu.

had, he also has not alleged that it was irrational for the BOP to prohibit contractors from entering a prison (that is still subject to limited access) to prevent Covid. *See* BOP Modified Operations (Nov. 25, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp. Mostafa also hasn't alleged how long his beard must be in order not to burden his beliefs,[8] but there is no constitutional mandate that a prison facilitate an inmate's ability to maintain a beard of whatever length he desires. *Cf. Holt v. Hobbs*, 574 U.S. 352, 369-70 (2015) (prison policy prohibiting ½-inch beard violates RLUIPA). Nor has he alleged the absence of a rational justification for not facilitating this unknown desire—particularly if it would require that he possess a battery-operated "trimmer."

No free exercise claims should proceed.

## II.   Mostafa has not alleged that his conditions of confinement violate the Eighth Amendment or shown that he has a redressable injury (Claim 2). Mot. at 17-21.

### A.   Mostafa's response confirms he has failed to plead a constitutional violation.

The facts show that Mostafa's claim reduces to his disagreement with BOP officials concerning their assessment of his disability and their judgment that he can function safely and productively at ADX. As a matter of law, his disagreement does not violate the Constitution.

***No allegations of subjective culpable intent***. Mostafa has not alleged that any official believed he faced an "excessive risk" to his health and safety, let alone disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 839 (1976). Rather, the facts show that BOP officials have dedicated extensive time and resources to evaluating Mostafa and providing him accommodations, though he disagrees with every decision they have made. He criticizes their "repeated mistakes," which he contends constitute "malpractice." Rsp. at 47, 51. He rejects the medical conclusions of

---

[8] Mostafa wears a neatly-groomed beard that is at least 3 to 4 inches long. *See* Rsp. at 254.

BOP's Director for Rehabilitation Services, a certified hand therapist who has treated combat causalities, who evaluated Mostafa and his ADX living conditions and concluded that he has the necessary accommodations to allow him to perform all activities of daily living without compromise to his health or safety.[9] ECF No. 96-5 at 35-37 (4/26/2016 Chorosevic evaluation).

Mostafa also disagrees with the judgment of officials who designed and constructed for him a special cell that complies with the Architectural Barriers Act—and that is twice the size of any other ADX cell. *See generally* ECF No. 96-7 (describing cell design, including shower with upper and lower heads programmed to provide longer-running water). Here, again, the prison officials allegedly got everything wrong: Mostafa needs "lever faucet taps," not longer-running water because it "floods his cell,"[10] a bidet instead of a lower shower head to clean his body, and different safety rails—to list just a few of his many disagreements. Rsp. at 41-42, 47. And Mostafa vigorously disputes the officials' decision to provide him brand new custom prostheses as replacements for his missing hands and lower forearms, an open offer he continues to reject. ECF No. 96-6 ¶¶ 11-20; Rsp. at 50-51 (claiming that "the prosthetic type offered would not work" and that this good-faith effort by BOP officials to help him is actually "entrapment").

No constitutional violation arises from Mostafa's many disagreements with BOP officials, where the record unequivocally shows that he has received accommodations and a consistent course of medical care. His disagreement states no claim. *Callahan v. Poppell*, 471 F.3d 1155,

---

[9] *See* Rsp. at 42-47, 52 (alleging Rehabilitation Director conducted a "strange" evaluation, misdiagnosed redness on Mostafa's stumps, misstated his ability to perform basic tasks, refused to adopt recommendations from an earlier evaluation in another prison, relied on a "fabricated" report by another BOP professional, and gave Mostafa assistive items that don't work).

[10] Undersigned counsel is authorized to represent there have been no reports of flooding in Mostafa's cell, which would be a serious security issue to which staff would immediately respond.

1160 (10th Cir. 2006) (no constitutional entitlement to particular course of treatment); *Sherman v. Klenke*, 653 F. App'x 580, 588 (10th Cir. 2016) ("Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.") (quotation omitted).

Neither does Mostafa plead a constitutional violation based on an alleged disagreement among BOP officials about managing his confinement. Rsp. at 44, 52 (referencing 2013 evaluation[11] and alleged opinions of BOP dentist). But even if Mostafa were correct that there was a "disagreement among medical experts," that is "not actionable under the Eighth Amendment." *Toler v. Trout*, 631 F. App'x 545, 574-78 (10th Cir. 2015) (no violation where prison doctor prescribed different medication than recommended by consulting physicians). The officials charged with confining Mostafa do not violate the Constitution when they elect to follow the guidance of BOP's chief rehabilitation officer, even if other employees might disagree. *See Broadus v. Corr'l Health Partners, Inc.*, 770 F. App'x 905, 909 (10th Cir. 2019) (inference that inmate faces a substantial risk of serious harm "*cannot* be drawn solely from evidence that a diagnosis or course of treatment was debated or debatable") (emphasis in original); *Dean v. Hamblin*, 69 F.3d 547, at *2 (10th Cir. 1995) (unpublished) (prison officials' "adherence to the medical directives they received does not demonstrate deliberate indifference").

At bottom, even if Mostafa were correct that officials made mistaken medical judgments, those mistakes do not amount to deliberate indifference. *Farmer*, 511 U.S. at 835 ("deliberate indifference describes a state of mind more blameworthy than negligence"). Even mistakes rising

---

[11] In fact, there is no disagreement. Rsp. at 271, 273 (2013 recommendations include that Mostafa wear his prostheses and that regular toothbrush and push-button-activated shower were adequate).

to the level of malpractice—which cannot be inferred from the facts here—state no claim. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Mostafa has alleged no facts showing the obduracy, wantonness, and malicious intent required to satisfy the subjective element. *See Wilson v. Seiter*, 501 U.S. 294, 299 (1991). The Court's analysis can end here, but the claim has other fatal defects.

   ***No objectively inhumane conditions.*** No facts support an inference that Mostafa is housed in an inhumane manner: BOP stands ready to fabricate new prostheses; Mostafa lives in a large, custom-built cell; and he has been examined by BOP's top rehabilitation expert—who found that Mostafa's prostheses "allow him to function independently and effectively at the ADX." ECF No. 96-5 at 10 ¶ 26. Mostafa has not alleged the deprivation of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 835; Mot. at 18-19. The claim fails on this basis, too.

   **B. Mostafa has not established subject-matter jurisdiction.**

   Mostafa's refusal consistently to use the prostheses he has, or to accept the outstanding offer of new ones, ECF No. 96-6 at 6 ¶¶ 15-19, prevents him from establishing a redressable injury sufficient to confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). His assertion that the new, yet-unbuilt prostheses will not work, Rsp. at 50, is mere speculation, which is insufficient to carry his burden in the face of testimony from a medical expert who has verified that prostheses allow Mostafa to accomplish the basic activities of daily living at ADX. ECF No. 96-5 at 9 ¶ 23 ("reported lack of independence is a result of underutilization of his prostheses").

   Any order this Court could issue necessarily would include a directive that BOP provide prostheses that are appropriate for Mostafa, but there is no need for such an order. Mostafa "cannot manufacture standing" by engaging in self-sabotage and refusing relief that is the *sine qua non* of functionality for a person without hands. *Clapper*, 568 U.S. at 416 (rejecting standing based on

self-inflicted harm and "fears of hypothetical future harm that is not certainly impending"). Mostafa lacks standing to pursue Claim 2.

## III.   The Court should not imply a *Bivens* remedy (Claim 3). Mot. at 21-27.

The sound reasoning underlying the directive in *Abbasi*—that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," 137 S. Ct. at 1857—is emphasized in Mostafa's excessive force claim against Officers Garduno, Averitt, and Parry. His core argument now is that a medical record he incorporated into his complaint—which he previously called "a proper hunger strike assessment" that was conducted just a few hours after the alleged excessive force, *see* SAC at 19—has been "falsified." *See*, *e.g.*, Rsp. at 52, 55-56. That new, wholly conclusory allegation emphasizes how Mostafa will turn on a dime to keep alive claims that threaten the personal financial stability of correctional officers who must interact with him every day. This Court should refuse to imply a damages remedy that stands to interfere with sound correctional decision-making.

### A.   The context is new, and Mostafa has alternative remedies.

Mostafa claims to dispute that the context here is new, *see* Rsp. at 55, but he does not explain how it bears any similarity to the three cases in which the Supreme Court has recognized a *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1859. Neither does he refute that other remedies are available. He doesn't even mention the alternative damages remedy under the FTCA, nor does he dispute that the Court might fashion some form of injunctive relief, such as "an injunction requiring the warden to bring his prison into compliance with the regulations" governing uses of force. *See id.* at 1864. Indeed, Mostafa acknowledges that he has other remedies, which he has used. Rsp. at 56. (discussing administrative remedy process and complaint to Office of Inspector General). Even if these remedies are not "perfectly congruent" with a *Bivens* remedy, there is no dispute that

alternative remedies are available to Mostafa. *Minneci v. Pollard*, 565 U.S. 118, 129 (2012).

The existence of other remedies puts an end to Mostafa's damages demand, but other special factors also require the rejection of a judicially-created damages remedy in this case.

### B. The "falsification" claim exposes the risks of implying a damages remedy here.

Mostafa's new take on the hunger strike assessment incorporated into the complaint emphasizes why the Court should reject a damages remedy against ADX officers who bear the brunt of managing Mostafa's daily confinement. That contemporaneous document, prepared by a BOP medical professional who personally examined Mostafa—and that is marked with the day, hour, and minute it was entered into the electronic medical records system, ECF No. 96-6 at 33— states that Mostafa reported that *he* self-inflicted an abrasion on his stump and streaked blood across his cell on the day the officers allegedly used excessive force. *Id.*

Now, Mostafa claims, in entirely conclusory fashion without supporting facts, that this record is "falsified." *See*, *e.g.*, Rsp. at 52. And the obvious ease with which he mounted that charge emphasizes the point that implying a personal-capacity damages remedy here would incentivize him to manufacture excessive force claims. Mot. at 26-27. His readiness to claim "falsification" of a BOP record chronicling his own contemporaneous statements—a record written by a medical provider who had no involvement in the use of force—demonstrates the lengths to which he will go to pursue a claim against officers on whom he has set his sights. Officers Garduno, Parry, and Averitt must anticipate that they will forever tilt at windmills as Mostafa's story evolves to suit his ends. For years of litigation, the financial cloud of a lawsuit will hang over the heads of these officers and their families, who may be hampered in completing such common tasks as refinancing a mortgage or buying a car—a victory for a terrorist who has urged jihad against the United States.

17

The risks of approving money damages claims extend beyond those faced by the individual officers themselves. The desire to avoid being hamstrung by Mostafa's lawsuits may affect the judgment of all correctional staff, who might refrain from taking necessary action or attempt to avoid him altogether. *See Abbasi*, 137 S. Ct. at 1863. As the trial court recognized on remand of the claim in *Abbasi*, the impact of a damages remedy on prison officials imposes "adverse effects on investigations of correctional officer abuse," as well as "create[s] substantial costs, in the form of defense and indemnification." *Turkmen v. Ashcroft*, No. 02-CV-2307 (DLI) (SMG), 2018 WL 4026734, at *9 (E.D.N.Y. Aug. 13, 2018). The Court should defer to Congress, which is in the best position to determine whether to provide such a remedy, balancing the costs and the harms. Congress has created no such remedy, even though it comprehensively evaluated prison litigation in the Prison Litigation Reform Act. This Court also should decline to do so.

The negative consequences of manufacturing a *Bivens* remedy for Mostafa's claim, where Congress chose not to create such a remedy, are on full display here. His claim falls far outside the narrow range of cases in which a federal employee can be held personally responsible for damages.

## IV. The claim about risks of Covid from food presentation fails (Claim 5). Mot. at 27-29.

Nothing in Mostafa's cursory treatment of this claim, *see* Rsp. at 57-58, shows that he has met his burden to plead that the manner in which he receives his food constitutes inhumane treatment in violation of the Eighth Amendment.

***Objective element not alleged.*** Mostafa has not alleged that he faces a risk of contracting Covid—where he is fully vaccinated and where BOP's myriad protective measures have resulted in no H Unit inmate being diagnosed with the virus—so great as to deprive him of the minimal civilized measure of life's necessities. *See* Mot. at 28-29. He argues that he brought the claim

"during the rage of Covid" and before he had the vaccine, Rsp. at 58, but for this official-capacity claim, he must plead that he *currently* faces an objective deprivation that can be remedied by a court order. *Farmer*, 511 U.S. at 846-47 (injunctive relief must be based on current "attitudes and conduct"). None of his allegations support that he faces a serious risk of Covid from his food.[12]

*Subjective element not alleged.* Neither has Mostafa alleged that any BOP official was aware of facts permitting them to infer that he faced a substantial risk of contracting Covid from his food trays and actually drew that inference—which would have been impossible, given that such facts do not exist. *See* Mot. at 29. No official is alleged to have possessed culpable intent amounting to criminal recklessness. *Farmer*, 511 U.S. at 837, 839. The claim fails.

## V.      The bandage claim cannot proceed (Claim 5). Mot. at 30-33.

Mostafa contends that a BOP medical provider failed to "secure or fit" a bandage on one occasion nearly three years ago. SAC at 31 ¶ 9. He points to nothing in his response, *id.* at 59-60, sufficient to overcome the defects in both jurisdiction and pleading that require dismissal of this injunctive-relief claim. ECF No. 60 at 35 (limiting claim to official-capacity claim).

*Mostafa has failed to carry his burden to establish jurisdiction.* The record of Mostafa's encounter with a BOP medical provider on October 20, 2018, shows that he had only a superficial abrasion, which was so insignificant he declined to have it bandaged. ECF No. 96-6 at 31. Mostafa has failed to establish that he has any certainly impending, redressable injury that is sufficient to confer standing. *Clapper*, 568 U.S. at 409. Neither has he shown that any potential complaint about

---

[12] Mostafa's arguments have nothing to do with this issue. Rsp. at 57-58 (arguing about disciplinary "ticket" and water temperature in his cell). To the extent he now wants to litigate about commissary purchases, *id.* at 58, he has no constitutional right to purchase food from a prison commissary. *Leatherwood v. Rios*, 705 F. App'x 735, 738 n.3 (10th Cir. 2017).

a wound not being bandaged in the future is sufficiently ripe to be litigated now. *See* Mot. at 31-32.

       ***Mostafa has not alleged deliberate indifference.*** Even if Mostafa had not failed to establish subject-matter jurisdiction, his claim fails because he has not alleged either the objective or subjective elements of deliberate indifference. Mot. at 32-33. At best, Mostafa has alleged a single instance in which a medical provider disagreed with Mostafa's apparent self-diagnosis that a cut on his arm was sufficiently serious to require placement of a bandage—although the provider gave Mostafa a bandage anyway. Rsp. at 59 (new allegation that provider threw bandage at Mostafa). This isolated incident, which Mostafa does not alleged caused anything but temporary discomfort, is far from an "extreme deprivation" that implicates the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Whitington v. Ortiz*, 307 F. App'x 179, 187 (10th Cir. 2009).

       Equally deficient is Mostafa's pleading on the subjective prong because he has not alleged that the provider acted with criminally reckless intent in evaluating Mostafa and deciding how to respond to his complaint. Mostafa's main point reduces to his dislike of the provider's question, inquiring "why" Mostafa cut his hand. Rsp. at 60. But that simple question, even if Mostafa felt insulted, evinces no criminally reckless intent, supporting as it does the equally plausible inference that the provider simply sought to understand what happened. Mostafa's bandage claim fails.

       In conclusion, the Court should dismiss all remaining claims.

Respectfully submitted on August 27, 2021.   MATTHEW T. KIRSCH
                                   Acting United States Attorney
                                   *s/ Susan Prose*
                                   Susan Prose, Assistant United States Attorney
                                   1801 California Street, Suite 1600
                                   Denver, Colorado 80202
                                   Tel: (303) 454-0100
                                   Email: susan.prose@usdoj.gov
                                   Counsel for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on August 27, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

B. Willms
Senior Attorney
Federal Bureau of Prisons

and I hereby certify that I have directed personnel in the U.S. Attorney's office to mail the foregoing, with copies of the unpublished cases cited therein, to the following non-CM/ECF participant by U.S. Mail:

Mostafa Kamel Mostafa
#67495-054
Florence Admax
U.S. Penitentiary
Inmate Mail/Parcels
P.O. Box 8500
Florence, CO 81226

s/ *Susan Prose*
U.S. Attorney's Office

21