# Exhibit 3

Case 1:07-cv-02697-MSK-BNB Document 398 Filed 06/17/14 USDC Colorado Page 1 of 45
Case No. 1:20-cv-00694-BNB-MSK Document f68-3 filed 12/26/21 USDC Colorado page 1 of 2
of 46

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Honorable Marcia S. Krieger

Civil Action No. 07-cv-02697-MSK-BNB

**KHALFAN KHAMIS MOHAMMED,**

      **Plaintiff,**

**v.**

**ERIC HOLDER, The U.S. Attorney,**
**HARLEY LAPPIN, Director of B.O.P.,**
**RON WILEY, ADX Warden, and**
**HARRELL WATTS, Administrator of National Inmate Appeals, and**
**FEDERAL BUREAU OF INVESTIGATION,**

      **Defendants.**

---

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

---

**THIS MATTER** came before the Court for a bench trial on May 5 to May 8, 2014.
Having considered the evidenced and arguments presented, the Court makes the following
findings of fact and conclusions of law, as well as resolving (implicitly, if not explicitly) the
remaining pending motions in this matter (**# 343, 352, 354, 359, 367, 387**).

### BACKGROUND[1]

Mr. Mohammed is a terrorist currently serving a sentence for his participation in the
bombing of the U.S. embassy in Tanzania. He is housed at the Federal Bureau of Prisons'
("BOP") Administrative Maximum facility ("ADX") in Florence, Colorado. He objects to

---

[1] The Court offers only a brief substantive and procedural background here, making more
elaborate factual findings as part of its analysis. Mr. Mohammed commenced this action *pro se*
in 2007, challenging various aspects of his confinement. Counsel was appointed to represent him
during the pretrial phase. Through various dispositive motions, all but one of Mr. Mohammed's
claims were dismissed or resolved.

certain Special Administrative Measures ("SAMs") imposed upon him.  SAMs are imposed

pursuant to 28 C.F.R.. § 501.3(a), which provides that the Attorney General of the United States

may direct the BOP to "implement special administrative measures" upon the Attorney General's

conclusion "that there is a substantial risk that a prisoner's communications or contacts with

persons could result in death or serious bodily injury" to others.  These special measures "may

include . . .  limiting certain privileges, including, but not limited to, correspondence, visiting, . . .

and use of the telephone."  *Id.*  The SAMs at issue limit Mr. Mohammed's communications with

members of his family and his friends.  Mr. Mohammed contends that these restrictions violate

his rights to freedom of speech and freedom of association guaranteed by the First Amendment

to the United States Constitution.

## ISSUES PRESENTED

There are several issues to be resolved.  First, the Court must define the nature of Mr.

Mohammed's claim and the standard of review.  Second, the Court must determine the scope of

evidence to be considered.  Finally, the standard of review must be applied to the applicable

record.

## ANALYSIS

### A.  Standard of review

The first difficulty faced by the Court is defining the precise character of Mr.

Mohammed's claim.  Originally, he asserted claims with regard to his detention both against

individuals and agencies—the BOP and FBI.  In his closing arguments at trial, he clarified that

he asserts his claims only against the named Defendants in their official, not individual,

capacities and that he seeks no monetary relief, only prospective injunctive relief.

The Court had assumed Mr. Mohammed's claims were in the nature of those arising under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), which recognizes "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Correctional Serv's. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). Although sometimes described as a federal analogue to 42 U.S.C. § 1983, *see e.g. King v. Federal Bureau of Prisons*, 415 F.3d 634, 636 (7th Cir. 2005), these type of claims are actually narrower.  The United States Supreme Court in *Malesko*, expressly noted that Bivens type claims had been recognized in alleged violations of the 5th Amendment's Due Process clause and the 8th Amendment's Cruel and Unusual Punishments clause.  534 U.S. at 519-20.  It emphasized that these extensions were intended to "provide an otherwise nonexistent cause of action against *individual officers* alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked *any alternative remedy* for harms caused by an individual officer's unconstitutional conduct," and cautioned that "we have consistently refused to extend *Bivens* liability to any new context or new category of defendants."  *Id.* at 521 (emphasis in original). The 10th Circuit has "note[d]" the Supreme Court's narrow construction of *Bivens* in subsequent opinions.  *See e.g. Reyes v. Sedillo*, 222 Fed.Appx. 753, 754 (10th Cir. 2007).  In light of Mr. Mohammed's clarification in his closing arguments, the Court agrees that *Bivens* is not applicable.

Mr. Mohammed argues that his claims arise under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*  That statute grants a right of action to "a person suffering legal wrong because of agency action."  5 U.S.C. § 702.  Under the APA, a court may "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right."  5 U.S.C. § 706(2)(A), (B).  APA

claims are limited to those "seeking relief other than money damages" and may only be brought against federal officers in an *official* capacity. 5 U.S.C § 702. (This would necessarily require the dismissal of Defendants Wiley and Watts, who are not officers of a federal agency amenable to suit under the APA.)

Treatment of Mr. Mohammed's claims as an APA challenge is a colorable approach, but not an exact fit. Imposition of SAMs is an administrative decision made pursuant to 28 C.F.R. § 501.3(a). But, there are several administrative entities involved in the creation, adoption and enforcement of the SAMs. The decision to impose, modify, and maintain SAMs against Mr. Mohammed is made by the FBI. Its recommendation was considered and approved by the Department of Justice's Office of Enforcement Operations ("OEO"), which then directed the BOP to enforce the SAMs.

There is some suggestion that an administrative review of SAMs is appropriate in the provisions of 28 C.F.R. § 501.3(e). It directs inmates subject to SAMs, such as Mr. Mohammed, to "seek review of any special restrictions imposed . . . through the Administrative Remedy Program, 28 CFR part 542." The referenced Administrative Remedy Program is the process for challenging BOP policies, however it does not reach to decisions made by the FBI and OEO. Thus, the Court finds that administrative type of review under the APA is appropriate,[2] but because it was not the BOP that made the decisions to implement the SAMs that are challenged, the Court will examine the sufficiency of the FBI/OEO's decisionmaking.

An APA review is "very deferential to the agency," presuming that the agency's action is valid and permissible. This places the burden on Mr. Mohammed to defeat that presumption. *Council Tree Investors, Inc. v. FCC*, 739 F.3d 544, 555 (10th Cir. 2014). The Court reviews legal

---

[2] *See Royer v. Federal Bureau of Prisons*, 933 F.Supp.2d 170, 180-82 (D.D.C. 2013).

4

questions *de novo*, but as to matters confined to the agency's discretion, the Court merely considers whether the agency has abused that discretion, as the Court "is not to substitute its judgment for that of the agency." *Id.* To establish that a decision is "arbitrary and capricious," Mr. Mohammed must show that "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, ordered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* To the extent Mr. Mohammed alleges that the Defendants' actions are "contrary to law" because they violate his First Amendment rights, the constitutional analysis is controlled by *Turner v. Safley*, 482 U.S. 78 (1987), and its progeny.

*Turner* recognizes that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it reasonably related to legitimate penological interests." *Id.* at 89; *see Beard v. Banks*, 548 U.S. 521, 528 (2006) ("imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment. But at the same time the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere"). *Turner* identifies four factors that inform that inquiry: (i) there must be a valid and rational connection between the regulation and the legitimate governmental interest put forward to justify it (put differently, the regulation may not be based on arbitrary or irrational goals)[3]; (ii) whether there are alternative means of exercising

---

[3]     *Turner* expressly noted that, where the regulation impinges on an inmate's First Amendment rights, the Court should also consider whether it "operates in a neutral fashion, without regard to the content of the expression." Although the record reflects that Mr. Mohammed was briefly subject to a content-based SAMs restriction (one that limited his ability to communicate with certain members of his family to those matters having a connection with this litigation), the current SAMs he challenges operate in a content-neutral manner.

Case No. 1:20-cv-00654-RNB-MDB Document 68-3 filed 12/26/21 USDC Colorado pg 7 of 7
Case 1:07-cv-02697-MSK-BNB Document 309 Filed 06/17/14 USDC Colorado Page 6 of 45
of 46

the right; (iii) the impact that accommodation of the asserted right would have on other inmates,

guards, and on the allocation of prison resources generally; and (iv) the presence or absence of

ready alternatives to the regulatory path chosen. *Id.* at 89-90. The inmate bears the burden of

persuasion on these factors. *Beard*, 548 U.S. at 529.

## B. The evidence to be considered

The first question with regard to the evidence presented is whether Mr. Mohammed's

background and history is relevant. The Defendants contend that the particular SAMs that are at

issue are justified because Mr. Mohammed is a terrorist and his behavior continues to

demonstrate his risk to the United States. As is set out more fully later in this opinion, there is no

issue as to whether Mr. Mohammed has properly been subjected to SAMs.[4] The question is

whether the specific SAMs imposed were arbitrary and capricious. Thus, the Court will consider

the following background information only insofar as it bears on the particular SAMs at it issue.

Mr. Mohammed was one of several conspirators affiliated with the terrorist group al-

Qaeda that participated in the bombing of the U.S. Embassy in Dar es Salaam, Tanzania on

August 7, 1998, resulting in the deaths of 11 people. After the bombing, using an alias provided

by a friend, Mr. Mohammed fled to South Africa. The FBI's criminal investigation into the

---

[4]     A large amount of the evidence offered at trial concerned reasons for the FBI's
imposition, modification, and renewal of Mr. Mohammed's SAMs, generally. For example, FBI
Agent Robert Moen contended that Mr. Mohammed was engaged in a variety of actions "straight
out of the al Qaeda playbook," such as leading hunger strikes, making false allegations against
the BOP, and generally disparaging prison officials, all with the purpose of consuming federal
resources and "radicalizing" others against the United States. The Defendants also put on
evidence that Mr. Mohammed had attempted to evade his SAMs on one occasion by having his
sister forge return addresses in order to send him certain books, and that Mr. Mohammed refused
to cooperate with the FBI in various other respects. These incidents were apparently offered to
explain why Mr. Mohammed continued to remain under SAMs, but, as the discussion below
makes clear, the Defendants never specifically cited to any of these events as justifying the
<u>particular</u> SAMs restrictions that Mr. Mohammed challenges.

embassy bombing discerned Mr. Mohammed's involvement, and the FBI alerted South African Immigration authorities about Mr. Mohammed.  South African officials arrested Mr. Mohammed in October 1998.  Thereafter, he was indicted in the United States on various offenses relating to the embassy bombing.

In October 1999, FBI Agent Abigail Perkins traveled to South Africa and interviewed Mr. Mohammed.  Mr. Mohammed admitted his participation in the bombing. He also explained that, in 1994, he had attended an al-Qaeda training camp in Afghanistan where he received training in the use of weapons and explosives, religious training, and instruction on operational and logistical issues.[5]  He stated that he was instructed about a *jihad* against the United States and stated that "according to his study of Islam, it was his responsibility to be involved with the bombings."  Ms. Perkins asked him whether, if he had not been apprehended or if he were to be released from custody, he would continue to participate in other terrorist activity.  According to Ms. Perkins, Mr. Mohammed responded that "he would continue on if he could, and he hoped that others continued on in his stead now that he had been arrested."

Mr. Mohammed was extradited to the United States and tried on various charges in the Southern District of New York.  On May 29, 2001, he was convicted on numerous charges and sentenced to life in prison.  *See generally U.S. v. Bin Laden*, 92 F.Supp.2d 225, 227-232 (S.D.N.Y. 2000) (background information); *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93 (2d Cir. 2008) (affirming convictions).

As explained by FBI Agent Robert Moen, the purpose of imposing SAMs on inmates like Mr. Mohammed is "to try to prevent the dissemination or even receipt of messages that would cause harm . . . whether that's messaging going out [from the inmate] that might inspire attacks

---

[5]     Mr. Mohammed subsequently attended a second terrorist training camp, where he was assigned the role of a trainer.

or whether it's messages coming in that might tend to further radicalize the inmates, making them more difficult for the [BOP] to handle."

Inmates subject to SAMs in ADX are placed in the "Special Security Unit Program." That program has several phases with increasing privileges, and inmates move through the phases based on various criteria (most notably, by means of good behavior). At present, Mr. Mohammed is at Phase Two of the program, which entitles him to two[6] social telephone calls per month, with each call limited to no more than 15 minutes.

SAMs are imposed for a one-year period, and are reviewed annually for possible renewal. 28 C.F.R. § 501.3(c). The FBI initiates each annual renewal, first seeking input from the agent in the Colorado Springs office responsible for the day-to-day monitoring of Mr. Mohammed's telephone calls and mail correspondence, from other agents involved in the National Joint Terrorism Task Force, and from a representative of the U.S. Attorney's Office from the Southern District of New York familiar with the embassy bombing and criminal case against Mr. Mohammed. The FBI also seeks some limited information from the BOP, but only as to certain administrative matters, such as whether the inmate had any prison disciplinary actions or medical conditions that were of note; the BOP's recommendations regarding whether SAMs should be modified or continued are not generally given significant weight. (Indeed, the record reflects that, to some extent, the BOP believes that restraints on Mr. Mohammed's ability to communicate with his family are counterproductive to its penological mission.) The FBI then drafts a recommendation regarding the SAMs renewal or modification and forwards it to the OEO. The OEO's representative testified that the OEO does not conduct any independent

---

[6]     It appears that the BOP has some latitude in enforcing this restriction. Mr. Mohammed testified that he is usually permitted three phone calls per month, and there is some suggestion that extra phone calls are permitted during certain holiday periods.

investigation of the issues; its review is guided entirely by the contents of the FBI's
recommendation letter. The OEO approves the recommendation,[7] then submits the request for
renewal or modification to the Deputy Attorney General for final approval. The record does not
reflect whether the Deputy Attorney General then engages in any significant review of the
merits, or whether his signature is given as a mere formality. In any event, once approved by the
Deputy Attorney General, the SAMs are then provided to the BOP with the instructions to
implement them.

      Mr. Mohammed was initially placed under SAMs in 1999. His SAMs have contained
(and continue to contain) a variety of restrictions, most of which are not particularly pertinent.
There are three categories of restrictions that he challenges.

      First, Mr. Mohammed was permitted to make telephone calls of a social nature (*c.f.*
telephone calls with his attorney or in furtherance of legal or administrative proceedings) only to
certain, specifically-identified individuals. From 1999 to approximately 2001, he had fairly
broad telephone contact with immediate and extended family and friends. However, upon his
arrival at ADX in 2001, his telephone contacts were limited to his "immediate family," a term
defined as his "parents, siblings, spouse, and natural children." Mr. Mohammed has no spouse
or children, and his father is apparently deceased; thus, his "immediate family" consists of his
mother and his eight siblings. This provision was modified slightly in or about 2010, allowing
Mr. Mohammed to have telephone calls with four additional non-immediate family members.
All of Mr. Mohammed's telephone calls are monitored in real time by an FBI agent and/or a FBI
designated linguist (for calls conducted in languages other than English, which essentially all of

---

[7]      Although he bristled at the characterization of OEO as just a "rubber stamp," Mr.
O'Brien acknowledged that the OEO had never rejected a recommendation by the FBI for
approval of a renewal or modification of SAMs for any inmate.

Mr. Mohammed's are) and are recorded for future review. The linguist or agent are authorized to immediately terminate a telephone call if they believe that information harmful to national security is being conveyed, although it is undisputed that there can be a brief delay before the order to terminate a call is effectuated.

Second, the SAMs restrict Mr. Mohammed's ability to receive in-person social (*i.e.* non-attorney) visits. The restrictions on those who may visit Mr. Mohammed essentially parallel the restrictions on his telephone communications: he is permitted in-person visits only from his "immediate family" members or the additional persons specifically cleared for visitation, and all visits are contemporaneously monitored and their audio recorded.[8] The visits are "non-contact," with a pane of glass separating Mr. Mohammed from his visitor and the parties communicating by telephone handsets.

The third category of SAMs at issue concerns the processing of Mr. Mohammed's social mail correspondence. For the bulk of the relevant time period, the SAMs have provided that the FBI would have up to 60 business days to translate and review Mr. Mohammed's incoming or outgoing mail correspondence to determine whether that correspondence poses any security risks. After that review has been satisfactorily completed, the FBI returns the correspondence to the BOP, who either supplies it to the U.S. Postal Service for delivery to its addressees (for outgoing mail) or provides it to Mr. Mohammed (for incoming mail). Until 2005, Mr. Mohammed was essentially unrestricted in the scope of persons with whom he could communicate by mail; since 2005, his mail correspondence has been limited to his immediate

---

[8]     Due to a variety of factors, including distance and cost, difficulties with immigration authorization, and Mr. Mohammed's own discouragement, no one in Mr. Mohammed's immediate or extended family has attempted to visit him since his trial.

family, although, as discussed below, more recent modifications have allowed him to have mail contact with certain additional individuals.

As noted, Mr. Mohammed has received extensive training as a terrorist and was found guilty of participating in a bombing that caused nearly a dozen deaths and scores of injuries.  He also played a role in another inmate's assault on a Corrections Officer.  Although Mr. Mohammed now denies any desire to be involved in "*jihad*" against the United States, and the Defendants are unable to identify anything but the most minor and seemingly harmless violations of SAMs by Mr. Mohammed over the past 15 years, the Court will nevertheless defer to the FBI's experience and knowledge in such matters and assume, consistent with his 1999 statements to Ms. Perkins that he would still attempt to support and assist anti-U.S. terrorist organizations overseas in any way possible, were an opportunity to do so to present itself.[9]  The Court also accepts, at face value, the FBI's belief that Mr. Mohammed is a highly intelligent person, that the passage of time has not necessarily blunted his enmity towards the United States, and that the al Qaeda-affiliated terrorist group al-Shabaab is active in Tanzania (although that group did not come into existence until after Mr. Mohammed had been imprisoned).  In short, the Court will operate on the assumption that Mr. Mohammed still poses, at least in the abstract, a considerable risk of harm to the United States.

At the same time, the Court also finds that granting Mr. Mohammed the maximum permissible opportunity to have contact with his family (both immediate and extended) and

---

[9]    That being said, the Court is utterly unpersuaded by Mr. Moen's contentions that Mr. Mohammed's engaging in hunger strikes, making false accusations against BOP or its staff, and his disparaging of the U.S. or the BOP in communications with others are reflective of his efforts to wage a continuing *jihad* against the U.S.  The examples given by Mr. Moen of such conduct by Mr. Mohammed are entirely mundane and indistinguishable from the sorts of behavior that this Court sees from ordinary inmates (*i.e.* those who have not received training "out of the al Qaeda playbook") on a near-daily basis.

friends serves important social and penological goals. Mr. Mohammed, obviously, retains a strong personal interest in preserving communications with his family and friends, notwithstanding his life sentence. The BOP has expressly stated that it encourages inmates to maintain social ties with family and friends, as it "has a positive impact on his or her incarceration period" and increases "their ability to serve their sentence in a peaceful, meaningful way." And, as a matter of societal interests, the First Amendment to the U.S. Constitution strongly discourages restraints on Mr. Mohammed's ability to communicate with his family and friends.

The Court carefully limits itself to evaluating Mr. Mohammed's specific challenges to specific components of his SAMs. The Court is not considering whether SAMs in general are permissible or useful, whether Mr. Mohammed should be subject to them, or whether it is fair or unfair that other inmates are or are not subject to similar SAMs as Mr. Mohammed. Moreover, the Court gives no consideration to the components of the SAMs other than those being challenged by Mr. Mohammed, nor does it consider any other aspects of Mr. Mohammed's confinement.

The second source of evidence to consider is classified information that the Defendants submitted to the Court *in camera* in the discovery process, rather than during trial.

The Defendants have consistently contended that many matters relating to the 1999 embassy bombing, the investigation into it, the prosecution of Mr. Mohammed, and other matters relating to the imposition and maintenance of his SAMs all involve certain items of classified information. In response to this litigation, the Defendants have sought to have some of that information de-classified so that it could be presented publicly, and indeed, much of the

documentary evidence produced at trial appears to be formerly-classified records that are now unclassified.

Throughout the trial, however, defense counsel repeatedly raised objections and sought instructions to witnesses that they limit their testimony so as to not reveal any classified information. At times, this instruction left witnesses only able to testify about certain matters in general terms; at other times, witnesses acknowledged that they could not answer certain questions at all without revealing classified information.

At the close of trial, the Court asked defense counsel to "confirm . . . that you are not relying on, and you do not want me to consider any information that is a state secret." Defense counsel initially agreed that "we would not be relying on that material," but stated that if the Court were to "conclude that the unclassified record . . . is not sufficient to support the SAMs of Mr. Mohammed, I think the Government would request the opportunity at that point to provide briefing to the Court on the consequences of removal of that classified information, and the extent to which that information would provide the government with a valid defense." The Court expressed some doubt about the proposition that "you get a second bite at the apple," but invited defense counsel to address the issue more fully in closing arguments.

At closing arguments, defense counsel again stated that "the government is not relying on classified information or classified evidence at trial, is not relying on classified evidence now, and does not intend to rely on classified evidence in the future to prevail on the merits of plaintiff's claim." However, when the Court inquired as to what would happen if the Court were to conclude that the unclassified record warranted a judgment in Mr. Mohammed's favor. Defense counsel stated that "at that stage, the Court would need to consider the effect that the exclusion of the privileged classified information has on the court's ability' to enter

judgment" — in other words, that the Court "would need to consider the classified excluded information" in order to evaluate whether the classified information would alter that conclusion. The Court asked whether the Defendants had "supplied to the Court all of the information that you believe is subject to the state secrets doctrine that bears upon the issues presented to the Court." Defense counsel responded with references to certain declarations and supporting classified material that the Defendants had previously filed (**# 340, 376**) *ex parte* with regard to a discovery dispute, suggesting that "we still do believe that the specific information presented to the Court in [those] *ex parte* declaration[s] would need to be considered by the Court if and only if it goes to an issue on which the Court finds the unclassified evidence at trial insufficient." The Court asked what result would occur if the Court concluded that the Defendants' unclassified evidence produced at trial, plus the contents of the two *ex parte* declarations, still remained insufficient. Defense counsel responded that "in that event . . . I believe the answer would be judgment against the government."

When the Government invokes the state secrets privilege to exclude evidence of classified matters, "the privileged information is excluded and the trial goes on without it," to the detriment of whichever party the evidence would have favored. *See General Dynamics Corp. v. U.S.*, 131 S.Ct. 1900, 1906 (2011). Here, that detriment runs to the Defendants, who seemingly would rely upon classified information known to them to explain their justification for their otherwise seemingly-arbitrary decisions. Having objected to those facts being presented at trial, the Defendants may not now ask the Court to consider them in some *ex parte* capacity.

Arguably, the Defendants' request that the Court consider the material previously submitted *ex parte* appears to be invoking a procedure discussed in cases like *In re U.S.*, 872 F.2d 472, 476 (D.C. Cir. 1989). There, the court explained the potential ramifications of the

Government's successful invocation of the state secrets privilege.  Addressing the situation where the privilege impaired the Government defendant, the court explained that "summary judgment against the plaintiff is proper if the district court decides that the privileged information, if available to the defendant, would establish a valid defense to the claim." *Id.* at 476.  Although the Court has some doubt that the Defendants' invocation of this issue for the first time in closing arguments, referencing material that was never identified or tendered at trial, is a proper way to seek the "summary judgment" permitted by cases such as *In re U.S.*, the Court will nevertheless treat the Defendants' post-trial request that the Court consider the classified information as such a request for relief pursuant to Fed. R. Civ. P. 52.  The Court will address that request as part of its analysis of each of Mr. Mohammed's contentions.

## C. The SAMs challenged

There are three SAMs that Mr. Mohammed challenges – 1) his inability to orally communicate with his brother Nassor; 2) his ability to communicate with nieces, nephews and others; and 3) his inability to receive inspected mail during the time promised by the FBI. Consistent with the prior discussion, the Court reviews the rationale given and the process used for determining to impose these restrictions to determine whether they are arbitrary or capricious in light of the *Turner* standards.

## DISCUSSION

## A.  Oral communication with Nassor

As noted above, Mr. Mohammed was permitted to have telephone contacts and in-person visits with his "immediate family" — namely, his parents and siblings — from 2001 until approximately October 2009.  The record reflects that, during this time period, the FBI and BOP

understood that permission to include Mr. Mohammed having contact with his brother, Nassor.[10]

In or about October 2009, Mr. Mohammed was advised that he was no longer being permitted to make telephone calls to Nassor. Exhibit 15, an October 27, 2009 FBI memo to the BOP, instructs that "Due to national security concerns by the FBI, Inmate Mohammed's request for telephonic contact [with Nassor] is denied." (The memo provided that Mr. Mohammed would still be permitted to communicate by mail with Nassor.) It appears that the prohibition against Mr. Mohammed having telephone contact with Nassor was formalized as an explicit modification to the SAMs in or about January 2011 (although some witnesses testified that the modification occurred at some point in 2010).[11]

The record before this Court does not identify any clear precipitating event for the decision to revoke permission for Mr. Mohammed to make calls to Nassor in or about October 2009.[12] In other words, the Defendants have not contended that a specific SAMs violation by Mr. Mohammed in or around that time that justified the removal of Nassor from his list of permissible telephone contacts, or that the FBI had recently obtained some new, adverse information about Nassor in that time frame. It appears that the decision to revoke permission to

_____

[10]     As mentioned below, the record seems to reflect that Mr. Mohammed has only communicated by telephone with Nassor once, in January 2010. Nassor wrote a letter to Mr. Mohammed in 2000, but has not written to him since, nor has he responded to several letters Mr. Mohammed has written to him.

[11]     The modification also prohibited Mr. Mohammed from having in-person visits with Nassor.

[12]     Mr. Mohammed believes that the precipitating event for the change is the fact that, during a January 2010 telephone conversation between them, Nassor had expressed an interest in coming to visit Mr. Mohammed in person. Mr. Mohammed believes that the FBI terminated Nassor's ability to have telephone and in-person contact with him in order to prevent the visit from occurring. However, as noted above, FBI records indicate that oral contact with Nassor was terminated in 2009, prior to that telephone call.

communicate orally with Nassor was made by FBI Agent Christopher Johnson.  Mr. Johnson did

not testify, and the Court's understanding of Mr. Johnson's rationale is limited to another FBI

Agent, Robert Moen, attempting to interpret memoranda from Mr. Johnson discussing his

reasons.  (The memoranda themselves were discussed at trial but never offered for admission,

and thus, they are before the Court only to the extent referenced in Mr. Moen's testimony.)

Mr. Moen acknowledged that the reasons given by Mr. Johnson were "number one, [Nassor is]

not [Mr. Mohammed's] brother, and number two, he's suspected of providing substantial

assistance to [Mr. Mohammed] in obtaining a fraudulent passport or visa."  These matters require

some explanation.

In 1999, during the investigation into Mr. Mohammed's possible involvement in the

embassy bombing, FBI officials discovered a copy of a July 1998 (*i.e.* pre-bombing) letter that

Mr. Mohammed had faxed to Nassor, who was then living in Canada.  The letter made mention

of Mr. Mohammed's difficulties in obtaining a visa (to an unspecified destination); asked Nassor

to make contact with their other brother, Mohammed Mohammed, living in London; and

requested that Mohammed Mohammed make contact with Mr. Mohammed by August 6, 1999,

which happened to be the day before the embassy bombing occurred.  According to Ms. Perkins,

the letter also made some reference to "something very important for Mr. Mohammed to tell 'the

boys,' that he wanted to share with his brother, Mohammed in London," although neither

Ms. Perkins nor any other witness was able to say what the reference to "the boys" meant or

what information Mr. Mohammed had for them.  When FBI agents contacted Nassor in Canada,

he told them that his name was "Nassor Solomons," that he was adopted by Mr. Mohammed's

family as a young boy.  Both of these statements were lies.  Nassor admitted that he had received

the July 1998 fax, but stated that he had ignored its instructions.  Separately, FBI agents had also

discovered that, after the bombing, Mr. Mohammed had managed to escape to South Africa by obtaining passport and visa in the name of "Zharan Nassor Maulid Hussein." Based on these facts, FBI agents initially concluded that, given Mr. Mohammed's contact with Nassor about a visa in July 1998 and his use of the alias "Nassor," his brother Nassor had assisted in facilitating his post-bombing escape by providing him a false passport and visa.

Eventually, however, the FBI came to realize that this belief was mistaken. In actuality, Mr. Mohammed had used the birth certificate of a person named Nassor Maulid, a friend of Mr. Mohammed's in Tanzania, to obtain the false passport and visa in that name. The record does not clearly reflect precisely when the FBI realized its mistake, although Ms. Perkins testified that she interviewed Nassor a second time in 1999, this time in South Africa (where he had been deported after Canadian authorities determined his immigration documents were fraudulent). In that later 1999 interview, Nassor admitted that he was actually Nassor Mohammed, not "Nassor Solomons"; that he was Mr. Mohammed's blood brother, not adopted; and that he had received the July 1998 fax and had sent some money to Mr. Mohammed, but did not otherwise contact Mohammed Mohammed as instructed or otherwise respond to the fax. The record also reflects that Nassor Maulid was called as a witness in Mr. Mohammed's criminal trial, suggesting that the FBI was aware of Mr. Mohammed's connection to him as early as 1999.

Although the FBI realized by approximately 2010 that it had been mistaken about brother Nassor facilitating Mr. Mohammed's post-bombing escape, this realization did not prompt the FBI to return Nassor to Mr. Mohammed's list of permissible telephone contacts. Rather, the FBI maintained the prohibition on contact with Nassor, simply articulating different reasons for it. Agent Moen testified that, by January 2011, when the prohibition on telephone contact with Nassor was memorialized as an official part of Mr. Mohammed's SAMs, the FBI's justifications

for that action were now that: (i) Nassor had lied to the FBI about various matters when first

contacted in Canada in 1999; and (ii) Nassor may be "embittered" or "angry" towards the United

States because he may believe that the United States was responsible for him being deported

from Canada to South Africa, and then from South Africa back to Tanzania.[13]

Granting full deference to the knowledge and experience of the FBI, the Court finds that

the stated justification for prohibiting Mr. Mohammed from having telephone contact with

Nassor — that such contact poses a risk to national security because Nassor lied to FBI agents in

1999 and may be "embittered" towards the U.S. due to its involvement with his deportation from

Canada and South Africa — is arbitrary for several reasons.

First, the Court notes that these justifications are based on facts that have been known to

the FBI since 1999.  By the time Ms. Perkins conducted her second interview with Nassor in

South Africa in 1999, she knew that he had lied — about being "Nassor Solomons," about being

Mr. Mohammed's adopted brother, about the extent of his contacts with Mr. Mohammed prior to

---

[13]     Mr. Moen seemed to suggest that these were not "new" reasons for prohibiting contact
with Nassor, even though they had not been mentioned by Mr. Johnson in the memo outlining
the initial decision.  Mr. Moen explained that FBI memos justifying SAMs restrictions are not
intended to comprehensively address all of the reasons underlying the decision, but merely to set
forth just enough information to justify the recommendation, even if doing so results in relevant
supplemental information being omitted.

        The Court finds Mr. Moen's contention that the FBI had always considered these facts —
Nassor's untruthfulness and his perceived animosity towards the U.S. — as further supporting
Mr. Johnson's October 2009 decision to limit contact with Nassor to be incredible.  Mr. Moen
explained that when the FBI thought that Nassor had assisted Mr. Mohammed in escaping, "the
rest of the stuff is sort of irrelevant – not irrelevant, but less important if you have that fact."  He
went on to state that "had [Mr. Johnson] known that [brother Nassor allegedly assisting with Mr.
Mohammed's escape] wasn't the case, I would certainly hope he would have dug further in the
file or reached another conclusion."  The suggestion that Mr. Johnson should have "dug further
in the file or reached another conclusion" seems to suggest that Mr. Johnson's initial decision to
prohibit telephone contact with Nassor was not motivated, even tacitly, by concerns about
Nassor being untruthful in interviews or embittered towards the United States.  Otherwise, Mr.
Moen would have testified that Mr. Johnson need not have done anything differently, even if he
knew that Nassor had not actually assisted Mr. Mohammed in escaping.

the bombing — during her interview with him in Canada, and she also observed at that time that he was "angry" and "upset" at "having sort of lost everything that he had worked for," knowing he was going to be deported back to Tanzania.[14]  Despite having knowledge since 1999 of Nassor's untruthfulness, the FBI permitted Nassor to be on Mr. Mohammed's list of permitted telephone contacts from 2001 to 2009.  The Defendants have offered no explanation as to why facts that have been known to the FBI since the earliest days of Mr. Mohammed's SAMs and apparently deemed inconsequential suddenly justified restricting Mr. Mohammed's oral contacts with him in 2009.

Second, these justifications are facially implausible and inconsistent with how the FBI treats other members of Mr. Mohammed's family.  Ms. Perkins testified that, during the investigation into the embassy bombing, several members of Mr. Mohammed's immediate family — his brother Rubeya and his twin sister, among others — were arrested by Tanzanian police and charged with lying to authorities.[15]  Nevertheless, Mr. Mohammed retains the ability to have telephone contact with these individuals.  The Court can conceive of no colorable justification that suggests why Nassor's lying to FBI agents warrants prohibiting telephone contact with him, yet Rubeya's (or others') lying to Tanzanian officials does not warrant similar restraints.

---

[14]  Curiously, Ms. Perkins described Nassor as being "angry at the circumstances," but she did not "correlate that [anger] to an act of terrorism or enmity that . . . [Nassor] may have articulated with regard to America. . . I wasn't coordinating that to – that [Nassor] was going to go do a terrorist attack or bombing."  Asked if she thought Nassor posed a risk of committing terrorist attacks, Ms. Perkins stated that, at least as of 1999 when she last spoke to him, she "did not have information that suggested that . . . he was involved in terrorism."

[15]  *See also* Exhibit 162 (SDNY's 2013 concurrence in FBI's recommendation to continue SAMs, noting that "several members of Mohammed's family have lied to BFBI agents and other investigators") (emphasis added).

Similarly, Mr. Moen stated that he still has concerns about the extent of Nassor's involvement with Mr. Mohammed's post-bombing escape due, in part, to the July 1998 fax from Mr. Mohammed to Nassor. However, that same fax also implicated their brother Mohammed Mohammed — even more so than Nassor (who was apparently just being asked to relay a message to Mohammed Mohammed; Mohammed Mohammed was, in turn, being asked to make contact with Mr. Mohammed to receive further instructions). Moreover, as Ms. Perkins testified, the FBI has no concrete concerns about Nassor's involvement in terrorist activities, but when she was asked that same question about Mohammed Mohammed, the Defendants objected that answering that question might reveal classified information, and Ms. Perkins stated that she could not answer the question without doing so. Thus, by all appearances from the record, Mohammed Mohammed presents at least as much of a security concern as Nassor does, if not more, yet he remains on Mr. Mohammed's list of permissible telephone contacts while Nassor does not. In the absence of some clear explanation as to why the FBI is less concerned about the similarly-situated Mohammed Mohammed, the Court is left with the conclusion that the exclusion of Nassor from telephone contact, but not Mohammed Mohammed, is arbitrary.

Similarly, the FBI's suggestion that Nassor's anger or bitterness towards the United States is grounds to perceive him to be a national security threat is equally unpersuasive. The Court will assume that the FBI is correct and that Nassor is indeed embittered towards the United States for its role in bringing about his deportations back to Tanzania. But even with the broad deference the Court grants to the FBI's expertise in such matters, the FBI failed to articulate any facts that would warrant concluding that such bitterness is itself sufficient to render Nassor a national security threat. As noted above, Ms. Perkins stated that she was unable to "correlate" Nassor's anger with any apparent intention to engage in terrorism. No witness testified that

Nassor had received terrorist training, or that he engaged in any particular conduct or associated

with persons known to harbor terroristic inclinations (other than the fact that, Mr. Moen points

out, he and known terrorist Mr. Mohammed "gr[e]w up together"). Several FBI witnesses

professed a lack of knowledge as to whether Nassor was radicalized like Mr. Mohammed was,

nor could they even state with knowledge whether Nassor considered himself to be a Muslim.

(Mr. Mohammed testified that Nassor is a Muslim, but not a practicing one. He said his family

complains about Nassor's "pro-western behavior.")

The mere fact that Nassor might be "embittered" towards the U.S., without any other

evidence, is hardly grounds to justify restrictions on Mr. Mohammed contacting him by

telephone when it is entirely logical to assume that many of Mr. Mohammed's family members

are equally embittered towards the United States for its arrest and incarceration of their son and

brother.[16] For example, Agent Moen pointed to a 2012 letter to Mr. Mohammed from his sister,

Zuhura, in which she states that she "pray[s] for [him] who cannot even enjoy the pleasure of

reading the Quran." Mr. Moen testified that this was in response to an apparently fruitful attempt

by Mr. Mohammed to "radicalize" his sister against the United States by lying about the

conditions of his confinement, and that a claim of being denied access to the Quran is "a serious

affront to Muslims." Yet despite concrete evidence of far more recent "bitterness" towards the

United States by Zuhura, she remains on the list of persons whom Mr. Mohammed is permitted

---

[16]     Conversely, it may be logical to assume that some (or even much) of Nassor's anger
might be directed at Mr. Mohammed himself. "Pro-western" Nassor was apparently living
safely in Canada, until his extremist brother's involvement with the embassy bombing set in
motion a chain of events that led to attention being focused on Nassor, which in turn led to him
being deported from Canada and eventually back to Tanzania. This might possibly explain
Nassor's general refusal to have more than one telephone call with Mr. Mohammed in a decade
and his refusal to respond to Mr. Mohammed's letters.

to telephone while Nassor, whose bitterness towards the United States was merely inferred by

Ms. Perkins some 15 years ago, does not.

Although they are not found in any of the FBI memos setting forth the basis for

modifying or continuing Mr. Mohammed's SAMs,[17] Mr. Moen offered two additional

justifications for the decision to permit Mr. Mohammed to have only mail, not telephone, contact

with Nassor.  Mr. Moen points out that, although Nassor has the ability to send written

correspondence to Mr. Mohammed, he has not done so.  (Mr. Moen supposes that "Nassor

doesn't seem to want to [communicate] unless he can do it contemporaneously in a way that we

couldn't readily stop the communication," although this appears to be pure supposition by Mr.

Moen as to Nassor's motivations.)  Mr. Moen states that if Nassor "had communicated with his

brother via a series of letters,  . . . we could get a sense of who he is, what he's about, how he

communicates that would help us to approve [him]" for telephone contact.

Arguably, if the FBI is articulating a position that it did not generally approve persons for

telephone correspondence until they had an established track record of written correspondence

with a SAMs inmate, the Court might find this justification to have merit.  There is support in the

record for the FBI's contention that real-time oral communication poses greater security risks

than written correspondence, it being easier to stop delivery of a mail message that it is to

process a security threat in a telephone call (particularly one that depends upon a translator to

---

[17]    The Court has concerns about Mr. Moen's statement that his recommendation letters
simply recite that information that he deems enough to justify the recommendation.  Doing so
deprives reviewing entities, such as the OEO and this Court, of a full understanding of the
reasons for the decision.  Typically, APA reviews are limited to the administrative record itself.
*See Kappos v. Hyatt*, 132 S.Ct. 1690, 1696 (2012).  If, as Mr. Moen contends, renewal or
modification letters fail to set forth a full statement of the FBI's reasons for its recommendation,
the "true" reasons for the recommendation will thus not be apparent on the face of the record
itself.  This, in turn, raises the specter that the "stated" reasons for the agency's actions are not
actually its "true" reasons.

perceive of the threat and act to terminate the call). And the Court might even accept the premise that knowledge of an inmate's normal communication patterns, gleaned from written correspondence, makes it easier to detect harmful messages later conveyed via telephone — *i.e.* because they stray into atypical subject matter or involve reference to a heretofore unknown person or idea.

But these arguments spring from the premise that a history of harmless mail correspondence is necessary to dispel a <u>legitimate</u> concern that the correspondent poses a significant security risk. As explained above, the FBI simply has not shown that its vague and unsupported concerns about Nassor have any demonstrable basis in fact, and that they warrant treating him as a greater risk than Mr. Mohammed's other siblings or his in-laws. As Paul O'Brien, former OEO Director, explained, all SAMs begin from a standardized template that permits telephonic contact with "immediate family," including siblings like Nassor. Mr. O'Brien stated that immediate family are "presumed to have ability to have telephone contact," and Mr. Moen stated that "there is a preference for [permitting telephone contact with] immediate family." Mr. Moen went on to explain that "it's our assessment that family has more to lose, if you will, by violating the terms of the SAMs . . . his mother enjoys talking to him once, twice, whatever it is per month, and would be more reluctant to breach the SAM and be removed from it [by engaging in acts against the United States] than, say, one of his buddies he knew from a terrorist training camp." Like Mr. Mohammed's other siblings, Nassor falls into the "presumptive" zone of family members who have a greater interest in talking to him and "more to lose" by breaching the SAMs than non-relatives, yet the FBI offers no colorable justification for not extending that same presumption of harmlessness to Nassor. There is no showing that the FBI required other members of Mr. Mohammed's immediate family — his mother, his sisters,

Mohammed Mohammed — to establish a "track record" of written communication before they would be permitted to telephone him.  Accordingly, even assuming that the FBI actually asserted the "absence of a track record of written communication" as a justification for revoking the privilege of oral contact with Nassor, the Court finds that justification to be arbitrary as well.

Mr. Moen's second unwritten justification for restricting telephone contact with Nassor refers to an FBI memo written in May 1999 (Exhibit 168).  That memo, in which the FBI requests the assistance of Canadian law enforcement in the FBI's investigation into Nassor, mentions "new developments in the investigation have revealed" the following:

> A fax was sent from Canada to Tanzania in care of Zahran Nassor (close variant of [Mr. Mohammed's alias].  The fax was in reference to the possible acceptance of employment by Zahran with Sea Cruise Enterprises [at an address in Toronto].  Initial checks have revealed that this is a fictitious company name but the address corresponds to a home office of National Tilden Inter Rent, which is Nassor['s] employer.

The 1999 memo goes on to observe that the Toronto address is "in close proximity" to Nassor's own home address, and that Nassor "has access to the fax machine" where the letter was sent.  The memo also repeats the now-discredited belief that Nassor "sent [Mr. Mohammed] documents in furtherance of [him] obtaining a passport and visa," pointing to the discovery of the July 1998 fax from Mr. Mohammed to Nassor discussed previously (which asked Nassor to have Mohammed Mohammed contact Mr. Mohammed).  Mr. Moen testified that he considered the May 1999 memo as being "the one that discusses in some length sort of why the FBI thought as they did at the time that [Nassor] was complicit in helping him to obtain fraudulent documentation to avoid capture following the bombing."  Mr. Moen testified that "it's my understanding for the purposes of this litigation, the United States has conceded that brother Nassor didn't help [procure false documents for Mr. Mohammed after the bombing].  My point

is just as a case agent, from what I've read, I'm much less convinced that's the case, going back to [the May 1999 memo]. I think there's quite a bit of circumstantial evidence that brother Nassor is involved."

Once again, the Court emphasizes that it grants considerable deference to Mr. Moen's experience and expertise. But his purported reliance on the May 1999 memo is problematic for several reasons. First, as he notes, the Defendants here have stipulated that the FBI's belief "that Nassor has provided [Mr. Mohammed] with a false passport and visa . . . is inaccurate, and is not currently relied upon as a basis for restricting telephone contact with Nassor." *Docket* # 361 at 31, ¶ 4. Although Mr. Moen apparently disagrees that this conclusion "is inaccurate" and "is not currently relied upon," the Court is bound by the terms of the stipulation and must therefore reject Mr. Moen's contention that lingering concerns about Nassor's involvement with Mr. Mohammed's escape to South Africa warrant the SAMs restrictions concerning Nassor. Second, even if the Court were to agree with Mr. Moen that the May 1999 memo <u>does</u> suggest some vague connection between Nassor and Mr. Mohammed's post-bombing flight from justice,[18] the

---

[18]      The Court is troubled by the absence of meaningful detail in the record on this point. Assuming, for the moment, that the fax warrants the inference that Nassor was communicating with Mr. Mohammed (under his "Zahran Nassor" alias) and was purporting to extend employment to Mr. Mohammed (or perhaps "verify" such non-existent employment) at a fictitious company with the same address as Nassor's own employer, the remaining circumstances of the communication remain murky. The May 1999 memo does not identify the date of this fax, making its temporal connection to the bombing and Mr. Mohammed's flight from justice unclear. Nor is there evidence in the record that clearly discloses Nassor's understanding that the fraudulent "employment" is part of a scheme to help Mr. Mohammed evade prosecution post-bombing. Assuming the fax predated the bombing (or even that it predated Nassor's knowledge of Mr. Mohammed's involvement in the bombing), the fax suggests nothing more than Nassor's offering to assist his brother in the same type of ordinary immigration fraud that Nassor himself participated it, rather than the more troubling situation of Nassor knowingly assisting a known terrorist in escaping prosecution.

     Mr. Moen conceded that "my understanding [of this issue] comes not from personal knowledge but from reading the case file." The Court assumes, then, that Mr. Moen knows nothing more than the May 1999 memo recites; the Defendants did not offer any other

Court is still left with the observation that the FBI had been aware of this information since 1999, yet had no apparent concerns about Mr. Mohammed having telephone contact with Nassor from 2001 to 2009. Absent some cogent explanation of new developments occurring in or about 2009 regarding Nassor, or some other contemporaneous information justifying the FBI's change in position, the Court must conclude that the decision then to revoke Mr. Mohammed's longstanding permission to communicate by phone with Nassor was arbitrary.

Because the Court intends to grant relief to Mr. Mohammed, it must address the Defendants' position that it should first consider the effect of certain classified information submitted at an earlier stage of this case. The Court has carefully examined the *ex parte* submissions at Docket # 340 and 376, including the classified information tendered as exhibits. Based upon that review, the Court finds nothing therein that would offer a colorable reason for revoking Mr. Mohammed's permission to talk to Nassor that has not already been addressed, nor any information that would explain away the apparent arbitrariness of the FBI's decisions as discussed above. Accordingly, even if the Court were to permit the Defendants to supplement their evidentiary presentation with the classified information filed pre-trial, that classified information fails to rebut the conclusion that the decision to revoke permission for Mr. Mohammed to speak to Nassor in 2009, continuing to date, was arbitrary and capricious.

---

documents or evidence that followed up on the matters raised in the fax, and Mr. Moen's testimony did not indicate anything Mr. Moen did beyond simply interpreting the contents of the May 1999 memo. Given this lack of subsequent elaboration on stale and partially-discredited information, coupled with the Defendants' stipulation that Nassor did not assist Mr. Mohammed in avoiding capture, the Court simply cannot credit Mr. Moen's contention that the May 1999 memo can independently justify the restriction of telephone contact with Nassor. Indeed, as Mr. Moen testified regarding Mr. Johnson's recommendations in 2009, once Mr. Moen became aware that the FBI had rejected the theory that Nassor had helped Mr. Mohammed avoid capture post-bombing, Mr. Moen was obligated to "d[i]g further in the file" to find more evidence to support his theory or else "reach[ ] another conclusion."

Accordingly, the Court finds that the FBI's decision to modify the SAMs, informally beginning in October 2009 and formally as of January 2011, to prohibit Mr. Mohammed from having telephone or in-person contacts with Nassor, was arbitrary and capricious in violation of 5 U.S.C. § 702(2).[19]  The Court will address the appropriate remedy below.

## B.  Communication with extended family members

From 2001 to 2005, Mr. Mohammed was permitted to communicate by mail with anyone he wanted.  He testified that, during this time period, he wrote letters (and made telephone calls) to various extended family members, including his nieces and nephews.  However, in 2005, the FBI discovered that certain terrorist inmates at ADX (although not Mr. Mohammed) had managed to maintain mail contact with associates involved in a terrorist cell in Spain and that the inmates' letters were successfully used by the cell to enhance its recruiting capability.  In response to this incident, the FBI tightened SAMs restrictions on all inmates, essentially limiting all communication — mail, telephone, or in-person — to immediate family members only.

The apparent justification for narrowly limiting communication to immediate family members, to the exclusion of extended family, is one of resources.  The parties' stipulated facts refer to a declaration made by FBI Agent Donald Shannon in another SAMs case, in which Mr. Shannon stated:

> Members of extended families, such as in-laws, nieces, nephews and cousins, are not included in the definition of immediate family because that number of correspondents would overwhelm review and translation resources, which must be allocated among all SAMs inmates.  By narrowing the universe of potential correspondents, this limitation ensures that the quality of the analysis can be maintained.  However, SAMs are sometimes modified to permit the inmate to communicate with those who do

---

[19]  Because the Court finds no reasonable rationale has been articulated for this (and other) decision(s), it need not (and indeed, cannot) address how the *Turner* analysis would apply to the restraint on Mr. Mohammed's First Amendment rights.

>                   not fit within the SAMs definition of immediate family,
>                   particularly for those inmates who have fewer correspondents who
>                   fall within the immediate family definition.

*Docket* # 361 at 36, ¶ 47.

In November 2009, Mr. Mohammed's SAMs were modified to allow him to make "requests for additional nonlegal [telephone] contacts" beyond his immediate family, with such requests "considered on a case-by-case basis" by the FBI. Although the record is fairly vague and incomplete on this issue, it appears that in 2009 or 2010, Mr. Mohammed made a request that he be allowed to add 36 names to his list of permissible contacts. Most of the names on the list were Mr. Mohammed's in-laws, his nieces and nephews of varying ages (from 4-5 years old to adults), an uncle, and certain friends from Tanzania or South Africa.

Precisely how this request was addressed and resolved by the FBI remains unclear.[20] Mr. Mohammed testified that, at one point, ADX Warden Blake Davis and BOP official Christopher Synsvol told him that the FBI had completed background checks on and provisionally approved at least 31 of the 36 names. However, Mr. Mohammed testified that he was later told that only four additional contacts would be approved, and that he must select the

---

[20]     On the one hand, some of Mr. Moen's testimony seemed to suggest that, except as discussed below, Mr. Mohammed's request for 36 additional contacts was denied. Speaking of the request in the past tense, Mr. Moen expressed concern that the number of individuals requested by Mr. Mohammed "was unprecedented as far as how it would have overwhelmed our resources, both translation availability, agent availability to review mail, would have opened up a much broader aperture for him to write."

On the other hand, Mr. Moen also appeared to testify that Mr. Mohammed's request for additional correspondents was still being considered. He explained that "there is a significant vetting process that has to take place" in order to expand an inmate's contact list, requiring searches of various FBI databases and contacts with law enforcement officials in Tanzania, and, in some circumstances, other locations as well. Mr. Moen testified that, when he left the FBI's Colorado Springs office in 2013, "that [vetting] process had been undertaken" and that, to his knowledge as of the date of trial, "its not yet been completed because they're still waiting for Tanzanian authorities to opine." Thus, it appears that, at least nominally, Mr. Mohammed's request to add the 36 additional contacts remains pending in some respect.

four from his list that he wished to have designated. He chose two sisters-in-law, his brother-in-law Msellem, and his cousin Seif.

The Defendants' evidence did not specifically address Mr. Mohammed's belief that most of his requested contacts were provisionally cleared by the FBI. Except as noted in the preceding footnote, Mr. Moen, the only witness to directly address this issue, began his explanation of the issue at the point in time that the FBI had a meeting "in which it was decided that we would aim for approximately plus four, meaning four additional social contacts [beyond immediate family] for each of the [SAMs] inmates." This appears to be a "universal" change, applying to all inmates under SAMs, not simply Mr. Mohammed. The record suggests this meeting took place in either 2009 or 2010, and thus, Mr. Moen was not actually involved in it.

In December 2010, Mr. Mohammed's SAMs were modified to permit him to have mail, telephone, and in-person contact with his two sisters-in-law and Msellem, in addition to the permissible mail, in-person, and telephone communications with his immediate family members (except Nassor). It appears that there were delays in the FBI's background check into Seif, and it was not until July 2011 that approval was formally given to also add Seif to Mr. Mohammed's list of permissible contacts.

However, in February 2012, the FBI withdrew authorization for phone calls with Seif and Msellem, citing "national security concerns with the inmate contacting [the] telephone number[s]" given for those two individuals. Mr. Moen testified that the FBI's concern regarding Msellem was strictly limited to concerns about the <u>telephone number</u> involved, not with any personal characteristics of Msellem..[21] The issue is less clear regarding Seif. Mr. Moen

---

[21] That being said, Mr. Mohammed's counsel asked Mr. Moen if Mr. Mohammed could restore his ability to have telephone contact with Msellem simply by Msellem obtaining a new telephone number. Defense counsel instructed Mr. Moen not to answer the question, citing

appeared to suggest that the FBI had certain concerns about Seif himself, stating "it's my understanding Mr. Seif is not allowed telephone contact regardless of the telephone number he puts forward." (Mr. Moen testified that, as with Nassor, Mr. Mohammed is still authorized to have mail correspondence with Seif.)  Beyond these facts, the record is silent as to the status of Mr. Mohammed's request for the 36 (now 32) additional contacts.

The Court has some difficulty in addressing Mr. Mohammed's challenge to the denial of his request for 36 additional contacts, because one possible interpretation of the record is that the request remains under active consideration.  As Mr. Moen explained, the FBI is still awaiting the results of background checks on some of Mr. Mohammed's requested correspondents.[22] Arguably, then, Mr. Mohammed's challenge on this point is premature.

---

concerns about the answer disclosing classified information.  Thus, the record does not reflect whether simply obtaining a non-objectionable telephone number would be sufficient to resolve the prohibition against telephone contact with Msellem.

[22]     Giving due deference to the need for comprehensive background checks and the inevitable delays that arise from relying upon the assistance of law enforcement agencies in foreign countries, the Court nevertheless finds it implausible that it has taken the FBI or Tanzanian authorities more than four years to complete a background check on someone like Mr. Mohammed's five-year old niece.

Mr. Moen testified that any person, including a young child, poses some national security threat, as even young children might unwittingly be a vehicle by which an inmate passes along a message to a genuine threat.  Mr. Moen gave the example of an inmate who "reached out to his minor daughter and said, hey pass this message to your brother that he should go see our friends in a certain area of the world.  And the daughter responds with 'we don't have any family there, what are you talking about.'  The inmate says, 'pass the message, he'll understand.'  The message was passed, he understood, and the son went to a training camp in a foreign country. Probably unwittingly, but the minor daughter was utilized to pass a message through that we really were unable to stop from being passed."

Accepting this concern as valid, the Court notes that it is also a universal one: the risk that a permitted contact might be unwittingly used to pass along a message to a prohibited person accompanies permitting the inmate to have contact with anyone.  The example given by Mr. Moen would be the same if, instead of the inmate's daughter being the conduit for the message, the inmate was speaking to his mother or to his wife (or even to his lawyer), asking them to pass along a seemingly nonsensical message.  Thus, Mr. Moen's example establishes nothing more

If, on the other hand, the FBI's position is that the request for 36 additional contacts was formally addressed, the FBI's decision on that request remains unclear to the Court. The record does reflect that at some point in 2009 or 2010, the FBI decided that each inmate subject to SAMs would be allowed four additional non-immediate family contacts. The Court understands that the Defendants may be contending that the decision to permit four additional contacts was a partial granting (and partial denial) of Mr. Mohammed's request for 36 additional contacts, but if so, it is not entirely clear that the two events are indeed related. Certainly, no witness clearly testified that the FBI's decision to add four contacts for all SAMs inmates was prompted by and specifically intended to fully resolve Mr. Mohammed's request for 36 additional contacts. Indeed, if it was intended to be the final resolution of Mr. Mohammed's request, this would contradict Mr. Moen's apparent suggestion that Mr. Mohammed's request remains under consideration.

Moreover, if the Defendants' position is that Mr. Mohammed's request for 36 additional contacts was fully-resolved, being granted to the extent of him being allowed four additional contacts, the record is inadequate to explain how the FBI determined that four additional contacts were the maximum that could reasonably be granted to Mr. Mohammed. There are some general statements about the need to preserve scarce translator and analyst resources by witnesses like Mr. Moen and the affidavit of Mr. Shannon, but nothing in the record expressly states how those concerns about resources justified the decision to permit four additional contacts, nor address the resolution of Mr. Mohammed's request for the other 32 additional contacts. If the FBI has indeed denied Mr. Mohammed's request for the remaining requested contacts, and scarcity of

_____

than the unremarkable proposition that anyone the inmate is permitted to have contact with is a potential vector for unwittingly conveying coded messages to others.

resources is the ostensible justification, the record is too incomplete on this point to permit the

Court to determine whether resource constraints justify the limitation to four contacts.[23]

_____

[23]     This is not to say, however, that scarcity of resources could never justify a denial a request like Mr. Mohammed's. Mr. Shannon's stated concern that granting inmates large numbers of permitted contacts would "overwhelm review and translation resources," and that restricting those numbers "ensures that the quality of the analysis can be maintained," is, at least on the surface, a plausible justification. As Mr. Moen and others made clear, the FBI relies upon linguists and translators to monitor and Mr. Mohammed's telephone calls with his family and to translate his non-English mail correspondence. There is evidence in the record that recruiting qualified linguists is a difficult task, as they must not only be capable of rapid and accurate translation, they must also pass a rigorous background check, be familiar with the particular circumstances of the inmate they are monitoring, and be capable of rapidly and accurately assessing whether a telephone call is being used to pass a coded message and should be immediately terminated. Given that the pool of qualified linguists is likely small (especially for languages such as Mr. Mohammed's native Swahili, for which there are comparatively few American speakers), there is some valid logic to the FBI's concern that broadening the list of permitted contacts for an inmate like Mr. Mohammed would quickly drain the pool of available linguist time.
         But in this case, such logic does not stand up to close scrutiny. The record is clear that, like all SAMs inmates, Mr. Mohammed is subject to restrictions on the frequency of his communications. He is nominally limited to two 15-minute phone calls per month and 6 pages of written correspondence per week (although the BOP apparently has discretion to permit him to exceed those limits). In that sense, expanding the pool of potential contacts for Mr. Mohammed from, say, 10 people to 30 does not mean that Mr. Mohammed will suddenly be making three times as many phone calls or using up three times as much linguist time. Presumably, he would still be limited to two short phone calls per month, and thus, the time spent on translation would remain largely unchanged. And although the BOP has apparently permitted Mr. Mohammed to exceed the stated restrictions on frequency or length of some of his permitted communication (allowing, for example, 20-page letters instead of the 6-page letters permitted by the SAMs), it could arguably exercise its discretion to more strictly enforce those limitations if Mr. Mohammed were to obtain a greater number of permitted contacts, so as to ensure that scarce linguist and translator resources are not being unduly consumed.
         Arguably, the most precious resource at issue is not translator time, but analyst time. Even if Mr. Mohammed continues to make only the maximum communications expressly permitted by the SAMs — say, two 15-minute telephone calls per month — he does indeed use more resources by spreading those calls around to numerous recipients than he would if the calls were routinely made to the same people each time. As Mr. Moen explained, the FBI prefers to keep a single linguist assigned to a particular inmate for an extended period of time, as that linguist would "build up an understanding of how people write, how they communicate, who the recipients are, [and whether] what they're saying makes sense in light of what they said in the past." It may be reasonable for the FBI to assert that familiarity with the nature of an inmate's past communications with a particular contact might make the FBI more sensitive to a deviation from those typical communication patterns and makes it more likely that the FBI could identify

Accordingly, the Court finds that the record fails to demonstrate a reasoned, non-arbitrary explanation for the FBI's disposition (if any) of Mr. Mohammed's request to add 32 additional contacts. The Court further finds that the classified information previously submitted by the Defendants does not address this issue or otherwise alter this conclusion. Thus, the Court finds that decision to be in violation of 5 U.S.C. § 702(2).

## C. Delays in mail processing

Since mid-2003, Mr. Mohammed's SAMs have provided that his incoming and outgoing mail correspondence may be held by the FBI for a period of 14 days (if the correspondence is in English) to 60 days (if the correspondence is in another language, as Mr. Mohammed's

---

and intercept attempts to pass coded messages. Adding new contacts for Mr. Mohammed would thus increase the number of people that a given linguist or case agent would have to be familiar with, requiring the linguist or agent to remember those additional contacts' backgrounds and their own communication patterns with Mr. Mohammed, etc. Thus, although there may be no legitimate justification to contend that broadening Mr. Mohammed's contacts list would unduly strain translation resources, there may a legitimate argument to be made that expanding that list would unduly tax analytical resources.

Assuming that will be the justification the FBI offers upon remand, the Court emphasizes that such a justification will require something more than a conclusory assertion that "resource constraints require only four additional contacts." At the same time, this Court has neither the authority nor the inclination to scrutinize details of FBI budgets or opine as to the wisdom or sufficiency of the FBI's allocation of its financial or personnel resources. What is necessary is some showing that correlates the reasonable amount of linguist and/or analyst time that is devoted to Mr. Mohammed's case to the particular incremental demands that each additional contact would pose. Arguably, there may be some qualitative component to such an analysis: Mr. Mohammed's communications with his adult nieces and nephews might be expected to range over a broader array of subjects than his communications with a five-year old girl would, and thus, it may be appropriate resource-wise for the FBI to grant permission for the latter but not the former. (Indeed, this would be precisely the sort of "case-by-case" consideration promised by the SAMs.) Moreover, to fully address the *Turner* analysis, it might also be appropriate for the FBI to consider the extent to which it may be possible to permit Mr. Mohammed to have partial permission to communicate with some of his requested contacts, *e.g.* to permit more easily reviewable mail correspondence with some or all suitable contacts, while prohibiting the more difficult to monitor real-time communications via telephone or in-person.

Case 1:07-cv-02697-MSK-BNB   Document 398   Filed 06/17/14   USDC Colorado   Page 35 of 46

correspondence typically is). During this time period, the BOP transmits a copy of the letter to the FBI, who, in turn, forwards a copy of any foreign-language correspondence to a trained linguist. The FBI requests that the linguist either provide a general summary of the contents (if neither the linguist reviewing the correspondence or the FBI Agent reviewing the summary find any issues of concern) or a verbatim translation of some or all of the document (if closer inspection is deemed warranted). If the Agent concludes that the letter is acceptable, the FBI communicates that decision to the BOP, who then releases the letter for delivery. If the Agent concludes that the letter should be rejected, that decision must be approved by superiors within the FBI and notice of the rejection of the correspondence is given to the inmate.

Occasionally, the mail review process is delayed, either due to higher priority demands on the linguists (*e.g.* the need to contemporaneously monitor and translate wiretap evidence in furtherance of an existing investigation) or on the supervising FBI agent (*e.g.* immediate criminal investigations within the jurisdiction of the local office). Up until 2005, Mr. Mohammed's mail was reviewed by FBI agents in the Southern District of New York, where he had been prosecuted. However, possibly due to delays in that processing (as reflected in Exhibit 228), the task of reviewing Mr. Mohammed's mail was reassigned in 2005 to FBI agents in the Colorado Springs office. From 2011 to 2013, that task was performed by Mr. Moen. Mr. Moen supplied exhibit 164, his log of Mr. Mohammed's correspondence, showing the dates on which he received such correspondence, the dates on which the correspondence was sent to and received from linguists, and the date on which Mr. Moen released the correspondence back to the BOP. Mr. Moen concluded that in 2011, the average time to complete the FBI's processing of Mr. Mohammed's mail was 50 business days, with 4 mail items exceeding the 60-day deadline contained in Mr. Mohammed's SAMs. In 2012, the average processing delay shrunk to 24

business days, due in part to a policy change that allowed copies of correspondence to now be sent between agencies electronically, rather than in paper form. The average delay in 2013 was 26 business days.

Separate from the issue of timeliness of the mail processing is Mr. Mohammed's request that, once his mail is approved by the FBI, that the FBI be required to send the mail to his attorney who can, in turn, forward it (either by e-mail or regular mail) on to the named recipient. This was the procedure used when his SAMs were first implemented in 2001, but by 2003, the SAMs provided that approved mail would be released by the BOP for distribution via ordinary postal channels. Mr. Mohammed testified to his belief that the FBI, BOP, or other unidentified forces are withholding his mail and not informing him of that fact. He explained that this belief arises from the fact that his letters address important issues, yet his recipients do not respond to them. He testified that, on some occasions, he has asked his sister whether she received a particular letter, and she responded that she had not. Mr. Mohammed acknowledges that the postal service in Tanzania can be unreliable, but he does not believe that the undelivered mail is attributable to that. The record does not clearly reflect when Mr. Mohammed actually requested to route his mail through his attorney, nor precisely how that request was described.

Although the Defendants deny that Mr. Mohammed's letters are being withheld without notice to him or lost while on the FBI or BOP's watch,[24] they do not dispute that Mr. Mohammed did indeed request to have the mail routed through his attorney. It is not clear that this request was ever formally considered, much less expressly denied by the FBI; all of the testimony about the disposition of the request was phrased in fairly abstract and hypothetical

---

[24]     Mr. Moen posited that it was likely that Mr. Mohammed's family was ignoring his "important" letters because of their length or banality, and then lying to him about never having received them.

Case No. 1:20-cv-00694-PAB-MDB   Document 308   filed 06/17/14   USDC Colorado   pg 37
Case 1:07-cv-02697-MSK-BNB   Document 398   Filed 06/12/2013   USDC Colorado   Page 37 of 45
of 46

terms.  Mr. Moen stated that the FBI's objection to this request had to do with the component of
Mr. Mohammed's attorney sending the correspondence to the recipients via e-mail.  As Mr.
Moen explained, Mr. Mohammed holds an elevated status in the terrorist community due to his
completion of a successful bomb attack.  Mr. Moen stated that a putative terrorist's physical
possession of one of Mr. Mohammed's letters would thereby elevate that terrorist's statute by
showing that he was personal friends with Mr. Mohammed, or perhaps enhance that terrorist's
ability to recruit others.  (This concern was independent of the content of the letters, as Mr. Moen
testified that even possession of an ordinary letter "could still be used as sort of bona fides [to
show that the terrorist is] connected with people who are the real deal.")  Mr. Moen expressed
concern that letters sent electronically to recipients posed a greater risk of dissemination beyond
their intended recipients due to the ease of copying and forwarding electronic messages.[25]

Mr. Moen stated that he would have less of an objection to Mr. Mohammed's request to
send correspondence via his attorney if that correspondence would still be sent via paper mail.
Asked "if [the attorney] were to not use e-mail . . . and send a paper copy to the family member,
. . . what would your recommendation be about that?," Mr. Moen responded "obviously, it would
be less concerning then."  Asked "would you agree to it," Mr. Moen acknowledged that "I would

---

[25]     There is some inherent tension between, on the one hand, Mr. Moen's suggestion that a
putative terrorist's physical possession of a piece of Mr. Mohammed's correspondence would
verify that terrorist's relationship with Mr. Mohammed, and, on the other hand, the observation
that electronic communications could be readily copied and widely disseminated to audiences
well beyond Mr. Mohammed's own circle of acquaintances.  Presumably, a putative terrorist's
possession of a printout of a widely-forwarded e-mail from Mr. Mohammed would do little to
establish that terrorist's "bona fide" connection to Mr. Mohammed.  Nevertheless, the Court will
accept the general proposition that the dissemination of Mr. Mohammed's correspondence
electronically poses a greater risk that such correspondence will be distributed to those who
would seek to harm the United States.

say I wouldn't object to it," but posited that he could not represent that his supervisors, other members of the FBI, or the OEO would necessarily agree.[26]

There are two components to Mr. Mohammed's challenge to the handling of his mail correspondence.  First, he contends that the FBI is not meeting the 60-day deadline in the SAMs for processing his mail.  Mr. Mohammed concedes that the problem has largely abated since 2011 (and indeed, since 2005), but he argues that this does not "moot the issue."  In his closing argument, Mr. Mohammed requested "an injunction requiring the defendant to deliver the plaintiff's non-English mail within the 60-day period in the SAMs."

The Court declines to award any relief on this portion of Mr. Mohammed's claim. Indeed, the Court has some doubt that it is even cognizable as an APA claim.  Individual instances of mail handling are not readily characterized as "final agency actions" subject to APA review.  Arguably, the imposition of the 60-day deadline in the SAMs might be an agency action capable of being reviewed, but it is difficult to see how an argument that the 60-day period was arbitrary could ever work to Mr. Mohammed's benefit.  Assuming Mr. Mohammed could demonstrate that the FBI routinely takes more than 60 days to screen his mail, the Court might find that 60-day deadline to have been arbitrarily-selected by the FBI and remand that decision back to the FBI for further consideration.  The likely result is simply that the FBI would grant itself even more time to process Mr. Mohammed's mail.  Short of a showing by Mr. Mohammed of some plain systemic defect in the FBI's processing system — and Mr. Mohammed has identified none — his complaint about the length of time spent reviewing his mail is nothing more than a subjective desire that it be done more quickly.  Such subjective desires are

---

[26]     Mr. Moen admitted that although he personally met with Mr. Mohammed in 2012 and 2013 to discuss the SAMs renewals, he had not discussed the request to route mail through the attorney, and thus, had not attempted to ascertain whether Mr. Mohammed would be willing to limit his request to having his attorney send the mail in paper, not electronic, form.

insufficient to demonstrate that the FBI's belief that it requires 60 days to review mail is arbitrary or capricious.

Arguably, the delay in processing Mr. Mohammed's mail is amenable to review under the *Turner* standard. Delaying his mail for review does inhibit, to some extent, Mr. Mohammed's First Amendment rights, as it interposes a lengthy (albeit shrinking, at least since 2011) delay between letter and response, somewhat impairing prompt communication. Thus, the Court will briefly consider whether the delay is justified by the *Turner* factors. First, the Court finds that there is a valid and rational connection between the requirement that Mr. Mohammed's mail be analyzed prior to delivery to its recipient. As noted above, the Court accepts the Defendants' assertion that the nature of Mr. Mohammed's offenses and his background pose the potential for him to attempt to facilitate or encourage future terrorist acts. Moreover, the 2005 incident in which other terrorist inmates were able to send mail messages to a terrorist cell overseas adequately demonstrates that rigorous monitoring of terrorist inmates' correspondence may be necessary to prevent harmful communications from occurring. Thus, this factor tips substantially in favor of the restriction.

Second, *Turner* inquires whether there are alternative means of exercising the right. Mr. Mohammed does have some ability to have more rapid communication — *i.e.* via telephone — with at least some of his permissible contacts. However, mail is currently his only means to have contact with persons such as Nassor, Msellem, or Seif. (On the other hand, the record reflects that both Mr. Mohammed and Nassor speak English, and that English-language letters require less processing time than foreign-language letters do, providing Mr. Mohammed with another means to communicate more rapidly with an English-speaking contact like Nassor.) Because

Case No. 1:07-cv-02697-MSK-BNB   Document 398   filed 06/17/14   USDC Colorado   pg 40 of 41
Case 1:07-cv-02697-MSK-MJW   Document 398   filed 06/17/14   USDC Colorado   Page 40 of 45
of 46

Mr. Mohammed has some ability to communicate more rapidly with most of his permitted contacts, this factor tips slightly in favor of the restriction.

The third *Turner* factor inquires into the impact that accommodation of the asserted right would have on other inmates, guards, and on the allocation of prison resources generally. In this case, the "accommodation" requested is simply faster processing of Mr. Mohammed's mail. The FBI has taken the position that it has taken steps to lessen that burden by, for example, communicating documents electronically, rather than in paper format. Beyond that, neither party has made a substantial showing as to whether there are other economies that can be found in the system by which Mr. Mohammed's mail is processed, nor shown what deleterious effects (if any) might result if those economies were obtained. Thus, this factor is largely neutral.

Finally, the Court considers whether there are any ready alternatives to having Mr. Mohammed's correspondence translated and reviewed before it is sent. With the exception of suggesting that approved mail be routed through his attorney, which the Court discusses below, Mr. Mohammed has not identified any alternatives that would meet the Government's legitimate purpose of ensuring that his correspondence does not contain harmful messages, yet would allow that purpose to be met in some less restrictive way. In the absence of some proffered or obvious alternative, the Court finds that this factor favors the current restriction as well. Thus, taken together, the *Turner* factors indicate that although the review of Mr. Mohammed's mail does inhibit, to some extent, his First Amendment rights, it does so in a permissible way.

Accordingly, the Court finds that the decision by the FBI to require up to 60 days for processing and reviewing Mr. Mohammed's correspondence does not violate either the APA or the First Amendment.

Turning to the second component of this claim, Mr. Mohammed requests that his mail be routed through his attorney after FBI review, rather than having it given to the BOP to be deposited with the Postal Service. Mr. Moen's testimony made clear that he (and, by extension, since no other witness from the FBI testified about it, the agency) would not oppose this request if the mail was thereafter to be dispatched by the attorney in paper form, but that the FBI had concerns about widespread dissemination of Mr. Mohammed's correspondence if the attorney was allowed to send it in electronic form.

Once again, the Court will defer to the FBI's expertise in such matters and accept the proposition that a putative terrorist who comes into possession of a piece of correspondence from a high-profile person like Mr. Mohammed may find his own stature elevated. And the Court accepts the general proposition that e-mail correspondence and electronically-stored documents are much more readily capable of broad and rapid dissemination than ordinary paper documents are, at least initially. However, as Mr. Mohammed's counsel pointed out, even paper mail could be scanned by its recipient and turned into the same easily-disseminated electronic version that the FBI fears. Mr. Moen acknowledged that fact, but suggested that "it would be more difficult, especially in Tanzania, to go through the scanning process." Assuming that to be the case, it would be a simple matter for a recipient of one of Mr. Mohammed's letters to simply retype its contents into an e-mail and distribute it to others that way. Thus, the Court finds that the skeletal rationale offered here by the FBI for its position that routing mail through the attorney for electronic delivery poses national security concerns, but routing such mail through the attorney for paper delivery does not, to be so ephemeral as to be arbitrary.

The record makes clear that Mr. Moen, the only witness to testify about this issue, would have had no objection to approving a SAMs modification that would permit Mr. Mohammed's

attorney to route paper mail to its recipients. Thus, there is no apparent reason why Mr. Mohammed's request for such a modification has not been granted, even conditionally on these more limited terms. The Court has considered the classified information previously tendered by the Defendants, but such material does not address this issue. Accordingly, the Court finds that the FBI's apparent rejection of Mr. Mohammed's request to route mail through his attorney is arbitrary and capricious in violation of 5 U.S.C. § 702(2).

## Remedy

Having concluded that the FBI has acted arbitrarily in violation of 5 U.S.C. § 702 when it revoked Mr. Mohammed's permission to have oral contact with Nassor, denied his request for 32 additional permitted contacts, and refused Mr. Mohammed's request to route his mail to recipients through his attorney, the Court must consider what remedy to afford.

Generally, when a court finds that an agency has acted arbitrarily in violation of the APA, the appropriate remedy is to remand the issue back to the agency for reconsideration and, if appropriate, further investigation or an explanation adequate to support the agency's decision upon remand. *Fox Television Stations, Inc. v. F.C.C.*, 280 F.3d 1027, 1047 (D.C. Cir. 2002). When the Defendants concede that there may be certain relevant information bearing on the issues herein that has not been presented to the Court, it is inappropriate for the Court to assume the mantle of decisionmaker and conduct its own *de novo* determination[27] of Mr. Mohammed's requests. *See e.g. Kroger Co. v. Regional Airport Authority of Louisville*, 286 F.3d 382, 387 (6th Cir. 2002).

---

[27]     Such *de novo* review is appropriate only where: (i) there were (and are) inadequate factfinding procedures used in an adjudicatory proceeding; or (ii) the APA claim is brought to enforce an administrative determination that has already been made. *Id.* Neither situation is present here.

For the reasons discussed above, a remand is most properly directed to the FBI.  It is the agency that initiates the annual SAMs review and the agency most directly involved with assessing whether factual circumstances warrant changes to the SAMs.  Nominally, the FBI's "recommendations" concerning SAMs must be acted upon by the OEO and the Deputy Attorney General, but the record reflects that these agencies do not conduct any independent investigation into the circumstances underlying the FBI's recommendation and have never reached a conclusion different than that recommended by the FBI.  Thus, at least in practice, it appears that the FBI is the actual decision-making agency, and thus, the proper party to whom to remand the decisions.

Mr. Mohammed argues that a remand to the FBI, rather than a *de novo* resolution by this Court, will merely delay an already prolonged denial of his ability to contact his relatives. Although the Court is sympathetic to Mr. Mohammed's situation, it believes that reconsideration can be accomplished within the annual renewal cycle and will so direct.  In addition, the Court will retain jurisdiction over this matter and may, upon appropriate request by Mr. Mohammed or of the Court's own accord, require the FBI to provide periodic status reports regarding the status of the issues on remand.

Indeed, increased cooperation and candor on the part of both sides to this dispute could help resolve disputes of this type before they blossom into litigation.  Although the Court understands the FBI's concern about disclosing information that might reveal investigatory methods or targets (or accidentally reveal situations where its knowledge about an issue is deficient in some respect), it appears that this concern has led the FBI to be needlessly parsimonious with information it shares with Mr. Mohammed.  For example, Mr. Moen made clear that the FBI's concerns about Mr. Mohammed having contact with Msellem are limited to

concerns about Msellem's phone number, not any particular characteristics of Msellem himself. Were the FBI to advise Mr. Mohammed of specific steps that Msellem could take to resolve that issue, Mr. Mohammed might be able to restore his ability to speak to Msellem without having to resort to grievances and litigation that consume precious FBI resources. Similarly, Mr. Mohammed's refusal to constructively participate in interviews with the FBI concerning SAMs renewals perpetuates an adversarial relationship that is only likely to lead to more conflict, and potentially more restrictions, in the future.

## **CONCLUSION**

For the foregoing reasons, the Court finds that the Defendants violated the APA, 5 U.S.C. § 702, in that: (i) the 2009 decision, continuing to date, to revoke Mr. Mohammed's permission to have oral communication with Nassor; (ii) the denial (if any) of his request to add 32 more persons to his list of permitted contacts was; and (iii) the denial of his request (of unspecified date) that he be permitted to have his outgoing mail, once cleared by the FBI, delivered to his attorney for distribution to recipients, were each arbitrary and capricious and unsupported by substantial evidence in the record. These decisions are **REMANDED** to the FBI for further consideration and resolution within the current cycle of SAM's review in accordance with the terms of this Order. Judgment consistent with these findings shall enter contemporaneously.

The remaining pending motions (**# 343, 352, 354, 359, 367, 387**), to the extent not expressly or

impliedly granted herein, are deemed **DENIED**.

Dated this 17th day of June, 2014.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge