Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00694-PAB-NYW

MOSTAFA KAMEL MOSTAFA,

Plaintiff,

v.

MERRICK GARLAND, United States Attorney General, in his official capacity,
CHRISTOPHER WRAY, FBI Director, in his official capacity,
MICHAEL CARVAJAL, BOP Director, in his official capacity,
B. TRUE, ADX Warden, in his official capacity,
TUTOILUMUNDO, ADX Unit Manager, in his official capacity,
MACMILLAN, ADX Facilities Department, in his official capacity,
FOLLOWS, ADX Medical Department Manager, in her ~~official~~ individual capacity,
LOEWE, ADX officer, in his ~~official~~ individual capacity,
NORJANO, ADX Officer, in his ~~official~~ individual capacity,
CHOROSEVIC, ADX Occupational Therapist, in his individual capacity,
PARRY, ADX Officer, in his individual capacity,
AVERIT, ADX Officer, in his individual capacity,
GARDUNO, ADX Lieutenant, in his individual capacity,
WILLIAM, ADX Nurse, in his individual capacity,
HUDELSTON, ADX Nurse, in his individual capacity,
STERETT, ADX Doctor,  in his individual capacity,
ARMIJO, ADX Lieutenant, in his individual capacity, and
EDWARDS, ADX Officer, in his individual capacity.

Defendants.

## ~~Third~~ Fourth Amended Complaint

## I.  THE NATURE OF THE ACTION

1.      The Plaintiff is a 64-year-old civil engineer, who was well-known as the imam of a mosque in Finsbury Park, London in the United Kingdom ("UK").  The Plaintiff was convicted, and sentenced to life imprisonment for allegedly inspiring others to resist the wars in Afghanistan, Yemen, and other Muslim countries at war with the United States.  The Plaintiff

1

was severely disabled in 1993, losing both hands up to his mid-arms, leaving him blind in his left eye, and with poor vision in his right eye.  At the time, the Afghan resistance was fighting against the Soviet Union, not the United States.  The Plaintiff then returned to the UK to be with his wife, nine children, and grandchildren (he now has 11), who are all British.

2.      Prior to his trip to Afghanistan, the Plaintiff had worked as a civil engineer, and designed several large construction projects, including the Royal Military Academy Sandhurst, which is used by the British military.  However, upon his return from Afghanistan, beginning in 1994, the Plaintiff began preaching at the Finsbury Park Mosque (FPM), where he was named as the imam of the mosque.  The FPM was closed by the UK authorities in January of 2003, due to concerns that the FPM was "radicalizing" its members to oppose the UK's wars in Muslim countries.

3.      The Plaintiff continued to lead prayers on the street in front of the closed mosque, until he was arrested and put in the Belmarsh prison in the UK on May 27, 2004.  The Plaintiff was charged and convicted of inciting violence and racial hatred in the UK after the United States designated him a terrorist and requested his extradition. After an eight-year legal battle, the Plaintiff was extradited to the United States to face additional charges arising from the content of his speech.  His extradition was at first denied by the European Court of Human Rights, until officials from the U.S. Department of Justice made assurances to that court that the Plaintiff would not be held in the ADX "administrative maximum security" prison in Florence, Colorado on account of his disabilities.  After he was extradited, the Plaintiff was convicted, sentenced to life imprisonment, and placed in the ADX for the rest of his life.

4.      The Plaintiff's conditions of confinement in the ADX have at times been unique and unlike any other prisoner held in the United States.  The Defendants built a special cell in the ADX to prevent the Plaintiff from ever communicating with other inmates, although now he is

allowed to do so.  The Plaintiff is severely disabled, having lost both arms in 1993, with no vision in one eye, and poor vision in his remaining eye.  The Plaintiff's cell was designed for a person in a wheelchair, and doesn't accommodate his disabilities.  Nor does he have prosthetic devices that allow him to attend to the basic funcions of life, such as eating and cleaning himself. He is not allowed to pray with other Muslims, and has no reasonable access to <u>halal</u> food that accomodates his disabilities.  The Plaintiff suffers from two different kinds of discrimination, based on his religion and his disabilities.

## II.  JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based on the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb <u>et seq</u>., the Civil Rights Act of 1871, 42 § U.S.C. 1983, based on violations of the First, Fifth, and Eighth Amendments of the U.S. Constitution, the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and the Administrative Procedure Act, 5 U.S.C. § 500 <u>et seq</u>.

6.      The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), for claims relying on the theory in <u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388 (1971).  The Plaintiff  is a citizen of the United Kingdom.  The <u>Bivens</u> Defendants are citizens of various U.S. states.  The amount in dispute between the Plaintiff and each <u>Bivens</u> Defendant exceeds $75,000.

7.      This  Court  has  personal  jurisdiction  over  Defendants.   Defendants Parry, Averit, Garduno, William, Hudelston, Sterett, Armijo ~~and,~~ Edwards, <u>Follows, Chorosevic, Loewe and Norjano</u> are alleged to work at the ADX prison in Colorado, and on information and belief, reside in Colorado.  The remaining Defendants  Garland, Wray, Carvajal, True, Tutoilumundo, Macmillan, ~~Follows, Loewe, Norjano and Chorosevic~~ are sued in their official capacities as officials of the Department of Justice, which controls every aspect of the ADX prison and the Plaintiff's situation.  On information and belief each is a resident of a state of the United States.

3

There is general personal jurisdiction over all Defendants under Colorado's long arm statute, Colo. Rev. Stat. § 13-1-124, since the DOJ transacts business, owns property, enters into contracts, and commits torts in this state. Id. There is also specific personal jurisdiction over all Defendants, because they or the agency they represent purposefully directed their activities towards residents of Colorado, and this litigation results from alleged injuries that arise from or relate to those activities.

8.      Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b)(2), (c) and (d). The events giving rise to these claims occurred in the ADX prison in Colorado. For venue purposes, the Defendants sued in their official capacities "reside" in Colorado, are subject to personal jurisdiction in Colorado, and have systematic and continuous contacts with Colorado. 28 U.S.C. §1391(b)(1), (c) and (d).

### III. PARTIES

### Plaintiff

9.      The Plaintiff is a British national who is now incarcerated in the ADX prison in Florence, Colorado, in the United States, after his extradition on October 6, 2012.

### Defendants

10.     Merrick Garland is the Attorney General of the United States. Defendant Garland is being sued in his official capacity. On information and belief Defendant Garland is a resident of a state of the United States.

11.     Christopher Wray is the Director of the Federal Bureau of Investigation. Defendant Wray is being sued in his official capacity. On information and belief Defendant Wray is a resident of a state of the United States.

12.     Michael Carvajal is the Director of the Bureau of Prisons.  Defendant Carvajal is being sued in his official capacity.  On information and belief, Defendant Carvajal is a resident of a state of the United States.

13.     B. True is the Warden at the ADX.  Warden True was Assistant Warden in 2015 when the Plaintiff arrived at the ADX, and was promoted to Warden in 2017.  Defendant True is being sued in his official capacity.  On information and belief Defendant True is a resident of a state of the United States.

14.     Defendant Tutoilumundo is a Unit Manager in the ADX.  Defendant Tutoilumundo is being sued in his official capacity.  On information and belief, Defendant Tutoilumundo is a resident of a state of the United States.

15.     Defendant MacMillan is a BOP official in the ADX Facilities Department.  Defendant MacMillan is being sued in his official capacity.  On information and belief Defendant MacMillan is a resident of a state of the United States.

16.     Defendant Follows is the ADX Medical Department Manager.  Defendant Follows is being sued in her ~~official~~ individual capacity.  On information and belief, Defendant Follows is a resident of a state of the United States.

17.     Defendant Loewe is a corrections officer in the ADX.  Defendant Loewe is being sued in his ~~official~~ individual capacity.  On information and belief, Defendant Loewe is a resident of a state of the United States.

18.     Defendant Norjano is a corrections officer in the ADX.  Defendant Norjano is being sued in his ~~official~~ individual capacity.  On information and belief, Defendant Norjano is a resident of a state of the United States.

19.     Defendant Chorosevic is an ADX Occupational Therapist.  Defendant Chorosevic is being sued in his ~~official~~ individual capacity.  On information and belief, Defendant Chorosevic is a resident of a state of the United States.

20.     Defendant Parry is an ADX corrections officer.  Defendant Parry is being sued in his individual capacity.  On information and belief, Defendant Parry is a resident of a state of the United States.

21.     Defendant Averit is an ADX corrections officer.  Defendant Averit is being sued in his individual capacity.  On information and belief, Defendant Averit is a resident of a state of the United States.

22.     Defendant Garduno is an ADX Lieutenant.  Defendant Garduno is being sued in his individual capacity.  On information and belief, Defendant Garduno is a resident of a state of the United States.

23.     Defendant William is a nurse in the ADX.  Defendant William is being sued in his individual capacity.  On information and belief, Defendant William is a resident of a state of the United States.

24.     Defendant Hudelston is a nurse in the ADX.  Defendant Hudelston is being sued in his individual capacity.  On information and belief, Defendant Hudelston is a resident of a state of the United States.

25.     Defendant Sterett is a doctor in the ADX.  Defendant Sterett is being sued in his individual capacity.  On information and belief, Defendant Sterett is a resident of a state of the United States.

26.     Defendant Armijo is a Lieutenant in the ADX.  Defendant Armijo is being sued in his individual capacity.  On information and belief, Defendant Armijo is a resident of a state of the United States.

27.     Defendant Edwards is a Corections Officer in the ADX.  Defendant Edwards is being sued in his individual capacity.  On information and belief, Defendant Edwards is a resident of a state of the United States.

## IV.  BACKGROUND FACTS CONCERNING THE PLAINTIFF'S EXTRADITION AND INCARCERATION IN THE UNITED STATES

28.     On May 27, 2004, Plaintiff Mostafa Kamel Mostafa ("Plaintiff" or "Mostafa") was detained on remand by British authorities and appeared before magistrates pursuant to a request for extradition by John Ashcroft, Attorney General of the United States.  The indictment charged the Plaintiff with hostage taking and conspiracy to take hostages in connection with an attack in Yemen in December of 1998; for providing material support to *al Qaeda*, by allegedly attempting to set up a terrorist training camp in Bly, Oregon, from October 1999 to early 2000; for providing material support to *al Qaeda* and the Taliban; and for facilitating violent *jihad* in Afghanistan.

29.     An eight and a half year legal battle over the Plaintiff's extradition ensued.  During this time, the Plaintiff was held in Belmarsh prison in the UK.  [Doc. 37-1 at 28].  At no time was the Plaintiff ever a fugitive.  The Plaintiff behaved well in the Belmarsh prison and obeyed the prison's rules.  The UK authorities attended to the Plaintiff's basic needs, providing him with a nurse and prosthetics to accommodate his disabilities.

### *The Defendants' Promise to the European Court of Human Rights*

30.     On August 1, 2008, the Plaintiff lodged an application under Article 34 of the European Convention for the Protection of Human Rights and Fundamental Freedoms, against the United

Kingdom of Great Britain and Northern Ireland.   <u>See</u> Judgment of April 10, 2012, of the European Court of Human Rights, in <u>Babar Ahmad and Others v. the United Kingdom</u>, available online at: https://hudoc.echr.coe.int/fre#%7B%22itemid%22:[%22001-110267%22]%7D.

31.     On July 8, 2010, the ECHR blocked the Plaintiff's extradition to the United States until it could be satisfied that he would not be treated inhumanely.   The Human Rights Act requires UK courts, including the Supreme Court, to take account of decisions of the European Court of Human Rights, although they are not strictly bound by them.  Signatories to the ECHR, including the UK, are prohibited from transferring anyone to a place where they would be subject to inhumane or degrading treatment.

32.     After considering the statements of officials at the ADX Florence prison, including then-Warden Ron Wiley, and of the Defendant Department of Justice, on April 10, 2012, the ECHR approved the extradition of the Plaintiff and four others, relying on representations that the Plaintiff wouldn't be held in the ADX.   "The Court also refused [the Plaintiff] Abu Hamza's request for reconsideration of its decision to declare his complaint concerning ADX inadmissible.   The Court observed that the United States authorities would consider Abu Hamza's detention at ADX impossible because of his disabilities (particularly the amputation of his forearms)."  April 10, 2012 Press Release of the ECHR at 3, "Detention conditions and length of sentences of five alleged terrorists would not amount to ill-treatment if they were extradited to the USA," ECHR 146 (2012); <u>see</u> April 10, 2012 Judgement in <u>Case of Babar Ahmad and Others v. the United Kingdom</u>, which became final on September 24,2012.

33.     After another appeal, on October 5, 2012, the High Court granted the UK's government's request to extradite the Plaintiff to the U.S.  On October 6, 2012, the Plaintiff was extradited to the United States.

34.     On May 19, 2014, the Plaintiff was convicted of conspiratorial and/or substantive crimes relating to terrorism; specifically, hostage taking, 18 U.S.C. § 1203 (Counts One and Two); providing material support for terrorism, id. §§ 371, 2339A (Counts Three, Four, Seven, and Eight); providing material support to *al Qaeda*, a designated foreign terrorist organization, id. § 2339B(a)(l) (Counts Five, Six, Nine, and Ten); and supplying goods and services to the Taliban, id. § 371; 50 U.S.C. § 1705(b); 31 C.F.R. §§ 545.204, 545.206(b) (Count Eleven).  On January 9, 2015, the Plaintiff was sentenced to life in prison without parole.

### *The Plaintiff is being punished for his speech.*

35.     The Plaintiff's conviction was despite the lack of any causal connections between his abstract statements about *jihad* or alleged praise of Osama bin Laden, and any specific lawless action that was both imminent and likely.  This was the standard set by the United States Supreme Court in Brandenburg v. Ohio, 395 U.S. 444 (1969), defining the limits of freedom of speech.  In Hess v. Indiana, 414 U.S. 105 (1973) the Court found that Hess's speech "amounted to nothing more than advocacy of illegal action at some indefinite future time," and therefore did not meet the imminence requirement.  The Plaintiff's speech was about an abstract ideology rather than a role in planning or coordinating the activities of others.

36.     The Plaintiff was convicted for the crime of hostage-taking in Yemen, pursuant to 18 U.S.C. § 1203, despite a lack of ~~jurisdiction~~ involvement.  For offenses occurring outside the United States, 18 U.S.C. § 1203 requires (A) the defendant or the person seized is a national of the United States; (B) the defendant is found in the United States; or (C) the governmental organization sought to be compelled is the Government of the United States. 18 U.S.C. § 1203(b)(1).  ~~None of these factors would apply to hostage taking in Yemen, unless the motive of the hostage takers were to compel the government of the United States.  If their motive were to~~

~~compel the Yemeni government to do something, as it was, that would not be a basis for jurisdiction.  This should have been obvious to the trial judge, and properly explained to the jury.~~

37.     The Plaintiffs' alleged support of the Islamic Army of Aden (the hostage-takers) was between 1997-1998, four years before it was declared a terrorist group in 2002.  ~~The Plaintiff's conviction for providing support to this group before they were declared a terrorist organization was an ex post facto application of a criminal statute, and also invalid on its face.~~  At the time, the United States wasn't involved in the war in Yemen, and the Islamic Army of Aden wasn't hostile to the United States.  The Plaintiff had allegedly put air time on a phone used by this group, even though he was not the owner and did not have the ability to.

38.     Moreover, the Plaintiff's alleged support for the Taliban should be viewed in the light of the Taliban's agreement to cease hostilities with the United States and the Afghan government's release of prisoners after the Taliban assumed control.  Although no agreement was made with respect to the Plaintiff, he is in some sense a prisoner of war, from a war that has now concluded. Precisely what did the Plaintiff do to support the Taliban?  He was accused of donating money to a school for girls, which wasn't suspected of any illegal activities.

39.     In summary, the ~~trial court had no jurisdiction over any of the charges for which the Plaintiff was convicted.  T~~he Plaintiff was punished for his speech, which although legal in the United States, was apparently extremely upsetting to British authorities.  The Plaintiff was, essentially, making the moral case for opposing the western-led war in Yemen.

40.     About eight months after he was convicted, in February of 2015 the Plaintiff was transferred from the Metropolitan Correction Center (MCC) in New York to the Federal Medical Center (FMC) in Missouri.  The Plaintiff was housed in the FMC Missouri for another eight months, until in October of 2015, when the Plaintiff was transferred to the United States

10

Penitentiary, Administrative Maximum Facility ("ADX") in Florence, Colorado.  This is where the Plaintiff is incarcerated now, despite assurances made by the Defendants to the ECHR, and its finding that U.S. authorities would consider the Plaintiff's detention at the ADX "impossible."

### The impact on the case of Julian Assange.

41.     The Defendant's illegal placement of the Plaintiff in the ADX has made it difficult for the UK, and other countries bound by the European Convention on Human Rights, to extradite anyone to the United States if there is a possibility or "real risk" they could be held in the ADX. The possibility standard can not only be found in the ECHR Judgment in Babar Ahmed (the Plaintiff's extradition case), but also in an extradition challenge made by Wikileaks founder Julian Assange.  See Trial Court decision of Jan. 4, 2021 in US v. Julian Assange, Case No. CO/150/2021.  On appeal, the High Court of Justice, Queen's Bench Division, described the decision below as follows: "The judge then considered the evidence as to the mental health care which would be available to Mr Assange if detained in the USA. She was satisfied that, if he is subjected to the extreme conditions of SAMs, Mr Assange's mental health would deteriorate to the point where he would commit suicide.  Again, she accepted Professor Kopelman's opinion on that issue.  She accepted that it was 'by no means certain' that SAMs would be imposed on Mr Assange, but was satisfied that there was 'a real risk that he will be kept in the near isolated conditions imposed by the harshest SAMs regime, both pre-trial and post-trial.'"  U.S. v. Assange, [2021] EWHC 3313 (opinion of 10/12/2021) at ¶17: https://www.judiciary.uk/wp-content/uploads/2021/12/USA-v-Assange-judgment101221.pdf

42.     All of the expert psychiatric witnesses in that case, including the government's, agreed that pre-trial SAMs restrictions would have a deleterious impact on Mr Assange's mental health. Id. at ¶15(ii).  In addition, an attorney for the Plaintiff in this case, Lindsey Lewis, submitted a

declaration in Mr. Assange's case explaining what had happened to the Plaintiff.  The UK trial court ordered Julian Assange released.  Id. at ¶19.

43.     The U.K. High Court then reversed, after the Defendants' representatives provided assurances that Mr. Assange wouldn't be held in the ADX.  "The United States undertakes that, pretrial, Mr. Assange will not be held at the United States Penitentiary – Administrative Maximum Facility (ADX) in Florence, Colorado. If he is convicted and sentenced to a term of imprisonment, Mr. Assange will not be held at the ADX save that the United States retains the power to designate Mr. Assange to ADX in the event that, after entry of this assurance, he was to commit any future act that then meant he met the test for such designation."  Id. at ¶30.  "The United States has provided assurances to the United Kingdom in connection with extradition requests countless times in the past.  In all of these situations, the United States has fulfilled the assurances it provided."  Id. at 31.  As of the time this Complaint is written, Mr. Assange has not be extradited, and whether the Defendants will keep their promise in that case is unknown.

44.     The Plaintiff has been held in the ADX since February of 2015.  He has been housed in two different cells, both of which are far from other prisoners, and designed to prevent the Plaintiff from communicating with other prisoners.  The Plaintiff is uniquely isolated, in a unique cell in the H Unit, which itself is meant to isolate Muslim prisoners from others in the ADX, which is the highest security prison in the United States.  He is too far away to communicate with other prisoners using the ventillation system, as many ADX prisoners do.  The extreme isolation is in addition to the suffering caused by the Defendants' failures to take proper care of the Plaintiff, accommodate his disabilities, and treat him humanely.  As a disabled person, the Plaintiff is even less suitable for placement "in the near isolated conditions imposed by the harshest SAMs regime" than Julian Assange.

45.     The Plaintiff is disabled, missing both hands and one eye.  The Plaintiff can barely see out of his one good eye because of cataracts and an apparently unsuccessful cataract surgery. The Plaintiff is held in a cell in the ADX designed for a person in a wheelchair, not a person who is missing his hands.  The Plaintiff's prosthetics from the UK were removed, and replaced with devices inadequate for him to meet his daily needs.  The Plaintiff's food is sometimes served in packages that he has to open with his teeth.

46.     The Plaintiff is not allowed to pray with an imam or with other prisoners, to wash before praying, and is served <u>kosher</u> meals instead of <u>halal</u> meals, preventing him from exercising his religious beliefs, and discriminating against him on account of his religion.  Some of these conditions have changed over time, or are authorized in the SAMs but not allowed in practice.

47.     The Plaintiff exhausted his administrative remedies, a process reviewable under the standards in 5 USC § 706 of the Administrative Procedure Act.  According to the Defendants, the Plaintiff "has filed no fewer than 423 individual administrative remedies and appeals of those remedies."  Defendants' Motion for Partial Summary Judgment at 3 [Doc. 102].  The Defendants only challeged the exhaustion of several of Plaintiffs' First Amendment claims.  <u>Id</u>.  However, Plaintiff has no burden to exhaust his legal theories, and need only complain about the conduct of the Defendants that is at issue.

## V.  DEFENDANTS' VIOLATIONS OF LAW

48.     Defendants' actions violate, and Plaintiff's causes of action arise from, the following laws:

     (a)     The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb <u>et seq</u>.

     (b)     The Rehabilitation Act, 29 U.S.C. § 794(a);

     (c)     The Civil Rights Act, 42 U.S.C. § 1983;

     (d)     The United States Constitution;

(e)      The Administrative Procedure Act, 5 U.S.C. § 500 <u>et seq</u>.;

(f)      Common law of the United States of America;

(g)      Statutes and common law of Colorado;

(h)      The US-UK Extradition Treaty; and

(i)      The UK Human Rights Act.

## VII.  CAUSES OF ACTION

49.      With respect to all of the causes of action described below, the harm to Plaintiff was caused by the acts or omissions of Defendants.  Numerous individuals are sued in their official capacities, even though they all work for the Department of Justice, because they are believed to have had a role in the conduct or policies at issue in this case.  The Defendants conspired and aided and abetted each other in ways unknown to the Plaintiff, and most have <u>respondeat superior</u> liability, as agency officials, for the conduct of those working for them.

### <u>First Cause of Action</u>

**Violation of the Religious Freedom Restoration Act, of 1993, 42 U.S.C. 2000bb  <u>et seq</u>., asserted against Defendants Garland, Wray, Carvajal, and True, in their official capacities.**

50.      The Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

51.      The Plaintiff is a Muslim and the former Imam of a mosque in London, England.

52.      The restrictions placed on Plaintiffs' communications prevent him from attending worship services or praying with other prisoners, substantially burdening the Plaintiffs' practice of his religion.  As the Plaintiff explains in more detail <u>infra</u> at ¶¶ 60-61, group prayer is totally prohibited in the H Unit of the ADX prison, where the Plaintiff is housed.  The Plaintiff has never been allowed to pray with other Muslim prisoners since he was transferred to prisons in the United States, including the ADX, Metropolitan Correctional Center ("MCC") or Federal

Medical Center in Missouri ("FMC").  This is in contrast to the Belmarsh Prison in the United Kingdom, where the Plaintiff was previously incarcerated and allowed to pray with other prisoners.

53.     After the Plaintiff arrived in the United States, he was kept in complete isolation, and wasn't allowed to communicate with any other prisoners between 2012-2015.

54.     In October of 2015, the Plaintiff was for the first time allowed to go to "rec."  This refers to "recreational time," which is spent in a cage next to five other prisoners in similar cages.  Beginning October 18, 2019, the Plaintiff was allowed go to "rec" approximately once per week.  At some point, this was reduced to once every two weeks.  The Plaintiff wasn't allowed to leave his cell at all between the periods of November 14, 2020 - January 29, 2021 and October 15, 2021 - November 5, 2021.  The Plaintiff has not been to "rec" at all in the past three months.  This is due partly to the Defendants' restrictions, and partly due to the Plaintiffs' health problems.

55.     The Plaintiff has asked for the rec time to be used for group prayer.  There are many other Muslim prisoners in the H Unit of the ADX, where the Plaintiff is housed.  However, group prayer has never been permitted.  Moreover, when recreational time is allowed, it is scheduled for times between 7AM-11AM, which doesn't include any of the 5 times per day Muslims are supposed to pray.  Only a small change to the schedule would cause it the rec time to coincide with one of the prayer times.  The Defendants refusal to accommodate group prayers is an arbitrary and unreasonable restriction on the prisoners' practice of their religion.

56.     Muslim prisoners should also be allowed to make a row, or rows, while facing in the direction of Mecca.  The Defendants arbitrarily placed the recreational cages facing in a different direction.  A change in orientation of 45 degrees or less would allow the Muslim prisoners to make either two rows or three, or three rows of two.

57.     Although no photographs of recreational cages in the H Unit are available, since the H Unit is used for Muslim prisoners, the Defendants should have alternative means that are readily available to accommodate the prisoners' right to group prayer.  The Defendants could reserve one or another of these types of cages for one of the Muslim prayer times on Fridays, and allow the prisoners to choose whether to use their rec time this way, and decide amongst themselves which of them will lead the Friday prayers.  This would place a <u>de minimis</u> burden on the Defendants to alter the rec schedule, not requiring any additional staff, or impacting on any legitimate penological interest in any way.

58.     When the Plaintiff was in Belmarsh prison in the UK, he had daily prayers with other prisoners, weekly prayers with other prisoners on Fridays, and two additional *Eid* prayers, all of which were held in person, in groups.  At times, the Plaintiff was asked by the prison managers to lead Friday sermons, when the prison's Imam wasn't available.  The Defendants don't need to provide an Imam, though, since any Muslim prisoner could lead the prayers.

59.     For some period of time, the Plaintiff was allowed monthly visits by an Imam while at the ADX, for three to five minutes each.  In March 2020, these visits were stopped altogether and have not been resumed.  [Doc. 43-1 at 11 ¶ 12]  These visits are a poor substitute for group prayer, which is essential to the religion of Islam.

60.     A connection with the *ummah*, or community of Muslims, is essential to the religion of Islam.  [Doc. 43-1 at 11 ¶ 12].  The Plaintiff's SAMs state that: "c) Inmate Communication Prohibitions - i)  You are limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could reasonably foreseeably [sic] result in you

16

communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting your ability to communicate (send or receive) threatening or other terrorism-related information.  ii)  The USMS/BOP/DF may permit you to communication with other SAM inmates orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF.  You shall not have any physical contact with other inmates during this predesignated time and all such predesignated sessions may be monitored and/or recorded." [Doc. 169-1 at 6, ¶ (1) (c)(ii)].  Nevertheless, the Plaintiff has never been allowed to pray with others.  Nor has he observed any other prisoners in the ADX engaged in group prayer, during recreational time, or at other times.  According to the Plaintiffs' January 6, 2022 SAMs, which are currently in force, "5) **Religious Visitation**  a) If a USMS/BOP/DF- and/or FBI-approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF."  [Doc 169-1] at 16. (emphasis in original)  The Defendants have never had to use this discretion because they have never approved any such visit or even group prayer among the prisoners.  The Plaintiff worked as an *Imam* and could lead the prayer, or another Muslim prisoner could lead the prayer.  The Defendants don't need to provide personnel to lead the prayers.

61.    Courts have recognized the right of prisoners to group prayer.  See Lindh v. Warden, Fed. Corr. Inst., 2013 WL 139699 Case No. 2:09-cv-00215-JMS-MJD (S.D. Ind. Jan. 11, 2013).  So have the Defendants themselves.  BOP Program Statement 5360.09, Religious Beliefs and Practices, requires the Defendants to provide prisoners with "reasonable and equitable opportunities" to pursue their religious beliefs.  But instead of providing equitable opportunities, the Defendants discriminate against Muslims and unfairly associate the religion with terrorism.

62.     In addition to being unable to participate in group prayer, the failure to provide <u>halal</u> food in a form that is accessible to the Plaintiff substantially burdens his practice of his religion. Serving the Plaintiff <u>kosher</u> food instead, puts substantial pressure on the Plaintiff to modify his behavior and violate his beliefs.  <u>Halal</u> meals are available generally, but the Plaintiff had to choose <u>kosher</u> over <u>halal</u> because the <u>halal</u> food is packaged differently and delivered in a different type of tray that the Plaintiff is unable to use.  A reasonable accomodation would be for the Defendants to serve the Plaintiff <u>halal</u> food packaged the same was as the <u>kosher</u> food.

63.     Specifically, the tray used to serve <u>kosher</u> food is half the height of the tray used for <u>halal</u> food, and is easier for the Plaintiff to scoop from.  The Plaintiff wants to eat the <u>halal</u> meals, but the way they are served makes them too difficult to eat.  The different types of food trays appear arbitrary and serve no legitimate penological interest.  The Defendants have failed to accommodate the Plaintiff's disability by forcing him to eat food prepared according to a different religion.

64.     In addition, the Plaintiff is denied feast meals related to his Islamic faith.  [Doc. 43-1 at 11 ¶ 12]  He should be provided with feast meals for *Eid*.  The Plaintiff's religion requires that he eat meat for these meals.  The Defendants would not give the Plaintiff a Passover meal, even though the dates for Passover meals, which are provided for a week to Jewish inmates, coincides with one of the <u>Eid</u> festivals.  The Defendants' failure to provide a meal with meat on *Eid* places a substantial burden on the Plaintiff's practice of his religion.

65.     Due to the restrictions imposed by the Defendants, the Plaintiff cannot wash himself "after toilet to pray his minimum 5 times" and "always soil his cloths and area in trying." [sic] [Doc. 43-1 at 11 ¶ 12].  The Plaintiff's religion requires that he wash himself before praying.  The poor hygiene afforded to the Plaintiff serves no legitimate penological interest, burdens the

Plaintiff's exercise of his religion, which need not be compelled by, or central to, his system of religious belief in order to be protected.

66.     These conditions must be considered in their totality, and are not pled as individual claims.

67.     The restrictions on prayer, meals, washing, and physical appearance are not in furtherance of any compelling governmental interests, or the least restrictive means of furthering those interests.   The Defendants have no legitimate interest in prohibiting group prayer, providing accessible <u>kosher</u> but not <u>halal</u> food, or appropriate food on *Eid*.   The Defendants haven't considered less restrictive means to try to accomodate Muslim times for prayer, lining up in rows to face Mecca, washing, and eating food that is consistent with their religion.

### Second Cause of Action

**Violation of First Amendment free exercise of religion, asserted against
Defendants Garland, Wray, Carvajal, and True, in their official capacities.**

68.     Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

69.     The restrictions on group prayer, ritual washing, and food are not reasonably related to legitimate penological interests because there are no valid, rational connections between the regulations and any governmental interest.

70.     Any rational-sounding connections between these rules and either prison security or efficiency are so remote as to render the rules arbitrary or irrational.   The Defendants can easily allow some prisoners to use rec time for group prayer, alter the rec time to correspond to one of the five times a day Muslims pray, provide a way for the Plaintiff to clean himself, change the packaging of <u>halal</u> meals to make them as accessible as <u>kosher</u> meals, and even change the orientation of the recreational cages without expending more than <u>de minimus</u> efforts.

19

71.     The restrictions placed on the practice of Islam in the ADX are an exaggerated response, partly motivated by political pressure from the United Kingdom, to the real threat posed by the Plaintiff, which is minimal.  It is based on the Plaintiff's ideas and speech, rather than on any specific misdeeds.  The Plaintiff's behavior in prison has been excellent.  He is not violent, and wasn't convicted of committing any act of violence himself.  The exaggerated precautions taken against Muslim prisoners are exaggerated even more in the case of a Muslim religious leader.

72.     The rights at issue are clearly established in the law.  See e.g., Lindh v. Warden,. 2013 WL 139699 (S.D. Ind. Jan. 11, 2013) (right to group prayer).  The right of Muslim prisoners to wear beards was recently upheld in Ashaheed v. Currington, Case No. 20-1237 (10th Cir. August 10, 2021).

### Third Cause of Action

**Violation of Fifth Amendment equal protection clause, asserted against
Defendants Garland, Wray, Carvajal, and True, in their official capacities.**

73.     Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

74.     Restrictions on group prayer, food and washing discriminate against Muslims, or have disparate impacts on Muslims.

75.     The provison of kosher but not halal food in an accessible form discriminates against Muslims in favor of Jews.  The provision of Passover meals, but not *Eid* meals, does the same. The prohibition on group prayer has a disparate impact on Muslims, who practice their religion as part of the Ummah, or worldwide community of Muslims, and all pray at certain times, in the direction of Mecca.  The Defendants prohibit Muslim prisoners from participating in this, cutting them off from this source of psychological support, to further punish the prisoners by compounding their sense of isolation.  The poor level of hygiene provided to the Plaintiff means

that he is unable to properly clean himself before he prays.  This also has a disparate impact on Muslims because other religions don't require their adherents to wash themselves before praying.

76.     Although the Defendants' policies may not refer to religion, they are discriminatory in effect.  The Defendants' conduct has effectively classified prisoners according to their religious beliefs, and produced unequal effects.

77.     The Defendants' discriminatory intent can be proved circumstantially, from the totality of all relevant facts.

78.     Religion a suspect classification.  The free exercise of religion is a fundamental right. Therefore, strict scrutiny applies.

79.     The Plaintiff has been treated differently from similarly situated persons who are alike in all relevant respects, other than religion, insofar as his total isolation prevents him from participating in group prayer.

80.     None of these prohibitions are necessary to further a compelling government interest. They have not been narrowly tailored to accommodate both the Plaintiff's rights, and the prison's interests in security and administrative efficiency.  Alternative means haven't been considered.

81.     Plaintiffs' free exercise and equal protection claims for intentional religious discrimination largely overlap.  See Davis v. Passman, 442 U.S. 228 (1979) (allowing Bivens action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment); Ashcroft v. Iqbal, 556 U.S. 662, 675-77 (2009) (describing a religious discrimination Bivens claim brought by a federal pretrial detainee as alleging a violation of "the First and Fifth Amendments," and proceeding to treat it as a single claim); Morris Cnty. Bd. of Chosen Freeholders v. Freedom from Religion Found., 139 S. Ct. 909, 909 (2019) (statement of Kavanaugh, J., respecting the denial of certiorari) ("governmental discrimination against religion

... violates the Free Exercise Clause and the Equal Protection Clause"); <u>Colo. Christian Univ. v. Weaver</u>, 534 F.3d 1245, 1266-67 (10th Cir. 2008) (observing that religious discrimination claims can arise under the Free Exercise Clause or Equal Protection Clause); <u>Fields v. City of Tulsa</u>, 753 F.3d 1000, 1012 (10th Cir. 2014) (holding that religious discrimination claims under the Free Exercise Clause and Equal Protection Clause were duplicative).

### Fourth Cause of Action

**Violation of First Amendment rights of freedom of speech and association, asserted against Defendants Garland, Wray, Carvajal, and True, in their official capacities.**

82.     Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

83.     In addition to severely restricting Plaintiff's communications with his foreign attorneys, and with prospective, un-approved attorneys, the Defendants have placed categorical restrictions on Plaintiff's communications with his family members.

84.     The Plaintiff is not permitted to communicate at all with three of his sons or his stepson, and may only contact one of his eleven grandchildren by phone, who is ten years old and named Bilal.  [Doc. 43-1 at 10 ¶ 11, Doc. 37-1 at 14-15].  On information and belief, the Defendants have a rule prohibiting children under 9 years of age from communicating with SAMs prisoners. [Doc. 37-1 at 15]

85.     The Plaintiff has four grandchildren who are allowed to contact the Plaintiff in writing, but not by phone.  This isn't reasonable  because these children are too young to be able to read or write.  This modification of Plaintiffs SAMs, to allow written communications to them, may create the impression that the Defendants were giving serious consideration to the Plaintiffs' Administrative Remedy Requests, when in fact they were not.  Likewise, children under 5 wouldn't be capable of visiting the Plaintiff in prison without the assistance of an adult.  At this time, the majority of the Plaintiff's grandchildren are under 5 years old.  For the others, who are

able to read and write, it serves no legitimate penological interest to deprive the Plaintiff of the love and emotional support that he might have from speaking to his grandchildren on the phone. The Defendants' own policies show that they should encourage these kinds of relationships, to protect the mental health of the prisoners they are supposed to be taking care of.

86.     Aside from his attorneys, the only two individuals who are allowed to visit the Plaintiff are the Plaintiff's wife and one of his daughters, neither of whom can travel alone.  The result is that the Plaintiff is almost entirely isolated from the outside world.

87.     On information and belief, the SAMs have been an impediment to visits by qualified medical professionals, such as qualified occupational therapists, doctors and dentists, or religious leaders.  The poor medical care the Plaintiff has received appears to result from the Defendant's exaggerated concerns over the Plaintiff's ability to communicate with the outside world.

88.     For the eight years he was in Belmarsh prison in the UK, the Plaintiff's communications weren't restricted in any comparable comparable way.  The Plaintiff was taken care of while he was in the Belmarsh prison.  The Plaintiff's family lived on a property adjacent to the home of the Secretary of Defense of the United Kingdom, Lord Hatton, and shared a garden fence with Lord Hatton.  The Plaintiff's children, who are now prohibited from contacting the Plaintiff by the SAMs, once played on the lawn next to the UK Defense Secretary's home.

89.     At times, the Defendants impose harsher conditions than these for administrative reasons unrelated to the Plaintiff.  At the time this Complaint was written, the ADX had been on a 24/7 lockdown since January of 2022.

90.     The Defendants' rules restricting prisoner communications to immediate family members has already been held to be arbitrary and capricious in a similar case.  See Mohammed v. Holder, 47 F. Supp. 3d 1236 (D. Colorado. Jun 17, 2014).  Yet the Defendants maintain the same

policies, which were already proven to be illegal, preventing the Plaintiff from receiving the love and emotional support of his children and grandchildren, who are harmless.

91.    The restrictions are not reasonably related to legitimate penological interest because there are no valid, rational connections between them and any governmental interest.

92.    The restrictions appear to be pretexts for punishing the Plaintiff in ways not authorized by law, or by the sentencing judge.  Their connection to real security threats is so remote as to render them arbitrary or irrational.  For example, the Plaintiffs' SAMs cite an instance in which one of his family members put his voice on a speaker phone during a call, as a violation of the SAMs by the Plaintiff, even though he did not cause the violation himself.  See [Doc. 169-1] at 3-4, "Basis for Special Administrative Measures."  The de minimus rule violations listed as the justification for the renewal of the Plaintiff's SAMs are similar to those found arbitrary and capricious in the Mohammed case.  See [Doc 168-3], Opinion in Mohammed v Holder, at 11 n 9. ("That being said, the Court is utterly unpersuaded by Mr. Moen's contentions that Mr. Mohammed's engaging in hunger strikes, making false accusations against BOP or its staff, and his disparaging of the U.S. or the BOP in communications with others are reflective of his efforts to wage a continuing jihad against the U.S.  The examples given by Mr. Moen of such conduct by Mr. Mohammed are entirely mundane and indistinguishable from the sorts of behavior that this Court sees from ordinary inmates (i.e. those who have not received training "out of the al Qaeda playbook") on a near-daily basis.")

93.    The arbitrary and irrational nature of the SAMs is also shown by the fact that while the Plaintiff awaited extradition in Belmarsh prison for eight and a half years, no special restrictions were placed on his communications, compared to the other prisoners in Belmarsh.  The US could have asked the UK authorities to impose limitations on the Plaintiffs' speech during those eight

years, but did not.  No harm ever resulted to anyone from the Plaintiffs' speech while he was in Belmarsh.

94.     The restrictions placed on Plaintiffs's communications are an exaggerated response to the real threat posed by the Plaintiff, which is minimal.  The SAMs document exaggerates the Plaintiff's alleged role in supporting terrorism, and exaggerates the dangers of Muslim terrorists over persons committing similar acts, who are motivated by other reasons.  Even the Plaintiff's infant grandchildren are considered dangerous.  This is due to a discriminatory animus which the Defendants have institutionalized.

95.     The Defendants have failed to consider ready alternatives that fully accommodate the prisoner's rights, at de minimis costs to valid penological interests, such as changing the times for prayers, the orientation of the cages, or packaging halal meals the same way as kosher meals.

96.     The Defendants have failed to properly balance the impact on prison staff, on the Plaintiffs' liberty, and on the allocation of limited prison resources, including the costs of litigating issues that should be resolved at the administrative agency level.  The Defendants' responses to requests and appeals pursuant to the Administrative Remedy Program don't make use of any legal analysis, cite any laws, or the facts relied on to make decisions.  Whatever factors the Defendants take into account in processing these requests are left unstated.  The overwhelming majority of them are denied without explanation, placing the burden on the Court to review handwrittten complaints and no legal analysis or reasoning to use as a starting point.  Most of them are Bivens actions because that is the theory suggested in the Defendant's prisoner complaint form.

### Fifth Cause of Action

**Violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), against Defendants Garland, Wray, Carvajal, and True, in their official capacities, for**

**failure to provide reasonable accomodation for Plaintiff's amputated arms.**

97.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

98.    The Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("Rehab Act") apply to prisoners in state and federal prisons, respectively.  They are treated identically in the law, except that the ADA has an additonal requirement that the Defendant receive federal funds. The relief provided by the two statutes is coextensive.  See  Barnes v. Gorman, 536 U.S. 181, 189 & n. 3 (2002); Morris v. Rumsfeld, 420 F.3d 287, 290 (3d Cir.2005); Washington v. Ind. High Sch. Athletic Ass'n, Inc., 181 F.3d 840, 845 n. 6 (7th Cir.1999).  For this lawsuit, the analysis governing each statute is the same.  See  Cutter v. Wilkinson, 544 U.S. 709, 716 n. 4 (2005); Jaros v. Ill. Dep't of Corr., 684 F.3d 667, 672 (7th Cir. 2012).

99.    The Plaintiff is disabled within the meaning of the Rehabilitation Act because two of his arms were amputated, he lost sight completely in one eye, and has problems with cataracts and very poor vision in his other eye.  These physical impairments substantially limit many of the major life activities of the Plaintiff, and qualify as disabilities under § 103 of the Rehabilitation Act.  See 29 USC § 705.  Although the text of the Rehabilitation Act speaks in terms of employment, it also applies in the prison context, but instead of being a substantial impediment to employment, a disability must be a substantial impairment to major life activities.  Lacking both arms and being nearly blind are two different disabilities, neither of which have been reasonably accomodated by the Defendants.

100.    The Plaintiff is qualified to participate in the Defendant Bureau of Prisons' programs for inmates, because he is incarcerated in a federal penitentiary, which must accommodate his disabilities so that he can participate in all of the programs and activities available to other prisoners.  See Wis. Cmty. Serv. v. City of Milwaukee, 465 F.3d 737, 746 (7th Cir.2006); Foley

v. City of Lafayette, 359 F.3d 925, 928 (7th Cir.2004); Grzan v. Charter Hosp. of Nw. Ind., 104 F.3d 116, 119 (7th Cir.1997).  Refusing to make reasonable accommodations is tantamount to denying access.  Although the Rehabilitation Act doesn't expressly require accommodation, "the Supreme Court has located a duty to accommodate in the statute generally." Wis. Cmty. Serv., 465 F.3d at 747; Alexander v. Choate, 469 U.S. 287, 300–01 (1985).

101.    Although incarceration isn't a program or activity, the meals and showers made available to prisoners are.  Jaros v. Ill. Dept of Corrections, 684 F.3d 667,672 (7th Cir. 2012);  Cassidy v. Ind. Dep't of Corr., 199 F.3d 374, 375 (7th Cir. 2000); Crawford v. Ind. Dep't of Corr., 115 F.3d 481, 483 (7th Cir. 1997); Shomo v. City of New York, 579 F.3d 176, 185 (2d Cir. 2009); Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 287–88 (1st Cir. 2006).  In addition, the basic necessities of life, like opening food packages, eating, washing, using the toilet, brushing teeth and hair, cutting toenails, cleaning the cell, or even leaving the cell when allowed, are all made unreasonably difficult by the Defendants, who fail to accommodate the Plaintiff's disabilitites.

102.    The Plaintiff isn't dangerous to other inmates, either physically or otherwise.   The Plaintiff has an excellent disciplinary record during more than ten years in prison.  See School Bd. of Nassau County v. Arline, 480 U.S. 273, 287 (1987) (holding that a person who poses a significant risk to others is not "otherwise qualified" for the activity, establishing a four-part test for determining whether a contagious disease constitutes such a risk); 42 U.S.C. § 12182(b)(3).

103.    The Plaintiff is excluded from, is not allowed to benefit from, or has been subjected to discrimination in the BOP's programs because he doesn't have adequate prosthetic devices or access to prison facilities and programs that accommodate his diabilites.

104.    All of the prison officials and the governmental agencies named as Defendants receive federal funding.  See ¶¶ 8-19 supra.

105.    According to the Bureau of Prisons' regulations, the Defendants are required to provide a reasonable accomodation for the Plaintiff's disabilities.   "Accommodation needs vary from person to person, and therefore must be individualized. If an accommodation is needed, it will be provided by the department that verified the disability. When a determination is made that an inmate's needs go outside the scope of the department, different professions must work collaboratively to meet the needs of the inmate. For particularly complex cases, accommodations are determined by a team comprised of a psychologist, medical provider, educator, recreation specialist, unit manager, reentry affairs coordinator, and captain. This team is led by the Associate Warden, Programs, whose responsibility is to serve as the local coordinator on disabilities. Legal staff are consulted as needed. A social worker is part of the team if the position is filled."   See Management of Inmates With Disabilities, BOP Program Statement 5200.05 at 8 (2017).  Reasonable discovery will determine how these determinations were really made.

106.    The Defendants have also failed to provide any of the accomodations listed in BOP Program Statement 5200.05.  It says "Accommodations may include, but are not limited to, accessibility of all relevant areas of the compound, assistive devices or technologies, specialized approaches to learning, interpreters, additional time to complete tasks, modified materials (e.g., large print), enhanced reentry planning, and inmate companions. Information about accommodations authorized for a particular inmate is documented by the department approving them, and a notification is sent to the Unit Team."  Id. at 9.  See Cummings v. Roberts, 628 F.2d 1065, 1068 (8th Cir. 1980) (prisoner bedridden by a back injury alleged that prison staff failed to provide him a wheelchair, forcing him to drag himself along the floor); Maclin v. Freake, 650

F.2d 885, 889 (7th Cir. 1981) (paraplegic prisoner alleged that he had not received physical therapy for nearly a year after entering prison).

107.    The Defendants' failure to provide adequate prosthetics for the Plaintiff's arms impairs his abilities to perform actions that involve the management of basic bodily functions, which are considered Activities of Daily Living (ADLs) in the Defendants' regulations.  Id. at 2.  See Plaintiffs Pro Se Motion for TRO at 6 [Doc. 39].

108.    The Plaintiff was provided with adequate prosthetics when he was in the Belmarsh prison in the UK.  However, about six years ago, the Defendants sent the Plaintiff's prosthetics to their facility in Maryland, which lost or destroyed them.  The Plaintiff went almost nine months without any prosthetics at all, from September 13, 2016, through April of 2017.

109.    After nine months, the Defendants provided new prosthetics.  However, the prosthetic arms provided by the Defendants are made of a material that causes the Plaintiff's arm stumps to become inflamed and swell.  They should be made of similar materials to the prosthetics used by the Plaintiff in the UK, which didn't cause this reaction.

110.    Due to skin irritation problems, the Plaintiff can only use his prosthetics for 10-15 minutes at a time.

111.    The prosthetic arms provided by the Defendants aren't waterproof.  The inside of the prosthetics are blackened and contaminated, which is dangerous because the Plaintiff's arm stumps have protruding bones not covered by flesh, which are susceptible to infections.  The Plaintiff has had to have further amputations of his arms due to these infections, which were treated when he was in the MCC in 2013, but have not been treated while the Plaintiff has been in the ADX.

112.    The prosthetic arms provided by the Defendants don't have adjustable holding fingers, allow different pressures to be applied, or allow different contact surfaces on the fingers.

113.    The Plaintiff is unable to hold toilet paper with prosthetics provided by the Defendants. Since the Plaintiff uses the same prosthetic fingers for everything, the contamination of the prosthetic fingers with feces is unhygenic and potentially dangerous to the Plaintiff's health.

114.    When the Plaintiff explained this problem to Defendant Chorosevic (an occupational therapist) on February 16, 2022, Defendant Chorosevic responded "use your stumps to hold the toilet tissue then."  Defendant Chorosevic knows that the Plaintiff's arms are amputated, and that he cannot reach this part of his body with his arm stumps, but is indifferent to the Plaintiff's suffering.  On information and belief, Defendant Chorosevic has no experience with double upper amputees, since this disability is uncommon or unique in the ADX.

115.    The prosthetic arms provided by the Defendants have holding fingers that are sharp and can cut the Plaintiff if he is not careful.

116.    The prosthetic arms provided by the Defendants don't have elbow hinges, so that he cannot adjust the angle, or control them like other types of prosthetic arms that Plaintiff has had. The new prosthetics also require a lot of strength to operate, and are difficult to use.  Some prosthetics are motorized, but the Plaintiffs' are not.

117.    The Plaintiff wasn't allowed to participate in the design of the new prosthetics, nor would the Defendants ever allow the Plaintiff a visit by an occupational therapist of his choice, as demanded by his lawyers.  Instead, the persons provided by the Defendants were unqualified to design the prosthetics, and have been indifferent to the fact that they don't work properly.

118.    The Defendants have also failed to provide dental care, or an electric, prosethetic toothbrush the Plaintiff can use.  Id.  This has caused the Plaintiff to lose many of his teeth due to

infections.  The Plaintiff has lost all his lower back teeth, two of his top back teeth, and suffered severe abrasions to his front teeth and gums, because he is only able to open packets by using his stumps to hold the item and his teeth to rip it open.  [Doc. 43-1 at 24 ¶ 5].

119.    The Defendants serve the Plaintiff food in packages that he is unable to open except by using his teeth.  Id.  The Plaintiff is at greater risk of contracting covid because of this, and because he has to put these packs in his mouth after they have been touched by prison staff.  Id. at 18.  The Plaintiff fears that once his remaining teeth are gone, he will not be able to open the packages.  A reasonable accomodation would be to package the food differently, or to provide the Plaintiff with a prosthetic tool for opening the packages.

120.    The Plaintiff's persistent, untreated dental infections put him at greater risk of contracting a serious case of covid-19 or other illnesses.  The Defendants have persistently refused to provide antibiotics or other treatments for the Plaintiff's dental infections.  When he was housed in the MCC in NY until February, 2015, PA Ramos treated the Plaintiff's infections, which have gone untreated or have been inadequately treated since the Plaintiff has been housed in the ADX. The dental work done by dentists in the Belmarsh prison in the UK has been damaged and destroyed over time, and has not been replaced.

121.    The Plaintiff also needs a soap pump to attend to his basic hygeine and keep himself clean.  Id.  The levers on the sink and shower in Plaintiff's cell should be designed to take Plaintiff's disabilities into account, so that he can operate them without injuring himself or flooding his cell..

122.    The Plaintiff is unable to trim his toenails, and has cut himself and developed infections of his toes.  Id. at 15.  At the present time, the flesh behind both of the Plaintiff's big toes is infected and painful.  The Plaintiff has Type 2 Diabetes, and fears that infections of his toes

could lead to amputations of his toes or feet.  The dangers of covid-19 may are compounded if the Plaintiff has to fight two infections at once.  The Defendants ignored Plaintiffs' requests for assistance with his toenails and infections for 9 1/2 months, demonstrating an attitude of indifference.  See Leach v. Shelby Cnty. Sheriff, 891 F.2d 1241, 1243 (6th Cir. 1989) (inmate with paraplegia not bathed for several days despite danger of a recurring ulcer, forced to lie in own urine due to a lack of catheters, and receiving insufficient aid for bowel training needs).

123.    The Plaintiff has difficulty tying his shoelaces with the prosthetics provided.  The Plaintiff also has difficulty putting on his socks. As a result, the Plaintiff only changes socks about once every ten days, and wears them to the shower.   An occupational therapist noted this issue with the prosthetics in 2013, but this has never been adequately addressed.

124.    The Plaintiff was completely deprived of glasses for two lengthy periods of time.  The second occasion lasted nearly nine months, from October 2020 through August of 2021.  The Defendants' slowness in replacing the Plaintiff's glasses demonstrates the poor quality of medical care he has received.  The Plaintiff's near blindness, even with glasses, compounds his other disability.

125.    Due to the restrictions imposed by the Defendants, the Plaintiff cannot properly comb his hair, is provided no suitable hairbrush, cannot safely shave, and is unable to cut his own hair, and is denied haircuts for months on end.  [Doc. 43-1 at 11 ¶ 12]  The Defendants' denial of any way for the Plaintiff to brush or cut his hair serves no valid penological interest.  The Defendants don't regularly cut the Plaintiffs' hair, or allow him to cut it himself.

126.    The Defendant's failure to provide a hairbrush means that the only tool the Plaintiff has to brush his hair is a toothbrush.  The Plaintiff has an old toothbrush for this purpose, although the bristles aren't strong enough to penetrate all of his hair.  The Plaintiff normally uses water and

compacts his hair with his arm stumps to arrange it.  The Plaintiff cannot maintain a beard or make himself presentable due to the Defendants' restrictions.

127.    In 2018, the Defendants provided the Plaintiff with a hair brush.  However, the handle was removed for security reasons.  The Plaintiff was able to use this until some time in 2020, but it could not reach the back of his head.  The Plaintiff no longer has access to a hair brush.

128.    The Plaintiff also needs to trim the hair under his arms and pubic area to adhere to his religious practices, but has no way to do this.  This should be done on a monthly basis, at least.

129.    The Defendants have failed to provide other reasonable accomodations, including a plate, tray and spork designed for an upper amputee.  Id. at 8.  These accomodations were recommended by the Defendants' occupational therapist when the Plaintiff was imprisoned in the Metropolitan Detention Center in New York in 2013.  Id. The occupational therapist also recommended providing the Plaintiff with assistance with cleaning his cell and bedding.  Id.  The Defendants also refused to take into account the recommendations made by an occupational therapist in the United Kingdom.  Id. at 11-12.

130.    In response to Plaintiff's attorney's requests to provide Plaintiff with the essentials of daily care, an evaluating Occupational Therapist visited the Plaintiff in 2013.  In making her recommendations, the occupational therapist incorrectly assumed that the Plaintiff could make his own bed, open condiment packages, required no assistance in opening or drinking fluids safely, and required no additional help or items for cleaning assistance.  [Doc. 43-1 at 22 ¶ 4].

131.    Notwithstanding the Occupational Therapist's assumptions, the Plaintiff has to use his bare arm stumps to collect garbage from and clean his cell, which takes a long time and results in injuries, abrasions, sweating, and fatigue. [Doc. 43-1 at 22 ¶ 5].  Similarly, the Plaintiff has great difficulty changing his bedding with the prosthetics he has. [Doc. 43-1 at 22 ¶ 5, 24 ¶ 5].  Instead

of providing the Plaintiff with reasonable accomodations to clean his cell and arrange his bedding, the Defendants have required the Plaintiff to clean his cell and arrange his bed without adequate tools.  The Plaintiff doesn't have appropriate prosthetic fittings that can be used for these tasks.  Id. at 9.

132.    The Plaintiff's medical chart requires that his cell and bed must be cleaned and changed daily because of his skin problems and hyperhidrosis, and because abrasion causes his arm stumps to bleed.  [Doc. 43-1 at 24 ¶ 5].  The Plaintiff is unable to do this by himself.

133.    The Occupational Therapist nevertheless recommended that adaptive equipment, shower grab bars, a disability-friendly food tray, plastic plate, and fabricated utensils be provided; and other personal grooming items be provided to the Plaintiff until his criminal trial was finished. [Doc. 43-1 at 24 ¶ 7].  None of the foregoing items have ever been provided to the Plaintiff, either during the criminal trial, or since.  Id.

134.    In February 2015, the Plaintiff was assessed by another occupational therapist while he was temporarily housed at the Federal Medical Center in Missouri.  [Doc. 43-1 at 25 ¶ 10]. This assessment lasted less than ten minutes and, despite numerous requests, the Plaintiff has never been provided with a copy of her report.  Id.  He was never seen or assessed by this occupational therapist again.  Id.

135.    On April 15, 2016, while housed at ADX, another occupational therapist assessment was conducted.  [Doc. 43-1 at 25 at ¶ 11]. This assessment was only twenty-two minutes in duration and was conducted under extreme duress.  Fourteen other ADX officials from various departments, including the legal, medical, and food departments, were present for the assessment.  Id.

136.    That occupational therapist concluded that "because [Plaintiff] has prosthetics and can open a peanut butter jar he does not need anything from the list of fitting and items he requested from ADX."  Id.  Unknown to the Occupational Therapist, an ADX officer had loosened the peanut butter jar so that the Plaintiff could open it.  Id.  Nevertheless, the ability to open a jar of peanut butter doesn't show that the prosthetics are adequate for the Plaintiff's needs or a reasonable accomodation of his disability.

137.    Aside from failing to address the Plaintiffs' issues managing basic bodily functions, the Defendants have failed to consider their own rules that prohibit housing disabled prisoners in isolation.  "Peer support, such as inmate companions, are considered at institutions housing inmates with disabilities." Id. at 9.

138.    Compensatory damages and attorneys fees are available for Rehabilitation Act claims, in addition to injunctive relief.  29 U.S. Code § 794a.

## Sixth Cause of Action

**Violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a),
against Defendants Garland, Wray, Carvajal, and True, for failure to provide
adequate facilities, including accomodations to his toilet, shower, sink and table.**

139.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

140.    In 2015, the Defendants built a special cell in the ADX for the Plaintiff, which was Cell #300.  The Plaintiff was then transferred to the ADX from the Federal Medical Center in Missouri where he had been temporarily housed.

141.    Cell #300 is dark and has dangerous, sharp edges.  It has no windows, so no sunlight can get in.  The Plaintiff is blind in one eye and has poor vision in the other.  The Defendants failed to accommodate the Plaintiff's failing vision, which qualifies as a disability on its own, by providing a cell with adequate light.  This cell, like others at the ADX, was designed to allow

35

only a minimum amount of sunlight to reach the prisoner.  However, the Plaintiff's poor vision requires that he be provided with a reasonable accomodation.

142.    In 2017, the Defendants built Cell #511 in the ADX.  Cell #511 has a window to allow light in, but was designed for a person in a wheelchair.  The Plaintiff has no arms, and is not in a wheelchair.  The Defendants then moved the Plaintiff from Cell #300 to Cell #511, after two years of being incarcerated in the darkness.

143.    The sink, shower and toilet in Cell #511 do not accommodate the Plaintiff's disabilities. The buttons have sharp edges and are too difficult for the Plaintiff to push with his prosthetics. The Plaintiff has to press the buttons directly with the bone from one of his arm stumps, which are not covered with flesh.

144.    Reasonable discovery of the Plaintiff's medical records will show that in 2007, while in prison in the UK, the Plaintiff developed a serious bone infection from similar activities, resulting in further bone amputation.  After this incident, the UK authorities had only allowed the use of "lever faucets" and "U shape outlets" to prevent further bone injury.  The Defendants are aware of this, but indifferent to it, denying Plaintiff's administrative remedy requests and not responding to his attorneys' letters.

145.    The Plaintiff needs an upward water stream from the toilet in order to clean his rectum. This is required for hygiene as well as the Plaintiff's religion, which requires its adherents to clean themselves before praying.  The only water stream in the cell points downward, from a height of about four feet, and is not a reasonable accomodation for a double upper amputee.

146.    The toilet in the Plaintiff's cell is difficult for him to flush and doesn't have a lever that the Plaintiff can easily use.  This contributed to an infection of one of Plaintiff's arms, and a further amputation of it.

147.    At times, the Plaintiff's inability to control the shower has resulted in flooding of the Plaintiff's cell because he was unable to turn the water off.

148.    The shower has a safety rail at the level of a person sitting in wheelchair, which is too low to be used by a person standing up.

149.    The Plaintiff needs a larger table that he can use to arrange and move objects, and often has to use his mouth to lift objects, which is unsanitary and dangerous during the pandemic.  In October of 2021, apparently in response to the Plaintiff's Administrative Remedy Program requests and letters from his attorney, the Defendants increased the size of the Plaintif's table, but refused to move it closer to the sink.  The new table is located such that the Plaintiff has to sit on the toilet to use it.  This is demeaning and unhygenic, and more in the nature of retaliation than a genuine effort to accommodate the Plaintiff's disabilities.

150.    Cells #300 and #511 are both near steel gates that open every 30 minutes and make a lot of noise, resulting in the Plaintiff's perpetual state of sleep deprivation.  Although this might appear unintentional on the part of the Defendants, it is yet another condition of confinement that distinguishes the Plaintiff from other prisoners, and a type of punishment not authorized by law. The Plaintiff formally complained about this through the Administrative Remedy Program.

151.    The U.S. Department of Justice issued prison and jail-specific ADA regulations in 2010. 28 C.F.R. § 35.152.  These regulations require prisons and jails to, as a general rule, place disabled prisoners in the most integrated setting appropriate to their needs.  The Defendants have failed to consider these regulations, or weigh them properly in determining Plaintiff's housing needs.  The Defendants placed the Plaintiff in a cell which isolates him from other prisoners and prevents him from ever communicating with them.

152.    The ADX prison is unable to accommodate disabled or special needs prisoners, and wasn't designed for them.  According to Program Statement 5200.05, "Institutions should be accessible to the extent required under the Rehabilitation Act, the Architectural Barriers Act, relevant Federal standards concerning Government buildings (e.g., P5200.05 10/27/2017 10 U.S. Access Board Standards), and Bureau policies including the Program Statements Design and Construction Procedures and Facilities Operations Manual." Id. at 9-10.

153.    The ADX prison is lacks trained healthcare professionals, including occupational therapists, to appropriately care for the Plaintiff and his needs on a daily basis.  [Doc. 43-1 at 16 ¶ 10].  See Ramos v. Lamm, 639 F.2d 559, 577-78 (10th Cir. 1980) (upholding district court's finding that prison's mental-health staff was unconstitutionally inadequate when it provided only one psychiatrist who visited the prison once every two months, and the prison's other mental-health staff were "overworked, undertrained, and underqualified.")  On information and belief, the Plaintiff is the only double upper amputee at the ADX, whose personnel have no experience with any others.

154.    Prior to Plaintiff's transfer to ADX, Defendant MacMillan traveled to Plaintiff's "pre-designation place" in "Springfield Federal Health Center Prison" in Missouri, with promises to replicate the disabled cell provided to Plaintiff at the time at ADX. [Doc. 43-1  at 14 ¶ 5]. Defendant MacMillan's promises were designed to secure the ADX designation.  Id.  They remain unfulfilled.

155.    Defendant Follows failed to properly conduct an introductory admission assessment or risk health hygiene evaluation, and failed to follow Plaintiff's documented daily care in record. [Doc. 43-1 at 17 ¶ 15].

156.    Defendants Warden, True and MacMillan accepted the designation without providing a thorough assessment by an occupational therapist, considering the assessments of other occupational therapists, or allowing the Plaintiff his own independent assessment.  Id. at 17 ¶ 15.

157.    The Defendants' failure to provide the Plaintiff with help, fittings, and items essential to his health, safety, and hygiene have led to his injuries and inability to participate in inmate life. [Doc. 43-1 at 15 ¶ 7].

### Seventh Cause of Action

**Violation of Eighth Amendment due to excessive force,  against
Defendants Parry, Averit, Garduno, William, Hudelston, Sterett,
Armijo, and Edwards, in their individual capacities.**

158.    The Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

159.    On October 19, 2019, the Plaintiff engaged in a hunger strike in a "peaceful and legal protest" after he was moved from one cell to "the more harmful Cell 300." [Doc. 43-1 at 18]. This is the cell described supra at ¶ 140 as being dark and having dangerous, sharp edges.

160.    Three days later, at approximately 5:00 PM, Defendants Armijo and Edwards forcefully entered the Plaintiff's cell and "confiscated all of his legal, personal and religious property."  Id.

161.    On October 28, 2019, Defendants Garduno, Parry, Averit, and Hudelston purportedly forcefully entered Plaintiff's cell to perform a medical assessment.  [Doc. 43-1 at 19]  When the Plaintiff refused the assessment, these Defendants threatened him with promises to return with force.  Id.

162.    They did return.  Defendants Garduno, Parry and Averit returned with Defendant Sterett, and a female nurse with a camera, both of whom also entered the cell.  The Plaintiff does not know what, if anything, was recorded on the camera, or the name of the female nurse.  The

Plaintiff asked Defendant Sterett for help to protect him from the prison guards, who had threatened the Plaintiff with a physical assault.

163.    Defendant Garduno gestured to Defendant Sterett to wait outside, which Defendant Sterett did. Cell #300 has a transparent wall, except for a small part that restricts the view of the toilet. Defendant Sterett could observe the assault through the transparent wall. The Plaintiff saw that Defendant Sterett remained outside, and only left after the Plaintiff was assaulted, along with the guards who perpetrated the assault. Defendant Sterett didn't provide any medical assistance, or re-enter the room to check on the Plaintiff's considition.

164.    Defendants Garduno, Parry and Averit then pushed the Plaintiff away from the cell door and onto his bed. [Doc. 43-1 at 19] Defendant Garduno told the Plaintiff, "we are gonna tie you up to this chair very hard, don't care if you defecate." Id. In response, the Plaintiff stated that Defendant Garduno wasn't acting professionally and would likely cause serious harm to his health, and further refused to comply with an assessment unless a "team" and camera were provided. Id.

165.    Defendants Garduno, Parry and Averit proceeded to physically assault the Plaintiff for more than seven minutes, leaving him bleeding, dizzy, and disoriented. Afterwards, they left the Plaintiff's cell without asking Dr. Sterett, who was standing outside, to help the Plaintiff. [Doc. 43-1 at 19].

166.    Defendant Armijo didn't make an incident report for this incident, even though he was involved in it, and it involved the use of force. Id.

167.    Five hours later, another team came with cameras and different staff, and a proper hunger strike medical assessment took place. Id.

168.    During this assessment, which was conducted somewhere other than the Plaintiff's cell, Defendants Armijo and Edwards ordered another inmate to clean the blood from the Plaintiff's cell.  Id. at 19-20.  When the inmate refused, Defendants Armijo and Edwards entered Plaintiff's cell, and cleaned Plaintiff's blood from the floor, walls, and ceiling themselves, and failed to write an incident report about the assault.  Id. at 20.

169.    Dr. Sterett failed to intervene, and subsequently failed to examine the Plaintiff or provide medical care to him.  Id.  Although Defendant Sterett was present, he didn't check to see if the Plaintiff was OK after the incident.  Defendant Sterrett didn't write a report, treat the Plaintiff's injuries, or send a nurse until hours later, while the Plaintiff remained bleeding.

170.    The Plaintiff was bleeding from his arm stump and "blood was everywhere," but - despite pressing the "duress button" to get medical help - no help was provided for approximately five more hours.  [Doc. 43-1 at 19]  After five hours, bandages were applied to the Plaintiff's bleeding stump, which were not removed until three weeks later.

171.    Defendant Hudelston was present for the threats made in the early morning.  On information and belief, Defendant Hudelston didn't tell any manager about the incident or make a report.  On information and belief, Defendant Hudelston assisted Defendants Parry, Averit, and Garduno in assaulting the Plaintiff, by deliberately ignoring the alarm from the duress button for five hours.  Id. Four days later, on Nov 4, 2019, Defendant Hudelston attempted to obtain a medical sample from the Plaintiff by force and without his consent.

172.    A report made of this incident by another ADX nurse falsely claimed that the Plaintiff's injuries were self-inflicted.

173.    Defendant True ignored the Plaintiff's requests for an investigation, and provided only vague, general responses to the Plaintiff's grievances concerning the assault.  Defendant True raised the ticket to the Regional DHO.

174.    Defendants not only ignored Plaintiff''s request to investigate and report the incident, but also ignored his attorney's letters about it.  Id.  Reasonable discovery will show who determined whether or not to investigate the incident.

175.    The Plaintiff's subsequent administrative grievances concerning the October 28, 2019 assault yielded only vague responses.  Id. at 20.  On information and belief, the Defendants never even investigated the incident.

176.    During the same time period as the hunger strike, the Plaintiff didn't receive any toenail trimmings, from March 2019 until January 13, 2020, when Defendant Hudelston used a tool from his pocket to crudely cut them, causing bleeding and some pain.  As explained supra, the Plaintiff can't trim his own toenails, and frequently suffers from toenail infections as a result. These infections are particularly dangerous because of the Plaintiff's Type 2 Diabetes, which could eventually result in the amputation of his toes.  The Plaintiff was told by Defendants Chorosevic, Sterett and Follows that his toenails would not be trimmed until he ended the hunger strike.  This type of punishment is not authorized by law.

177.    In addition, Defendant Tuttoilmundo confiscated or denied the Plaintiff access to his clothes, legal documents, religious books, and other items during the hunger strike.  [Doc. 43-1 at 36].  This was retaliatory and served no legitimate penological purpose.

178.    The Plaintiff's force-feeding and forced intraveneous hydration during the hunger strike were medical treatments not authorized by the Plaintiff.  The Defendants had a duty to obtain the Plaintiff's informed consent, which they never obtained.  The Plaintiff was cited for refusing to

obey orders when he wouldn't eat, and for when he tried to pull out the IV tubing in another incident on November 21, 2019.  See [Doc 98] at 53-54.  Forced medical treatments violate many U.S. and European Union laws.

179.    The Plaintiff's hunger strike was a form of symbolic speech.  The Defendants' reaction to the hunger strike was retaliatory and intended to discourge hunger strikes, even though the Defendants have no legal authority to force a prisoner to eat, or to force-feed them.  Force-feeding is a medical intervention to which the hunger striker doesn't consent.

180.    The Plaintiff was deprived of a constitutional right at the hands of these federal officials, who are sued in their individual capacities pursuant to Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971).

181.    The Plaintiff has no other legal remedy available to him.  He has exhausted his administrative remedies with respect to this claim.

182.    No special factors or immunity defenses can be raised to defeat the claim.  For this claim, the officials were acting under color of law, but did not have the discretion to violate the Plaintiff's constitutional rights by physically assaulting him.

183.    As a result of the physical injuries he received, the Plaintiff also suffered emotional distress.  Plaintiff's injuries were more than de minimis.  See Schultz v. Pugh, 728 F.3d 619, 621 (7th Cir. 2013)

### Eighth Cause of Action

**Violation of Eighth Amendment for deliberate indifference to medical needs, asserted against Defendants Follows, Hudelston, Sterett, Loewe, Chorosevic and Narjano, in their individual capacities.**

184.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

185.    The Defendants' failure to provide adequate dental care, including an electric toothbrush, has led to infections and the loss of many or most of the Plaintiff's teeth.

186.    The Plaintiff has to open food packages with his teeth, further damaging his teeth.

187.    The Defendants' failure to provide adequate foot care, or including trimming the Plaintiff's toenails, resulted in infections of his toes.

188.    These infections of Plaintiffs' teeth and toes are especially dangerous because of the covid pandemic.  The Plaintiff has contracted covid-19 in the ADX at least once, most likely from interacting with ADX staff.

189.    From 2005 until his admission to ADX in 2015, the Plaintiff was able to control some of his medical conditions without medication through a specific diet. [Doc. 43-1 at 28 ¶¶ 1-2]. Upon his entry at ADX, he has been denied this medical diet, despite repeated and renewed requests for the same, id. at 29 ¶ 4, leading to deteriorating health and, since 2017, dependence on pharmaceutical medications to treat his symptoms.   Id. at 28 ¶ 3. The Plaintiff's blood pressure is now very high, his skin cracked and bleeding, and he is plagued with constipation, blood sugar fluctuations, and excessive sweating.  Id. at 29 ¶ 3.  The Plaintiff has psoriasis and hyperhydrosis (overheating) of the skin, Type 2 Diabetes, and has had high blood pressure for 20 years.  [Doc. 37-1 at 5].  His request for a "proper diet: salad, tomatoes" [Doc. 43-1 at 39 ¶ 6], is essentially a request that his diet include vegetables, which are necessary for proper nutrition.  A reasonable interpretation of the word "food" in the case law should be understood as referring to nutritious food appropriate for the Plaintiff's medical conditions, including diabetes and high blood pressure.  [Doc. 37-1 at 5]  The Plaintiff should be allowed out of his cell to exercise.

190.    In response to one of the Plaintiff's Administrative Remedy Program requests, the Regional Office of the Bureau of Prisons determined that Plaintiff's food should be opened

before it is delivered to his cell.  The Defendants placed a note on Plaintiff's cell door stating that the Plaintiff "need[s] help with food and all food provided should be taken out of plastics and placed on another container for safe easy eat[ing]."  [Doc. 43-1 at 59 ¶ 2].  Nevertheless, the Defendants have failed to remove the food from the packaging. Id. at 30 ¶¶ 7-8.

191.    For about ten months, the Kitchen Manager, Officer Kunduf, didn't comply with the decision of the Regional Office, and the food was still delivered wrapped in plastic, despite the note on the Plaintiff's cell.  The Plaintiff has been unable to eat approximately 150 meals because of difficulties in opening the packaging.  When Officer Kunduf was replaced, the new kitchen manager made efforts to comply with the rule, but the Plaintiff still receives food wrapped in plastic at times, and the guards who deliver it do not open it.

192.    Defendants Loewe and Norjano effectively deprived the Plaintiff of about 150 evening meals by providing them wrapped in plastic. [Doc. 43-1 at 59 ¶ 3].  On one such occasion, on September 20, 2020, upon discovering that his meal didn't comply with the note on his cell door, the Plaintiff called out to the officers.  When they ignored him, he pushed the duress button and told the controller about the problem and the need to comply with the medical notes on his door. Id. at 59 ¶¶ 4-5.  The controller didn't reply and cut the Plaintiff off.  Id. at ¶ 5.  The Plaintiff reminded them to comply with the notes, showed them his tray, and expressed his concern that he would lose his opportunity to eat the meal if he didn't have help opening it.  Id. at 59 ¶ 6.  See Parrish v. Johnson, 800 F.2d 600, 602-603 (6th Cir. 1986) (prison guard habitually refused or procrastinated in transmitting requests for aid to nurses for inmates with diminished control over their bladders and bowels, forcing the inmates to sit in their own waste for significant periods of time).  The Plaintiff's requests for assistance with this problem from Defendants True and Follows went unanswered.  [Doc. 43-1 at 5].

193.    The Defendants also fail to provide the Plaintiff with a mask when interacting face to face with prison staff, in violation of numerous government policies.   The Plaintiff has contracted covid-19 on at least one occasion, and believes he contracted it twice, and has almost no contact with anyone, aside from prison staff, who probably infected him with covid-19.

194.    The Plaintiff has no way to wash food or utensils in his cell, putting him at risk of contracting covid or another illness.

195.    Due to the lack of adequate prosthetics, the Plaintiff cannot avoid touching his face when eating, putting him at risk of contracting covid.

196.    The Plaintiff's isolation, combined with his life sentence, create a sense of hopelessness and disasociation from the world that is harmful to the Plaintiffs' mental health.

197.    The Plaintiff experiences psychological problems which make it difficult for him to concentrate.  [Doc 37-1] at 5.

198.    The Defendants have at times failed to renew Plaintiff's prescription medications on time. See Doc. 39-1 at 23-24.  See Hunt v. Uphoff, 199 F.3d 1220 (10th Cir. 1999) (prison officials violated Eighth Amendment by providing such inadequate medical treatment for inmate's diabetes and hypertension that inmate consequently suffered heart attack).

199.    The Plaintiff's isolation is compounded by his disability and the removal of his prosethetics, which prevent him from participating in the BOP's programs and hinder the Bureau of Prisons' responsibility to rehabilitate prisoners.  Although  the general conditions in the ADX may not amount to cruel and unusual punishment, some of the conditions imposed on the Plaintiff have been unique.  See LaFaut v. Smith, 834 F.2d 389 (4th Cir. 1987) (prison officials violated Eighth Amendment by failing to provide disabled inmate with needed physical therapy and adequate access to facilities).

200.    The Defendants' indifference is objectively shown by the foregoing, by the extraordinary and unique punishments imposed on him, and by the summary denial of his administrative complaints without investigating the facts or providing any reasoning for their decisions.

201.    Letters sent on behalf of the Plaintiff by his attorneys to the Defendants, including two letters sent December 3 and December 6, 2019, respectively, requesting certain items to accommodate Plaintiff's disability and mitigate his injuries, have gone unanswered.  [Doc. 43-1 at 26 ¶ 12].  See also [Doc. 43-1 at 26 ¶ 14].  Similarly, requests for certain items made to Defendant Follows have gone unanswered.  [Doc. 43-1 at 27 ¶ 15].

202.    Defendant Follows refused Plaintiff's request for his own independent occupational therapist to make an assessment [Doc. 37-1 at 41], Plaintiff's request that his assessment be video recorded, [Doc. 43-1 at 27 ¶¶ 16, 17]; and for "denying items, fittings help under the pretext of security and for interfering with medical necessities."  [Doc. 43-1 at 27 ¶ 17].

203.    These communications show that Defendant Follows knew of these problems, and of the subtantial risks of serious harm to the Plaintiff, which the Plaintiff and his lawyers explained in their correspondence.  The failure to respond demonstrates a disregard of those risks.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001); Estate of Martinez v. Taylor, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016) (comparing the subjective component to recklessness in criminal law, where, to act recklessly, a person must "consciously disregard a substantial risk of serious harm").

204.    Adequate food and facilities to wash and use the toilet are among the "minimal civilized measure of life's necessities" that must be afforded prisoners.  Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Wilson v. Seiter, 501 U.S. 294, 304 (1991); Thompson v. Colorado, 278 F.3d 1020, 1032 (10th Cir.2001); Vinning–El v. Long, 482 F.3d 923, 924 (7th Cir.2007); LaFaut v.

Smith, 834 F.2d 389, 392–94 (4th Cir.1987).   See Reed v. McBride, 178 F.3d 849, 853 (7th Cir.1999) (extent, duration, and consequences are relevant in assessing whether deprivation of food violates Eighth Amendment).

205.   Likewise, the persons who processed the Plaintiff's many requests for help using the Administrative Remedy Program had knowledge of the Plaintiff's difficulties, for the requests that they reviewed.  Their mental states may be inferred from their responses, which reflect that they were more than merely negligent in disregarding the risks of harm.  These persons serve a function similar to that of Administrative Law Judges under the APA, yet make arbitrary decisions unsupported by the application of standards or legal reasoning.

206.   The subjective component of Defendants' deliberate indifference is also shown by various statements, such as "This is not a hospital;" "Why did you cut your hands?" (belittling Plaintiff's injuries); and "No, see you in court." by the Plaintiff's Unit Manager and others.  See Doc. 39-1 at 9.  The Plaintiff has been told on various occasions that his injuries and bleeding are not "life threatening" which is not a standard of care, and shows indifference to his suffering.

### Ninth Cause of Action

**Violation of Eighth Amendment due to deliberate indifference
to medical needs, against Defendant Nurse William in his individual capacity.**

207.   Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

208.   During a cell rotation on October 20, 2018, Plaintiff's stumps were injured and bled due to his efforts to clean his cell, pack his belongings, and unpack them in the new cell.  [Doc. 43-1 at 32 ¶ 13].  The Plaintiff asked Defendant William to assist him in putting an adhesive bandage on his bleeding arm stump, but Defendant William refused to assist him. Defendant William dropped the adhesive bandage onto the cell floor, and said "No.  Why did you cut your hands?" knowing that the Plaintiff has no hands.

209.    The Plaintiff was injured during the transition, and further injured by Defendant William's refusal to secure a bandage.  Defendant William had a duty to stop the bleeding by securing a bandage, and breached the duty.  He knew of the bleeding and decided to do nothing to stop it.  The Court has already held that this states a claim.  See [Doc. 60 at 30].

210.    As a result of the physical injuries he received, the Plaintiff also suffered emotional distress.

### Tenth  Cause of Action

**Violation of 5 U.S.C. § 706 of the Administrative Procedure Act,
against Defendants Garland, Wray, Carvajal, and True, in their official capacities.**

211.    Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

212.    The Plaintiff's extradition to the United States was only granted by the United Kingdom after the Defendants provided assurances to the European Court of Human Rights ("ECHR") that it would be "impossible" for Mr. Mostafa to be held in the ADX because of his disability.  See ¶ 29 supra.

213.    The Second Circuit suggested that challenges to the Plaintiffs' placement in the ADX should be brought as a collateral, habeas corpus action against the Bureau of Prisons.  "Thus, whatever collateral challenge Mustafa might bring against the BOP for the place or conditions of his incarceration, see Levine v. Apker, 455 F.3d at 78 (referencing possible action against BOP pursuant to 28 U.S.C. § 2241), he cannot show that the district court's failure to make a discretionary recommendation that the BOP would not be required to follow renders his sentence either procedurally or substantively unreasonable."  United States v. Mustafa, 753 Fed.Appx. 22 , 43 (2018).  "[T]he district court, which had played an active role in ensuring Mustafa's pre-trial medical care, urged the BOP to consider Mustafa's doctor's report submitted at sentencing and to arrange for an evaluation by an independent occupational therapist.  See App'x 649-50."  Id. at

43 n. 9.  The Defendants have never allowed the Plaintiff a visit by an independent occupational therapist, despite numerous requests, in defiance of this order.

214.    The placement of the Plaintiff in the ADX was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to the constitutional rights set forth as separate claims in this Complaint; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law; unsupported by substantial evidence on the record; or unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.  These are the standards of review enumerated in 5 U.S. Code § 706, which defines the Scope of Review of the Administrative Procedure Act.

215.    The Plaintiff has exhausted his administrative remedies.  Many of his grievances were administratively exhausted using the Defendants' Administrative Remedy Program, requesting a transfer to another prison as relief.  In his court filings as well, although it was not pled as an APA claim, the Plaintiff sought a permanent transfer from the ADX as a remedy.  [Doc. 43-1 at 39 ¶ 3].

216.    The Plaintiff isn't asking to be transferred from the ADX to another prison.  This wouldn't necessarily fix the problems.  The Defendants should address the ECHR's concerns about the ADX by modifying the Plaintiffs considitions of confinement.  The ECHR didn't believe it was even possible that the Defendants would put a disabled prisoner like the Plaintiff in the ADX.

217.    In addition to his placement in the ADX, all of the Plaintiff's other claims requiring exhaustion are reviewable under § 706 of the APA, as well as on the merits.  These are standards of review, not separate claims that need to be pled.

218.    The Colorado District Court is innundated with pro se prisoner complaints.  This is mostly because the Bureau of Prisons doesn't have adequate administrative procedures to filter

the complaints.  Nevertheless, prisoners must exhaust these remedies to have standing to sue in court.  Therefore, they must meet APA standards.  That is, the Court may review them under § 706, and remand them if the agency's reasoning doesn't hold up.

### Eleventh Cause of Action

**Violation of First Amendment, for denial of access to the court and to legal counsel, against Defendants Garland, Wray, Carvajal, and True, in their official capacities.**

219.    The Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein.

220.    The Defendants seize and review the Plaintiffs' written communications, including to and from the Court and the Plaintiff's attorneys, before delivering it to him.

221.    Written communications to and from the Plaintiff are delayed about two weeks by Office of Enforcement Operations Technicians for their review process.

222.    Provisions of the Code of Federal Regulations governing prisoner mail do not permit the Defendants to open a prisoner's mail outside of his presence, as long as the mail is marked "Special Mail - Open Only in Presence of Inmate."  28 CFR §§ 540.18, 540.19.  Letters sent by the Plaintiff's attorney, Paul Wolf, and properly marked "Special Mail - Open Only in Presence of Inmate" are opened before they are delivered to the Plaintiff, in violation of his rights and the attorney-client privilege.  Counsel marks every envelope this way, yet the Defendants open the mail already opened, and do not deliver the envelope to the Plaintiff.

223.    The regulations authorizing the Special Administrative Measures, 28 CFR § 501.3, contain specific provisions for when the Defendants may breach the attorney-client privilege.  It says: "In any case where the Attorney General specifically so orders, based on information from the head of a federal law enforcement or intelligence agency that reasonable suspicion exists to believe that a particular inmate may use communications with attorneys or their agents to further

or facilitate acts of terrorism, the Director, Bureau of Prisons, shall, in addition to the special administrative measures imposed under paragraph (a) of this section, provide appropriate procedures for the monitoring or review of communications between that inmate and attorneys or attorneys' agents who are traditionally covered by the attorney-client privilege, for the purpose of deterring future acts that could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." The Defendants cannot show a reasonable suspicion that undersigned counsel would do any of this. The Defendants applied the same boilerplate policy that they apply to all SAMs prisoners.

224.    The provisions of the Plaintiff's SAMs  pertaining to attorney-client communications can be found in Section 2 of that document.  See [Doc. 169-1] at 6-7.  They warn the Plaintiff of various sanctions that may occur if communications to an attorney are used for another purpose outside of the scope of legal representation, and require the attorney to certify this.  Id.  The SAM's don't mention opening the Plaintiff's mail before delivering it, refusing requests for copies of the "SAMS Affirmation" form made by prospective attorneys, or staying a case for three months to investigate an attorney before approving him.  All of these issues have occured in this case, reflecting the Defendants' illegal policies that they apply to all SAMs prisoners.

225.    The Plaintiff's ability to mount a legal defense in the underlying criminal case was also compromised by the mail restrictions imposed by his SAMs.  The Plaintiff wasn't permitted to communicate with prospective human rights or disability attorneys, or the Plaintiff's attorneys in the United Kingdom.  [Doc. 43-1 at 10 ¶ 10].

226.    The Plaintiff has no access to a law library, a disabled pen, cannot use a computer, has no access to his computer files, which are in the possession of the Defendants, cannot print documents, and has had difficulty meeting court deadlines because of all this.

227.    The Plaintiff had to litigate the pro se part of this case by writing court filings by hand, which is difficult for him with the prosethetics he has.  On April 28, 2021 the Plaintiff filed a document entitled "Pro Se Motion Seeking Extension of Time to File His Reconsideration of Court Document 60 Due to Retaliatory Impediments by ADX Officials Exacerbating His Disability and Poor Health to Prevent Him Writing to Court Without Severe Pain and Stress" [Doc. 86, filed April 28, 2021].

228.    One of the Plaintiff's attorneys in New York, Lindsay Lewis, requested that the Plaintiff have access to Microsoft Office, his printed files and a pouch opener, but received no reply. [Doc. 37-1 at 42-43]

229.    While it may be true that ADX prisoners are not generally allowed access to a computer, providing a computer with assistive technology is a reasonable accommodation for a prisoner whose arms were amputated above the elbows.  Moreover, documents filed in court would be easier for the court and the public to read if they were typed on a computer.

230.    The Plaintiff had tried to contact another attorney, named Jules Lobel, but the Defendants wouldn't permit the contact.  The Plaintiff then attempted to use the Administrative Remedy Program without success.  The Defendants eventually determined that the Plaintiff was already permitted to contact three attorneys, and the Plaintiff wouldn't be permitted to contact another attorney.  See DE 116 at 8-10.  This deprived the Plaintiff of counsel, because those other attorneys are representing the Plaintiff in a different matter, his criminal case in New York.

231.    Almost a year passed from the time the Court ordered counsel be appointed through the Pro Bono program, and sending the details of the case to prospective attorneys.  See Doc [168-6].  Once the case was listed, undersigned counsel responded by expressing interest the same day.  Undersigned counsel wrote to counsel for the Defendants, and to the US Attorneys Office

in the Southern District of New York, which prosecuted the underlying criminal case, but didn't receive a reply to requests for the SAMs Affirmation form from any of them.  Then, undersigned counsel obtained a court order requiring the Defendants to treat the undersigned's communications with the Plaintiff as attorney-client communications.  [Doc. 160]

232.    None of these restrictions are authorized by law.  They are not reasonably related to legitimate penological interests because there are no valid, rational connections between the regulations and any governmental interest.

233.    Any rational-sounding connections between these rules and either prison security or efficiency are so remote as to render the rules arbitrary or irrational.  They are an exaggerated response to generalized fears of Muslims following the attacks on the World Trade Center and Pentagon in 2001.  That was more than 20 years ago, yet the animus lives on.  A prisoner's right to contact an attorney is clearly established in the law.

## Damages

234.    The Plaintiff seeks injunctive relief, removing the restrictions on his practice of religion and association with others inside and outside of prison, and providing prosthetics and facilities that reasonably accommodate his disability.

235.    The Plaintiff seeks compensatory and punitive damages in amounts to be ascertained at trial.

236.    The Plaintiff seeks attorneys fees for bringing this action, at the lodestar rate.

## VIII. DEMAND FOR JURY TRIAL

237.    The Plaintiff demands a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to:

(a)      enter judgment in favor of Plaintiff on all counts of the Complaint;

(b)      declare that Defendants have violated the Plaintiffs' rights and the laws of the United States, as set forth herein;

(c)      order the Defendants to remove the restrictions on Plaintiff's practice of religion and right to speak with others, both inside and outside the prison, provide for group prayer, provide <u>halal</u> and *Eid* food, and provide a means for ritual washing before prayer;

(d)      order the Defendants to house the Plaintiff in a cell that reasonably accommodates the Plaintiff's disabilities, including a toilet, sink, shower and table to accommodate the Plaintiff's amputated arms;

(e)      order the Defendants to provide prosthetics that reasonably accommodate Plaintiff's disabilities, including an electric toothbrush, a soap pump, a pouch opener, a hair brush, eating utensils, reasonable bedding materials, and accomodations for Plaintiff's inability to cut his own toenails or clean his prison cell;

(f)      order the Defendants to provide dental implants to replace the Plaintiff's teeth, many of which were lost due to infections resulting from Plaintiff's inability to adequately brush his teeth;

(g)      order the Defendants to allow the Plaintiff to be visited by an occupational therapist of his choice, at Plaintiff's expense, and to provide the occupational therapist with the SAMs and SAMs affirmation form;

(h)      award Plaintiff compensatory damages for the pain, suffering and emotional distress he has endured;

(i)      award Plaintiff punitive damages for the Defendants' reckless indifference to the Plaintiff's suffering;

(j)      grant Plaintiff equitable relief;

(k)       award Plaintiff the costs of the suit and reasonable attorneys' fees, under the RFLRA and

Rehabilitation Act;

(l)       award Plaintiff such other and further relief as the Court deems just under the

circumstances.

Respectfully submitted this ~~21st~~ 11th day of ~~May~~July, 2022.

                     /s/ Paul Wolf

    _____
    Paul Wolf
    CO Bar #42107
    P.O. Box 21840
    Washington, D.C. 20009
    Tel. (202) 431-6986
    paulwolf@yahoo.com