# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00694-PAB-SKC

MOSTAFA KAMEL MOSTAFA,

     Plaintiff,

v.

MERRICK GARLAND, United States Attorney General, in his official capacity,
CHRISTOPHER WRAY, FBI Director, in his official capacity,
MICHAEL CARVAJAL, BOP Director, in his official capacity,
B. TRUE, ADX Warden, in his official capacity,
TUTOILUMUNDO, ADX Unit Manager, in his official capacity,
MACMILLAN, ADX Facilities Department, in his official capacity,
FOLLOWS, ADX Medical Department Manager, in her individual capacity,
LOEWE, ADX officer, in his individual capacity,
NORJANO, ADX Officer, in his individual capacity,
CHOROSEVIC, ADX Occupational Therapist, in his individual capacity,
PARRY, ADX Officer, in his individual capacity,
AVERIT, ADX Officer, in his individual capacity,
GARDUNO, ADX Lieutenant, in his individual capacity,
WILLIAM, ADX Nurse, in his individual capacity,
HUDELSTON, ADX Nurse, in his individual capacity,
STERETT, ADX Doctor, in his individual capacity,
ARMIJO, ADX Lieutenant, in his individual capacity, and
EDWARDS, ADX Officer, in his individual capacity,

     Defendants.

---

## MOTION TO DISMISS PURSUANT TO RULES 12(b)(1) AND 12(b)(6)

---

ADX inmate Mostafa Kamel Mostafa—the radical jihadist known as "Abu Hamza al-Masri"— fomented terrorism across the globe, spearheading a deadly hostage-taking scheme in Yemen and establishing a jihad training camp in a remote Oregon town. He supported al Qaeda and the Taliban. He urged his many followers to gratuitously kill *kaffirs*, or non-Muslims. He is the patriarch of a family that includes known terrorists and other criminals. His claims here attack the rules governing his communications and his confinement at ADX. *See* Fourth Amended Complaint,

ECF No. 199 ("FAC"), Almost all[1] are subject to dismissal now.

## BACKGROUND

***Mostafa's crimes of terrorism and Special Administrative Measures.*** Mostafa is serving a life sentence for conspiracy to take hostages, providing material support for terrorism, providing material support for al Qaeda, and supplying goods and services to the Taliban. *United States v. Mustafa*, 753 F. App'x 22, 26-27 (2d Cir. 2018). The trial court found that Mostafa would continue to "support and inspire others to acts of violence." Sentencing (excerpt), ECF No. 96-1, 73:9-12.[2]

Mostafa, the jihadist former imam of London's Finsbury Park mosque, told his followers it was "okay" to kill non-Muslims "even if there's no reason for it," and that "[a]nyone can take a Kaffir, capture him, and enslave him, or 'even sell him in the market.'" *Mustafa*, 753 F. App'x at 27; *see also United States v. Mostafa*, 16 F. Supp. 3d 236, 258, 267 (S.D.N.Y. 2014). He was the mouthpiece for a terrorist group known as the Islamic Army of Aden. Trial Tr. (excerpts), ECF No. 96-2 at 3476:16-22. He aided and abetted that group in kidnapping 16 non-Muslim tourists in Yemen, including two Americans, to try to compel the Yemeni government to release his followers from custody. *Mustafa*, 753 F. App'x at 27. Those followers included his stepson, Mohsin Ghalain, and his son, Mohammed, who was fleeing authorities at the time. ECF No. 96-2, 3502:2-3503:14,

---

[1] This motion is not brought on behalf of Defendant Williams, who has not to date requested representation from the Department of Justice or been served. "Defendants" do not include Williams, nor do Defendants move to dismiss Claim 9, which is solely against him. Defendants move to dismiss all other claims except certain aspects of Claim 1, a RFRA claim, as summarized in the attached table. Ex. 1. Defendants will shortly file an early motion for summary judgment concerning Mostafa's unexhausted allegations and claims.

Although the deficiencies discussed here are not correctable by amendment, undersigned counsel has advised Mostafa's counsel of the arguments presented in this motion in advance of filing.

[2] On a motion to dismiss, a court may consider documents incorporated by reference, documents referred to in the complaint that are central to the claim (e.g., Special Administrative Measures), and matters subject to judicial notice, including public court records. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *Abdulmutallab v. Barr*, No. 17-cv-02493-RM-KMT, 2019 L 4463284, at *3 (D. Colo. Sept. 18, 2019); *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

3505:10-3506:6, 3506:17-19. Four hostages died in the kidnapping. *Mustafa*, 753 F. App'x at 27.

Mostafa sent followers to Oregon to set up a jihad training camp. *Mustafa*, 753 F. App'x at 42-43. He professed his "love" for Osama bin Laden and extolled him as a "hero." ECF No. 96-2, 3515:25-3516:4, 3516:18-23, 3517:3-16, 3523:10-25; *see also Mustafa*, 753 F. App'x at 27-28. He praised al Qaeda's attacks on the World Trade Center and the USS *Cole*. *Mustafa*, 753 F. App'x at 28; *Mustafa*, 2014 WL 1621277, at *2 (S.D.N.Y. Apr. 22, 2014); ECF No. 96-2 at 3530:5-11, 3531:20-22. He sent a follower to an al Qaeda-run terrorist training camp in Afghanistan and urged his followers to support the Taliban in Afghanistan. *Mustafa*, 753 F. App'x at 28, 32; *see also United States v. Mostafa*, 965 F. Supp. 2d 451, 457 (S.D.N.Y. 2013). Mostafa spent eight years in prison in the United Kingdom—where he was caught with a bomb-making manual—before being extradited to the United States in 2012. *Mustafa*, 753 F. App'x at 39; *Mustafa*, 965 F. Supp. 2d at 454-55. He has been incarcerated at ADX since October 8, 2015. SAMs Docs., Ex. 2 at 2 (January 2022 SAMs).

The Attorney General has imposed Special Administrative Measures ("SAMs") on Mostafa pursuant to 28 C.F.R. § 501.3. *See id.* The SAMs detail Mostafa's history as a terrorist whose footprint spans the globe. *Id.* at 2-3. The SAMs describe his inspirational "leadership of thousands of followers," at least four of whom have been incarcerated at ADX under SAMs—including "Shoe Bomber" Richard Reid and Zacarious Moussaoui, the "20th hijacker." *Id.* at 2-3, 5; *United States v. Moussaoui*, 591 F.3d 263, 275 (4th Cir. 2012). Mostafa's "ability and willingness to incite others to commit violence, terrorism, and murder," supported national security officials' conclusion that "communications made or received by [Mostafa] could pose an operational threat, even though he is incarcerated." Ex. 2 at 2, 5.

The Attorney General recognized that for Mostafa violence and terrorism are a family affair. While Mostafa can communicate in writing, by telephone, and via personal visits with most members

of his large immediate family, he cannot communicate with two sons, Mohammed Mostafa Kamel and Sufyan Mostafa because "Mohammed Mostafa Kamel was part of the criminal enterprise in Yemen (the case prosecuted against [Mostafa])," and "Sufyan Mostafa has been stripped of his British passport and has called for the death of Bashar al Assad. Further, he has an extremely active presence on social media on which he shares jihadist propaganda. Sufyan Mustafa is a well known jihadi fighter and remains free to use social media to spread his hate against the west." *Id.* at 4; *id.* (noting that Mohammed and Sufyan are non-approved contacts "due to derogatory information" about them). The Attorney General also has denied communication between Mostafa and Mohsin Ghailan,[3] his stepson and another of his co-conspirators in the Yemen hostage-taking enterprise. *Id.* (noting "a wealth of information providing a continuing basis to deny [Mostafa] access to these three relatives," i.e., Ghailan, Sufyan, and Mohammed Mostafa Kamel); *see also* ECF No. 96-2 at 3477:11-3478:3, 3502:2-3503:14.

While there are risks whenever Mostafa has contact with persons outside the prison, he is allowed to communicate with other members of his immediate family (a wife and other children), six grandchildren, and a minister named Stephen Coles by phone, in-person visits, and mail. Ex. 2 at 11-12; *id.* at 20-25 (8/9/2022 modification re: communications with six grandchildren). He may request additional social contacts who are evaluated "on a case-by-case basis." *Id.* at 11 n.7.

Mostafa brings eight official-capacity claims (not counting sub-claims) under the First and Fifth Amendments, the Religious Freedom Restoration Act, the Administrative Procedure Act, and the Rehabilitation Act. He also brings various individual capacity Eighth Amendment claims for damages against eleven BOP officials. The claims fail for the reasons discussed below.

---

[3] Because Ghailan is not Mostafa's "immediate family," he is not listed as a prohibited contact.

# ARGUMENT

## I.      The First Amendment association and access-to-courts claims fail (Claims 4, 11).

### A.      Claim 4 cannot proceed.

Mostafa challenges the SAMs provision barring him from communicating with some of his sons[4] and a stepson. FAC ¶ 84. He complains that he cannot speak with some of his grandchildren by phone, *id.* ¶¶ 84-85, but a recent modification allows communication by phone, mail, and visits with all grandchildren with whom he has requested contact, rendering the subclaim moot. Ex. 2 at 20-25. He complains that he is "severely restricted" in communications with unidentified "foreign attorneys" and "with prospective, un-approved attorneys." *Id.* ¶ 83.[5] Claim 4 fails.

### 1.      Rational-basis standard.

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This deferential standard reflects the principle that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948), *overruled on other grounds*, *McCleskey v. Zant*, 499 U.S. 467 (1991).

Based on *Turner*, the Supreme Court has repeatedly held that First Amendment rights are appropriately curtailed in prison and that "freedom of association is among the rights least

---

[4] Mostafa references three sons, but the SAMs restrict his communications with only two, Mohammed and Sufyan, and a stepson named Mohsin Ghailan. A past restriction with a son named Imran was removed in January 2022. *See* Ex. 2 at 4.

[5] Mostafa makes one reference to the SAMs allegedly being an "impediment" to receiving care from "qualified medical professionals." FAC ¶ 87. He pleads no facts to support this conclusory "information and belief" allegation, which should not be presumed true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 551 (2007); *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013). The SAMs impose no restrictions on BOP transporting Mostafa to outside medical visits or bringing medical providers into the institution to see Mostafa. *See generally* Ex. 2 at 1-19.

compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). The *Turner* test is satisfied if the officials, in their judgment, believe that the restriction would advance the desired goal. *See Johnson v. California*, 543 U.S. 499, 513 (2005) (*Turner* does not require proof that policy advances the stated goal, but only that officials "might reasonably have thought" the policy would advance the goal); *Beard v. Banks*, 548 U.S. 521, 535 (2006) (upholding restriction even absent showing that it had "proven effective"). In conducting this analysis, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132. "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Id.*

To survive a motion to dismiss, it is Mostafa's burden to account for the "core holding" of *Turner* by alleging facts showing "that there is no legitimate, rational basis" for the restrictions. *Al-Owhali v. Holder*, 687 F.3d 1236, 1239, 1241 (10th Cir. 2012) (upholding dismissal of First Amendment SAMs challenge). "Government conduct that would be unacceptable, even outrageous, in another setting may be acceptable, even necessary, in a prison." *Gee*, 627 F.3d at 1185. He must allege specific facts showing that the anticipated, "usual justifications" for each of the rules he challenges lack a rational connection to the challenged restrictions—facts "that might well be unnecessary in other contexts to surmount a motion to dismiss[.]" *Al-Owhali*, 687 F.3d at 1240. Here, that includes facts that address the government's "uniquely federal penological interest in addressing national security risks." *Rezaq v. Nalley*, 677 F.3d 1001, 1014 (10th Cir. 2012).

While prison administrators are entitled to substantial deference, *Overton*, 539 U.S at 132, that deference is even greater in the realm of national security, where "conclusions must often be based on informed judgment rather than concrete evidence[.]" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-36 (2010). That predictive judgment receives deference because "it is not reasonably

possible for an outside nonexpert body to review the substance of such a judgment." *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988). Based on this legitimate interest in protecting national security, the Tenth Circuit and courts in this district have repeatedly upheld SAMs restrictions, including such restrictions with the inmate's children. *Gowadia v. Stearns*, 596 F. App'x 667, 673 (10th Cir. 2014) (finding "obvious and reasonable relationship" between the crimes and "measures the BOP implemented to restrict … communications."); *Nicholson v. Brennan*, No. 15-cv-01999-KLM, 2017 WL 4337896, at *5 (D. Colo. Sept. 28, 2017) (upholding communication restriction with son of SAMs inmate involved in crime); *Salim v. Sessions*, No. 13-cv-03175-RM-CBS, 2017 WL 11487131 at *5-6 (D. Colo. May 2, 2017) (upholding prohibition on contact with inmate's son); *Abdulmutallab v. Barr*, No. 17-cv-02493-RM-KMT, 2019 WL 1064062, at *5 (D. Colo. Mar. 6, 2019) (finding "an obvious, rational connection" between SAMs restriction limiting terrorist inmate's communications to his immediate family and inmate's crimes of terrorism), *adopted in relevant part*, 2019 WL 4463284 (D. Colo. Sept. 18, 2019); *see also Al-Owhali*, 687 F.3d at 1241.

Equally is there an "obvious and reasonable relationship" between Mostafa's crimes and risks and the SAMs rules he challenges here.

### 2.      Element not alleged (sons/stepson subclaim): Absence of rational basis.

Mostafa has not alleged the absence of a rational basis for barring communications with his sons and stepson, nor does his pleading rebut the obvious justifications for the rule. *See Al-Owhali*, 687 F.3d at 1241 (upholding dismissal of First Amendment claim where SAMs inmate did "not rebut in his pleadings" the government's "coherent explanation" that communications with his contacts could result in death or serious bodily injury). Both Mostafa's son Mohammed and his stepson Ghailan were his partners in the Yemen terrorist plot in which four people were murdered. Ex. 2 at 4. Sufyan, the other prohibited son, is well-known to national security officials as Mostafa's ideologic fellow traveler—a jihadist fighter who has called for the death of the Syrian president and who is a

jihadist presence on social media. *Id.*; *see also id.* at 26-29 (7/29/2019 Sufyan modification). In imposing the restriction, the Attorney General took into account the demonstrable jihadist proclivities of these individuals, in combination with other derogatory information emphasizing Mostafa's dangers: the Yemen hostage-taking, the Oregon terrorist training camp, Mostafa's support for al Qaeda and the Taliban, Mostafa's "long held ties to senior-level terrorist leaders" and the sprawling network of terrorists Mostafa has spawned, including many who have become ADX inmates. *Id.* at 2-5.

In the face of this overwhelming record, Mostafa's conclusory allegations are wholly insufficient to allege that restricting communications with his jihadist sons and stepson is not reasonably related to the penological interest of protecting national security. He seeks to portray himself as an innocent, claiming that his "alleged support of the Islamic Army of Aden (the hostage-taker)" and his "alleged support for the Taliban" must be viewed as *he* sees it: as "punish[ment] for his speech." FAC ¶¶ 36-39. But he cannot use this proceeding as a means to collaterally attack his valid convictions. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (litigant cannot challenge finding in a civil case that was essential to the decision or sentence in a prior criminal proceeding).

Moreover, national security officials do not act irrationally in refusing to adopt Mostafa's benign self-justifications. Even if he had renounced his commitment to jihad and promised not to engage in jihad in the future—or said that he would not attempt to inspire his like-minded children to do so—the officials would not be obliged to believe him. *Turner* does not focus on whether the challenged restrictions are actually necessary, but on whether Defendants might rationally believe they advance the stated national security interests. *See Johnson*, 543 U.S. at 513; *Sperry v. Werholtz*, 413 F. App'x 31, 40 (10th Cir. 2011) (finding that it was irrelevant whether prison policy actually advanced legitimate interests, and that "[t]he only question" is whether the judgment of prison

officials "was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests"). Because officials cannot know with certainty Mostafa's intentions (nor those of his jihadist sons and stepson), the officials must exercise predictive judgment, which receives substantial deference and must be upheld if there is any rational basis for the restrictions. *Overton*, 539 U.S. at 132; *Humanitarian Law*, 561 U.S. at 34-35. There is.

Mostafa's allegations cast no doubt on the fact that Defendants might reasonably believe that prohibiting communications with Mohammed, Sufyan, and Ghailan advances national security interests in light of their shared commitment to violent jihad and the other facts about Mostafa and the scope of his influence, as detailed above. He fails to state a claim.

### 3. Element not alleged (grandchildren subclaim): Live case or controversy/absence of rational basis.

**The claim is moot.** Mostafa complains he cannot communicate with some grandchildren by phone (as opposed to in-person or mail). FAC ¶¶ 84-85. This claim was mooted by a recent modification allowing Mostafa to communicate with all grandchildren by phone, in-person, and mail. Ex. 2 at 20-25 (8/9/2022 modification). Because Mostafa can contact these grandchildren by phone, he "no longer suffers actual injury that can be redressed by a favorable judicial decision." *Ind v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1213 (10th Cir. 2015). "[G]ranting a present determination of the issue" will have no "effect in the real world"—the "crucial question" for mootness. *Brown v. Buhman*, 822 F.3d 1151, 1165-66 (10th Cir. 2016). The claim should be dismissed as moot.

**No allegations showing absence of a rational basis.** Even if the claim were not moot, Mostafa's claim lacks merit. *Turner* does not require that inmates be permitted to engage in their preferred form of communications. *Turner* emphasized consideration of whether there is an absence of "all means of expression." 482 U.S. at 92. Similarly, in finding that a prison regulation prohibiting

visits with certain minor nieces and nephews bore a rational connection to legitimate penological interests, the Court observed that the inmates could communicate with these children by letter and telephone. *Overton*, 539 U.S. at 135. With the ability to write to and visit with children, Mostafa certainly was not deprived of "all means of expression," either in general or when it comes to these children. The elimination of one sort of communication, in favor of others that may pose fewer risks, is precisely the sort of decision entitled to judicial deference. *Humanitarian Law*, 561 U.S. at 33-34.

Indeed, the officials would not have acted irrationally had they chosen to ban all communications between Mostafa and small children to prevent the creation of a new generation of Mohammeds, Sufyans, and Ghailans. Children, it goes without saying, are highly vulnerable to influence and may be particularly susceptible to proclamations from a grandfather with a track record of inspiring family to follow in his jihadist footsteps. The government has a legitimate interest in preventing Mostafa from attempting to inculcate a desire to harm the United States in these vulnerable young children. Nevertheless, the officials have not taken so extreme an approach, preferring instead to give Mostafa a chance to show that he will not abuse these communications.

The grandchildren subclaim should be dismissed.

### 4.      Element not alleged (attorney subclaim): Absence of rational basis.

Mostafa's sole allegation concerning attorneys—that the SAMs "severely restrict[] … communications with his foreign attorneys and with prospective, un-approved attorneys," FAC ¶ 83—mischaracterizes the SAMs, which neither restrict Mostafa from communicating with "foreign attorneys" nor bar him from contacting any attorney of his choice to discuss representation. While it is not clear who Mostafa's "foreign attorneys" may be (or whether he even asked to communicate with them), he can request contact with any attorney he chooses and has done so. Ex. 2 at 30-34 (four current attorney affirmations; attorney Swift modification). Notably, he has not alleged that a specific request from him to contact an attorney has been denied.

Furthermore, there is plainly a legitimate, rational basis for including attorney communication protocols in the SAMs, including the attorney affirmation provision. *See United States v. Stewart*, 590 F.3d 93, 101-08 (2d Cir. 2009) (attorney convicted for smuggling messages from SAMs inmate to co-conspirators in Egypt, despite acknowledging SAMs provision that forbade her conduct).[6] Mostafa has not alleged the absence of a rational basis for these requirements. Any communications with the outside world—whether with attorneys or social contacts—are dangerous when it comes to Mostafa, who approves the killing and enslavement of non-Muslims, infiltrated the United States by sending jihadists to Oregon, and successfully inculcated in his own children an avidity for terrorism, to take just a few examples.

On these facts, the rational basis for rules that seek to prevent him from manipulating attorneys to promote jihad is readily apparent. *See*, *e.g.*, *Al-Owhali v. Holder*, No. 07-cv-02214-LTB-BNB, 2011 WL 288523, at *4 (D. Colo. Jan. 27, 2011), *aff'd*, 687 F.3d 1236 (10th Cir. 2012) (finding terrorist SAMs inmate failed to allege "facts showing that the attorney affirmation provision as to the SAMs does not rationally further a legitimate governmental interest").[7]

To sum up, Mostafa has not alleged that any SAMs restriction lacks a rational relationship to the legitimate penological interest of protecting national security. Claim 4 fails.

### B.     Mostafa's access-to-courts claim fails (Claim 11).

Claim 11, an access-to-courts claim, is difficult to understand. The crux of the claim seems to be that the SAMs protocols prevent him from contacting attorneys and thus deprive him of access to the court, both in this case and in his "underlying criminal case." FAC ¶¶ 224-231, 233. The claim

---

[6] Attorneys who want to communicate confidentially with Mostafa must sign an affirmation acknowledging receipt of the SAMs and agreeing to abide by the SAMs, including the requirement not to "forward third party messages to or from" Mostafa. Ex. 2 at 6-7 ¶ 2.a.

[7] *See also United States v. Mohamed*, 103 F. Supp. 3d 281, 289 (E.D.N.Y. 2015) (SAMs attorney rules bore a "rational connection to legitimate Government objectives"); *Hashmi v. United States*, 621 F. Supp. 2d 76, 86-87 (S.D.N.Y. 2008) (same).

fails, both for lack of standing and for failure to state a claim.

### 1.   Standing elements not shown: Concrete injury/redressable injury.

The claim hinges on alleged interference with Mostafa's "right to contact an attorney." *Id.* ¶ 24. The first defect in the claim is one of standing. To satisfy the Article III case-or-controversy requirement, Mostafa must establish an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). He cannot make this showing because he currently is represented by four attorneys, including the attorney who represents him here. Ex. 2 at 30-33 (attorney affirmations). If Mostafa wishes to speak with other attorneys, he need only ask, and a SAMs modification will be prepared to allow him to do so—a process he has used. *Id.* at 34 (Swift modification).[8] He has no injury because he faces no bar to contacting attorneys, and no court order compelling Defendants to allow Mostafa to contact attorneys can redress this non-existent injury.

### 2.   Elements not alleged: Actual injury; loss of a separately existing non-frivolous right; absence of a rational basis.

Setting aside this standing defect, Mostafa falls short of meeting the exacting standards required to plead an access-to-courts claim, on both the civil and criminal sides of the house.

To plead an access-to-courts claim, Mostafa must allege that he sustained an actual injury to his ability to pursue litigation. *Lewis v. Casey*, 518 U.S. 343, 349, 351 (1996). The well-pleaded facts must support a plausible inference that he was either (1) frustrated in his ability to "prepar[e] and fil[e]" suit at the present time, or (2) prevented from achieving a now-unobtainable result in past litigation. *Christopher v. Harbury*, 536 U.S. 403, 413-14 (2002). For either prong, Mostafa must identify a "nonfrivolous, arguable underlying claim." *Id.* at 414 (quoting *Lewis*, 518 U.S. at 353). His

---

[8] The Court can consider evidence in support of a Rule 12(b)(1) motion without converting it to a summary judgment motion. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).

pleading does not satisfy these standards.

**No lost access: civil claims.** Mostafa does not allege that the SAMs protocols have interfered with his access to the court in this or any other civil case. Mostafa has alleged no actual injury related to his alleged inability to contact counsel. He is actively pursuing his claims in this case with the assistance of an attorney, and he has not alleged that he has been prevented from achieving some lost result in past litigation. The record here shows that he was not hindered in pursuing this lawsuit before an attorney came on the scene. Before an attorney entered an appearance, Mostafa had presented a complaint that clearly articulated his core claims. He had prepared responses to all motions and had presented properly-directed oral arguments during court hearings. Mostafa has not alleged that he has been deprived of access to this Court or any other.

**No lost access: defense in a criminal case.** Equally has Mostafa failed to allege an access claim in a criminal case. He has not alleged that his "ability to mount a legal defense" in his criminal case, FAC ¶ 225, was in any way compromised by the SAMs attorney protocols. To the contrary, three of the attorneys who have executed SAMs affirmations are currently serving as his criminal defense counsel and have made multiple filings on his behalf. *United States v. Mustafa*, No. 1:04-cr-00356 (E.D.N.Y.), available on PACER (listing Schmidt, Shroff, and Bachrach as Mostafa's counsel). And he was represented by even more attorneys at trial. *See id.*

Mostafa also has been assisted in his criminal appeal by two attorneys, both of whom have current SAMs affirmations on file, who filed lengthy briefs raising sophisticated legal arguments and took the matter all the way to the Supreme Court. *See* No. 15-211 (2d Cir.), PACER Docket, available at https://ecf.ca2.uscourts.gov/n/beam/servlet/TransportRoom; *see also* 140 S. Ct. 274 (2019) (denying petition for writ of certiorari). The effectiveness of the attorneys' advocacy—which confirms Mostafa's access to the court—is reflected in their success in convincing the Court of

Appeals to overturn his convictions on two counts. *Mustafa*, 753 F. App'x at *29-32. That Mostafa's convictions were affirmed in all other respects is not plausibly alleged to be related to the SAMs protocols, but rather is attributable to the overwhelming evidence against him. Mostafa's wholly conclusory and speculative allegations are insufficient to support an access-to-courts claim.

**No absence of rational basis for the rules.** Finally, as discussed above, Mostafa has not alleged that the attorney protocols in the SAMs are not rationally related to the United States' uniquely federal penological interest in protecting national security. *See* § I.A.4., above.

For all of these reasons, Mostafa alleges no violation of the right of access to the Court.

## II.     Mostafa's religion claims fail (Claims 1 and 2).

Mostafa's free exercise and RFRA claims each cover four sub-claims related to "group prayer, ritual washing, and food." FAC *e.g.* ¶¶ 52, 62, 64, 65, 69. The claims should not proceed.

### A.     The free exercise claims fail (Claim 2).

The subcomponents of the claim fail for various pleading and jurisdictional deficiencies.

#### 1.     Element not alleged (group prayer subclaim): Absence of rational basis.

Mostafa claims that group prayer is "totally prohibited" for SAMs inmates. *Id.* ¶¶ 52, 55. In assessing plausibility, the Court can consider the actual group prayer policy for SAMs inmates, which allows SAMs inmates to pray together during "their regularly-scheduled outside recreation" in the same manner as inmates in ADX general population units. 4/20/2021 Communal Prayer for SAMs Inmates, Ex. 3; *see also* 7/9/2019 Communal Prayer for ADX Inmates, Ex. 4; *Matthews v. Wiley*, 744 F. Supp. 2d 1159, 1172 (D. Colo. 2010) (BOP policies subject to judicial notice). Mostafa, however, wants more than the policy allows, including alteration of the recreation schedule to precisely conform with shifting prayer times and to move the ADX recreation enclosures, apparently to facilitate the inmates' ability to line up in rows. FAC ¶¶ 55, 70.

Mostafa has not alleged the absence of a legitimate, rational basis for limiting group prayer for SAMs inmates at ADX to outdoor recreation times when the inmates are already out of their cells. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (court first evaluates whether prison rule "substantially burdened sincerely-held religious beliefs," then balances the *Turner* factors); *see also Blair v. Raemisch*, 840 F. App'x 909, 916 n.7 (10th Cir. 2020) (to state a free exercise claim, inmate must plead "facts from which a plausible inference can be drawn that the [allegedly impinging] action was not reasonably related to a legitimate penological interest") (quoting *Gee*, 627 F.3d at 1187-88). As an inmate, Mostafa has no entitlement to a particular form of group prayer under the Free Exercise Clause. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 351-52 (1987) (under *Turner*, prison officials were not required to provide Jumu'ah, even though there were no alternative means of attending Jumu'ah). As Tenth Circuit precedent makes clear, *even a complete prohibition on group religious activities* for maximum-security inmates does not violate the Free Exercise Clause in light of legitimate prison security interests. *Williams v. Miller*, 696 F. App'x 862, 863 (10th Cir. 2017). Given this holding, the far more lenient rule allowing group prayer for SAMs inmates at ADX at outdoor recreation is clearly constitutional.

Mostafa has not alleged that it is irrational for prison officials to establish firm recreation times so as to not to upend the many other activities that must be accomplished in H Unit every day: legal and social visits and telephone calls, medical and dental appointments, law library time, staff rounds, meal and mail delivery, inmate showers, inmate counts, and staff shift changes, to name just a few. In this highly secure environment, it is rational for ADX officials to adhere to firm recreation times. It is also rational for those officials not to accede to Mostafa's demand to "reorient" recreation enclosures as he prefers. No one is stopping him from turning his body in a specific direction.

Mostafa does not come close to rebutting the obvious, rational connection between the prayer

rules for SAMs inmates and the legitimate penological interests in protecting institutional security by maintaining a firm schedule in H Unit. It is a matter of common sense that elevating the preferences of one inmate or group of inmates—here, by conceding that scheduling revolves around that group—carries risks, too. After all, the ADX houses "the most violent, dangerous, and disruptive inmates in the federal prison system[.]" *Hall v. Oliver*, No. 15-cv-01949-RBJ-MJW, 2017 WL 3723250, at *3 (Aug. 29, 2017). Inmates carry grudges, which are manifest in attacks on ADX staff and inmates. *United States v. Petty*, 856 F.3d 1306, 1308 (10th Cir. 2017) (inmate assaulted three ADX officers); *Cuevas v. United States*, No. 16-cv-00299-MSK-KMT, 2018 WL 1399910, at *9 (D. Colo. Mar. 19, 2018) (finding "ample evidence that, despite ADX's security protocols, there are opportunities for inmates to assault one another during routine operations"); *see also Williams*, 696 F. App'x at 863 (prohibition on group prayer "rationally connected to the safety and security risks associated with escorting maximum-security inmates to and from group activities"). The even-handed approach of limiting group prayer for all H Unit inmates to regularly scheduled outdoor recreation times reduces these risks and is plainly rational under *Turner*.

### 2.    Standing element not shown (halal diet subclaim): Redressable injury.

Mostafa next complains that he must eat kosher food because halal food is not available in a form accessible to him. FAC ¶¶ 62-63 (kosher food tray "easier for Plaintiff to scoop from"). Mostafa cannot show that he has a concrete, actual or imminent injury that can be redressed by a favorable ruling. *Clapper*, 568 U.S. at 409. ADX Food Services staff open all prepackaged food on Mostafa's meal tray—heated entrees, tuna, sardines, potato chips, peanut butter, all condiments, etc.—and place those items on trays for easy access by Mostafa. Mazon Decl., Ex. 5 ¶¶ 4-5. Food Services staff peel and cut his fresh fruit and pour his beverages for him. *Id.* ¶¶ 6-7. These meticulous procedures, which are performed at every meal, mean that Mostafa sometimes receives as many as three separate food trays per meal. *Id.* ¶ 5. While Mostafa currently has selected BOP's Certified

Religious Diet, which is a kosher menu, Food Services staff will prepare whatever menu he chooses, including a halal menu, in the exact same way—i.e., removing all packaging and segregating the food on separate trays in the manner he has requested. *Id.* ¶¶ 8-9.

If Mostafa wants halal meals, all he has to do is ask. *Id.* There is no impediment to his receiving and eating halal meals at ADX. *Id.* ¶ 10.

### 3.   Element not established (Eid meal subclaim): Certainly impending injury.

Mostafa's subclaim regarding meat on Eid, FAC ¶ 64, fails because he cannot meet his burden to establish standing. To establish standing for forward-looking injunctive or declaratory relief, the Court has "repeatedly reiterated" that the "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409; *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-107 (1983) (past illegal chokehold "does nothing to establish a real and immediate threat" of injury in the future necessary for injunctive relief). Indeed, even "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Rezaq*, 677 F.3d at 1008.

This year, Mostafa was served meat on Eid, which fell on May 2, 2022. Ex. 5 ¶10; *see also* https://www.islamicfinder.org/islamic-calendar/.[9] Mostafa alleges no facts showing that he faces a real and immediate, certainly impending injury, alleging at most that at some point in the past he did not receive meat on Eid. This is insufficient to establish standing for injunctive relief. The Eid meal aspect of Claim 2 fails for lack of standing.

### 4.     Element not alleged (ritual washing subclaim): No concrete injury/redressability.

This component of the claim rests on Mostafa's contention that he cannot pray at all because

---

[9] The Court may take judicial notice of this commonly known fact, which is not subject to dispute.

he has no means of washing himself. FAC ¶¶ 65, 69. Jurisdiction is lacking because he cannot establish a redressable injury. Mostafa has his own sink and two shower heads, one high and one low, in his in-cell shower, all of which are programmed to run significantly longer than other sinks and showers at ADX. McMullen Decl., Ex. 6 ¶¶ 5-6. There is no evidence in Mostafa's medical records that he is unable to use these means to wash himself. Hall Decl., Ex. 7 ¶ 8 (noting Mostafa's well-maintained hygiene, absence of "bone infections" and skin breakdowns, and fact that he has had no "further amputations" of his arms while in BOP custody).

In sum, Mostafa can establish no injury related to washing himself, nor would a favorable ruling from this Court redress that non-existent injury. The BOP already provides Mostafa the means to perform both ritual washing, not to mention the deeper washing that has allowed him to avoid skin breakdown, "bone infections," and "further amputations"—unsupported contentions which find no support in Mostafa's medical records.

### B. Most aspects of the RFRA claim are subject to dismissal and the remaining piece, as will be separately explained, is unexhausted.

The standing defects that require dismissal of the halal diet, feast meal, and ritual washing components Mostafa's free exercise claim similarly mean that Mostafa cannot establish jurisdiction under RFRA. 42 U.S.C. § 2000bb-1(c) ("Standing to assert a claim" under RFRA" shall be governed by the general rules of standing under article III of the Constitution."). The Court should dismiss each of these RFRA subclaims.[10]

### III. The Rehabilitation Act claims fail (Claims 5 and 6).

In these claims brought under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a),

---

[10] While Defendants do not argue that the group prayer aspect of Mostafa's RFRA claim is subject to dismissal under Rule 12(b)(1), the group prayer subclaim is not exhausted, as will be explained in Defendants' forthcoming early motion for partial summary judgment. With that, no aspect of Mostafa's RFRA claim should proceed.

Mostafa alleges that he has not received a reasonable accommodation for his "amputated arms"[11] or "adequate facilities" for a person with no hands. FAC at 25, 35. The essence of the claims is that he cannot function because BOP refuses to give him adequate prostheses.[12] The claims cannot proceed.

In addition to the fact that the claims are unexhausted pursuant to the Department of Justice procedures in 28 C.F.R. § 39.170, as will be explained in Defendants' early summary judgment motion, Congress authorized no private right of action for such claims. And even if there were a private right of action, Mostafa cannot establish the redressability element of standing.

### A.      Mostafa cannot bring a claim against the federal government under the Act.

Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency. 29 U.S.C. § 794(a). Section § 794a(a)(2) grants an express private right of action to "any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." The Supreme Court has held that this provision waives sovereign immunity for monetary damages only with respect to suits against a federal agency acting as a "Federal provider" of financial assistance, but not for programs or activities conducted by a federal agency. *Lane v. Pena*, 518 U.S. 187, 193 (1996). The Supreme Court has not addressed whether the Rehabilitation Act provides an implied private right of action to

---

[11] Mostafa has lost his arms below the elbows.

[12] FAC *e.g.*, ¶ 103 (alleging "discrimination in the BOP's programs because he doesn't have adequate prosthetic devices"); ¶ 107 (alleged failure "to provide adequate prosthetics for [his] arms impairs his abilities to perform actions that involve the management of basic bodily functions"); ¶¶ 109-116 (complaining about alleged inadequacies of prostheses); ¶¶ 118-123, 125-132 (allegations about activities he cannot perform because of inadequate prostheses); ¶¶ 143, 145-149 (ADX cell allegedly inadequate for person without hands).

sue for injunctive or declaratory relief based on alleged disability discrimination for programs or activities conducted by a federal agency, as alleged here. The Court should find no implied right.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The Supreme Court has emphasized that "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979). In determining whether a federal statute provides a private right of action, "[t]he ultimate question is one of congressional intent." *Id.* at 577. For a private right of action to exist, "the statute Congress has passed" must "display[] an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286.

Under these standards, the Rehabilitation Act does not provide Mostafa with a private right of action. Through the Rehabilitation Act, Congress enacted two provisions creating express rights of action against federal agencies: § 794a(a)(1) creates an express cause of action for employment discrimination based upon disability; and § 794a(a)(2) creates an express cause of action for disability discrimination by a "Federal provider of [financial] assistance." 29 U.S.C. 794a(a). These express causes of action delineate where Congress intended to create a private right of action, and where, like here, it intended other rights to be enforced administratively. *See* 29 U.S.C. § 794(a) (requiring each agency head to "promulgate such regulations as may be necessary to carry out" the Rehabilitation Act amendments). Further, "[b]y adding a broad attorney fees provision and broadening the rights-granting language under section 504 but not amending the remedies-granting language of section 505, Congress may be understood to have made a deliberate choice to maintain a limited cause of action to enforce section 504." *De Dandrade v. United States Dep't of Homeland Security*, 367 F. Supp. 3d 174, 191 (S.D.N.Y. 2019), *aff'd sub nom Moya v. U.S. Dep't of Homeland Security*, 975 F.3d 129 (2d Cir. 2020).

Simply put, Congress knew how to create rights of action, and chose to create two rights of action in the Rehabilitation Act. Its decision not to create a right of action here should be respected, and the Court should refuse to create an implied cause of action. *See*, *e.g.*, *Bacote v. Fed. Bureau of Prisons*, No. 17-cv-03111-RM-NRN, 2021 WL 248808, at *8 (D. Colo. Jan. 26, 2021) (refusing to imply a cause of action because "there is no remedy specifically provided for discrimination 'under any program or activity conducted by any Executive agency'" in Section 794a(a)).[13] In any event, the Tenth Circuit has also held that the BOP is not running "programs and activities" within the meaning of Section 504, thus further precluding any claim. *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991). Therefore, Mostafa cannot bring a Section 504 claim because he does not have an available private right of act under the Rehabilitation Act.

**B.      Element of standing not met: Traceability/Redressability of the claim.**

Even if there were a private right of action for Mostafa's Rehabilitation Act claims, he would lack standing to pursue those claims. Here, Mostafa's alleged injury is BOP's purported refusal to provide him prostheses that will allow him to function at ADX. FAC *e.g.,* ¶¶ 103, 107, 109-116, 118-123, 125-132, 142-143, 145-149. Here, again, he cannot show that he has a concrete, actual or imminent injury that can be redressed by a favorable ruling. *Clapper*, 568 U.S. at 409.

This supposed injury is not redressable by an order from this Court because BOP stands ready—as it has for over a year and a half—to manufacture Mostafa brand new custom-built prostheses, or to have repaired the prostheses Mostafa has. Ex. 7 ¶¶ 4, 6.[14] When it comes to Mostafa's ability to function at ADX, his prostheses are the foundation for allowing him to

---

[13] *See also*, *e.g.*, *Mathis v. GEO Group, Inc.*, No. 2:08-CT-21-D, 2009 WL 10736631, at *7 (E.D.N.C. Nov. 9, 2009) (refusing to imply a private right of action under section 504 against the federal government or its officials).

[14] Just a few days ago, Mostafa asked to be evaluated for new prostheses, Ex. 7 ¶ 5, but it remains to be seen whether he will cooperate with the prosthetist's work, or obstruct that process as he has done in the past. *See* ECF No. 96-6 ¶¶ 11-19.

independently perform the basic activities of daily living. *Id.* ¶ 4 (discussing conclusion of February 2022 evaluation by BOP's Director of Rehabilitation Services). The Court could order nothing more than what BOP has already offered, repeatedly, to do for Mostafa, and will do, if he allows medical providers to do their job. He should not be allowed to pursue relief in this Court while simultaneously obstructing efforts by BOP to provide the very relief he claims to want. Mostafa's own actions preclude him from satisfying the traceability and redressability elements of standing.

## IV.     Mostafa fails to allege an equal protection violation (Claim 3).

This claim is based on the same contentions underlying Mostafa's religion claims, i.e., the alleged "[r]estrictions on group prayer, food and washing," which Mostafa contends have "a disparate impact on Muslims." FAC ¶ 75. The claim lacks merit.

To begin, it does not make sense that an alleged inability to eat halal food, or to wash, based on a disability particularized to Mostafa has an impact on Muslims generally. Regardless, as discussed above in connection with Mostafa's religion claims, he cannot establish standing to litigate his purported inability to eat halal food or to wash himself before prayer because he has no redressable injury. The real crux of the alleged equal protection violation, it appears, is about group prayer and the alleged inability of Muslims to pray at specific times as part of the "Ummah," or "worldwide community of Muslims." *Id.* Put simply, the equal protection violation hinges on the contention that the rule allowing group prayer for all H Unit inmates when they are at outdoor recreation means that Muslims are not treated equally. To make the statement is to confirm its invalidity. Similarly situated inmates are *not* treated differently in H Unit at ADX.

### A.     Elements not alleged: Dissimilar treatment of similarly situated inmates; purposeful discrimination; absence of legitimate penological interest.

The guarantee of equal protection "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Here,

Mostafa attempts to plead a violation of equal protection as to a group—specifically, Muslim inmates in H Unit. One "who alleges [such] an equal protection violation has the burden of proving the existence of purposeful discrimination" causing an adverse effect. *McCleskey v. Kemp,* 481 U.S. 279, 292 (1987). And "plaintiffs in a prison context have the burden of demonstrating that 'the difference in treatment was not reasonably related to legitimate penological interests.'" *Rojas v. Baumgartner*, 604 F. App'x 692, 695 (10th Cir. 2015) (quoting *Fogle v. Pierson*, 435 F.3d 1252, 1261 (10th Cir. 2006)). His pleading does not come close to satisfying these standards.

First, Mostafa identifies no inmate, or group of inmates, "treated more favorably" than him, or than Muslims as a group, when it comes to opportunities for group prayer in H Unit. *All* inmates in H Unit "may engage in communal prayer with other ADX SAM inmates while they are at their regularly-scheduled outside recreation." Ex. 3. *All* inmates in H Unit "may bring with them to outside recreation one (1) item of religious property utilized for daily prayer." *Id. All* inmates are barred preaching and teaching other inmates during congregate prayer on the recreation yard. *Id.* Mostafa has not alleged any inmate, similar to him in all material respects, who receives more favorable treatment when it comes to group prayer in H Unit. *See*, *e.g.*, *Meek v. Jordan*, 534 F. App'x 762, 764-65 (10th Cir. 2013) (inmate "does not allege any facts that would suggest similarities to other prisoners who were treated more favorably," an "omission … fatal to the equal-protection claim").

At bottom, Mostafa's complaint isn't about unequal treatment but about his disagreement with the group prayer policy in H Unit and his desire that ADX to adopt a different policy.[15] His assertion that the consistently-applied ADX group prayer policy has a disparate impact on Muslims because they are the *only* religious group "who practice their religion as part of the Ummah, or

---

[15] The opportunities for group prayer in H Unit are exactly the same as those for inmates in ADX general population units. *See* Ex. 4 (allowing group prayer on recreation yard).

worldwide community of Muslims, and all pray at certain times," is conclusory and not entitled to the presumption of truth. It is commonly known that communal worship at specified times is at the heart of other centuries-old world religions, including the Sunday Divine Liturgy in Orthodox and Catholic Christianity and Saturday Shabbat services in Judaism. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1323 (10th Cir. 2010) (holding "vague and conclusory allegations, without any specific facts" regarding differential treatment of white inmates insufficient to support equal protection claim). ADX inmates who espouse these beliefs may be unable to pray these particular communal prayers with other inmates during "regularly-scheduled outside recreation at ADX." All inmates, equally, may be obliged to adjust the time for their prayers, or to engage in another form of prayer, if they desire to pray with others in H Unit.

Neither does the prayer policy evince "purposeful discrimination" against Muslim inmates or inmates of any other religion. *See McCleskey*, 481 U.S. at 292.

Finally, Mostafa has not alleged that the group prayer policy for H Unit inmates is not reasonably related to the legitimate penological interest of protecting ADX staff and helping to ensure the secure and orderly operation of the institution. The decision to allow congregate prayer during a time when the inmates are scheduled to be outside their cells in a central location—thus eliminating the need for additional escorts by correctional officers—reduces the risk of assault, which is present every time correctional staff come into contact with ADX inmates. *See*, *e.g.*, *Petty*, 856 F.3d at 1308. Reducing opportunities for assaults clearly does not evince a discriminatory motive.

In sum, Mostafa has not met his burden to allege (1) he is treated differently from H Unit inmates similarly situated to him, (2) that such treatment was prompted by discriminatory intent, and (3) that the group prayer rule lacks a rational penological purpose. The Court should dismiss Claim 3.

V.     **The Administrative Procedure Act claim fails (Claim 10).**

Mostafa asserts that his placement at ADX violates the APA. FAC ¶ 214. He contends that

decision should be set aside under 5 U.S.C. § 706(2). *Id.* (arguing that his ADX placement is

unlawful under each ground set forth in § 706(2)).[16] The claim cannot proceed.

**Element not alleged: Subject-matter jurisdiction.** Jurisdiction over this claim is lacking

because the BOP's placement decisions pursuant to 18 U.S.C. § 3621(b)—including the decision to

place Mostafa in ADX—are specifically exempted from review under the APA. *See* 18 U.S.C.

§ 3625 ("The provisions of sections … 705 through 706 of title 5, United States Code, do not apply

to the making of any determination, decision, or order under this subchapter."); *see also Hunnicutt v.*

*Hawk*, 229 F.3d 997, 1000 (10th Cir. 2000) (recognizing the APA does not apply to § 3621);

*Standifer v. Ledezma*, 653 F.3d 1276, 1279 n.3 (2011) (holding 18 U.S.C. § 3625 "prohibits judicial

review under the APA of RDAP [substance abuse treatment program] placement decisions").[17]

In sum, the APA does not waive sovereign immunity for Mostafa's claim because a statute—

18 U.S.C. § 3625—precludes review. 5 U.S.C. § 701(a)(1); *High Country Citizens All. v. Clarke*, 454

F.3d 1177, 1181 (10th Cir. 2006). The Court should dismiss the claim.

VI.     **The Eighth Amendment *Bivens* claims fail (Claims 7 and 8).**

A.     **Claim 7, an excessive force claim, fails.**

<u>Claim 7</u> is an excessive force claim against ADX Officers Parry, Averitt, Garduno, Armijo,

---

[16] The claim is also time-barred, which will be addressed in Defendants' early motion for summary judgment. Mostafa states that all his "other claims" also "are reviewable" under the APA, but that he is not obliged to plead these as separate APA claims. FAC ¶ 217. It is unclear what he means, but if the Court countenances such unpled claims, Defendants request an opportunity to explain in separate briefing why any such APA claims would fail.

[17] *E.g.*, *Reeb v. Thomas*, 636 F.3d 1224, 1227 (9th Cir. 2011) (finding determinations made pursuant to 18 U.S.C. § 3621 non-reviewable in light of 18 U.S.C. § 3625); *Grimsley v. Quintana*, No. 5:20-331-DCR, 2020 WL 8717103, at *2 (E.D. Ky. Aug. 3, 2020) ("BOP's placement decisions under Section 3621(b) are insulated from judicial review by 18 U.S.C. § 3625.").

and Edwards, ADX Health Technician Huddleston, and ADX physician Sterett based on an incident that occurred on October 28, 2019. FAC ¶ 161. Garduno, Parry, and Averitt allegedly assaulted Mostafa. *Id.* ¶¶ 162, 165. Dr. Sterett allegedly failed to intervene. *Id.* ¶ 169. Huddleston, who was not present during the alleged assault, allegedly "assisted" by ignoring Mostafa's duress button afterwards. *Id.* ¶ 171. Armijo and Edwards allegedly cleaned up Mostafa's blood but did not write a report about it. *Id.* ¶ 168. The claim should not proceed, for multiple reasons.[18]

### 1. Element not met: *Bivens* remedy for excessive force.

Mostafa's *Bivens* claim fails because there is no implied remedy. The Supreme Court has directed courts to address a two-part inquiry in deciding whether to imply a *Bivens* remedy: (1) whether the claim arises in a "new context" different from the only three "instances in which the Court has approved of an implied damages remedy under the Constitution itself," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017),[19] and (2) whether any alternative remedies or "special factors" counsel hesitation against a new damages remedy. *Id.* at 1857-58.

Very recently, in *Egbert v. Boule*, the Court affirmed that analytical framework, while clarifying that the two steps "often resolve to a single question: whether there is *any reason to think* that Congress might be better equipped to create a damages remedy." *See* 142 S. Ct. 1793, 1803

---

[18] Mostafa raises scattershot allegations about conduct that is not related to excessive force or attributed to the *Bivens* Defendants in Claim 7. *E.g.*, FAC ¶ 176 (Huddleston "crudely" cut Mostafa's toenails); ¶ 177 (Tuttoilmondo took Mostafa's property during a hunger strike); ¶ 178 (unnamed "Defendants" should have obtained "informed consent" to feed Mostafa during a hunger strike). If the Court construes these allegations as separate claims against different Defendants, those Defendants request an opportunity to respond, and if necessary, to seek representation.

[19] Those three cases, each decided over 40 years ago, are *Bivens*, 403 U.S. at 396 (Fourth Amendment claim against federal agents who allegedly manacled suspect and threatened his family during an arrest); *Davis v. Passman*, 442 U.S. 228, 248-49 (1979) (gender-discrimination claim against a congressman under the equal-protection component of the Fifth Amendment Due Process Clause); and *Carlson v. Green*, 446 U.S. 14, 16, 19-23 & n.1 (1980) (Eighth Amendment claim against prison officials who failed to provide any care to inmate, resulting in his death).

(2022). If there is "even a single" rational reason to defer to Congress, the court must do so. *Id.* And a reason to defer to Congress will be present "in most every case." *Id.* The Tenth Circuit has held excessive force claims fall in that large majority in which "no *Bivens* action may lie." *Id.*

In *Silva v. United States*, No. 21-1008, 2022 WL 3023684 (10th Cir. Aug. 1, 2022),[20] the Court refused to create a *Bivens* remedy for an excessive force claim brought by an ADX inmate. *Id.* at *4-5. The Court observed that "the key takeaway from *Egbert*" is "that courts may dispose of *Bivens* claims for 'two *independent* reasons: Congress is better positioned to create remedies in the [context considered by the court], and the Government already has provided alternative remedies that protect plaintiffs." *Id.* at *4 (emphasis in original). The Court then focused on "the alternative remedial scheme" available to an ADX inmate: BOP's Administrative Remedy Program. *Id.*

The Tenth Circuit rejected the inmate's arguments that the Administrative Remedy Program is an "inadequate" alternative to a damages remedy, observing that regulatory schemes created by the Executive Branch are acceptable and emphasizing that "the Supreme Court has long since described the BOP Administrative Remedy Program as an adequate remedy." *Id.* (discussing *Corr'l Services Corp. v. Malesko*, 534 U.S. 61 (2001)). And "[s]o long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Egbert*, 142 S. Ct. at 1807.

The Tenth Circuit had "little difficulty concluding the BOP Administrative Remedy Program is an adequate means through which allegedly unconstitutional actions … can be brought to the attention of the BOP and prevented from recurring," and that the Program is thus "an independently sufficient ground to foreclose Plaintiff's *Bivens* claim." *Silva*, 2022 WL 3023684; *see also Bivens v.*

---

[20] *Silva* was ordered to be published on August 18, 2022. *See* PACER Docket, available athttps://ecf.ca10.uscourts.gov/n/beam/servlet/TransportRoom?servlet=CaseSummary.jsp?caseNum=21-1008&dktType=dktPublic&incOrigDkt=Y&incDktEntries=Y.

*Blaike*, No. 21-cv-00783-PAB-NYW, 2022 WL 2158984, at *6 (D. Colo. June 2022) (same), *adopted*, 2022 WL 2716533 (D. Colo. July 13, 2022).

The same analysis compels dismissal of the excessive force claim brought by Mostafa, Silva's fellow ADX inmate. This Court need inquire no further to dismiss with prejudice Mostafa's excessive force claim against all Defendants. *Silva*, 2022 WL 3023684, at *5.

> **2.      Sterrett, Huddleston, Armijo, and Edwards are entitled to qualified immunity.**

Even if there were a *Bivens* remedy, Huddleston, Sterrett, Armijo, and Edwards are entitled to qualified immunity. Qualified immunity shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This immunity recognizes the "social costs [of litigation against public officials, which include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Id.* at 814. To overcome qualified immunity, the plaintiff bears the heavy two-part burden to show that (1) each defendant violated a constitutional right, and (2) the right violated was clearly established at the time of the conduct. *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018). Unless the record "clearly demonstrate[s]" he has satisfied this burden, Defendants are entitled to qualified immunity. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

The cardinal rule in evaluating qualified immunity is that clearly established law must be particularized to the facts of the case with a high degree of specificity. *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 552 (2017). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *Estate of Smart v. City of Wichita*, 951 F.3d 1161, 1172 (10th Cir. 2020). To meet this burden, the plaintiff must point to "a

Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts," in existence at the time of the conduct in question. *Estate of Smart*, 951 F.3d at 1168-69. The contours of the right must be "sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). Existing precedent must have placed the question "beyond debate." *Id.*

Incorporated into the qualified immunity doctrine is the requirement of personal participation. *Pahls v. Thomas,* 718 F.3d 1210, 1225, 1227 (10th Cir. 2013). That means a plaintiff must plausibly allege that each defendant violated the plaintiff's rights through his or her "own individual actions." *Ashcroft v. Iqbal,*, 556 U.S. 662, 676 (2009). It is not enough for a plaintiff to allege generally that his rights "were violated" or to make an "undifferentiated contention" that "defendants" infringed his rights. *Pahls*, 718 F.3d at 1225-26. The plaintiff must make individualized allegations against each defendant that allow for "an individual assessment of each defendant's conduct and culpability." *Id.* at 1233; *see Brown v. Montoya*, 662 F.3d 1152, 1165 (10th Cir. 2011).

This pleading standard takes on added importance when a claim seeks to impose personal liability on government officials—especially in lawsuits involving multiple defendants. *Pahls*, 718 F.3d at 1225. In this context, "it is particularly important … that the complaint makes clearly exactly *who* is alleged to have done *what* to *whom*" to distinguish the basis for claims against individuals from collective allegations against the government. *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). Those allegations must plausibly attribute the alleged violation to specific actions of each individual. *Moya v. Garcia*, 895 F.3d 1229, 1232 (10th Cir. 2018); *Pahls*, 718 F.3d at 1226.

          a.      **Elements not alleged (Sterett): Constitutional violation, violation of clearly established law.**

Dr. Sterett allegedly failed to intervene during the October 29, 2018 use of force. FAC

¶ 169. In order to be liable, a bystander must "have had a realistic opportunity to intervene." *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (cleaned up). Mostafa's allegations fall short.

Dr. Sterett followed Officer Garduno's direction to wait outside Mostafa's cell during the alleged assault. FAC ¶ 163. Somehow, in the throes of the alleged assault, Mostafa saw that Dr. Sterett "remained outside, and only left after the Plaintiff was assaulted." *Id.* He did not "re-enter the room to check on" Mostafa. Dr. Sterett didn't write a report "or send a nurse until hours later." *Id.* ¶ 169. This is the same nurse who wrote, in a contemporaneous medical record Mostafa incorporated by reference into his complaint, that Mostafa told her his injuries were self-inflicted. *Id.* ¶ 172; *see also* ECF No. 96-6 at 32-34 (incorporated medical record from 10/28/2019 noting "quarter sized abrasion" on Mostafa's right stump and his statement that he self inflicts wounds "all the time").

Even countenancing Mostafa's improbable assertions, he has *not* alleged that Dr. Sterett had an opportunity to intervene in the alleged assault. *Jones*, 809 F.3d at 576. He has not alleged (1) that Dr. Sterett is responsible for correctional decisions about how to manage inmates, including when force must be used; (2) that Dr. Sterett is trained in use-of-force techniques; or (3) that Dr. Sterett has any correctional standing, status, duties, or authority that permits him to intervene in correctional matters. Neither has Mostafa alleged that a doctor has any supervisory authority over correctional officers that would have given him the power to step into the middle of the supposed fray and order the officers to stop. *See Smith v. Donate*, No. 4:10-cv-2133, 2012 WL 1899323, at *6 (M.D. Pa. April 5, 2012) ("[P]rison medical officials, who are not law enforcement officers, have no legal duty to intervene on behalf of an inmate in the midst of physical altercations with staff, and thus cannot be liable under 1983 for alleged violations of the Eighth Amendment predicated on their alleged failure to intervene or stop the use of force by corrections officers or prison officials"), *adopted*, 2012 WL 1899318 (M.D. Pa. May 24, 2012). Rather, it was Officer Garduno who *ordered Dr. Sterett* to leave

the cell. FAC ¶ 163. Put simply, Mostafa has not alleged that Dr. Sterett had any ability to alter the course of an alleged use-of-force event being handled by trained correctional officers outside the physician's supervisory chain.

Finally, there is no clearly established law, particularized to the facts here, that would have put every reasonable prison physician in Dr. Sterett's position on notice *beyond debate* that he was required to intrude into the correctional realm and order non-medical officers to take a different course. Prison physicians do not issue orders to correctional officers who are charged with protecting the safety and security of a prison; when it comes to safety and security, the hierarchy goes the other way—as Dr. Sterett recognized when he followed Officer Garduno's directive to leave Mostafa's cell. FAC ¶ 163. Dr. Sterett is entitled to qualified immunity.

### b. Elements not alleged (Huddleston): Personal participation, constitutional violation, violation of clearly established law.

Huddleston, a Health Technician, was not present at the alleged excessive force. Earlier in the day, he accompanied Garduno, Parry, and Averitt to Mostafa's cell, apparently so that Huddleston could medically assess Mostafa during an ongoing hunger strike. FAC ¶¶ 159, 161; *see also* 28 C.F.R. § 549.63(b). When Mostafa refused to cooperate, the Officers allegedly "promise[d] to return with force." FAC ¶ 161. But Huddleston never came back. *Id.* ¶ 162. His lack of personal participation establishes his entitlement to qualified immunity. *Pahls*, 718 F.3d at 1227.

Mostafa's other allegations do not overcome qualified immunity. He claims that Huddleston "didn't tell any manager" about the alleged "threats" made earlier in the day, and then "deliberately ignor[ed]" Mostafa's "duress button for five hours" after the alleged assault. *Id.* ¶ 171. Not making a report to a manager does not constitute excessive force. *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003) (elements of excessive force are "(1) an objective prong that asks if the alleged

wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind") (cleaned up); *see also Marshall v. Milyard*, 415 F. App'x 850, 852 (10th Cir. 2011); *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 115 (10th Cir. 2006).[21]

The bottom line is that Huddleston used no force against Mostafa at all, let alone force applied "maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992); *see also Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994) (explaining that this "very high state of mind" requirement is necessary in excessive force cases "where the decisions of prison officials are typically made in haste, under pressure, and frequently without the luxury of a second chance"). He receives qualified immunity for that reason, too. And there is no clearly established law, particularized to the facts here, that would have made it clear beyond debate that not making such a "report" would subject Huddleston to liability for excessive force.

Neither is Huddleston's assertion of qualified immunity overcome by the conclusory and unsupported allegations that Huddleston "deliberately ignor[ed]" Mostafa pressing his duress alarm. Mostafa has not alleged facts supporting a plausible inference that Huddleston, who works in the medical department, would have heard an alarm that sounds in the control center in H Unit. In any event, not responding to such an alarm is not "excessive force." And there is again no clearly established law in these circumstances.

Huddleston is entitled to qualified immunity because he used no force at all, and Mostafa has not alleged that Huddleston violated any clearly established law.

---

[21] To the extent Mostafa construes this as a failure to intervene claim, it fails. Such a claim typically requires presence at the scene and an opportunity to intervene. *E.g.*, *Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008) (supervising police officer had a "realistic opportunity" to prevent fellow officers' use of excessive force where the supervisor was present for the arrest, which lasted several minutes, and failed to intervene); *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996) (same).

      c.        **Elements not alleged (Armijo/Edwards): Personal participation, constitutional violation, violation of clearly established law.**

Like Huddleston, Officers Armijo and Edwards were not present at the scene during the alleged excessive force on October 29, 2022. [22] On October 22, 2019, a week before the incident, Armijo and Edwards "confiscated" the hunger-striking Mostafa's property. FAC ¶ 166. And five hours after the use of force on October 29, 2022, Armijo and Edwards ordered an inmate "to clean the blood" from Mostafa's cell, but wound up cleaning it themselves and then did not write an incident report. *Id.* ¶168. Armijo and Edwards are entitled to qualified immunity for three reasons.

First, they are not alleged to have personally participated in the alleged assault.

Second, Mostafa has not alleged the objective or subjective prongs of excessive force as to these officers. It is beyond dispute that removing an inmate's property bears no resemblance to applying force maliciously and sadistically for the very purpose of causing harm. Neither does cleaning a cell or not writing a report. Mostafa asks the Court to presume that these Officers knew everything about what happened hours earlier (if anything happened), when neither was present. No well-pleaded fact supports such an assumption, nor may any cover-up by Armijo and Edwards be inferred from the few allegations against them. Finally, and critically, Mostafa has not alleged that either Armijo or Edwards was in a position to prevent the use of alleged excessive force.

Third, it is even more evident that no clearly established law, particularized to these unusual circumstances, would have given Armijo and Edwards unquestionable notice that their conduct violated Mostafa's Eighth Amendment rights. Armijo and Edwards are aware of no Supreme Court or Tenth Circuit authority holding fellow correctional officers liable for excessive force who were not

---

[22] In paragraph 166, Mostafa alleges that Armijo "didn't make an incident report" for the use of force incident, even though he was "involved in it," but there is no other allegation concerning the presence of either Armijo or Edwards when force allegedly was used. The reference to Armijo in paragraph 166 is presumed to be a typographical error.

present at the scene of the force and lacked any opportunity to stop it.

*    *    *

Binding Supreme Court and Tenth Circuit authority confirm that there is no damages remedy for excessive force, requiring that Claim 7 must be dismissed against all Defendants. In addition, Dr. Sterett, Huddleston, Armijo, and Edwards are entitled to qualified immunity.

### B.     Claim 8 fails.

Claim 8 is styled as a deliberate indifference claim against Huddleston, Dr. Sterett, ADX Officers Loewe and Naranjo, former ADX Assistant Health Services Administrator Fellows, and Director of Rehabilitation Services Chorosevic, who works at BOP's facility in Butner, North Carolina. The claim consists of scattered allegations, most of which do not focus on medical care:

| Complaint paragraph | Alleged indifference | Defendant |
| --- | --- | --- |
| 185-186 | "Failure to provide adequate dental care," including electric toothbrush | "Defendants" collectively |
| 187 | "Failure to provide adequate foot care" | "Defendants" collectively |
| 189 | Failure to provide a "specific diet" with vegetables | No Defendant identified |
| 192 | Failure to remove plastic packaging from evening meals | Loewe/Naranjo |
| 193 | Failure to provide mask | "Defendants" collectively |
| 194 | No way to wash food/utensils in cell | "Defendants" collectively |
| 195 | Lack of "adequate prosthetics" | No Defendant named |
| 197 | Mostafa experiences "psychological problems" | No Defendant named |
| 198 | Failure to renew unidentified prescriptions on time | "Defendants" collectively |
| 199 | "Removal" of prosthetics | No Defendant named |
| 200-201 | Denial of administrative remedies/no answer to his attorney's letter | "Defendants" collectively |
| 202 | Denial of "own independent occupational therapist," denial of "fittings," and "interfering | Fellows |

| | with medical necessities" | |
| 204 | Facilities are not "adequate" | No Defendant named |

No claim should proceed, against any of the six *Bivens* Defendants.

### 1.      Element not met (Chorosevic and Fellows): Waiver of immunity.

To begin, Chorosevic and Fellows, as commissioned officers in the U.S. Public Health Service, have absolute immunity from damages suits. Chorosevic Decl., Ex. 8 ¶¶ 1-2; Fellows Decl., Ex. 9 ¶¶ 1, 3. The Federally Supported Health Care Assistance Act, 42 U.S.C. § 233(a), "grants absolute immunity to [Public Health Service] officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct." *Hui v. Castaneda*, 559 U.S. 799, 806 (2010). Claim 8 against Chorosevic and Fellows must be dismissed for this reason alone.

### 2.      Element not met (all Defendants): Damages remedy.

Mostafa's scattershot complaints about his conditions at ADX fall in that large majority of case in which "no *Bivens* action may lie." *Egbert*, 142 S. Ct. at 1803.

**The context is new.**[23] Mostafa claims that he does not have adequate dental care, that his foot care is not adequate because his nails are not trimmed in the manner and frequency he prefers, that he has undefined "psychological problems" (for which he does not claim to have sought medical treatment), and that some of his prescriptions have not been filled exactly on time (for which he does not claim to have suffered harm). FAC ¶¶ 185-187, 198.

These claims are dissimilar in their nature and severity to *Carlson*, where the inmate suffered such a gross deprivation of care that he died. Because of this different factual context—even a

---

[23] *Egbert* did not overrule the two-step inquiry, while finding that it "often resolve[s]" to the single question of whether there is any reason to think Congress should create a damages remedy. *See* 142 S. Ct. at 1803. Defendants conduct the two-step analysis here, but also analyze the situation from the perspective of the single question. Under either analysis, no remedy should be implied.

"modest extension is still an extension," *Abbasi*, 137 S. Ct. at 1864—the Court must conduct an alternative remedies and special factors analysis. *See*, *e.g.*, *Martinez v. U.S. Bureau of Prisons*, No. 5:15-cv-002169-TJH, 2019 WL 5432052, at *9 (C.D. Cal. Aug. 20, 2019) (allegations of inadequate exercise and deprivation of medical care for hypertension, "which may have caused him to feel light-headed and nauseated," and claim for inadequate exercise were deprivations "demonstrably different in kind and severity from that of *Carlson* and therefore present[] a new context under the *Abbasi* analysis"), *aff'd*, 830 F. App'x 234 (9th Cir. 2020); *Dissler v. Zook*, No. 3:20-cv-00942-D, 2021 WL 2598689, at *4 (N.D. Tex. May 7, 2021) ("deliberate indifference claim for inadequate dental treatment arises in a new context"), *adopted*, 2021 WL 2589706 (N.D. Tex. June 23, 2021); *Nabaya v. Bureau of Prisons*, No. 3:19-cv-215-L, 2020 WL 7029909, at *3 (N.D. Tex. Oct. 7, 2020) (same), *adopted*, 2020 WL 7027470 (N.D. Tex. Nov. 30, 2020).

A new context is equally apparent in Mostafa's other wide-ranging allegations about his ADX confinement, including his complaints about the need for a "specific diet" with "salad" and tomatoes, the presentation of meals, the alleged lack of a mask, his alleged inability to wash food/utensils in cell, the fact that his prostheses were "removed," his desire for his "own independent occupational therapist," and his gripe that the "facilities" are not adequate. FAC ¶¶ 189-195, 197-204. Here, again, these claims are much different from *Carlson* and fall easily within the Supreme Court's "broad" understanding of new context. *Abbasi*, 137 S. Ct. at 1864-65; *see also Mammana v. Barben*, 856 F. App'x 411, 415 (3d Cir. 2021) (new context in challenge to "confinement in a chilled room with constant lighting, no bedding, and only paper-like clothing"); *Schwarz v. Meinberg*, 761 F. App'x 732, 734 (9th Cir. 2019) (new context for claim regarding unsanitary cell conditions).[24]

---

[24] *E.g.*, *Oden v. True*, No. 3:18-cv-600-GCS, 2020 WL 4049922, at *1, 3 (S.D. Ill. July 20, 2020) (no *Bivens* remedy for placement of three inmates in a two-person cell, causing "duress, stress, overcrowding, cell conflicts, assaults, [and] privacy [violations]"); *Mercer v. Matevousian*, No. 1:18-

**Mostafa has the alternative remedy approved by the Tenth Circuit, and there are other special factors.** At step two, Mostafa must demonstrate both that there is no alternative remedial process and that no special factors counsel hesitation. *Abbasi*, 137 S. Ct. at 1858-60. In *Silva*, the Tenth Circuit framed the analysis this way: "courts may dispose of *Bivens* claims for 'two *independent* reasons: Congress is better positioned to create remedies in this context, and the Government already has provided alternative remedies that protect plaintiffs." 2022 WL 3023684 at *4 (quoting *Egbert*, 142 S. Ct. at 1804). Both reasons compel rejection of a *Bivens* remedy here.

First, Congress is in a superior position to decide. Indeed, Congress already considered the matter and decided against a personal damages remedy in the Prison Litigation Reform Act. In rejecting the prisoner abuse claim in *Abbasi*, the Supreme Court explained that, in enacting the PLRA, "Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs." 137 S.Ct. at 1865. Congress's decision not to provide for a "standalone damages remedy" therefore suggests "Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Id.*

The wisdom behind deferring the damages question to Congress is evident. Prison employees must make difficult judgment calls about how to manage inmates, particularly one like Mostafa who will complain of everything—even the offer of custom-built prostheses. Under these circumstances, the specter of personal damages claims may motivate prison staff to accede to Mostafa's demands, or to decide that it is not worth it to work with the inmate population at all. "Federal employees faced with the added risk of personal liability for decisions that they believe to be a correct response to

cv-00265-DAD-BAM, 2018 WL 4859312, at *3 (E.D. Cal. Oct. 5, 2018) (no *Bivens* remedy for failure to provide handicap-accessible shower), *adopted*, 2018 WL 10742588 (E.D. Cal. Dec. 18, 2018); *Hill v. Lappin*, 561 F. Supp. 3d 481, 487 (M.D. Pa. June 2, 2021) ("the better-reasoned authority has declined to recognize a *Bivens* remedy for Eighth Amendment conditions-of-confinement … claims").

improper activity would be deterred from carrying out their duties." *Egbert*, 142 S. Ct. at 1807

(cleaned up). These risks "convinced" the Supreme Court that "'Congress is in a better position to

decide whether or not the public interest would be served' by imposing a damages action." *Id.*; *see*

*also Turner*, 482 U.S. at 85 (prison administration "committed to the responsibility of [the legislative

and executive] branches, and separation of powers concerns counsel a policy of judicial restraint").

That is the case here. Mostafa has continued to target *Bivens* defendants as the case proceeds.

No prison official, no matter how well-intentioned, is safe from the personal risks of Mostafa's

sprawling litigation and the "intrusions resulting from the discovery and trial process." *Abbasi*, 137

S. Ct. at 1856. Congress, as the Supreme Court and Tenth Circuit have decided, is better-positioned

to create a damages remedy. That is sufficient grounds to reject one here.

Second, *Silva* made clear that the BOP's Administrative Remedy Program, is "*an*

*independently sufficient ground* to foreclose [Mostafa's] *Bivens* claims. *See* 2022 WL 3023684, at *4

(emphasis added). As the Tenth Circuit recognized, inmates have an opportunity to bring issues of

concern to the officials who are in a position to address them—for example, the officials who

decided to provide brand new, custom-built prostheses as soon as Mostafa says the word. As *Silva*

held, the existence of the Program dispositively settles the question against extending *Bivens*.

To sum up, expanding *Bivens* "is an action that is impermissible in virtually all

circumstances," *id.*, and that includes Mostafa's claims. Put in terms of the question of "whether

there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and

benefits of allowing a damages action to proceed,'" *Egbert*, 142 S. Ct. at 1805, the answer here is

decidedly yes. All of Mostafa's individual-capacity claims fail for this reason alone.

### 3. All Defendants are entitled to qualified immunity.

Even if there were a damages remedy, the *Bivens* claims fail.

a.      **Element not alleged: Constitutional violation, violation of clearly established law.**

The *Bivens* claims fail because each Defendant is entitled to qualified immunity.

To clear the deliberate indifference pleading hurdle, Mostafa must allege an "extreme deprivation[]" taken with a sufficiently culpable mental state. *Hudson*, 503 U.S. at 8-9. That requires allegations showing a deprivation that is "'objectively, sufficiently serious'" such that "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834. He must also allege that each individual Defendants has "a sufficiently culpable state of mind" that amounts to "deliberate indifference" to his health or safety. *Id.* at 834. "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Mostafa's allegations must demonstrate a criminally reckless state of mind, a high standard that isolates those who seek to punish. "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id.* at 837, 839.

Mostafa has not alleged—in complaining about inadequate dental care, how his toenails are trimmed, unspecified "psychological problems," undefined delays in filling prescriptions, masks, washing food and utensils, the "removal" of prostheses, the thwarting of his desire to see an occupational therapist of his choice, and facilities that are not "adequate"—exposure to objectively inhumane prison conditions. *Id.* at 838. No plausible inference can be drawn that Mostafa faces conditions falling below the minimal civilized measure of life's necessities.

Neither has Mostafa alleged that any individual Defendant was actually aware of, but chose

to disregard, an excessive risk to his health or safety. *Id.* at 839. Indeed, as explained below, Mostafa improperly lumps all Defendants together, without coming close to alleging any acted with criminally reckless intent. Given these pleading deficiencies, there certainly is no law, clearly established in the circumstances, that would have put every reasonable officer on notice that Mostafa's scattershot complaints amounted to an Eighth Amendment violation.

At bottom, Mostafa may be aiming for a totality-of-conditions challenge to his ADX confinement. If so, he fails to state a claim on that basis, too. The Supreme Court and Tenth Circuit have rejected such "overall conditions" claims, concluding that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter*, 501 U.S. 294, 305 (1991). Based on this precedent, the Tenth Circuit and this Court repeatedly have held that the alleged "solitary confinement" of ADX— including for inmates like Mostafa who are subject to SAMs—does not violate the Eighth Amendment. *Gowadia*, 596 F. App'x at 674.[25]

Nothing distinguishes Mostafa's claim from these numerous failed attempts to show that ADX conditions are so "extreme" as to deprive inmates of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834, 837, 839; *Hudson*, 503 U.S. at 8-9. The individual Defendants would be entitled to qualified immunity on an "overall" conditions claim, too.

   **b.**  **Element not alleged (10 subclaims): Personal participation.**

The vast majority of Mostafa's allegations are precisely the kind of undifferentiated allegations that the Tenth Circuit has deemed insufficient to defeat qualified immunity. He repeatedly

---

[25] *E.g.*, *Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739, 756, 759 (10th Cir. 2014); *Ajaj v. United States*, 293 F. App'x 575, 582-84 (10th Cir. 2008); *Hill v. Pugh*, 75 F. App'x 715, 721 (10th Cir. 2003); *Davis v. Fed. Bureau of Prisons*, No. 15-cv-0884-WJM-MJW, 2016 WL 1156755, at *6 (D. Colo. Mar. 24, 2016); *McMillan v. Wiley*, 813 F. Supp. 2d 1238, 1250-51 (D. Colo. 2011).

lumps together "Defendants" and makes allegations about them as a group. In a counseled case, the Court should not infer personal participation that is not plainly alleged. *See Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007) (filings of licensed attorneys not entitled to liberal construction).

Mostafa's collective allegations mean subclaims based on these allegations cannot proceed against any Defendant: failure to provide adequate dental care; failure to provide a "specific diet"; failure to provide a mask; inability to wash food/utensils; lack of "adequate prostheses"; Mostafa's "psychological problems"; failure to renew prescriptions "on time"; "removal" of prosthetics; and ADX facilities are "not adequate." FAC ¶¶ 185-189, 193-195, 197-199, 204. Because each of these alleged violations were committed by "Defendants" collectively, or are not attributed to any Defendant at all, the allegations are plainly insufficient to "isolate the allegedly [unlawful] acts" of any individual Defendant. *Brown*, 662 F.3d at 1165. All six *Bivens* Defendants[26] are entitled to qualified immunity on these 10 subclaims for lack of personal participation.

Once these collective allegations are set aside, it is clear that Mostafa has not overcome qualified immunity as to any of his arguably more individualized allegations, as explained below.

### c.   Elements not alleged (foot care): Constitutional violation, violation of clearly established law.

Regarding "foot care," Mostafa similarly lumps together all Defendants together. FAC ¶ 187. At another point in the pleading, though, he claims that Sterett, Fellows, and Chorosevic told him that his toenails would not be trimmed during a hunger strike, that he didn't like how Huddleston trimmed his toenails, and that he has developed toenail fungus.[27] *Id.* ¶ 176. Regardless, these

---

[26] The alleged denial of a grievance, FAC ¶¶ 200-201, also does not suffice to establish personal participation. *Sherratt v. Utah Dep't of Corr.*, 545 F. App'x 744, 747 (10th Cir. 2013).

[27] As discussed above, Fellows and Chorosevic have absolute immunity. Moreover, neither of them provided medical care at ADX (for example, Chorosevic works in North Carolina), which only underscores the implausibility of Mostafa's complaint.

allegations do not overcome qualified immunity.

First, with respect to the objective prong, Mostafa fails to allege any "sufficiently serious" medical need that his toenails were not sufficiently trimmed during an unidentified hunger strike. *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022). Mostafa's minor medical complaint of common toenail fungus, or onychomycosis, does not meet the objective prong, as many courts, including this one, have found. *Aragon v. Baroni*, No. 13-cv-2772-RBJ-BNB, 2014 WL 3562998, *9 (D. Colo. July 18, 2014) (nail fungus "does not meet the Eighth Amendment's objective component"); *Serna v. Laursen*, 19-CV-214 MV-GBW, 2020 WL 1324072, at *4 (D.N.M. Mar. 20, 2020) ("Most courts have held that nail fungus does not constitute a serious medical need.") (collecting cases). As in these failed claims, Mostafa has not alleged that any physician diagnosed his nail fungus as "mandating treatment," or that an average lay person would "easily recognize" this common problem as something that would require a physician's attention. *Prince*, 28 F.4th at 1044. Neither does Mostafa's mere speculation that toenail fungus "could eventually result in the amputation of his toes," FAC ¶ 176, get him over the objective hurdle. A risk must be "*sure or very likely* to cause serious illness and needless suffering" to invoke the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993); *Brewer v. Landrigan*, 562 U.S. 996, 996 (2010).

Second, Mostafa's toenail complaint fails the subjective prong. He has not alleged that Fellows, Chorosevic, Sterett, or Huddleston were aware of facts plausibly indicating they believe he was at substantial risk of serious harm. Rather, Mostafa merely alleges his own view about the care provided. The Tenth Circuit has long recognized that an inmate's disagreement with medical professionals does not demonstrate a constitutional violation. *Perkins v. Kansas Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir. 1993). Even an error constituting medical malpractice "is not subject to second-guessing in the guise of an Eighth Amendment claim." *Mata v. Saiz*, 427 F.3d 745, 751 (10th

Cir. 2005). Mostafa also cannot show a violation of clearly established law.

Huddleston, Sterett, Fellows, and Chorosevic are entitled to qualified immunity.

### d.     Elements not alleged (plastic-wrapped food): Constitutional violation, violation of clearly established law.

Correctional Officers Loewe and Naranjo allegedly "effectively" prevented Mostafa from eating "about 150 evening meals by providing them wrapped in plastic." FAC ¶ 192. But Mostafa contends that he raised this issue one time, on "September 20, 2020," when he "called out to" them and "they ignored him." *Id.* On that one occasion, Mostafa then pushed his duress button "and *told the controller*"—i.e., not Loewe or Naranjo, but the officer in the control room of H Unit—"about the problem." *Id.* (emphasis added). Mostafa does not allege the "controller" informed the officers about the issue. Mostafa has not alleged a violation of clearly established law by Loewe and Naranjo.

**No constitutional violation.** First, Mostafa fails to allege any "sufficiently serious" harm stemming from the fact that, on these particular days, he was able to eat only two meals a day (not counting any commissary items he may have kept in his cell). He has not alleged that this caused him any physical harm at all. And to the extent this two-meal-per-day regimen may have left Mostafa feeling hungry, that also would not implicate the Eighth Amendment, where he does not allege that his health was is in serious jeopardy. *See Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999) (no violation where inmate did not allege specific physical harm other than "hunger pains"); *Green v. Ferrell*, 801 F.2d 765, 770-71 (5th Cir. 1986) (providing prisoner two meals a day did not violate the Eighth Amendment where no health issues resulted).

Having alleged no serious harm, Mostafa's pleading fails the objective prong. *See McCarty v. Aramark*, No. 22-3035, 2022 WL 3571412, at *1 (10th Cir. Aug. 19, 2022) (finding that complaint did not adequately allege an Eighth Amendment violation where inmate claimed that

"the food provided by Aramark was low-quality and spicy" but did "not allege that it has been nutritionally inadequate or that it has suffered from some other serious deficiency"); *see also*, *e.g.*, *Sawyer v. Jefferies*, 315 F. App'x 31, 35 (10th Cir. 2008) (rejecting Eighth Amendment claim where plaintiff did "not allege [his] cod meals were nutritionally inadequate").

Even less do Mostafa's allegations demonstrate that Loewe and Naranjo acted with criminally reckless intent. After all, he only tried to bring the matter up once, and the allegations are unclear whether they were ever informed of an issue, let alone recognized a risk of serious harm.

**No violation of clearly established law.** Neither can Mostafa point to any particularized established law that would have put every reasonable officer in Loewe's and Naranjo's position on notice, beyond debate, that their actions violated Mostafa's constitutional rights. These officers are entitled to qualified immunity.

**CONCLUSION**

The Court should grant the motion to dismiss.

Respectfully submitted on August 24, 2022.

COLE FINEGAN
United States Attorney

s/ *Susan Prose*
Susan Prose, Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Tel: (303) 454-0100
Email: susan.prose@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on August 24, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Paul Wolf, Esq.

_s/ Susan Prose_
U.S. Attorney's Office