## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00694-PAB-NYW

MOSTAFA KAMEL MOSTAFA,

      Plaintiff,

v.

MERRICK GARLAND, United States Attorney General, in his official capacity,
CHRISTOPHER WRAY, FBI Director, in his official capacity,
MICHAEL CARVAJAL, BOP Director, in his official capacity,
B. TRUE, ADX Warden, in his official capacity,
TUTOILUMUNDO, ADX Unit Manager, in his official capacity,
MACMILLAN, ADX Facilities Department, in his official capacity,
LOEWE, ADX officer, in his individual capacity,
NORJANO, ADX Officer, in his individual capacity,
PARRY, ADX Officer, in his individual capacity,
AVERIT, ADX Officer, in his individual capacity,
GARDUNO, ADX Lieutenant, in his individual capacity,
WILLIAM, ADX Nurse, in his individual capacity,
HUDELSTON, ADX Nurse, in his individual capacity,
ARMIJO, ADX Lieutenant, in his individual capacity, and
EDWARDS, ADX Officer, in his individual capacity,

      Defendants.

### Plaintiff's Opposition to Defendants' Motion to Dismiss

### FACTUAL SUMMARY

The Plaintiff initiated this action on March 12, 2020 by filing a pro se prisoner complaint asserting ten claims against six defendants, generally related to a lack of medical care and accomodation of his disabilities, the conditions of his confinement, the special administrative measures imposed on his communications, and an incident of excessive force during a hunger strike. [Doc. 6]. On April 6, 2020, the Honorable Judge Gallagher ordered the Plaintiff to file an Amended Prisoner Complaint to address various deficiencies identified by the court. [Doc. 6]. The Plaintiff filed an Amended Prisoner Complaint ("First Amended Complaint") on May 18,

2020, asserting claims for "[i]njuries, [d]iscrimination against [d]isability, cruel and unusual conditions in prolonged continuous dangerous solitary confinement in violation of several amendments such as: one, four, five, six, eight, and fourteen." Id.

On September 29, 2020, the Plaintiff filed a Motion for Temporary Restraining Order, with 14 Exhibits. [Doc 39] The Plaintiff asked the Court to order the Defendants to provide him with accomodations for his disabilties, including prosthetic devices and changes to his cell. Id. These concerned a prosthetic electric toothbrush, and modifications to the toilet, shower and table in his cell. Id.  On November 2, 2020, Plaintiff filed a Pro Se Letter Motion (or "Motion to Amend"). [Doc. 43]. Attached to Plaintiff's Motion to Amend was a proposed Second Amended Prisoner Complaint. See [Doc. 43-1]. The Plaintiff enumerated five claims, for his complaints of "COVID-19 urgency, discrimination against my type of disability, cruel and unusual conditions in prolonged confined solitary confinement where no help, fittings, items, intimidations, physical assault, sleep deprivation, lack of medical, dental care in violation of several Amendments such as: 1, 4, 5, 6, 8, 14 … and other rules of Disability Act and COVID Prevention." [Doc 61 at 4]. The Court construed the Second Amended Complaint as setting forth the following claims not subject to summary dismissal: (1) First Amendment familial association and free exercise claims asserted in Claim One against Defendants Garland, Director Wray, Director Carvajal, Warden True, and the Unknown SAMs Operatives in their official capacities; (2) Eighth Amendment conditions of confinement claims asserted in Claim Two against Defendants Garland, Director Wray, Director Carvajal, Warden True, Defendant MacMillan, and Defendant Follows in their official capacities; (3) Eighth Amendment excessive force claims asserted in Claim Three against Defendants Lt. Garduno, Officer Parry, and Officer Averit in their individual capacities; (4) Eighth Amendment deliberate indifference claims based on presentation of Plaintiff's food as

asserted in Claim Five against Defendants Loewe, Norjano, and True in their official capacities; and (5) an Eighth Amendment deliberate indifference claim based on refusal to dress wounds as asserted in Claim Five against Defendant William in his official capacity. See [Doc. 60] at 35. The Court didn't dismiss any of the Plaintiff's claims.

On January 27, 2021, the Court ordered that counsel be appointed through the Pro Bono Program of the Court. [Doc. 59] On December 10, 2021, the Pro Bono Program listed the instant case among its available cases, and sent a description to attorneys participating in the program. On the same day, the undersigned wrote to Ashley Sheehan of the Pro Bono Program, expressing interest in the case. See [Doc. 168-6] On December 16, 2021, the Court issued an Order of Appointment, a letter to the Plaintiff, and another Order requiring the Defendants to treat communications between the undersigned and the Plaintiff as attorney client communications. On January 26, 2022, the Court ordered the case be administratively closed, pursuant to D.C.COLO.LCivR 41.2, for ninety (90) days. See Recommendation and Order of United States Magistrate Judge at 7. [Doc. 177] The case was reopened on April 27, 2022 by another Minute Order. [Doc. 184].

On May 16, 2022 the Plaintiff's counsel filed an unopposed Motion for Leave to Amend, [Doc. 185, 186].  On May 20, 2022, the Court directed the Plaintiff to separately file a signed and dated version of the proposed Third Amended Complaint [Doc. 187], which was filed on May 21, 2022 as [Doc. 188].  On July 11, 2022 the Plaintiff filed a Notice of  Filing  a  Fourth Amended Complaint. [Doc. 195]  This was in response to at least two requests by the Defendants to do so, because of inconsistencies in describing several Defendants as being sued in their individual or personal capacities.  See correspondence [Doc. 195-3].

On July 18, 2022, the Court directed the Plaintiff to separately file a signed and dated version of the proposed Fourth Amended Complaint [Doc. 198], which was filed on the same day as [Doc. 199].[1]   On August 24, 2022, Defendants filed a Motion to Dismiss, asserting a number of 12(b)(1) and 12(b)(6) defenses, after obtaining leave to increase the page length of the brief and the time to reply.  [Doc. 222].  On August 25, 2022, the Court granted Plaintiffs Motion to extend the page length for this brief to 44 pages, and a Motion to Extend the time to respond to September 24, 2022.  [Doc 223].  On September 24, 2022, Plaintiff filed this brief.  On September 26, 2022, the Court ordered Plaintiff's counsel to refile the brief for exceeding the page limit, since the Court's practice standards would include the ten page table of contents and authorities, which were eliminated.

## SUMMARY OF ARGUMENT

The Court has jurisdiction to hear the Plaintiffs claims[2] under the Rehabilitation Act because the Plaintiff is disabled, the Defendants have failed to accommodate his disabilities, and because the Rehabilitation Act applies to disabled prisoners in federal prisons.  The Court has jurisdiction to hear the Plaintiffs A.P.A. claims because the decision under review was made by the Office of Enforcement Operations, not the B.O.P., so 18 U.S.C. § 3621(b) is inapplicable. The Court has jurisdiction over Plaintiffs Bivens claims for excessive force and deliberate indifference, because the conditions in the ADX are not a "new context," but more extreme than

---

[1]  As used in the remainder of this memorandum, the term "Complaint" refers to this document.

[2]  The Defendants' have mixed their 12(b)(1) and 12(b)(6) together throughout their brief, requiring the Plaintiff and the Court to sort them out.  The Defendants only refer to subject matter jurisdiction with regard to Claim 10 for the APA (see Table, [Doc. 222-1].  However, several of the Defendants other arguments are properly evaluated under 12(b)(1) rather than 12(b)(6), and are labled this way by the Plaintiff in the headings of this brief, which are organized to match the structure used by the Defendants in their Motion.

conditions in other prisons.  Nor does the Plaintiff's combination of disabilities qualify as a new context.

The Plaintiff stated Free Speech claims under the First Amendment because the prohibitions on contacting his remaining grandchildren and to prospective attorneys are not reasonably related to legitimate penological interests, and he need not show actual harm to his case resulting from his near-incommunicado isolation.  The Plaintiff has stated Free Exercise of Religion claims under the First Amendment because the prohibitions on group prayer, problems obtaining <u>halal</u> food and the ability to wash and groom himself substantially burden the practice of his religion, and are not reasonably related to legitimate penological interests.  The same allegations more easily meet the requirements of the Religious Freedom Restoration Act, which Congress passed to strengthen Free Exercise claims under the First Amendment.

The Plaintiff stated claims under the Rehabilitation Act because both his arms were amputed below the elbows and he does not have adaquate prosthetics or an adequate cell for this disability, and is nearly blind as well.  He does not receive the kind of personal care he needs, such as clipping his toenails, which he is unable to do with his prosthetics, and causes his toes to become infected.  The Plaintiff has made numerous suggestions and requests that would help him meet his daily living needs, which the Defendants unreasonably refuse to consider.

The Plaintiff stated claims under the Equal Protection clause because he alleged that the H Unit of the ADX is used to house Muslim prisoners, and the restrictions on this Unit have a disparate impact on Muslims. The Plaintiff stated claims under the APA because the Defendants exceeded their statutory authority by ignoring the factors specified by Congress, relying instead on a determination made by another component of the Department of Justice, the Office of

Enforcement Operations ("OEO").  It is this determination that is really under review, not the placement decision by the BOP, which is just a rubber stamp.

The Plaintiff stated claims under the Eighth Amendment for the use of excessive force and deliberate indifference to medical needs against Defendants Hudelston, Armijo and Edwards because they conspired with and aided and abetted Defendants Garduno, Parry and Averit, who used excessive force to force-feed the Plaintiff through his nose, in an assault lasting approximately eight minutes, leaving the Plaintiff bleeding and in need of medical treatment, which arrived five hours later.  They failed to provide the required medical care, even though they were present at the scene, didn't report the incident as they were supposed to do, and then cleaned the blood from the Plaintiff's cell after another prisoner refused to do it.

## ARGUMENT

**I.** **The Plaintiff has stated claims for violations of the First Amendment Freedom of Speech and Association because the restrictions on contacting his family members and prospective attorneys are not reasonably related to any legitimate penological interests.**

In Turner v. Safley, 482 U.S. 78 (1987) the Supreme Court recognized that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it reasonably related to legitimate penological interests." Id. at 89; see Beard v. Banks, 548 U.S. 521, 528 (2006).  Turner identifies four factors that inform that inquiry: (i) there must be a valid and rational connection between the regulation and the legitimate governmental interest put forward to justify it (put differently, the regulation may not be based on arbitrary or irrational goals); (ii) whether there are alternative means of exercising the right; (iii) the impact that accommodation of the asserted right would have on other inmates, guards, and on the allocation of prison resources generally; and (iv) the presence or absence of ready alternatives to the regulatory path chosen. Id. at 89-90. The inmate bears the burden of persuasion on these factors.

<u>Beard</u>, 548 U.S. at 529.  The Defendant argues, with respect to this claim and several others, that the Plaintiff has failed to state a claim because he failed to allege a lack of a rational basis for the government's actions.  <u>See</u> [Doc. 222] at 7.  The Plaintiff didn't include this allegation, because it is not the correct standard of review.[3]

The Plaintiff alleged that in addition to severely restricting Plaintiff's communications with his foreign attorneys, and with prospective, un-approved attorneys, the Defendants have placed categorical restrictions on Plaintiff's communications with his family members. Complaint at ¶ 83. The Plaintiff has not been permitted to communicate at all with three of his sons or his stepson, and may only contact one of his eleven grandchildren by phone, who is ten years old and named Bilal. <u>Id</u>. at ¶ 84. On information and belief, the Defendants have a categorical rule prohibiting children under 9 years of age from communicating with SAMs prisoners. <u>Id</u>. It serves no legitimate penological interest to deprive the Plaintiff of the love and emotional support that he might have from speaking to his grandchildren on the phone. The Defendants' own policies show that they should encourage these kinds of relationships, to protect the mental health of the prisoners they are supposed to be taking care of. <u>Id</u>. at ¶ 85.

Aside from his attorneys, the only two individuals who are allowed to visit the Plaintiff are the Plaintiff's wife and one of his daughters, neither of whom can travel alone. The result is that the Plaintiff is almost entirely isolated from the outside world. Id. at ¶ 86. The SAMs appear to have been an impediment to visits by qualified medical professionals, such as qualified occupational therapists, doctors and dentists, or religious leaders. <u>Id</u>. at ¶ 87. The poor medical care the Plaintiff has received appears to result from the Defendant's exaggerated concerns over

---

[3] The argument that the Plaintiff hasn't alleged the lack of a rational basis is repeated throughout the Defendants' brief, but isn't the standard of review for any of the claims.

the Plaintiff's ability to communicate with the outside world. Id. At times, the Defendants impose harsher conditions than these for administrative reasons unrelated to the Plaintiff. Id. at ¶ 89.

The Defendants' rules restricting prisoner communications to immediate family members have already been held to be arbitrary and capricious in a similar case. See Mohammed v. Holder, 47 F.Supp.3d 1236 (D. Colo. 2014). Yet the Defendants maintain the same policies, which were already proven to be illegal, preventing the Plaintiff from receiving the love and emotional support of his children and grandchildren, who are harmless. Id. at ¶ 90.

The restrictions aren't reasonably related to legitimate penological interest because there are no valid, rational connections between them and any governmental interest. Id. at ¶ 91. The restrictions appear to be pretexts for punishing the Plaintiff in ways not authorized by law, or by the sentencing judge. Id. at ¶ 92. Their connection to real security threats is so remote as to render them arbitrary or irrational. Id. For example, the Plaintiffs' SAMs cite an instance in which one of his family members put his voice on a speaker phone during a call, as a violation of the SAMs by the Plaintiff, even though he did not cause the violation himself. Id. The *de minimus* rule violations listed as the justification for the renewal of the Plaintiff's SAMs are similar to those found arbitrary and capricious in the Mohammed case. Id.[4]

The arbitrary and irrational nature of the SAMs is also shown by the fact that while the Plaintiff awaited extradition in Belmarsh prison for eight and a half years, no special restrictions were placed on his communications, compared to the other prisoners in Belmarsh. Id. at ¶ 93.

---

[4] See Mohammed v Holder at 11 n 9. ("That being said, the Court is utterly unpersuaded by Mr. Moen's contentions that Mr. Mohammed's engaging in hunger strikes, making false accusations against BOP or its staff, and his disparaging of the U.S. or the BOP in communications with others are reflective of his efforts to wage a continuing jihad against the U.S. The examples given by Mr. Moen of such conduct by Mr. Mohammed are entirely mundane and indistinguishable from the sorts of behavior that this Court sees from ordinary inmates (i.e. those who have not received training "out of the al Qaeda playbook") on a near-daily basis.") Id.

The US could have asked the UK authorities to impose limitations on the Plaintiffs' speech during those eight years, but did not. Id. No harm ever resulted to anyone from the Plaintiffs' speech while he was in Belmarsh. Id.

The restrictions placed on Plaintiffs's communications are an exaggerated response to the real threat posed by the Plaintiff, which is minimal. Id. at ¶ 94. The SAMs document exaggerates the Plaintiff's alleged role in supporting terrorism, and exaggerates the dangers of Muslim terrorists over persons committing similar acts, who are motivated by other reasons. Even the Plaintiff's infant grandchildren are considered dangerous. Id. This is due to a discriminatory animus which the Defendants have institutionalized. Id. The Defendants have failed to consider ready alternatives that fully accommodate the prisoner's rights, at de minimis costs to valid penological interests, such as changing the times for prayers, the orientation of the cages, or packaging halal meals the same way as kosher meals. Id. at ¶ 95. The Defendants have also failed to properly balance the impact on prison staff, on the Plaintiffs' liberty, and on the allocation of limited prison resources, including the costs of litigating issues that should be resolved at the administrative agency level. Id. at ¶ 96.  The Defendants' responses to requests and appeals pursuant to the Administrative Remedy Program don't make use of any legal analysis, cite any laws, or the facts relied on to make decisions. Whatever factors the Defendants take into account in processing these requests are left unstated. The overwhelming majority of them are denied without explanation, placing the burden on the Court to review handwrittten complaints and no legal analysis or reasoning to use as a starting point. Id.

    **A.**    **The Defendants' change in position over whether Plaintiff may contact his grandchildren doesn't moot the claims.**

        **1.**    **The Plaintiff has eleven grandchildren but is only allowed to contact six of them.**

The Plaintiff alleged that he has eleven grandchildren, Complaint at ¶ 84, but at the time the Complaint was filed, was only allowed to communicate with one of them by phone, named Bilal, and with four others in writing, although they were too young to read or write.  Id.  On August 9. 2022, the Defendants modified the Plaintiffs SAMs to allow additional contacts and methods for five other grandchildren, as a response to the appointment of counsel in this case.  See Plaintiff's Notice of Change in SAMs Permitting Contacts with Grandchildren[Doc. 208]. This is insufficient because the Defendants continue to impose the same restrictions on the Plaintiffs remaining grandchildren that were already held to be illegal in Mohamed v Holder, 47 F. Supp. 3d 1236 (2014).  After the Mohamed decision, it should have been clear to the Office of Enforcement Operations that the restrictions on the Plaintiff's communications with his grandchildren were a violation of his rights. This component of the Department of Justice determines the policies that result in prohibitions on communications with family members, which punished the Plaintiff by depriving him of the love of his family, or to ever meet his own grandchildren, which are types of punishments not authorized by law, and an exaggerated response to the attacks on the World Trade Center and Pentagon over 20 years ago, which led to the war on terrorism.  The Defendants make accusations against other family members of the Plaintiff.  The Plaintiff is entitled to discovery of the basis for them, and they should be allowed to testify in their own defense.  Although the Court may eventually defer to the agency (the Office of Enforcement Operations of the Department of Justice) and it's determinations, the Court may still review the factual basis for them, and provide these individuals with an opportunity to respond to the Defendants' allegations.

> **2.**      **The Plaintiff has standing because the Defendants' change in position can be changed again at the Defendants' whim.**

On August 16, 2022, undersigned counsel received an email from defense counsel, who forwarded a new SAMs Letter, dated August 9, 2022, which modified the restrictions on five of the Plaintiffs grandchildren.  See Plaintiff's Notice of Change in SAMs Permitting Contacts with Grandchildren [Doc. 208] filed the next day.  This does not moot all of the issues with his grandchildren, of which he has 11.  See 4th Amended Complaint at ¶¶ 84-85.  In addition, although the government has changed its position in relation to 5 grandchildren, to the best of counsel's knowledge, the Plaintiff hasn't actually spoken with them yet, so the issues in the 4th Amended Complaint, which was a catalyst for this, are not necessarily moot. Further, the government's change in position can be arbitrarily reversed at any time.  The Plaintiff has a legal right to contact his family members, which is not something that can be arbitrarily given and taken away.  While there may be no money damages remedy available, the Plaintiff is entitled to injunctive relief.

**B.     The Plaintiff has no burden to prove that the prohibition on contacting prospective attorneys caused him actual harm in his case.**

The Plaintiff's right to contact attorneys - other than those appointed to represent him - is a deprivation of his First Amendment right of freedom of speech, independent of any harm done to his cases.  The Defendants argue that the Plaintiff must show actual injury, citing Lewis v Casey, 518 U.S. 343, 349, 351 (1996).  In Lewis, inmates in Arizona state prisons brought a class action against prison officials, alleging the officials were furnishing them with inadequate legal research facilities legal assistance programs, depriving them of their right of access to the courts, in violation of Bounds v. Smith, 430 U.S. 817 (1977).  The Bounds case had held that "[t]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with

adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828.[5]

Finally, the Lewis case quoted the rule in Bounds requiring that prisoners be provided with the

tools they need to challenge the conditions of their confinement.  "Bounds does not guarantee

inmates the wherewithal to file any and every type of legal claim, but requires only that they be

provided with the tools to attack their sentences, directly or collaterally, and *to challenge the*

*conditions of their confinement*." 518 U.S. at 355.  (emphasis added).[6]

The Defendants' that the Plaintiff is "currently represented by four attorneys" [Doc. 222

at 12], and that any attorney may contact the Plaintiff by simply signing the SAMs Affirmation

form.  This argument is a cynical one.  The Defendants prohibit prospective attorneys from

communicating with SAMs prisoners by refusing to provide them with the SAMs Letter or

SAMs Affirmation Form. The Defendants would not produce either the Form or the Letter

without a Court Order, in either this case, or the Mohamed v. Holder case, or respond to any

requests for them.  Undersigned counsel explained all this, and his listing on an airport watchlist

for the duration of the Mohamed case, which was intended to harrass and scare the plaintiff's

attorney.  See Opposition to Defendants' Motion for Modification and Clarification of Minute

Order to Allow for Completion of SAMs Attorney Vetting Process [Doc. 168].

The Court should follow Turner v. Safley, which, although not providing any monetary

relief, empowers the Court to enjoin the Defendants from prohibiting communications to certain

---

[5] In the instant case, the Plaintiff isn't even challenging any ADX legal assistance program, if there is one, but access to private attorneys, including undersigned counsel, without requiring a Court order.  The Pro Bono Program of the Court isn't one of the Defendants' programs, but a system created by the Court to deal with problems such as the Defendant's failure to manage its Administrative Remedy Program in a way that would respect the prisoners' rights.  If the Defendants administrative procedures were adequate, prisoners wouldn't be bringing so many meritorious cases to federal court.

[6] Since the Plaintiff isn't trying to overturn his conviction with this civil case, the line of cases following Strickland v. Washington, 466 U.S. 668 (1984) would be misapplied here.

people, such as family members and prospective attorneys, which is valuable relief to a person sentenced to life imprisonment, and held nearly incommunicado.

II.     **The Plaintiff has stated claims for violations of the First Amendment Free Exercise Clause and Religious Freedom Restoration Act.**

   A.     **The Plaintiff has stated claims for violations of the Free Exercise Clause of the First Amendment.**

As argued supra in § I, the Plaintiff need not allege the lack of a rational basis because this is not the correct standard to use. The standard is one of reasonableness, not rationality. "Inmates ... retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). "[A] prison regulation imping[ing] on inmates' constitutional rights ... is valid if it is reasonably related to legitimate penological interests." Id. at 349. To allege a free exercise claim, a prisoner-plaintiff must first show that a prison regulation "substantially burdened ... sincerely-held religious beliefs." Boles v. Neet, 486 F.3d 1177, 1182 (10th Cir.2007); Snyder v. Murray City Corp., 124 F.3d 1349, 1352 (10th Cir.1997). If the prison officials-defendants identify a legitimate penological interest to justify the conduct, Boles, 486 F.3d at 1182, courts then balance the factors in Turner v. Safley, 482 U.S. 78, 89-91 (1987) to determine the reasonableness of the conduct under review. Kay v. Bemis, 500 F.3d 1214, 1219 (10th Cir. 2007) at 1219, citing Boles, 486 F.3d at 1181. The other case relied on by the Defendants, Blair v. Raemisch 840 F.App'x 909 916 n.7 (10th Cir. 2020) uses the same analysis. The rational relationship to a legitimate penological interest is only one of the factors, and the Plaintiff need not allege that the govnernment's conduct was irrational. In the context of the Free Exercise Clause, the Supreme Court has held that a government imposes a substantial burden when it "puts substantial pressure on an adherent to modify his behavior and violate his beliefs." Thomas

v. Review Bd., 450 U.S. 707, 718 (1981).  McKinley v. Maddox, 493 F. App'x. 928 (10th Cir. 2012) (refusal to permit inmate to attend church services constitutes a substantial burden on his religious exercise).

With respect to the First Amendment claims, the Plaintiff alleged that "[t]he restrictions on prayer, meals, washing, and physical appearance are not in furtherance of any compelling governmental interests, or the least restrictive means of furthering those interests.  The Defendants have no legitimate interest in prohibiting group prayer, providing accessible kosher but not halal food,[7] or appropriate food on *Eid*.  The Defendants haven't considered less restrictive means to try to accomodate Muslim times for prayer, lining up in rows to face Mecca, washing, and eating food that is consistent with their religion." Complaint at ¶ 67.  "The different types of food trays appear arbitrary and serve no legitimate penological interest." Id. at ¶ 63. "The poor hygiene afforded to the Plaintiff serves no legitimate penological interest, burdens the Plaintiff's exercise of his religion, which need not be compelled by, or central to, his system of religious belief in order to be protected."  Id. at ¶ 65.  By alleging these facts, the Plaintiff has met his burden.

**B.      The Plaintiff has stated claims for violations of the Religious Freedom Restoration Act.**

The Religious Freedom Restoration Act of 1993 ("RFRA") was enacted "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of

---

[7] The Defendants dispute the shapes of the trays used to package Plaintiff's food.  The Court shouldn't consider these contradictory versions of the alleged facts, based on declarations attached to a Rule 12(b)(6) motion.

religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1).[8] Section 2000bb-1(a) of RFRA

provides that the "[g]overnment shall not substantially burden a person's exercise of religion." 42

U.S.C. § 2000bb-1(a); accord Holt v. Hobbs, 135 S. Ct. 853, 860 (2015).

"[A] plaintiff establishes a prima facie claim under RFRA by proving the following three

elements: (1) a substantial burden imposed by the federal government on a (2) sincere (3)

exercise of religion." Kikumura v. Hurley, 242 F.3d 950, 960 (10th Cir. 2001).  If the Plaintiff

establishes a prima facie case, the "burden then shifts to the government to show that the

'compelling interest test is satisfied through application of the challenged law 'to the person'−the

particular claimant whose sincere exercise of religion is being substantially burdened.' " Hobby

Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1126 (10th Cir. 2013).  The government must also

establish that the substantial burden "is the least restrictive means" of furthering that interest.

---

[8] The statute reflects Congressional concern over the Supreme Court's holdings in Employment Division v. Smith, 494 U.S. 872 (1990), and O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987), both of which, in Congress' view, weakened traditional First Amendment protections. See S. Rep. 103-11, 1993 U.S.C.C.A.N 1892, 1895-1901. Congress thought that Smith and Lone gave prison wardens a level of discretion that was too restrictive on prisoners' rights, and sought to hold the Warden to a higher standard than would be required by a constitutional claim.  "The genesis of [the] RFRA lies in a protracted exchange between the Supreme Court and Congress over the proper standard to apply when reviewing laws that burden religion." United States v. Wilgus, 638 F.3d 1274, 1279 (10th Cir. 2011).  Congress enacted RFRA in 1990 in response to the United States Supreme Court's holding in Employment Division v. Smith, 494 U.S. 872 (1990) that neutral laws of general applicability burdening the exercise of religion are subject to rational-basis scrutiny.This is the standard the government urges the Court to apply: rational basis review.  However, the RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of 'general applicability'" unless it demonstrates that "the application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest." 42 U.S.C. § 2000bb-1. The RFRA states that "the term 'exercise of religion' means "religious exercise, as defined in section 2000cc-5 of this title," 42 U.S.C. § 2000bb-2(4), RLUIPA. The term "religious exercise" means "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7). The term refers not only to belief and profession but also "the performance of ... physical acts [such as] assembling with others for a worship service." Cutter v. Wilkinson, 544 U.S. 709, 720 (2005).

Yellowbear v. Lampert, 741 F.3d 48, 56 (10th Cir. 2014).  The "court does not consider the prison regulation in its general application, but rather considers whether there is a compelling government reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant." Kikumura, 242 F.3d at 962 (explaining that this inquiry is stricter than the more deferential inquiry under Turner v. Safley, 482 U.S. 78, 89 (1987) ).  Compelling interests are "'only those interests of the highest order.'" United States v. Hardman, 297 F.3d 1116, 1127 (10th Cir. 2002) (listing examples of compelling interests) (quoting Wisconsin v. Yoder, 406 U.S. 205, 215 (1972) ). Whether an interest qualifies as compelling is a question of law.

If the BOP can establish a compelling interest in restricting the Plaintiff's sincerely held religious beliefs, it must also "demonstrate that there are no feasible less-restrictive alternatives." Newland v. Sebelius, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012). The burden is two-fold: the government "must support its choice of regulation, and it must refute the alternative schemes offered by the challenger, but it must do both through the evidence presented in the record." Wilgus, 638 F.3d at 1289 (emphasis added)

The "plaintiff's ability to practice his faith by means other than group prayer is irrelevant to the question whether his ability to freely exercise his beliefs was substantially burdened." Meyer v. Teslik, 411 F. Supp. 2d 983, 989 (W.D. Wis. 2006). "Unlike the First Amendment, RLUIPA protects more than the right to practice one's faith; it protects the right to engage in specific, meaningful acts of religious expression in the absence of a compelling reason to limit expression." Id.; see Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. This applies under the RFRA as well, because the RFRA and RLUIPA are "substantively identical with respect to prisoners' entitlements." Whitfield v. Illinois Dep't of Corr., 237 Fed. Appx. 93, 94 (7th Cir. 2007)

The Defendants argue that Tenth Circuit precedent makes it clear that "even a complete prohibition on group religious activities for maximum-security inmates does not violate the Free Exercise Clause in light of legitimate prison security interests." [Doc. 222] at 15, citing <u>Williams v. Miller</u>, 696 F. App'x 862, 863 (10th Cir. 2017) Although the Defendants would like to establish this as a rule of law, the reasonableness of the prohibition must be determined based on the facts of each case.[9]   The defendant in that case, the Corrections Corporation of America, submitted the declaration of John Hilligoss, the member of CCF's security staff who made the decision to deny group worship to maximum-security inmates.   The court of appeals didn't discuss the details, but concluded that it "provides adequate justification for the decision - allowing maximum-security inmates to participate in group worship would have a serious impact on (1) prison security, (2) the safety of prison staff and other inmates, and (3) prison resources." The decision merely states the elements of a legal test in conclusory fashion and says they were met by the declaration.   In addition, the court noted that "Williams had pointed to no alternative that would accommodate his right at <u>de minimis</u> cost to the prison's security and safety concerns." <u>Id</u>. at 864.  In the instant case, there is no expert witness or declaration stating how or why group prayer in the ADX would be unreasonably dangerous.[10]  The Defendant has failed to

---

[9] <u>Williams</u> was a <u>pro se</u> prisoner appeal, in which the appellant had no legal training who failed to challenge the defendant's expert testimony.  <u>Id</u>. at 865. "In his reply brief, Williams raises two additional arguments for the first time on appeal. We need not consider these arguments. … They are utterly without merit; we briefly mention them because they reveal how fatuous unrestrained prisoner litigation can become." (internal citation omitted) Other aspects of the case do appear frivolous, and may have influenced the court's reasoning on the group prayer issue. The plaintiff's other claim, based on the Eighth Amendment, was to compel the government to take a second set of X-rays of the plaintiff's fingers, which he thought were broken, but which were shown not to be broken in the first set of X-rays.

[10] Although the Defendants want to portray the <u>Williams</u> case as creating a rule that "even a complete prohibition on group religious activities for maximum-security inmates" would be constitutional, other courts have held the opposite.  In <u>Lindh v. Warden, Fed. Corr. Inst</u>., 2013 WL 139699 Case No. 2:09-cv-00215-JMS-MJD (S.D. Ind. Jan. 11, 2013), a district court found

make the showing that would shift the burden, as in <u>Williams</u>.  In addition, the Plaintiff proposed numerous alternatives at <u>de minimus</u> cost, including adjusting the H Unit rec time to correspond with Muslim prayer times, and positioning the rec cages so that the prisoners may form rows in the direction of Mecca.

The Plaintiff alleged that group prayer isn't allowed in the H Unit, even though Muslim prisoners are segregated there.  "The Plaintiff is uniquely isolated, in a unique cell in the H Unit, which itself is meant to isolate Muslim prisoners from others in the ADX, which is the highest security prison in the United States." Complaint at ¶ 44. "Although no photographs of recreational cages in the H Unit are available, since the H Unit is used for Muslim prisoners, the Defendants should have alternative means that are readily available to accommodate the prisoners' right to group prayer." <u>Id</u>. at ¶ 57. Since the H Unit is used for Muslim prisoners, a change in the rec time to correspond with the Muslim prayer times would have a <u>de minimus</u> effect on non-Muslim prisoners.  The Defendants have no legitimate interest in prohibiting group prayer, providing accessible <u>kosher</u> but not <u>halal</u> food, or appropriate food on <u>Eid</u>. The Defendants haven't considered less restrictive means to try to accomodate Muslim times for prayer, lining up in rows to face Mecca, washing, and eating food that is consistent with their

---

a prohibition on group prayer in a Communications Management Unit at Terra Haute, Indiana, to place a substantial burden on the prisoners' rights under the RFRA.  "Given Mr. Lindh's sincere religious belief that he is required to engage in daily congregate prayer, and the Court's findings of fact regarding the Warden's current policy on group prayer, the Court concludes that Mr. Lindh is substantially burdened in his exercise of religion. Indeed, his ability to engage in daily group prayer is not only substantially burdened in the CMU, but it is absolutely prohibited. "We have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise," and, therefore, prohibiting the plaintiff "from attending religious worship services substantially burden[s] his ability to exercise his religion." <u>Lindh</u> at *18, <u>citing</u> <u>McKinley v. Maddox</u>, 493 F. App'x 928 (10th Cir. 2012).  In addition, the Defendants are violating their own policies.  BOP Program Statement 5360.09, Religious Beliefs and Practices, requires the Defendants to provide prisoners with "reasonable and equitable opportunities" to pursue their religious beliefs. But instead of providing equitable opportunities, the Defendants discriminate against Muslims and unfairly associate the religion with terrorism.

religion." Id. at ¶ 67.  "The different types of food trays appear arbitrary and serve no legitimate penological interest." Id. at ¶ 63.  "The poor hygiene afforded to the Plaintiff serves no legitimate penological interest, burdens the Plaintiff's exercise of his religion, which need not be compelled by, or central to, his system of religious belief in order to be protected."  Id. at ¶ 65.

III.    **The Court has jurisdiction for Plaintiff's Rehabilitation Act claims because every Circuit that has ruled on the issue has held it applies to prisoners in prisons receiving federal funding.**

The Defendants argue that Congress never authorized a private right of action under the Rehabilitation Act [Doc. 222] at 19, that the U.S. Supreme Court has never addressed whether the Rehabilitation Act provides an implied private right of action for injunctive relief, id. at 19-20, and that the conditions and deprivations imposed on the Plaintiff by the Defendants are not "programs and activities" as defined by the Act, citing Williams v. Meese, 926 F.2d 994, 997 (10th Cir. 1991).  Id. at 21.  In the Defendants' view, no disabled federal prisoner can sue under the Rehabilitation Act, and there is no remedy analogous to the the Americans with Disabilities Act, which applies to prisoners in state prisons.

In Williams, a federal prisoner claimed that the defendant prison officials denied him certain prison job assignments, for which he was qualified, solely on the basis of his age, race, or handicap,[11] retaliated against him by transferring him from his position as law library clerk to a position as laborer, denying his application for vacation, and depriving him of his graduation ring and other property.  926 F.2d at 996.  The court dismissed the plaintiff's Title VII and ADEA claims, ruling that the plaintiff couldn't show he had an employment relationship with the prison. Id. at 997.  The court sustained the claim, though, as a Bivens claim for deprivation of the right

---

[11] There is no indication in this case of what the plaintiff's "handicap" may have been, and the harms he suffered appear trivial in comparison with the extreme cruelty inflicted on the Plaintiff in this case.

to equal protection secured by the fifth amendment.  Id. at 998.  The lack of an employment relationship was also fatal to the plaintiff's Equal Pay Act and Rehabilitation Act claims.[12]

In Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206 (1998), the Supreme Court unanimously held that the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, applies to prisoners, affirming a Third Circuit ruling.  The court rejected the defendants' argument that prisons do not provide prisoners with the "benefits" of "programs, services or activities."  524 U.S. at 210.  It held that modern prisons do provide prisoners with many activities, services and programs within the meaning of the ADA, id., and that there was no basis to distinguish between services and activities provided by prisons, and those provided by other government entities.  Id.  The court also held that simply because some prison activities aren't voluntary doesn't exclude them from ADA coverage.  Id.  Even though it doesn't mention prisons or prisoners in its text,  the court held that the ADA is not ambiguous on this point:

> Petitioners contend that the phrase "benefits of the services, programs, or activities of a public entity," § 12132, creates an ambiguity, because state prisons do not provide prisoners with "benefits" of "programs, services, or activities" as those terms are ordinarily understood. We disagree. Modern prisons provide inmates with many recreational "activities," medical "services," and educational and vocational "programs," all of which at least theoretically "benefit" the prisoners (and any of which disabled prisoners could be "excluded from participation in"). See Block v. Rutherford, 468 U. S. 576, 580 (1984) (referring to "contact visitation program"); Hudson v. Palmer, 468 U. S. 517, 552 (1984) (discussing "rehabilitative programs and services"); Olim v. Wakinekona, 461 U. S. 238, 246 (1983) (referring to "appropriate correctional programs for all offenders"). Indeed, the statute establishing the Motivational Boot Camp at issue in this very case refers to it as a "program." Pa. Stat. Ann., Tit. 61, § 1123 (Purdon Supp.

---

[12] The court noted, in dicta, that the "Plaintiff's claims under those statutes also have additional defects. … The section of the Rehabilitation Act cited by plaintiff, 29 U.S.C. § 794, does not give plaintiff any substantive rights since the Federal Bureau of Prisons does not fit the definition of 'programs or activities' governed by that section."  Id.  While this language does appear to support the Defendants' argument, the opinion didn't rely on it, and the facts of the case aren't set forth in detail.  The plaintiff had alleged discrimination based on age, race, or handicap, but it's not clear what disability the plaintiff had, or to what degree he was disabled.  Although the ADA and Rehabilitation Act are most often applied to government employees, they also apply to prisoners.

1998). The text of the ADA provides no basis for distinguishing these programs, services, and activities from those provided by public entities that are not prisons.

Yeskey, 524 U.S. at 210.  Similarly, the text of the Rehabilitation Act is silent as to whether it applies to prisons.  It says:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).  While there may be no case making this precise holding in the Rehabilitation Act context, the government's argument has already been rejected with respect to the ADA, based on similar text.

In Jaros v. Ill. Dep't of Corr., 684 F.3d 667 (7th Cir.2012), the 7th Circuit held that the relief available under the Rehabilitation Act and the ADA is "coextensive," since both incorporate 42 U.S.C. § 2000e–5 to create a private right of action.  Id. at 672-672.  "[T]he analysis governing each statute is the same, except that the Rehabilitation Act includes as an additional element the receipt of federal funds, which all states accept for their prisons."  Id., citing Cutter v. Wilkinson, 544 U.S. 709, 716 n. 4 (2005); Wagoner v. Lemmon, 778 F.3d 586, 592 (7th Cir. 2015) (Rehabilitation Act and ADA are "functionally identical"); Washington v. Ind. High Sch. Athletic Ass'n, Inc., 181 F.3d 840, 845 n. 6 (7th Cir.1999) ("We have held previously that the standards applicable to one act are applicable to the other.  Title II of the ADA was modeled after § 504 of the Rehabilitation Act; the elements of claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other." ) The widespread application of the ADA to disabled prisoners in state prisons is, in fact, based on statutory constructions of the Rehabilitation Act, which was passed earlier.  In Crowder v.

Kitagawa, 81 F.3d 1480, 1483 (9th Cir.1996) the Ninth Circuit reached the same conclusion, noting that § 12133 of the ADA, 42 U.S.C. § 12133, requires that "[t]he remedies, procedures, and rights set forth in the [Rehabilitation Act] shall be the remedies, procedures, and rights" applicable to section 12132 discrimination claims)." (internal quotations omitted); see McDonald v. Pennsylvania Department of Public Welfare, 62 F.3d 92, 95 (3d Cir.1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same."); Saunders v. Horn, 960 F. Supp. 893, 897 (E.D. Pa. 1997) ("Accordingly, if it be the case that when Congress writes a statute in plain words those plain words are to be the paramount guides utilized by the courts in construing the statute, it would seem to follow that both the ADA and the Rehabilitation Act apply to state and local correctional facilities.") (citations omitted)

In Garcia v. State Univ. of New York Health Scis. Ctr., 280 F.3d 98 (2d Cir. 2001), the Second Circuit held that § 504 of the Rehabilitation Act and Title II of the ADA "offer essentially the same protections for people with disabilities." Id. at 113. "Indeed, the most significant distinction between Title II of the ADA and § 504 of the Rehabilitation Act is their reach. While Title II applies to all state and municipal governments, § 504 applies only to those government agencies or departments that accept federal funds, and only those periods during which the funds are accepted." Id. at 113 n. 2.  In Shariff v. Coombe, 655 F. Supp. 2d 274 (S.D.N.Y. 2009), the holding in Garcia was applied to eight disabled inmates who sued state prison officials.  The claim for money damages was dismissed because the prisoners were unable to show that the New York prison authorities had knowingly received federal funds.  Id. at 307.[13]

---

[13] Although it is really a side issue, numerous courts have concluded that the Rehabilitation Act applies to state prisons, if the state prison receives federal funding. See Duffy v. Riveland, 98 F.3d 447, 453 (9th Cir.1996); Lue v. Moore, 43 F.3d 1203, 1205 (8th Cir.1994); Gates v.

"The Court notes, however, that this holding in no way impacts Plaintiffs' prayer for injunctive relief under both Title II and § 504." Id.  See Kaufman v. Carter, 952 F.Supp. 520, 527-8 (W.D. Mich. 1996) ("It is not disputed that the Michigan Department of Corrections receives federal financial assistance. Likewise, being a "program or activity," it would appear to be subject to the Rehabilitation Act by the Act's literal language.")

In Lue v. Moore, 43 F.3d 1203 (8th Cir.1994), the Eighth Circuit dismissed a Rehabilitation Act claim by a blind prisoner in a Missouri state prison, on the basis that when told the prison's vocational programs weren't suitable for a blind inmate, the prisoner neither applied for the existing programs, nor requested that the officials make accommodations for him. Id. at 1206.  The court also found that the Rehabilitation Act doesn't require the invention of new programs designed for handicapped individuals,[14] citing P.C. v. McLaughlin, 913 F.2d 1033, 1041 (2d Cir. 1990) (Rehabilitation Act does not require that programs meet handicapped people's particular needs, just that handicapped people not be denied equal access) and Traynor v. Turnage, 485 U.S. 535, 548 (1988) (purpose of Act is to ensure handicapped people receive evenhanded treatment in relation to non-handicapped people).  The case is not precisely on point, but is nevertheless another example of an application of the Rehabilitation Act in a prison context.

---

Rowland, 39 F.3d 1439, 1446 (9th Cir.1994); Harris v. Thigpen, 941 F.2d 1495 (11th Cir. 1991); Bonner v. Lewis, 857 F.2d 559, 562 (9th Cir.1988); Journey v. Vitek, 685 F.2d 239, 242 (8th Cir.1982); Niece v. Fitzner, 941 F. Supp. 1497, 1511 (E.D.Mich.1996); Clarkson v. Coughlin, 898 F. Supp. 1019, 1036 (S.D.N.Y.1995); Austin v. Pennsylvania Dep't of Corrections, 876 F. Supp. 1437, 1465 n. 17 (E.D.Pa.1995); Donnell C. v. Illinois State Bd. of Educ., 829 F. Supp. 1016, 1020 (N.D.Ill.1993); Sites v. McKenzie, 423 F. Supp. 1190, 1197 (N.D.W.Va.1976).  The Rehabilitation Act applies in federal prisons like the ADX as well, since it also receives federal funding.

[14] The term "handicapped" is no longer used, and has been replaced with the term "disabled." The original term "handicapped" is preserved in these citations for accuracy.

It appears that every Circuit that has considered this issue has held that the Rehabilitation Act applies in prisons. The Court should consider the weight of authority presented here, and whether the government has really shown that the 10th Circuit is an outlier, and would deny disabled prisoners in federal prisoners the same rights as disabled prisoners in state prisons, in Colorado and elsewhere. Ruling this way would create a circuit split, and only highlight the mistreatment of prisoners at the ADX, if the prison doesn't have to respect the rights of the disabled.

The Plaintiff is disabled within the meaning of the Rehabilitation Act because two of his arms were amputated, he lost sight completely in one eye, and has problems with cataracts and very poor vision in his other eye. Complaint at ¶ 99. These physical impairments substantially limit many of the major life activities of the Plaintiff, and qualify as disabilities under § 103 of the Rehabilitation Act. See 29 USC § 705. Although the text of the Rehabilitation Act speaks in terms of employment, it also applies in the prison context, but instead of being a substantial impediment to employment, a disability must be a substantial impairment to major life activities. Lacking both arms and being nearly blind are two different disabilities, neither of which have been reasonably accomodated by the Defendants. Id.

The Plaintiff is qualified to participate in the Defendant Bureau of Prisons' programs for inmates, because he is incarcerated in a federal penitentiary, which must accommodate his disabilities so that he can participate in all of the programs and activities available to other prisoners.[15] See Wis. Cmty. Serv. v. City of Milwaukee, 465 F.3d 737, 746 (7th Cir.2006); Foley

---

[15] Although incarceration isn't a program or activity, the meals and showers made available to prisoners are. Jaros v. Ill. Dept of Corrections, 684 F.3d 667,672 (7th Cir. 2012); Cassidy v. Ind. Dep't of Corr., 199 F.3d 374, 375 (7th Cir. 2000); Crawford v. Ind. Dep't of Corr., 115 F.3d 481, 483 (7th Cir. 1997); Shomo v. City of New York, 579 F.3d 176, 185 (2d Cir. 2009); Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 287–88 (1st Cir. 2006). In addition, the basic necessities of

v. City of Lafayette, 359 F.3d 925, 928 (7th Cir.2004); Grzan v. Charter Hosp. of Nw. Ind., 104 F.3d 116, 119 (7th Cir.1997). Refusing to make reasonable accommodations is tantamount to denying access. Although the Rehabilitation Act doesn't expressly require accommodation, "the Supreme Court has located a duty to accommodate in the statute generally." Wis. Cmty. Serv., 465 F.3d at 747; Alexander v. Choate, 469 U.S. 287, 300–301 (1985).

The Plaintiff is excluded from, is not allowed to benefit from, or has been subjected to discrimination in the BOP's programs because he doesn't have adequate prosthetic devices or access to prison facilities and programs that accommodate his diabilities. Complaint at ¶ 103. The Defendants' failure to provide adequate prosthetics for the Plaintiff's arms impairs his abilities to perform actions that involve the management of basic bodily functions, which are considered Activities of Daily Living (ADLs) in the Defendants' regulations.[16] Id. at ¶ 107. The prosthetic arms provided by the Defendants are made of a material that causes the Plaintiff's arm stumps to become inflamed and swell. They should be made of similar materials to the prosthetics used by the Plaintiff in the UK, which didn't cause this reaction. Id. at ¶ 109. Due to skin irritation problems, the Plaintiff can only use his prosthetics for 10-15 minutes at a time. Id. at ¶ 110. The prosthetic arms provided by the Defendants aren't waterproof. Id. at ¶ 111. The inside of the prosthetics are blackened and contaminated, which is dangerous because the Plaintiff's arm stumps have protruding bones not covered by flesh, which are susceptible to

---

life, like opening food packages, eating, washing, using the toilet, brushing teeth and hair, cutting toenails, cleaning the cell, or even leaving the cell, are all made unreasonably difficult by the Defendants, who fail to accommodate the Plaintiff's disabilities. Complaint at ¶ 101.

[16] According to the Bureau of Prisons' regulations, the Defendants are required to provide a reasonable accomodation for the Plaintiff's disabilities. See Management of Inmates With Disabilities, BOP Program Statement 5200.05 at 8 (2017). See Cummings v. Roberts, 628 F.2d 1065, 1068 (8th Cir. 1980) (prisoner bedridden by a back injury alleged that prison staff failed to provide him a wheelchair, forcing him to drag himself along the floor); Maclin v. Freake, 650 F.2d 885, 889 (7th Cir. 1981) (paraplegic prisoner alleged that he had not received physical therapy for nearly a year after entering prison).

infections. Id. The Plaintiff has had to have further amputations of his arms due to these infections, which were treated when he was in the MCC in 2013, but have not been treated while the Plaintiff has been in the ADX. Id.

The prosthetic arms provided by the Defendants don't have adjustable holding fingers, allow different pressures to be applied, or allow different contact surfaces on the fingers. Id. at ¶ 112. The Plaintiff is unable to hold toilet paper with prosthetics provided by the Defendants. Since the Plaintiff uses the same prosthetic fingers for everything, the contamination of the prosthetic fingers with feces is unhygenic and potentially dangerous to the Plaintiff's health. Id. at ¶ 113. The prosthetic arms provided by the Defendants have holding fingers that are sharp and can cut the Plaintiff if he is not careful. Id. at ¶ 115. The prosthetic arms provided by the Defendants don't have elbow hinges, so that he cannot adjust the angle, or control them like other types of prosthetic arms that Plaintiff has had. Id. at ¶ 116. The Plaintiff is unable to trim his toenails, and has cut himself and developed infections of his toes. Id. at ¶ 122. The Plaintiff also needs to trim the hair under his arms and pubic area to adhere to his religious practices, but has no way to do this. This should be done on a monthly basis, at least. Id. at ¶ 128.

The Defendants have failed to provide dental care, or an electric, prosethetic toothbrush the Plaintiff can use. Id. at ¶ 118. This has caused the Plaintiff to lose many of his teeth due to infections. Id. The Plaintiff has lost all his lower back teeth, two of his top back teeth, and suffered severe abrasions to his front teeth and gums, because he is only able to open packets by using his stumps to hold the item and his teeth to rip it open. Id. The Defendants serve the Plaintiff food in packages that he is unable to open except by using his teeth. Id. at ¶ 119. A reasonable accomodation would be to package the food differently, or to provide the Plaintiff with a prosthetic tool for opening the packages. Id.

The Plaintiff has difficulty tying his shoelaces with the prosthetics provided. <u>Id</u>. at ¶ 123. The Plaintiff also has difficulty putting on his socks. <u>Id</u>. The Plaintiff is unable to trim his toenails, and has cut himself and developed infections of his toes. <u>Id</u>. The Plaintiff cannot properly comb his hair, is provided no suitable hairbrush, cannot safely shave, and is unable to cut his own hair, and is denied haircuts for months on end. <u>Id</u>. at ¶ 125. The Plaintiff has to use his bare arm stumps to collect garbage from and clean his cell. <u>Id</u>. at ¶ 131. Similarly, the Plaintiff has great difficulty changing his bedding with the prosthetics he has. <u>Id</u>.

The Defendants have failed to provide other reasonable accomodations as well, including a plate, tray and spork designed for an upper amputee. <u>Id</u>. at ¶ 129. The Plaintiff needs a soap pump to attend to his basic hygeine and keep himself clean. <u>Id</u>. at ¶ 121. The levers on the sink and shower in Plaintiff's cell should be designed to take Plaintiff's disabilities into account, so that he can operate them without injuring himself or flooding his cell. <u>Id</u>. The Plaintiff was completely deprived of glasses for two lengthy periods of time. <u>Id</u>. at ¶ 124.

Finally, aside from failing to address the Plaintiffs' issues managing basic bodily functions, the Defendants have failed to consider their own rules that prohibit housing disabled prisoners in isolation. "Peer support, such as inmate companions, are considered at institutions housing inmates with disabilities." <u>Id</u>. at ¶ 137. Disabled prisoners have challenged their confinement in isolation and segregation units under the ADA and the Rehabilitation Act. <u>Carty v. Farrelly</u>, 957 F.Supp. 727, 741 (D.V.I. 1997) (prison officials violated ADA by housing inmate not suffering from mental illness with mentally ill prisoners because his cane was considered security threat).

**A.   The Plaintiff has standing because the Defendants have not provided Plaintiff with new prosthetics despite numerous requests, and has exhausted his administrative remedies.**

The Defendants change their position and now say they are willing to design and build new prosthetics for the Plaintiffs any time he wants.  [Doc. 222 at 21].  The argument refers to the Hall Exhibit [Doc. 222-7] and is contradicted by correspondence from Plaintiff's other attorneys, which went unanswered.  Complaint at ¶ 201.  The Defendants essentially argue that the claim is not exhausted, but that they have known about it for a year and a half and done nothing, blaming the Plaintiff.  [Doc 222 at 21, 222-7 ¶¶ 4,6].  Without the instant case as a catalyst, the Defendants would have continued to ignore the Plaintiff's requests, which were properly made.

## IV.    The Plaintiff has stated a claim for equal protection.

The Plaintiffs' free exercise and equal protection claims for religious discrimination largely overlap.[17]  See Davis v. Passman, 442 U.S. 228 (1979) (allowing Bivens action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment); Ashcroft v. Iqbal, 556 U.S. 662, 675-77 (2009) (describing a religious discrimination Bivens claim brought by a federal pretrial detainee as alleging a violation of "the First and Fifth Amendments," and proceeding to treat it as a single claim); Morris Cnty. Bd. of Chosen Freeholders v. Freedom from Religion Found., 139 S. Ct. 909, 909 (2019) (statement of Kavanaugh, J., respecting the denial of certiorari) ("governmental discrimination against religion ... violates the Free Exercise Clause and the Equal Protection Clause"); Colo. Christian Univ. v.

---

[17]  The Plaintiff's claims for the Free Exercise of his religion and discrimination against his religion are not entirely duplicative. The Court evaluates the first type of claim by balancing the rights of the Plaintiff against those of the Defendants, which involves issues of prison administration and security.  The discrimination claims make use of a different analysis that doesn't balance these rights, but compares the treatment of persons of different religions, and can be either intentional, or am unintentional disparate impact that the prison rules have on Muslim prisoners.  In this case, both types of discrimination occur. The Defendants have institutionalized an animus towards Muslims, and the discrimination is for the most part intentional, although some restrictions merely have a disparate impact on Muslims.

Weaver, 534 F.3d 1245, 1266-67 (10th Cir. 2008) (observing that religious discrimination claims can arise under the Free Exercise Clause or Equal Protection Clause); Fields v. City of Tulsa, 753 F.3d 1000, 1012 (10th Cir. 2014) (holding that religious discrimination claims under the Free Exercise Clause and Equal Protection Clause were duplicative).[18]

The Defendant also argues that the SAMs allow communal prayer, [Doc. 222 at 23], but the Plaintiff says he has never been allowed to engage in it.  "As the Plaintiff explains in more detail infra at ¶¶ 60-61, group prayer is totally prohibited in the H Unit of the ADX prison, where the Plaintiff is housed.  The Plaintiff has never been allowed to pray with other Muslim prisoners since he was transferred to prisons in the United States, including the ADX, Metropolitan Correctional Center ("MCC") or Federal Medical Center in Missouri ("FMC"). This is in contrast to the Belmarsh Prison in the United Kingdom, where the Plaintiff was previously incarcerated and allowed to pray with other prisoners." Fourth Amended Complaint [Doc. 199] at ¶ 52.  The Plaintiff agrees that his SAMs allow group prayer.  Id. at ¶ 60.  It is factually disputed whether the Plaintiff may engage in group prayer, and the Defendant's version of the facts is based on allegations in declarations, which may not be considered without converting the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment.

**V.     The Court may review all of the Plaintiffs' claims under the APA, as well as on the merits, because he was required to exhaust them using the Bureau of Prison's Administrative Remedy Program.**

---

[18] The Defendant erroneously argues that the Plaintiff hasn't stated a claim for equal protection because his allegations describe the general conditions in the H Unit of the ADX.  However, the Plaintiff alleged that the H Unit is primarily used to house Muslim prisoners.   "The Plaintiff is uniquely isolated, in a unique cell in the H Unit, which itself is meant to isolate Muslim prisoners from others in the ADX, which is the highest security prison in the United States."  Complaint at ¶ 44.  "Although no photographs of recreational cages in the H Unit are available, since the H Unit is used for Muslim prisoners, the Defendants should have alternative means that are readily available to accommodate the prisoners' right to group prayer."  Id. at ¶ 57.  Since the H Unit is used for Muslim prisoners, a change in the rec time to correspond with the Muslim prayer times would have a de minimus effect on non-Muslim prisoners.

The Defendants argue that their decision to place the Plaintiff in the ADX was made pursuant to 18 U.S.C. § 3621(b), and that 18 U.S.C. § 3625 specifically exempts this decision from review, citing Hunnicutt v. Hawk, 229 F.3d 997 (10th Cir. 2000).  [Doc. 222 at 25]  In Hunnicutt, although the Court didn't review whether the BOP erred in Mr. Hunnicutt's particular case, it did review whether the BOP exceeded its statutory authority in construing § 3621(e)(2)(B), which pertains to the period of custody of a person who completes a drug treatment program. 229 F.3d at 1000.  Hunnicutt had argued that the BOP based its eligibility determination on underlying offense conduct, rather than on the conviction itself.  "An agency's interpretation of a statute by formal regulation or adjudication is entitled to deference, so long as the agency's interpretation is based upon a permissible construction of the statute." Id., quoting Fristoe v. Thompson, 144 F.3d 627, 631 (10th Cir. 1998).  The provision at issue here, 18 U.S.C. § 3621(b), states that

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence … The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau. … Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.

Id.  Instead of doing this, the Defendants relied on a determination made by another component of the Department of Justice, the Office of Enforcement Operations ("OEO"), that the Plaintiff be held under the extremely restrictive conditions he is experiencing now, including the SAMs restrictions which the OEO imposes over and above the prison designation. It is this determination which is under review, not the placement decision by the BOP, which in Muslim

terrorism cases is just a rubber stamp.  The Court may still review the OEO's determinations, and

any other decisions made by the Defendants in the Administrative Remedy Program, pursuant to

the APA.

**VI.     The Court has jurisdiction to hear the Plaintiff's <u>Bivens</u> claims.**

> **A.      The Defendants' reliance on <u>Silva v. U.S</u>. is misplaced because the Plaintiff
> exhausted his administrative remedies using the Defendants' Administrative
> Remedy Program.**

The Defendant argues that pursuant to <u>Silva v.United States</u>, No. 21-1008, 2022 WL

3023684 (10th Cir. Aug. 1, 2022) there is no implied cause of action under the Eighth

Amendment for the use of excessive force by federal prison guards against prisoners.  However,

Silva's case was dismissed because he failed to exhaust his administrative remedies with the

Bureau of Prisons' Administrative Remedy Program, which the court found not only sufficient,

but necessary for a <u>Bivens</u> claim.  "A remedy is sufficient to foreclose a <u>Bivens</u> action, then, '[s]o

long as Congress or the Executive has created a remedial process that it finds sufficient to  secure

an adequate level of deterrence.' The Court concluded that the Border Patrol's internal grievance

process satisfied this requirement and foreclosed <u>Bivens</u> relief." <u>Silva</u> at *8, quoting <u>Egbert v.</u>

<u>Boule</u>, 142 S.Ct. 1793, 1806-1807 (2022).  "Defendant argues that the BOP Administrative

Remedy Program qualifies as an adequate alternative remedy for Plaintiff's claim. The magistrate

judge and district judge considering the case below both list the BOP's Administrative Remedy

Program as one of several adequate alternative remedies available to Plaintiff. Plaintiff

disagrees." <u>Id</u>. at *8. (citations omitted)  "We therefore have little difficulty concluding that the

BOP Administrative Remedy Program is an adequate 'means through which allegedly

unconstitutional actions ... can be brought to the attention of the BOP and prevented from

recurring.'" <u>Id</u>. Unlike the plaintiff in <u>Silva</u>, Mostafa did exhaust his remedies using the

Defendants' Administrative Remedy Program, so <u>Bivens</u> relief is not foreclosed. The Administrative Remedy Program isn't substantive, and doesn't provide a cause of action for anything. It consists of administrative procedures for bringing other kinds of claims, such as <u>Bivens</u> claims. The Court should <u>estop</u> the Defendants from now aguing that the Administrative Remedy Program isn't adequate, and follow the case cited by the Defendants which agreed with the Defendants that it is. <u>Id</u>.

**B.      The Court has jurisdiction to hear the Plaintiff's claims for the use of excessive force.**

<u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388 (1971)[19] "established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." <u>Carlson v. Green</u>, 446 U. S. 14, 18 (1980). In <u>Carlson</u>, a prisoner in a federal prison died because prison officials failed to give him proper medical attention after an asthmatic attack. 446 U.S. at 16. Although the defendants were "fully apprised of the gross inadequacy of medical facilities and staff at the Federal Correction Center in Terre Haute, Ind., and of the seriousness of [the decedent's] chronic asthmatic condition, [they] nonetheless kept him in that facility against the advice of doctors, failed to give him competent medical attention for some eight hours after he had an asthmatic attack, administered contraindicated drugs which made his attack more severe,

---

[19] In <u>Bivens</u>, the Court created an implied cause of action for the homeowner for a warrantless, but consensual, entry into his apartment, followed by a nonconsensual search, in violation of his Fourth Amendment rights. The Court noted that, since Bivens consented to the federal agents entering his home, his act precluded a state tort claim for trespass. 403 U.S. at 394. Absent a right of action implied by the Court from the Constitution, Bivens would have had no means by which to vindicate his Fourth Amendment rights against unreasonable searches and seizures by recovery of damages, and through recovery of damages to deter the individual officers from engaging in such conduct in the future. <u>Id</u>. Though more limited in some respects, a <u>Bivens</u> action is the federal analogue to suits brought against state officials under 42 U. S. C. §1983. <u>Hartman v. Moore</u>, 547 U.S. 250, 254 n.2 (2006).

attempted to use a respirator, known to be inoperative, which further impeded his breathing, and delayed for too long a time his transfer to an outside hospital." Id. at 16 n. 1.

### 1.    This case doesn't present a new context for the application of Bivens.

As in Carlson, Mostafa's excessive force claim arises under the Eighth Amendment Cruel and Unusual Punishment Clause, Estate of Booker v. Gomez, 745 F.3d 405, 419 (10th Cir. 2014), which places strict scrutiny on an inmate's treatment and conditions of confinement, and not only requires the provision of adequate medical treatment, but also prohibits the use of excessive force.[20]  See Mohamed v. Jones, No. 20-cv-02516-RBJ-NYW, 2022 WL 523440 at *14 (D. Colo. Feb 22, 2022) citing Contreras on behalf of A.L. v. Dona Ana Cty. Bd. of Cty. Comm'rs, 965 F.3d 1114, 1116-17 (10th Cir. 2020) (Tymkovich, J., concurring).

The District Court has upheld Bivens remedies for excessive force claims under the Eighth Amendment in several recent decisions.  See Mohamed at *10; Smith v. Trujillo, No. 20-cv-00877-RBJ-NYW, 2021 WL 1799400, at *4 (D. Colo. Mar. 26, 2021), report and recommendation adopted, 2021 WL 1608829 (D. Colo. Apr. 26, 2021).  "Indeed, to find that Mr. Mohamed cannot seek redress for the alleged constitutional violations here would allow individual federal officials to escape liability for the alleged unconstitutional use of force so long as officials provide adequate medical care afterwards - even with dire consequences. This court

---

[20] Under either theory - deliberate indifference or excessive force - an inmate must establish both an objective and subjective component.  Redmond v. Crowther, 882 F.3d 927, 936 (10th Cir. 2018) (outlining the two prongs of an excessive force claim as requiring a showing that the force "was objectively harmful enough to establish a constitutional violation" and done so "maliciously and sadistically for the very purpose of causing harm"); Wilson v. Falk, 877 F.3d 1204, 1209 (10th Cir. 2017) (outlining the two prongs of a deliberate indifference claim as requiring a showing the defendant was "subjectively aware" of an objectively serious medical need and "recklessly disregarded that risk."). In this case, awareness is shown by participation in the assault, or at least being present at the scene.

is not convinced that the Supreme Court, in cautioning against extending <u>Bivens</u> remedies to new contexts, intended for such a result." <u>Mohamed</u> at *15.

In both <u>Mohamed</u> and <u>Smith</u>, the plaintiff alleged that he was physically assaulted by BOP officials while in federal custody and asserted a <u>Bivens</u> claim for a violation of his Eighth Amendment rights. <u>Smith</u> at *1-2. The court concluded that, in light of extensive precedent implicitly recognizing a <u>Bivens</u> claim challenging the use of excessive force, and because an Eighth Amendment excessive force claim isn't materially different from an Eighth Amendment deliberate indifference claim, there was "no meaningful difference between the deliberate indifference claim in <u>Carlson</u> and [the] excessive force claim—both arising under the Eighth Amendment." <u>Mohamed</u> at *10, <u>citing Smith</u> at *5; <u>see Jacobs v. Alam</u>, 915 F.3d 1028, 1038 (6th Cir. 2019).[21]

The Supreme Court implicitly recognized that a prisoner can pursue a <u>Bivens</u> claim for failure to protect under the Eighth Amendment if prison officials know that the inmate faces a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834-45 (1994). Other Tenth Circuit cases, while not

---

[21] The Defendant argues that under <u>Ziglar v. Abbasi</u>, 582 U. S. 120 (2017), the Supreme Court directed courts to inquire whether the claim arises in a "new context" different from the only three "instances in which the Court has approved of an implied damages remedy under the Constitution itself" and whether any "special factors" counsel hesitation against a new damages remedy. [Doc. 222] at 26. The use of excessive force by prison guards isn't a new context for <u>Bivens</u>, though. In <u>Estate of Booker v. Gomez</u>, 745 F.3d 405, 419 (10th Cir. 2014), the plaintiff was held face-down to the ground, placed in a chokehold, and tased by officers of the Denver Police Department, and then died. His estate the sued five officers under 42 U.S.C. § 1983, alleging they used excessive force against the plaintiff, and failed to provide him with immediate medical care, which resulted in his death. The Defendants moved for summary judgment on qualified immunity grounds, which the district court denied, because disputed facts precluded summary judgment. In the context of § 1983 excessive force claims, the Supreme Court implicitly acknowledged the viability of a <u>Bivens</u> action. <u>See Graham v. Connor</u>, 490 U.S. 386, 394 n. 9 (1989) (in articulating the applicable standard, acknowledging that "[t]he same analysis applies to excessive force claims brought against federal law enforcement and correctional officials under [Bivens].").

expressly passing on the issue, do not preclude such a cause of action either.   See Jones v. Theodoroff, 104 F. App'x 141, 143 (10th Cir. 2004) (affirming dismissal of a Bivens action arising from alleged excessive force brought by an inmate against federal correctional officers without passing on whether such a claim under Bivens is cognizable). Ziglar didn't broadly prohibit the extension of a Bivens remedy to claims not already recognized under Bivens and its progeny.  Rather, the court must consider the specific facts and claims presented in making its determination.  Lanuza v. Love, 899 F.3d 1019, 1026-27 (9th Cir. 2018)

### 2.      No special factors counsel against applying a Bivens remedy.

The Plaintiff has no alternative remedies available, since he exhausted his claims using the Bureau of Prisons' Administrative Remedy Program.  This program doesn't provide a cause of action, but merely an administrative procedure for processing every other kind of claim. Neither would a case brought under the Federal Tort Claims Act suffice, because the Plaintiff alleges that particular prison guards are responsible for the assault, rather than institutional policies.[22]  The Supreme Court in Carlson held that the FTCA did not preclude a Bivens claim because the FTCA imposes liability on the United States, not individual federal actors, and thus does not have the same deterrent effect as a Bivens remedy.  Smith v. United States, 561 F.3d 1090, 1103 (10th Cir. 2009).  A Bivens claim allows for punitive damages and a jury trial, neither of which is available under the FTCA. Id.  In Corr. Servs. Corp. v. Malesko, 534 U.S. 61 (2001), the Supreme Court said it is "crystal clear that Congress intended the FTCA and Bivens to serve as parallel and complementary sources of liability." Id. at 68.  The absence of any other remedy is what puts this case on all fours with Bivens.

---

[22] As a practical matter, almost no prisoners in Federal prisons have ever heard of the FTCA, which isn't listed as an option on the Prisoner Complaint Form used by nearly all pro se prisoners.  Undersigned counsel amended the complaint to include alternative legal theories, but could not add an unexhausted FTCA claim, over which the court would have no jurisdiction.

3. **Defendants Hudelston, Armijo and Edwards are not entitled to qualified immunity because a reasonable person would have known the assault violated the Plaintiff's rights.**

The Plaintiff plausibly alleged that each Defendant violated the Plaintiff's rights through their own individual actions. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). A reasonable person would have known that the conduct violated the Plaintiff's rights. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Defendants physically assaulted the Plaintiff, causing him to bleed, as part of inserting a feeding tube up the Plaintiff's nose and down into his esophagus and stomach, to prevent the Plaintiff from using a hunger strike to protest his placement in a cell that did not accommodate his disabilities, as described in the Complaint. Complaint at ¶¶ 178-179. A jury could find the Defendants' conduct unreasonable, depending on the severity of the assault. The Plaintiff has shown a high degree of specificity particularized to the facts of the case. White v. Pauly, 580 U.S. 73, 137 S.Ct. 548, 552 (2017) The Plaintiff was force-fed through his nose and physically assaulted during the process, such that he bled and required medical treatment afterwards. Complaint at ¶¶ 165-170. The Plaintiff's injuries were more than de minimis. See Schultz v. Pugh, 728 F.3d 619, 621 (7th Cir. 2013).

a. **The Plaintiff concedes that the claim against Defendant Sterett should be dismissed.**

The Plaintiff concedes that as an employee of the U.S. Public Health Service, Defendant Sterett has immunity pursuant to 42 U.S. Code § 233(a) and Hui v. Castaneda, 559 US 759 (2010), and should be dismissed from the case.

b. **Defendant Hudelston[23] Hudelston personally participated by going to the Plaintiffs' cell to assist the officers who committed the assault so that he could perform a medical assessment, and**

---

[23] The Plaintiff does not know the correct spelling of this Defendant's name. The government spells it two ways: as Hudelston and Huddleston. See [Doc. 222]. Counsel will try to clear this up in future filings.

**then not responding to the duress alarm when he knew the Plaintiff was seriously injured.**

On October 19, 2019, the Plaintiff engaged in a hunger strike in a "peaceful and legal protest" after he was moved from one cell to "the more harmful Cell 300," Complaint at ¶ 159, which is dark and has dangerous, sharp edges.  Id. at ¶ 140. Three days later, at approximately 5:00 PM, Defendants Armijo and Edwards forcefully entered the Plaintiff's cell and "confiscated all of his legal, personal and religious property." Id. at ¶ 160. On October 28, 2019, Defendant Hudelston forcefully entered Plaintiff's cell, purportedly to perform a medical assessment.  Id. at ¶ 161.  When the Plaintiff refused the assessment, Defendants Hudelston, Armijo and Edwards threatened to return with force.  Id.  After the assault by Defendants Garduno, Parry and Averit, the Plaintiff was bleeding from his arm stump and "blood was everywhere," but - despite pressing the "duress button" to get medical help - no help was provided for approximately five more hours. Id. at ¶ 170. After five hours, bandages were applied to the Plaintiff's bleeding stump, which were not removed until three weeks later. Id. Reasonable discovery will show that after the incident, Defendant Hudelston deliberately ignored the alarm from the duress button for five hours, that Defendant Hudelston didn't tell any manager about the incident or make a report, id. at ¶ 171, and that it was his job to respond to the alarms and report these kinds of incidents. Four days later, on Nov 4, 2019, Defendant Hudelston attempted to obtain a medical sample from the Plaintiff by force and without his consent.  Id. at ¶ 170.  In addition, during the same time period as the hunger strike, the Plaintiff didn't receive any toenail trimmings until January 13, 2020, when Defendant Hudelston used a tool from his pocket to crudely cut them, causing bleeding and some pain. Id. at ¶ 176. The Plaintiff can't trim his own toenails, and frequently suffers from toenail infections which are particularly dangerous because of the Plaintiff's Type 2 Diabetes, and could eventually result in the amputation of his toes. Id.

The Plaintiff alleged that the "Defendants conspired and aided and abetted each other in ways unknown to the Plaintiff, and most have <u>respondeat superior</u> liability, as agency officials, for the conduct of those working for them."  Complaint at ¶ 49.  To state a claim for aiding and abetting, a plaintiff must show that the defendant provided knowing, substantial assistance to the person who caused the harm.  <u>Halberstam v. Welch</u>, 705 F.2d 472 (D.C. Cir. 1983).[24]   The Plaintiff alleged that Defendant Hudelston was the person who was supposed to respond when he pressed the alarm for duress, but failed to do so, and no one helped the Plaintiff for the next five hours until a different team arrived to perform the assessment.  Complaint at ¶ 167.  The new medical team applied bandages to the Plaintiff's bleeding arm stump, which were not removed for three weeks.  <u>Id</u>. at ¶ 170.  The hunger stike, assault, and the medical assessment that Defendant Hudelston wanted to perform were all part of the same incident, and Defendant Hudelston was present earlier in the day when the threat to use force was made. <u>Id</u>. at ¶ 171.  The refusal to trim the Plaintiff's toenails occurred during the same time period.

### c.   The Plaintiff has stated claims against Defendants Armijo and Edwards for making threats and destroying evidence.

On October 28, 2019, after the Plaintiff refused to cooperate with Defendant Hudelston's medical assessment, Defendants Armijo and Edwards threatened to return with force.  <u>Id</u>. at ¶

---

[24] In <u>Central Bank of Denver,</u> the Supreme Court cited the D.C. Circuit Court of Appeals' opinion in <u>Halberstam v. Welch</u> as a "comprehensive" authority on aiding and abetting liability in the civil context.  <u>Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 181 (1994).  <u>Halberstam</u> affirmed a finding of joint and several liability against a plaintiff whose partner killed the plaintiff's spouse while robbing their home.  705 F.2d at 474. In finding her liable, the D.C. Circuit relied on § 876(b) of the Restatement (Second) of Torts, which extends civil liability for the tort of a third party to those who knowingly provide significant help to the third party in violating their duty. RESTATEMENT (SECOND) OF TORTS § 876(b) (AM. L. INST. 1979). The standard differs significantly from aiding and abetting standards used in the criminal and securities fraud contexts.

161.   Then, after the assault was committed by Defendants Garduno, Parry and Averit,[25] Defendants Armijo and Edwards ordered another inmate to clean the blood from the Plaintiff's cell. Id. at ¶ 168.  When the inmate refused, Defendants Armijo and Edwards entered Plaintiff's cell, and cleaned Plaintiff's blood from the floor, walls, and ceiling themselves.  Id.  Reasonable discovery will show that they also failed to write an incident report about the assault.  Id.  By making the threat, and then destroying the evidence and not reporting the incident as they were supposed to, Defendants Armijo and Edwards conspired with and aided and abetted Defendants Garduno, Parry and Averit, who committed the assault.

### C.    The Plaintiff has stated claims for deliberate indifference.

The Plaintiff's claim for deliberate indifference to medical needs (Claim 8) immediately follows his claim for the use of excessive force (Claim 7).  Paragraph 184 states that "Plaintiff incorporates by reference all of the preceding paragraphs as if set forth herein."  Id.  In other words, this is another legal theory applicable to the same facts as Plaintiff's excessive force claim.[26]  "Failure to provide adequate medical care is a violation of the Eighth Amendment if it is a result of deliberate indifference to a prisoner's serious medical needs." Garcia v. Salt Lake Cty., 768 F.2d 303, 307 (10th Cir. 1985) (citing Estelle v. Gamble, 429 U.S. 97 (1976)).

To establish a prison official's constitutional liability, a plaintiff must satisfy both the objective and subjective components of the deliberate indifference test.  See Sealock v. Colo., 218 F.3d 1205, 1209 (10th Cir. 2000).  The objective component requires Mr. Mostafa to allege objective facts that demonstrate that the deprivation is "sufficiently serious." Mata v. Saiz, 427

---

[25] By not making similar arguments that their participation in this incident wasn't signficant, these Defendants have waived the arguments under Rules 12(b)(6) and 12(h).

[26] It is unclear that the Defendants really challenge this claim on 12(b)(1) grounds.  If the Defendants are asking the Court to follow Silva, then it is really an assertion of the defense of failure to exhaust administrative remedies.

F.3d 745, 751 (10th Cir. 2005) citing Farmer v. Brennan, 511 US 825,834 (1994).  See Hunt v. Uphoff, 199 F.3d 1220 (10th Cir. 1999) (prison officials violated Eighth Amendment by providing such inadequate medical treatment for inmate's diabetes and hypertension that inmate consequently suffered heart attack).  In addition to medical treatments, adequate food and facilities to wash and use the toilet are among the "minimal civilized measure of life's necessities" that must be afforded prisoners, and fall into the same category.  Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Wilson v. Seiter, 501 U.S. 294, 304 (1991); Thompson v. Colorado, 278 F.3d 1020, 1032 (10th Cir.2001); Vinning–El v. Long, 482 F.3d 923, 924 (7th Cir.2007); Reed v. McBride, 178 F.3d 849, 853 (7th Cir.1999) (extent, duration, and consequences are relevant in assessing whether deprivation of food violates Eighth Amendment); LaFaut v. Smith, 834 F.2d 389 (4th Cir. 1987) (prison officials violated Eighth Amendment by failing to provide disabled inmate with needed physical therapy and adequate access to facilities).  The subjective component requires the plaintiff to produce evidence of the defendant's culpable state of mind, to establish that the defendants  knew the plaintiff faced a substantial risk of harm, yet disregarded that risk.  Estelle, 429 U.S. at 106;  Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001).  To satisfy the subjective element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Estate of Martinez v. Taylor, 176 F. Supp. 3d 1217, 1227 (D. Colo. 2016) (comparing the subjective component to recklessness in criminal law, where, to act recklessly, a person must "consciously disregard a substantial risk of serious harm").  See Parrish v. Johnson, 800 F.2d 600, 602-603 (6th Cir. 1986) (prison guard habitually refused or procrastinated in transmitting requests for aid to nurses for inmates with diminished control over their bladders and bowels).

     1.      **The Plaintiff concedes that the claims against Defendants Chorosevic and Follows should be dismissed.**

For the reasons stated in § VI (B)(3)(a) above, and in light of the declarations of Defendants Chorosevic and Follows that they are Public Health Service employees, see [Doc 222-8 and 222-9], the Plaintiff agrees that the claims against them should be dismissed.

     2.      **The Court should reject the Defendants' attempt to put facts into dispute and introduce declarations in support of a Rule 12(b)(6) motion.**

The declarations of Mazon, McMullen and Hall [Doc. 222-5, 222--6, and 222-7] should be stricken because they seek to put facts into dispute, and also because they raise matters outside of the pleadings in support of the Defendants' Rule 12(b)(6) Motion to Dismiss. Mazon seeks to put facts into dispute regarding the details of Plaintiff's cell and shower, McMullen does the same with regard to the delivery and packaging of food, and Hall does so with other aspects of Plaintiff's medical neglect claims. The Defendant argues that ADX Food Services staff open all prepackaged food on the plaintiff's meal tray. [Doc. 222 at 15] The Hall Declaration claims that Plaintiffs hygiene is "well-maintained." [Doc. 222-7; Doc. 222 at 18]. The alternative scenarios and facts proposed by the Declarants cannot be used to support a Rule 12(b)(6) Motion. The Defendants' argument that providing Plaintiff with food that he is unable to open to eat is frivolous, and the Plaintiff need not prove that adverse health effects resulted from missing more than 100 meals for this reason.

The Court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)6) for failure to state claim by accepting all factual allegations of the plaintiff as true and by resolving all reasonable inferences in his favor. Roman v. Cessna Aircraft Co., 55 F.3d 542, 543 (10th Cir. 1995) Rule 12(b)(6) must be read in conjunction with Fed. R. Civ. P. 8(a) which sets forth the requirements for pleading a claim, calling for "a short and plain statement of the claim showing

that the pleader is entitled to relief."  FED. R. CIV. P. 12(h) explains how courts should decide Rule 12(b)(6) motions for judgment on the pleadings.  On these motions, "[i]f ... matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." When presented with "matters outside the pleadings" attached to 12(b)(6) motions to dismiss, the court has two options: it may ignore the matters outside the pleadings, or treat the motion as one for summary judgment.  Id.  The court should not consider these declarations, because they are prohibited for 12(b)(6) purposes.

> ### 3.    The Plaintiff has made particularized allegations against the remaining non- Public Health Service Defendants Loewe and Norjano.

Although the Plaintiff acknowledges that the Defendants employed by the U.S. Public Health Service have statutory immunity, the same can't be said for Defendants Loewe and Norjano, who effectively deprived the Plaintiff of about 150 evening meals by providing them wrapped in plastic. Complaint at ¶ 192. On one such occasion, on September 20, 2020, upon discovering that his meal didn't comply with the note on his cell door, the Plaintiff called out to the officers. When they ignored him, he pushed the duress button but was ignored. Id. The Plaintiff reminded Defendants Loewe and Norjano to comply with the notes, showed them his tray, and expressed his concern that he would lose his opportunity to eat the meal if he didn't have help opening it.  Id.  Adequate food and facilities to wash and use the toilet are among the "minimal civilized measure of life's necessities" that must be afforded prisoners. Rhodes, 452 U.S. at 347; Wilson, 501 U.S. at 304; Thompson, 278 F.3d at 1032; see LaFaut, 834 F.2d at 392–94 (prison is required to provide the disabled with accessible toilets in order to comply with the prohibition against cruel and unusual punishment contained in the Eighth Amendment);

Vinning–El, 482 F.3d at 924; Reed, 178 F.3d at 853 (extent, duration, and consequences are relevant in assessing whether deprivation of food violates Eighth Amendment).

> **4.     The neglect violates clearly established law because the Plaintiff's lack of hands doesn't present a new legal context, but an unusual factual situation.**

The Defendants argue that the Plaintiff's claims for inadequate dental and foot care, diet, psychological stress, and failing to fill his prescriptions on time do not violate clearly established law because they "are dissimilar in their nature and severity to Carlson, where the inmate suffered such a gross deprivation of care that he died," [Doc 222] at 35, and that the Court must conduct an "alternative remedies and special factors analysis," citing Martinez v. U.S. Bureau of Prisons, 2019 WL 5432052, at *9 (C.D. Cal. Aug. 20, 2019).   The Defendant doesn't explain how to do this, but appears to agree that the court must analyze the facts of this particular case rather than making categorical determinations.  What makes this case unusual is that the Plaintiff is a double upper amputee and is unable to brush his teeth or trim his toenails by himself.  Those are not new contexts or extensions of the law, but problems particular to this Plaintiff.   The essence of the Defendants' argument in this section, again, is that the Plaintiff has failed to exhaust his administrative remedies.  [Doc. 222] at 37-38. The Defendants are clearly eager to litigate exhaustion issues, but they depend on the language in his hundreds of Administrative Remedy Program requests and responses,.  Neither the Plaintiff nor his attorney has access to those files, or the administrative record for th claims, which will be requested in discovery.

> **5.     Plaintiff has stated a claim for lack of footcare because he does not have hands and is unable to trim his toenails himself, and develops infections if his toenails are not cut.**

The Defendants argue that the "minimal civilized measure of life's necessities" that must be afforded prisoners, does not include toenail clipping. [Doc 222] at 41. The Plaintiff's situation

is unusual because he is a double upper amputee and is unable to cut them himself, and develops serious infections as a result.  Complaint at ¶ 176.  The infections are particularly dangerous because the Plaintiff is diabetic, after years of living under these conditions.  <u>Id</u>. The Supreme Court's conclusion in <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), that deliberate indifference to an inmate's medical needs is cruel and unusual punishment, rested on the fact that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." 429 U. S. 103.  Although toenail clipping may not normally be a medical need, the plaintiff has stated a claim that his his case, it is.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss should be DENIED, except for dismissing Defendants Sterett, Chorosevic and Follows from the case.

Respectfully submitted,

/s/ Paul Wolf

_____
Paul Wolf, CO Bar #42107
*Attorney for Mostafa Kamel Mostafa*
PO Box 21840
Washington, DC 20009
Tel. (202) 431-6986
Fax: N/A
Email: paulwolf@yahoo.com

September 27, 2022

## Certificate of Service

I hereby certify that on September 27, 2022, I electronically filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, which will send notices to all persons entitled to receive them.

/s/ Paul Wolf

_____
Paul Wolf